Pages 1 - 63

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

REGENTS OF UNIVERSITY OF      )
CALIFORNIA, ET AL.,           )
                              )
          Plaintiffs,         )
                              )
  VS.                         )      NO. CV 17-05211-WHA
                              )
UNITED STATES DEPARTMENT OF   )
HOMELAND SECURITY, ET AL.,    )
                              )
          Defendants.         )
_____)
STATE OF CALIFORNIA, ET AL.,  )
                              )
          Plaintiffs,         )
                              )
  VS.                         )      NO. CV 17-05235-WHA
                              )
DEPARTMENT OF HOMELAND        )
SECURITY, ET AL.,             )
                              )
          Defendants.         )
_____)
CITY OF SAN JOSE,             )
                              )
          Plaintiff,          )
                              )
  VS.                         )      NO. CV 17-05329-WHA
                              )
DONALD J. TRUMP, PRESIDENT OF )
THE UNITED STATES, IN HIS     )
OFFICIAL CAPACITY, ET AL.,    )
                              )
          Defendants.         )
_____)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

| | | |
|---|---|---|
| DULCE GARCIA, ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| VS. | ) | **NO. CV 17-05380-WHA** |
| | ) | |
| UNITED STATES OF AMERICA, ET | ) | |
| AL, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

San Francisco, California
Monday, October 16, 2017

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs in CV 17-05211-WHA:
                    COVINGTON & BURLING LLP
                    One Front Street -- 35th Floor
                    San Francisco, CA 94111
            BY:  **JEFFREY M. DAVIDSON, ESQUIRE**

For Plaintiffs in CV 17-05235-WHA:
                    GIBSON, DUNN & CRUTCHER LLP
                    555 Mission Street
                    San Francisco, CA  94105
            BY:  **KEVIN YEH, ESQUIRE**

For Plaintiff in CV 17-05329-WHA:
                    COTCHETT, PITRE & MCCARTHY, LLP
                    840 Malcolm Road
                    Burlingame, CA  94010
            BY:  **NANCY L. FINEMAN, ESQUIRE**

Reported By:        Pamela A. Batalo, CSR No. 3593, RMR, FCRR
                    Official Reporter

APPEARANCES CONTINUED:

For Plaintiffs in 17-05380-WHA:
                         OFFICE OF THE ATTORNEY GENERAL
                         State of California
                         Department of Justice
                         1515 Clay Street - Suite 2000
                         Oakland, CA  94612
                    BY:  **JAMES ZAHRADKA**
                         **DEPUTY ATTORNEY GENERAL**

For Defendants:
                         U.S. DEPARTMENT OF JUSTICE
                         Civil Division
                         20 Massachusetts Avenue, N.W.
                         Washington, DC  20001
                    BY:  **BRAD P. ROSENBERG, ESQUIRE**

| | |
|---|---|
| 1 | <u>**Monday - October 16, 2017**</u>                                    **11:00 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | **---000---** |
| 4 | **THE CLERK:**  Calling In Re:  DACA cases; CV 17-5211, CV |
| 5 | 17-5235, CV 17-5329, and CV 17-5380. |
| 6 | Counsel, please approach the podium and state your |
| 7 | appearances for the record. |
| 8 | **MR. DAVIDSON:**  Good morning, Your Honor.  Jeffrey |
| 9 | Davidson, Covington & Burling, on behalf of the plaintiff, |
| 10 | University of California. |
| 11 | **THE COURT:**  Thank you.  Welcome. |
| 12 | **MR. ZAHRADKA:**  Good morning, Your Honor.  James |
| 13 | Zahradka for the Attorney General's Office, representing the |
| 14 | states of California, Maine, Maryland, and Minnesota. |
| 15 | **THE COURT:**  Great.  Welcome to you, too. |
| 16 | **MS. FINEMAN:**  Good morning, Your Honor.  Nancy |
| 17 | Fineman -- Cotchett, Pitre & McCarthy -- for plaintiff, City of |
| 18 | San Jose. |
| 19 | **MR. WEISSGLASS:**  Good morning, Your Honor.  Jonathan |
| 20 | Weisglass from Altshuler Berzon.  I'm counsel for the |
| 21 | plaintiffs in the Santa Clara cases which we are seeking to |
| 22 | relate to these cases. |
| 23 | **THE COURT:**  I'm going to relate them.  I thought I |
| 24 | already had, but maybe the time hasn't run for that. |
| 25 | You are the fifth case; right? |

1    **MR. WEISSGLASS:**  Yes, Your Honor.  I'm really just

2  here to observe today and make sure that we can fit in

3  efficiently.

4    **THE COURT:**  Thank you.

5    There is a fourth case that somebody is not here on.  Who

6  is the fourth case?  Anybody remember?

7    **MR. YEH:**  Judge, this is Kevin Yeh from Gibson Dunn.

8  I have not appeared in the case.  I'm just here to observe.

9    **THE COURT:**  But your firm is in the fourth case;

10  right?

11    **MR. YEH:**  Yes.

12    **THE COURT:**  Why doesn't somebody from your firm appear

13  at the counsel table?

14    **MR. YEH:**  The partner is in Washington for an

15  unexpected deposition.

16    **THE COURT:**  Why don't you come up here anyway.  Maybe

17  you can be of use at due course.

18    What is your name again?

19    **MR. YEH:**  Kevin Yeh, Y-E-H.

20    **THE COURT:**  Okay.  So now you have appeared.

21    **MR. YEH:**  Thank you.

22    **THE COURT:**  All right.  On their side.

23    **MR. ROSENBERG:**  Good morning, Your Honor.  Brad

24  Rosenberg from the Department of Justice, Civil Division,

25  Federal Programs Branch, on behalf of all defendants.

1        **THE COURT:**  Thank you.

2        All right.  We are here on an issue that concerns the

3  Administrative Record and more or less an emergency motion by

4  most of or all of the plaintiffs to augment, supplement, the

5  Administrative Record that was filed by the agency just a few

6  days ago.

7        So as a first matter, I had sent out an order asking the

8  Department of Justice to supply me with materials that are set

9  forth in the October 10 order.  And at least for present

10  purposes, you can do this on an *ex parte* -- not *ex parte* -- but

11  on an *in camera* basis, but I can't promise you that I won't

12  order it to be produced.  I might in fact order it to be

13  produced, but until I see it I can't -- but I do need for you

14  to hand that up.  It looks like that's it right over there.

15        **MR. ROSENBERG:**  Your Honor, these are the documents.

16  I would ask and, if necessary, move that before the Court

17  considers releasing the documents, that it stay that order so

18  that we can have an opportunity to seek appellate relief.

19        **THE COURT:**  I'll consider that.  Time is of the

20  essence in this case, but that's a legitimate request.  I will

21  consider that.  I can't promise anything anymore, but I will

22  consider it.

23        **MR. ROSENBERG:**  Thank you.

24        **THE COURT:**  Please hand it to the clerk.

25        I have no idea what's in there.  Just for the record, it

1    looks like about -- what would you all say?  Three inches, four

2    inches worth of materials in a big brown envelope; right?

3          **MR. ROSENBERG:**  It is about three inches of materials

4    in a sealed brown envelope.

5          We take the position that we are under the order of this

6    court to provide those materials.  We have moved -- if the

7    Court were to release those materials or consider releasing

8    those materials or otherwise make them a part of the public

9    docket, that would effectively be a move that could not be

10   undone by this Court because once those materials are out in

11   the public domain, they could not be retrieved back.

12         We view these materials as being very sensitive,

13   reflecting numerous privileges, and so as reflected in our

14   colloquy a few minutes ago, we do move that if the Court does

15   consider releasing these materials, that it provide us with

16   time to seek appellate review in consultation with the

17   Solicitor General's office on an expedited basis.

18         **THE COURT:**  That's a reasonable request.  Without

19   looking at them, there may be reasonable reasons not to do so,

20   but I understand your point.  I will try to honor that, if I

21   can.

22         Okay.  I don't have time to look at these materials now,

23   so I'm going to proceed with the rest of the hearing without

24   knowing what's in this package because we're here on an

25   expedited basis at the request of the plaintiffs.  I'm here to

1    listen to what you have to say and just to start off by saying

2    what would be of most benefit to the Court at this hearing at

3    some point soon would be to hone in on very specific types of

4    documents or materials that you feel ought to be in the

5    Administrative Record as opposed to generalized blather,

6    meaning if you just give me platitudes, I don't know how that

7    translates to anything.  If I'm going to give you an order in

8    your favor, I need to say very specific categories of documents

9    ought to be included, and so at some point, we need to zero in

10   on that issue.

11       But you can begin any way you wish.

12       State your name again please.

13       **MR. DAVIDSON:**  Jeffrey Davidson, Covington & Burling

14   on behalf of the Regents of the University of California.

15       **THE COURT:**  Go ahead.

16       **MR. DAVIDSON:**  Your Honor, if I might start where this

17   began, which is the contents of that mysterious envelope that

18   is on the bench, we do have serious concerns about whether the

19   government complied with the order about what they were to

20   bring to the hearing.

21       The Court's order was that the government was to bring to

22   the hearing -- and I quote -- "hard copies of all emails,

23   internal memoranda, and communications with the Justice

24   Department on the subject of rescinding DACA," unquote.

25       From the Government's papers, we derived that what they've

1    chosen to put in that envelope is only documents in the

2    possession of the Secretary of Homeland Security and that they

3    would not have included, for example, emails with -- lower down

4    within the Department of Homeland Security, emails between the

5    Department of Homeland Security and the Department of Justice,

6    or other documents that were not physically and personally

7    possessed by the Secretary of Homeland Security.

