Jeffrey M. Davidson (SBN 248620)
Alan Bersin (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the University of California and Janet Napolitano, in her official capacity as President of the University of California*

Theodore J. Boutrous, Jr. (SBN 132099)
Ethan D. Dettmer (SBN 196046)
Jesse S. Gabriel (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez, and Jirayut Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
Deputy Attorney General
1515 Clay Street, 20th Floor
Oakland, CA 94612-0550
Telephone: (510) 879-1247
E-mail: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

Joseph W. Cotchett (SBN 36324)
Nancy L. Fineman (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

Jonathan Weissglass (SBN 185008)
Stacey M. Leyton (SBN 203827)
Eric P. Brown (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and Service Employees International Union Local 521*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

REGENTS OF UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security,

Defendants.

CASE NO. 17-CV-05211-WHA

**PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF**

**MEMORANDUM IN SUPPORT**

Judge: Honorable William Alsup
Hearing: December 20, 2017, 8:00 a.m.
Courtroom: 8, 19th Floor

1

2

STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, STATE OF MINNESOTA,

CASE NO. 17-CV-05235-WHA

3

Plaintiffs,

4

v.

5

6

7

U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA,

Defendants.

8

9

CITY OF SAN JOSE, a municipal corporation,

Plaintiff,

CASE NO. 17-CV-05329-WHA

10

v.

11

12

DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA,

13

Defendants.

14

15

16

DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN,

CASE NO. 17-CV-05380-WHA

Plaintiffs,

17

18

19

20

v.

UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security,

Defendants.

21

22

County of Santa Clara and Service Employees International Union Local 521,

CASE NO. 17-CV-05813-WHA

23

Plaintiffs,

24

25

26

27

v.

DONALD J. TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS, in his official capacity as Attorney General of the United States; ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security; and U.S. DEPARTMENT OF HOMELAND SECURITY,

28

Defendants.

## **TABLE OF CONTENTS**

Notice of Motion and Motion for Provisional Relief........................................................ 1

Memorandum in Support of Motion for Provisional Relief .............................................. 2

Introduction..................................................................................................................... 2

Background ...................................................................................................................... 4

       A.      History of Deferred Action ................................................................. 4

       B.      The Creation of DACA ....................................................................... 6

       C.      Benefits of DACA ............................................................................... 7

       D.      The Rescission of DACA .................................................................... 8

       E.      Harm from the Rescission ................................................................. 10

Standard of Review........................................................................................................ 15

Argument ...................................................................................................................... 15

PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS .................................................. 15

I.      Defendants' Rescission of DACA Is Arbitrary and Capricious. ....................... 15

       A.      Defendants Failed to Explain the Basis for the Rescission................... 16

       B.      Defendants Failed to Consider All Relevant Factors and Articulate a Rational Connection Between the Facts Found and the Choice Made. ............................. 18

       C.      Defendants Failed to Offer a Reasoned Explanation for Their Reversal of Policy. ................................................................................................................... 20

       D.      The Rescission Appears to Rely on a False Legal Premise. ................. 22

       E.      The Announced Reason for the Rescission Was Pretextual ................. 29

II.     The Rescission Should Be Vacated Because It Is a Substantive Rule That Did Not Comply with the APA's Notice and Comment Requirements ......................................... 31

PLAINTIFFS SATISFY THE REMAINING REQUIREMENTS FOR INJUNCTIVE RELIEF............................ 34

I.      Plaintiffs Face Irreparable Harm....................................................................... 34

II.     The Balance Of Equities and the Public Interest Weigh Heavily in Favor of Provisional Relief............................................................................................................ 35

CONCLUSION .............................................................................................................. 37

i

PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF; MEMORANDUM IN SUPPORT
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alaska v. U.S. Dep't of Transp.*,
  868 F.2d 441 (D.C. Cir. 1989) ...................................................................................33

*All. for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ...................................................................................16

*Amerijet Int'l, Inc. v. Pistole*,
  753 F.3d 1343 (D.C. Cir. 2014) ..................................................................................18

*Ariz. Dream Act Coal. v. Brewer*,
  757 F.3d 1053 (9th Cir. 2014) .....................................................................................7

*Ariz. Dream Act Coal. v. Brewer*,
  81 F. Supp. 3d 795 (D. Ariz. 2015) ............................................................................8

*Ariz. Dream Act Coal. v. Brewer*,
  855 F.3d 957 (9th Cir. 2017) ...............................................................21, 26, 35, 36

*Arizona v. United States*,
  567 U.S. 387 (2012)...................................................................................................23

*Bair v. Cal. State Dep't of Transp.*,
  867 F. Supp. 2d 1058 (N.D. Cal. 2012) ...................................................................18

*Batalla Vidal v. Duke*,
  No. 16 cv. 41196 (E.D.N.Y. Oct. 27, 2017) ................................................. *passim*

*Burlington Truck Lines, Inc. v. United States*,
  371 U.S. 156 (1962)...................................................................................................20

*Butte Envtl. Council v. U.S. Army Corps of Eng'rs*,
  620 F.3d 936 (9th Cir. 2010) .....................................................................................16

*Chalk v. U.S. Dist. Court Cent. Dist. of Cal.*,
  840 F.2d 701 (9th Cir. 1988) .....................................................................................35

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971)..............................................................................................16, 31

*Cmty. Nutrition Inst. v. Young*,
  818 F.2d 943 (D.C. Cir. 1987) ..................................................................................32

*Colwell v. Dep't of Health & Human Servs.*,
  558 F.3d 1112 (9th Cir. 2009) .............................................................................32, 33

*Consumer Energy Council of Am. v. FERC,*
    673 F.2d 425 (D.C. Cir. 1982) .................................................................................34

*Crane v. Johnson,*
    783 F.3d 244 (5th Cir. 2015) ..................................................................21, 22, 26

*Crickon v. Thomas,*
    579 F.3d 978 (9th Cir. 2009) .................................................................................20

*Crowley Caribbean Transp., Inc. v. Peña,*
    37 F.3d 671 (D.C. Cir. 1994) .................................................................................24

*Edison Elec. Inst. v. EPA,*
    996 F.2d 326 (D.C. Cir. 1993) ..........................................................................24, 25

*Encino Motorcars, LLC v. Navarro,*
    136 S. Ct. 2117 (2016) .......................................................................................21, 22

*Enyart v. Nat'l Conference of Bar Examiners, Inc.,*
    630 F.3d 1153 (9th Cir. 2011) ...............................................................................36

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ...........................................................................................3, 21

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ..............................................................................................16

*Gant ex rel. Gant v. E.E.O.C. v. Ethan Allen, Inc.,*
    44 F.3d 116 (2d Cir. 1994) ....................................................................................31

*Greene v. McElroy,*
    360 U.S. 474 (1959) ..............................................................................................20

*Hernandez v. Hughes Missile Sys. Co.,*
    362 F.3d 564 (9th Cir. 2004) .................................................................................30

*Humane Soc'y of U.S. v. Locke,*
    626 F.3d 1040 (9th Cir. 2010) ..........................................................................18, 23

*Int'l Chem. Workers Union Council of the United Food & Commercial Workers Int'l v.*
    *NLRB,* 467 F.3d 742 (9th Cir. 2006)....................................................................25

*Int'l Longshoremen's & Warehousemen's Union v. Meese,*
    891 F.2d 1374 (9th Cir. 1989) ...............................................................................25

*Int'l Union, United Mine Workers of Am. v. U.S. Dep't of Labor,*
    358 F.3d 40 (D.C. Cir. 2004)................................................................................28

*Jicarilla Apache Nation v. U.S. Dep't of the Interior,*
    613 F.3d 1112 (D.C. Cir. 2010).............................................................................20

iii

*Kenney v. Glickman*,
    96 F.3d 1118 (8th Cir. 1996) ....................................................................................24

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*,
    752 F.3d 755 (9th Cir. 2014) ...................................................................................36

*Lester v. Parker*,
    235 F.2d 787 (9th Cir. 1956) ...................................................................................20

*Lincoln v. Vigil*,
    508 U.S. 182 (1993)..................................................................................................33

*California ex rel. Lockyer v. U.S. Dep't of Agric.*,
    459 F. Supp. 2d 874 (N.D. Cal. 2006) .....................................................................28

*Mada-Luna v. Fitzpatrick*,
    813 F.2d 1006 (9th Cir. 1987) .................................................................................34

*Massachusetts v. EPA*,
    549 U.S. 497 (2007)..................................................................................................23

*Mexichem Specialty Resins, Inc. v. EPA*,
    787 F.3d 544 (D.C. Cir. 2015) .................................................................................29

*Michigan v. EPA*,
    135 S. Ct. 2699 (2015)..............................................................................................19

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)..............................................................................................17, 19

*Municipality of Anchorage v. United States*,
    980 F.2d 1320 (9th Cir. 1992) .............................................................................32, 33

*N.E. Coal. on Nuclear Pollution v. Nuclear Regulatory Comm'n*,
    727 F.2d 1127 (D.C. Cir. 1984)...........................................................................17, 31

*Nat'l Ass'n of Home Builders v. Norton*,
    340 F.3d 835 (9th Cir. 2003) ...................................................................................18

*Neil v. Biggers*,
    409 U.S. 188 (1972)..............................................................................................18, 26

*Noel v. Chapman*,
    508 F.2d 1023 (2d Cir. 1975)...................................................................................34

*Norsworthy v. Beard*,
    87 F. Supp. 3d 1164 (N.D. Cal. 2015) .....................................................................35

*Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*,
    477 F.3d 668 (9th Cir. 2007) ...................................................................................18

iv

*Organized Vill. of Kake v. U.S. Dep't of Agric.,*
    795 F.3d 956 (9th Cir. 2015) ...............................................................................28

*United States ex rel. Parco v. Morris,*
    426 F. Supp. 976 (E.D. Pa. 1977) ..............................................................4, 6, 34

*Paulsen v. Daniels,*
    413 F.3d 999 (9th Cir. 2005) ...............................................................................33

*Perez v. Mortg. Bankers Ass'n,*
    135 S. Ct. 1199 (2015) ...........................................................................3, 16, 22

*Phillips Petroleum Co. v. FERC,*
    792 F.2d 1165 (D.C. Cir. 1986) ..........................................................................23

*Pinho v. Gonzales,*
    432 F.3d 193 (3d Cir. 2005) .................................................................................25

*Pub. Citizen v. Heckler,*
    653 F. Supp. 1229 (D.D.C. 1986) ...................................................................17, 31

*Regents of Univ. of Cal. v. Bakke,*
    438 U.S. 265 (1978) .............................................................................................20

*Reno v. Am.-Arab Anti-Discrimination Comm.,*
    525 U.S. 471 (1999) .............................................................................................23

*Rodriguez v. Robbins,*
    715 F.3d 1127 (9th Cir. 2013) .............................................................................36

*Sacora v. Thomas,*
    628 F.3d 1059 (9th Cir. 2010) .............................................................................16

*Safe Air for Everyone v. EPA,*
    488 F.3d 1088 (9th Cir. 2007) .............................................................................23

*San Diego Air Sports Ctr., Inc. v. F.A.A.,*
    887 F.2d 966 (9th Cir. 1989) ...............................................................................32

*SEC v. Chenery Corp.,*
    318 U.S. 80 (1943) (*Chenery I*) ..................................................................2, 17, 23

*SEC v. Chenery Corp.,*
    332 U.S. 194 (1947) (*Chenery II*) ................................................................17, 28

*Sierra Club v. Jackson,*
    833 F. Supp. 2d 11 (D.D.C. 2012) ......................................................................29

*Squaw Transit Co. v. United States,*
    574 F.2d 492 (10th Cir. 1978) ......................................................................17, 31

v

*Texas v. United States*,
787 F.3d 733 (5th Cir. 2015) (*Texas I*) ...............................................................26, 27

*Texas v. United States* (*Texas II*),
809 F.3d 134 (5th Cir. 2015) ...........................................................................25, 26, 27

*United States v. Texas*,
136 S. Ct. 2271 (2016)................................................................................. *passim*

**Statutes and Regulations**

8 C.F.R. § 212.5(f) .........................................................................................................8

8 C.F.R. § 214.11(k)(1), (k)(4), (m)(2) .........................................................................5

8 C.F.R. § 214.14(d)(2).................................................................................................5

8 C.F.R. § 274a.12(c)(14) .............................................................................................7

5 U.S.C. § 551(5) ...................................................................................................32, 34

5 U.S.C. § 553....................................................................................................3, 30, 33

5 U.S.C. § 604(a) .......................................................................................................3, 33

5 U.S.C. § 706(2)(A)..................................................................................................2, 16

6 U.S.C. § 202(5) ...........................................................................................................4

8 U.S.C. § 1103(a)(3).....................................................................................................23

8 U.S.C. § 1182(a)(9)(B)–(C)......................................................................................7, 11

8 U.S.C. §§ 1611(b)(2)–(3), 1621(d) .............................................................................8

Act of July 25, 1958, Pub. L. No. 85-559, § 2, 72 Stat. 419, 419-20 .....................4, 14

Act of Sept. 11, 1957, Pub. L. No. 85-316, § 4(d), 71 Stat. 639, 640.............................4

Cal. Unemp. Ins. Code § 1264(a)(2)..............................................................................8

Cal. Veh. Code § 12801(a)-(b) .......................................................................................8

Cal. Veh. Code § 12801.5 ..............................................................................................8

Cal. Veh. Code § 1208.9 ................................................................................................8

Cuban Adjustment Act, Pub. L. No. 89-732, §1, 80 Stat. 1161 (1966)..........................5

Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 ....................................5

Immigration Reform and Control Act, Pub. L. No. 99-603, 100 Stat. 3359 (1986).....................................5

## NOTICE OF MOTION AND MOTION FOR PROVISIONAL RELIEF

Please take notice that on December 20, 2017, 8:00 a.m., at 450 Golden Gate Avenue, San Francisco, California, Courtroom 8, plaintiffs in the above-captioned actions will, and hereby do, move for provisional relief enjoining defendants from implementing the September 5, 2017 memorandum rescinding the Deferred Action for Childhood Arrivals program ("the Rescission"). Plaintiffs will demonstrate that (1) they are likely to succeed on the merits of their claims under the Administrative Procedure Act ("APA"), (2) the Rescission is causing irreparable harm, and (3) the balance of equities and the public interest weigh heavily in favor of provisional relief in the form of returning to the status quo existing prior to the Rescission.

