

# EXHIBIT 16

JEFFREY M. DAVIDSON (SBN 248620)
ALAN BERSIN (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the
University of California and Janet Napolitano, in
her official capacity as President of the
University of California*

THEODORE J. BOUTROUS, JR. (SBN 132099)
ETHAN D. DETTMER (SBN 196046)
JESSE S. GABRIEL (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam
Gonzalez Avila, Saul Jimenez Suarez, Viridiana
Chabolla Mendoza, Norma Ramirez, and Jirayut
Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and
Service Employees International Union Local 521*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

THE REGENTS OF THE UNIVERSITY OF
CALIFORNIA and JANET NAPOLITANO,
in her official capacity as President of the
University of California,

Plaintiffs,

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY and ELAINE DUKE, in her
official capacity as Acting Secretary of the
Department of Homeland Security,

Defendants.

CASE NO. 17-CV-05211-WHA

**DECLARATION OF ANGELA CHUAN-RU
CHEN**

STATE OF CALIFORNIA, STATE OF
MAINE, STATE OF MARYLAND, and
STATE OF MINNESOTA,

    Plaintiffs,

     v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, ELAINE DUKE, in her official
capacity as Acting Secretary of the Department
of Homeland Security, and the UNITED
STATES OF AMERICA,

    Defendants.

CASE NO. 17-CV-05235-WHA

---

CITY OF SAN JOSE, a municipal corporation,

    Plaintiffs,

     v.

DONALD J. TRUMP, President of the United
States, in his official capacity, ELAINE C.
DUKE, in her official capacity, and the
UNITED STATES OF AMERICA,

    Defendants.

CASE NO. 17-CV-05329-WHA

---

DULCE GARCIA, MIRIAM GONZALEZ
AVILA, SAUL JIMENEZ SUAREZ,
VIRIDIANA CHABOLLA MENDOZA,
NORMA RAMIREZ, and JIRAYUT
LATTHIVONGSKORN,

    Plaintiffs,

     v.

UNITED STATES OF AMERICA, DONALD
J. TRUMP, in his official capacity as President
of the United States, U.S. DEPARTMENT OF
HOMELAND SECURITY, and ELAINE
DUKE, in her official capacity as Acting
Secretary of Homeland Security,

    Defendants.

CASE NO. 17-CV-05380-WHA

---

1  | COUNTY OF SANTA CLARA and                                CASE NO. 17-CV-05813-WHA
2  | SERVICE EMPLOYEES INTERNATIONAL
   | UNION LOCAL 521,

3  |                        Plaintiffs,

4  |                v.

5  | DONALD J. TRUMP, in his official capacity
6  | as President of the United States, JEFFERSON
   | BEAUREGARD SESSIONS, in his official
7  | capacity as Attorney General of the United
   | States; ELAINE DUKE, in her official
8  | capacity as Acting Secretary of the Department
   | of Homeland Security; and U.S.
9  | DEPARTMENT OF HOMELAND
   | SECURITY,

10 |                        Defendants.

I, ANGELA CHEN, DECLARE:

**I.     Background.**

1.          I have been the Director of Pre-Health Dreamers, the organization that Jirayut "New" Latthivongskorn co-founded, since June 2015.  From January 2013 to June 2015, I was the Director of the Undocumented Students Program at UCLA.  Prior to that role, I was completing my PhD at UCLA and co-chairing the UCLA Undocumented Student Ally Committee, coordinating over 60 faculty and staff in creating resources across campus.  I have personal knowledge of the facts set forth in this declaration, and if called as a witness, I could and would competently testify to them.

2.          Pre-Health Dreamers is an organization that New co-founded in 2013.  It increases the knowledge-base of medical and health professional schools with respect to DACA beneficiaries and undocumented students, in order to demonstrate to them that New and others like him meet admissions and degree requirements such as employment authorization, and could fulfill the requirements of medical residency.  As Director of the Pre-Health Dreamers, I oversee all aspects of the project, including day-to-day operations, staffing, and programming.

3.          The Undocumented Students Program at UCLA was established to support undocumented students who are interested in attending UCLA or who are already students at UCLA.  When I was its Director, it served about 600 students on campus, providing meal vouchers, a text book loan program, and advocacy for resources and programs like research fellowships.  It also conducted outreach to students' families, to help their parents become more involved on campus.

4.          I first came to know New while I was working as the Director of the Undocumented Students Program at UCLA.  New was a pre-med student at UC-Berkeley, in the process of applying to medical school in early 2012, before the issuance of DACA.  He contacted me, as well as many others in the UC system, in order to try and find out more information about how to apply.  At the time, many programs were not admitting any undocumented students because they could not become resident physicians.

5.          In June 2015, I transitioned from my role as Director of the UCLA Undocumented Students Program to begin working with New as Director of Pre-Health Dreamers, the organization he co-founded in 2013.  I have spoken with New on many occasions about his undocumented status; how

DECLARATION OF ANGELA CHUAN-RU CHEN
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

0167

DACA affects him and those in his situation; DACA's impact on pre-med and other pre-health students, medical students, and other professional and graduate students; how to educate health professional programs regarding DACA's benefits; and how to educate the same programs regarding DACA's cancellation.  From the beginning, New has understood how important DACA is to pre-health students, acting as a resource regarding DACA's benefits for me and others; and I have understood how much DACA means to him and how deeply he has relied on it.  DACA made students like New eligible for medical school.  This program transformed admissions and enrollment policies and practices to be more inclusive of students with undocumented status.  In this way, DACA was one of the most life-changing programs available to many undocumented individuals in terms of educational and professional opportunities, including the ability to contribute to the health care system.

**II.       New's personal qualities.**

6.       New is highly committed to uplifting those around him, including his family, friends, and students like himself.  He is approachable, personable, outgoing, and generous with his time.  He makes it easy to relate to him and makes others feel comfortable reaching out to him for support.  In additional to his role as founder of Pre-Health Dreamers and medical student, he goes above and beyond to work individually to advise and mentor students following his footstep.  His kindness is felt by all who have had the opportunity to work with New.

**III.       New's roles in the Undocument Students Program and Pre-Health Dreamers.**

7.       When I was Director of the Undocumented Students Program at UCLA, New acted as an educational resource for me, providing a tremendous amount of information regarding DACA's benefits for pre-health students, which I passed on to interested, similarly-situated students at UCLA.

8.       New subsequently cofounded Pre-Health Dreamers after building a significant network to educate medical and other schools, including those in the UC System, regarding DACA benefits.  Pre-Health Dreamers started with 3 people, including New, and now has over 1,000 members across the country, in over 40 states.  It has expanded beyond medicine, into research, dentistry, pharmacy, nursing, and public health.  And it has fulfilled a need among DACA beneficiaries and undocumented students in higher education, who are often interested in the STEM fields (i.e., science,

0168

technology, engineering, and math), but need specific advice related to their immigration status in order to effectively pursue graduate and professional programs.

9.      New used the knowledge he gained through his own journey to found Pre-Health Dreamers and help these students.  He took the initiative to cultivate donors, applying the same resourcefulness he applied as a student fundraising for own education costs, and ultimately found funding to support Pre-Health Dreamers' work and to build a platform.

10.     When New founded Pre-Health Dreamers, there were zero undocumented students in medical school.  Now, Pre-Health Dreamers is associated with 65 DACA beneficiaries in medical schools across the country, and hundreds of others in allied health programs.  New is building a network and a legacy that very clearly benefit the communities with which these students identify, and that ultimately will help fulfill needs in hospitals for a diverse medical profession and increase the quality of healthcare and medical outcomes.

11.     New is also on the Council of the University of California Office of the President, as an advisor on issues related to undocumented students.  When he was an undergraduate student seeking information regarding medical school admissions, the support network he built led numerous people in the UC system to become familiar with him and the issues he advocated, and he continues to play a similar role as adviser for the Office of the President.

**IV.     DACA benefited New.**

12.     The most transformative aspect of DACA was that it provided New an opportunity to be admitted and enrolled in UCSF as a medical student.  It allowed him to pass background and similar employment-related checks; work in hospitals; complete rotations; and work directly with patients.  After he completes his fourth year, it would allow him to apply for medical residency programs.  This has been transformative for him personally, academically, and professionally.  I have seen this first-hand, and discussed it with him through our work together at Pre-Health Dreamers and our personal conversations.  Moreover, in my role as Director of Pre-Health Dreamers, interacting with numerous similarly-situated students, I know that New's journey is similar to the journey of other students benefiting from DACA.

13.     Through my conversations with New, I also know that the dignity and value afforded by simply being able to work are incredibly important to him.  He is very close to his family, and his ability to assist them financially is very important to him.

14.     I also recall New telling me about working with underserved immigrant patients during his rotations, and being able to relate to them, and how their shared experiences have been very powerful for both him and his patients.  Although he has multiple aspirations as a doctor, it is very clear that he wants to work with underserved patients.

**V.     DACA's cancellation would harm New.**

15.     DACA is the most essential program for opening the door to a health-field education for most members of Pre-Health Dreamers.  About 93% of Pre-Health Dreamers' members are DACA recipients.  DACA's cancellation will mean that the more than 65 medical students who Pre-Health Dreamers has helped place in medical school will not be able to complete their education, complete their residencies, or fulfill their aspirations to become physicians.

16.     Because so much is at stake, it has been difficult for New to discuss the impact that DACA's cancellation would have on him.  But I know that the affects would be the same for him as for other DACA beneficiaries.  It would mean that he likely would not be able to complete his education, and could not become a resident physician; that he might not be able to qualify for any funding to continue as a student; that he would be ineligible for student loans; that he might not have employment opportunities to pay back any loans; and that necessary tasks, like traveling in his capacity as a medical student and an advocate for Pre-Health Dreamers, would expose him to increased uncertainty, including risk of detention and deportation solely due to his immigration status.

17.     New is in an uncertain state, waiting for the proverbial ball to drop.  Waiting for the rug to be pulled out from under him.  He does not know if he will be asked to leave his program due to DACA's cancellation, leaving him in a precarious, challenging position.  The same is true of other pre-health students, who will have increased trouble applying and pulling together the necessary resources to support their professional education.

18.     Currently, health education programs are trying to determine what steps to take in connection with existing and future students who benefit from DACA.  I have communicated with Pre-

4

0170

Health Dreamers' liaisons at many of these programs, and there is considerable uncertainty.  While Pre-Health Dreamers has issued guidance and recommendations to programs, it remains unclear what actions they will take.

**VI.     New's impact on me.**

19.     Witnessing New's advocacy and persistence has taught me many lessons on what it means to love and to give of oneself to a family, community, and country.  I have to come to understand New's life work arises out of a deep love and desire to create a positive impact in this country.  From his example, I learned a new framework of civic engagement, one that is not limited or bounded by immigration status.  Instead, meaningful civic engagement has to transcend limitations and to be grounded in a profound desire to cultivate collective social good.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 26, 2017, in Santa Ana, California.

_____
Angela Chuan-Ru Chen



# EXHIBIT 17

JEFFREY M. DAVIDSON (SBN 248620)
ALAN BERSIN (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the
University of California and Janet Napolitano, in
her official capacity as President of the
University of California*

THEODORE J. BOUTROUS, JR. (SBN 132099)
ETHAN D. DETTMER (SBN 196046)
JESSE S. GABRIEL (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam
Gonzalez Avila, Saul Jimenez Suarez, Viridiana
Chabolla Mendoza, Norma Ramirez, and Jirayut
Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and
Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, <br><br> Defendants. | CASE NO. 17-CV-05211-WHA <br><br> **DECLARATION OF SARA H. CODY, M.D.** |

0172

| | |
|---|---|
| 1 | STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA, | CASE NO. 17-CV-05235-WHA |
| 2 | |
| 3 | Plaintiffs, |
| 4 | v. |
| 5 | U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA, |
| 6 | |
| 7 | |
| 8 | Defendants. |

1  STATE OF CALIFORNIA, STATE OF
   MAINE, STATE OF MARYLAND, and               CASE NO. 17-CV-05235-WHA
2  STATE OF MINNESOTA,

3                 Plaintiffs,

4          v.

5  U.S. DEPARTMENT OF HOMELAND
   SECURITY, ELAINE DUKE, in her official
6  capacity as Acting Secretary of the Department
   of Homeland Security, and the UNITED
7  STATES OF AMERICA,

8                 Defendants.

9  CITY OF SAN JOSE, a municipal corporation,    CASE NO. 17-CV-05329-WHA

10                Plaintiffs,

11         v.

12 DONALD J. TRUMP, President of the United
   States, in his official capacity, ELAINE C.
13 DUKE, in her official capacity, and the
   UNITED STATES OF AMERICA,
14
                  Defendants.
15
16 DULCE GARCIA, MIRIAM GONZALEZ          CASE NO. 17-CV-05380-WHA
   AVILA, SAUL JIMENEZ SUAREZ,
17 VIRIDIANA CHABOLLA MENDOZA,
   NORMA RAMIREZ, and JIRAYUT
   LATTHIVONGSKORN,
18
19                Plaintiffs,

20         v.

21 UNITED STATES OF AMERICA, DONALD
   J. TRUMP, in his official capacity as President
22 of the United States, U.S. DEPARTMENT OF
   HOMELAND SECURITY, and ELAINE
   DUKE, in her official capacity as Acting
23 Secretary of Homeland Security,

24                Defendants.

25

26

27

28

0173

| | |
|---|---|
| COUNTY OF SANTA CLARA and SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 521, | CASE NO. 17-CV-05813-WHA |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS, in his official capacity as Attorney General of the United States; ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security; and U.S. DEPARTMENT OF HOMELAND SECURITY, | |
| Defendants. | |

I, SARA H. CODY, M.D., DECLARE:

1.      I am a resident of the State of California.  I submit this declaration in support of the Plaintiffs' Motions for Preliminary Injunction and for Summary Judgment.  I have personal knowledge of the facts set forth in this declaration.  If called as a witness, I could and would testify competently to the matters set forth herein.

2.      This declaration provides an overview of the Santa Clara County Public Health Department's work and explains why these efforts are undermined by federal policies that increase immigrants' reluctance to interact with government institutions that play a critical role in protecting public health.

3.      I am the Director of the County of Santa Clara's ("County") Public Health Department, as well as the Health Officer for the County and each of the 15 cities located within Santa Clara County. I have held the Health Officer position from 2013 to the present, and I have held the Public Health Department Director position from 2015 to the present.  In these roles, I provide leadership on public health issues for all of Santa Clara County and oversee approximately 450 Public Health Department employees who provide a wide array of services to safeguard and promote the health of the community.