8          **THE COURT:**  When I read that part of the brief, I

9    paused over that and wondered if it was in compliance with the

10   way they had -- I had before me my order, but read to me the

11   language from the Justice Department's brief that makes us

12   wonder whether or not they complied.

13       Here comes some -- you need to be prepared next time.  I

14   have very little time this morning, about an hour, so we

15   need -- you need to have this at the ready next time.

16       Okay.  Your counsel has rescued you.  Go ahead.  Read it

17   please.

18         **MR. DAVIDSON:**  Thank you, Your Honor.  It's on page 4,

19   beginning line 2, of the Government's opposition.

20         **THE COURT:**  All right.

21         **MR. DAVIDSON:**  It said, "In addition, defendants will

22   bring hard copies of those documents identified in the

23   Privilege Log to the October 16th hearing."

24       And if the Court were to go to the Government's

25   certification about what's included in the Privilege Log, which

1    I do have at the ready, they say -- and this is the eight-line

2    certification which is at this Court's Docket No. 64.  It says,

3    "The Administrative Record attached to this filing as Exhibit 1

4    is a true, correct, and complete copy of the non-privileged

5    documents that were actually considered by Elaine C. Duke, the

6    acting Secretary of Homeland Security."

7         And so --

8              **THE COURT:**  I don't know what that means.

9         This is what I wanted to be in this envelope:  Anything in

10   the world that the agency has on the subject of rescinding

11   DACA, whether it was with the Justice Department or not.

12        It couldn't be clearer, "all copies of emails, internal

13   memoranda and communications with the Justice Department on the

14   subject of rescinding DACA."

15        So if there is an email within DHS that says, "We're going

16   to rescind DACA" or "here are the reasons" or "here are not the

17   reasons" or "here is why we should or should not do it" -- that

18   email, even from somebody four levels down, would have to be

19   included.

20        Same thing with internal memos because people don't always

21   communicate by email; sometimes there is a memo.  Or

22   communications with the Justice Department.  All of those are

23   meant to be included here.

24        Now, that doesn't mean they get put into the

25   Administrative Record.  That just means I get to look at it to

1   see if I think it should be in the Administrative Record

2   because it's hard for me to imagine all the possibilities.

3       Now, let me just ask flatout to the government, did you

4   follow what I just said or did you -- is it truncated?

5       **MR. ROSENBERG:**  Your Honor, we did not interpret the

6   order in the way that you're expressing it now.  What is

7   reflected in that envelope are the documents that were in the

8   Privilege Log that we provided.  There are two reasons why we

9   provided the documents in this form.

10      First, I would direct the Court to the numerous

11  declarations that we provided with our opposition brief.  We

12  have been working around the clock, and there have been -- we

13  have collected in the neighborhood of hundreds of thousands, if

14  not millions, of emails that we have to sort through, sift, and

15  collect, to figure out what would or would not be responsive to

16  the request as plaintiffs have put it in terms of the scope of

17  the Administrative Record.

18      **THE COURT:**  There can't possibly be a million emails

19  on rescinding DACA.

20      **MR. ROSENBERG:**  No, it's not -- and I apologize,

21  Your Honor.  It's not a question of whether there are a million

22  emails, but in order to respond to plaintiffs' position as to

23  what needs to be in the Administrative Record, both DHS and

24  DOJ, even though we do not think that DOJ is responsible for an

25  Administrative Record because it's not the relevant agency

1    here, have to first identify all relevant custodians who might

2    have any potentially responsive records.  Then those documents

3    need to be retrieved in a forensically sound manner and

4    processed.

5         There are -- we have this in the declarations so I don't

6    want to misspeak as to the volume, but it is literally

7    enormous, and so it would have been impossible for us to

8    provide all of those documents, and we believe that that is

9    well-supported by the declarations we provided.

10         **THE COURT:**  All right.  It's one thing to say I asked

11    you to do the impossible.  It's another thing to say you're not

12    going to do it.

13         Now, if what I hear you saying is you will do what I

14    ordered you to do but you need more time, then I will be

15    reasonable and give you more time, if that's -- in my

16    assessment of this, this is such a recent event that I'm --

17    this is a guess -- that there are less than a thousand relevant

18    emails, less than 20 relevant internal memos that would be

19    covered by this, and that you could do computer searches and

20    probably find a pretty good -- with 90 percent assurance that

21    you got all the materials from your email database.  Then you'd

22    have to process them to get those one thousand emails and go

23    through and say okay, we're going to assert privilege over

24    these, not over those.  Nevertheless, all of them have to be

25    produced to me so that I can do my job of sorting through there

1    to see which ones should or should not have been in the

2    Administrative Record.

3         So we'll come back to -- I think you fell short in

4    complying with my order.  But if the reason is that it was

5    physically impossible, then I'm sympathetic.  If it was that

6    you just disagree with my authority to do what I'm ordering you

7    to do, then we have a problem.

8         Which is it?

9         **MR. ROSENBERG:**  We certainly do not disagree with your

10   authority on that, Your Honor.  That is why I came here with

11   the envelope.

12        But we also do think that our interpretation of the order

13   was certainly a reasonable one in light of the fact that we are

14   here today on plaintiffs' motion on which this Court has not

15   yet ruled.

16        We have provided those documents that we do not think are

17   part of an Administrative Record because we don't think that

18   privileged documents constitute a part of an Administrative

19   Record.  We recognize that plaintiffs disagree with that

20   position.  But we've, nevertheless, provided those documents

21   that we've identified that were relevant or at least that were

22   as part of the acting Secretary's DACA file, so to speak, and

23   so we have provided the documents that we had prepared in

24   conjunction with the Administrative Record that we provided to

25   the Court.

1      Now, if this Court were to order relief of some sort that

2  expands the scope of what would constitute the Administrative

3  Record, then we would have to potentially search for and

4  identify additional documents.

5      But we are here scratching our heads, as perhaps the Court

6  is, wondering what is it that should in fact be in this

7  Administrative Record.

8      Because this is not a typical case in which, you know, you

9  have an agency rule-making, for example, and there are many

10 comments, there are hundreds of thousands of comments that are

11 submitted by the public, and those comments may or may not

12 filter up to the ultimate decision-maker, nor is this a case of

13 an APA formal rule making where there might be an adjudicatory

14 proceeding and those type of indirect materials to which

15 plaintiffs have referenced in their motion would actually be

16 indirectly part of the record, even if not directly considered

17 by the decision-maker.

18      **THE COURT:**  Well, right now it's what -- the Ninth

19 Circuit standard is whatever was directly or indirectly

20 considered by the agency at the time that they made this

21 decision.

22      And then we may have to scratch our heads -- after we get

23 to see what the full deck of cards is, we may scratch our heads

24 as to whether or not any of those cards make any difference,

25 but I think you've got the cart before the horse.  You're

1    trying to say well, since this is a legal issue, then nothing

2    really matters except what the judges say.  That's one way to

3    look at it.

4         But what if, for example, there are memos in there saying

5    this -- what we're about to do is illegal or this is incorrect,

6    it's an incorrect -- and it would just totally undercut your

7    position that the agency made a reasonable decision and just

8    reversed its legal -- you know, the legal interpretation used

9    to be the exact opposite of what you're espousing now.

10        So I don't know what's in there.  I think we have to see

11   what's in there first before we can assess what its impact

12   should be on the ultimate decision under the arbitrary and

13   capricious standard.

14        So I -- no.  We get to see the evidence first.  Then we'll

15   decide.

16        Now, what I want to do is go through some specific

17   categories.  I want to get -- you can stay right there, please.

18   We've got two lecterns.

19        Let's go through some specific categories of things that

20   you think ought to be in the Administrative Record that you, on

21   the plaintiffs' side, could help me identify.  I'll just give

22   you a hint for the first one to give you an example of what

23   would be useful to me.

24        In February of this year, as I understand the history,

25   then Secretary of Homeland Security -- was it Kelly?

1          **MR. DAVIDSON:**  Yes.

2          **THE COURT:**  -- Kelly affirmatively issued an

3    announcement saying that the DACA program would be continued.

4    Am I right about that or not?  Is that true?

5          **MR. DAVIDSON:**  He did.  He did.

6          **THE COURT:**  Okay.  So one thing you could be arguing

7    for is that since these are the same agency, the same question

8    close in time, that that reversal of that initial position

9    should be part of the Administrative Record.  That's a cogent

10   concept that I can -- that's the kind of example of a

11   collection of materials that we should have available to us to

12   consider that I can understand.

13        All right.  Now, I tend to agree that that ought to be in

14   there.  Why isn't that in there?

15        Now, returning to the government, why isn't Secretary

16   Kelly's decision and whatever he relied upon and -- indirectly

17   or directly, why isn't that also part of this record?

18         **MR. ROSENBERG:**  Well, a couple of things, Your Honor.

19   I mean, first I do want to draw the Court's attention to the

20   Administrative Record because the memo is in the record at

21   page --

22          **THE COURT:**  The decision memo --

23         **MR. ROSENBERG:**  The February decision memo to which

24   the Court is referring.

25        He did not affirmatively take a position on DACA.  He

1    simply excluded it from the modification of the agency's update

2    to its guidance.  So I think it is overstating it --

3        **THE COURT:**  That's possibly a good point.  Let me see

4    if I can find that in this very -- which --

5        **MR. ROSENBERG:**  It's page 230 of the Administrative

6    Record, ECF 64-1 at 230.

7        **THE COURT:**  All right.  230.  What I have only goes up

8    to page 125 or so -- oh, wait.  Here's the second part.  230.