As the Court held in its Order Re Motion to Complete Administrative Record (Dkt. No. 79), the administrative record filed by defendants (Dkt. No. 64) is incomplete and must be expanded. Defendants' compliance with that ruling has been stayed by the court of appeals. Nonetheless, as provided in the Court's scheduling order and because of the urgency caused by defendants' arbitrary selection of March 5, 2018 as the termination date for DACA, plaintiffs now move on the basis of the current incomplete administrative record, the discovery they obtained prior to the court of appeals' stay, and the declarations and exhibits submitted in connection with this motion and the accompanying request for judicial notice. Plaintiffs will supplement their motion if the court of appeals permits expansion of the administrative record or if discovery reveals additional relevant information. As demonstrated below, however, the current record establishes that plaintiffs are likely to succeed on the merits of their claim that the rescission of DACA was arbitrary, capricious, and not in accordance with law. Plaintiffs seek injunctive relief at this time only as to their APA claims, but maintain their other constitutional, statutory, and equitable claims for a later stage of this case.

## MEMORANDUM IN SUPPORT OF MOTION FOR PROVISIONAL RELIEF

### INTRODUCTION

Since 2012, the Deferred Action for Childhood Arrivals ("DACA") program has enabled nearly 800,000 young people who were brought into the United States as children to live and work in this country without fear of deportation.[1]  Since the program was established, DACA recipients have relied on its protections to become medical residents and teachers, serve in the U.S. military, open businesses and earn degrees, start families, and purchase homes.  Yet on September 5, 2017, defendants rescinded DACA, telling its beneficiaries that "DACA was fundamentally a lie," Appendix ("App.") at 1869-70 (Duke Statement), and that they should "prepare for and arrange their departure from the United States," *id.* at 2199–2200 (Talking Points).  The Rescission already is causing catastrophic and irreparable harm to DACA recipients, as the threat of deportation—to countries where they have not lived since they were children—forces them to make wrenching choices whether to leave their schools, jobs, and even their U.S. citizen children and other family members.  The harm also extends to their loved ones, employers, schools, and communities.  The Rescission is unjust and unlawful, and it violates the fundamental prohibition on arbitrary agency action imposed by the Administrative Procedure Act ("APA").

The APA requires courts to set aside agency action that is "arbitrary, capricious, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  This standard requires agency action to be both reasonable and reasonably explained.  The Rescission is neither.  The Rescission contains only a single vague sentence of justification: "Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated."  AR 255.  This conclusory assertion fails the requirement that the basis for agency action "be clearly disclosed and adequately sustained," *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) (*Chenery I*), especially for an action threatening the expulsion of nearly 700,000 current DACA recipients from their country.

---

[1]     Although 800,000 young people have received DACA at various times, this motion focuses on the irreparable harm to the 700,000 current DACA recipients if defendants are permitted to implement the Rescission.

The government's empty explanation of the Rescission echoes its failure to consider the Rescission's consequences. The government's decision fails to acknowledge the human and economic havoc that it will inflict on DACA recipients, their families, schools, employers, employees, clients, and communities. The record further reveals that the Department of Homeland Security ("DHS") never evaluated the benefits of DACA when rescinding the program. The absence of reasonable consideration or explanation is particularly appalling where, as here, an agency is reversing a "prior policy [that] has engendered serious reliance interests." *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015). Reasonable decision-making in these circumstances demands a "more detailed justification than what would suffice for a new policy created on a blank slate." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). The government's one-sentence justification for rescinding DACA fails to meet this standard, contradicting its own statements to the Ninth Circuit and the Supreme Court asserting that DACA is both lawful and sound policy, as well as its decision eight months ago to leave DACA intact.

The government's failure to consider relevant factors or plausibly explain the basis for the Rescission suggests that its proffered justifications are pretextual. Inconsistent and shifting explanations for the Rescission reinforce this conclusion. For example, although the government has sought to defend the Rescission as a response to purported "litigation risk," the author of the Rescission memorandum testified that responding to "litigation risk" would be "the craziest policy you could ever have as a department." App. at 1928-26 (Hamilton Dep. 207:20-208:11). Agency action that is based on pretext is arbitrary by definition and must be set aside.

Finally, the Rescission was accomplished without the procedural steps required by law. The Rescission constitutes a substantive rule subject to the APA's notice and comment requirements, 5 U.S.C. § 553, which are designed to ensure that agency action proceeds on the basis of relevant factors. *See also* 5 U.S.C. § 604(a) (requiring consideration of effects on small entities). Had the government considered such factors—including the Rescission's devastating impact on DACA recipients and their families, and its broader consequences for local governments, employers, educators, and the economy— the Rescission could not reasonably have been adopted.

This Court should grant provisional relief enjoining defendants' illegal action and preserving the status quo pending a final judgment in this action.

3

**BACKGROUND**

A.      **History of Deferred Action**

DACA is consistent with a series of deferred action programs dating back half a century.  The government has long recognized that "there simply are not enough resources to enforce all of the rules and regulations presently on the books" and that "[i]n some situations, application of the literal letter of the law would simply be unconscionable and would serve no useful purpose."  App. at 1594 (Bernsen Memo).  Accordingly, consistent with their authority to "[e]stablish[] national immigration enforcement policies and priorities," 6 U.S.C. § 202(5), DHS and previously the INS have frequently exercised discretion not to remove otherwise removable immigrants.  App. at 1822-23 (Johnson Letter).

Consistency and administrative convenience have often led the government to exercise its discretion programmatically.  Since at least 1956, the government has implemented numerous forms of "discretionary relief," including parole, temporary protected status, deferred enforced departure, extended voluntary departure, and deferred action.  Administrative Record ("AR") (Dkt. No. 64-1) 15.

- In 1956, President Eisenhower "paroled" into the United States roughly 1000 foreign-born orphans who had been adopted by American citizens overseas but were precluded from entering the United States because of statutory quotas, App. at 1602 (Eisenhower Letter — Orphans), as well as tens of thousands of Hungarian refugees after the unsuccessful Hungarian revolution, App. at 1603 (Eisenhower Letter — Hungarians).  In both cases, Congress eventually passed laws enabling the paroled individuals to become lawful permanent residents.  *See* Act of Sept. 11, 1957, Pub. L. No. 85-316, § 4(d), 71 Stat. 639, 640 (orphans); Act of July 25, 1958, Pub. L. No. 85-559, § 2, 72 Stat. 419, 419-20 (Hungarian refugees).

- That same year, the Eisenhower Administration granted "extended voluntary departure" to nonimmigrants present in the United States who had sought, but not received, "Third Preference" visas based on exceptional ability in the arts and sciences.  When the INS rescinded this policy sixteen years later with a perfunctory explanation that the program was "having an increasingly unfavorable effect on the domestic job market," a federal court held that the rescission was ineffective because it did not comply with the APA's notice-and-comment procedures, even though the original policy had not been published in the Federal Register.  *United States ex rel. Parco v. Morris*, 426 F. Supp. 976, 980 n.8, 983, 984, 986 (E.D. Pa. 1977).

- The Eisenhower, Kennedy, Johnson, and Nixon Administrations paroled more than 600,000 Cubans in the United States through a series of discretionary programs.  For example, in 1961, the Kennedy Administration established the Cuban Refugee Program, which directed the routine admission of Cubans under the Attorney General's parole authority.  *See* App. at 1604 (Kennedy Letter).  This program ended through an agreement between the United States and Cuba, followed by legislation providing lawful permanent residence for the individuals who had been paroled under the program.  Cuban Adjustment Act, Pub. L. No. 89-732, §1, 80 Stat. 1161 (1966).

- In 1962, in response to famine in China, President Kennedy established the Hong Kong Parole Program to provide extended voluntary departure to 15,000 Chinese refugees.  App. at 1605

4

(USCIS Refugee Timeline).  This program ended in 1966 with passage of the Immigration and Nationality Act of 1965, which for the first time provided for the regular admission of refugees.

- In 1987, President Reagan instituted the Family Fairness Program, which provided extended voluntary departure to children whose parents were in the process of legalizing their immigration status under the Immigration Reform and Control Act, Pub. L. No. 99-603, 100 Stat. 3359 (1986).  App. at 1607 (1987 INS Analysis).  In 1990, President George H. W. Bush expanded the program to spouses of such immigrants.  *Id.* at 1612-13 (1990 INS Analysis).  Collectively, the Family Fairness Program extended relief to approximately 1.5 million people, estimated to be 40 percent of the undocumented population at the time.  *Id.* at 1613.  The Family Fairness Program ended with the passage of the Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978, providing a path to permanent residence for the beneficiaries of the program.

- In 1997, the Clinton Administration established a deferred action program for individuals self-petitioning for relief under the Violence Against Women Act of 1994.  App. at 1640-46.  The George W. Bush Administration similarly provided deferred action to certain applicants for T visas (victims of human trafficking) and U visas (victims of crimes such as domestic violence) in 2002 and 2003, respectively.  *Id.* at 1650-51.  These programs are still in place, *see id.* at 1651, and the deferred action programs for T visa and U visa applicants have been codified, *see* 8 C.F.R. § 214.11(k)(1), (k)(4), (m)(2) (T visa applicants); 8 C.F.R. § 214.14(d)(2) (U visa applicants).

- The George W. Bush Administration also established a deferred action program in 2005 temporarily granting relief to thousands of foreign students affected by Hurricane Katrina who, because of the hurricane, could not satisfy the requirements of their student visas.  App. at 1661-62.  Because this program was initiated in response to a specific event, USCIS made clear from the outset that all benefits would expire on February 1, 2006.  *Id.*

- In 2009, the Obama Administration established a deferred action program providing relief to widowed spouses who had been married to U.S. citizens for less than two years and therefore could not obtain permanent residence through their spouses.  *Id.* at 1664-71.  Several months later, Congress eliminated the statutory requirement that had prompted the establishment of the program and USCIS accordingly withdrew the program as "obsolete."  *Id.* at 1672-82 (Neufeld Memo).

A chart summarizing the 17 prior deferred action programs is attached as Addendum A.

This history underscores three important points.  First, programmatic grants of deferred action have been common for half a century, across many presidential administrations.  Second, the programmatic use of deferred action has gone largely unchallenged.  Until the Texas DAPA litigation in 2014, there had been no judicial challenge to the creation of any prior deferred action program.  *See* Br. of Former Federal Immigration and Homeland Security Officials as Amici Curiae in Support of the United States at 3, *United States v. Texas*, 136 S. Ct. 2271 (2016) (No. 15-674), 2016 WL 922865 ("While [deferred action] policies have at times generated political controversy, until recently their legal underpinnings did not.").

Third, the Rescission is the first time the government has terminated a deferred action program and subjected its existing beneficiaries to deportation.  Virtually all of the prior programs ended either because a statute or regulation was enacted to protect the recipients, or because the program was designed from the outset to address a temporary disruption (e.g., the Hurricane Katrina program).  In the single instance where the executive branch attempted to terminate a deferred action program without providing an opportunity for notice and comment, a court found a violation of the APA.  *See Parco*, 426 F. Supp. at 985.

## B.  The Creation of DACA

On June 15, 2012, then-Secretary of Homeland Security Janet Napolitano issued a memorandum establishing DACA (the "2012 DACA Memorandum").  *See* AR 1–3.  Under DACA, individuals who were brought to the United States as children and met certain criteria could apply for deferred action for renewable two-year terms.  *Id.*  The 2012 DACA Memorandum explained that DACA covers "certain young people who were brought to this country as children and know only this country as home" and that our immigration laws are not "designed to remove productive young people to countries where they may not have lived or even speak the language."  *Id.* at 1–2.

Eligibility for DACA was limited to individuals who (1) came to the United States under the age of sixteen; (2) had continuously resided in the United States since June 15, 2007, and were present in the United States both on June 15, 2012 and on the date they requested DACA; (3) were in school, had graduated from high school, had obtained a GED, or had been honorably discharged from the United States military or Coast Guard; (4) had clean criminal records and were not a threat to national security or public safety; (5) were under the age of 31 as of June 15, 2012; and (6) did not have lawful immigration status.  *See* AR 1.  To apply for DACA, eligible individuals were required to provide the government with sensitive personal information, such as their home addresses and fingerprints, submit to a rigorous DHS background check, and pay a considerable fee.  App. at 1744-45, 47 (USCIS FAQs).  Applicants then were evaluated on a case-by-case basis.  *See* AR 2.