4.      Prior to becoming the Health Officer for the County and each of its cities, I was employed for 15 years as a Deputy Health Officer/Communicable Disease Controller at the County's Public Health Department, where I oversaw surveillance and investigation of individual cases of communicable diseases, investigated disease outbreaks, participated in planning for public health emergencies, and responded to Severe Acute Respiratory Syndrome (also known as "SARS"), influenza A virus subtype H1N1 (also known as "swine flu" or H1N1), and other public health emergencies.

5.      The mission of the Public Health Department is to promote and protect the health of Santa Clara County's 1.9 million residents.  None of Santa Clara County's 15 cities have a health department.  All 15 cities within the county, and all Santa Clara County residents, rely on the Public Health Department to perform essential public health functions.  The Public Health Department's work is guided by core public health principles of equity, the value of every life, and harm prevention.

6.      The work of the Public Health Department is focused on three main areas: (1) infectious disease and emergency response, (2) maternal, child, and family health, and (3) healthy communities.

1

0175

1    7.    First, the Public Health Department is responsible for safeguarding the public health by

2    preventing and controlling the spread of infectious diseases and planning for and responding to public

3    health emergencies.  Programs in this branch of the Public Health Department receive reports on 85

4    different diseases and conditions; track overall trends in infectious diseases; investigate individual cases

5    of concern; provide long term case management for certain categories of patients (e.g., active

6    tuberculosis cases); provide immunizations and preventive therapy; identify, investigate and control

7    outbreaks; and plan for and respond to public health emergencies.  They also ensure that all children

8    attending school or child care facilities in Santa Clara County comply with State immunization

9    requirements; conduct HIV and other STD testing and education for vulnerable communities; and

10   distribute opioid overdose prevention kits for at-risk individuals.

11   8.    This branch of the Public Health Department also operates two pharmacies.  One of these

12   pharmacies provides free, donated medicine to individuals who cannot afford the retail cost of such

13   drugs.  The other pharmacy specializes in serving patients with HIV/AIDS, patients with tuberculosis,

14   patients from the Public Health Department's STD clinic, and patients being discharged from the

15   County jail.  Pharmacy staff also support communicable disease control by procuring, storing,

16   maintaining, and distributing essential medications and vaccines during outbreaks; distributing

17   approximately 20,000 state-funded influenza vaccines, annually, to health care providers in Santa Clara

18   County to administer to low-income and elderly residents at no charge; and overseeing all enrollment

19   workers in Santa Clara County for the State-sponsored AIDS Drug Assistance Program.

20   9.    Second, in the area of maternal, child, and family health, the Public Health

21   Department provides services for Santa Clara County's most vulnerable children and families.  This

22   includes, but is not limited to, (1) the Special Supplemental Nutrition Program for Women, Infants and

23   Children (WIC) program, which provides low-income pregnant, postpartum, and breastfeeding women,

24   infants, and children up to age 5 with nutritious foods to supplement their diets, information on healthy

25   eating, and referrals to health care; (2) the Child Health and Disability Prevention (CHDP) Program,

26   which ensures that low-income children and youth, including foster care youth, receive routine health

27   assessments and treatment services; (3) the Childhood Lead Poisoning Prevention Program, which

28   provides nursing and environmental case management and follow-up for lead-poisoned children,

1   promotes screening for lead poisoning, and provides community education regarding lead poisoning

2   prevention; (4) the California Children's Services (CCS) program, which provides diagnostic and

3   treatment services, medical case management, and physical and occupational therapy to children under

4   21 years of age with CCS-eligible medical conditions, such as cystic fibrosis, hemophilia, cerebral palsy,

5   muscular dystrophy, spina bifida, cancer, and traumatic injuries; and (5) the Nurse Family Partnership,

6   which provides young, low-income first-time mothers with home visitation services from specially-

7   trained nurses to improve pregnancy outcomes and child health and development.

8          10.    Third, to create and maintain healthy communities, the Department conducts localized

9   health assessments and planning throughout Santa Clara County, and works with community partners

10  and County leadership to promote system wide and environmental changes to reduce the incidence of

11  chronic diseases and injuries in Santa Clara County.

12         11.    The Public Health Department's work is undermined by federal policies that increase

13  immigrant communities' reluctance to interact with government institutions.  One of the Department's

14  major priorities is to advance health equity to eliminate health disparities, including health disparities

15  that exist between immigrant and non-immigrant communities and different racial and ethnic

16  communities.  However, the Department is limited in its ability to develop partnerships with community

17  organizations, to engage communities of color and immigrant and refugee communities, and to improve

18  health equity when such communities and organizations fear or lose trust in the government and are

19  unwilling to access necessary health services.

20         12.    The rescission of DACA would likely lead to greater health inequity within Santa Clara

21  County.  I have heard from community-based service providers in Santa Clara County that the current

22  political climate has already caused immigrants to miss medical appointments; to avoid going out in

23  public for fear of being detained by immigration agents; to avoid utilizing public safety services; and to

24  suffer from increased stress, anxiety and depression.  Rescission of DACA would only cause more of the

25  same.  Through the Department's work in serving vulnerable communities, I am acutely aware that the

26  loss of employment and employer-provided healthcare can mean greater economic instability and stress

27  on the affected individuals and the families they support; less access to food, medicine, other basic

28  necessities, and essential services; and increased need for safety net services.

DECLARATION OF SARA H. CODY, M.D.
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

13.    Beyond health equity, the rescission of DACA could negatively impact the Department's core areas of work in controlling infectious disease and providing emergency response; promoting maternal, child, and family health; and ensuring healthy communities.  Individuals unwilling to access necessary health services may miss necessary vaccinations.  Immigrants—for whom their country of birth can provide important information for risk of diseases such as hepatitis B and tuberculosis—may be reluctant to share their national origin with their health care providers.  Infectious individuals who wish to avoid detection by the government may be less likely to cooperate with public health efforts to monitor and control their diseases, thereby putting other community members at risk.

14.    Healthy families and communities cannot be sustained when residents are suffering from illness, injury, or mental health issues but unwilling to access health services, when residents are too afraid to avail themselves of necessary public safety services, and when residents do not dare to leave their homes for fear of being deported.

0178

1    I declare under penalty of perjury under the laws of the State of California that the foregoing is

2    true and correct and that this declaration was executed on ____Oct 26_____, 2017 in San

3    José, California.

4

5

6    _____
     SARA H. CODY, M.D.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



**EXHIBIT 18**

JEFFREY M. DAVIDSON (SBN 248620)
ALAN BERSIN (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the
University of California and Janet Napolitano, in
her official capacity as President of the
University of California*

THEODORE J. BOUTROUS, JR. (SBN 132099)
ETHAN D. DETTMER (SBN 196046)
JESSE S. GABRIEL (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam
Gonzalez Avila, Saul Jimenez Suarez, Viridiana
Chabolla Mendoza, Norma Ramirez, and Jirayut
Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and
Service Employees International Union Local 521*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, <br><br> Defendants. | CASE NO. 17-CV-05211-WHA <br><br> **DECLARATION OF DOE 1** |

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA, | CASE NO. 17-CV-05235-WHA |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN, | CASE NO. 17-CV-05380-WHA |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security, | |
| Defendants. | |

COUNTY OF SANTA CLARA and
SERVICE EMPLOYEES INTERNATIONAL
UNION LOCAL 521,

              Plaintiffs,

       v.

DONALD J. TRUMP, in his official capacity
as President of the United States, JEFFERSON
BEAUREGARD SESSIONS, in his official
capacity as Attorney General of the United
States; ELAINE DUKE, in her official
capacity as Acting Secretary of the Department
of Homeland Security; and U.S.
DEPARTMENT OF HOMELAND
SECURITY,

              Defendants.

CASE NO. 17-CV-05813-WHA

I, ███████████████████████, KNOWN FOR THE PURPOSES OF THIS CASE AS DOE 1, HEREBY DECLARE:

1.      I am a DACA recipient and an undergraduate senior in the University of California ("UC") system. The matters set forth herein are true and correct of my own personal knowledge and, if called as a witness, I could and would testify competently thereto.

2.      I was born in Oaxaca, Mexico, and later moved to Tijuana. While I was growing up in Mexico, my father worked hard to provide for my family. But because there were no good jobs in our area, it was nearly impossible to earn a decent income and my family often went hungry. I came to the United States in 2002, when I was six years old. I have not returned to Mexico since then.

3.      My family's first home in the United States was a one-bedroom apartment in ███████, California. It was a challenging place to live because at the time it was a bad neighborhood filled with gang activity. I remember once there was a drive-by shooting in our neighborhood when I was a very young. Our apartment was hit, and a bullet ended up coming through to our living room, but we were luckily not harmed.

4.      After about three years in our first apartment, we moved from home to home, following affordable rent and available jobs. At one point we lived on an Indian Reservation outside of ██████ before moving back to ████████████, where my family has been for the last seven years.

5.      I did not know that I was undocumented until eighth grade. That year, I tried to apply for the Upward Bound program, a Department of Education program designed to help low-income students prepare for college. I reached the part of the application that asked for "immigration status," and I did not know what that phrase meant, so I asked my mom. She told me that I did not have any immigration status, and as a result, I could not apply for the program.

6.      I did not fully understand what being "undocumented" meant until high school. I quickly learned that I would not have the opportunities that most of my classmates took for granted. Without the benefit of Upward Bound, visiting colleges was prohibitively expensive for my low-income family. I also learned that most college scholarships were not available to me. I learned that I would have to select my college on the basis of which institution offered financial aid despite my undocumented status, rather than on the basis of which school would best advance my career goals.

7. When DACA was first announced, I heard about it right away. I had been keeping up with the news, and the DACA policy seemed to offer a good new protection for me and my community. I discussed the pros and cons of signing up for DACA extensively with friends and some teachers who knew about my particular immigration status.

8. I was wary of government programs generally, and the Spanish-language news often reported that giving our information to the government was a risk. Most teachers still did not know about my immigration status, and I was not registered with any government programs, so I was essentially in the shadows. That had become a way of life for me.

9. Nevertheless, I ended up deciding to apply for DACA for two main reasons. First, I had already decided that I would submit my personal information in college applications, so I thought that this application process would not involve new risks. Second, I needed a way to obtain lawful employment that would pay me fairly so that I could support my family and help raise us all out of poverty. I did not want to limit my career goals because of my family's financial constraints, but it was difficult to see how college would be feasible for me.

10. It took my mom and me a year to raise the money needed to apply for DACA. I applied near the end of ████ ████████████████████████ Once I became a DACA recipient, I wondered how I had ever lived without it, and I felt fortunate because my family is still of mixed immigration status.

11. For a while after receiving DACA, I felt unstoppable. I was able to live in a way that I never had before. I had always wanted to go to college, but with DACA I suddenly felt for the first time that college was feasible and within reach. I felt that there were opportunities available to me that had not been before, and that I could do anything.

12. I also became motivated to become politically active and to share my feelings of exclusion, and DACA helped empower me to do so. I grew up in a generation when the DREAM Act movement was very strong and visible, and I was fortunate that I had the social and emotional support to go to UC. I am a first-generation college student, partially as a result of that support.

13.     I started college in 2014. As a result of DACA, I continued to develop the confidence to work and speak freely. Last year, I started looking for an advisor for my senior thesis. I had developed a personal connection with a professor whose class I had taken during my sophomore year. Her teaching style appealed to me, and I felt that she understood me both as a scholar and as a person. I was happy when she agreed to advise me, and she has been a good academic mentor in my studies.

14.     I have also been able to work and gain professional experiences as a result of my work authorization through DACA. Early in college, I worked at UC's call center. After that, I served as both an Orientation Leader and Peer Adviser for Student Housing. I also interned at the UC School of Law, and that experience led me to volunteer with an Immigration Law Clinic, where I have worked on a number of projects, including supporting unaccompanied minors.

15.     I have continued to rely on my work authorization to fund my living expenses while I pursue my college education. I have a position in the Chicana/o Studies Department, where I serve as an Academic and Community Counselor and organize programming for students. I am paid hourly and rely on the work authorization associated with my DACA status to continue working.

16.     My work experience during college inspired me to apply to law school, and I aspire to one day become an immigration lawyer. I recently took the Law School Admissions Test ("LSAT") and began my applications to law school. I want to work with the communities that I come from and help empower people who feel powerless. In a way, helping people through their immigration troubles would be like helping the community I love.

17.     The announcement that DACA would be rescinded felt like cold water in my face. Initially, I felt exhausted from fighting so long to stay in the country I love, and it took a while for the full effects of the rescission to sink in. I think my self-defense mechanism kicked in, and I decided not to feel the change, but to simply know it, just like when I discovered my undocumented status.

18.     If I had known that DACA would be rescinded, I would not have spent so much of my time in school preparing for law school, nor would I have taken the LSAT. Instead of doing the research and internships that prepared me for law school, I would have spent my timing working as much as possible to save money in order to survive after DACA expires.

19.     For now, I am still hopeful that I can fulfill my dream of becoming an immigration lawyer in the United States. However, I know that I will not be able to practice law in the United States if I cannot continue to get my work authorization. I have relied on the fact that I could renew my DACA status, and I have made academic and career plans based on that reliance. So far I have not given up on my dreams, but who knows what will happen? I hope that I can continue to be resilient.

20.     I reapplied for DACA immediately after the rescission announcement, and I recently received my new DACA status. My protections will expire in 2019, in the middle of my second year of law school. The prospect of losing DACA in two years, when I will have already paid for and completed half of law school, is daunting.

21.     Several of my friends in similar positions were not as fortunate as I was to reapply for DACA so recently, and their situations are more dire. Their employment authorizations will end in a few months, at which point they will no longer have money to attend school and support themselves and may need to drop out, even now, so close to graduation. I see the hopelessness. As amazing as it is to see how hard they have worked and their many accomplishments in their studies, it is equally depressing to see it all melt away. It is very disheartening.

22.     I also have friends who have been negatively affected by the loss of the advance parole option that DACA used to provide. One friend, a UC graduate, was recently admitted to program for aspiring medical students and had an opportunity to go to Mexico to do research, but she will no longer be able to do so after the rescission. She now has to reconsider her career goals.

23.     In retrospect, I realize that my undocumented status had a very negative impact on my health growing up in this country. We had to live in communities that were dangerous after dark, which meant no playing outside after sunset. We had to stay in our small apartment where it was safer. Our neighborhood was low-income and had few sources of fresh, healthy food nearby. This led to eating habits focused on quick snacks of unhealthy prepared foods, which has stayed with me as I grew up. The common threat of living in poverty and not having legal ways to emerge from it was very limiting. It was frustrating to see that even though my parents were skilled, they could not get good jobs. If I lose my work authorization, I may face that same reality and continue this cycle. I do not like to think about that, because it scares me and I hope there will be some other way for me to succeed.