9        All right.  I'm at 230.

10       **MR. ROSENBERG:**  If you look the at top paragraph, that

11   sets forth the extent to which the memo addresses the DACA

12   program.

13       **THE COURT:**  I'm sorry.  This is page -- do you agree,

14   Mr. Davidson, that page 230 is where I should be looking?

15       **MR. DAVIDSON:**  Yes, Your Honor.  Very beginning of the

16   page starting with the language "With the exception of the

17   June 15th, 2012 memorandum."

18       **THE COURT:**  All right.  So it says, "With the

19   exception of the June 15, 2012 memorandum entitled *Exercising*

20   *Prosecutorial Discretion with Respect to Individuals Who Came*

21   *to the United States as Children*, and the November 20, 2014

22   memorandum entitled *Exercising Prosecutorial Discretion with*

23   *Respect to Individuals Who Came to the United States as*

24   *Children and with Respect to Certain Individuals Who Are the*

25   *Parents of U.S. Citizens or Permanent Residents,* all existing

1   conflicting directives, memoranda, or field guidance regarding

2   the enforcement of our immigration laws and priorities for

3   removal are hereby immediately rescinded -- to the extent of

4   the conflict -- including, but not limited to, the November 20,

5   2014, memorandum entitled *Policies for the Apprehension,*

6   *Detention and Removal of Undocumented Immigrants and Secure*

7   *Communities.*"

8          What that is saying is a lot of things got revoked on

9   February of this year, but the DACA memorandum did not get

10  revoked.

11          **MR. ROSENBERG:**  It was carved out, essentially.

12          **THE COURT:**  It was carved out.  Okay.  All right.  So

13  your point is it wasn't affirmatively re-validated.  It was

14  just left out of the revocation for the time being.  That's

15  your spin on it; right?

16          **MR. ROSENBERG:**  That's the way that I read that

17  document, Your Honor.

18          **THE COURT:**  Your spin on it is what, Mr. Davidson?

19          **MR. DAVIDSON:**  Well, I don't know if it's spin.

20          There was a conscious decision at the time to rescind all

21  guidance about prioritization for removal except for the DACA

22  program.  So there was a deliberate and explicit choice to

23  leave the DACA program in place in February.

24          **THE COURT:**  Well, that's true.  That is true.  That's

25  the way I read it, too.  But it also left in place the one

1    about --

2              MR. DAVIDSON:  It's called DAPA.

3              THE COURT:  -- the one about parents.  But the one

4    about parents the Fifth Circuit invalidated; right?

5              MR. DAVIDSON:  They did, Your Honor.

6              THE COURT:  All right.  But that was before.  That

7    happened before this; correct?

8              MR. DAVIDSON:  It did, Your Honor, and if you look at

9    Footnote 1 at the bottom of the page, it says, "The November

10   20th, 2014 memorandum will be addressed in future guidance."

11   The November 20th is the memorandum that relates to the

12   parents.  So it's leaving out DACA.  It's not --

13             THE COURT:  So maybe what that means is that DACA will

14   survive, but parents will not, in light of the Fifth Circuit

15   decision.

16             MR. DAVIDSON:  It may be, Your Honor.

17        The only point we're making is that there was a process

18   that occurred at the Department of Homeland Security prior to

19   this memorandum being issued, and there had to be -- and I

20   don't hear the government denying that there was --

21   consideration about whether to include the DACA program in this

22   memorandum or not.

23             THE COURT:  That's a fair point.  Here it is, February

24   of this year, the Secretary of Homeland Security makes a

25   conscious decision to carve out, as you put it, the DACA

1   program, and that's in the face of and in the teeth of the

2   Fifth Circuit decision, and I've just got to believe that

3   somewhere within the agency, there was memoranda, emails, that

4   discuss the advisability of that or the non-advisability of

5   that and which then in turn bear upon the very subject of the

6   thing that brings us here today, which is the eventual

7   revocation or rescission, I should call it.

8       Shouldn't that be in the Administrative Record being so

9   close in time, so close on subject, same agency?

10          **MR. ROSENBERG:**  Well, I guess I would say a couple of

11   things, if I may, Your Honor, on that.

12       First, I think the proper way to review this issue and

13   decide what should be in the Administrative Record is to look

14   at the decision itself rather than start by looking at

15   documents or potential documents and try to construct

16   something, because that's the opposite of what the APA provides

17   for and what Supreme Court precedent and D.C. Circuit precedent

18   provide for.

19       So I would direct the Court -- and bear with me on this --

20   but I would direct the Court to the actual rescission decision

21   itself, which is on page 255 of the Administrative Record that

22   we have provided.

23          **THE COURT:**  All right.  Let's look at that.  I'm going

24   to bear with you for a minute and see where that leads us.  All

25   right.  255.  All right.

1        **MR. ROSENBERG:**  Now, while you're looking for that, I

2   think an important piece of context here is that the February

3   2017 memo was issued many months before the State of Texas and

4   the fellow plaintiffs in that case threatened to bring a

5   preliminary injunction --

6        **THE COURT:**  You know, I must say about that, was that

7   even in writing?  Was that threat in writing someplace?

8        **MR. ROSENBERG:**  Yes.  That's in our Administrative

9   Record as well, Your Honor --

10       **THE COURT:**  Show me.  I want to see that.  I have

11   never seen the United States Department of Justice back down so

12   quickly as they have backed down in the face of a threat.  To

13   me -- okay.  All right.

14      Show me where that earthshaking threat is.

15       **MR. ROSENBERG:**  I'm looking for it right now.  It's in

16   the Administrative Record starting on page 238.

17       **THE COURT:**  All right.

18       **MR. ROSENBERG:**  Running through page 240.

19       **THE COURT:**  Okay.  This is dated June 29, 2017,

20   addressed to the Attorney General, and it's from, it looks

21   like, Ken Paxton, Attorney General of Texas.

22      And we don't have time to read it all, but I see a key

23   paragraph says, "For these same reasons that DAPA" --

24   D-A-P-A -- now, that's what was decided by the Fifth Circuit

25   was illegal -- "and expanded DACA unilateral Executive Branch

1    conferral of eligibility for lawful presence and work

2    authorization was unlawful, the original June 15th, 2012, DACA

3    memorandum is also unlawful."

4        All right.  So then -- now, that's exactly contrary to

5    what the agency itself had said, but, okay, that's the position

6    of Ken Paxton.

7        And now we go further down.

8        "We respectfully request that the Secretary of Homeland

9    Security phase out the DACA program.  Specifically, we request

10   that Secretary of Homeland Security rescind the June 15, 2012,

11   DACA memorandum and order that the Executive Branch will not

12   renew or issue any new DACA or expanded DACA permits in the

13   future."

14       So they say what the request is.

15       And they say if you do all of that, then the plaintiffs

16   will dismiss their lawsuit; otherwise, the Complaint in that

17   case will be amended to challenge both the DACA program and the

18   remaining expanded DACA permits.

19       All right.  So there's the threat.  Otherwise, they're

20   going to expand their lawsuit.  And then that's the end of the

21   letter, and it's signed by Attorney Generals of Texas, Alabama,

22   Arkansas, Idaho, Governor of Idaho, Attorney General Kansas,

23   Louisiana, Nebraska, South Carolina, Tennessee, West Virginia,

24   so that's 1, 2, 3, 4, 5, 6, 7, 8, 9, 10 -- 10 states; right?

25            MR. ROSENBERG:  It looks like that, Your Honor, yes.

1      THE COURT:  So that's the threat?

2      MR. ROSENBERG:  Yes.

3      THE COURT:  All right.  So in the face of that threat,

4  the Justice Department of the United States rolled over and

5  said "you win"?

6      MR. ROSENBERG:  I would disagree with that

7  characterization, Your Honor.  I mean, in the face of that

8  threat --

9      THE COURT:  Well, wait a minute.  Just to be fair now,

10  your Justice Department told the prior administration that this

11  was a lawful program; right?  That's in the -- that's probably

12  in here too, somewhere.

13      MR. ROSENBERG:  Well, it is in there, and it is, in

14  fact, one of the documents plaintiffs have accused the

15  government of not including any unhelpful documents, but we did

16  include the OLC memo.

17     The OLC memo addressed the legality of the DAPA program,

18  but there is a footnote in the OLC memo that acknowledges that

19  OLC did verbally opine on the legality of the DACA program, but

20  of course that opinion effectively was superseded by the

21  actions of the Southern District of Texas, the Fifth Circuit

22  and a 4/4 divided Supreme Court that upheld the preliminary

23  injunction against the DAPA program.

24      THE COURT:  The original OLC memo that I remember

25  reading the first time you were here, it actually did say that

1   the DAPA program was probably not legal; right?

2            **MR. ROSENBERG:**  I think it depended on -- there were a

3   couple of particular permutations of that program that they

4   were opining on, and it depended on -- I would have to take a

5   closer look at that memo.

6            **THE COURT:**  I believe it said that the DAPA program

7   was -- for different reasons was illegal, but that the program

8   for the DACA, the children program, was legal, so the Fifth

9   Circuit agreed with the DAPA, D-A-P-A, part of that memo and

10  did not reach the DACA part.  So to me, it looks like these

11  Attorney Generals had every right -- if they wanted to litigate

12  the issue of the DACA program, God bless them, that's fine.

13       But I don't understand why the Justice Department just so

14  suddenly decided that its OLC memo was incorrect.