A DACA determination results in an initial two-year deferral, which DHS stated from the outset would be "subject to renewal, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States."  AR 3.  DHS established a straightforward

6

renewal process and "strongly encourage[d]" DACA recipients to submit renewal requests in advance of the relevant expiration date.  App. at 1756-57 (USCIS FAQs).[2]

Understanding that eligible individuals might be reluctant to step forward and voluntarily disclose information which, absent DACA, could facilitate their removal from the United States, the government launched an extensive outreach campaign to promote applications and renewals.  App. at 1742-61, 1762-64, 1785, 1799 (USCIS DACA Outreach).  The government repeatedly promised that information provided in connection with the program would not be used for immigration enforcement purposes absent special circumstances.  *Id.* at 1763-64, 1747, 1772 (DACA Toolkit).

### C.      Benefits of DACA

DACA has conferred important benefits on recipients.  Most directly, DACA recipients are permitted to reside in the United States and are protected from arrest or detention.  *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1058–59 (9th Cir. 2014); *see also* AR 2.  During the period of deferred action, DACA recipients do not accrue time for "unlawful presence" for purposes of the immigration law's bars on re-entry.  *See* 8 U.S.C. § 1182(a)(9)(B)–(C).

Under longstanding regulations, immigrants benefiting from deferred action may seek social security numbers and employment authorization.  App. at 1742-45 (USCIS FAQs); AR 3; *see also* 8 C.F.R. § 274a.12(c)(14).  DACA recipients also became eligible for "advance parole," allowing them to apply to travel abroad and return lawfully to the United States.  *See* App. at 1787-88 (USCIS Toolkit); 1758-59 (USCIS FAQ); *see also* 8 C.F.R. § 212.5(f).  Advance parole has permitted DACA recipients to

---

[2]      To qualify for renewal, DACA recipients were required to meet just three basic criteria: (1) they must not have left the United States without advance parole; (2) they must have continuously resided in the United States after submitting their DACA applications; and (3) they must not have been convicted of serious or repeated crimes, or otherwise pose a threat to national security or public safety.  App. at 1742, 1757 (USCIS FAQs).

visit ailing family members, attend births and funerals, and participate in educational, cultural, and employment-related conferences.  App. at 2202, Topic 3.[3]

DACA recipients also became eligible to receive certain public, private, and practical benefits. For example, the individual plaintiffs have obtained driver's licenses, medical insurance, research funding and tuition benefits.  App. at 2203–04, Topic 6; *see also* 8 U.S.C. §§ 1611(b)(2)–(3), 1621(d); *Ariz. Dream Act Coal. v. Brewer*, 81 F. Supp. 3d 795, 811 (D. Ariz. 2015).[4]  DACA also has enabled recipients to open bank accounts, obtain credit cards, and purchase homes and vehicles.  App. at 2201, Topic 2.

DACA has been transformative for beneficiaries and their families and communities.  *See, e.g.*, App. at 1373-74 (Suárez-Orozco Decl. ¶¶ 7-8); App. at 0363-68 (Gonzales Decl. ¶¶ 18-32).  As the government has recognized, DACA has enabled hundreds of thousands of young people "to enroll in colleges and universities, complete their education, start businesses that help improve our economy, and give back to our communities as teachers, medical professionals, engineers, and entrepreneurs—all on the books."  App. at 1822-23 (Johnson Letter); App. at 2201, 2203, Topics 1, 5.  Even more fundamentally, DACA has provided recipients with a sense of dignity and security that carries demonstrable benefits to their mental and physical health, family well-being, and ability to make life plans.  App. at 2202-03, Topic 4.

### D. The Rescission of DACA

In December 2016, Secretary of Homeland Security Jeh Johnson publically stated that "representations made by the U.S. government, upon which DACA applicants most assuredly relied, must continue to be honored."  App. at 1822-23 (Johnson Letter).  And initially, even after the change in

---

[3]     Where multiple declarations provide support for the facts stated herein, the citation provided is to the Topical Index to Plaintiff and Third-Party Declarations within the Appendix, *see* App. at 2201-2210, which identifies and provides a specific citation to each supporting declaration.

[4]     DACA permits otherwise ineligible individuals in California to obtain regular driver's licenses. *See* Cal. Veh. Code §§ 12801(a)-(b), 12801.5, 12801.6(a)-(b).  California also provides "AB 60" driver's licenses to undocumented immigrants without DACA, *see* Cal. Veh. Code § 12801.9, but such licenses are "not acceptable for official federal purposes."  *Id.* § 12801.9(d)(2).  DACA recipients also can obtain unemployment insurance benefits, *see* Cal. Unemp. Ins. Code § 1264(a)(2).

8

PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF; MEMORANDUM IN SUPPORT
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

1    administrations, Secretary of Homeland Security John Kelly in February 2017 specifically exempted

2    DACA from the administration's broad repeal of other immigration directives, AR 230, and

3    characterized "DACA status" as a "commitment . . . by the government towards the DACA person,"

4    App. at 1841.  President Trump himself emphasized that "dreamers should rest easy" and agreed that the

5    "policy of [his] administration [is] to allow the dreamers to stay."  *Id.* at 1853.

6         No court has ever held DACA to be unlawful.  Yet, in June 2017, government officials,

7    including Attorney General Sessions, began communicating with attorneys general from several states

8    that had previously challenged another deferred action program, Deferred Action for Parents of

9    Americans and Lawful Permanent Residents ("DAPA").  App. at 2033-34 (*Batalla Vidal* Interrogatory

10   Response).  Those discussions culminated in a June 29, 2017 letter from nine state attorneys general to

11   Attorney General Sessions, threatening to challenge DACA in court unless the federal government

12   rescinded the program by September 5, 2017.  AR 238-40.[5]  A group of 20 other attorneys general sent a

13   competing letter to President Trump urging him to *maintain* DACA, asserting that the arguments against

14   the program were "wrong as a matter of law and policy."  App. at 2089 (Becerra Letter).

15        On September 4, 2017, Mr. Sessions sent a one-page letter to Acting Secretary of Homeland

16   Security Elaine Duke asserting that DACA "was effectuated . . . without proper statutory authority" and

17   "was an unconstitutional exercise of authority by the Executive Branch."  AR 251.  He noted that DAPA

18   had been "enjoined on a nationwide basis in a decision affirmed by the Fifth Circuit on the basis of

19   multiple legal grounds and then by the Supreme Court by an equally divided vote," and suggested that

20   DACA might encounter the same result.  *Id.*

21        The next day, the Attorney General held a press conference where he "announce[d] that the

22   program known as DACA . . . is being rescinded."  App. at 1866 (Sessions Press Conf.).  As in his letter

23   to the Acting Secretary, the Attorney General asserted that DACA was an unconstitutional exercise of

24   authority by the executive branch and "vulnerable to the same legal and constitutional challenges that

25   the courts recognized with respect to the DAPA program."  AR 251.  He also claimed that DACA had

26

27   ———————————
     [5]     On September 1, 2017, Tennessee Attorney General Herbert H. Slatery III reversed course and
28   decided Tennessee would not join the threatened expansion of the suit, citing "a human element to this
     [issue]" that "should not be ignored."  App. at 1859-60 (Slatery Letter).

"contributed to a surge of unaccompanied minors on the southern border that yielded terrible humanitarian consequences." *Id.*  This was nonsensical; DACA eligibility was restricted to a fixed group of individuals who had lived continuously in the United States for at least five years since June 15, 2007 and were present in the United States on June 15, 2012; DACA could not have led to any changes at the border in 2017.

Minutes after the Attorney General's press conference, Acting Secretary of Homeland Security Duke issued a memorandum formally rescinding the DACA program.  *See* AR 252–56.  The Rescission instructed DHS to immediately stop accepting DACA applications or approving new applications for advance parole; to accept renewal applications only from individuals whose current deferred action would expire on or before March 5, 2018, and to accept such renewals only through October 5, 2017; and to allow individuals' DACA to expire beginning March 5, 2018.  AR at 255.

Secretary Duke issued an accompanying statement asserting that the government had decided to end DACA rather than "allow the judiciary to potentially shut the program down completely and immediately."  App. at 1869-70 (Duke Statement).  Secretary Duke also expressed "sympath[y]" and "frustrat[ion]" on "behalf" of DACA recipients and asserted that "DACA was fundamentally a lie."  *Id.*

### E.     Harm from the Rescission

The Rescission is causing irreparable injuries right now that will only worsen with time. Because the Rescission threatens nearly 700,000 deeply-rooted immigrants with deportation from the United States, its consequences are enormous and multi-faceted.  The accompanying Appendix presents extensive evidence of the severe harm that is being and will be inflicted by the government's action. The discussion below can only begin to describe the Rescission's damaging effects.

#### 1.     Direct Legal Consequences

As a result of the Rescission, eligible individuals were prevented from applying for DACA, and others were unable to gather sufficient funds in time to pay the renewal fee by the abrupt October 5, 2017 cutoff.  App. at 2209, Topics 19, 21.  As a result, eligible individuals already have been denied the benefits of the program.  *Id.*  DACA recipients have already lost the ability to seek advance parole and are therefore precluded from traveling outside the United States.  App. at 2210, Topic 23.  Each day

10

PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF; MEMORANDUM IN SUPPORT
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

1
2
3
4
5
6
7

beginning March 5, 2018, an average of more than one thousand individuals will lose DACA and immediately become vulnerable to arrest, detention, and removal.  App. at 2097 (CAP Study).  If they are removed, most of these individuals will become subject to a 10-year bar on re-entry because they accrued more than one year of "unlawful presence" prior to the creation of DACA.  In some cases, DACA recipients will be subject to a *permanent* bar if, in addition to one year of "unlawful presence," they were previously ordered removed or granted voluntary departure and then later re-entered.  *See* 8 U.S.C. § 1182(a)(9)(B)–(C).

8

### 2.    Injuries to Individual DACA Recipients

9
10
11
12
13
14
15
16
17
18
19

The Rescission has already inflicted severe harm on DACA recipients and their families.  DACA recipients are experiencing anxiety, depression, and fear because of the Rescission.  App. at 2205, Topic 13.[6]  This is taking an immediate toll on DACA recipients' well-being and affecting their studies, work, and families.  App. at 2206-07, Topics 12-13.  The University of California has observed an increase in demand for mental health services, which it cannot fully meet.  App. at 2202, Topic 8; *see also id.*, Topic 7 (allocation of scarce resources).  And understandably so: because of the program's age restrictions, DACA recipients are mostly young adults, now making decisions whether to get married, start families, take mortgages, attend college or graduate school, start businesses, or change careers.  App. at 2204-06, Topics 9-10.  Of course, hundreds of thousands of DACA recipients already have made such life-changing decisions in reliance on DACA, and now face devastating personal, professional, and economic losses as a result of the government's precipitous reversal.

20
21
22
23
24
25

The Rescission carries immediate economic and professional consequences.  DACA recipients have invested enormous effort and financial resources into building their lives and careers in this country, which they now stand to lose.  App. at 2205-06, Topics 9-10.  They face the loss of educational and employment opportunities, and even those early in their two-year DACA grants face immediate losses from the unavailability of advance parole.  App. at 2204-05, 2208, Topics 9-10, 23.  The Rescission has already prevented more than 70 recipients who have pending advance parole applications

26
27
28

---

[6]    As one researcher found, the physical and emotional manifestations of stress can include chronic headaches, ulcers, sleep loss and eating disorders, and thoughts of suicide.  App. at 362 (Gonzales Decl. ¶ 13).

from studying abroad and presenting research.  App. at 1479 (Vazquez-Ramos Decl. ¶¶ 6-7).  For example, Joel Sati—described as a "once-in-a-decade" doctoral candidate and academic prospect in jurisprudence and social policy who had a pending advance parole application at the time of the Rescission—has already been deprived of important opportunities to present his research abroad.  *See* App. at 656-57 (Kutz Decl. ¶ 13); App. at 875 (Morrill Decl. ¶ 21); App. at 1322-23 (Sati Decl. ¶¶ 39-41).

DACA recipients are being forced—right now—to make momentous and irreversible decisions about their educational and professional paths.  For example, plaintiff and first-year UC Irvine law student Viri Chabolla Mendoza is struggling to decide whether to continue making the personal and financial investments required to attend law school, because without a work authorization, the Rescission will limit or eliminate her ability to work as an attorney, App. at 113 (Chabolla Decl. ¶ 69), as it will for other DACA recipient law students, who have been incurring significant debt to finance their legal education.  App. at 448-49 (Gorjian Decl. ¶¶ 15-16).  Medical and doctoral students— including plaintiffs New Latthivongskorn and Norma Ramirez—are wrestling with similar decisions.  App. at 670–71 (Latthivongskorn Decl. ¶¶ 47–49); App. at 1161 (Ramirez Decl. ¶ 52).  Medical students at UC are facing the choice of self-selecting out of their only real opportunity to obtain a medical residency position after years of medical training, lest they be rendered unable to care for their patients when their work authorization expires.  App. at 65-67 (Braddock Decl. ¶¶ 4-5, 8); App. at 723-24 (Lucey Decl. ¶¶ 13-18); App. at 1357-59 (Stobo Decl. ¶¶ 6, 10, 12); App. at 0519-20 (Huang Decl. ¶ 16).  And plaintiff Saul Jimenez already has been forced to abandon plans to pursue a master's degree.  App. at 0557 (Jimenez Decl. ¶ 45).  Many other DACA recipients are being forced to make choices now that may adversely impact their ability to pursue their education and career objectives.  App. at 2203-04, Topics 9-10.