24. I know that as time goes on, it will be difficult to continue to stay positive and help other students in my capacity as an Academic and Community Counselor. I feel mentally and emotionally exhausted supporting students in similar situations. If I dwell on my future and the uncertainty surrounding my DACA status, then I would not be able to successfully do my job, and I would probably stop trying so hard to have a successful future. That is not who I am. And that is not who I want to be. I refuse to fully internalize this latest announcement of DACA's rescission, because I am terrified of how it will make me feel. I know myself, and I know that this reality will damage me, and I will not be able to be the person that I have been over the past almost five years, and I will not be able to support others either.

25. I choose to submit this declaration to give a voice to the many other students who are in my position. I worry, however, that if it becomes known that I provided this statement or participated in this lawsuit, the personal information I provided to the government to obtain DACA in the first place could be used by immigration officials to target both my family and me. I also worry that if my identity becomes known, I may be targeted by others who are not happy that we are in this country.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on Monday, October 23, 2017 in         California.

5



JEFFREY M. DAVIDSON (SBN 248620)
ALAN BERSIN (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the
University of California and Janet Napolitano, in
her official capacity as President of the
University of California*

THEODORE J. BOUTROUS, JR. (SBN 132099)
ETHAN D. DETTMER (SBN 196046)
JESSE S. GABRIEL (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam
Gonzalez Avila, Saul Jimenez Suarez, Viridiana
Chabolla Mendoza, Norma Ramirez, and Jirayut
Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and
Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, <br><br> Defendants. | CASE NO. 17-CV-05211-WHA <br><br> **DECLARATION OF NORBERTO DUENAS** <br><br><br> Date:  December 20, 2017 <br> Time:  8:00 a.m. <br> Judge: Honorable William Alsup <br> Dept.:  Courtroom 8 <br><br> Complaint Filed:  September 14, 2017 <br> Trial Date:  February 05, 2018 |

| | | |
|---|---|---|
| 1 | STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA, | CASE NO. 17-CV-05235-WHA |
| 2 | | |
| 3 | Plaintiffs, | |
| 4 | v. | |
| 5 | U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA, | |
| 6 | | |
| 7 | | |
| 8 | Defendants. | |
| 9 | CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| 10 | Plaintiffs, | |
| 11 | v. | |
| 12 | DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA, | |
| 13 | | |
| 14 | | |
| 15 | Defendants. | |
| 16 | DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN, | CASE NO. 17-CV-05380-WHA |
| 17 | | |
| 18 | | |
| 19 | Plaintiffs, | |
| 20 | v. | |
| 21 | UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security, | |
| 22 | | |
| 23 | | |
| 24 | Defendants. | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

DECLARATION OF NORBERTO DUENAS
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

| | | |
|---|---|---|
| 1 | COUNTY OF SANTA CLARA and SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 521, | CASE NO. 17-CV-05813-WHA |
| 2 | | |
| 3 | Plaintiffs, | |
| 4 | v. | |
| 5 | DONALD J. TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS, in his official capacity as Attorney General of the United States; ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security; and U.S. DEPARTMENT OF HOMELAND SECURITY, | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | Defendants. | |

I, **NORBERTO DUENAS**, declare and state as follows:

1.    I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently thereto.

2.    I was the City Manager of the City of San Jose, California ("San Jose") from 2015 until October 2017.  I began my career in public service in 1984 as an intern, before ultimately taking on a variety of roles over my 33 years of rising through the ranks of city government.  Prior to my current position, I attended San Jose State University for both my bachelor's in political science and master's in public administration.

3.    My experience as a Cuban refugee and international upbringing, along with my decades of educational and administrative experience in San Jose, have singularly enabled me act as a link between the immigrant community and the City. It has been my judgment based on the many projects I have overseen during my tenure that our employees' collaborative spirit and dedication to public service are what have most contributed to our City's successes and achievements. This same collaborative spirit and dedication has served us well during the good as well as the challenging times.

4.    San Jose is the third largest city in California, the tenth largest city in the United States, and one of the most racially diverse cities in California. Immigrants from all over the world have come to San Jose.  On its website, San Jose has a Fact Sheet that provides important information about the

1

0190

1  city.  Attached hereto as Exhibit A is a true and correct copy of the Fact Sheet, which can also be found

2  at http://www.sanjoseca.gov/DocumentCenter/View/780.

3       5.     San Jose is extremely diverse, with recent immigrants making up nearly 40% of its

4  population. Immigrants contribute an estimated $77 billion to the economy of Santa Clara County as a

5  whole. Of these immigrants, it is estimated that at least 77,000 are either eligible for or have received the

6  benefits of the DACA program.

7       6.     San Jose has made it a central mission to aid these DACA recipients, and to foster full

8  participation among them in our community. Consistent with that, the City Council authorized the

9  creation of an Office of Immigrant Affairs to coordinate responses upon the advent of DACA. The

10  following is a sample of the City's dedication to and dependence on immigration communities within its

11  borders:

12      a.  In September 2016, the Mayor and City Council adopted a "Welcoming San Jose"

13          Resolution that described guiding principles for making San Jose a more welcoming

14          and inclusive place for all residents. Afterward, the Office of Immigrant Affairs

15          developed a three-year immigrant integration plan.

16      b.  Also in 2016, the City of San Jose became a member of Welcoming America, a

17          national organization leading the movement to create more inclusive communities.

18      c.  San Jose partnered thereafter with the White House's Building Welcoming

19          Communities Campaign and Cities United for Action. As a result of active

20          participation in these networks and successful progress made on developing the Plan,

21          San Jose has benefitted from national attention on the issue of immigration.

22      d.  The White House selected ten cities to co-host a convening to discuss immigrant

23          integration strategies, and San Jose was one of the cities honored with the

24          opportunity.

25      e.  San Jose's Office of Immigrant Affairs is a recipient of the "Gateways for Growth

26          Challenge" grant from the Partnership for a New American Economy. This grant

27          provides the Office a research brief with data on local immigrants.

28

0191

7. In order to properly serve its residents, San Jose must have employees who are fluent in languages other than English, and who are sensitive to the different cultures and backgrounds of its residents. This is especially true when San Jose experiences a disaster: it is critical to have city employees who can communicate with the affected residents and understand the residents' immediate needs. We were again reminded of this all too powerfully during recent flooding events, when the language and cultural skills unique to DACA recipients were in short supply.

8. Finding qualified employees is always difficult for municipalities, but it is particularly challenging for San Jose because of competition with Silicon Valley companies. San Jose has not been able to hire all the qualified employees that it needs. As the Fact Sheet, Exhibit A, confirms, Silicon Valley employers like Cisco Systems, eBay, PayPal, IBM Corporation, Adobe Systems, and Kaiser Permanente hire thousands of San Jose residents as employees. Luckily, unemployment in San Jose is low. It is therefore important for San Jose and the companies in the Silicon Valley to have as many potential employees as possible.

9. As a result of the enactment of DACA (Deferred Action for Childhood Arrivals) in June of 2012, the employment pool for San Jose and Silicon Valley companies increased. San Jose does not ask about immigration status on its employment applications; therefore, it cannot quantify the number of DACA recipients who work for the City of San Jose. However, there is no question that San Jose has benefited by being able to hire DACA recipients because the pool of qualified applicants has increased.

10. Under federal regulations, employees who begin work are required to demonstrate that they have authorization to work in the United States. If DACA is rescinded, San Jose would have to take steps to make sure that all of its employees have valid authorization to continue working. If DACA is rescinded, San Jose will not be able to retain as employees anyone who is not authorized to work.

11. The loss of even one San Jose employee because of the rescission of DACA will hurt San Jose, not to mention the individual employee, because San Jose spends time and resources to train employees. San Jose has spent particular resources for training and outreach related to the DACA program. Moreover, the experience that employees gain in their jobs is invaluable in the provision of critical City services.

12.    I speak to community leaders and residents on a regular basis as part of my job duties. Since President Trump's election, there has been fear in the immigrant community that his administration would start mass deportations, especially of people of Mexican heritage.  After the announcement that DACA would be rescinded, that fear and anxiety has increased.  It is not only fear and anxiety by DACA recipients, but also their families and the entire immigrant community. Not only with DACA's rescission harm San Jose's workforce, but based upon projections I have reviewed, San Jose stands to lose tax revenues if DACA is rescinded.

13.    DACA's recession will result in direct harm to our city residents insofar as it would result in the City's losing employees. The residents would lose critical services at a time when we are already stretched thin with hundreds of vacancies at City Hall. The City would suffer tangible losses from DACA's rescission given the significant services, work product, and taxes that these employees currently contribute.

14.    As an immigrant to the United States myself, I have a deep and personal appreciation of the challenges of joining a new society, the opportunities that exist in America, and the contributions that immigrants make that enrich our communities. I also have profound respect for the courage and talents of immigrants to our community, for I know it is not an easy transition.  The City of San Jose understands that our neighborhoods and our businesses gain so much from what immigrants bring: their energy, their skills, and their perspectives that strengthen the vitality of our city.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on October 27, 2017 at San Jose, California.

NORBERTO DUEÑAS

# EXHIBIT A



# FACT SHEET: HISTORY & GEOGRAPHY

*Department of Planning, Building & Code Enforcement, Planning Division*

## HISTORIC ORIGIN

**FOUNDED:**
November 29, 1777 (as Pueblo de San Jose,
California's first civilian settlement)

**INCORPORATED:**
March 27, 1850 (as City of San Jose)

## TERRITORY

Incorporated area = 180.2 square miles



*Downtown San Jose, Circa 1950*



*Downtown San Jose, 2000*

## GEOGRAPHIC DATA

**COORDINATES:**

Longitude:               -121.89
Latitude:                 37.33

(at Cesar Chavez Plaza, Downtown)

## ELEVATION

Minimum: Sea level (Alviso)
Maximum: 4,372'
(Copernicus Peak, near Lick Observatory at Mt. Hamilton)



Department of Planning, Building & Code Enforcement, 200 East Santa Clara Street, San Jose, CA 95113-1905. Ph: 408-535-3555; Fax: 408-292-6055

Page 1 of 10

0195



# FACT SHEET: DEMOGRAPHICS

*Department of Planning, Building & Code Enforcement, Planning Division*

## POPULATION FACTS

San Jose is the:

- Largest City in the nine-County Bay Area
- 3rd Largest City in California
- 10th Largest City in the United States

## POPULATION HISTORY

| Year | Number of Persons |
|------|-------------------|
| 1777 | 66 |
| 1850 | 4,000 |
| 1900 | 21,500 |
| 1950 | 95,280 |
| 1960 | 204,196 |
| 1970 | 459,913 |
| 1980 | 629,442 |
| 1990 | 782,248 |
| 2000 | 894,943 |
| 2010 | 945,942 |
| **2016** | **1,042,094** |

Source: US Census Bureau; California Department of Finance

## AGE COMPOSITION

| Age Groups | % of Total |
|------------|------------|
| Under 18 years | 23.4% |
| 18-24 years | 9.4% |
| 25-44 years | 30.1% |
| 45-64 years | 25.4% |
| 65 and over years | 11.7% |
| **Median Age** | **36.5 years** |

Source: US Census Bureau, American Community Survey; 2014

## LANGUAGE SPOKEN AT HOME

| Language | % of Total |
|----------|------------|
| English | 43.2% |
| Spanish | 23.5% |
| Asian/Pac. Is. | 25.6% |
| Other | 7.7% |

Source: US Census Bureau, American Community Survey; 2014



Source: City of San Jose

## HOUSEHOLD SIZE

| Year | Number of Households | Persons Per Household |
|------|----------------------|-----------------------|
| 1970 | 130,607 | 3.35 |
| 1980 | 218,177 | 2.96 |
| 1990 | 250,135 | 3.08 |
| 2000 | 276,598 | 3.20 |
| 2010 | 301,366 | 3.09 |
| **2014** | **312,227** | **3.21** |

Source: US Census Bureau; California Department of Finance

## RACIAL COMPOSITION



Source: US Census Bureau, American Community Survey; 2014

0196



# FACT SHEET: EDUCATION

*Department of Planning, Building & Code Enforcement, Planning Division*

## EDUCATIONAL ATTAINMENT

|                                   | *Percent* |
| --------------------------------- | --------- |
| Graduate or Prof. Degree          | 16%       |
| Bachelor's Degree                 | 24%       |
| Associate Degree                  | 7%        |
| Some College, No Degree           | 18%       |
| High School Diploma (or Equiv.)   | 18%       |
| Less than High School Diploma     | 17%       |



**Educational Attainment**

Source: US Census Bureau, American Community Survey; 2014

## EDUCATIONAL FACILITIES

### PRIMARY AND SECONDARY SCHOOL DISTRICTS

Alum Rock Union Elementary School District
Berryessa Union Elementary School District
Cambrian School District
Campbell Union Elementary School District
Campbell Union High School District
Cupertino Union School District
East Side Union High School District
Evergreen School District

Franklin-McKinley School District
Fremont Union High School District
Luther Burbank School District
Moreland School District
Mount Pleasant School District
Oak Grove Elementary School District
Orchard School District
Union Elementary School District

### UNIFIED SCHOOL DISTRICTS

Morgan Hill Unified School District
San Jose Unified School District
Santa Clara Unified School District

### UNIVERSITIES AND COLLEGES

Evergreen Valley College
Lincoln Law School of San Jose
San Jose City College
San Jose State University
Silicon Valley University
St. Mary's College of California
University of San Francisco

Source: City of San Jose; Santa Clara County Office of Education; 2012

0197



# FACT SHEET: INCOME

*Department of Planning, Building & Code Enforcement, Planning Division*

## PERSONAL INCOME

| **Household Income** | | **Nonfamily Income** | |
|---|---|---|---|
| Median | $87,210 | Median | $57,029 |
| Average | $111,952 | Average | $81,429 |
| | | | |
| **Family Income** | | **Per Capita Income** | $33,142 |
| Median | $96,706 | | |
| Average | $119,753 | | |

Source: US Census Bureau, American Community Survey; 2014

## INCOME DISTRIBUTION AND WAGES



Source: US Census Bureau, American Community Survey; 2014



**0198**



# FACT SHEET: EMPLOYMENT AND EMPLOYERS

*Department of Planning, Building & Code Enforcement, Planning Division*

## INDUSTRY EMPLOYMENT

| Industry Category | Employment in San Jose MSA* (thousands) | Percent |
|---|---|---|
| **Total, All Industries** | **1083.1** | 100.0% |
| Total Farm | 5.4 | 0.5% |
| Total Nonfarm | 1077.7 | 99.5% |
| Goods Producing | 208.2 | 19.2% |
| Mining | 0.2 | 0.0% |
| Construction | 46.4 | 4.3% |
| Manufacturing | 161.6 | 14.9% |
| Durable Goods | 150.5 | 13.9% |
| Computer and Peripheral Equipment | 48.9 | 4.5% |
| Semiconductor and Elec. Component | 41.8 | 3.9% |
| Electronic Instrument | 12.7 | 1.2% |
| Other | 47.1 | 4.3% |
| Nondurable Goods | 11.1 | 1.0% |
| Service Providing | 869.5 | 80.3% |
| Trade, Transportation and Utilities | 138.4 | 12.8% |
| Wholesale Trade | 36.5 | 3.4% |
| Retail Trade | 86.0 | 7.9% |
| Transp., Warehousing and Utilities | 15.9 | 1.5% |
| Information | 78.4 | 7.2% |
| Financial Activities | 35.5 | 3.3% |
| Professional and Business Services | 229.2 | 21.2% |
| Educational and Health Services | 162.9 | 15.0% |
| Leisure and Hospitality | 100.8 | 9.3% |
| Other | 28.2 | 2.6% |
| Government | 96.1 | 8.9% |
| Federal Government | 9.9 | 0.9% |
| State and Local Government | 86.2 | 8.0% |

*San Jose Metropolitan Statistical Area (MSA) is equivalent to Santa Clara and San Benito Counties.