15           **MR. ROSENBERG:**  Well, I want to take a step back, and

16  this, in effect, brings us back to where I originally wanted to

17  take the Court, which was page 255 of the Administrative

18  Record.

19       And to be clear, it's not the Justice Department that is

20  the ultimate decision-maker here; it's the Department of

21  Homeland Security.  The DACA program was created -- or DACA

22  policy, because it's not a program.  The DACA policy was

23  created by the Department of Homeland Security.  It was

24  administered by the Department of Homeland Security and it was

25  rescinded by the Department of Homeland Security.  So it's

1    ultimately a DHS decision, which is one of the issues that goes

2    to the scope of what the Administrative Record should be.

3        But if the Court -- I don't know if the Court has page 255

4    of the AR in front of it.

5        **THE COURT:**  Yes, I do.  You were making a point on

6    that page, and I probably interrupted you.  So go ahead.

7        **MR. ROSENBERG:**  This is an important point because I

8    think this does help to define what the scope of the

9    Administrative Record should be because the record that exists

10   should be that which is consistent with or would support or

11   include documents that might not support the actual decision.

12       And here on page 255 under the title "Rescission of the

13   June 15th, 2012 DACA Memorandum," the memo says, "Taking into

14   consideration the Supreme Court's and the Fifth Circuit's

15   ruling in the ongoing litigation and the September 4, 2017,

16   letter from the Attorney General, it is clear that the

17   June 15th, 2012 DACA program should be terminated."

18       And the rest of the paragraph goes on to say, "In my

19   exercise" -- "In the exercise of my authority in establishing

20   national immigration policies and priorities, except for the

21   purposes explicitly identified below, I hereby rescind the

22   June 15th, 2012 memorandum."

23       That's the decision that's being challenged in this

24   lawsuit.

25       **THE COURT:**  Fair enough.  Fair enough.

1        But nevertheless, it's the exact opposite of the decision

2   by the very same agency in February where they decided to carve

3   out the DACA program from any revocation.

4        So maybe in that decision record, there will be memoranda

5   that either supports or draws into question the arbitrary and

6   capriciousness arguably of the later action.

7        To me it just sound like you want to put into the record

8   the things that help you and leave out the things that might

9   hurt you.  It could be that putting in the complete record

10  would actually help you.  I don't know.  But until we see the

11  complete record, I just have to take your word for it that this

12  is the complete record, but there are all these events out

13  there that seem so related, they should be in there.

14        **MR. ROSENBERG:**  I think, Your Honor -- I think

15  respectfully that puts the process backwards.  The Court should

16  look at what the ultimate decision was that was made by the

17  agency and use that to define what the appropriate scope of the

18  record should be rather than searching for documents, and

19  plaintiffs have never identified what specific documents they

20  think should be in this record.  They've only identified

21  general categories.

22        But identify the specific -- rather identify specific

23  documents and then try to build a record from the ground up

24  because then this Court would be usurping the role of the

25  agency, a co-equal branch of government, in trying to define

1    what the basis for the decision is.

2              THE COURT:  Well, see, this -- let's follow your logic

3    through, though.  If I were to decide that the agency did have

4    authority, despite the Fifth Circuit decision to continue the

5    DACA program, then I guess you would just, at that point, roll

6    over and say the judge has decided the legal question; the

7    agency was wrong as a matter of law, so it's not in accordance

8    with law under the APA, and therefore plaintiffs win.

9         Now, would you accept that?

10             MR. ROSENBERG:  That's not for me to accept, as this

11   Court knows, Your Honor.

12             THE COURT:  Well, I think that is -- one scenario

13   they're looking for on the other side, is that exact scenario.

14   So I have a feeling that what you're going to back up to before

15   this is over is, *Well, Judge, it doesn't matter whether what*

16   *you think.  What matters is whether the head of the agency*

17   *could reasonably, even if incorrect, could reasonably have*

18   *drawn this conclusion.*

19        Okay.  Once you retreat to that position, all of this

20   stuff that was in the file becomes highly relevant because it

21   could undercut the reasonableness of coming to the conclusion

22   that they didn't have the authority to do it, to do DACA.

23             So I think you're trying to have it both ways here.  I

24   think we need a complete record of what led up to this

25   conclusion that DACA should be terminated because of the letter

1    from the Attorney General and the Fifth Circuit's rulings.   And

2    then we get to decide whether or not it was a reasonable

3    decision or -- so -- all right.

4        I understand your position.   Time is running out here.

5    Give me -- I'm not making a ruling yet on this, but give me

6    another example of some cogent, concrete category that we can

7    possibly order to be included in the Administrative Record.

8        MR. DAVIDSON:   Your Honor, on the rationale leading up

9    to the February decision, I would just point the -- point

10   Your Honor to the case law that we cite in our brief saying

11   that when an agency reverses a decision that they've had

12   before, that that's the -- that you have to take into account

13   what it was that justified the original decision --

14       THE COURT:   Well, tell me -- give me the name -- I

15   missed that in your papers.

16       MR. DAVIDSON:   So let me give you one citation.   All

17   of this comes from a D.C. Circuit case called *Fox*

18   *Communications*.   Let me give up one I have handy which is

19   *Public Citizen vs. Heckler*, 653 F.Supp 1229, and that's from

20   the district court for the District of Columbia, 1986.

21       But that will point the Court to *Fox Communications* and a

22   number of other cases that say that when the agency reverses

23   course, they have to consider the things that motivated the

24   original decision and provide an explanation for why things

25   have changed.

1          **THE COURT:**  I'll look at that.  Let's go to a

2     different category.  We've already discussed -- give me a

3     different category of documents that you think should be in the

4     Administrative Record.

5          **MR. DAVIDSON:**  Next category is documents that were

6     considered by subordinates to the Secretary of Homeland

7     Security.

8          The government takes the position that only documents in

9     the literal possession of the acting Secretary of Homeland

10    Security are part of the Administrative Record.

11         At a high level, that's inconsistent with *Thompson*

12    *Portland Audubon*, which are the core Ninth Circuit cases about

13    the content of the Administrative Record.

14         *Thompson* --

15         **THE COURT:**  That's the indirect or direct?

16         **MR. DAVIDSON:**  It says indirect or direct and it says,

17    "The full Administrative Record before the agency when it made

18    its decision."  So it's not limited to the documents that are

19    in front of one particular decision-maker.  And it's easy to

20    understand why.

21         Number one, that's not how agency decision-making works.

22    It's not that there is a pile of documents in front of the

23    acting Secretary and she makes the decision and it all happens

24    in a day.  There's a process.  There is a way by which the

25    Department of Homeland Security uses its policymaking apparatus

1    to digest the information and come to a conclusion.

2            THE COURT:  But how far down do you go -- how many

3    layers down do you go in the bureaucracy to require production

4    of, let's say, emails, just emails between people four levels

5    down and the agency over whether DACA should be rescinded?  Are

6    you really saying that we've got to go that deep?

7            MR. DAVIDSON:  There's a limiting principle, but the

8    limiting principle is more than zero.  You have to go into the

9    policymaking apparatus to figure out what feeds up to the

10   Secretary of Homeland Security.

11       In this case, from the Privilege Log, we know the people

12   that the Secretary was in communication with as she made her

13   decision.

14           THE COURT:  Who are those people?

15           MR. DAVIDSON:  Well, if you look at the Privilege Log,

16   it identifies several dozen -- several dozen people.

17           THE COURT:  Several dozen like 24, 36?

18           MR. DAVIDSON:  It's in that neighborhood, Your Honor.

19   I haven't counted them.

20           THE COURT:  She had communications with, say, 24 to 36

21   agency personnel on this subject?

22           MR. DAVIDSON:  Yes.

23           THE COURT:  All right.  Now, pause there for a second.

24       Let me ask the government.  In my experience, a lot of it

25   is done on paperwork, that's true, but there are also verbal

1  communications made to the Secretary.  I would be surprised

2  if -- so were there, in this case -- or tell me if you know one

3  way or the other -- did the Secretary receive any verbal input

4  on this decision?

5          MR. ROSENBERG:  I would be surprised if she did not.

6          THE COURT:  So what if that was important to the

7  Secretary in deciding how to make a decision, the verbal input?

8          MR. ROSENBERG:  Again, that's not typically part of an

9  Administrative Record.  And on this issue as well, I think

10  there are a couple of points that are critically important.

11      One is plaintiffs here still have not identified what the

12  limiting principle for how far down the government would need

13  to go to create the Administrative Record.  Is it DHS

14  headquarters only?  Is it USCIS and DHS headquarters?  It is

15  the potential impacts within Customs and Border Protection and

16  ICE as well?

17      Plaintiffs, based on what they filed with the Court as

18  well as the letter that they sent to us in advance of our

19  filing of the Administrative Record seemed to think that the

20  Administrative Record should include any document that opines

21  on the legality of DACA that's within, initially they said,

22  anywhere in the Executive Branch but now appear to take the

23  position anywhere within DHS or the Department of Justice.

24      Now, again, there can be no Administrative Record within

25  the Department of Justice because the Department of Justice did

1    not issue a decision in the context of the APA regarding this

2    program.

3         So I think that there -- to the extent that the Court is

4    inclined to provide any form of relief, you know, we do need to

5    identify what the limiting principle is so we know what it is

6    that we're required to search for.