Beyond its immediate career consequences, the Rescission is imposing economic and financial harms on DACA recipients, many of whom are already looking to minimize or unwind the long-term financial commitments—including student loans and mortgages, office leases, and employee hires— they made in reliance on the program.  App. at 2205-06, 2209, Topics 10, 20.  The Rescission, by

1    canceling work authorizations, will deprive DACA recipients of the ability to work legally, and in many

2    cases render them unable to continue their education.  App. at 2203-04, Topics 9-10.

3         The Rescission is also causing irreparable harm to the parents, children, and siblings of DACA

4    recipients.  *See, e.g.*, App. at 2206, Topic 11.  Approximately 26 percent of DACA recipients have U.S.-

5    citizen children, while approximately 17 percent have a U.S.-citizen spouse, and nearly 60 percent have

6    a U.S.-citizen sibling.  App. at 1510 (Wong Decl. ¶ 31).  DHS's decision that DACA recipients should

7    "prepare for and arrange their departure from the United States," App. at 2199–2200 (Talking Points);

8    App. at 1510-12 (Wong Decl. ¶ 32), therefore presents DACA recipients with the agonizing decision

9    whether to uproot their loved ones from their country of citizenship or leave them behind.  As a result of

10   the Rescission, almost two hundred thousand U.S.-citizen children face the terrifying prospect that their

11   parents may soon be deported.  The Rescission has caused some DACA recipients not to begin families

12   at all.  For example, as a result of the Rescission, plaintiff Dulce Garcia has put on hold her dream of

13   adopting a child and becoming a mother.  App. at 267–68 (Garcia Decl. ¶¶ 64, 700).

14        **3.      Injuries to State and Local Governments and Educational Institutions**

15        The Rescission is also harming DACA recipients' schools and employers, and the cities,

16   counties, and states where they reside and work.  App. at 2206–10, Topics 14, 17, 18, 22.  For example,

17   some DACA recipients have decided to cancel their enrollment at the University of California because

18   the Rescission forecloses their ability to work during and after their education.  App. at 0512 (Holmes-

19   Sullivan Decl. ¶ 18).  The University of California and other educational institutions such as the

20   California State University and the California Community Colleges, thus face the loss of their

21   investments in time, financial aid, research dollars, housing benefits, and other support, and the loss of

22   DACA students and employees is diminishing the research expertise, exchange of ideas, and cultural

23   vitality that are central to their academic missions.  App. at 2205, Topic 14; *see also id.* at 2206, Topic

24   12.  And public school districts are also struggling to effectively educate their student populations given

25   decreased attendance and the fear and stress caused by the Rescission.  App. at 353–54 (L. Gonzales

26   Decl. ¶¶ 4-5, 10); *id.* at 784–85 (Maxwell Decl. ¶¶ 9, 11).

27

28

The interests of the plaintiff States, County of Santa Clara, and City of San Jose are also being irreparably harmed by the Rescission.  The DACA program has improved the economic welfare of recipients by providing access to higher-skilled jobs, better job mobility, higher wages, and greater purchasing power.  App. at 1500 (Wong Decl. ¶ 12); *see also* App. at 2201-02, 2203, Topics 2, 5.  Recent data show that 91 percent of DACA recipients are currently employed (93 percent for those 25 years and older), and hourly wages of DACA recipients have increased by 69 percent (81 percent for those 25 years and older since the program began).  App. at 1500, 1503 (Wong Decl. ¶¶ 13, 18).

As DACA employees leave the workforce, the economy as a whole will continue to suffer enormous losses.  DACA has greatly benefited state and local economies, including plaintiff States, plaintiff County of Santa Clara, and plaintiff City of San Jose, by increasing DACA recipients' earnings and growing the tax base.  App. at 2206–07, Topic 17.  As entrepreneurs and employees, DACA recipients are achieving financial independence and purchasing cars and homes, thereby generating additional economic activity, along with tax revenue for state and local governments.  App. at 2199-2200, 2206–07, Topics 2, 17.  Over a ten-year period, it is estimated that the Rescission will cost the federal government $60 billion in lost revenue and $215 billion in lost GDP.  App. at 0073 (Brannon Decl. ¶ 11).  The comparable figures for California alone are $19 billion and $71 billion.  App. at 0073 (Brannon Decl. ¶¶ 11, 14).  State and local governments, including plaintiffs States, County of Santa Clara, and City of San Jose, also employ DACA recipients to provide important public services.  App. at 2209, Topic 18.

As DACA recipients continue to lose employment authorization, many will lose their health insurance.  App. at 716 (Lorenz Decl. ¶ 7); App. at 1310 (Santos Toledo Decl. ¶ 26); App. at 1324 (Sati Decl. ¶ 48); App. at 1448 (Tabares Decl. ¶ 14).  The resulting increase in the uninsured population will place an increased burden on emergency healthcare services in plaintiff States, plaintiff County of Santa Clara, and plaintiff City of San Jose, and will reduce overall public health as fewer people will seek medical care because they lack insurance or because they fear being reported to immigration authorities.  App. at 2206, Topic 15.

The separation of families caused by the Rescission will likely bring more children into government child welfare services programs, further increasing government costs.  App. at 0779

(Márquez Decl. ¶ 18).  Uncertainty about parental immigration status contributes to heightened levels of stress and anxiety in children.  For example, one study found that mothers' eligibility for DACA led to significant improvements in their children's mental health—improvements that will be lost because of the Rescission.  App. at 0814–16 (Mendoza Decl. ¶¶ 4, 6–8); App. at 0464–67 (Hainmueller Decl. ¶¶ 4–11).

Public safety will also suffer.  Effective local law enforcement depends on a trusting relationship between police and the communities they serve.  App. 2206, Topic 16.  DACA recipients face particular vulnerabilities once their DACA grants end, given the information they have already turned over to federal immigration authorities.  *See* App. at 2210, Topic 24.  If DACA recipients lose their protection, and fear that interactions with police could end with their deportation, they will be less likely to call the police if they are victimized or if they witness crimes.  App. at 2206, Topic 16.  By forcing these particularly vulnerable individuals back into undocumented status, the Rescission damages the public safety mission of law enforcement agencies.  *Id.*

## STANDARD OF REVIEW

A preliminary injunction is warranted where the plaintiffs establish that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities" tips in their favor, and (4) that an "injunction is in the public interest."  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)).

## ARGUMENT

### PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

Agency action cannot stand if it is arbitrary, capricious, or contrary to law, or if it is done without appropriate process.  The unexplained rescission of DACA cannot withstand the slightest scrutiny, and therefore plaintiffs are likely to succeed on the merits.

## I.    Defendants' Rescission of DACA Is Arbitrary and Capricious.

The Administrative Procedure Act "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts."  *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992).  To ensure that agency actions are reasonable and lawful, a court must

15

conduct a "thorough, probing, in-depth review" of the agency's reasoning and a "searching and careful" inquiry into the factual underpinnings of the agency's decision. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16 (1971). After undertaking that review, a court "shall" set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Butte Envtl. Council v. U.S. Army Corps of Eng'rs*, 620 F.3d 936, 945 (9th Cir. 2010).[7] As with formal rulemaking, final agency action achieved through an informal process is subject to review under § 706 of the APA. *See, e.g.*, *Perez*, 135 S. Ct. at 1209 (arbitrary and capricious review is available for agency rules that do not proceed through notice and comment); *Sacora v. Thomas*, 628 F.3d 1059, 1068–69 (9th Cir. 2010) (same).

Agency action should be set aside as arbitrary and capricious if the agency fails to explain the basis of its decision, fails to consider all relevant factors and articulate a "rational connection between the facts found and the choice made," or fails to offer a "reasoned explanation" for departures from preexisting policies. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In cases where the purported rationale for agency action is pretextual, it must be set aside without further inquiry. *See, e.g.*, *N.E. Coal. on Nuclear Pollution v. Nuclear Regulatory Comm'n*, 727 F.2d 1127, 1130–31 (D.C. Cir. 1984); *Squaw Transit Co. v. United States*, 574 F.2d 492, 496 (10th Cir. 1978); *Pub. Citizen v. Heckler*, 653 F. Supp. 1229, 1237 (D.D.C. 1986). Here, defendants violated the APA on each of these grounds.

### A.    Defendants Failed to Explain the Basis for the Rescission.

It is a "simple but fundamental rule of administrative law" that "a reviewing court . . . must judge the propriety of [agency] action solely by the grounds invoked by the agency," and not post hoc grounds articulated during litigation. *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (*Chenery II*). Meaningful judicial review cannot proceed unless "the grounds upon which the administrative agency acted [are]

---

[7]      An action under the APA requires final agency action that is ripe for review. In the motion to dismiss filed in *Batalla Vidal v. Duke*, No. 16-cv-41196 (E.D.N.Y. Oct. 27, 2017), ECF No. 95-1, defendants did not challenge finality or ripeness. If defendants take a contrary position in this case, plaintiffs will respond either in their opposition to defendants' motion to dismiss or in their reply supporting the instant motion.

clearly disclosed and adequately sustained." *Chenery I*, 318 U.S. at 94.  Accordingly, an agency action must be set aside unless its basis is "set forth with such clarity as to be understandable." *Chenery II*, 332 U.S. at 196.

The four-page Rescission memorandum flunks this basic test, inflicting grievous harm on millions of people without providing any clear explanation why.  The bulk of the document is a two-and-a-half page "Background" section that provides a generic discussion of the history of the DACA and DAPA programs, including a brief discussion of the DAPA litigation in the Fifth Circuit.  It summarizes the Attorney General's one-page September 4, 2017 letter, and quotes his assertions that DACA was "effectuated without statutory authority," and was "an unconstitutional exercise of authority by the Executive Branch."  DHS's entire purported reasoning for rescinding DACA is then set forth in a 66-word paragraph, which states in full:

> Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated.  In the exercise of my authority in establishing national immigration policies and priorities, except for the purposes explicitly identified below, I hereby rescind the June 15, 2012 memorandum.

AR 255.

This cryptic statement does not remotely meet the APA's requirement that an agency provide a reasoned basis for its actions.  *See Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("[C]onclusory statements will not do; an agency's statement must be one of reasoning." (internal citations omitted)).  Indeed, the memorandum barely states any rationale for the decision at all.  The reference to the Attorney General's one-page letter is not reasoning—the Attorney General's letter contains only a conclusory assertion that DACA is illegal.  AR 251.  Just as perplexing is the reference to the Supreme Court's purported "ruling" in the "ongoing litigation"—presumably referring to the four-four affirmance in the Texas DAPA case.  This even split was no "ruling" at all, let alone a ruling regarding DACA.  *See Neil v. Biggers*, 409 U.S. 188, 192 (1972) ("Nor is an affirmance by an equally divided Court entitled to precedential weight.").

Because DHS failed to provide any comprehensible rationale for its decision, the Rescission must be set aside.  *See Chenery II*, 332 U.S. at 196–97 ("It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must

17

be precise from what the agency has left vague and indecisive."); *Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 849 (9th Cir. 2003) (same).

**B.    Defendants Failed to Consider All Relevant Factors and Articulate a Rational Connection Between the Facts Found and the Choice Made.**

To survive review under the arbitrary-and-capricious standard, an agency must "demonstrate a rational connection between the facts it found and the choice it made."  *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 687 n.15 (9th Cir. 2007); *Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1051 (9th Cir. 2010) (same).  Although courts "defer to agency expertise on questions of methodology, they do not ignore an agency's failure to address factors pertinent to an informed decision." *Bair v. Cal. State Dep't of Transp.*, 867 F. Supp. 2d 1058, 1065 (N.D. Cal. 2012) (Alsup, J.). The Rescission addresses none of the considerations appropriate to an action of this magnitude, nor does it articulate a rational connection between the facts found and the action undertaken.

Defendants failed to consider any of DACA's numerous benefits before issuing the Rescission. *See* App. at 2199-2202, Topics 1-6; App. at 1935-36 (Nealon Dep. 151:21-152:13).  Defendants ignored DHS's own finding, when creating DACA, that "many of [the] young people [eligible for DACA] have already contributed to our country in significant ways."  AR 2.  Defendants likewise failed to evaluate the enormous economic benefits of DACA.  *See* App. at 73-74 (Brannon Decl. ¶¶ 10-16); App. at 2205-08, Topics 14, 15, 17, 18, 22; App. at 1873-75 (McCament Dep. 12:14-14:7); App. at 1936-37, 1938 (Nealon Dep. 152:15-153:2, 154:9-22) (acknowledging benefits).