Note: numbers may not sum due to rounding.

Source: California Employment Development Department, Labor Market Information Division; May 2016

0199



# FACT SHEET: EMPLOYMENT AND EMPLOYERS

*Department of Planning, Building & Code Enforcement, Planning Division*

## UNEMPLOYMENT RATES



**Unemployment Rates**

| | San Jose MSA | California | United States |
|---|---|---|---|
| % Unemployed | 3.4% | 5.2% | 4.7% |

Source: California Employment Development Department, Labor Market Information Division; May 2016

## MAJOR PRIVATE / PUBLIC EMPLOYERS

| No. | Company/Organization | San Jose Employees |
|---|---|---|
| 1 | County of Santa Clara | 17,800 |
| 2 | Cisco Systems | 14,000 |
| 3 | City of San Jose | 5,945 |
| 4 | San Jose State University | 4,300 |
| 5 | Western Digital/HGST | 3,000 |
| 6 | eBay | 2,800 |
| 7 | Paypal, Inc. | 2,800 |
| 8 | IBM Corporation | 2,800 |
| 9 | Adobe Systems | 2,100 |
| 10 | Kaiser Permanente | 2,100 |
| 11 | Good Samaritan Hospital | 2,000 |
| 12 | Target Corporation | 1,900 |
| 13 | Brocade Communication | 1,700 |
| 14 | Cadence Design Systems Inc. | 1,600 |
| 15 | Maxim Integrated Products | 1,600 |

Source: Office of Economic Development, City of San Jose; 2014

## MAJOR HIGH TECH EMPLOYERS

| No. | Company | Product | San Jose Employees |
|---|---|---|---|
| 1 | Cisco Systems | Computer Equipment | 13,600 |
| 2 | eBay | Online Auction | 4,700 |
| 3 | IBM | Computer Equipment | 4,200 |
| 4 | Hitachi | Storage | 2,070 |
| 5 | Adobe Systems | Software | 2,000 |
| 6 | Cadence Design Systems | Software | 1,800 |
| 7 | Sanmina-SCI | Electronics Manufacturing | 1,770 |
| 8 | Maxim Integrated | Semiconductors | 1,650 |
| 9 | Brocade Communications | Computer Equipment | 1,470 |
| 10 | Ericsson | Telecommunications | 1,360 |
| 11 | Xilinx | Semiconductor Equipment | 1,300 |
| 12 | Altera | Semiconductors | 970 |
| 13 | BD Bioscience | Biotechnology | 920 |
| 14 | SuperMicro | Computer Equipment | 920 |
| 15 | Micrel Semiconductor | Semiconductors | 660 |

Source: Office of Economic Development, City of San Jose; 2013

0200



# FACT SHEET: HOUSING

*Department of Planning, Building & Code Enforcement, Planning Division*

## HOUSING RENTALS

| Unit Type | *Asking Rental Rate* |
|-----------|---------------------|
| Studio | $1,802 |
| 1 Bedroom | $2,244 |
| 2 Bedroom | $2,792 |
| 3 Bedroom | $3,368 |
| *Average* | **$2,473** |



Source: RealFacts; First Quarter 2016

Ohlone Court Apartments, South San Jose

## HOUSING SALES

| Unit Type | Sales | *Average Price* | *Median Price* | *Days on Market* |
|-----------|-------|-----------------|----------------|-------------------|
| Single-Family Detached | 299 | $889,423 | $811,000 | 36 |
| Condominium/Townhouse | 155 | $543,903 | $500,000 | 28 |

Source: Santa Clara County Assoc. of Realtors; January 2016

## HOUSING TENURE AND VACANCY

| *Tenure* | |
|----------|-----|
| Owner Occupied Units | 56.1% |
| Renter Occupied Units | 43.9% |
| *Vacancy Rate* | 4.5% |



Source: US Census Bureau, American Community Survey; 2014

## HOUSING UNITS BY TYPE

Los Esteros Apartments, North San Jose

| | | Single-Family | | | |
|---|---|---|---|---|---|
| | *Total Units* | *Detached* | *Attached* | *Multi-Family* | *Mobile Homes* |
| San Jose | **323,195** | 176,881 | 36,745 | 100,179 | 9,390 |
| Santa Clara County | **651,171** | 348,959 | 67,992 | 216,121 | 18,099 |

Source: California Department of Finance; 2014

0201



# FACT SHEET: HOUSING

*Department of Planning, Building & Code Enforcement, Planning Division*

## RESIDENTIAL CONSTRUCTION



Source: City of San Jose; 2015

| New Housing by Unit Type | | | |
|---|---|---|---|
| Year | Single-Family | Multi-Family | Total |
| 2005 | 846 | 1,742 | 2,588 |
| 2006 | 604 | 1,875 | 2,479 |
| 2007 | 482 | 1,644 | 2,126 |
| 2008 | 260 | 1,709 | 1,969 |
| 2009 | 86 | 221 | 307 |
| 2010 | 82 | 2,382 | 2,464 |
| 2011 | 109 | 937 | 1,046 |
| 2012 | 193 | 3,304 | 3,497 |
| 2013 | 280 | 3,459 | 3,739 |
| 2014 | 394 | 4,066 | 4,460 |
| 2015 | 160 | 1,860 | 2,020 |
| | | | |
| Average | 318 | 2,109 | 2,427 |



Three Sixty Residences, Downtown



Tierra Encantada, Alum Rock



Palma Sorrento, Edenvale

0202



**FACT SHEET: QUALITY OF LIFE**

*Department of Planning, Building & Code Enforcement, Planning Division*

## CULTURAL / RECREATIONAL RESOURCES





**Family Resources**

Children's Discovery Museum
Christmas in the Park
Downtown Farmer's Market
Dr. Martin Luther King, Jr. Library
Happy Hollow Park and Zoo
History Park
HP Pavilion
Japanese Friendship Garden in Kelley Park
Lake Cunningham Park/Raging Waters
Lick Observatory
Logitech Ice at San Jose
Mexican Heritage Plaza
Outback Adventures
Peralta Adobe and Fallon House Historic Site
Prusch Farm Park
Rosicrucian Egyptian Museum
San Jose Municipal Rose Garden
San Jose Museum of Art
San Jose Museum of Quilts and Textiles
The Tech Museum of Innovation
Winchester Mystery House

**Nightlife / Performing Arts Resources**

Ballet San Jose Silicon Valley
Broadway San Jose
Children's Musical Theater San Jose
Opera San Jose
San Jose Jazz
San Jose Repertory Theatre
San Jose Stage Company
Symphony Silicon Valley



**Professional Sports Resources**

Amgen Tour of California (Professional Cycling)
San Jose Giants (Minor League Baseball)
San Jose SaberCats (Arena Football League)
San Jose Sharks (National Hockey League)
San Jose Stealth (National Lacrosse League)

Source: City of San Jose; 2011



0203



## FACT SHEET: QUALITY OF LIFE

*Department of Planning, Building & Code Enforcement, Planning Division*

### TRANSPORTATION

**Air** (Norman Y. Mineta San Jose Int'l)
| | |
|---|---:|
| Annual Passengers | 8.4 million |
| Major Passenger Airlines | 11 |
| Nonstop Service Destinations | 32 |

| **Rapid Transit** (BART) | **Scheduled** |
|---|---:|
| **Under Construction (Berryessa)** | 2018 |

| **Commuter Rail** (Caltrain) | **Systemwide** |
|---|---:|
| Weekday Ridership | 42,354 |
| Stations | 33 |

| **Light Rail** | **Countywide** |
|---|---:|
| Annual Ridership | 10.0 million |
| Stops | 62 |

| **Bus** | **Countywide** |
|---|---:|
| Annual Ridership | 32.0 million |
| Stops | 4,300 |

| Mean Travel Time to Work | 26.8 minutes |
|---|---:|

Source: City of San Jose, 2014;

US Census Bureau, American Community Survey; 2014





### PUBLIC SAFETY

**Crime Rate**
(Crimes per 1,000 population)

| City | Crime Rate |
|---|---:|
| San Jose | 27.6 |
| Boston | 33.6 |
| Denver | 39.6 |
| Phoenix | 43.0 |
| Dallas | 67.3 |
| Portland | 57.1 |
| Seattle | 42.5 |

**San Jose is rated as one of the
"Safest Big Cities" in the nation.**

Source: Federal Bureau of Investigation; 2014

### CLIMATE

**Seasonal Temperatures**

| *Month* | *Avg. Temp* |
|---|---:|
| January | 50 °F |
| April | 58 °F |
| July | 70 °F |
| October | 63 °F |
| | |
| Annual | 60 °F |

**Seasonal Rainfall**

| *Month* | *Avg. Rainfall* |
|---|---:|
| January | 2.78 in. |
| April | 1.17 in. |
| July | 0.06 in. |
| October | 0.90 in. |
| | |
| Annual | 14.42 in. |

0204



# EXHIBIT 20

JEFFREY M. DAVIDSON (SBN 248620)
ALAN BERSIN (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the University of California and Janet Napolitano, in her official capacity as President of the University of California*

THEODORE J. BOUTROUS, JR. (SBN 132099)
ETHAN D. DETTMER (SBN 196046)
JESSE S. GABRIEL (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez, and Jirayut Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, <br><br> Defendants. | CASE NO. 17-CV-05211-WHA <br><br> **DECLARATION OF KATHRYN EIDMANN** |

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA, | CASE NO. 17-CV-05235-WHA |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN, | CASE NO. 17-CV-05380-WHA |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security, | |
| Defendants. | |

DECLARATION OF KATHRYN EIDMANN
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

| | |
|---|---|
| COUNTY OF SANTA CLARA and SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 521, | CASE NO. 17-CV-05813-WHA |

1  COUNTY OF SANTA CLARA and
   SERVICE EMPLOYEES INTERNATIONAL
2  UNION LOCAL 521,

3                    Plaintiffs,

4          v.

5  DONALD J. TRUMP, in his official capacity
   as President of the United States, JEFFERSON
6  BEAUREGARD SESSIONS, in his official
   capacity as Attorney General of the United
7  States; ELAINE DUKE, in her official
   capacity as Acting Secretary of the Department
8  of Homeland Security; and U.S.
   DEPARTMENT OF HOMELAND
9  SECURITY,

10                   Defendants.

CASE NO. 17-CV-05813-WHA

**DECLARATION OF KATHRYN EIDMANN**

I, KATHRYN EIDMANN, declare as follows:

1.     I am a Supervising Senior Staff Attorney at Public Counsel.  Public Counsel is the nation's largest not-for profit law firm specializing in delivering pro bono legal services.  Founded in 1970, Public Counsel strives to protect the legal rights of disadvantaged children, represent immigrants who have been the victims of torture, persecution, domestic violence, trafficking, and other crimes, and foster economic justice by providing individuals and institutions in underserved communities with access to quality legal representation.  I have personal knowledge of the facts set forth in this declaration, and if called as a witness, I could and would competently testify to them.

2.     I am the Robins Kaplan Supervising Senior Staff Attorney in Public Counsel's Opportunity Under Law Project. In this capacity, I bring impact litigation to advance economic justice, including in the areas of education equity, children's rights, economic rights, and immigrants' rights. I currently supervise a team of six attorneys, two community organizers, and one paralegal. I have worked at Public Counsel since January 2013. (The Opportunity Under Law Project was called the Impact Litigation Project until approximately August 2014).  Previously, I was a litigation associate at the law firm of Munger, Tolles & Olson LLP and clerked for Judge Thomas B. Griffith of the U.S. Court of Appeals, District of Columbia Circuit.  I graduated from Yale Law School in 2009 and Harvard College in 2006.

3.     I came to know Viridiana Chabolla (Viri) through her work at Public Counsel.  I participated in Viri's hiring at Public Counsel. Together with Catherine Lhamon, the Directing Attorney of the Impact Litigation Project at the time, I initially interviewed Viri in April 2013.  At the time, I was particularly impressed with Viri's emotional intelligence, passion, and commitment to working on behalf of disenfranchised communities.  Over the course of four years, Viri worked closely with me and the other lawyers in our unit to develop and pursue innovative education equity and civil rights litigation as a community organizer in Public Counsel's Opportunity Under Law project.

4.     Viri's contribution to Public Counsel has been quite significant.  She was the driving force behind *Cruz v. California*, an education rights class action that resulted in the elimination of contentless courses through statewide legislation.  *Cruz v. California* involved students at low-income

elementary, middle, and high schools in the Bay Area and Southern California, who were receiving less meaningful learning time than students in better-resourced California schools serving more affluent students.  After two years of litigation, we were successfully resolved the litigation.  A new state law, AB 1012 was passed to eliminate the scheduling and course assignment practices that led to students losing valuable learning time statewide.  The California Department of Education, the State Board of Education, and the State Superintendent of Public Instruction additionally agreed to immediately assist six schools in Compton, Los Angeles, and Oakland to secure compliance with AB 1012.

5.      Viri's work was indispensable to the initiation and ultimate success of *Cruz v. California*. Viri identified, developed, and maintained relationships with scores of student declarants and teachers throughout Southern California, including coordinating all communications regarding declarations, discovery, and potential trial testimony.  She did much of the work that attorneys would otherwise be doing, including interviewing witnesses and drafting declarations.