7         I would also remind the Court that plaintiffs in this

8    case, as well as in the New York case, have had the opportunity

9    to serve discovery.  Now, the government vehemently objects to

10   any discovery taking place in this case and thinks that

11   discovery is inappropriate, but we are where we are, and

12   depositions in fact have already begun here as well as --

13        **THE COURT:**  Is there a deposition for this acting

14   secretary scheduled?

15        **MR. DAVIDSON:**  We've asked for it and the government

16   has declined to provide --

17        **THE COURT:**  I think you should give that just because

18   what if she says, just as you indicate is probably the case,

19   that she got verbal input?  That would be good to know what the

20   verbal input was that was given to her before she made her

21   decision.  That alone would justify the deposition, I think.

22        **MR. ROSENBERG:**  So under the apex doctrine,

23   Your Honor, we think that any depositions of senior Cabinet

24   officials is wholly inappropriate.

25        **THE COURT:**  Apex is a loser with em.  I overrule that

1    all the time.  This is too important, even under the apex

2    doctrine.

3        By the way, it's not a doctrine.  That's just what people

4    say when they want to uphold it.  It's just an idea that some

5    judge had somewhere.  Apex doctrine.  The Supreme Court has

6    never validated that rule.

7        In any event, it's not going to fly with me.  That would

8    be a legitimate question to ask the acting Secretary.

9        **MR. ROSENBERG:**  Let me address one other point on

10   that, though, Your Honor.  It relates to the scope of discovery

11   in this case, as well as plaintiffs' request of relief

12   regarding the Administrative Record.

13       This is not a situation in which -- when courts refer to

14   information indirectly considered by the decision-maker,

15   typically what they are referring to in a rule-making context

16   or even a formal rule-making context is factual information.

17       Each and every one of the cases that plaintiffs have cited

18   involves a type of factual information, be it a letter that was

19   before an administrative law judge that ultimately was before a

20   secretary who was the decision-maker or factual reports or

21   studies that are created or developed in the context of a

22   rule-making process or some other process where it's necessary

23   for the Court to be able to evaluate the same factual

24   information that the agency did in reaching its decision in

25   order to determine whether the decision was arbitrary and

1    capricious.

2        That's not what plaintiffs are seeking here.  Virtually

3    all of the categories of information that plaintiffs want are

4    going to be covered by one of several different privileges, be

5    it the work product doctrine because of the pending litigation

6    in the Texas case, the attorney-client privilege because many

7    of these issues involve the seeking or provision of legal

8    advice, the deliberative process privilege because these are

9    internal agency deliberations about how to develop and

10   ultimately rescind a policy, and depending on the

11   circumstances, executive privilege as well.

12       So it's not factual information that plaintiffs want here.

13   What they want to do is go straight to the privileged

14   information that the government possesses.

15       We think that's not properly part of an Administrative

16   Record any more than a law clerk's bench memo is part of a

17   record that a court develops when issuing its decision and

18   Findings of Fact and Conclusions of Law.

19       But it's particularly inappropriate here in light of the

20   fact that these are core decisions that the agencies are

21   making.  And the Court has spoken on its view on the apex

22   doctrine, but that is something I will say that the government

23   feels very strongly about.

24       **THE COURT:**  Well, if it's up to me, I would  --

25   this is, in the first instance, up to the magistrate judge,

1    Sally Kim, but my own view is I would order that deposition

2    pronto.

3         Let me address the point that you made about privilege.

4         Here, you wrap the entire decision as based on legal

5    advice, and when you -- at least in my experience, when anyone

6    decides that they're going to rely on advice of counsel, they

7    open up that opinion to all of the underlying pros and cons,

8    everything that was communicated by that lawyer to that client,

9    including contrary legal advice becomes -- even though it might

10   have been otherwise privileged, it is now waived, W-A-I-V-E-D,

11   waived.  And that -- I think that's a serious problem we've got

12   in this case.

13        Let me give you an example.  What if there were memos to

14   the Secretary that said -- that were not produced here or let's

15   say there -- make it more realistic, they were memos that

16   didn't go to the Secretary but went to whoever it was that

17   verbally briefed her.  And the memos said you know, this is a

18   close call.  Maybe the Fifth Circuit decision doesn't even

19   apply to DACA.  The Fifth Circuit itself said it didn't apply

20   to DACA, so maybe we ought to just stick with this, but on the

21   other hand for political reasons, let's take the position that

22   it is a legal problem and that there was no authority.  Then

23   we'll throw it back to Congress and see what Congress does with

24   it and this is the best way to get to the bottom of it.

25        Even if this is done for the benevolent purposes of

helping all the children, it does seem to me that that would

undercut your position that this was a reasonable legal

rationale.

Now, maybe that kind of document doesn't exist.  Who knows

until we actually see whether such a document exists?  But that

counsels in favor of a waiver.  In any other kind of case it

would be waiver black and white.  It wouldn't even be close to

question it would be a waiver.  Now, because we're dealing with

the government here, does that same principle apply?  I'm

inclined to think that it does.

So I want to give the government a chance to explain why

the ordinary principle about reliance on advice of counsel, a

waiver of that in circumstances like this, should not apply.

So please answer that question.

**MR. ROSENBERG:**  Well, I think there's a very

straightforward answer and then there is a somewhat more

complicated answer.

The straightforward answer is that the government wouldn't

be able to function if that were the case.  The government is

sued constantly.  In fact, we feel a little bit whiplashed in

this lawsuit because obviously the Justice Department defended

DACA in the Texas case and here we are defending the rescission

of DACA.

So Department of Justice and the government generally has

to make decisions based on litigation risks all of the time.

1    And unlike the *La Raza* case that plaintiffs cited where there

2    was found to be a waiver of deliberative process privilege

3    because the government had explicitly incorporated the analysis

4    of an OLC memo into its ultimate policy, here the only issue is

5    whether it was irrational for the Secretary, acting Secretary

6    of Homeland Security, to decide that there was substantial

7    litigation risks such that DACA should be rescinded.

8        And we did not, the government did not, the Secretary of

9    Homeland Security did not cite any specific studies or analyses

10   on that issue.  And so there is -- unlike the *La Raza* case that

11   plaintiffs cite in their brief, the Second Circuit case, there

12   is no incorporation of those analyses into the government's

13   decision and therefore there's no waiver.

14       **MR. DAVIDSON:**  Your Honor, if I may be heard on that,

15   I mean that's a stunning argument.  They're saying the

16   litigation risk -- the risk of the Texas litigation is what

17   drove the decision.  Well, what if there is a memo there saying

18   but if we rescind DACA, then the State of California, Maine,

19   Maryland, Minnesota, they're going to come sue us.  What about

20   that litigation risk?

21       Or what about the assessment of well, there's a litigation

22   risk so should we just back down and deport 800,000 children

23   who have grown up in the United States and will now be -- isn't

24   it worth fighting for that over a little bit of litigation

25   risk?  How can we assess the veracity or the reasonableness of

1  the government's litigation risk argument without having the

2  other documents that were considered within the Department of

3  Justice?

4          MR. ROSENBERG:  Your Honor --

5          MR. DAVIDSON:  They put it at issue.  They did not

6  have to assert litigation risk as the reason for what they did,

7  but having done that and saying that that's the basis on which

8  this administrative decision should be upheld, that has to be

9  tested with respect to the whole Administrative Record that was

10  before the agency.

11          MR. ROSENBERG:  Your Honor, if I could speak to

12  that --

13          THE COURT:  Yes.

14          MR. ROSENBERG:  -- a couple of things.

15          THE COURT:  Go ahead.

16          MR. ROSENBERG:  A couple of things on that,

17  Your Honor.

18       As a threshold matter, taking a step back to the very

19  fundamental principles of this lawsuit, the DACA program is

20  effectively a question -- or DACA policy is effectively a

21  question of deferred prosecution, and we don't think that any

22  of these issues are reviewable for the reasons set forth in our

23  brief based on the *Heckler vs. Chaney* case and the *AADC* case.

24  That's a dispositive argument that we intend to make shortly.

25          Assuming, however, that the Court disagrees, plaintiffs

1  here told the Court that we need to be able to test the

2  government's analysis of whether -- of the litigation risk.

3       What is involved in that test?  Does that mean that this

4  Court has to go in and evaluate for the government whether or

5  not the litigation risk was sufficiently substantial such that

6  the DACA policy should be rescinded?  That's not what the APA

7  provides for.

8       **THE COURT:**  I'm not sure you're right about that.

9  Let's say that you have a memo somewhere in your file that

10  was -- the talking points memo that was used by whoever

11  verbally advised the Secretary.  Let's say there is a memo that

12  says we have a 90 percent chance to win the DACA issue, even in

13  the Texas litigation.  We have a 10 percent chance to lose

14  that.

15       Next bullet point:  If we were to cancel the program, it

16  would disrupt the lives of 800,000 people who have signed up

17  for the program, and wreak havoc.  I'm making it somewhat

18  extreme in order to make the point.

19       So nevertheless, for political reasons and in order to

20  force Congress to come clean on the DACA program, this is what

21  we're going to do.  All these are verbal points made to the

22  Secretary.

23       Now, in a case like that, a judge might say look, that was

24  arbitrary and capricious.  Ninety percent chance you would win

25  and you turned your back on that opportunity and you gave in to

1   10 states who signed that letter.  A judge might say that.

2        A judge might agree with you and say look, it's up to the

3   government to run its own agencies.  That's what elections are

4   all about.  The Republicans won.  They can do what they want.

5   The Democrats -- that's another possible answer.  I'm not

6   ruling on the merits of that now.

7        But I am saying it is a plausible claim under the APA that

8   such a course of action would be arbitrary and capricious and

9   maybe even not in accordance with law.