Defendants also failed to assess—at all—the devastating impact that the Rescission will have on DACA recipients, their families and friends, their employers, employees, clients, or universities, or the public at large.  *See State Farm*, 463 U.S. at 52 ("reasoned decisionmaking" requires agencies to "look at the costs as well as the benefits" of their actions).  The fundamental consequence of the Rescission— that nearly 700,000 young people will be vulnerable to deportation to countries that many cannot remember—is not even mentioned.  The collateral consequences—the loss of work, the loss of the

18

PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF; MEMORANDUM IN SUPPORT
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

ability to travel, the damage to DACA recipients' mental and physical health, the destruction of human capital and potential—are not addressed either.[8]

Defendants also ignored the economic and social costs associated with the Rescission. Rescinding DACA will cause massive economic harm, depleting the country's workforce and reducing the demand for goods and services.  The American economy will lose an estimated $215 billion in GDP over ten years—a loss equivalent to the entire economic output of Oregon—and the federal government alone will lose an estimated $60 billion as a result of the Rescission.  *See* App. at 73 (Brannon Decl. ¶ 11); *see also id.* ¶ 14.  None of these costs were referenced in the Rescission or incorporated into the agency's decision-making process.  *See Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015) (ignoring cost, even where the relevant statutes "leave[] agencies with flexibility," constitutes arbitrary and capricious action).

Defendants also ignored the Rescission's infringement on core constitutional interests.  For example, DACA recipients are already being deprived of the ability to travel internationally or practice particular professions.  *See, e.g.*, *Lester v. Parker*, 235 F.2d 787, 789 (9th Cir. 1956) (recognizing the "constitutionally protected right to work"); *Greene v. McElroy*, 360 U.S. 474, 492 (1959) (recognizing the constitutionally protected right to "hold specific private employment and to follow a chosen profession"); *Kent v. Dulles*, 357 U.S. 116, 125-26 (1958) (recognizing that the right to travel abroad is a constitutionally protected liberty interest).  The interests of educational institutions in choosing whom they will educate and to create a rich and diverse academic climate informed by DACA recipients' perspectives—central aspects of academic freedom protected by the First Amendment—are also being seriously impaired.  *See* App. at 504 (Hexter Decl. ¶ 14).[9]

---

[8]    *See, e.g.*, App. at 724-25 (Lucey Decl. ¶¶ 19-20) (Rescission impacting medical students' decisions as to whether to enter National Residency Matching Process); App. at 186 (Doe 1 Decl. ¶ 19) (Rescission causing uncertainty about ability to become a lawyer); App. at 1324 (Sati Decl. ¶¶ 45-46) (Rescission causing uncertainty about ability to complete professional school).

[9]    Academic freedom is a First Amendment right that protects a university's right "to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study."  *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 312 (1978) (internal citation omitted).

19

PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF; MEMORANDUM IN SUPPORT
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

1   The administrative record here reflects none of the consideration of the benefits or costs that

2   normally would be relevant to agency decisions.  Indeed, the decision to rescind DACA was reached

3   after just two-and-a-half hours of meetings and a handful of follow-up conversations.  *See, e.g.*, App. at

4   1878-80, 1884-89, 1890-92 (McCament Dep. 72:22-75:17, 124:22-128:16, 130:2-132:7); App. at 1911-

5   26 (Hamilton Dep. 98:6-113:15).  The decision was made without input from any of a host of interested

6   or knowledgeable sources.  *See, e.g.*, App. at 1942-45 (Nealon Dep. 165:3-168:18); App. at 1904-06

7   (McCament Dep. 240:20-242:5); App. at 2023-24 (Neufeld Dep. 187:6-188:8).  Indeed, the agency did

8   not even consult with its own personnel responsible for immigration enforcement.  *See* App. at 2192-93,

9   2196 (Miller Dep. 99:12-19, 100:3-7, 204:1-21).

10   As far as the record reveals, there was no policy rationale for the Rescission at all.  Where, as

11   here, there "are no findings and no analysis . . . to justify the choice made," the APA "will not permit" a

12   court to accept the agency's decision.  *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167

13   (1962); *see also Crickon v. Thomas*, 579 F.3d 978, 985 (9th Cir. 2009) (same).

14   **C.      Defendants Failed to Offer a Reasoned Explanation for Their Reversal of Policy.**

15   When the government reverses its own earlier policy, it has an even greater burden to justify its

16   actions.  The agency must "acknowledge and provide an adequate explanation for its departure from

17   established precedent, and an agency that neglects to do so acts arbitrarily and capriciously."  *Jicarilla*

18   *Apache Nation v. U.S. Dep't of the Interior*, 613 F.3d 1112, 1119 (D.C. Cir. 2010) (internal citation

19   omitted); *see also Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (agency cannot

20   depart from prior policy without "explaining its changed position").  Thus, reversing a pre-existing

21   policy requires a "more detailed justification than what would suffice for a new policy created on a

22   blank slate."  *Fox*, 556 U.S. at 515.

23   Here, the Rescission represents a 180-degree reversal of DHS's prior position on the merits of

24   deferred action and the legality of DACA.  In introducing the program in 2012, the agency explained

25   that DACA was "necessary to ensure that [DHS's] enforcement resources are not expended on [] low

26   priority cases but are instead appropriately focused on people who meet our enforcement priorities."  AR

27   1.  It further explained:

28

20

PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF; MEMORANDUM IN SUPPORT
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

1

2

> Our Nation's immigration laws must be enforced in a strong and sensible manner.  They are not designed to be blindly enforced without consideration given to the individual circumstances of each case.  Nor are they designed to remove productive young people to countries where they may not have lived or even speak the language.  Indeed, many of these young people have already contributed to our country in significant ways.  Prosecutorial discretion, which is used in so many other areas, is especially justified here.

3

4

5

AR 2.  The Rescission did not address these findings at all.

6

With respect to the program's legality, just two years ago, the government defended DACA

7

before the Ninth Circuit, stating that DACA was "a valid exercise of the Secretary's broad authority and

8

discretion to set policies for enforcing the immigration laws, which includes affording deferred action

9

and work authorization to certain aliens who, in light of real-world resource constraints and weighty

10

humanitarian concerns, warrant deferral rather than removal."  United States' Br. as Amicus Curiae,

11

*Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957 (9th Cir. 2017), *petition for cert. filed*, No. 15-15307

12

(U.S. Mar. 31, 2017), 2015 WL 5120846 at *1.[10]  DHS made similar arguments before the Fifth Circuit

13

in 2014.  *See* Br. for United States, *Crane v. Johnson*, 783 F.3d 244 (5th Cir. 2015) (No. 14-10049),

14

2014 WL 10657553; *see also* Br. for United States at 23, *Crane*, 2012 WL 6633751 ("It is in the public

15

interest to focus the government's limited resources to the enforcement of its highest priority cases—

16

such as aliens who pose national security risks, serious criminals, and repeat offenders, rather than to

17

aliens who arrived in the United States as children and have no criminal record.").

18

Because the Rescission did not address the policy merits of DACA at all, it did not begin to

19

evaluate the reliance interests engendered by the program.  *Perez*, 135 S. Ct. at 1209 (government must

20

provide special justification "when its prior policy has engendered serious reliance interests that must be

21

taken into account").  The policy justification for the program has become ever stronger as DACA

22

recipients, in reliance on the program, have become more educated, better-employed, and even more

23

embedded in the fabric of American life.  *See supra* Background § C.  Since 2012, DACA recipients

24

have structured their lives around the program, making decisions to get married, start families, take out

25

26

[10]     The Ninth Circuit concluded that Arizona's policy of rejecting documents issued to DACA recipients as proof of authorized presence for the purpose of obtaining a state driver's license was preempted by federal law, but declined to consider the legality of DACA.  *Ariz. Dream Act*, 855 F.3d at 975.

27

28

21

1  loans, enroll in graduate programs, and build careers in reliance on the government's promises and

2  representations.  *See, e.g.*, App. at 2199-2201, Topics 1, 2, 4, 5.

3         Employers, employees, and institutions likewise have made important decisions in reliance on

4  the government's representations about DACA.  For example, educational institutions like UC have

5  admitted and hired DACA recipients, with the expectation that they would be able to live and teach,

6  research, pursue professional careers, or otherwise work in the United States for the foreseeable future.

7  *See, e.g.*, App. at 2205-06, Topic 14.  As DACA recipients are being forced to abandon their work and

8  studies—in many cases dropping out of degree programs—their employers and educational institutions

9  are losing the benefits they derive from the contributions of DACA recipients, as well as the value of the

10 considerable time, effort, energy, and financial resources invested in them.  *See, e.g.*, App. at 2205-06,

11 2208, Topics 14, 22.  The elimination of DACA will force "systemic, significant changes" to these

12 institutions, *see Encino Motors*, 136 S. Ct. at 2126, disrupting education, research, and health care as

13 DACA-recipient teachers, scientists, and hospital workers can no longer fulfill those roles.

14        The Rescission's failure to weigh the reliance interests created by DACA renders it untenable.

15        **D.     The Rescission Appears to Rely on a False Legal Premise.**

16        In his one-page letter, the Attorney General opined that DACA was illegal and should be

17 rescinded.  In the Rescission memorandum, the Acting Secretary stated that she was taking this letter

18 "into consideration."  AR 254–55.  To the extent the Rescission depends on a conclusion that DACA

19 was illegal, that conclusion is wrong: DACA was a lawful exercise of DHS's enforcement discretion.

20 And if, contrary to the Attorney General's letter, DACA is legal, then the Rescission must be set aside.

21 *See, e.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 532 (2007); *Chenery I*, 318 U.S. at 94 ("[A]n order may

22 not stand if the agency has misconceived the law."); *Safe Air for Everyone v. EPA*, 488 F.3d 1088, 1101

23 (9th Cir. 2007); *Locke*, 626 F.3d at 1051; *see also Phillips Petroleum Co. v. FERC*, 792 F.2d 1165,

24 1170–71 (D.C. Cir. 1986) (rejecting agency interpretation of statute where agency's position "was based

25 solely on its erroneous reading" of a Supreme Court case and agency "believed itself bound by" that

26 case).

27

28

### 1.     DACA Is a Lawful Exercise of Enforcement Discretion

Contrary to the Attorney General's assertion that DACA was an unconstitutional exercise of authority by the Executive Branch, DACA was a lawful exercise of well-established enforcement discretion that has been conferred by Congress.  Deferred action programs like DACA are a lawful exercise of the Secretary's broad statutory authority to "[e]stablish[] national immigration enforcement policies and priorities," 6 U.S.C. § 202(f), and to carry out the "administration and enforcement of th[e INA] and all other laws relating to the immigration and naturalization of aliens," 8 U.S.C. § 1103(a), including by authorizing aliens to be lawfully employed, 8 U.S.C. § 1324a(h)(2).

Prosecutorial discretion is well-recognized as important to the enforcement of the immigration laws.  *See Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490 (1999).  This is true both because "[d]iscretion in the enforcement of immigration law embraces immediate human concerns," such as which individuals "pose less danger than" others, *Arizona v. United States*, 567 U.S. 387, 396 (2012), and because there are many more removable aliens than there are enforcement resources.  See AR 4 ("[A]lthough there are approximately 11.3 million undocumented aliens in the country, [DHS] has the resources to remove fewer than 400,000 such aliens each year."); *see also* 8 U.S.C. § 1103(a)(3) (granting DHS Secretary authority to "establish such regulations; . . . issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the [INA]").  Deferred action is explicitly contemplated in DHS's regulations and "has become a regular feature of the immigration removal system that has been acknowledged by both Congress and the Supreme Court."  AR 16.  As set forth above, DHS has often exercised enforcement discretion on not just an individual but a programmatic basis, dating to the 1950s.  *See* Background § A.

DACA is entirely consistent with earlier deferred action programs and is a reasonable exercise of DHS's enforcement authority under the INA.  DACA is explicitly framed as an exercise of prosecutorial discretion.  *See* AR 1 (2012 DACA Memorandum sets forth how "in the exercise of our prosecutorial discretion, the Department of Homeland Security (DHS) should enforce the Nation's immigration laws").  The 2012 DACA Memorandum identifies certain categories of "criteria" that "should be satisfied before an individual is considered for an exercise of prosecutorial discretion."  *Id.*  Some of the criteria provide guidelines for how DHS employees are to exercise their discretion, such as whether the

23

PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF; MEMORANDUM IN SUPPORT
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

individual "poses a threat to national security or public safety." *Id.* Moreover, the 2012 DACA

Memorandum instructs DHS officials to take deferred action under the policy only "on an individual"

and "case by case basis," and to give "consideration . . . to the individual circumstances of each case."

AR 2. Just like past deferred action programs, DACA is a use of "[d]iscretion in the enforcement of

immigration law" to "embrace[] immediate human concerns" by deprioritizing enforcement for those

who were brought to this country as children, have clean records, and have lived continuously in the

United States since 2007. *Arizona*, 567 U.S. at 396. ("The equities of an individual case may turn on

many factors, including whether the alien has . . . long ties to the community.").

Merely because the creation of DACA was an act of prosecutorial discretion does not mean,

however, that the *termination* of DACA is unreviewable. First, courts have emphasized that judicial

review of general enforcement policies should proceed. *See, e.g.*, *Crowley Caribbean Transp., Inc. v.