6.      Public Counsel trusted Viri to represent our work in the community and in the media. She initiated and fostered relationships with numerous, diverse community-based organizations, work that has been instrumental in developing consistent and reliable advocacy partners.  She also served effectively as a spokesperson for Spanish-language media.

7.       Viri is an intelligent, capable, and skilled advocate, as well as an empathetic, passionate, and inspiring person.  She developed impressive rapport and skillfully gained the trust of clients, witnesses, and community partners.  She demonstrated remarkable sensitivity and empathy in appropriately addressing emotional, delicate, or challenging conversations. She treated everyone she encountered with honor and respect, taking time and care not only to develop, but to maintain, longstanding and effective relationships with clients and community members.  She quietly did a tremendous amount of work that sometimes went unnoticed to foster a solid and trusting relationship with clients: sending birthday and graduation cards, providing help with college admissions, or stopping by to offer emotional support to young people in crisis.

8.      Viri is incredibly hard-working and demonstrated impressive flexibility, reliability, and responsiveness in response to the urgency and unpredictability that often characterize litigation, often

1    working late at night, early in the mornings, and all through the weekends.  Through her work at Public

2    Counsel, Viri has already become a tremendously skilled advocate.  She has a rare combination of

3    intellect and interpersonal skills that will no doubt make her an outstanding attorney.

4            9.      I have had several conversations with Viri over the years about her professional plans

5    after leaving Public Counsel.  Based on these conversations, I understand that Viri would not have

6    elected to attend law school if she did not have DACA status, which would permit her to obtain

7    employment in the legal field after she completes her studies.

8            10.     Based on numerous conversations I had with her over the years, I understand that Viri is

9    pursuing a legal degree so she can advocate on behalf of families and communities like her own.  She is

10   precisely the type of lawyer that our profession desperately needs.  If DACA were rescinded and Viri

11   were not able to obtain employment as at attorney, the years of training and preparation that Viri has

12   spent working to prepare to enter the legal field would be lost.  Moreover, immigrant and low-income

13   communities—communities that are often in desperate need of legal services but are often unable to

14   obtain these services due to resource limitations—would be deprived of a rare advocate who is not only

15   capable and zealous, but has a deep and nuanced understanding of the concerns and perspectives of the

16   community derived from her own personal experiences.

17            I declare under penalty of perjury under the laws of the United States of America that the

18   foregoing is true and correct.

19            Executed on October 27, 2017, in Los Angeles, California.

21    _____
                 KATHRYN EIDMANN



# EXHIBIT 21

JEFFREY M. DAVIDSON (SBN 248620)
ALAN BERSIN (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the
University of California and Janet Napolitano, in
her official capacity as President of the
University of California*

THEODORE J. BOUTROUS, JR. (SBN 132099)
ETHAN D. DETTMER (SBN 196046)
JESSE S. GABRIEL (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam
Gonzalez Avila, Saul Jimenez Suarez, Viridiana
Chabolla Mendoza, Norma Ramirez, and Jirayut
Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and
Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security,<br><br>Defendants. | CASE NO. 17-CV-05211-WHA<br><br>**DECLARATION OF CHRISTOPHER ENGELMANN** |

0211

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA,<br><br>    Plaintiffs,<br><br>    v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA,<br><br>    Defendants. | CASE NO. 17-CV-05235-WHA |
| CITY OF SAN JOSE, a municipal corporation,<br><br>    Plaintiffs,<br><br>    v.<br><br>DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA,<br><br>    Defendants. | CASE NO. 17-CV-05329-WHA |
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN,<br><br>    Plaintiffs,<br><br>    v.<br><br>UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security,<br><br>    Defendants. | CASE NO. 17-CV-05380-WHA |

0212

| | |
|---|---|
| COUNTY OF SANTA CLARA and SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 521, | CASE NO. 17-CV-05813-WHA |

<table>
<tr><td>1</td><td colspan="2">COUNTY OF SANTA CLARA and<br>SERVICE EMPLOYEES INTERNATIONAL</td></tr>
</table>

1   COUNTY OF SANTA CLARA and        CASE NO. 17-CV-05813-WHA
    SERVICE EMPLOYEES INTERNATIONAL
2   UNION LOCAL 521,

3                    Plaintiffs,

4           v.

5   DONALD J. TRUMP, in his official capacity
    as President of the United States, JEFFERSON
6   BEAUREGARD SESSIONS, in his official
    capacity as Attorney General of the United
7   States; ELAINE DUKE, in her official
    capacity as Acting Secretary of the Department
8   of Homeland Security; and U.S.
    DEPARTMENT OF HOMELAND
9   SECURITY,

10                   Defendants.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I, CHRISTOPHER ENGELMANN, DECLARE:

1.      I am a currently a psychology student at Fuller Theological Seminary – School of Psychology.  I have my masters in psychology and I am working towards earning my Ph.D in clinical psychology.  I am also working as a therapist-in-training at Fuller Psychological and Family Services. Fuller Theological Seminary is a Christian academic institution that takes a holistic approach to psychological therapy and that incorporates a faith perspective and understanding into our therapeutic work.  Our school and clinic are located in Pasadena, California.

2.      I have personal knowledge of the facts set forth in this declaration, and if called as a witness, I could and would competently testify to them.

3.      Norma Ramirez and I are in the same Ph.D program at Fuller.  We have gotten to know one another on a professional level, and have also developed a close personal friendship.  We worked together as therapists-in-training at Pacific Clinics in Monrovia, California from September 2016-June 2017, and we now work together at Fuller Psychological and Family Services also as therapists-in-training.  In our work together and in class together, we help sharpen each other's skills and develop our research interests.

4.      Ms. Ramirez is one of the most kind-hearted people I know.  She consistently puts other people first, and it is a privilege to know her as a friend and a colleague.  Ms. Ramirez has a unique ability to understand and to empathize with others, and she meets people where they are emotionally and psychologically.  She is also able to balance the role of being kind with being firm when necessary, which is critical in the field of psychology.  She has incredible insight into the field of psychology, and her personal background adds to that insight and also to our classroom experience.

5.      I learned that Ms. Ramirez is an immigrant when I first met her back in 2015.  She explained to me that, because of her personal background, she worked to help people who had just immigrated to the United States when she was in Las Vegas.  Her background as an immigrant and the challenges she has faced as a result of her undocumented status have allowed her to develop unique and meaningful relationships with her clients, which I myself have witnessed while working with her.  Ms. Ramirez is able to help clients with similar backgrounds feel like they are fully understood and empathized with, and I believe that this helps immensely with their healing process.  Whereas she

1

0214

1  generally does not disclose her own personal background to clients, I believe that she is able to forge a

2  deeper connection with those with similar backgrounds and connect with them on a deeper level in a

3  way that facilitates deep healing, compared to therapists who do not share her experience as an

4  immigrant.

5     6. As a fellow trainee in two different locations over the past year and a half, I have been in

6  supervision groups with Ms. Ramirez. As such, I have personally heard de-identified stories of clients

7  she has seen as a therapist-in-training. Thus, I have personal knowledge of the fact that Ms. Ramirez has

8  helped many individuals with therapy. Among other things, her work has involved helping those dealing

9  with trauma, including those with trauma related to immigration status. In such cases, Ms. Ramirez's

10  own experiences as an undocumented immigrant have enabled her to empathize more deeply and she

11  has facilitated hope and therapeutic progress in ways that would have been less likely for a therapist

12  without these experiences.

13     7. Ms. Ramirez's work as a therapist-in-training has had a critical impact on her clients'

14  lives, particularly in crisis situations. I have seen her respond readily in such circumstances, going well

15  beyond the regular weekly therapy session and providing additional support and help as was necessitated

16  by the crisis, even when this involved meeting more frequently and at multiple locations (e.g., school,

17  home).  She is clearly a person who is willing to give her all in her efforts to provide the best services

18  possible.

19     8. Based on my hearing the descriptions of multiple cases in our joint supervision sessions, I

20  can attest that many clients have improved significantly as a result of the therapy that Ms. Ramirez has

21  provided to them.  I have no doubt that Ms. Ramirez's work as a therapist-in-training has significantly

22  helped clients, and for those in acute crisis, this might have even involved the avoidance of self-injurious

23  or suicidal behavior.

24     9. If Ms. Ramirez is not allowed to continue with her education and her therapy work on

25  account of her loss of Deferred Action for Childhood Arrivals ("DACA") status, the impact on her

26  clients and the community more generally will be devastating.  Simply put, the consequences of Ms.

27  Ramirez losing her DACA status will be measured in countless missed opportunities for her to provide

28  valuable psychological help to those in need.  Moreover, it will prevent other clinicians from learning

2

1   from her, both regarding her therapeutic work and her ongoing research regarding the impacts of
2   immigration status on mental health.
3       10.    In the United States, there is a shortage of qualified therapists—let alone therapists and
4   researchers as skilled as Ms. Ramirez.  Not only will Ms. Ramirez's current and future clients suffer if
5   Ms. Ramirez loses her DACA status, but Ms. Ramirez's loss of DACA will be a huge loss to the field of
6   clinical psychology as a whole.  Her cutting-edge research into the effects of parental immigration status
7   on Latino youth and their academic aspirations would go unfinished, and its potentially exponential
8   positive impact on clinicians and clients would not be realized.  Moreover, Mr. Ramirez has already had
9   an enormous impact on our fellow students at Fuller.  She has shared her experiences as an immigrant in
10  the classroom, and in doing so has taught other students at Fuller about the unique difficulties and
11  emotional challenges that immigrants in the United States face.  This has made us better students and
12  therapists-in-training for our immigrant patients.
13      11.    Ms. Ramirez also has made an incredible impact on me personally as her colleague and
14  friend.  I am even more inspired and impressed by her achievements in light of the potential
15  discontinuation of DACA.  We have had conversations about how she depends on DACA to work in the
16  United States and to obtain the education she needs to follow her vocational calling.  The fear of being
17  deported is a huge source of stress and anxiety for her, although we never spoke about it before we
18  learned the results of the presidential election in 2016, and the threat of losing her DACA status became
19  a reality.  Since then, she has shared with me her great sadness and deep fears of being deported.  Her
20  ability to continue her work helping others in light of that personal stress and fear, however, reinforces
21  my belief that Ms. Ramirez truly is a selfless and remarkable individual.  Our society would be
22  irreparably harmed if Ms. Ramirez is not permitted to continue her life-changing work.
23
24
25
26
27
28

3

0216

1

2   I declare under penalty of perjury that the foregoing is true and correct.

3   Executed on October 30, 2017, in Pasadena, CA.

4

5

6                                                    Christopher Engelmann

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

0217



**EXHIBIT 22**

JEFFREY M. DAVIDSON (SBN 248620)
ALAN BERSIN (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the
University of California and Janet Napolitano, in
her official capacity as President of the
University of California*

THEODORE J. BOUTROUS, JR. (SBN 132099)
ETHAN D. DETTMER (SBN 196046)
JESSE S. GABRIEL (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam
Gonzalez Avila, Saul Jimenez Suarez, Viridiana
Chabolla Mendoza, Norma Ramirez, and Jirayut
Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and
Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, <br><br> Defendants. | CASE NO. 17-CV-05211-WHA <br><br> **DECLARATION OF ALAN ESSIG, MEG WIEHE, AND MISHA HILL** |

0218

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA, | CASE NO. 17-CV-05235-WHA |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN, | CASE NO. 17-CV-05380-WHA |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security, | |
| Defendants. | |

DECLARATION OF ALAN ESSIG, MEG WIEHE, AND MISHA HILL
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

0219

1   COUNTY OF SANTA CLARA and          CASE NO. 17-CV-05813-WHA
    SERVICE EMPLOYEES INTERNATIONAL
2   UNION LOCAL 521,

3                   Plaintiffs,

4        v.

5   DONALD J. TRUMP, in his official capacity
    as President of the United States, JEFFERSON
6   BEAUREGARD SESSIONS, in his official
    capacity as Attorney General of the United
7   States; ELAINE DUKE, in her official
    capacity as Acting Secretary of the Department
8   of Homeland Security; and U.S.
    DEPARTMENT OF HOMELAND
9   SECURITY,

10                  Defendants.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

We, Alan Essig, Meg Wiehe, and Misha Hill, declare:

1.    We are tax policy experts working for the Institute on Taxation and Economic Policy (ITEP).  ITEP is a non-profit, nonpartisan research organization that provides in-depth analyses on the effects of federal, state, and local tax policies.  ITEP's mission is to ensure the nation has a fair and sustainable tax system that raises enough revenue to fund our common priorities, including education, health care, infrastructure, and public safety.  ITEP researchers use a microsimulation tax model to produce distributional and revenue analyses of current tax systems and proposed changes at the federal, state, and local level.

2.    Alan Essig has been the Executive Director of ITEP since April 2017.  He holds a master's degree from the Nelson A. Rockefeller College of Public Affairs and Policy at the State University of New York at Albany and an undergraduate degree from the State University of New York at Buffalo.  Attached as Exhibit A is a true and correct copy of Alan Essig's curriculum vitae.

3.    Meg Wiehe is the Deputy Director of ITEP.  She has worked with ITEP since 2010.  Meg is nationally recognized expert on state and local taxation.  She studies, writes, and provides commentary and insight to a wide range of audiences on historical and current trends in state tax and budget policy.  In particular, her analyses focus both on how tax and budget policies affect low- and moderate-income families as well as the intersection of fiscal policies and state and local governments' ability to fund basic public priorities, including education, infrastructure, and health care.  Meg has conducted hundreds of revenue and distributional analyses of proposed tax changes in more than 40 states using ITEP's microsimulation tax model.  She also is a lead author of ITEP's flagship report, *Who Pays? A Distributional Analysis of the Tax Systems in All Fifty States.*  Meg holds a Master of Public Administration from the Maxwell School at Syracuse University and a Bachelor of Arts in Anthropology from the University of Virginia.  Attached as Exhibit B is a true and correct copy of Meg Wiehe's curriculum vitae.

4.    Misha Hill has been a State Policy Fellow at ITEP since 2016.  She holds a Master of Public Policy from The George Washington University and Bachelor of Arts in Hispanic Studies from the University of Pennsylvania.  Attached as Exhibit C is a true and correct copy of Misha Hill's curriculum vitae.