10       So I'm not so sure that you're right when you say that

11  this is -- it's just -- is the judge going to get in the

12  position -- your point was is the judge really going to get in

13  the position of deciding whether something is a legitimate

14  response to litigation risks?  Of course normally judges don't

15  do that.  You're right about that.  But maybe that's because

16  most of the time those are within the realm of not arbitrary,

17  not capricious.  It's a reasoned decision.  But here you're not

18  giving me enough of a record to see whether we can even test

19  that.

20       So I feel like the government wants me to -- you keep

21  falling back to well, it's a legal decision, it's a legal

22  decision.  Yes, in part, it is a legal decision, but I think

23  there is more to it because you then say well, no, it's just

24  assessment of litigation risks.  That's not quite the same as

25  saying that it's a legal decision.

1      **MR. ROSENBERG:**  Well, I mean, Your Honor, what we are

2   saying is the justification for the rescission of the DACA

3   policy is reflected in the rescission memo itself, which the

4   court has just reviewed.  And the only question that this Court

5   need decide is whether or not that litigation risk, as

6   reflected in the rescission memo, is irrational.

7      And the government's argument will be and it is the view

8   of the government that in light of a preliminary injunction

9   that was issued by a judge in the Southern District of Texas on

10  the DAPA program --

11         **THE COURT:**  DAPA program.

12         **MR. ROSENBERG:**  On the DAPA, D-A-P-A, program.

13     The fact that injunction was upheld by the Fifth Circuit

14  and was then upheld on a 4/4 decision by the Supreme Court and

15  that there is no meaningful way to distinguish the DAPA program

16  or DAPA policy from the DACA policy, that litigation risk was

17  quite substantial.

18         **THE COURT:**  Well, but your own Justice Department for

19  whom you work in the OLC memorandum made exactly that

20  distinction.

21         **MR. ROSENBERG:**  And the OLC is -- obviously opines on

22  various issues, and their opinions carry substantial weight

23  within the Government, but it's not the same thing as a

24  decision from a district court judge entering a nationwide

25  preliminary injunction.

1          **THE COURT:**  But that judge in Texas did not even

2     address DACA.  He never addressed DACA, did he?  Am I wrong

3     about that?

4          **MR. ROSENBERG:**  I don't believe that he explicitly

5     addressed DACA.

6          **THE COURT:**  So it would be, as the lawyer said in that

7     ten -- the ten Attorney Generals, they said they were going to

8     expand their lawsuit to try to include DACA in the case that

9     successfully challenged DAPA.  That is a fair point.

10         But merely including it is not the same thing as saying

11    they were going to win that case.  In the face of the OLC memo,

12    I think there is at least a substantial question.

13         Anyway, this rescission memo nowhere even -- where does it

14    say litigation risks?  It doesn't even say that.  It just -- it

15    says, "Taking into consideration the Supreme Court's and Fifth

16    Circuit's rulings in the ongoing litigation and the

17    September 4, 2017 letter from the Attorney General, it is clear

18    that the June 15, 2012 DACA program should be terminated."

19         **MR. DAVIDSON:**  Your Honor --

20         **THE COURT:**  Does she even mention litigation risks?

21         **MR. ROSENBERG:**  I don't believe it uses those terms,

22    but I think it's implicit in what is stated right there.

23         **THE COURT:**  Did the Attorney General -- let's look at

24    his letter.  Where can I find that in here?  September 4.

25         **MR. ROSENBERG:**  That would be page 251 of the

Administrative Record.

             THE COURT:  Maybe he used that term.  That's one page,
September --

             MR. ROSENBERG:  And the relevant analysis toward the
middle of the letter.

             THE COURT:  Well, the closest on point after going
through the Texas litigation, "Because the DACA policy has the
same legal and constitutional defects that the Court recognized
as to DAPA, it is likely that potentially imminent litigation
would yield similar results with respect to DACA."

        Okay.  So that's a fair point that at least that one
sentence says that there is a litigation risk that the -- but
on the other hand, it's based on his opinion that the DACA
policy has the same legal and constitutional defects that the
Court recognized as to DAPA.

             MR. DAVIDSON:  Your Honor, I'd point you to the top of
that paragraph because it's an important point.  Litigation
risk is not what this memo is about.  In the --

             THE COURT:  Which one are you looking at?

             MR. DAVIDSON:  I'm looking at the second paragraph in
the middle of the page.

             THE COURT:  This is the Sessions letter?

             MR. DAVIDSON:  This is the Sessions letter.  It starts
by saying, "DACA was effectuated by the previous administration
through executive action without proper statutory authority and

1   with no established end date after Congress's repeated

2   rejection of proposed legislation that would have accomplished

3   a similar result."

4       Then it says, "Such an open-ended intervention of

5   immigration laws was an unconstitutional exercise of authority

6   by the Executive Branch."

7       He is not saying litigation risk.  He is saying the DACA

8   is illegal.

9           **THE COURT:**  You're right.  That is -- that's true

10  there.  That part is not -- you're right about that.  But the

11  last sentence can be spun to be litigation risks I guess.

12          **MR. DAVIDSON:**  And, Your Honor, I think this points to

13  why there needs to be a complete Administrative Record here --

14          **THE COURT:**  But what is your limiting principle on how

15  far down and how many offices?  Do we go to the regional

16  offices, the district offices?  I can't make them do that.

17  That would be unworkable.

18      There has to be a limiting principle that makes it

19  practical to be able to compile the Administrative Record.  And

20  there you have failed me.  You haven't given me -- you've given

21  me some platitudes, but you haven't given me much help on how

22  to frame an order.

23          **MR. DAVIDSON:**  Until we got the Privilege Log, we did

24  not know, because the government did not say, who else was

25  involved in the policymaking process.  Now that we have the

1   Privilege Log, we know.  We know who is generating the

2   documents that fed into this process, and so those are the

3   people --

4           THE COURT:  Tell me who they are.

5           MR. DAVIDSON:  For instance, there's -- let me get to

6   the Privilege Log.  All right.  So there is Chad Wolf at the

7   Department of Homeland Security.  There is Frank Wuco at the

8   Department of Homeland Security.

9           THE COURT:  How do you spell that last name?

10          MR. DAVIDSON:  W-U-C-O.

11      There is John Mashburn at the White House.  There's

12  Matthew Flynn at the White House.  There's Anthony Paranzino --

13  Paranzino at the White House.

14          THE COURT:  Paranzino.

15          MR. DAVIDSON:  Yes.  There is Kevin McAleenan at the

16  Department of Homeland Security.

17          THE COURT:  Wait.  Now, were these -- let's go back to

18  the first one at the White House.  Who was that?

19          MR. DAVIDSON:  That is John Mashburn at the White

20  House.

21          THE COURT:  Okay.  Now, what makes you think that he

22  wrote any memo that went to someone close to the Secretary at

23  DHS?

24          MR. DAVIDSON:  All of these documents, the only

25  documents that the government logged were documents in the

1   possession and custody of the acting Secretary.

2            THE COURT:  Is that true?

3            MR. ROSENBERG:  Yes.  I mean, if the documents were

4   either collected electronically from the Secretary or

5   physically from her office.

6            THE COURT:  All right.  So we're not talking about

7   some regional office.  We're talking about right there at her

8   office; right?

9            MR. ROSENBERG:  Physically in the acting Secretary's

10  office.

11           THE COURT:  Let's just focus on -- is it Mashburn?

12  M-A-S-H?

13           MR. DAVIDSON:  Correct.

14           THE COURT:  Explain what the log says about the --

15  what can you glean and how many instances and so forth from

16  him?

17           MR. DAVIDSON:  Well, he's the recipient of an email

18  from Frank Wuco at Department of Homeland Security.  The

19  subject of the email that the government's provided or the

20  description is "email regarding cabinet report containing

21  deliberations on DACA."  That's what their log says.  And it's

22  August 31st, 2017, so six days before the rescission memo was

23  issued.

24           THE COURT:  Read it to me again.  It went by me too

25  fast.

1          **MR. DAVIDSON:**  Sure, the description of the document

2     is "Email regarding cabinet report."

3          **THE COURT:**  Cabinet report?

4          **MR. DAVIDSON:**  Cabinet, capital C.  "Containing

5     deliberations on DACA."  The date is August 31st, 2017, which

6     is six days before the rescission was announced.  The document

7     was authored, it appears, by Frank Wuco at the Department of

8     Homeland Security.  It copies Elizabeth Newman at the

9     Department of Homeland Security and Chad Wolf at the Department

10    of Homeland Security, and it's addressed to three White House

11    officials.  That's what we know from the Privilege Log entry.

12         **THE COURT:**  Give me one more example, one that

13    involves the White House.

14         **MR. DAVIDSON:**  Your Honor, I think that is the only

15    document that identifies White House personnel.  I would say

16    that their Privilege Log for a majority of the entries does not

17    include any information about who authored, sent, or received

18    the document.

19         **THE COURT:**  Why is that?

20         **MR. ROSENBERG:**  A couple of things, Your Honor.  I

21    mean, some of the documents -- my understanding is that some of

22    the documents, a substantial number, were physically retrieved

23    from the Secretary's office and so there is not going to be a

24    "To"  or a "From" that is associated with that document, unlike

25    an electronic document.

1    The Privilege Log is lengthy.  I don't have the exact

2   number of documents on it, but I believe it's somewhere within

3   the range of a hundred and it was prepared in two days.