Peña*, 37 F.3d 671, 676 (D.C. Cir. 1994) ("[A]n agency's statement of a general enforcement policy may

be reviewable for legal sufficiency where the agency has . . . articulated it in some form of universal

policy statement."); *Edison Elec. Inst. v. EPA*, 996 F.2d 326, 333 (D.C. Cir. 1993) (distinguishing

between a reviewable "Enforcement Policy Statement" and the unreviewable particularized enforcement

decision); *Kenney v. Glickman*, 96 F.3d 1118, 1123 (8th Cir. 1996) (same and collecting cases)). Here,

plaintiffs challenge DHS's wholesale rescission of a program—a clearly justiciable policy choice.

Second, DHS's decision to rescind DACA appears to be based on a legal determination

regarding the legality of DACA. Such legal questions fall squarely within the core function of the

judiciary; there is "law to apply," and the policies underlying judicial deference to executive discretion

do not come into play. *See, e.g.*, *Int'l Longshoremen's & Warehousemen's Union v. Meese*, 891 F.2d

1374, 1378–79 (9th Cir. 1989) (permitting judicial review of advisory opinion and policy statement in

light of agency's interpretation of its organic statute); *Edison*, 996 F.2d at 333 (explaining that plaintiffs'

challenge to agency policy statement involves a challenge to "the [agency's] interpretation of [the Act]

and its implementing regulations . . . Clearly, this interpretation has to do with the substantive

requirements of the law; it is not the type of discretionary judgment [that is] shield[ed] from judicial

review."); *Pinho v. Gonzales,* 432 F.3d 193, 203-04 (3d Cir. 2005) ("purely legal determinations made

24

PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF; MEMORANDUM IN SUPPORT
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

by the agency [ ] remain subject to judicial review").  Courts can and should say what the law is, rather than abdicating that function to administrative agencies.

> ## 2.    The *Texas* Decision Is Neither Controlling Nor Persuasive with Respect to DACA

The Attorney General's one-page letter focused on a Fifth Circuit decision affirming a preliminary injunction of DAPA.  *See* AR 51; *see also* AR 253–255 (citing *Texas v. United States* (*Texas II*), 809 F.3d 134 (5th Cir. 2015)).  To the extent the Rescission was based on the premise that *Texas* was controlling or persuasive authority for a finding that DACA was illegal, that premise is mistaken.

First, *Texas* did not even purport to decide the legality of DACA.  *See, e.g.*, *Texas II*, 809 F.3d at 172–73 (observing that although district court's "finding was partly informed by analysis of the implementation of DACA, the precursor to DAPA, any extrapolation from DACA [to DAPA] must be done carefully"); Br. for Pet'rs at 59, *Texas*, 2016 WL 836758 ("This suit does not challenge the original DACA policy.").

Second, *Texas* is an out-of-circuit case that does not control this Court or the Ninth Circuit.  *See, e.g.*, *Int'l Chem. Workers Union Council of the United Food & Commercial Workers Int'l v. NLRB*, 467 F.3d 742, 748 n.3 (9th Cir. 2006).[11]  The Supreme Court's four-four deadlock, *see United States v. Texas*, 136 S. Ct. 2271 (2016), is not a precedential ruling either.  *See Neil v. Biggers*, 409 U.S. at 192 ("If the judges are divided, the reversal cannot be had, for no order can be made.").

Third, the executive branch's formal public statements affirming DACA's legality are more persuasive and relevant to evaluating the Rescission than *Texas*'s provisional evaluation of DAPA.  The Office of Legal Counsel expressed its "preliminary view" in 2014 that DACA is "permissible."  AR 21 n.8.  And the government has vigorously advocated DACA's legality in court, explaining that the program is "a valid exercise of the Secretary's broad authority and discretion to set policies for

---

[11]    The Fifth Circuit issued two decisions in *Texas*—one denying the government's motion for a stay pending appeal, *see Texas v. United States*, 787 F.3d 733 (5th Cir. 2015) (*Texas I*), and a second affirming a preliminary injunction of the DAPA program, *see Texas II*, 809 F.3d 134.  Both decisions are accompanied by powerful, lengthy dissents.  *See Texas II*, 809 F.3d at 188-219 (King, J., dissenting); *Texas I*, 787 F.3d at 769-84 (Higginson, J., dissenting).

25

1    enforcing the immigration laws."  United States' Br. as Amicus Curiae, *Arizona Dream Act*, 2015 WL

2    5120846; *see also* Br. for United States, *Crane*, 2014 WL 10657553; Br. for United States, *Crane*, 2012

3    WL 6633751; Br. for Pet'rs at 59–60, *Texas*, 2016 WL 836758.

4         *Fourth*, *Texas* is distinguishable on the facts and the law.  DAPA was a deferred action program

5    for certain individuals who were parents of U.S. citizens or lawful permanent residents.  *See Texas II*,

6    809 F.3d at 191 (King, J., dissenting).  The Fifth Circuit found that DAPA was not actually discretionary

7    and therefore violated the APA's notice-and-comment procedures.  *See id.* at 170–78.  The same cannot

8    be said for DACA.  *See* Letter to Judge Garaufis from Counsel for Defs. at 5, *Batalla Vidal v. Duke*, No.

9    16-cv-4756 (E.D.N.Y. Sept. 29, 2017) (Dkt. No. 69) ("the original DACA policy itself . . . is an exercise

10   of 'prosecutorial discretion' that is 'a special province of the Executive'").  Indeed, the Fifth Circuit has

11   acknowledged that the 2012 DACA Memorandum "makes it clear that [ICE] Agents shall exercise their

12   discretion in deciding to grant deferred action, and this judgment should be exercised on a case-by-case

13   basis."  *Crane v. Johnson*, 783 F.3d 244, 254-55 (5th Cir. 2015).

14        Moreover, the Fifth Circuit concluded that DAPA was foreclosed by statute because the INA

15   contained "an intricate process for illegal aliens to derive a lawful immigration classification from their

16   children's immigration status," and DAPA was inconsistent with the statutory scheme.  *Texas II*, 809

17   F.3d at 179; *see also id.* at 186.  There is no comparable pathway for individuals brought to this country

18   as children.

19        The Fifth Circuit further suggested that the large number of individuals potentially eligible for

20   DAPA suggested administrative overreach.  *See id.* at 181, 183.  But more than one-third of the entire

21   undocumented population was eligible for DAPA, compared with less than ten percent potentially

22   eligible for deferred action under DACA.  *See id.* at 148, 174 n.138.

23        *Fifth* and finally, any application of the Fifth Circuit's reasoning to DACA would be unfounded,

24   as the government argued to the Supreme Court.[12]  The Fifth Circuit's ruling depended heavily on the

25   invalid inference that because an allegedly low percentage of DACA applications had been denied based

26   on discretionary reasons, the discretion embedded in the DAPA program might be illusory.  *See id.* at

27   _____

28   [12]    *See* Br. for Pet'rs, *Texas*, No. 15-674, 2016 WL 836758 (Mar. 1, 2016).

172-76.  But it was entirely consistent with the reasonable exercise of discretion for there to be a low denial rate for DACA.  As even the Fifth Circuit recognized, "DACA involve[s] . . . self-selecting applicants, and persons who expect[] to be denied relief would seem unlikely to apply."  *Texas II*, 809 F.3d at 174; *see also id.* ("Eligibility for DACA was restricted to a younger and less numerous population, which suggests that DACA applicants are less likely to have backgrounds that would warrant a discretionary denial." (footnote omitted)).  A declaration from Donald Neufeld, Associate Director for USCIS Service Center Operations confirmed that "deferred action under DACA is a case-specific process that necessarily involves the exercise of the agency's discretion"; identified "several instances of discretionary denials"; and noted "that approximately 200,000 requests for additional evidence had been made upon receipt of DACA applications."  *Id.* at 175 (alteration and internal quotation marks omitted).

The Fifth Circuit also improperly conflated two separate concepts—lawful *presence* and legal *status*—in finding DAPA was a grant of legal status foreclosed by the INA.  Those are immigration law terms of art that are distinct.  "Whereas legal status implies a right protected by law, legal presence simply reflects an exercise of discretion by a public official."  *Texas I*, 787 F.3d at 774 (Higginson, J., dissenting) (internal citation and emphasis omitted); *see also Texas II*, 809 F.3d at 199 (King, J., dissenting); Reply Br. for Pet'rs at 16-18, *Texas*, 2016 WL 75049.  DACA does not confer a legal status under the immigration laws, which only Congress can do.  Instead, it confers at most lawful presence.

In sum, the Rescission cannot be justified on the premise that *Texas* dictates a finding that DACA was illegal.

### 3.    Purported "Litigation Risk" Cannot Justify the Rescission

Despite the letter from Attorney General Sessions, the government has not in this litigation nor in *Batalla Vidal* asserted that DACA was illegal.  Instead, it has retreated to the position that DHS could rescind DACA based on mere "litigation risk" stemming from a threat by nine state attorneys general that they would seek to amend their complaint in the *Texas* case to encompass DACA.  This post hoc explanation was not asserted at the time of the Rescission and cannot be accepted as a justification for DHS's action.  *Chenery II*, 332 U.S. at 196.

27

1    Nor can the "litigation risk" rationale withstand scrutiny.  "Litigation risk," standing alone, is not

2    a sufficient reason for the federal government to do anything.  The senior DHS official responsible for

3    drafting the Rescission has testified that acting on the basis of "litigation risk" is the "craziest policy you

4    could ever have" as a basis for government action.  App. at 1928-26 (Hamilton Dep. 207:20-208:11);

5    *see also* App. at 1938-39 (Nealon Dep. 154:23-155:11) (not aware of any other policy rescinded due to

6    litigation risk); App. at 2025 (Neufeld Dep. 189:8-22) (not aware of termination of other deferred action

7    programs due to litigation risk or illegality).

8    This case and others illustrate the hollowness of the "litigation risk" rationale.  Far from

9    eliminating "litigation risk," the rescission of DACA predictably prompted at least nine lawsuits,

10   including suits by 19 state attorneys general, as well as universities, cities and counties, private

11   individuals, a union, and a civil rights group.  App. at 2090 (Becerra Letter).  Thus, "[a]t most, the

12   Department deliberately traded one lawsuit for another."  *Organized Vill. of Kake v. U.S. Dep't of*

13   *Agric.*, 795 F.3d 956, 970 (9th Cir. 2015) (agency's desire to avoid litigation did not satisfy its

14   obligation to provide a reasoned explanation for its change in policy); *see also Int'l Union, United Mine*

15   *Workers of Am. v. U.S. Dep't of Labor*, 358 F.3d 40, 44 (D.C. Cir. 2004) (litigation risk was not valid

16   grounds on which to act); *California ex rel. Lockyer v. U.S. Dep't of Agric.*, 459 F. Supp. 2d 874, 904

17   (N.D. Cal. 2006) ("legal uncertainty alone [is not] a sufficient justification" for agency action); *Sierra*

18   *Club v. Jackson*, 833 F. Supp. 2d 11, 34 (D.D.C. 2012) (similar).

19   To tolerate the "litigation risk" rationale—which could apply to virtually any agency action—

20   would be to countenance an end-run around the APA.  An agency could ignore the policy merits of any

21   issue and simply cite litigation risk as a basis for its action.  This is untenable.  *Cf. Mexichem Specialty*

22   *Resins, Inc. v. EPA*, 787 F.3d 544, 557 (D.C. Cir. 2015) ("The risk is that an agency could circumvent

23   the rulemaking process through litigation concessions, thereby denying interested parties the opportunity

24   to oppose or otherwise comment on significant changes in regulatory policy.  If an agency could engage

25   in rescission by concession, the doctrine requiring agencies to give reasons before they rescind rules

26   would be a dead letter.").

27   Even taking "litigation risk" on its own terms, the administrative record does not contain any

28   intelligent assessment of litigation risk that could withstand APA review.  A reasonable litigation risk

assessment would have to address the probability of prevailing in the district courts, the courts of appeals, and the Supreme Court, the timing of any resolution and the prospects of a stay of an adverse judgment, and the risks of litigation weighed against the benefits of DACA, among other factors.  A reasonable litigation risk analysis would have to consider the government's prior position that DACA was legal.  A reasonable analysis would also need to address the government's current position that the legality of deferred action programs such as DACA is non-justiciable.  If the government were right about that, then there would be no "litigation risk" justifying the Rescission.

The administrative record reflects no consideration of any of these factors.  Nor does it reflect any consideration of reasonable policy alternatives that could mitigate "litigation risk" while maintaining the benefits of DACA.  The government's "litigation risk" rationale cannot support the Rescission.

### E.   The Announced Reason for the Rescission Was Pretextual

The government's failures to provide a clear explanation for the Rescission, to address DACA's benefits, or to justify the government's reversal of position, suggest that the stated reasons for acting are not the true reasons.  In addition, the circumstances surrounding the announcement of the Rescission, and subsequent actions by DHS, DOJ, and the White House, show that the Attorney General's articulated reason for the Rescission—the supposed illegality of DACA—is pretextual:

- The very same day as the Rescission, the President tweeted:  "Congress now has 6 months to legalize DACA (something the Obama Administration was unable to do).  If they can't, I will revisit this issue!"[13]  But if the rationale for the Rescission were a genuine belief that DACA was illegal, there would be no basis to "revisit this issue" and possibly reinstate an illegal policy.