0221

5.      According to U.S. Citizenship and Immigration Services (USCIS), the agency that administers Deferred Action for Childhood Arrivals (DACA), as of September 4, 2017, approximately 689,800 young people who were brought to the United States as children without documentation are currently enrolled in DACA.[1]  This population estimate from USCIS takes into account the latest estimates of former DACA recipients who have become lawful permanent resident (about 40,000) and those who were granted DACA but failed to reapply or whose reapplication was denied (about 70,000). The Migration Policy Institute, a non-profit, non-partisan think tank that analyzes the movement of people worldwide, estimates an additional 617,000 individuals are eligible for DACA but not currently enrolled.[2]

6.      We used the above estimates of the current population receiving and eligible for, but not receiving DACA, in each state to estimate the annual aggregate state and local tax contributions of the DACA-eligible population.[3]

7.      Young undocumented immigrants eligible for or enrolled in DACA, like all people living and working in the U.S., pay state and local income, property, sales, and excise taxes.  We estimate that the population currently enrolled in DACA contributes more than $1.25 billion in state and local taxes. Further, the population eligible for DACA but not currently enrolled contributes an additional $497.6 million in state and local taxes.  This brings the total contribution of the DACA-eligible population to just under $1.8 billion annually in state and local taxes. The following assumptions were made to calculate the sales and excise, income, and property taxes of the DACA-eligible population:

a.   Taxpaying units and employment status:

---

[1] "Approximate Active DACA Recipients." Available at:
https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%2
0Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf.

[2] Migration Policy Institute, "Deferred Action for Childhood Arrivals (DACA) Data Tools." Available:
http://www.migrationpolicy.org/programs/data-hub/deferred-action-childhood-arrivals-daca-
profiles#overlay-context=events.

[3] ITEP released a report in April 2017 that used USCIS data from September 2016.  This analysis uses
the same methodology with the most currently available population figures.

2
DECLARATION OF ALAN ESSIG, MEG WIEHE, AND MISHA HILL
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

0222

i.  ITEP's analysis treats each DACA-eligible immigrant who is working as a single taxpaying unit.

ii.  The employment rate of immigrants depends on legal status.

iii.  A 2017 national survey of 3,063 DACA recipients found that 91.4 percent of respondents were employed.[4]  DACA enrollees pay the same income taxes (in states with income taxes) as other lawfully present individuals.  DACA enrollees receive a temporary social security number which allows them to file federal and state income taxes and, additionally payroll taxes are deducted from their paychecks.

iv.  The previously mentioned national survey also found that prior to obtaining DACA, only 44% of survey respondents were employed.  Our analysis assumes that 44% of the population that is eligible for DACA but not currently enrolled are employed.

b.  Income of DACA-eligible population

i.  Immigrant wages change depending on legal status.  Undocumented workers earn $22,029 a year on average and granting DACA increases wages by 8.5 percent, according to a 2014 report by the Center for American Progress.[5]  The average wages applied to the estimated DACA working population in ITEP's analysis are:

- $23,901 for the DACA-eligible population working and enrolled in the program.

---

[4] "Results of Tom K. Wong et al., 2017 National DACA Study." Center for American Progress, https://cdn.americanprogress.org/content/uploads/2017/08/27164928/Wong-Et-Al-New-DACA-Survey-2017-Codebook.pdf.

The April 2017 ITEP report used employment figures from the 2016 survey.

[5] Wong's 2017 survey found a higher average salary for the DACA-eligible population enrolled and working ($36,232) than the Center for American Progress report.  Thus, by using an average salary of $23,901, this analysis provides a conservative tax contribution estimate.

3
DECLARATION OF ALAN ESSIG, MEG WIEHE, AND MISHA HILL
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

0223

- $22,029 for the DACA-eligible population working, but not enrolled in the program.

c.  Estimated effective tax rates (taxes as share of income) for sales, income, and property taxes paid by DACA-eligible population in each state.

    i.  ITEP's microsimulation computer model is a sophisticated program that applies the state and local tax laws in each state (including sales, excise, income, and property tax laws) to a statistically valid database of tax returns to generate estimates of the effective tax rates paid by taxpayers at various income levels under state and local tax law.  In January of 2015, ITEP released the 5th edition of *Who Pays?* which estimates the effect of the state and local tax laws as of January 2015 on taxpayers at 2012 income levels. This report applies effective tax rates calculated in the 2015 *Who Pays?* report to the DACA eligible population with some modifications in states with major tax changes since *Who Pays?* was published.

d.  The methodology used to calculate the contributions of the DACA-eligible population differs from the methodology used to calculate the contributions of all undocumented immigrants.  The primary differences are that we assume a higher average income and employment rate for the DACA-eligible population.  Thus the state and local tax contributions of the DACA-eligible population are not proportional to their share of the undocumented population.

8.  We estimate that the population currently enrolled in DACA contribute $242.4 million in state and local income taxes annually. The population that is eligible for but not enrolled in DACA contributes an additional $44.5 million bringing the total contributions of the DACA-eligible population to $286.9 million in state and local income taxes annually.

a.  Eligible immigrants enrolled in DACA are required to pay personal income taxes using a temporary social security number.  Thus, this study assumes the 626,437 DACA-enrolled workers are fully complying with state personal income taxes.  Personal income tax effective rates in each state were applied accordingly.  Various studies have estimated

4

between 50 and 75 percent of undocumented immigrants currently pay personal income taxes predominantly using Individual Tax Identification (ITIN) numbers or with false social security numbers.  This analysis assumes a 50 percent compliance rate for DACA-eligible immigrants who are not enrolled and applies 50 percent compliance if DACA protections are lost.  Personal income tax effective rates in each state were applied to 50 percent of the estimated income.

b.   Enrolled DACA recipients are eligible to receive the federal Earned Income Tax Credit (EITC) and the state versions of the credit as well, however state EITC benefits were not included in this study for two reasons: 1) all DACA-eligible workers are treated as single taxpaying units and 2) the average income of the enrolled DACA population is above the EITC income eligibility amounts for single workers.  The impact of state EITCs was also left out of the other policy options given that DACA-eligible immigrants not enrolled in the program are ineligible for the credit.

9.      We estimate the population currently enrolled in DACA contributes $281.1 million in state and local property taxes.  The population eligible for not enrolled in DACA contributes an additional $131.9 million bringing the total $413 million annually in state and local property taxes.  The DACA-eligible population pays property taxes either directly as homeowners, or indirectly through higher rents as tenants.

a.   The first step in calculating property taxes was to identify the share of DACA-eligible immigrants who are homeowners or renters in each state.  This analysis used state-by-state data from the Migration Policy Institute to estimate homeownership rates for undocumented immigrants in each state.  The ITEP model assumes that for renters, half of the cost of the property tax paid initially by owners of rental properties is passed through to renters.

10.      We estimate the population currently enrolled in DACA contributes $726.1 million state and local sales and excise taxes.  The population eligible but not enrolled in DACA contributes an additional $321.2 million bringing the total contributions of the DACA-eligible population to over $1 billion annually in state and local sales and excise taxes.  The DACA-eligible population, like anyone

5

0225

purchasing goods or services, pays consumption taxes directly at the point of sale on taxable items.

    a.   Sales and excise taxes are collected by retailers every time a purchase is made on a taxable good or service.  It is reasonable to assume that DACA eligible immigrants pay sales and excise taxes at similar rates to U.S. citizens and legal immigrants with similar incomes, thus the estimated rates in ITEP's *Who Pays?* for each state were applied to the various estimated DACA-eligible population incomes.

11.   A useful way to compare taxes paid across income levels is the effective tax rate.  This is the total of all taxes paid - income, property, and sales and excise - as a share of income.  The DACA-eligible population pays an average effective tax rate of 8.3%.  ITEP's 2015 report, *Who Pays: A Distributional Analysis of the Tax Systems in All Fifty States* found that the middle 20% of taxpayers pays on average an effective tax rate of 9.4%, and the top 1% of taxpayers pays just 5.4% of their income in taxes.[6]  This means the DACA-eligible population pays state and local taxes at a similar rate to middle income taxpayers across the country.

12.   We also estimate that if DACA protections were lost, the population would continue to contribute to state and local revenues, but at much lower levels.  We estimate a total loss of $696 million in state and local tax revenues.

    a.   DACA protections increase state and local tax contributions because they increase employment rates, increase average salaries, and increase the share paying state personal income taxes from 50 to 100 percent.  Surveys of DACA recipients found that after receiving DACA protections respondents were employed at higher rates and earned higher wages.  This is likely because the work authorizations and deferral from deportation provided by DACA allow recipients to better compete with legally present workers, pursue advanced degrees, and protects them from wage theft by unscrupulous employers.  Thus, a loss of DACA protections would eliminate the revenue gained from the increased salaries DACA affords.

13.   There are residents of every state who are eligible for or enrolled in DACA, which means

---

[6] Carl Davis, et al., *Who Pays? A Distributional Analysis of the Tax Systems in All 50 States, 5th ed.*, Institute on Taxation and Economic Policy, Jan. 2015, www.whopays.org.

every state revenue stream could be harmed by the loss of DACA protections. Some examples relevant to this case are below:

a.  In California, approximately 197,900 residents are currently enrolled in DACA. They contribute $358.3 million in state and local taxes. An additional 181,100 residents are eligible for but not enrolled in DACA. They contribute $136.8 million bringing the total contributions of the 379,000 DACA-eligible California residents to $495.1 million in state and local taxes annually. If DACA protections were lost, the contributions of California's total DACA-eligible population would decrease by $208.7 million to $286.4 million.

i.  Those currently enrolled in DACA in California contribute $222.9 million in sales and excise taxes. Those eligible for but not enrolled in DACA contribute an additional $90.3 million bringing the total sales and excise tax contributions of California's total DACA-eligible population to $313.2 million.

ii.  Those currently enrolled in DACA contribute $41 million in state personal income taxes. Those eligible for but not enrolled in DACA contribute an additional $8.3 million bringing the total personal income tax contribution of California's total DACA-eligible population to $49.3 million.

iii.  Those currently enrolled in DACA contribute $94.3 million in property taxes. Those eligible for but not enrolled in DACA contribute an additional $38.2 million bringing the total property tax contributions of California's total DACA-eligible population to $132.5 million.

iv.  Santa Clara County has the twelfth largest DACA-eligible population of counties nationwide. Approximately 15,000 Santa Clara residents are currently enrolled in DACA.[7] They contribute $14.8 million in state taxes (personal income tax and state sales tax) and $12.4 million to local taxes (property taxes and local sales taxes). An additional 13,700 are eligible but not enrolled bringing the total

---

[7] "State and County Estimates of DACA-Eligible Populations," Migration Policy Institute, https://www.migrationpolicy.org/programs/data-hub/deferred-action-childhood-arrivals-daca-profiles.

1    DACA-eligible population to 28,700.  The population that is eligible but not

2    enrolled contributes $5.4 million in state and $5 million in local taxes.

3        Altogether, the total DACA-eligible population in Santa Clara County contributes

4    $20.2 million in state and $17.4 million in local taxes.

5  b.  In Maine, approximately 40 residents are currently enrolled in DACA. They

6  contribute over $67,600 in state and local taxes.  An additional 60 residents are eligible

7  for but not enrolled in DACA.  They contribute over $41,100 bringing the total

8  contributions of the 100 DACA-eligible Maine residents to over $108,700 in state and

9  local taxes annually.  If DACA protections were lost, their contributions would decrease

10  by $40,300 to $68,400.

11    i.   Those currently enrolled in DACA contribute $32,000 in sales and excise taxes.

12        Those eligible but not enrolled contribute an additional $26,000 in sales and

13        excise taxes bringing the total sales and excise tax contributions of Maine's

14        DACA-eligible population to $58,000.

15    ii.  Those currently enrolled in DACA contribute $23,000 in state personal income

16        taxes.  Those eligible but not enrolled contribute an additional $5,000 in personal

17        income taxes bringing the total personal income tax contributions of Maine's

18        DACA-eligible population to $28,000.

19    iii.  Those currently enrolled in DACA contribute $11,000 in property taxes.  Those

20        eligible but not enrolled contribute an additional $9,000 in property taxes bringing

21        the total property tax contributions of Maine's DACA-eligible population to

22        $20,000.

23  c.  In Maryland, approximately 8,100 residents are currently enrolled in DACA.  They

24  contribute $18.1 million in state and local taxes.  An additional 15,900 residents are

25  eligible for but not enrolled in DACA.  They contribute $15.5 million bringing the total

26  contributions of the 24,000 DACA-eligible Maryland residents to $33.6 million in state

27  and local taxes annually.  If DACA protections were lost, their contributions would

28

decrease by $10.3 million to $23.3 million.

    i.  Those currently enrolled in DACA contribute $7.5 million in sales and excise taxes.  Those eligible but not enrolled contribute an additional $8.5 million in sales and excise taxes bringing the total sales and excise tax contributions of Maryland's DACA-eligible population to $16 million in sales and excise taxes.

    ii.  Those currently enrolled in DACA contribute $7.4 million in state income taxes. Those eligible but not enrolled contribute an additional $2.3 million in income taxes bringing the total state income tax contributions of Maryland's DACA-eligible population to $9.7 million.

    iii.  Those currently enrolled in DACA contribute $3.2 million in property taxes. Those eligible but not enrolled contribute an additional $4.4 million in property taxes bringing the total property tax contributions of Maryland's DACA-eligible population to $7.6 million.

d.  In Minnesota, approximately 5,550 residents are currently enrolled in DACA.  They contribute $10.8 million in state and local taxes.  An additional 4,500 residents are eligible for but not enrolled in DACA.  They contribute $3.3 million bringing the total contributions of the 10,000 DACA-eligible residents to $14.1 million in state and local taxes annually.  If DACA protections were lost, their contributions would decrease by $6.8 million to $7.3 million.

    i.  Those currently enrolled in DACA contribute $5.5 million in sales and excise taxes.  Those eligible but not enrolled contribute an additional $2 million bringing the total sales and excise tax contributions of Minnesota's DACA-eligible population to $7.5 million.

    ii.  Those currently enrolled in DACA contribute $3.5 million in state income taxes. Those eligible but not enrolled contribute an additional $640,000 bringing the total state income tax contributions of Minnesota's DACA-eligible population to $4.1 million.

9

DECLARATION OF ALAN ESSIG, MEG WIEHE, AND MISHA HILL
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

0229

iii.   Those currently enrolled in DACA contribute $1.8 million in property taxes. Those eligible but not enrolled contribute an additional $671,000 bringing the total property tax contributions of Minnesota's DACA-eligible population to just under $2.5 million.

14.     For all the foregoing reasons, in our professional opinions, rescinding DACA would reduce the state and local tax contributions of the population eligible for DACA by at least half.  This would hamper state and local revenues and hurt their economies.

We declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of our knowledge.