4        **THE COURT:**  The two days part I can forgive, but

5   memos, somebody -- some wrote the memo.  Does it even say that,

6   you know, XYZ wrote this memo and it physically wound up in her

7   office?

8        **MR. ROSENBERG:**  I think it depends on the document.  I

9   don't want to speak to the specifics of a document because I

10   don't have them in front of me.  Actually, the Court now has

11   them, although, you know --

12        **THE COURT:**  Are these the ones that -- do I have --

13   all of the ones that are in your privileged log are in this

14   folder?

15        **MR. ROSENBERG:**  The documents that are in the

16   Privilege Log that we filed with the Court are in the envelope

17   that we provided to the Court earlier today.

18        **THE COURT:**  So there's at least a potential solution

19   there that I can review them myself?

20        **MR. DAVIDSON:**  Yes, Your Honor.

21        **THE COURT:**  All right.  So let's -- the time we've got

22   left over, give me another category of material that -- so let

23   me give you a potential limiting factor and you tell me what's

24   wrong with it.

25    I'm not saying this is what I'm going to do.  I'm just

1  trying to figure out how we could get to the -- so any written

2  material that went to the acting Secretary on DACA, I think

3  even the government is saying that that would be produced as

4  part of the Administrative Record; correct?  Written material

5  that was before the Secretary, whether she relied on it or not;

6  right?  That that would be in the Administrative Record?

7       MR. ROSENBERG:  Yeah.  I think we would take issue

8  with the inclusion of privileged documents in the

9  Administrative Record.  That's a legal issue.

10      But effectively, that's what we have.

11      THE COURT:  Okay.  Wait a minute.  So you would

12 subtract out privilege.  Would you subtract out anything else?

13      MR. ROSENBERG:  I believe that there may have been a

14 few documents that were excluded from the Administrative Record

15 because they're not -- they're relatively inconsequential

16 documents that are not typically included as part of an

17 Administrative Record.

18      THE COURT:  You mean inconsequential --

19      MR. ROSENBERG:  Maybe newspaper clippings, other

20 documents that are not --

21      THE COURT:  Why wouldn't those be in there?

22      MR. ROSENBERG:  Because that's not something the

23 decision-maker would have relied on.  The agency typically --

24      THE COURT:  Even you admit it's not relied upon.  It's

25 considered; right?  Anything that she considered.  So if she

1    glanced at it, read the headline even, that ought to be

2    produced; right?

3         **MR. ROSENBERG:**  I think it depends on the document,

4    Your Honor.

5         **THE COURT:**  If it's -- what if it was a newspaper

6    story saying something like "DACA is loaded with criminals."

7    Headline, DACA -- and then it goes on and that's -- it's in her

8    possession.  Of course that would be something everyone should

9    know.

10        I'm inventing that for purposes of example only.  I have

11   no idea whether -- but I think the newspaper stories that she

12   had before her when she made her decision or had read coming up

13   to it or even glanced at part of it, even just seeing the

14   headlines, I think that's enough that it should have been

15   produced as part of the Administrative Record.  You ought to

16   supplement on that.

17        All right.  What else --

18        **MR. ROSENBERG:**  I'm not saying that there are

19   necessarily those documents --

20        **THE COURT:**  You said maybe there were.  You said two

21   or three -- all right.  So if the -- what else are you

22   hiding -- not hiding but holding back?

23        **MR. DAVIDSON:**  May I say --

24        **THE COURT:**  Wait.  I want the government --

25        **MR. ROSENBERG:**  I'm not --

1       **THE COURT:**  Privileged newspaper stories.  What else?

2       **MR. ROSENBERG:**  Let me be clear, I'm not aware of any

3  specific newspaper stories.  In fact, I believe that there may

4  be some that are reflected in the envelope that I gave you.

5       **THE COURT:**  But if there are some, you need to produce

6  them.

7       **MR. ROSENBERG:**  Okay.

8       **THE COURT:**  Anyway, is there anything else?

9       **MR. ROSENBERG:**  Not that I'm aware of.

10      **THE COURT:**  Okay.  So now it seems to me that the --

11  she gets memos from people immediately below her, somewhere in

12  the organization, which go to her, and that one limiting

13  principle ought to be that the material that was available and

14  considered by -- pro or con by the people who wrote those memos

15  or emails should be in the Administrative Record.  So that

16  would be one level down.  It wouldn't -- it would be a limiting

17  principle, one level down.

18      So if it was two levels down and we somehow missed it,

19  okay, as a concession to the shortness of life, we've got to

20  draw the line somewhere.

21      But the things that were considered by the people who

22  wrote the emails and things she -- to me, that ought to be

23  included.

24      And same thing for the people who gave her verbal advice.

25  Whatever they considered in giving them verbal advice to the

1   Secretary -- I say acting secretary -- should be turned over.

2   That's a limiting principle that wouldn't be hard to live with.

3        I'm almost out of time.  I will give each of you one

4   last -- I don't have an order for you yet, but I will try to

5   get something out pronto this week.

6        I will give each of you a few minutes to wind up your

7   presentation.  Plaintiffs get to go first.

8            MR. DAVIDSON:  Your Honor, three -- three quick items.

9        First, we know from the public documentation of the

10  decision.  The Department of Justice was intimately involved in

11  making the decision.  The Sessions' letter was given as a

12  partial basis for the decision.  And yet the government has

13  excluded all materials from the Department of Justice from the

14  Administrative Record.

15       So we think --

16           THE COURT:  Well, no, that's not quite true.  The OLC

17  memo is in there; right?

18           MR. ROSENBERG:  Yes.

19           MR. DAVIDSON:  To be more precise, Department of

20  Justice materials in connection with the rescission as opposed

21  to the original --

22           THE COURT:  That's a fair point.

23           MR. DAVIDSON:  Second issue --

24           THE COURT:  Do you have authority that -- in your

25  brief that whenever the DOJ does give advice, that the

1    Administrative Record should include the Department of Justice

2    deliberations, too?

3          **MR. DAVIDSON:**  So I think that point is a little more

4    specific than what we have authority for.  What we show is

5    indirectly or directly considered and so of course that would

6    have to include from other agencies, and then we cite several

7    decisions --

8          **THE COURT:**  No.  You say of course it would, but to me

9    it's not clear it would have to.  I could imagine the Supreme

10   Court going either way on that issue or the Ninth Circuit going

11   either way.

12        So it would be good to know if there is a decision on

13   point that says the DOJ itself has got to have an

14   Administrative Record.

15         **MR. DAVIDSON:**  So there are two district court

16   decisions from other judges in this district.  One I would

17   point the Court to is the *Lockyer* case, and it's page 4 of the

18   Westlaw citation.  And there the government was ordered to

19   produce, among other things, interagency reviews and email

20   exchanges or other correspondence between and among the

21   agencies and/or others involved in the process.

22        So there Magistrate Judge Laporte ordered --

23         **THE COURT:**  But what does "and others involved in

24   the" -- see, the interagency communications, that would just

25   pick up the things that DOJ sent to the Secretary or the

1    agency, but it wouldn't pick up the internal DOJ materials.

2         **MR. DAVIDSON:**  That's right, Your Honor.

3         **THE COURT:**  Unless that phrase -- okay.  So we've got

4    Magistrate Judge Laporte.  I highly respect her.

5       Do you have anything at the Court of Appeals level?

6         **MR. DAVIDSON:**  The Court of Appeals has said is

7    directly or indirectly considered, and to give the Court a

8    roadmap, I mean, let's remember what we're doing here.  The

9    Court has to conduct a thorough, probing, in-depth review of

10   the agency decision.  That's from *Overton Park*.  And in order

11   to do that, the Court needs, quote, the whole record.  That's

12   right out of the APA, section --

13        **THE COURT:**  That's true.  It does say that.

14      Let me give you a hypothetical.  Let's say that the

15   agency, the acting Secretary, only got the Sessions' memo from

16   the Justice Department and the OLC memo and nothing else.

17   Let's say that's the only thing that came to the Secretary or

18   to any of the people below the Secretary.  Let's say that --

19   and the Secretary considered what came from the DOJ, just those

20   limited materials.  And that you get the benefit of any

21   communications that came to the underlings at the agency from

22   DOJ.

23      So let's say that part is solved in your favor.  But let's

24   say in addition, there is a treasure trove at DOJ of dramatic

25   documents that never got sent to anybody, documents that said,

1    "Oh, this is awful.  This is illegal, this is -- what we're

2    about to do.  We should never give this -- people resigned in

3    protest," let's say.

4         But it never -- those never went over to the agency and it

5    was a secret within DOJ.  So do we -- do you really get your

6    hands on that treasure trove of material?  Even though it's

7    relevant, is it nevertheless -- it wasn't relied upon.  It

8    wasn't even considered by the agency.  So why would you get

9    your hands on that treasure trove?

10        **MR. DAVIDSON:**  Well, I would say it's indirectly

11   considered because it fed into the documents that were

12   considered.  That would be the first thing.

13        Second of all, it's not clear to us that the

14   decision-maker here should be thought of to be the Department

15   of Homeland Security and the Department of Homeland Security

16   alone.  The decision to rescind DACA was publicly announced by

17   the Attorney General.  He gave a press conference announcing

18   the decision.

19        The basis for the rescission that's articulated in the

20   Secretary's memorandum is the letter that she received from the

21   Attorney General.  And so in our view, the decision-making

22   agency may well be the Department of Justice.

23        **THE COURT:**  I did see -- tell me if I'm right about

24   this.  In doing my homework on this case a few weeks back, I

25   read the statute.  Shock that a judge would go to the trouble

1  to read the statute.