- DHS did not immediately terminate DACA.  Instead, it announced that it would continue processing renewal applications for an additional month for benefits that expired between September 5, 2017 and March 5, 2018, and would recognize DACA grants already conferred, leaving the program in place for at least an additional six months.  If DACA were illegal, DHS would have no basis to leave it in place for months and years.

- On October 18, 2017, the Attorney General testified to Congress that DACA could be legal under the *Texas* case if it were implemented "on an individualized basis."  *See Oversight of the U.S. Department of Justice: Hearing before the S. Comm. on the Judiciary*, 115th Cong. (2017) (testimony of Jefferson B. Sessions, Att'y Gen. of the United States), available at

---

13    *See* Donald J. Trump (@realDonaldTrump), Twitter (Sept. 5, 2017, 8:38 PM), https://twitter.com/realDonaldTrump/status/905228667336499200.

https://www.judiciary.senate.gov/meetings/10/18/2017/oversight-of-the-us-department-of-justice.  If DACA "lacks statutory authority" and was "an unconstitutional exercise of authority by the Executive Branch," no manner of implementation by DHS could make it legal.

- The motion to dismiss filed by the government in *Batalla Vidal* makes no argument that DACA was effectuated without statutory authority or was an unconstitutional exercise of authority, but relies instead on the "litigation risk" justification.

- The Senior Counselor to the Acting Secretary of DHS, who *drafted* the Rescission, undercut the litigation risk justification when he testified that a policy of reacting to litigation threats would be the "craziest policy you could ever have" because "you could never do anything if you were always worried about being sued."  App. at 1928-26 (Hamilton Dep. 207:20-208:11).

- In their motion to dismiss in *Batalla Vidal*, defendants contend that the rescission of DACA is not reviewable under the APA and that the notice and comment requirement, 5 U.S.C. § 553, does not apply to the Rescission.  However, if defendants really believed that the *Texas* decision presented an unmanageable litigation risk, they also must believe that the *Texas* decision correctly held that a program like DACA is reviewable and that the notice-and-comment requirement applies.

These facts show that the decision to rescind DACA could not have been based on a good-faith belief that the program was unsupported by legislative authority, was an unconstitutional exercise of authority by the executive branch, or presented unmanageable litigation risk.  *Cf. Hernandez v. Hughes Missile Sys. Co.*, 362 F.3d 564, 569 (9th Cir. 2004) (conflicting explanations may serve as evidence of pretext); *E.E.O.C. v. Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d Cir. 1994) (same).

The true reason for the Rescission appears to have been revealed on October 8, 2017, when President Trump sent a letter to Congressional leaders setting forth the "Immigration Principles and Policies" that he said "must be included as part of any legislation addressing the status of [DACA] recipients."  App. at 1990-99.  The *New York Times* described the "Principles and Policies" as "a long list of hard-line immigration measures," including funding for a border wall.  App. at 2004.  This evidence, linking the Rescission to the administration's legislative strategy, suggests that the decision to rescind DACA was a cynical ploy to make DACA recipients a bargaining chip in order to secure support for harsh immigration legislation from members of Congress who support DACA recipients and would not otherwise support the administration's immigration agenda.  A complete administrative record and further discovery, if permitted by the court of appeals, will enable the parties to prove or disprove this

30

PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF; MEMORANDUM IN SUPPORT
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

point.[14]  But the current record of shifting explanations is enough evidence of pretext to warrant setting aside the Rescission.  *See Pub. Citizen*, 653 F. Supp. at 1237 ("For an agency to say one thing . . . and do another . . . is the essence of arbitrary action.  It indicates that the Secretary's stated reason may very well be pretextual." (citation omitted)); *see also New England Coal. on Nuclear Pollution*, 727 F.2d at 1130–31 (agency action arbitrary and capricious where agency's stated reason does not line up with action); *Squaw Transit Co.*, 574 F.2d at 496 (agency action is arbitrary and capricious where it "does not apply the criteria it has announced as controlling").

## II.     The Rescission Should Be Vacated Because It Is a Substantive Rule That Did Not Comply with the APA's Notice and Comment Requirements

The Rescission also fails to meet the APA's procedural requirements.  The Rescission is a categorical rule limiting the power of DHS to exercise discretion, and DHS was therefore required to abide by the full panoply of APA procedures including notice and comment in order to promulgate it.  It did not do so.

Under the APA, substantive rules must go through notice and comment rulemaking before they become effective.  *San Diego Air Sports Ctr., Inc. v. F.A.A.*, 887 F.2d 966, 971 (9th Cir. 1989); *see also* 5 U.S.C. § 551(5) (defining "rule making" to include "repealing a rule").  A rule is substantive if it "narrowly limits administrative discretion" or establishes a "binding norm" that "so fills out the statutory scheme that upon application one need only determine whether a given case is within the rule's criterion."  *Colwell v. Dep't of Health & Human Servs.*, 558 F.3d 1112, 1124 (9th Cir. 2009) (internal citation omitted).  The ultimate question in discerning between substantive rules and non-binding policy statements "is the agency's intent to be bound."  *Municipality of Anchorage v. United States*, 980 F.2d 1320, 1325 (9th Cir. 1992) (internal citation omitted).

The Rescission is a substantive rule at least because it (1) binds DHS and limits its discretion, and (2) bans DACA recipients from applying for and traveling on advance parole.

---

[14]     Pretextuality is one of the forms of "bad faith or improper behavior" that warrants discovery from agency decisionmakers.  *Overton Park*, 401 U.S. at 420.

1    There can be no dispute that DHS intends to be bound by the Rescission, and that the Rescission

2    limits the agency's discretion.  *See Colwell*, 558 F.3d at 1124; *Cmty. Nutrition Inst. v. Young*, 818 F.2d

3    943, 948 (D.C. Cir. 1987) ("cabining of an agency's prosecutorial discretion can in fact rise to the level

4    of a substantive, legislative rule").  The Rescission is a blanket prohibition that DHS and its agents must

5    apply in all DACA cases.  As of September 5, 2017, DHS is flatly prohibited from accepting new

6    DACA applications, and as of October 5, 2017, is flatly prohibited from issuing DACA renewals.

7    Unlike DACA, the Rescission makes no exceptions for case-by-case determinations.  *See, e.g.*, AR 255

8    (stating that DHS will "reject all DACA renewal requests and associated applications for Employment

9    Authorization Documents filed outside of the parameters" set forth in the Rescission).[15]  By its terms,

10   the Rescission thus ensures that new or renewed requests for deferred action will be categorically

11   denied.  Such mandatory language evinces a substantive rule.  *See Anchorage*, 980 F.2d 1324 (the

12   "critical factor" in evaluating the substantive nature of an agency action is "the extent to which the

13   challenged [action] leaves the agency, or its implementing official, free to exercise discretion to follow,

14   or not to follow, the [announced] policy in an individual case" (internal citation omitted)); *Alaska v. U.S.*

15   *Dep't of Transp.*, 868 F.2d 441, 447 (D.C. Cir. 1989) (holding that agency order was a rule in part due to

16   "mandatory language cabining DOT's enforcement discretion").  The Rescission's only reference to

17   DHS's discretion is its discretion to *terminate*, not continue, grants of deferred action.  *See* AR 255

18   (DHS will "continue to exercise its discretionary authority to terminate or deny deferred action at any

19   time when immigration officials determine termination or denial of deferred action is appropriate").

20      The Rescission is similarly categorical and substantive in banning current DACA recipients from

21   receiving advance parole based on their DACA eligibility.  *See id.* (DHS "[w]ill not approve any new

22   Form I-131 applications for advance parole under standards associated with the DACA program" and

23   "[w]ill administratively close all pending Form I-131 applications" filed under DACA program).  The

---

[15]    While the face of the Rescission admits no exceptions, DHS's website states that it "will
consider DACA requests received from residents of the U.S. Virgin Islands and Puerto Rico on a case-
by-case basis."  App. at 1894-95  (McCament Dep. 189:15-190: 13, 192:18-22) (USCIS not considering
whether to accept late applications from other geographic areas subject to natural disasters aside from
Puerto Rico and U.S. Virgin Islands); App. at 2011-12 (Neufeld Dep. 113:2-114:18) (similar).  *See also*
https://www.uscis.gov/archive/i-821d.

1    ban on advance parole is a "binding norm," such that DHS officials "need only determine whether a

2    given case is within the [the Rescission]'s criterion"; i.e., whether an individual with DACA seeks

3    advance parole.  *See Colwell*, 558 F.3d at 1124.

4           By creating a categorical rule barring DACA recipients from renewing their grants of deferred

5    action and precluding new potential DACA recipients from obtaining deferred action under DACA,

6    DHS promulgated a substantive rule without following the proper procedures including notice and

7    comment, *see* 5 U.S.C. § 553, and an assessment of effects on small entities, *see* 5 U.S.C. § 604(a).  The

8    Rescission must therefore be set aside.  *See Paulsen v. Daniels*, 413 F.3d 999, 1003-04 (9th Cir. 2005)

9    (concluding that Bureau of Prisons "plainly violated the APA" by promulgating a rule that barred

10   category of prisoners from relief without notice).

11          In this regard, it is irrelevant that the 2012 DACA Memorandum did not go through the notice-

12   and-comment process.  DACA was an exercise of prosecutorial discretion and not required to go

13   through notice and comment.  *See* 5 U.S.C. § 553(b)(A); *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993).  By

14   contrast, the Rescission does not present itself as an exercise of DHS's discretion, and in fact prohibits

15   the exercise of discretion in the adjudication of applications for deferred action.

16          In addition, DHS's obligation to follow notice-and-comment procedures for the Rescission exists

17   whether or not DACA itself went through such procedures.  *See* 5 U.S.C. § 551(5) (defining "rule

18   making" to include "repealing a rule"); *see also Consumer Energy Council of Am. v. FERC*, 673 F.2d

19   425, 448 (D.C. Cir. 1982) ("[T]he argument that repeal was required because the regulations were

20   defective does not explain why notice and comment could not be provided."); *id.* at 447 n.79 (allowing

21   repeal, without notice and comment, of a defective rule "would ignore the fact that the question whether

22   the regulations are indeed defective is one worthy of notice and an opportunity to comment").  As the

23   Ninth Circuit observed, "when the government seeks to repeal a regulation, it is generally not bound for

24   [notice-and-comment] purposes by the way it classified that regulation at the time of its promulgation."

25   *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1018 n.12 (9th Cir. 1987).

26          Under strikingly similar circumstances, the blanket rescission of a deferred action program has

27   been found to require notice and comment, even where the deferred action program itself was adopted

28   without such procedures.  *See Parco*, 426 F. Supp. at 980–81 (holding that memorandum revoking

33

existing discretion of immigration officials to extend indefinitely the voluntary departure of certain categories of immigrants must be subjected to notice and comment).  Because the rescission in *Parco* left no discretion for agency officials considering requests for deferred action, it was "in reality a flat rule of eligibility" requiring notice and comment.  *Id.* at 984-85 (distinguishing *Noel v. Chapman*, 508 F.2d 1023 (2d Cir. 1975), which considered a program providing the agency official "sole discretion" over applications for departure extensions).

The Rescission illustrates why the notice-and-comment process is so important.  The record developed through a proper procedure would have ensured that DHS did not "undo all that it accomplished" through DACA "without giving all parties an opportunity to comment on the wisdom" of that action.  *See Consumer Energy Council of Am.*, 673 F.2d at 446.  Had DHS considered the evidence that would have been presented in the notice-and-comment process—such as the Rescission's devastating effects on DACA recipients and their families and its broader consequences for employers, educators, and the economy—the Rescission could not reasonably have been adopted.

### PLAINTIFFS SATISFY THE REMAINING REQUIREMENTS FOR INJUNCTIVE RELIEF

The other preliminary injunction requirements are likewise satisfied because plaintiffs will suffer irreparable harm without provisional relief, the balance of equities tips sharply in their favor, and provisional relief is in the public interest.

### I.    Plaintiffs Face Irreparable Harm.

The Rescission is already inflicting severe and irreparable harm on plaintiffs, as discussed above and in the attached Appendix.  DACA recipients, including the individual plaintiffs and DACA-recipient UC students, have already lost eligibility to travel using advance parole, in some cases with irreparable consequences for their careers.  App. at 2210, Topic 23.  They are being forced right now to make decisions with life-altering personal and professional consequences—such as whether to pursue or continue professional educations and whether to forego the process for matching to a medical residency, an opportunity virtually impossible to recover.  App. 2204-2206, 2209, Topics 9-12, 20.  The "loss of opportunity to pursue one's chosen profession constitutes irreparable harm."  *Ariz. Dream Act Coalition v. Brewer*, 855 F.3d 957, 978 (9th Cir. 2017).  This irreparable injury is further "exacerbated by Plaintiffs' young age and fragile economic status."  *Id.*

The Rescission has caused serious emotional harm to the individual plaintiffs and DACA-recipient university and community college students, who have lost the security of knowing they will be able to live and work in the United States and are experiencing resulting anxiety, depression, and fear. *See* App. at 2204-05, Topics 12-13; *see also* App. at 2202, Topic 8 (University of California has observed increase in demand for mental health services, which it cannot fully meet). These emotional and psychological injuries constitute irreparable harm. *See, e.g.*, *Chalk v. U.S. Dist. Court Cent. Dist. of Cal.*, 840 F.2d 701, 710 (9th Cir. 1988); *Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1193 (N.D. Cal. 2015). Beyond the losses experienced by individual DACA recipients, the Rescission is harming their affiliated institutions such as the University of California, and cities and states within which they reside and work, causing imminent, irreparable harm to plaintiff States, plaintiff County of Santa Clara, plaintiff City of San Jose, and plaintiff University of California. *See, e.g.*, App. at 2205-07, Topics 14, 17. As set forth above, DACA has resulted in the integration of hundreds of thousands of individuals into the American social and economic fabric. The decisions made over the next few months by DACA recipients will have irreparable consequences for their communities and State and local governments, including the immediate losses of valued students, employees, and community members, along with erosion of the gains in economic output, public health, and safety that resulted from DACA. In this situation, "[a] delay, even if only a few months, pending trial represents precious, productive time irretrievably lost." *Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1166 (9th Cir. 2011).