Executed on October 26, 2017, at Washington, DC.

_____

Alan Essig

_____

Meg Wiehe

_____

Misha Hill

10

0230

# EXHIBIT A

**Alan Essig**
5914 Highgate Avenue
East Lansing, Michigan 48823
770-402-4630
aessig1959@gmail.com

**WORK EXPERIENCE**

**Executive Director**                                                      **2017-Present**
Institute on Taxation and Economic Policy

The Institute on Taxation and Economic Policy (ITEP) is a non-profit, non-partisan research organization that provides timely, in-depth analyses on the effects of federal, state, and local tax policies. Responsibilities include building and managing an annual budget of over $1.8 million and a staff of twelve, including analysts, communication staff, and administrative staff.

**Principal**                                                                **2016-2017**
Essig Gehl Consulting

Essig Gehl Consulting worked with non-profits to maximize their policy and advocacy impact through high-quality policy research and effective advocacy strategies. Responsibilities included the research and writing of policy reports as well as developing educational materials for a public education campaign.

**Executive Director**                                                       **2015**
Michigan Consumers for Healthcare

Michigan Consumers for Healthcare (MCH) was a nonprofit organization with a statewide mission focused on making affordable, quality healthcare a reality for all in Michigan. Upon taking over leadership of MCH it became apparent that the organization was not financially viable. Working with the Board of Directors, and to save the underlying mission of MCH, it was decided to merge MCH with an organization (Michigan League for Public Policy (MLPP)) with a similar mission and a stronger financial base. Working with the Executive Director and board of MLPP and the board of MCH, the merger was successfully completed by January 1, 2016.

**Founding Executive Director**                                              **2004-2015**
Georgia Budget and Policy Institute

The Georgia Budget and Policy Institute (GBPI) is an independent, nonprofit, nonpartisan organization that engages in research and education on the fiscal and economic health of the state of Georgia. GBPI studies tax and budget issues with an emphasis on the impact on low and moderate income Georgians. Areas of policy focus include healthcare (Medicaid, public health, implementation of Affordable Care Act), education (early childhood, K-12, higher education), anti-poverty and social safety net, economic development, and tax policy.
Responsibilities included building and managing an annual budget of over $1 million and a staff

of ten, including policy analysts, communication staff, development staff, and administrative staff.

Specific responsibilities included:

- Establishment of GBPI's research priorities and agenda.
- Researched and wrote policy reports and briefs concerning overall tax and budget policy.
- Oversaw organizational development and strategic planning, including capacity building.
- Worked with Development Director and appropriate Board committee to craft GBPI's long-term and annual development plan. Cultivated relationships with foundation representatives and other major donors, including foundations, corporations, and individuals.
- Write and delivered speeches and presentations in various venues, as well as represented GBPI at conferences and other relevant functions.
- In conjunction with Communications Director, implemented communications strategic plan by serving as main press spokesperson for organization and writing Op-Ed's and blogs.
- Built and maintained relationships with various politicians, policymakers, opinion leaders, and others involved in the legislative process. Wrote and presented legislative analysis, critique, and testimony.
- Built and maintained relationships with advocacy partner organizations, as well as coalitions.
- Ensured effective involvement of Board of Directors and brought appropriate matters before the Board for input, review, and/or approval.

**Senior Research Associate**                                                                 **2000-2004**
Georgia State University
Andrew Young School of Policy Studies
Fiscal Research Center

Researched and prepared public policy research reports and briefs in regards to taxes, state budget policy and process, economic development, Medicaid and other social welfare issues.

**Committee Aide**                                                                                    **2003**
Georgia House of Representatives Appropriations Committee

During 4-month legislative session was loaned as staff to Georgia House of Representatives. Responsibilities included advising Speaker and Chair of Appropriations Committee as to policy and budgetary issues in regards to state budget with emphasis on the Department of Community Health and the Department of Human Resources.

**Deputy Policy Director**                                                                     **2001-2002**
Office of the Governor
State of Georgia

As loaned senior staff to the Governor, helped formulate policy in the areas of health and human services,  including child welfare, public health, mental health, developmental disabilities, aging, Medicaid, economic development, taxes, and technology.  Provided oversight to the Departments of Human Resources, Community Health, Industry Trade and Tourism, Community Affairs, Labor, and the Georgia Technology Authority.

**Committee Aide**                                                              **2000 and 2001**
Georgia State Senate Appropriations Committee

During 4 month legislative session in 2000 and 2001 was loaned as staff to Georgia State Senate. Responsibilities included advising Lt. Governor and Chair of Appropriations Committee as to policy and budgetary issues in regards to state budget with a specific emphasis on the Department of Community Health and the Department of Human Resources.

**Assistant Commissioner**                                                     **1997-1999**
Office of Policy and Government Services
Georgia Department of Human Resources (DHR)

The Office of Policy and Government Services consists of the Office of Communications, Office of Fraud and Abuse, Office of Legal Services, and Office of Constituent Services and Intergovernmental Relations. Provided overall supervision to directors of the Offices and responsible for over 120 employees.

Legislative liaison to Georgia General Assembly and managed DHR legislation. Worked with the Commissioner and Division Directors to define the Department's position on legislation. Represented DHR with legislators and at legislative committee meetings.  Liaison for DHR with Governor's Office on policy and legislative matters.

Assisted the Commissioner on policy related areas.  Identified the issues involved for each policy area and worked on strategies to resolve the issues.

**Director, Deputy Director and Policy Analyst**                              **1993 -1997**
Georgia State Senate Research Office

Deputy Director (1996 - 1997) assisted the Director in the day to day operations of the office and staffed the Appropriations Committee.

Director during the 1996 legislative session, responsible for the day to day operations of office with staff of 10, and staffed the Appropriations Committee.

Policy Analyst (1993 - 1995) conducted research and analysis for the following committees: Appropriations, Finance and Public Utilities, and Retirement.  Advised the Lieutenant Governor and the Chair of Appropriations Committee as to policy and budgetary issues in regards to state budget.

**Deputy Director**                                                            **1995**
Budgetary Responsibility Oversight Committee (BROC)

Asked by Lieutenant Governor to serve in the newly created BROC office.  BROC was created to assist the Governor's Office of Planning and Budget and the Department of Audits in the performance of legislatively required program and policy evaluations.  Assisted the Director in hiring of initial staff and organizing initial evaluation projects.

**Operations Analyst**                                                    1989 - 1993
Georgia Department of Labor

Performed evaluations of the effectiveness of programs funded under the Job Training Partnership Act including program design, program participation, coordination of services and impact of program policy.  Designed mechanism to analyze state's return on investment for job training programs, created internal tracking system used to monitor job training programs, and managed ongoing $2.5 million contract for survey research.

**Policy Consultant**                                                           1991
Governor's Commission on Effectiveness and Economy in Government

Selected by the Commissioner of the Department of Labor to comply with the Governor's directive to serve on the Governor's Commission as Policy Consultant for the Economic Development Task Force. Recommended organizational and policy changes to save over $2 million, provided implementation plan to reorganize the Governor's Economic Development Council, and provided analytical and administrative support to task force.

**Legislative Budget Analyst**                                            1986 - 1989
New York State Senate Finance Committee (Minority Staff)

Analyzed budgetary and legislative issues for the New York State Departments of Labor, Civil Service, Economic Development and the Public Employees' Pension System.  Analyzed the New York City budget and made recommendations to Senate Minority Leader regarding state aid and tax issues affecting New York City. Assisted Senators and staff on agency appropriations, grants in aid, and state and federal legislation.

## EDUCATION

**Masters of Public Administration**                                          1985
Rockefeller College of Public Affairs and Policy
State University of New York at Albany
Major: Public Management

**Bachelor of Arts**                                                           1981
State University of New York at Buffalo
Major: History

## AWARDS

Named one of the 100 Most Influential Georgians by *Georgia Trend Magazine* in 2011, 2012, 2013, and 2014.

# EXHIBIT B

# MEG WIEHE

924 Green Street, Durham, NC 27701
(617) 230-3624 ● megwiehe@gmail.com

## EDUCATION

**Maxwell School of Syracuse University,** *Masters of Public Administration, June 2006*

**University of Virginia,** *Bachelor of Arts, Anthropology, May 1998.  Graduated with High Distinction*

## WORK EXPERIENCE

**Institute on Taxation and Economic Policy (ITEP)**                                    **Durham, NC/Washington, DC**
*Deputy Director (2016-present); State Tax Policy Director (2010-2016t)*

- Responsible for planning, managing, and implementing ITEP's state and federal tax policy programmatic work.  This includes setting organizational goals and priorities, tracking policy developments in all 50 states and the federal level, ensuring ITEP is informing and influencing key tax debates, and building and maintaining key partnerships.
- Serve as a spokesperson for ITEP, elevating the organization's profile through media interviews, presentations, and meetings with policymakers and funders.
- Along with Executive Director, oversee ITEP's fundraising program including grant proposal and report writing, maintaining relationships with funders, and cultivating new donors.
- Directly manage and support six staff members.
- Authored numerous ITEP reports on topics including tax credits for workers and families, documenting the taxes paid by undocumented immigrants, closing tax loopholes, promoting progressive revenue raising options, and comprehensive state and local tax reform.  Co-author on ITEP's flagship report, *Who Pays? A Distributional Analysis of the Tax Systems in All Fifty States.*

**North Carolina Justice Center**                                                                **Raleigh, NC**
*Senior Policy Analyst/Outreach Director; NC Budget and Tax Center (2006-2010)*
- Promoted progressive fiscal policy through coalition building, media outreach, lobbying, and public presentations
- Conducted research and wrote publications on state and local fiscal and economic policy
- Co-coordinator of statewide revenue coalition, Together NC, and led successful campaign to enact a state Earned Income Tax Credit in 2007

**Boston Museum Project**                                                                        **Boston, MA**
*Special Projects Coordinator/Project Coordinator (2002-2005)*
- Coordinated development operation laying ground work for $180 million capital campaign through prospect research, donor cultivation, and special events
- Led political and communications strategy including securing a site for project, producing newsletter, managing website content, and regular correspondence with project constituents
- Supervised two staff, conducted weekly staff meetings, and managed high-level Board of Directors

**MASSPIRG**                                                                                **Amherst and Boston, MA**
*Massachusetts Community Water Watch AmeriCorps Program Director (2000-2002)*
- Recruited, trained, and supervised 13 full-time AmeriCorps members
- Built collaborative relationships with non-profits and state and local government leaders
- Revised program mission, developed five year strategic plan, and established performance objectives
*Mass Student PIRG Campus Organizer (1998-2000)*
- Recruited, trained, and supervised college students and community volunteers to lead national, state, and local social change campaigns

**0237**

# EXHIBIT C

# Misha E. Hill

(C) 609.234.5931          804 Green St., Apt D-2, Durham, NC 27701          hill.misha@gmail.com

## EDUCATION

**Master of Public Policy Candidate,** concentration in Health Policy                     May 2016
*The George Washington University* | Washington, DC
  ❖ Women's Leadership Fellow: A highly selective leadership program
**B.A. Hispanic Studies,** concentrations in Modern Middle East Studies and Theatre Arts          May 2010
*University of Pennsylvania* | Philadelphia, PA
  ❖ Academic Research: Critical analysis of Spanish literature

## POLICY RESEARCH EXPERIENCE

**State Policy Fellow**                                                    Sept 2016—Present
*Institute on Taxation and Economic Policy* | Durham, NC
  ❖ Drafted blog posts on various state tax policy issues including taxes paid by undocumented immigrants, soda taxes, and state budgets
  ❖ Researched and drafted reports in collaboration with senior staff on various state policy issues including taxes paid by undocumented immigrants and soda taxes
  ❖ Analyzed existing and proposed state tax policies
  ❖ Tracked state legislative action related to tax policies
**Family Income Support Research Assistant**                                   Nov 2015—Sept 2016
*Center on Budget and Policy Priorities* | Washington, DC
  ❖ Compiled a weekly email for distribution to state and national advocates on the latest news and research related to TANF policies
  ❖ Collected national and state level TANF statistics, including annual spending, caseloads, and applications, from HHS and state agencies to inform internal analyses and future work
  ❖ Tracked state and federal legislative action related to income support programs
**Women's Health Policy Internship**                                         Jun 2015—Aug 2015
*The Henry J. Kaiser Family Foundation* | Washington, DC
  ❖ Peter G. Peterson Foundation Fiscal Policy Intern
  ❖ Compiled comprehensive database of Medicaid family planning expansion programs to inform future research
  ❖ Performed qualitative research for a fact sheet on financing of maternity care in the US
**Family Income Support Internship**                                         Sep 2014—May 2015
*Center on Budget and Policy Priorities* | Washington, DC
  ❖ Co-authored a report on state General Assistance programs and updated background research
  ❖ Drafted briefs for an advocacy tool kit distributed to 80 participants at a conference on expanding TANF work programs
  ❖ Modeled alternatives of changes to TANF policies displaying the effects on families' incomes
  ❖ Compiled data on TANF policies into summaries, fact sheets, graphs, and graphics for CBPP website used by advocates, experts, and civil society
  ❖ Monitored and summarized media on state and federal legislative and policy changes to income support programs
  ❖ Performed literature reviews of prior research related to various income support strategies

## LANGUAGES AND TECHNOLOGY SKILLS

**Language:**  Spanish, Fluent in written and oral
**Technology:** SPSS and STATA (academic training), Adobe Illustrator, WordPress, MailChimp, and The Raiser's Edge



# EXHIBIT 23

1  JEFFREY M. DAVIDSON (SBN 248620)
   ALAN BERSIN (SBN 63874)
2  COVINGTON & BURLING LLP
   One Front Street, 35th Floor
3  San Francisco, CA 94111-5356
   Telephone: (415) 591-6000
4  Facsimile: (415) 591-6091
   Email: jdavidson@cov.com,
5  abersin@cov.com
   *Attorneys for Plaintiffs The Regents of the*
6  *University of California and Janet Napolitano, in*
   *her official capacity as President of the*
7  *University of California*

8  THEODORE J. BOUTROUS, JR. (SBN 132099)
   ETHAN D. DETTMER (SBN 196046)
9  JESSE S. GABRIEL (SBN 263137)
   GIBSON, DUNN & CRUTCHER LLP
10 333 South Grand Avenue
   Los Angeles, CA 90071-3197
11 Telephone: (213) 229-7000
   Facsimile: (213) 229-7520
12 Email: tboutrous@gibsondunn.com,
   edettmer@gibsondunn.com,
13 jgabriel@gibsondunn.com
   *Attorneys for Plaintiffs Dulce Garcia, Miriam*
14 *Gonzalez Avila, Saul Jimenez Suarez, Viridiana*
   *Chabolla Mendoza, Norma Ramirez, and Jirayut*
15 *Latthivongskorn*