2  But somewhere in there, I saw an arcane provision that

3  said something like on questions of law, the opinion of the

4  Attorney General shall be final.  And this was on immigration

5  law.

6  Am I remembering incorrectly?  Is there something like

7  that?

8  **MR. DAVIDSON:**  I think in general, memoranda from the

9  Office of Legal Counsel are binding on the Government so --

10  **THE COURT:**  No, no.  But am I right that there is such

11  a provision in the Immigration Act as amended that says the --

12  the Department of Homeland Security now must treat as final any

13  opinion by the Attorney General, something like that?  I'm

14  pretty sure I'm right about that.

15  **MR. DAVIDSON:**  I don't know, Your Honor, but we will

16  be studiously looking --

17  **THE COURT:**  You look into that.

18  What do you think?  You should know the answer --

19  **MR. ROSENBERG:**  I don't know the answer off the top of

20  my head on that, Your Honor, but I suspect that -- because the

21  Department of Homeland Security is a relatively young agency

22  and many of its functions were originally DOJ functions, those

23  functions were transferred over to the Department of Homeland

24  Security, so I don't know if all of those provisions have

25  necessarily --

1   **THE COURT:**  That's a good point.  It may be a

2   historical artifact and it could be that provision was -- it

3   seemed like I was reading even the pocket parts, but that

4   may -- maybe it's -- maybe it's an artifact that doesn't apply

5   anymore.  You two ought to look at that and help me in the

6   future understand what it means.

7   You get one last word and then I've got to bring it to a

8   close.

9   **MR. ROSENBERG:**  A couple of points, Your Honor, and I

10  will try to be brief.

11  On the issue of the Department of Justice being a

12  decesion-maker, it was not.  We are not aware of a case where

13  an agency that does not administer a program and is not

14  responsible for the decision has to compile an Administrative

15  Record, and plaintiffs have cited none in their brief, and we

16  think that would --

17  **THE COURT:**  What do you say to the point that counsel

18  made that the Attorney General himself was the one who

19  announced this?

20  **MR. ROSENBERG:**  If you look at the letter that he

21  sent, it actually -- it actually directs -- it doesn't even

22  direct.  It simply notes that DHS should consider an orderly

23  and efficient wind down of the program and the Department of

24  Justice stands ready to assist and continue to support DHS in

25  these efforts.

1      This is a DHS program, and they are the only agency that

2  can have an Administrative Record in this case.

3      **THE COURT:**  Wait a second.  What page do I look at to

4  see that?

5      **MR. ROSENBERG:**  Page 251 at the bottom.

6      **THE COURT:**  All right.

7      Nevertheless, is it true that the Attorney General was the

8  one who announced this rescission?

9      **MR. ROSENBERG:**  I believe that he did make an

10  announcement about it.

11      **MR. DAVIDSON:**  And, Your Honor --

12      **THE COURT:**  Before the acting Secretary?

13      **MR. ROSENBERG:**  I don't know the exact timeline off

14  the top of my head.

15      **THE COURT:**  Do you know the timeline?

16      **MR. DAVIDSON:**  I don't believe that the acting

17  Secretary made any kind of public statement along with the

18  rescission.  She issued the memorandum, but the statement was

19  made by the Attorney General.

20      **THE COURT:**  Which came first?

21      **MR. DAVIDSON:**  That I don't know.  It was within a

22  matter of a very short --

23      **THE COURT:**  All right.

24      **MR. ROSENBERG:**  One or two other points that are

25  critically important here.

1    As the Court is contemplating fashioning relief, it's

2    important that it do not so in a vacuum.  At the initial status

3    conference, the Court did, of course, allow discovery.  Again,

4    we object to that discovery, but we are currently proceeding

5    with it.  It noted that there should not be bone-crushing big

6    firm discovery in this case.

7    Plaintiffs have moved to supplement or complete the

8    Administrative Record, but in the government's view, this

9    motion is essentially a motion to complete masquerading -- it's

10   a motion that really is more properly viewed as a discovery

11   motion.

12   **THE COURT:**  There is something -- I want you to know,

13   at some point, that's what it does become, and I also want to

14   say that the -- it is -- puts the judge in an uncomfortable

15   position when the plaintiffs are asking that I require the

16   Department of Justice, as well as the White House, to scour

17   their records and possibly invade deliberative privileged

18   material, possibly privileged materials.

19   If we go down that path, it may be we can't get a decision

20   in this case for a long time.  It would take a long -- it would

21   take a considerable amount of time to collect the documents

22   that the plaintiffs want me to require.

23   And I am troubled first about the burden and the breadth

24   of it, but more than that, I'm troubled by the -- how much --

25   to what extent does the Judicial Branch intrude on the

1  Executive Branch beyond what they say is the Administrative

2  Record to make them -- it would be a tenfold, twentyfold

3  increase in the size -- maybe a hundredfold increase in the

4  size of the Administrative Record.

5      So the limiting -- there needs to be some kind of a

6  limiting principle to balance all these competing interests, in

7  my view, and I am sorting it out.  All right.

8          MR. ROSENBERG:  But on that point --

9          THE COURT:  Your last point.

10          MR. ROSENBERG:  On that point, Your Honor, just so the

11  Court is aware, plaintiffs have served discovery requests,

12  document requests, and the very first request is literally for

13  "any and all documents or communications considered or created

14  by DHS or DOJ as part of the process of determining whether to

15  continue, modify, or rescind DACA."

16      They are seeking the same information through discovery.

17  Now, we haven't had an opportunity to serve our objections or

18  responses to that yet so the issue is not yet ripe, but the

19  Court should be aware that that is one of nine very extensive

20  sets of documents requests.

21          THE COURT:  I'm not going comment on that.

22      There are two different issues.  One is to what extent

23  does the Administrative Record have to be augmented.  That's

24  one thing.

25      Another one is over and above the Administrative Record,

1   to what extent do the plaintiffs get additional discovery to

2   try to make some of their points.  That's a fair point, too.  I

3   think those are separate.

4       Your point is that they're trying to get as much as they

5   can in the Administrative Record route so that they don't have

6   to rely on discovery and that maybe some of these things should

7   be more properly viewed as a discovery request.  Well, okay.

8       I see the concept.  It's a fair concept maybe.

9       On the other hand, I do think this Administrative Record

10  is a little thin so I feel like some relief is in order and

11  now -- and I don't know.  I can't tell you what the answer is

12  right now.  I'm going to go back and think about it and try to

13  get you a decision this week.

14      Now, you need -- if I rule in favor of any relief at all,

15  the DOJ needs to be in a position to move promptly -- if you

16  are going to seek mandamus, for example, God bless you, that's

17  good, but you got to be ready to go in a hurry.  You can't go

18  crying crocodile tears to the Court of Appeals and say you want

19  to hold up the case because -- now I have one last thought.

20      We have a very good schedule in place.  If it turns out

21  that we are still fighting over documents and the

22  administrative -- I hope we're not.  Please help the poor judge

23  in this case.  But if we're fighting that battle, then it's

24  going to lean more towards the provisional relief side than it

25  will towards the final side.

1    I'm not changing the scope of the briefing at all now.

2    You brief it just the way we set it up and with the documents

3    you got, and you on the plaintiffs side, don't start crying

4    crocodile tears to me saying you haven't gotten every document

5    you've demanded.  You do have some things to work with you and

6    ought to work with what you got and file your briefs

7    accordingly and then say at the end "and by the way, they

8    stonewalled us on all these documents."

9         MR. DAVIDSON:  May I say one more word, Your Honor.

10   The government has essentially blocked all communications --

11   all discovery into communications within the agency about the

12   decision on deliberative process grounds.

13        THE COURT:  Which agency?

14        MR. DAVIDSON:  Within the Department of Homeland

15   Security.

16        And the deliberative process privilege doesn't shield

17   segregable factual material, for example, that would be in

18   memos or meetings, and it's also a qualified privilege that can

19   be overcome by a showing of need.

20        And so --

21        THE COURT:  See, I would say the ones at that level

22   that I told you everything that the people who wrote the emails

23   and the memos that went to the Secretary, even if the Secretary

24   didn't see the -- everything they saw, the balance ought to be

25   struck in terms of turning it over.

1    But I wouldn't go below that because I just think as a

2    concession to the shortness of life, we got to draw the line

3    somewhere, and your side has been unhelpful in giving me a

4    limiting principle.  You just want the moon.  This is big firm

5    practice at its worst.  You want everything.  You can't get

6    everything in the real world.  We want a hurry-up schedule, we

7    want to get it done before March 5, and we don't have the

8    luxury to get everything.

9    So I'm trying to think of a limiting principle that is

10   fair to both sides that will work on the facts and

11   circumstances of this case.

12   My friends, I thank you for the excellent lawyering.

13   You're all great, both sides, even though you're out numbered

14   like ten to one.  You did a great job, you did a great job, and

15   I will see you back here soon, I suppose, but I need to bring

16   it to a close.  So I'll try to get an order out this week.  All

17   right.  Thank you.

18        **MR. ROSENBERG:**  Thank you, Your Honor.

19        **MR. DAVIDSON:**  Thank you, Your Honor.

20             (Proceedings adjourned at 12:23 p.m)

21

22

23

24

25

1

2

3                    <u>CERTIFICATE OF REPORTER</u>

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:    Tuesday, October 17, 2017

8

9    *Pamela A. Batalo*

10   _____
     Pamela A. Batalo, CSR No. 3593, RMR, FCRR
11   U.S. Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25