## II. The Balance Of Equities and the Public Interest Weigh Heavily in Favor of Provisional Relief.

The final two elements of the preliminary injunction test—the balance of the equities and the public interest—merge when the government is a party. *See League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014). In assessing these factors, courts consider the impacts of the injunction on nonparties as well. *See id.* at 766.

The balance of the equities and the public interest weigh overwhelmingly in favor of provisional relief. DACA recipients are integral contributors to their families, schools, employers, communities, and the United States as a whole. DACA permits recipients to earn a living in the United States, support

their families, and attend college.  *See, e.g.*, App at 2199-2200, Topic 2; *see also* App. at 2206-07, Topic 17; App. at 224-30 (Essig Decl. ¶¶ 8-10, 12-13); App. at 1347-48 (J. Smith Decl. ¶ 6); App. at 1505, 1515-16, 1518-19, 1520-21 (Wong Decl. ¶¶ 21, 43, 49, 55); App. at 2199-2200, 2206-07, Topics 2, 17; *see also* App. at 1504, 1509 (Wong Decl. ¶¶ 20, 30).

Moreover, the harm of taking DACA away from nearly 700,000 current DACA recipients would be a loss of $215 billion in U.S. GDP over the next ten years, App. at 73 (Brannon Decl. ¶ 11), and those losses are beginning now as DACA recipients prepare for the possibility of deportation.  Enjoining the rescission of the DACA program and allowing these individuals to continue contributing to their communities and the country at large is in the public interest.

An injunction would also further public health and safety, which will suffer due to the Rescission.  For example, as individuals lose DACA protection they may become less likely to interact with law enforcement even if they are victimized or witness crimes.  *See* App. at 1342 (Smith Decl. ¶¶ 7-8); App. at 1287-88 (Rosen Decl. ¶¶ 3, 5).  Without work authorization, DACA recipients will not be able to continue filling crucial positions providing public services.  App. at 2209, Topic 18; *see also* App. at 96 (Carrizales Decl. ¶¶ 9-10); App. at 790-91 (McLeod Decl. ¶ 6); App. at 1109 (Oh Decl. ¶ 6). The Rescission also would cause many DACA recipients to lose health insurance, *see* App. at 716 (Lorenz Decl. ¶ 7); App. at 1310 (Santos Toledo Decl. ¶ 26); App. at 1324 (Sati Decl. ¶ 48); App. at 1448 (Tabares Decl. ¶ 14), and an increased uninsured population will burden emergency healthcare services and reduce overall public health as people become reluctant to seek medical care due to lack of insurance or fear of being reported to immigration authorities, *see* App. 2206, Topic 15; App. at 0177-78 (Cody Decl. ¶¶ 11-13); App. at 777, 0779 (Márquez Decl. ¶¶ 12, 17); App. at 0716 (Lorenz Decl. ¶¶ 6– 7).  The Rescission also will likely contribute to an increase in the number of children using government child welfare services programs, *see* App. at 0779 (Márquez Decl. ¶ 18), and contribute to heightened levels of stress and anxiety in children whose parents face uncertain immigration status, *see* App. at 814-16 (F. Mendoza Decl. ¶¶ 4, 6-8); App. at 464-67 (Hainmueller Decl. ¶¶ 4-11).

The government will not face any harm if a preliminary injunction is granted.  There will be no harm—and much benefit—to the United States if DHS continues to process new applications for DACA status and renewal applications pending a final judgment.  Furthermore, the government has no interest

in enforcing unlawful rules.  *See Rodriguez v. Robbins*, 715 F.3d 1127, 1145  (9th Cir. 2013) ("[The government] cannot suffer harm from an injunction that merely ends an unlawful practice."); *Arizona Dream Act*, 855 F.3d at 978 ("[I]t is clear that it would not be equitable or in the public's interest to allow the state to violate the requirements of federal law, especially when there are no adequate remedies available." (quoting *Valle del Sol v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013)).  Moreover, it is estimated that up to 200,000 individuals have had their DACA grants renewed since President Trump took office.  App. at 2092 (CAP Study).  If the government believed DACA recipients presented a serious harm to its interests, the administration would not have continued granting renewals for almost nine months.

Accordingly, both the balance of the equities and the public interest favor provisional relief.

*     *     *

Plaintiffs have demonstrated a strong prospect of success on the merits, and have established irreparable harm if the Rescission is permitted to proceed.  The balance of equities and the public interest likewise point to a single conclusion: the Court should award provisional relief.

## CONCLUSION

For the foregoing reasons, this Court should enjoin defendants from proceeding with the Rescission and should award provisional relief directing the government to restore the DACA program pending adjudication on the merits.

Dated: November 1, 2017

Respectfully submitted,


COVINGTON & BURLING LLP

/s/ Jeffrey M. Davidson
Jeffrey M. Davidson (SBN 248620)
Alan Bersin (SBN 63874)
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com

Lanny A. Breuer (*pro hac vice*)
Mark H. Lynch (*pro hac vice*)
Alexander A. Berengaut (*pro hac vice*)
Megan A. Crowley (*pro hac vice*)
Ashley Anguas Nyquist (*pro hac vice*)
Jonathan Y. Mincer (Bar No. 298795)
Ivano M. Ventresca (*pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
E-mail: lbreuer@cov.com, mlynch@cov.com,
aberengaut@cov.com, mcrowley@cov.com,
anyquist@cov.com, jmincer@cov.com,
iventresca@cov.com

Mónica Ramírez Almadani (SBN 234893)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067-4643
Telephone: (424) 332-4800
Facsimile: (424) 332-4749
Email: mralmadani@cov.com

Erika Douglas (SBN 314531)
COVINGTON & BURLING LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94061-1418
Telephone: (650) 632-4700
Facsimile: (650) 632-4800
Email: edouglas@cov.com

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General

/s/ James F. Zahradka II
JAMES F. ZAHRADKA II (SBN 196822)
Deputy Attorney General

CHRISTINE CHUANG
REBEKAH A. FRETZ
RONALD H. LEE
KATHLEEN VERMAZEN RADEZ
SHUBHRA SHIVPURI
1515 Clay Street, 20th Floor
Oakland, CA 94612-0550
Telephone: (510) 879-1247

*Attorneys for Plaintiff State of California*

JANET T. MILLS
Attorney General of Maine
SUSAN P. HERMAN (*pro hac vice*)
Deputy Attorney General
6 State House Station
Augusta, Maine 04333
Telephone: (207) 626-8814
Email: susan.herman@maine.gov

*Attorneys for Plaintiff State of Maine*

BRIAN E. FROSH
Attorney General of Maryland
STEVEN M. SULLIVAN (*pro hac vice*)
Solicitor General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
Telephone: (410) 576-6325
Email: ssullivan@oag.state.md.us

*Attorneys for Plaintiff State of Maryland*

Charles F. Robinson (SBN 113197)
Margaret Wu (Bar No. 184167)
Julia M. C. Friedlander (SBN 165767)
Sonya Sanchez (SBN 247541)
Norman Hamill (SBN 154272)
Harpreet Chahal (SBN 233268)
Michael Troncoso (SBN 221180)
University of California
Office of the General Counsel
1111 Franklin Street, 8th Floor
Oakland, CA 94607-5200
Telephone: (510) 987-9800
Facsimile: (510) 987-9757
Email: charles.robinson@ucop.edu

*Attorneys for Plaintiffs The Regents of the
University of California and Janet Napolitano,
in her official capacity as President of the
University of California*

LORI SWANSON
Attorney General State of Minnesota
JULIANNA F. PASSE (*pro hac vice*)
Assistant Attorney General
445 Minnesota Street, Suite 1100
St. Paul, Minnesota 55101-2128
Telephone: (651) 757-1136
Email: julianna.passe@ag.state.mn.us

*Attorneys for Plaintiff State of Minnesota*

GIBSON, DUNN & CRUTCHER LLP

/s/ Theodore J. Boutrous, Jr.

THEODORE J. BOUTROUS, JR., SBN 132099
tboutrous@gibsondunn.com
KATHERINE M. MARQUART, SBN 248043
kmarquart@gibsondunn.com
JESSE S. GABRIEL, SBN 263137
jgabriel@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520

ETHAN D. DETTMER, SBN 196046
edettmer@gibsondunn.com
555 Mission Street
San Francisco, CA 94105
Telephone: (415) 393-8200
Facsimile: (415) 393-8306

COTCHETT, PITRE & McCARTHY, LLP
OFFICE OF THE CITY ATTORNEY

/s/ *Nancy L. Fineman*

NANCY L. FINEMAN
BRIAN DANITZ (SBN 247403)
bdanitz@cpmlegal.com
TAMARAH P. PREVOST (SBN 313422)
tprevost@cpmlegal.com
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA  94010
Telephone:  (650) 697-6000
Facsimile:   (650) 697-0577

RICHARD DOYLE (SBN 88625)
NORA FRIMANN (SBN 93249)
OFFICE OF THE CITY ATTORNEY
200 East Santa Clara Street, 16th Floor
San José, California 95113
Telephone: (408) 535-1900
Facsimile: (408) 998-3131
Email Address: cao.main@sanJoséca.gov

*Attorneys for Plaintiff City of San Jose*

PUBLIC COUNSEL
MARK D. ROSENBAUM, SBN 59940
mrosenbaum@publiccounsel.org
JUDY LONDON, SBN 149431
jlondon@publiccounsel.org
610 South Ardmore Avenue
Los Angeles, CA 90005
Telephone: (213) 385-2977
Facsimile: (213) 385-9089

BARRERA LEGAL GROUP, PLLC
LUIS CORTES ROMERO, SBN 310852
lcortes@barreralegal.com
19309 68th Avenue South, Suite R102
Kent, WA 98032
Telephone: (253) 872-4730
Facsimile: (253) 237-1591

LAURENCE H. TRIBE, SBN 39441
larry@tribelaw.com Harvard Law School
*Affiliation for identification purposes only
1575 Massachusetts Avenue
Cambridge, MA 02138
Telephone: (617) 495-1767

ERWIN CHEMERINSKY, *pro hac vice*
forthcoming
echemerinsky@law.berkeley.edu
University of California, Berkeley School of
Law
*Affiliation for identification purposes only
215 Boalt Hall
Berkeley, CA 94720-7200
Telephone: (510) 642-6483

LEAH M. LITMAN, *pro hac vice*
forthcoming llitman@law.uci.edu
University of California, Irvine School of Law
*Affiliation for identification purposes only
401 East Peltason Drive Irvine, CA 92697
Telephone: (949) 824-7722

*Attorneys for Plaintiffs DULCE GARCIA,
MIRIAM GONZALEZ AVILA, SAUL
JIMENEZ SUAREZ, VIRIDIANA CHABOLLA
MENDOZA, NORMA RAMIREZ, and JIRAYUT
LATTHIVONGSKORN*

1

2    /s/ James R. Williams                          /s/ Eric P. Brown

3
     JAMES R. WILLIAMS, County Counsel             JONATHAN WEISSGLASS
4    GRETA S. HANSEN                                jweissglass@altber.com
     LAURA S. TRICE                                 STACEY M. LEYTON
5    laura.trice@cco.sccgov.org                     sleyton@altber.com
     MARCELO QUIÑONES                               ERIC P. BROWN
6    marcelo.quinones@cco.sccgov.org                ebrown@altber.com
     OFFICE OF THE COUNTY COUNSEL                   ALTSHULER BERZON LLP
7    COUNTY OF SANTA CLARA                          177 Post St., Suite 300
8    70 West Hedding Street                         San Francisco, CA 94108
     East Wing, Ninth Floor                         Telephone: (415) 421-7151
9    San Jose, CA 95110-1770
10   Telephone: (408) 299-5900                      *Attorneys for Plaintiffs COUNTY OF SANTA*
     Facsimile: (408) 292-7240                      *CLARA AND SERVICE EMPLOYEES*
11                                                  *INTERNATIONAL UNION LOCAL 521*

12   *Attorneys for Plaintiff COUNTY OF SANTA*
     *CLARA*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## ATTESTATION

I, Jeffrey M. Davidson, hereby attest, pursuant to Civil L.R. 5-1, that I have received authorization to electronically sign and file this document from each of the persons identified in the signature block.

Dated: November 1, 2017

/s/ Jeffrey M. Davidson
Jeffrey M. Davidson

*Counsel for Plaintiffs The Regents of the University of California and Janet Napolitano, in her official capacity as President of the University of California*