   XAVIER BECERRA
   Attorney General of California
   MICHAEL L. NEWMAN
   Supervising Deputy Attorney General
   JAMES F. ZAHRADKA II (SBN 196822)
   1515 Clay Street, 20th Floor
   P.O. Box 70550
   Oakland, CA 94612-0550
   Telephone: (510) 879-1247
   Email: James.Zahradka@doj.ca.gov
   *Attorneys for Plaintiff State of California*

   JOSEPH W. COTCHETT (SBN 36324)
   NANCY L. FINEMAN (SBN 124870)
   COTCHETT, PITRE & McCARTHY, LLP
   San Francisco Airport Office Center
   840 Malcolm Road, Suite 200
   Burlingame, CA 94010
   Telephone: (650) 697-6000
   Facsimile: (650) 697-0577
   Email: nfineman@cpmlegal.com
   *Attorneys for Plaintiff City of San Jose*

   JONATHAN WEISSGLASS (SBN 185008)
   STACEY M. LEYTON (SBN 203827)
   ERIC P. BROWN (SBN 284245)
   ALTSHULER BERZON LLP
   177 Post Street, Suite 300
   San Francisco, CA 94108
   Telephone: (415) 421-7151
   Facsimile: (415) 362-8064
   Email: jweissglass@altber.com
   *Attorneys for Plaintiffs County of Santa Clara and*
   *Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, <br><br> Defendants. | CASE NO. 17-CV-05211-WHA <br><br> **DECLARATION OF MIRIAM FELDBLUM** |

0240

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA, | CASE NO. 17-CV-05235-WHA |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN, | CASE NO. 17-CV-05380-WHA |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security, | |
| Defendants. | |

DECLARATION OF MIRIAM FELDBLUM
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

0241

| | |
|---|---|
| 1 | COUNTY OF SANTA CLARA and SERVICE EMPLOYEES INTERNATIONAL |
| 2 | UNION LOCAL 521, |
| 3 | Plaintiffs, |
| 4 | v. |
| 5 | DONALD J. TRUMP, in his official capacity |
| 6 | as President of the United States, JEFFERSON BEAUREGARD SESSIONS, in his official |
| 7 | capacity as Attorney General of the United States; ELAINE DUKE, in her official |
| 8 | capacity as Acting Secretary of the Department of Homeland Security; and U.S. |
| 9 | DEPARTMENT OF HOMELAND SECURITY, |
| 10 | Defendants. |

CASE NO. 17-CV-05813-WHA

**DECLARATION OF MIRIAM FELDBLUM**

I, MIRIAM FELDBLUM, declare as follows:

1.      I am the Vice President for Student Affairs and the Dean of Students at Pomona College. I am also a Politics professor and an immigration scholar.  Located in Claremont, California, Pomona College is a highly selective, private liberal arts college that provides a comprehensive education in the liberal arts and sciences to a student body of about 1,650 undergraduates, awarding bachelor of arts and bachelor of science degrees to approximately 400 students each year.  Since 2008, the college has fully reviewed undocumented students who graduate from a U.S. high school both for need-blind admission and for every type of private full-need financial aid the college offers.

2.      I first met Ms. Viridiana Chabolla ("Viri") during her first year at Pomona in 2009.  As part of our practice at Pomona, we sought to reach out to undocumented students to let them know about the resources and support on campus.   Viri was very engaged and committed, working with my colleagues and me about how best to support undocumented students on campus.  Viri was also a student leader at Pomona, working in the Draper Center for Community Partnerships, and in student peer mentoring and campus organizations.

3.      As a Politics professor and immigration scholar, I had the pleasure of hearing from Viri about her work as a sociology major.   Over the four years I interacted with Viri, her skills and abilities grew in wonderful ways, and she matured impressively both as a student-scholar and leader.  Her current accomplishments in law school and the community continue to impress me.

4.      The challenges facing undocumented students prior to the advent of Deferred Action for Childhood Arrivals (DACA) were tremendous.  Prior to DACA, undocumented students at Pomona faced significant barriers to fully take advantage of their education, find support on and off campus, and as importantly, to contribute back to their community.

5.      Prior to DACA, undocumented students at Pomona had no access to employment on campus, even as many student employment positions are key student leadership and educational opportunities that foster students' skills, abilities, and talents.  These positions include resident advisor, research assistant, program assistant, head mentor positions, and so on.   While Viri was a student at Pomona, we worked with her and other undocumented students to identify student leadership

1

0243

opportunities that they could pursue that did not require work authorization.   While we worked over the years to identify and develop potential experiential learning fellowship positions that were not employment based positions, these opportunities were very limited, as they could not be in service to the College, faculty, staff, or other students, and they must incorporate specific kinds of educational components.

6.       Undocumented students at Pomona and elsewhere were also unable to participate in Study Abroad, which is integral to the undergraduate educational experience, and required, in fact, for some majors.  While we worked with students and faculty to identify alternative domestic programs or provide waivers from a study abroad requirement in certain majors, the inability to go abroad for educational reasons detracted from the liberal arts educational experience for these students.

7.       Overall, while Pomona College treated undocumented students as domestic students for the purposes of admission and institutional financial aid, undocumented students on our campus still faced numerous challenges both on and off campus.  Beyond issues of employment and academic opportunities, undocumented students at Pomona were not sure they could trust us with information regarding their status, or who they should go to with questions about financial issues, academic concerns, or family situations that were related to their status.  Off-campus, undocumented Pomona students faced numerous barriers as well, including lack of drivers' licenses or official state-issued identification cards, inability to access federal or state financial aid, and so on.  Undocumented students at Pomona came from across the country, and so many also had to travel domestically to get to and from home.   These students were worried about immigration enforcement for themselves and their families.

8.       As a student at Pomona before she received DACA, Viri faced all these significant challenges.  And, even as a student, Viri was also very involved in helping us at the college identify the ways in which we could provide effective support for the growing numbers of undocumented students on our campus.

9.       Prior to the advent of DACA, we worked with Viri and other students to develop support for undocumented students in terms of policy, people, practices, and programs.  As noted above, a foundational part of the College's support has been our policy in place since 2008, to treat undocumented students as domestic students for the purposes of admission and financial aid.  However,

in listening to and working with our undocumented students, we recognized that access to campus was only one component of the support that students needed to thrive and succeed at Pomona.  Other key components included: (1) identifying key staff members and faculty advisors to provide direct support to students, and who could serve as links to a student support network and other kinds of outreach; (2) providing program funding for the student support network and peer mentoring; (3) training staff and providing consultation for faculty on how to support undocumented students, including providing historical and policy contexts; (4) developing non-employment based opportunities for leadership and learning opportunities; and (5) identifying emergency grant funding for student needs.

10.     Overall, we worked to develop a proactive, visible network of support, programs, and funding for undocumented students on campus, and moved away from a "don't ask, don't tell" approach.  At the same time, we were also very mindful of the need to  safeguard student privacy and confidentiality.

11.     Because of our extensive work with undocumented students prior to the advent of DACA, Pomona College is well positioned to comment on the already powerful benefits of DACA for Viri, and other college students, as well as the devastating impact that the termination of the program has already had and will certainly continue to have unless something is done.  Approximately 4% of the Pomona undergraduate population is "DACAmented" or undocumented, with the vast majority of students being DACA recipients.

12.     As DACA recipients, we have witnessed numerous Pomona College students who have now been able to further their educational experiences through study abroad, research assistantships, job opportunities, internships, and work on campus as student leaders, future scholars and leaders of our communities.  Pomona College alumni, who are DACA recipients, have gone on to medical school, teaching and graduate school, as well as work in the high tech industry, business and community organizations.   Viri's incredible success as a law student, as well as her work in the community, are a testament to her potential as a future leader and societal contributor.

13.     DACA transformed the daily lives of our undocumented students, including through employment on campus as resident advisors, research assistants, head mentors, tutors, and more, the ability to go on Study Abroad, work in community-based organizations, and to travel to conferences and

3

0245

1  research or job opportunities during the academic year and summer, all without the fear of deportation.

2  Our undocumented students were able to receive drivers' licenses, which also opened up additional

3  opportunities.  While DACAmented students continued to face challenges on and off campus, the level

4  of anxiety among these students significantly decreased, and many of them engaged in long-term

5  planning.  In the past five years, among Pomona College DACAmented students and alumni, many have

6  pursued and received outstanding job offers across many different industries and graduate school

7  acceptances (academic fields, law, and medicine), which in turn, have helped them to provide for their

8  families and start to build for their future.  Almost without exception, all these students and alumni have

9  also been very engaged in the community, looking to pay it forward, and to contribute to supporting

10  others and the communities in which they live.

11      14.     With the new changes in interior enforcement since January 2017, and the announcement

12  of the rescinding of DACA in September 2017, life has once again changed for our students and alumni

13  who are DACA recipients – this time in devastating ways.  From deteriorating emotional wellbeing to

14  reporting grave concerns about family members, from losing access to go on study abroad to the

15  diminishment and precariousness of future work and life prospects, our students and alumni have been

16  gravely harmed by the rescinding of DACA.

17      15.     Since the termination of DACA earlier this year, I have had the opportunity to speak with

18  Viri, other alumni and many of our current students like Viri about how they are feeling.  In a gathering

19  of our DACAmented and undocumented students after the announcement on September 5, students

20  expressed deep fear, anxiety, numbness, uncertainty, and concern.  The termination has devastated those

21  students who are DACA recipients. They are scared about what their futures hold, and uncertain about

22  whether they will be able to continue their schooling or continue on to the dream jobs that they all are

23  striving for.   The fear and stress have manifested itself as depression and increased anxiety in many of

24  our students, and has impacted their ability to excel in school as they did before.  The impacts of the

25  termination are already palpable on campus and, unless it is stopped, the harm to these students and our

26  campus generally will be irreparable.

27      16.     In an September 5, 2017 op-ed piece for *USA Today*, Victor Cuicahua, a senior history

28  major at Pomona College who grew up in Alabama, where he was a co-founder of the Immigrant Youth

4

Leadership Initiative of Alabama, wrote eloquently about what the loss of the DACA means to him personally: "DACA changed everything.  It allowed me to work in cramped restaurant kitchens across Birmingham for 60 hours a week to save for an education that was expensive but no longer inaccessible.  It allowed me to become the first undocumented student at the University of Alabama, from which I later transferred to one of the best colleges in the country.  It allowed me to imagine returning to Alabama as a history teacher after graduation, ready to serve a future generation of students.  But the rescindment of DACA closes the door to a classroom I had hoped to enter for years."

17.     While the College continues to provide emergency grant funding for students, and has developed a pro-bono legal resource network for students, alumni, and their families along with other resources, the winding down of DACA is forcing our students and alumni back into a precarious "limbo" as Roberto Gonzales describes in his 2015 book on undocumented immigrant youth.   In a letter written to other college and university presidents, our current President Gabi Starr and President Emeritus David Oxtoby wrote: "Ending DACA means that these young people – Americans in all but legal status – will be vulnerable to deportation," said Starr and Oxtoby. "They will lose their ability to contribute fully to our campuses, to our communities and to our country.  Their loss, and that of other undocumented young people, is fundamentally our country's loss."  We at Pomona are very proud to support Viri Chabolla, a student leader while she was on campus, and now, an inspiring community leader.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 30, 2017, in Claremont, California.

MIRIAM FELDBLUM



# EXHIBIT 24

JEFFREY M. DAVIDSON (SBN 248620)
ALAN BERSIN (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the*
*University of California and Janet Napolitano, in*
*her official capacity as President of the*
*University of California*

THEODORE J. BOUTROUS, JR. (SBN 132099)
ETHAN D. DETTMER (SBN 196046)
JESSE S. GABRIEL (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam*
*Gonzalez Avila, Saul Jimenez Suarez, Viridiana*
*Chabolla Mendoza, Norma Ramirez, and Jirayut*
*Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and*
*Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, <br><br> Defendants. | CASE NO. 17-CV-05211-WHA <br><br> **DECLARATION OF MOISES FUENTES** |

0248

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA, | CASE NO. 17-CV-05235-WHA |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN, | CASE NO. 17-CV-05380-WHA |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security, | |
| Defendants, | |

0249

1   COUNTY OF SANTA CLARA and               CASE NO. 17-CV-05813-WHA
    SERVICE EMPLOYEES INTERNATIONAL
2   UNION LOCAL 521,

3                           Plaintiffs,

4               v.

5   DONALD J. TRUMP, in his official capacity
    as President of the United States, JEFFERSON
6   BEAUREGARD SESSIONS, in his official
    capacity as Attorney General of the United
7   States; ELAINE DUKE, in her official
    capacity as Acting Secretary of the Department
8   of Homeland Security; and U.S.
    DEPARTMENT OF HOMELAND
9   SECURITY,

10                          Defendants.

I, Moises Fuentes, declare and state as follows:

1. My name is Moises Fuentes and I am a resident of the Kern County. I arrived in the U.S. when I was only 1.

2. My mom works harvesting the fruits that make this state so economically powerful and its agriculture business one of the biggest and most successful ones of the world. For a summer, I went to the fields to see what my mother's job was all about, but I did not last more than a week. Thankfully, I have a work permit under DACA, which gives me the opportunity to be employed in an area that needs my professional and personal experience.

3. I am a technology enthusiast, I like programming and want to work in computer engineering or as a computer technician and in building computers after finishing college. I hope to make a career out of the education I am receiving now. However, the day I am ready for the job force, I will not be able to pursue a career because DACA will no longer be in place. DACA would have allowed me to enter the labor force and continue making this country successful.

4. My work permit expires soon, in 2018. Without DACA, I cannot receive financial aid.

5. I want a job in the technology field, for big companies to work with security purposes. I want to help companies with their financial security problems, with hacking issues and in development of products that will advance the technological world. Being able to continue having a work permit will allow me to get finish my education and get a job in the field that needs my experience. I would like the opportunity to contribute to the economy.

6. Now that DACA is terminated, I have a tight deadline where I must have enough money saved before my DACA expires so that I have money to pay off tuition and that is challenging because I am a full-time student.

7. DACA gave me a work permit, and it's going to be difficult not having a work permit and that itself has taken away the ability of being secure knowing that I can attend school and get a job to even pay for school if I can make it to school. Even if I work very hard to make it through college, without DACA I will not be able to get a job in my field of study.

0251

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on October 27, 2017, in Bakersfield, CA.

_Moises Pz Fuentes_
MOISES FUENTES

0252