

# EXHIBIT 99

JEFFREY M. DAVIDSON (SBN 248620)
ALAN BERSIN (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the*
*University of California and Janet Napolitano, in*
*her official capacity as President of the*
*University of California*

THEODORE J. BOUTROUS, JR. (SBN 132099)
ETHAN D. DETTMER (SBN 196046)
JESSE S. GABRIEL (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam*
*Gonzalez Avila, Saul Jimenez Suarez, Viridiana*
*Chabolla Mendoza, Norma Ramirez, and Jirayut*
*Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and*
*Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

THE REGENTS OF THE UNIVERSITY OF
CALIFORNIA and JANET NAPOLITANO,
in her official capacity as President of the
University of California,

Plaintiffs,

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY and ELAINE DUKE, in her
official capacity as Acting Secretary of the
Department of Homeland Security,

Defendants.

CASE NO. 17-CV-05211-WHA

**DECLARATION OF EVELYN VALDEZ-WARD**

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA, | CASE NO. 17-CV-05235-WHA |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN, | CASE NO. 17-CV-05380-WHA |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security, | |
| Defendants. | |

DECLARATION OF EVELYN VALDEZ-WARD
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

1466

| | |
|---|---|
| COUNTY OF SANTA CLARA and SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 521,<br><br>        Plaintiffs,<br><br>        v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS, in his official capacity as Attorney General of the United States; ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security; and U.S. DEPARTMENT OF HOMELAND SECURITY,<br><br>        Defendants. | CASE NO. 17-CV-05813-WHA |

I, EVELYN VALDEZ-WARD, DECLARE:

1.      I am a Deferred Action for Childhood Arrivals ("DACA") recipient. I am also a doctoral student in the Ecology and Evolutionary Biology Program at the University of California, Irvine. The matters set forth herein are true and correct of my own personal knowledge and, if called as a witness, I could and would testify competently thereto.

**My Path to DACA Status and How DACA Status Benefited Me and My Family**

2.      I was born in Mexico. I came to the United States with my mother at approximately six months of age.

3.      We came to the United States because existence was hard in the area in Mexico where my parents were from, which had serious violence and poverty. My parents had a difficult time finding jobs that paid enough to support our family. It was rare for students to continue beyond middle school. Teen pregnancies were common among girls that were only 15 or 16 years old. My parents tell me that they came to the United States to provide our family with a better future and a better life.

4.      When we first moved to the United States, we lived in Houston, Texas. Our first place was a small apartment in a rundown area of town called Sharpstown. We did not have any furniture. We slept on the floor in the living room and used milk cartons as dishes. Eventually, my dad got a job as a factory worker packing boxes. This enabled our family to move into a better apartment, and eventually a house. My dad worked, and my mother stayed home to care for my siblings and me.

5.      I went to a high school where I stood out, because it was not a diverse place. I had some friends who were also minorities, and we were made fun of by the other students. It was in high school that I started learning some people were "illegal" in the United States. I did not know that I was "illegal."

6.      During high school, I always thought I would go to college, so I worked hard to achieve that goal. I took AP classes, including AP Biology and AP Calculus, starting in my sophomore year. I was a member of the National Honor Society from sophomore year onward. Outside of the classroom, I spent time volunteering with my National Honor Society classmates at the Houston Humane Society, a local food bank, and a homeless shelter.

7.     I first found out I was undocumented in my senior year of high school, when I began applying for colleges. The applications called for a social security number, so I asked my mom for mine. My mom started crying. She explained that I did not have a social security number, and that I may not be able to go to college because I was undocumented.

8.     It was shocking to find this out about myself. I didn't know what to do with this information. I understand why my mom kept it from me, as a way to protect me, but it was a difficult thing to learn at that stage of my life. I became depressed upon realizing that I might not go to college. This was a year before the DACA policy was established.

9.     It seemed that all the hard work I had put into my high school classes was useless. My grades began to drop, and I missed the first deadline to apply to colleges. Some teachers reached out to me to ask what was wrong, but I was worried about telling them about my lack of legal status. I wasn't sure what was happening with college, but I finally decided to confide in a teacher and ask for a letter of recommendation. That teacher told me to just give up, that I had no future so there was no point in trying for college. But another teacher helped me; he explained that I could apply to certain colleges, and apply for Texas Application for State Financial Aid ("TASFA") to help with about $1,000 per semester for school.

10.     My parents tried to help me, too. They went to a workshop at a community center where they learned about colleges I could apply to. This included the University of Houston Downtown, where I was later accepted into the Biology program.

11.     In the summer of 2012, before my freshman year of college, I remember watching TV at my grandmother's house. That was when my family first heard the announcement that the DACA policy was being established. I hesitated to apply; it seemed like a big risk to provide my information.

12.     There was a lot of fear surrounding applications for DACA in our community. Rumors and videos were circulated saying that the DACA policy was a grand scheme by the government to identify undocumented children and their parents. Many believed that DACA was a plan the government would use to obtain addresses and fingerprints provided during the application process to track us down and deport us. This risk terrified me.

1469

13. Secret DACA application workshops were advertised through word of mouth and held at nearby community colleges and churches. My mother went to some of these workshops. She did not want me to attend them myself because of the risk of immigration enforcement catching or identifying me there. We thought about talking to a lawyer about whether I should apply for DACA. But at the time, lawyers were charging thousands of dollars in fees, plus the cost of the application. This was out of reach for my family.

14. That fall, I began attending the University of Houston Downtown and still had not applied for DACA status. I met an older undocumented student who had applied for DACA, and he encouraged me to do the same. My parents also encouraged me to apply, so I could work and drive. I was commuting 2-3 hours each way to school by bus, because I could not afford to live close to campus and none of my family members could drive me. Finally, I saw news articles on Facebook about DACA recipients being accepted into higher education, and I wanted to be one of those people.

15. I applied for DACA in November 2012. I received my initial DACA status and employment authorization in December 2012.

16. DACA changed my life in so many positive ways. I got my driver's license, which meant I could take our family van to school. I had more hours to focus on school and get sleep than when I was commuting by bus. DACA also meant I could help my family, by working and by providing transportation for my siblings, since I had the only driver's license in our family.

17. I would not have been able to finish college without my DACA work authorization. Just after I received my DACA work authorization, I immediately got my first real job as a cashier at Kroger's. I continued to work at up to three jobs simultaneously throughout my college degree, and also tutored neighborhood elementary school children. I was a host at Houston's restaurant and a server at Chili's and worked within the University of Houston as a Peer Led Team Learning Workshop leader, helping other students with algebra, trigonometry, and pre-calculus in group study sessions. The money from this work enabled me to pay for college.

18. After covering my educational expenses, I gave any extra money I earned to my parents, to help pay bills and cover the cost of food and rent. My younger siblings eat a lot; I remember using the

money I made to buy milk for cereal for them. This would not have been possible without my DACA employment authorization.

19.      My DACA employment authorization remains an important source of support for my family. My family was recently evacuated from their home in Texas because of Hurricane Harvey flooding. My parents were sending me messages as the flooding moved up the driveway to our family home. Their last text said the National Guard had arrived and they were being evacuated. After Hurricane Harvey I was the main breadwinner in my family. Damage to our family home and highways meant my parents could not work for almost a month. I have been sending all the money I can back home to help them buy food and supplies to start rebuilding our family home.

20.      I renewed my DACA status in December 2014. I renewed again in October 2017, having applied after the rescission of the DACA policy was announced. This has meant saving up for months in advance to afford the renewal fees. Then, I married an American citizen in March 2017. My husband and I are trying to save money so that I can apply for legal permanent residency status, but so far the cost is prohibitive for us. So, I applied to renew my DACA status after the announcement about the rescission of the DACA policy in September 2017 and I was granted a renewal until October 2019.

21.      Renewals of DACA have been straightforward for me in the past, aside from saving up for the fee, and easier than the initial application to fill out. I expected to be able to renew my DACA status in future so I could finish my graduate program. If I had known the DACA policy was going to disappear so suddenly, I do not think I would have started my graduate program. I uprooted my life near my family in Texas to move to California to start the program and my husband moved here as well. Now we are not sure what will come next, or if I will be able to finish my doctoral degree.

**My Research at UC Irvine**

22.      I graduated with my B.S. in Biology, Magna Cum Laude, in 2016 from the University of Houston Downtown. I began my doctoral studies in the Ecology and Biology Program at the University of California, Irvine in Fall 2016, and my program takes about 5-6 years to complete.

23.      My research focuses on how climate change is impacting the ways in which plants and soil microbes are interacting. Right now, I am leading research that connects two often-separate fields: plant growth and soil microbe analysis. My research is the link between two separate labs in the

Department of Ecology & Evolutionary Biology in the School of Biological Sciences, the lab of Professor Travis Huxman and Professor Sarah Kimball, who focus on plant/soil interactions, and that of Professor Jennifer Martiny, who focuses on plant microbiome research. The connection between these two areas of study is an emerging frontier of ecology research.

24.     My research involves a multi-year project on the impact of drought on soil microbes and plants. I conduct research throughout California, collecting plants and soil, focusing on a native plant species, coastal sage scrub. Native habitat for species like this is being lost throughout California, and impacts on native habitat are important to understand climate change. I conduct DNA tests on the plants and soil microbes to study the impact of drought. This is a long-term project, as the soil at the study site has been "droughted," meaning kept under drought conditions despite varying weather patterns, for many years. This work has broad implications for our understanding of the impact of climate change on the interactions between plants and their associated soil-microbes, which is important for our understanding of agricultural food production and native species proliferation in places like California. I will be supervising six interns on this research starting this fall.

25.     My main source of support for my graduate studies is a Ford Foundation Pre-Doctoral Fellowship granted by the National Academies of Science, Engineering, & Medicine. I received the Ford Fellowship in April 2017. I understand that I am one of only two students at UC Irvine to receive it in 2017. The fellowship provides for my tuition and a small living stipend.

26.     I am concerned that without DACA status I will lose my Ford Foundation grant. I provided my DACA employment authorization to the Ford Fellowship to receive this funding. I understand that to be eligible for this Ford Fellowship, I need to have certain immigration status like DACA status or lawful permanent residency. Many of the other significant sources of funding in my field, like the National Science Foundation, are available only to citizens so I have few alternatives to fund my research. Without my Ford Foundation grant, I do not think I could afford to finish my doctoral degree.

**My Work to Encourage Minority Participation in STEM**

27.     Because of this growing security — my DACA status, being married to an American citizen, becoming a graduate student — I feel safer and like I can be open about my immigration status.

That gives me the courage and freedom to advocate on behalf of other undocumented people, and also the sense that it falls to me to speak up. I would hesitate to tell my story about living an undocumented life in a declaration like this without these legal status protections. When the DACA policy rescission was announced, I also shared my story on Facebook to encourage others to stay resilient. I am writing an article for Science magazine about my story and how the DACA policy is important to the scientific community. Without DACA and my husband, telling my story would put at risk my ability to continue in my research and grad school. My project site is here in California; if I was deported, my most significant graduate level research project would be over.

28.     Most importantly, I started to feel secure in advocating on behalf of other DACA recipients and undocumented students. I have become a student leader in the science and related technology, engineering and math (STEM) career paths, and I work hard to help other DACA status and diverse students to succeed in STEM. STEM fields are a particular area of concern for diversity; minorities are extremely underrepresented in STEM. For example, I understand that underrepresented racial or ethnic groups together made up only 6% of doctoral degree recipients in Life Sciences among American Association of Universities public schools as of 2014-2015.[1] National Science Foundation statistics recently indicated less than 4% of graduate students in ecology are Hispanic or Latino.[2] I feel this on a personal level as a woman, a minority and a first-generation college student who has lived life undocumented and with DACA status. I am a rare bird in my field of ecology.

29.     As a leader among STEM students, I am highly concerned that the DACA rescission will result in fewer would-be DACA students entering into the STEM field, exacerbating STEM's diversity problem. The challenges of obtaining funding and support are already so great, a lack of legal status and employment authorization are likely to be the end of their aspirations.

30.     I know personally how difficult it can be to secure research funding in the sciences, because there are often restrictions on non-citizens receiving certain funding. For example, the summer after my freshman year, I almost lost a great opportunity to work on Professor Michael Tobin's

---

[1] *University of California, Accountability Report 2017*, at 7.2.2, http://accountability.universityofcalifornia.edu/2017/chapters/chapter-7.html#7.2.1.
[2] National Science Foundation, *Women, Minorities, and Persons with Disabilities in Science and Engineering*, Table 3-1, https://www.nsf.gov/statistics/2017/nsf17310/static/data/tab3-1.pdf.

environmental research in California. The position was originally federally funded by the National Science Foundation ("NSF"). I knew because of my immigration status I was not eligible to receive NSF research funding. I thought that meant I had to decline the job he offered. I got up the courage to tell Professor Tobin about my DACA status and that I could not accept his offer. But because I was open about my status, Professor Tobin was able to make alternate funding arrangements. I gained great research experience with him at a Bakersfield site of California State University. We continued to work together, and that has led to my later graduate study specialization. This is the type of experience I share with other DACA and undocumented students to encourage them to speak up about their status to earn funding so that they can experience these valuable opportunities.

31.     I am working hard to encourage other minority students to pursue their dreams in STEM, despite the challenges that many experience because of their immigration status. I worry the DACA policy rescission will change would-be DACA students' aspirations to continue in school.  I have been active in speaking on panels and at workshops designed to help STEM students who are minorities, including DACA students, navigate the often daunting prospect of graduate school and obtaining funding. Some highlights include speaking about my experience as a DACA-recipient graduate student during a workshop at the California State University at Fullerton, titled *Achieving Dreams The Undocumented Way*, where I was the only STEM representative. I also presented at the UndocuSTEM conference at California State University, Los Angeles. UndocuSTEM encourages undocumented students who are transitioning between various stages in their education, from high school through to doctoral degrees. I feel like by sharing my experiences on these panels, I help them to identify with someone like themselves. As a graduate student, I particularly focus on encouraging undergraduate students, guiding them to resources they need and standing up as an example of diverse success in STEM. I am often the only woman, the only DACA recipient and the only Latina person on the panels at these conferences.

32.     To help other minority STEM students, I also co-founded and am the Founding President of the UCI chapter of the Society for Advancement of Chicanos/Hispanics and Native Americans in Science (SACNAS), which is dedicated to fostering the success of Chicano/Hispanic and Native American scientists, from college students to professionals, in attaining advanced degrees, careers, and

positions of leadership in STEM. SACNAS was the organization that first helped me get involved in scientific research. I received a scholarship to present at a SACNAS conference in Fall 2015. At the conference, I met many diverse scientists, and they gave me the encouragement I needed to take on the challenges of the STEM field. I met Professor Ann Sakai, who works at UC Irvine, who reviewed my research statement and personal statement. She told me she was impressed and helped me apply to UC Irvine. This is how I met my current co-researchers, Professors Martiny, Huxman and Kimball. I was motivated to start the SACNAs chapter at UC Irvine to provide similar opportunities to other DACA and undocumented students.

33.     Finally, I am also working to help the next generation of STEM students as a reviewer for Ford Foundation applications. Usually faculty review these applications, but I was asked to become a reviewer because I was the only recipient of the Ford Foundation Fellowship in a particular program last year. I trained on how to review applications, and I will now review approximately 17 applications through the UCI Competitive Edge Summer Research Program to help the next generation of STEM students apply to the Ford Foundation.

34.     I am also concerned that the DACA policy rescission will cause students already successful in STEM to leave the United States. I have spoken to my DACA status STEM colleagues, and some are already looking for foreign schools where they could complete their studies. They have told me they no longer feel safe now that the DACA policy rescission has been announced; the government has their information and they feel like easy first targets for immigration enforcement. Their departure would be a great loss for the STEM field in the United States, and the schools who have invested in these students.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on October 25, 2017 in Irvine, California.                         EVELYN VALDEZ-WARD



# EXHIBIT 100

JEFFREY M. DAVIDSON (SBN 248620)
ALAN BERSIN (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the
University of California and Janet Napolitano, in
her official capacity as President of the
University of California*

THEODORE J. BOUTROUS, JR. (SBN 132099)
ETHAN D. DETTMER (SBN 196046)
JESSE S. GABRIEL (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam
Gonzalez Avila, Saul Jimenez Suarez, Viridiana
Chabolla Mendoza, Norma Ramirez, and Jirayut
Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and
Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California,

Plaintiffs,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security,

Defendants.

CASE NO. 17-CV-05211-WHA

**DECLARATION OF PROFESSOR ARMANDO VAZQUEZ-RAMOS**

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA, | CASE NO. 17-CV-05235-WHA |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN, | CASE NO. 17-CV-05380-WHA |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security, | |
| Defendants. | |

| | |
|---|---|
| COUNTY OF SANTA CLARA and SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 521, | CASE NO. 17-CV-05813-WHA |

Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS, in his official capacity as Attorney General of the United States; ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security; and U.S. DEPARTMENT OF HOMELAND SECURITY,

Defendants.

I, ARMANDO VAZQUEZ-RAMOS, declare and state as follows:

1. I am the Founder and Coordinator of the California-Mexico Project at California State University Long Beach (CSULB), and President & CEO of the California-Mexico Studies Center, Inc. (CMSC).

2. The California-Mexico Studies Center is a 501(c)(3) non-profit organization, whose mission is to research, develop, promote, and establish policies and programs between higher educational institutions and cultural organizations that will enhance the teaching, mobility and exchange of faculty, students, and professionals between California and the U.S. with Mexico, and other nations in the Western Hemisphere.

3. In 2014, the CMSC established the California-Mexico Dreamers Study Abroad Program and was among the first organizations to provide DACA-protected young adults with the opportunity to participate in a travel-study experience that allowed them to conduct ethnographic research on their family origins and migration, through college credit courses offered by CSULB and Mexico's graduate school El Colegio de la Frontera Norte.

4. Since 2014, I have led 6 travel-study classes that have allowed over 160 DACA participants, through approved applications for Advance Parole, the opportunity to study abroad, reconnect with their families, conduct research and return to their birthplace to learn as adults about their cultural origins and identity.

5. On September 5, 2017, the U.S. Attorney General announced the termination of DACA effective March 5, 2018, but the Homeland Security Administration (HSA) immediately cancelled the processing of I-131 Applications for Advance Parole filed prior to September 5, 2017, as well as during the 6-month grace period granted before the termination of DACA on March 5, 2018.

6. The CMSC's California-Mexico Dreamers Study Abroad Program (scheduled for December 22, 2017 to January 14, 2018) had filed 72 Applications for Advance Parole prior to September 5, 2017.

7. The termination of DACA by the Trump administration and the retroactive suspension of DACA's Advance Parole provision, has jeopardized the CMSC's Winter 2017 California-Mexico Dreamers Study Abroad Program, and foreclosed an opportunity for diligent DACA students to learn and share the knowledge acquired through the program with their classmates and community. It is yet another way that these young people are having their hopes and opportunities dashed.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on October 27, 2017, at Long Beach, California.

PROFESSOR ARMANDO VAZQUEZ-RAMOS

1

DECLARATION OF PROFESSOR ARMANDO VAZQUEZ-RAMOS
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

# EXHIBIT 101

1    JEFFREY M. DAVIDSON (SBN 248620)
     ALAN BERSIN (SBN 63874)
2    COVINGTON & BURLING LLP
     One Front Street, 35th Floor
3    San Francisco, CA 94111-5356
     Telephone: (415) 591-6000
4    Facsimile: (415) 591-6091
     Email: jdavidson@cov.com,
5    abersin@cov.com
     *Attorneys for Plaintiffs The Regents of the*
6    *University of California and Janet Napolitano, in*
     *her official capacity as President of the*
7    *University of California*

8    THEODORE J. BOUTROUS, JR. (SBN 132099)
     ETHAN D. DETTMER (SBN 196046)
9    JESSE S. GABRIEL (SBN 263137)
     GIBSON, DUNN & CRUTCHER LLP
10   333 South Grand Avenue
     Los Angeles, CA 90071-3197
11   Telephone: (213) 229-7000
     Facsimile: (213) 229-7520
12   Email: tboutrous@gibsondunn.com,
     edettmer@gibsondunn.com,
13   jgabriel@gibsondunn.com
     *Attorneys for Plaintiffs Dulce Garcia, Miriam*
14   *Gonzalez Avila, Saul Jimenez Suarez, Viridiana*
     *Chabolla Mendoza, Norma Ramirez, and Jirayut*
15   *Latthivongskorn*

     XAVIER BECERRA
     Attorney General of California
     MICHAEL L. NEWMAN
     Supervising Deputy Attorney General
     JAMES F. ZAHRADKA II (SBN 196822)
     1515 Clay Street, 20th Floor
     P.O. Box 70550
     Oakland, CA 94612-0550
     Telephone: (510) 879-1247
     Email: James.Zahradka@doj.ca.gov
     *Attorneys for Plaintiff State of California*

     JOSEPH W. COTCHETT (SBN 36324)
     NANCY L. FINEMAN (SBN 124870)
     COTCHETT, PITRE & McCARTHY, LLP
     San Francisco Airport Office Center
     840 Malcolm Road, Suite 200
     Burlingame, CA 94010
     Telephone: (650) 697-6000
     Facsimile: (650) 697-0577
     Email: nfineman@cpmlegal.com
     *Attorneys for Plaintiff City of San Jose*

     JONATHAN WEISSGLASS (SBN 185008)
     STACEY M. LEYTON (SBN 203827)
     ERIC P. BROWN (SBN 284245)
     ALTSHULER BERZON LLP
     177 Post Street, Suite 300
     San Francisco, CA 94108
     Telephone: (415) 421-7151
     Facsimile: (415) 362-8064
     Email: jweissglass@altber.com
     *Attorneys for Plaintiffs County of Santa Clara and*
     *Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, <br><br> Defendants. | CASE NO. 17-CV-05211-WHA <br><br> **DECLARATION OF JOSEPH WEINER** |

1480

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA, | CASE NO. 17-CV-05235-WHA |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN, | CASE NO. 17-CV-05380-WHA |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security, | |
| Defendants. | |

DECLARATION OF JOSEPH WEINER
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

1481

| | | |
|---|---|---|
| 1 | COUNTY OF SANTA CLARA and SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 521, | CASE NO. 17-CV-05813-WHA |
| 2 | | |
| 3 | Plaintiffs, | |
| 4 | v. | |
| 5 | DONALD J. TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS, in his official capacity as Attorney General of the United States; ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security; and U.S. DEPARTMENT OF HOMELAND SECURITY, | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | Defendants. | |

I, Joseph Weiner, declare:

1. I have been employed by Public Counsel in Los Angeles, California since 2012. I have been a staff attorney in Public Counsel's Immigrants' Rights Project ("IRP") since 2012, and have been a senior staff attorney in the IRP since 2016.

2. Since 2005, I have practiced exclusively immigration law. In 2012, my work involved helping to create and run a legal service program providing legal assistance to non-citizens eligible for Deferred Action for Childhood Arrivals ("DACA") in Southern California. I supervised Public Counsel's DACA legal service program until approximately 2014.

3. Public Counsel has a complex removal defense practice. We provide legal representation to approximately 200 unaccompanied minors in removal proceedings in Los Angeles, California. We also have several hundred asylum and U visa cases placed with pro bono attorneys whom we recruit and mentor. Finally, we represent immigrant detainees housed at the Musick and Adelanto detention facilities. Our staff has been stretched thin by demand for its services, as a result of both the unaccompanied minors' crisis and the increased immigration enforcement under the current Department of Homeland Security ("DHS").

4. When President Obama announced the DACA program in 2012, Public Counsel commenced work on implementation issues, meeting with the top leadership of U.S. Immigration and Citizenship Services ("USCIS"), including its director at that time, Alejandro Mayorkas, to facilitate the effective nation-wide implementation of the new program. IRP attorneys provided trainings to hundreds of attorneys and organizers throughout Southern California on the requirements for the DACA program. We also ran a DACA clinic at our office that assisted well over 1,000 non-citizens to apply for DACA benefits. We subsequently helped many DACA recipients renew their DACA grants. However, for the past year we referred DACA recipients wanting renewal assistance to other legal service agencies. We needed to dedicate our resources to removal defense, due to the crisis caused by enhanced immigration enforcement.

5. Since President Trump's order rescinding the DACA program, Public Counsel's IRP has been overwhelmed by requests for assistance from DACA recipients. Despite having no additional resources to serve the DACA eligible population at this time, our agency did all it could to respond to

1

1483

1   the October 5, 2017 renewal deadline by opening up weekend renewal clinics.  In planning these clinics,

2   we consulted with managers at legal service agencies throughout Los Angeles, and they shared our

3   belief that there would be a critical shortage of qualified legal assistance for thousands of DACA

4   recipients in the Los Angeles area needing to meet the renewal deadline.

5   6.   The IRP's attorneys routinely advise DACA recipients on renewal issues, including

6   deadlines for renewals.  Until the issuance of President Trump's rescission order, I advised numerous

7   DACA recipients who had not renewed prior to the expiration of their DACA work permits that they

8   could renew up to a year after the expiration date of their most recent DACA period.  I based this advice

9   on information provided on the USCIS website, which, until very recently, could be downloaded at

10  https://www.uscis.gov/archive/frequently-asked-questions, and which specifically allowed renewal

11  requests to be submitted up to one year after expiration.  The main reason people did not renew their

12  work permits prior to expiration of their DACA status was lack of the funds required to pay the $495.00

13  filing fee.

14  7.   The rescission order indicates that DACA recipients can only renew their work permits if

15  they expire between September 5, 2017 and March 5, 2018, and only if they file the renewal request by

16  October 5, 2017.  Unfortunately, we did not maintain a database of callers who had been advised that

17  they had a year to renew their work permits from the expiration of their DACA period.  Thus, we have

18  no way to inform these individuals that, as a result of the rescission order, new deadlines may affect

19  them.

20  8.   During our DACA clinics before October 5, I encountered many DACA recipients who

21  believed they could renew their DACA work permits, even though their permits had expired before

22  September 5, 2017.  Public Counsel held DACA renewal clinics at its office in Los Angeles on

23  September 22, 23, and 24, and then again on September 29, 30, and October 1 of 2017.  The reasons

24  people gave for not renewing their work permits prior to the expiration of their DACA status were a

25  belief that they still had time to renew or a lack of funds.

26  9.   For example, I met a young man on Sunday, October 1, 2017, who came to our DACA

27  clinic in order to renew his work permit.  His work permit had expired in August 2017, and I told him

28  that he would not be able to renew his work permit again because it had expired before September 5,

1   2017.  He told me that he believed that he still had time to renew his work permit even though it had

2   expired in August.  I met a young woman that same day whose work permit had expired in either June

3   or July of 2017.  I also told her that she would not be able to renew her work permit because it had

4   expired before September 5, 2017.  She thought that she had more time to renew her work permit as

5   well, even though it had already expired.  I am also aware that a 19-year-old woman came to our DACA

6   clinic on Saturday, September 30, 2017 in order to renew her work permit.  She discovered that she was

7   not eligible to renew, as her permit had expired on July 21, 2017.  She had not previously renewed

8   because she had no money to pay the USCIS filing fee.  She lived with her mother in a home shared

9   with her mother's abusive boyfriend.  When her mother finally demanded that the boyfriend leave their

10  home and obtained a restraining order against him, he ceased assisting the mother in paying rent.  The

11  19-year-old had to use all of the money she earned from her job to the pay her family's rent to prevent

12  eviction.  I am further aware that another 22-year-old woman came to the DACA clinic on September

13  29, 2017.  She thought she could still renew, but learned she could not since her DACA work permit had

14  expired on October 7, 2016.  She had been unable to afford to pay the DACA USCIS filing fee because

15  her grandmother had a stroke, and all of her family's income has gone to paying for care of the

16  grandmother.

17       10.     Public Counsel advertised its DACA renewal clinics through printed fliers, emails, and

18  social media.  We did not announce our clinics through television or radio because we were concerned

19  that we would be overwhelmed with clients.  On the six days that we held our renewal clinics, we

20  assisted approximately 225 DACA recipients with renewal requests.  The demand was great for our

21  services, and we would have been unable to assist many more than the 225 clients, given our limited

22  resources. We could not operate additional days, because we had no available staff to assign to the

23  DACA clinic on other days. We had several DACA recipients asking for help with renewals between

24  October 2 and October 4, but we had to send them elsewhere.

25       11.     At our six DACA clinics, we had clients travel from Santa Barbara, San Diego, and

26  Bakersfield, California, who were not able to find appropriate legal assistance closer to their homes.  We

27  even had a DACA recipient call us from Washington State.  She wanted to register for our clinic,

28  because she believed it would be cheaper to drive from her home in Washington to Los Angeles,

1   California, than to pay the $1,000.00 she was quoted by an attorney in Washington.  Public Counsel

2   provided pro bono legal services at its DACA renewal clinics and covered the cost of the $495.00 filing

3   fee.  Several clients who came to our clinics had been quoted $1500.00 in legal fees from private

4   immigration lawyers offering DACA renewal services.

5           12.     The majority of clients we served at our DACA renewal clinics during the weeks before

6   the October 5 deadline had never before had an experienced immigration lawyer advising them on how

7   to properly complete their DACA requests.  As a result, many of the DACA clients had mistakes on

8   their prior DACA requests.  We advise all DACA requestors to seek legal assistance from experienced

9   immigration lawyers because of the complex legal knowledge required to competently advise DACA

10  recipients.

11          13.     For example, DACA recipients must renew their DACA status by completing an I-821D

12  form as well as an I-765 form, which is the form used to request employment authorization.  The I-765

13  form requires requestors to indicate their "Status at Last Entry" at question 14.  Over the last two weeks,

14  I reviewed many of my clients' previous renewal applications.  I saw a common mistake.  At question

15  14 on the I-765 form, the prior applications indicated "EWI" which stands for "Entry Without

16  Inspection."  This was a serious mistake, because these clients had entered after being inspected and

17  admitted at their last entry.  Clients who had this mistake may be severely prejudiced in the future, since

18  the prior erroneous information may undercut a client's future claim to have been inspected and

19  admitted upon their last entry, and thus eligible for adjustment of status in the United States. This is but

20  one example of the legal complexity of the DACA renewal process.

21          14.     The absence of adequate legal advice also created a very real risk that a DACA requestor

22  would file a renewal request improperly, and be denied and thereby missing the October 5 renewal

23  deadline.  My agency currently represents a DACA recipient who timely filed a renewal months before

24  the rescission order on September 5, 2017.  This client's DACA work permit expired in August of 2017.

25  In March 2017, he filed his renewal.  However, it took months for the client to receive a notice from

26  USCIS that the client had submitted an incorrect filing fee, and therefore USCIS had rejected the filing.

27  The client did not file a new renewal request with the proper fee until September 2, 2017, and this

28

1   request was not received by USCIS until after September 5, 2017.  Recently, USCIS denied his renewal

2   request as untimely.

3        15.    The order rescinding DACA created a very short renewal period, making it virtually

4   impossible that all DACA recipients eligible to renew their DACA benefits could obtain adequate

5   immigration advice from an immigration lawyer within this shortened period.  There is, during ordinary

6   times, a very severe gap between the immigrant community's need for competent legal advice and its

7   availability.  There are simply not enough competent immigration attorneys to meet the needs of the

8   huge immigrant population in Southern California.  The order rescinding DACA turned the problem of

9   accessing competent legal advice into a crisis.  The need for adequate advice became immediate, due to

10  the rescission order, and there simply were not enough immigration attorneys to provide competent

11  advice to DACA recipients by the renewal deadline.

12      I declare under penalty of perjury under the laws of the United States that the foregoing is

13  true and correct.

14      Executed on October 27, 2017, at Los Angeles, California.

16  _____

17  JOSEPH WEINER

DECLARATION OF JOSEPH WEINER
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

# EXHIBIT 102

JEFFREY M. DAVIDSON (SBN 248620)
ALAN BERSIN (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the
University of California and Janet Napolitano, in
her official capacity as President of the
University of California*

THEODORE J. BOUTROUS, JR. (SBN 132099)
ETHAN D. DETTMER (SBN 196046)
JESSE S. GABRIEL (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam
Gonzalez Avila, Saul Jimenez Suarez, Viridiana
Chabolla Mendoza, Norma Ramirez, and Jirayut
Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and
Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, <br><br> Defendants. | CASE NO. 17-CV-05211-WHA <br><br> **DECLARATION OF SETH WOMACK** |

1488

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA, | CASE NO. 17-CV-05235-WHA |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN, | CASE NO. 17-CV-05380-WHA |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security, | |
| Defendants. | |

1  | COUNTY OF SANTA CLARA and | CASE NO. 17-CV-05813-WHA
   | SERVICE EMPLOYEES INTERNATIONAL
2  | UNION LOCAL 521,

3  |                Plaintiffs,

4  |           v.

5  | DONALD J. TRUMP, in his official capacity
   | as President of the United States, JEFFERSON
6  | BEAUREGARD SESSIONS, in his official
   | capacity as Attorney General of the United
7  | States; ELAINE DUKE, in her official
   | capacity as Acting Secretary of the Department
8  | of Homeland Security; and U.S.
   | DEPARTMENT OF HOMELAND
9  | SECURITY,

10 |                Defendants.

I, SETH WOMACK, DECLARE:

1.      I am the district athletic director and football coach at Eagle Point High School in Southern Oregon and have been so for the last five years.  I have personal knowledge of the facts set forth in this declaration, and if called as a witness, I could and would competently testify to them.

2.      Prior to my current employment, I worked at Westminster College as the offensive coordinator for the football program and the assistant athletic director for approximately two years in 2012 and 2013.  Prior to that, I coached for one year in Germany from 2011-2012, and I was an Assistant Professor and Assistant Football Coach at Oklahoma Panhandle State University from 2007 to 2011.  In that role, I coached Oklahoma Panhandle State University's football team and I was also a recruiting coordinator.  I was responsible for recruiting from high schools and junior colleges on the west coast.

3.      I first met Mr. Jimenez through the recruiting process for Oklahoma Panhandle State University.  He was playing football at East Los Angeles Community College, and his coaches spoke very highly of him as a potential recruit.  They also told me that Saul was not a United States citizen so it would be a challenge to recruit him.  Despite this potential obstacle, I could tell almost immediately that he was a young man I wanted on our team.  In addition to being a great student and football player, it was clear to me that Mr. Jimenez had strong leadership characteristics and would help his other teammates be better players and student athletes.  It was a no-brainer to recruit him.

4.      Because of Mr. Jimenez's immigration status, we had to bring him in as an international student.  As a non-citizen, Mr. Jimenez was not eligible for a Pell grant or other forms of government financial aid, but we worked hard to help him attend college.  We provided him with a significant scholarship and also worked to provide him with the necessary funds to pay for the additional costs of attendance charged to international students.

5.      Mr. Jimenez played both outside and inside linebacker positions on the football team.  His contributions to the team vastly exceeded his individual position, though.  He was a natural leader and helped his fellow players both on and off the field.  By his senior year, he became one of the defensive team captains based on nominations by his fellow teammates and, ultimately, by appointment by the head coach.  He was one of four captains out of a team of 150 players.  It was clear to the coaches

that Mr. Jimenez would make an excellent captain because other players always respected and listened to him.  Mr. Jimenez is a born leader, and one who leads by example and not just by talk.

6.   Off the field, Mr. Jimenez was an equally capable and natural leader.  He was very social and was actively involved in a variety of different organizations on campus, including the Fellowship of Christian Athletes and the Hispanic club.  People just wanted to be around Mr. Jimenez—he was the type of guy who would come to cheer on the basketball team or work out at the weight room and would bring ten or more friends with him every time.  Because people wanted to spend time with Mr. Jimenez and even aspired to be like him, Mr. Jimenez also helped to attract students to the football team who would not normally have been interested in joining.

7.   Mr. Jimenez has significant potential as a teacher and as a coach.  We have spoken about his career goals, and I know from our conversations that his passion is to help young kids better themselves through education and sports.  If he were willing to move to southern Oregon after he obtains his teaching credential, I know our school district would hire him in an instant.  In addition to his natural skills as a mentor, leader, teacher, and coach, our school district would value his dual language skills since we serve student populations that need or desire dual language instruction in English and Spanish.  We would hire him as an assistant football coach and teacher in a heartbeat.

8.   If Mr. Jimenez loses his DACA status, he will not be able to work or live in the United States.  We would not be able to hire him at our school district, and I do not think any other school district could hire him either.  The impact on Mr. Jimenez personally would be devastating, and I know that Mr. Jimenez is already concerned about the impact that the end of DACA would have on his life and career.  Mr. Jimenez was brought here as a little boy—it wasn't his choice.  He grew up here, and went to elementary school, high school, and college here.  He has made a life for himself here – and a good life.  He belongs here if that is what he chooses.  Taking away DACA would be doing a major disservice to him.  In addition, Mr. Jimenez's loss of DACA status will have a tremendously negative impact on his students, teams, and community.  I know the myriad of positive relationships Mr. Jimenez has built with his students and teams while teaching and coaching football in southern California.  If Mr. Jimenez is not allowed to live or work here anymore, this would not only hurt Mr. Jimenez but also the many young kids he provides with guidance, leadership, and inspiration.

1492

9.   ==I have communicated with Mr. Jimenez since the DACA termination.  I know he is
concerned about it.  I know that this must weigh heavily on him every day.==

I declare under penalty of perjury under the laws of the United States that the foregoing is true
and correct.

Executed on _____Oct    30_____, 2017, in Eagle Point, Oregon.

_____
                                    Seth Womack



# EXHIBIT 103

JEFFREY M. DAVIDSON (SBN 248620)
ALAN BERSIN (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the
University of California and Janet Napolitano, in
her official capacity as President of the
University of California*

THEODORE J. BOUTROUS, JR. (SBN 132099)
ETHAN D. DETTMER (SBN 196046)
JESSE S. GABRIEL (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam
Gonzalez Avila, Saul Jimenez Suarez, Viridiana
Chabolla Mendoza, Norma Ramirez, and Jirayut
Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and
Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security,<br><br>Defendants. | CASE NO. 17-CV-05211-WHA<br><br>**DECLARATION OF TOM K. WONG, PH.D.** |

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA, | CASE NO. 17-CV-05235-WHA |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN, | CASE NO. 17-CV-05380-WHA |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security, | |
| Defendants. | |

| | |
|---|---|
| COUNTY OF SANTA CLARA and SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 521,<br><br>                Plaintiffs,<br><br>        v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS, in his official capacity as Attorney General of the United States; ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security; and U.S. DEPARTMENT OF HOMELAND SECURITY,<br><br>                Defendants. | CASE NO. 17-CV-05813-WHA |

1496

I, Tom K. Wong, declare:

1.     I am an Associate Professor with tenure at the University of California, San Diego (UCSD).  I work in the political science department, which is consistently ranked by U.S. News & World Report as one of the top ten political science departments nationally.  I am also the Director of the International Migration Studies Program Minor at UCSD.

2.     I am an expert on immigration politics and policy, which includes the Deferred Action for Childhood Arrivals (DACA) program.  I have written two peer-reviewed books and several peer-reviewed journal articles, book chapters, and reports on these subjects.  My most recent research on DACA is a national survey of 3,063 DACA recipients conducted in August 2017 (henceforth referred to as the "2017 DACA survey").  The 2017 DACA survey is in addition to two peer-reviewed journal articles on DACA (*International Migration Review* and *Journal on Migration and Human Security*), another forthcoming peer-reviewed journal article on DACA (*Social Problems*), one book-length monograph (supported by a grant from the U.S. Department of Homeland Security [DHS]), and three other reports based on national surveys that I have conducted of DACA recipients.

3.     I received a Ph.D. in political science at the end of the 2010-2011 academic year.  I was a post-doctoral research fellow during the 2011-2012 academic year.  I joined the political science department at UCSD during the 2012-2013 academic year.  I served as an advisor to the White House Initiative on Asian Americans and Pacific Islanders (WHIAAPI), where I worked on the immigration portfolio, during the 2015-2016 academic year.

4.     I have attached a true and complete copy of my curriculum vitae as Exhibit A to this Declaration.  I have also attached a true and complete copy of the 2017 DACA survey as Exhibit B to this Declaration.

### 2017 National Survey of DACA Recipients

5.     Since it was first announced on June 15, 2012, the Deferred Action for Childhood Arrivals program has provided temporary relief from deportation and work authorization to 793,026

people.[1]  As of September 4, 2017, there are 689,800 active DACA recipients.[2]

6.       From August 1, 2017 to August 20, 2017, I conducted a national online survey of DACA recipients.  The resulting survey is the largest study to date of DACA recipients with a sample size of 3,063 respondents in forty-six states plus the District of Colombia.

7.       Methodologically, several steps were taken to account for the known sources of bias that can result from online panels.  To prevent ballot stuffing, meaning one person submitting multiple responses, incentives were not given for each completed survey that was submitted.  Moreover, the online survey platform used (Qualtrics) was programmed to prevent one IP address from submitting multiple responses.  To prevent spoiled ballots, meaning people who responded to the survey who were not undocumented, I used a unique validation test for undocumented status.

8.       Multiple questions were asked about each respondent's migratory history.  These questions were asked during different parts of the survey.  When a question was repeated, it was posed using different wording.  For example, "How old were you when you first came to the U.S.?" and, "In what year did you first come to the U.S.?" (current age was used to tether these answers).  If there was agreement in the answers, meaning there was consistency regarding the respondent's migratory history, the respondent was kept in the resulting sample.  If there were inconsistencies, the respondent was excluded.  Also, Facebook ads were used to improve the geographic representativeness of the resulting sample, as well as to recruit respondents who were outside of the networks of the organizations that conducted outreach for the survey.

9.       Because there is no directory of undocumented immigrants from which to randomly

---

[1] Based on the most recent publicly available data from U.S. Citizenship and Immigration Services (USCIS) at the time of this writing, which is up to June 30, 2017.  USCIS provides quarterly reports on DACA. See:
https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_performancedata_fy2017_qtr3.pdf.

[2] The lesser 689,800 figure represents the total number of individuals who, as of September 4, 2017, were "active DACA recipients."  For example, those who received DACA may have adjusted to lawful permanent resident (LPR) status.  *See*
https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf.

2

DECLARATION OF TOM K. WONG, PH.D.
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

sample from, researchers need to partner with organizations that interact with undocumented immigrants to conduct such surveys.  The outreach partners were United We Dream (UWD), the National Immigration Law Center (NILC), and the Center for American Progress (CAP).  These partners distributed the survey link to their respective email lists.  Given the nature of online opt-in surveys, it is not possible to construct a valid margin of error.  Nevertheless, the survey is methodologically rigorous and sound.  Indeed, a peer-reviewed academic journal on DACA based on survey results obtained using the methods described above is forthcoming in a top sociology journal.

10. Evaluating the representativeness of the survey sample requires current and complete data on the characteristics of DACA recipients.  The only publicly available data provided by USCIS in its quarterly DACA statistics that are both current and complete is the geographic breakdown of DACA recipients at the state level.[3]  Using these data, a two-sample Kolmogorov-Smirnov (K-S) test of equality of distributions can be run to evaluate how well the survey sample matches the actual distribution of DACA recipients by state.[4]  The results of the K-S test of equality of distributions shows that the state-by-state breakdown of the survey sample is representative of the state-by-state breakdown of all DACA recipients ($p = .570$).[5]

_____

[3] USCIS also provides publicly available data on the country of birth of DACA recipients, but these data are incomplete, as only the top twenty-five countries of birth are listed (and one of these is labeled "Unknown").  USCIS has analyzed the demographic characteristics of DACA recipients, but this initial analysis was based on data from August 2012 to September 2013.  See: https://www.uscis.gov/sites/default/files/USCIS/Humanitarian/Deferred%20Action%20for%20Childhood%20Arrivals/USCIS-DACA-Characteristics-Data-2014-7-10.pdf.  More recently, USCIS published an updated analysis (September 2017).

[4] A K-S test of equality of distributions shows that the state-by-state breakdown of the survey sample is representative of the state-by-state breakdown of all "active DACA recipients" ($p = .557$) that USCIS analyzed.  The null hypothesis for the K-S test is that the two distributions are statistically the same.  A $p$ value of .557 means that we are not confident that we can reject the null hypothesis.  In other words, this result means we are only 44% confident (1 minus .557) that we can reject the null hypothesis (and thus say that the two distributions are different).  By convention, scholars tend to accept a $p$ value of .05 or less as being statistically significant.  A $p$ value of .05 means that we are 95% confident (1 minus .05) in a result.  Moreover, the September 2017 USCIS report indicates that the average age of active DACA recipients is 23.8.  The average age of the survey sample is similar at 25.2.  The most recent USCIS data do not provide detailed cross-tabulations sufficient for weighting purposes.

[5] That is, there is no evidence to suggest that the distribution of survey respondents by state and the actual number of DACA recipients by state is statistically significantly different.  Moreover, analyzing

**Characteristics of DACA Recipients**

11.     The average age of respondents is 25.2.[6]  The average age that respondents first arrived in the United States is 6.5.  On average, DACA recipients first entered the United States during kindergarten or first grade.  The average number of years that respondents have lived in the United States is 18.8.  38.5% of respondents have lived in the United States for 20 years or more.  Regarding race and ethnicity, 93% of respondents identify as Hispanic/Latino, 4% identify as Asian or Pacific Islander, 2% identify as White, and 1% identify as Black.[7]  Also, 10% of respondents personally identify as lesbian, gay, bisexual, or transgender (LGBT).

**DACA and Economic Integration**

12.     DACA has been critical in improving the economic integration of DACA recipients, which is evidenced by their employment rates, their employment in "white collar," higher-skilled jobs, greater job mobility, higher wages, more financial independence, and increased consumer purchasing power, among other indicators.

13.     Regarding employment, the data show that 91% of DACA recipients are currently employed.  Among those 25 years and older, this percentage climbs to 93%.  Moreover, the data show that at least 72% of the top twenty-five Fortune 500 companies employ DACA recipients.

14.     DACA recipients are most likely to work in *Office and Administrative Support Occupations* followed by *Sales and Related Occupations* and then *Management, Business, Science, and*

---

and comparing the unweighted and weighted results show that the findings are substantively similar throughout.  As previously noted, the null hypothesis for the K-S test is that the two distributions are statistically the same.  A *p* value of .570 means that we are not confident that we can reject the null hypothesis.  In other words, this result means we are only 43% confident (1 minus .570) that we can reject the null hypothesis (and thus say that the two distributions are different).  By convention, scholars tend to accept a *p* value of .05 or less as being statistically significant. A *p* value of .05 means that we are 95% confident (1 minus .05) in a result.

[6] As previously noted, a September 2017 USCIS report shows that the average age of "active DACA recipients" is 23.8.  The average age of the survey sample is thus similar to the average age of active DACA recipients as reported by USCIS.

[7] USCIS does not report race and ethnicity in its quarterly DACA statistics.  However, the large majority of the "Top Countries of Origin" listed in the USCIS quarterly reports are Latin American countries.

4

1500

*Arts Occupations*.  U.S. Census occupation categories are used to distinguish between types of occupations.[8]  Table 1 lists the top ten occupation categories for DACA recipients.

Table 1

| | DACA |
|---|---|
| Office and Administrative Support Occupations | 16.5% |
| Sales and Related Occupations | 11.6% |
| Management, Business, Science, and Arts Occupations | 10.8% |
| Education, Training, and Library Occupations | 9.6% |
| Food Preparation and Serving Occupations | 6.8% |
| Healthcare Support Occupations | 6.4% |
| Healthcare Practitioners and Technical Occupations | 4.6% |
| Community and Social Services Occupations | 4.3% |
| Financial Specialists | 3.4% |
| Legal Occupations | 3.0% |
| Computer and Mathematical Occupations | 3.0% |
| Other | 19.9% |

15.    Table 2 below compares the occupations of DACA recipients to native-born workers between the ages of sixteen and thirty-five.  As the table shows, DACA recipients are more likely to work in "white-collar" higher-skilled occupations such as *Management, Business, Science, and Arts Occupations*, *Healthcare Support Occupations*, and *Legal Occupations*, and they are less likely to work in "blue-collar" lesser-skilled occupations such as *Building and Grounds Cleaning and Maintenance Occupations*, *Construction and Extraction Occupations*, and *Food Preparation and Serving Occupations*.

---

[8] For detailed occupation listing, see here: https://usa.ipums.org/usa/volii/c2ssoccup.shtml.

5

Table 2

| | | DACA | Native Born | Diff |
|---|---|---|---|---|
| Management, Business, Science, and Arts Occupations | ...................................... | 10.8% | 6.4% | +4.4% |
| Education, Training, and Library Occupations | ...................................... | 9.6% | 5.9% | +3.7% |
| Healthcare Support Occupations | ...................................... | 6.4% | 3.1% | +3.3% |
| Community and Social Services Occupations | ...................................... | 4.3% | 1.5% | +2.7% |
| Office and Administrative Support Occupations | ...................................... | 16.5% | 13.9% | +2.6% |
| Legal Occupations | ...................................... | 3.0% | 0.9% | +2.2% |
| Financial Specialists | ...................................... | 3.4% | 1.9% | +1.5% |
| Computer and Mathematical Occupations | ...................................... | 3.0% | 2.3% | +0.8% |
| Architecture and Engineering Occupations | ...................................... | 2.1% | 1.5% | +0.6% |
| Business Operations Specialists | ...................................... | 2.8% | 2.3% | +0.4% |
| Life, Physical, and Social Science Occupations | ...................................... | 1.2% | 0.8% | +0.4% |
| Extraction Workers | ...................................... | 0.1% | 0.2% | -0.1% |
| Farming, Fishing, and Forestry Occupations | ...................................... | 0.1% | 0.6% | -0.5% |
| Healthcare Practitioners and Technical Occupations | ...................................... | 4.6% | 5.2% | -0.5% |
| Arts, Design, Entertainment, Sports, and Media | ...................................... | 1.5% | 2.2% | -0.7% |
| Military Specific Occupations | ...................................... | 0.0% | 0.8% | -0.8% |
| Building and Grounds Cleaning and Maintenance | ...................................... | 1.4% | 2.8% | -1.4% |
| Sales and Related Occupations | ...................................... | 11.6% | 13.0% | -1.4% |
| Protective Service Occupations | ...................................... | 0.8% | 2.6% | -1.7% |
| Construction and Extraction Occupations | ...................................... | 1.8% | 3.9% | -2.1% |
| Installation, Maintenance, and Repair Workers | ...................................... | 0.8% | 3.2% | -2.3% |
| Personal Care and Service Occupations | ...................................... | 2.0% | 4.4% | -2.4% |
| Production Occupations | ...................................... | 2.6% | 5.1% | -2.5% |
| Transportation and Material Moving Occupations | ...................................... | 2.7% | 5.7% | -3.0% |
| Food Preparation and Serving Occupations | ...................................... | 6.8% | 9.9% | -3.0% |

Note: percentages may not sum to 100 due to rounding. The column "DACA" refers to DACA recipients. "Native Born" refers to native-born workers who are (a) employed and are (b) between the ages of sixteen and thirty-five. These data come from the U.S. Census 2011-2015 American Community Survey (ACS) 5-year Public Use Microdata, which represents the most up-to-date 5-year file. "Diff" is the difference in the percentage between DACA recipients and comparable native-born workers.

16.    Moreover, after receiving DACA:

a.    54% got their first job;

b.    69% got a job with better pay;

c.    54% got a job that better fits their education and training;

d.    54% got a job that better fits their long-term career goals;

6

e.    57% got a job with health insurance or other benefits;[9]

f.    56% got a job with improved work conditions; and

g.    5% started their own businesses.[10]

Table 3 summarizes these results. The column "≥ 25" reports the results for respondents 25 years and older.

Table 3

|  |  |  | ≥ 25 |
|---|---|---|---|
| Got my first job | ....................................... | 54.2% | 35.3% |
| Got a job with better pay | ....................................... | 68.5% | 77.7% |
| Got a job that better fits my education and training | ....................................... | 54.2% | 59.6% |
| Got a job that better fits my long-term career goals | ....................................... | 53.9% | 61.4% |
| Got a job with health insurance or other benefits | ....................................... | 57.3% | 66.9% |
| Got a job with improved work conditions | ....................................... | 56.2% | 64.4% |
| Started my own business | ....................................... | 5.4% | 7.9% |

Note: percentages do not sum to 100 as individuals may select all that apply. *n* = 1,662 for all respondents 25 years and older.

17.    Regarding earnings, the data make clear that DACA is having a positive and significant effect on the wages of DACA recipients.

18.    The average hourly wage of DACA recipients has increased by 69% since receiving DACA.  Among those 25 years and older, the average hourly wage has increased by 81% since receiving DACA.  I have noted in previous research that more work (and time) may be needed to parse out the short- and long-run wage effects of DACA, as well as to answer the question of whether short-run gains in wages represent a plateau in earnings or if more robust long-run wage effects exist.  This continues to be true.  However, because of the continued upward trajectory in the observed wages of DACA recipients, it is likely that there is even more room for wage growth as DACA recipients move further along in their careers.  These gains will disappear if these individuals lose their DACA status and the accompanying work authorization.

---

[9] 49.2% of respondents in my 2016 DACA survey reported that they obtained health insurance through their employer and 46.8% of respondents reported that they had "[r]eceived health care using [their] newly obtained health insurance."

[10] This rate of business starts is higher than the rate of business starts for the American public as a whole (3.1%).

19.    The data also show that average annual earnings among DACA recipients is $36,232. Among those 25 years and older, it is $41,621.  A multivariate Ordinary Least Squares (OLS) regression regressing annual earnings on age shows that annual earnings increase by $1,583 for each year that a DACA recipient grows older ($p < .001$).[11]  These gains will also disappear if these individuals lose their DACA status and the accompanying work authorization.

20.    Higher wages have meant greater financial independence and consumer purchasing power for DACA recipients:

a.   69% reported that after their DACA application was approved, "[they] have been able to earn more money, which has helped [them] become financially independent";

b.   71% reported that after their DACA application was approved, "[they] have been able to earn more money, which has helped [their] family financially";

c.   Among those who have a bachelor's degree or higher and are no longer in school, 27% reported paying off some or all of their student loans after their DACA application was approved;

d.   65% purchased their first car after their DACA application was approved; and

e.   16% purchased their first home after their DACA application was approved.

Table 4 summarizes these results.  The column "≥ 25" reports the results for respondents 25 years and older.

---

[11] The model controls for number of years in the United States, whether the DACA recipient is in school, whether the DACA recipient has a bachelor's degree or higher, and state-level fixed effects.  The null hypothesis for age is that age has no effect on annual earnings.  A $p$ value of less than .001 means that we are over 99.9% confident (1 minus < .001) that we can reject the null hypothesis that age has no effect on annual earnings and thus say that age is positively and statistically significantly related to annual earnings.  To recall, by convention, scholars tend to accept a $p$ value of .05 or less as being statistically significant.  A $p$ value of .05 means that we are 95% confident (1 minus .05) in a result.

DECLARATION OF TOM K. WONG, PH.D.
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

Table 4

| | | | ≥ 25 |
|---|---|---|---|
| I have been able to earn more money, which has helped me become financially independent | ........................................ | 69.0% | 73.4% |
| I have been able to earn more money, which has helped my family financially | ........................................ | 70.8% | 73.7% |
| Paid off some/all of my student loans | ........................................ | 27.1% | 27.4% |
| Bought my first car | ........................................ | 64.5% | 67.2% |
| Bought a home | ........................................ | 15.7% | 23.5% |

Note: percentages do not sum to 100 as individuals may select all that apply. *n* = 1,662 for all respondents 25 years and older.

21.    Higher wages are indicative of the broader positive economic impact of DACA.  For example, higher wages translate into more in Federal Insurance Contributions Act (FICA) contributions, which are mandatory payroll deductions for Social Security and Medicare.  Using data on wages and earnings from the 2017 DACA survey, I estimate that DACA recipients will add $39.3 billion in Social Security and Medicare contributions (half in employee contributions and half in employer contributions) over a ten-year period.[12]  These contributions will disappear if these individuals lose their DACA status and the accompanying work authorization.[13]

22.    In the 2017 DACA survey, respondents were asked to describe "what you will lose if DACA ends."

a.   One DACA recipient writes, "If I were to lose DACA the first thing to go with it would be my job as a nurse.  This would […] make it impossible for my family to afford to pay our mortgage.  I would lose my home."

b.   Another DACA recipient writes, "I will lose my job and the associated

---

[12] This breaks down into $31.8 billion in Social Security contributions and $7.4 billion in Medicare contributions.  For a detailed explanation of the methodology used to estimate Social Security and Medicare contributions, see here: https://www.ilrc.org/sites/default/files/resources/2017-09-29_draining_the_trust_funds_final.pdf.

[13] Higher wages also translate into more in federal income taxes paid, more in state income taxes paid.  Large purchases such as cars add to state tax revenues, as most states collect a percentage of the car purchase in sales tax, along with additional registration and title fees.  Similarly, home buying further adds to state and local tax revenues in the form of property taxes.  There is a large literature on how home buying creates new jobs and adds new spending in local economies.  For job creation, see here: https://www.nar.realtor/topics/home-ownership-matters/jobs-impact-of-an-existing-home-purchase.  For spending in local economies, see here: https://www.cnbc.com/2017/04/12/immigrant-households-impact-success-of-real-estate-market-says-report.html.

health/retirement benefits I have been paying into. Right now my family depends on the income that I make working […] I'm also paying off a new car that I bought last year. It would be difficult for me to continue paying for it if I'm not able to work where I do now."

    c.   Another DACA recipient writes, "I will lose my job, which then would have a trickle effect […] losing my vehicle for non-payment, losing my home and being evicted, going into higher debt for not being able to pay credit cards."

    d.   Another DACA recipient writes, "I have spoken to my supervisors about what would happen if DACA were to end and they informed me that since they know I have DACA they would not be able to keep me on if I did not have work authorization."

    e.   A DACA recipient who owns a business writes, "our restaurant would disappear." Another DACA recipient writes, "I would no longer be able to work as an EMT."

    f.   Another DACA recipient writes, "If DACA ends […] My students would be left without a teacher for the rest of the year."

    g.   Another DACA recipient writes, "I won't be able to accept [a] fulltime offer from [an employer], which is contingent on my completing my MBA in 2018."

    h.   Another DACA recipient writes, "I will not be able to practice medicine when I graduate from medical school."

    i.   Another DACA recipient writes, "I have a degree in engineering, and I want to obtain my professional engineering license. If I do not have DACA, I would not be able to work, thus I would not be able to accumulate the necessary work experience to obtain my PE license."

    j.   Another DACA recipient writes, "I will lose my career, the opportunity to get my CDL [Commercial Driver License], the opportunity to eventually become a citizen and join the army like I've always wanted since a child."

**DACA and Education**

23.   DACA improves educational outcomes for DACA recipients.

DECLARATION OF TOM K. WONG, PH.D.
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

24.   Regarding education, 45% of DACA recipients are currently in school.[14]  Among those who are currently in school, 94% reported, "[they] pursued educational opportunities that [they] previously could not" because of DACA.

25.   Moreover, among those in school, 72% are pursuing a bachelor's degree or higher (an additional 19% are pursuing an associate's degree).  The majors and specializations that DACA recipients are pursuing include accounting, biochemistry, business administration, chemical engineering, civil engineering, computer science, early childhood education, economics, environmental science, history, law, mathematics, mechanical engineering, neuroscience, physics, psychology, and social work, to name a few.  These majors and specializations concretize how the education that DACA recipients are receiving is contributing to the development of a better prepared and more competitive college-educated workforce.

26.   Regarding educational attainment, 36% of respondents 25 years and older have a bachelor's degree or higher.  This percentage is higher than the 30% of native-born persons 25 years and older who have a bachelor's degree or higher, but is similar to the 34% of foreign-born naturalized persons 25 years and older who have a bachelor's degree or higher.[15]

27.   In the 2017 DACA survey, respondents were asked to describe "what you will lose if DACA ends."

a.   One DACA recipient writes, "DACA has given me the opportunity to be someone in life.  Ever since I was in elementary school, I was a good student.  I liked school and I liked to learn […] Depression was really getting to me because I saw my friends pursuing their dreams, and I was not allowed to do the same.  It did not matter how smart I was, how much of a hard worker I was, or how much passion I had; I was never going to be able to become who I wanted

---

[14] The percentage of respondents who are currently in school has slowly declined over the four years that I have been surveying DACA recipients.  This makes intuitive sense: as DACA recipients grow older, they are more likely to transition out of school and into their careers.  Moreover, as the USCIS quarterly DACA statistics show, older DACA recipients are not being replaced at anywhere close to the rate in which younger DACA recipients have aged into eligibility.

[15] These data come from the U.S. Census 2011-2015 American Community Survey (ACS) 5-year Public Use Microdata, which represents the most up-to-date 5-year file.

DECLARATION OF TOM K. WONG, PH.D.
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

to be.  DACA opened the door, it gave a lot of us hope.  Thanks to DACA, I am now a woman who is pursuing an engineering degree."

b.   Another DACA recipient writes, "With DACA, I have worked as a researcher and am now starting the grad school application process for Ph.D. programs.  I have wanted to be a scientist since I was nine years old, staring out of my first telescope.  DACA allows that dream to not be hindered.  I still cannot apply for anything funded by the National Science Foundation or work for NASA, but hopefully my status will one day become permanent and those doors will become open to me as well."

c.   Another DACA recipient writes, "Without DACA, I would lose the ability to continue working legally and will have to stop attending school since I will not be able to afford it. I will lose the opportunity to become a certified teacher […] and will not be able to fulfill my dreams of being an educator."

d.   Another DACA recipient writes, "I will be unable to continue my education in computer science."

e.   Another DACA recipient writes, "If DACA ends, I will lose the opportunity of pursuing the career I've been studying for my whole life. I will not be able to work anywhere, so my degree won't matter."

**DACA and Normality in Day-to-Day Life**

28.   The data further show that DACA has given DACA recipients a sense of normality in their day-to-day lives, which has led to a greater sense of belonging and inclusion and, in some cases, improved mental health.

29.   In the 2017 DACA survey, respondents were asked to describe "what you will lose if DACA ends."

a.   One DACA recipient writes, "I will lose my feeling of belonging in the only country I have truly ever known."

b.   Another DACA recipient writes, "I would lose my sense of belonging. For the first time I feel safe without fear."

c.   Another DACA recipient writes, "Having DACA has changed my life completely, I

12

feel like I have purpose again.  I can go to school and work.  I can strive now for a better life.  Things are more manageable.  Before DACA, I lost all hope of ever becoming anything or accomplishing anything.  I've regained a lot of that hope and now I have a strong drive to succeed."

    d.   Another DACA recipient writes, "DACA was a glimpse of what I could have if I had papers and it made me love this country more."

    e.   Another DACA recipient writes, "DACA has allowed me to feel a sense of hope and security within the nation I grew up in […] its existence provides me with the reassurance that someone cares, that someone is listening, and that we are not alone."

    f.   Another DACA recipient writes, "I will lose feeling safe and protected."

    g.   Another DACA recipient writes, "I will lose the independence and freedom I had to wait so many years to have."

    h.   Another DACA recipient writes, "I will no longer be able to drive to school or work."

    i.   Another DACA recipient writes, "I will lose a sense of safety. I remember feeling a lot of fear, anxiety, and uncertainty about my future before DACA was passed. I'm worried all of that will come flooding back. Aside from the practical things, like losing my license, my job, my independence, I really don't want to feel that way again. I have become more open with people since DACA, and I don't want to go back to having to worry about what I say and to who."

30.    Moreover, despite being brought to the United States, on average, at the age of 6.5, and despite having lived in the United States, on average, 18.8 years, it was only after receiving DACA that:

    a.   61% opened a bank account;

    b.   66% got their first credit card;

    c.   90% got a driver's license or state identification card for the first time; and

    d.   49% became organ donors.

Table 5 summarizes these results. The column "≥ 25" reports the results for respondents 25 years and older.

---

13

Table 5

| | | | $\geq 25$ |
|---|---|---|---|
| Opened a bank account | ........................................ | 61.0% | 47.3% |
| Got my first credit card | ........................................ | 65.7% | 67.9% |
| Got my driver's license or state identification card for the first time | ........................................ | 90.3% | 88.3% |
| Became an organ donor | ........................................ | 48.7% | 49.8% |

Note: percentages do not sum to 100 as individuals may select all that apply. $n = 1,662$ for all respondents 25 years and older.

**DACA Recipients and American Citizen Family Members**

31.   The data also show that DACA recipients are deeply interwoven in families that include American citizen siblings, spouses, and children.  Indeed, 73% of DACA recipients have either an American citizen sibling, spouse, or child:

> a.   59% reported having an American citizen sibling;
>
> b.   17% reported having an American citizen spouse; and
>
> c.   26% reported having an American citizen child.

Table 6 summarizes these results.

Table 6

| | | |
|---|---|---|
| American citizen spouse | ........................................ | 16.6% |
| American citizen child | ........................................ | 25.7% |
| American citizen sibling | ........................................ | 58.9% |
| American citizen spouse, child, or sibling | ........................................ | 72.7% |

Note: percentages do not sum to 100 as individuals may select all that apply.

32.   In the 2017 DACA survey, respondents were asked to describe "what you will lose if DACA ends."

> a.   One DACA recipient writes, "My daughter is a 4 year old U.S. citizen and everything I do is to give her a better life.  I would lose the ability to safely go to school and work.  I would constantly worry that my daughter would end up in foster care."
>
> b.   Another DACA recipient writes, "I will lose my job and face possible deportation and

14

1510

1  being separated from my son who is only 3 and needs his mom."

2    c.   Another DACA recipient writes, "Sometimes I can't even sleep just thinking of

3  what's going to happen with DACA […] I'm not only thinking about my future, but my son's."

4    d.   Another DACA recipient writes, "I just had my second child 2 weeks ago […] my

5  plans are to go back to work by next year and I'm truly scared that by that time I won't be able to

6  […] Now more than ever I need DACA to support my kids."

7    e.   Another DACA recipient writes, "[A] year into my new DACAmented life, my

8  daughter was born and she has been such a blessing, but I am more afraid than ever about the

9  consequences my status might have.  If DACA ends, I lose the peace of mind that I will be here

10  to raise her.  I work 60+ hours a week at 2 jobs so I can provide for her and if DACA ends I will

11  not be able to do so."

12    f.   Another DACA recipient writes, "[W]e risk being homeless with a new-born child if

13  DACA ends."

14    g.   Another DACA recipient writes, "My kids are U.S. citizens […] I will lose my job, I

15  will lose the opportunity to give my kids a better life […] Please, I beg to continue to have

16  DACA.  It is not just about being legal, but is also about having a better life for my kids."

17    h.   Another DACA recipient writes, "[W]e would struggle providing for our kids who

18  are all citizens […] I hope this never happens because our family has so much riding on whether

19  my next permit is approved or not."

20    i.   Another DACA recipient writes, "I have a 3 year old daughter who is heading to

21  Head Start this year and I am currently pregnant.  I would miss out on my kid's lives, as they

22  would most likely stay in the U.S. with their dad."

23    j.   Another DACA recipient writes, "I would lose healthcare coverage for me and my

24  son."

25    k.   Another DACA recipient writes, "[H]aving my driver's license taken away would be

26  a devastating blow […] I take my sons to school and childcare almost every day."  Another

27  DACA recipient writes, "[W]ithout my driver's license I won't be able to drive to school or any

28  of my son's doctor's appointments."

15

l.   Another DACA recipient writes, "How do you tell your 5 year old mommy can't bring food to the table because of a simple paper?  How do you explain to your child that there will be no more sports because we can no longer drive?"

m.  Another DACA recipient writes, "I would lose my job first of all and if I lose my job I will lose my apartment.  I will have to stay with family or other people and hopefully find a way to make some money in order to take care of my 3 year old.  I will definitely end up in debt without a way to pay my bills and I will have to ask for public assistance to feed my son.  It sounds extreme but that's what will happen if I cannot work because I have no parents left and no one is going to take care of me or my son."

n.   Another DACA recipient writes, "I am married now with a 10 month old daughter […] if DACA ended I would be really scared to be split up from my daughter and husband and family.  I have been here since I was 8 months old, this is my home, I don't know my place of birth."

o.   Another DACA recipient writes, "My U.S. citizen husband and U.S. citizen children would constantly be worrying about me because the likelihood of deportation would increase greatly."

p.   Another DACA recipient writes, "My wife and I have barely just begun our adult lives together.  We have medical and student debt, monthly utility expenses, a mortgage, car payments, insurance payments and groceries to buy.  We are just like any other young responsible adults trying to kick start our careers to gain financial stability and potentially start a family.  Without my job I lose my ability to contribute to our monthly expenses.  We would lose our financial stability and could lose everything which could ruin our lives before they even begin."

q.   Another DACA recipient writes, "If DACA ended […] it would put a stress on my marriage."

r.   Another DACA recipient writes, "I would lose my family […] my husband is a U.S. citizen […] my brother is also a citizen, and a U.S. Marine."

**Many May Go "Into the Shadows" Without DACA**

33.    Many DACA recipients may go back into the shadows if these individuals lose their DACA status and the accompanying work authorization.

34.    In the 2017 DACA survey, respondents were asked to describe "what you will lose if DACA ends."

a.   One DACA recipient writes, "I really can't imagine living in the darkness again […] I have been a good member of society, I pay my taxes, and I have never gotten in trouble with the law."

b.   Another DACA recipient writes, "With DACA I was able to begin planning for a better future, if it's taken away I'll go back to trying to get by day to day."

c.   Another DACA recipient writes, "Losing DACA will be devastating because everything that I have built up to this point will be lost.  I will lose my current employment, the health insurance provided by my employer, and driver's license for starters.  Most importantly, I will return back to the shadows facing certain deportation considering the government already has all of my information."

d.   Another DACA recipient writes, "If DACA ends […] I lose everything. I can no longer work and my mental health will suffer.  Currently my mental health is already suffering because of the constant fear about whether DACA will be taken away.  This is the only place that I call home and people want to take that away from me.  It is a terrible feeling and I hate that I have to be in this position, but none of us chose it and we are trying to do our best to make a living and do things the right way."

e.   Another DACA recipient writes, "I would go back to the shadows that I once thought I would never go back too. I would live in fear."

f.   Another DACA recipient writes, "I will live in fear and hiding, again."

g.   Another DACA recipient writes, "[W]hat hurts most is losing my ability to live without fear.  To be back in the shadows, to feel less than and incapable of doing anything about the circumstances, [to] feel betrayed by the government who promised to protect us if we came out of the shadows and followed the rules."

17

h.   Another DACA recipient writes, "[L]osing DACA would make me lose faith in a government [that] asked us to come forth and identify ourselves in exchange for a taste of regular American life."

i.   Another DACA recipient writes, "Everything that I've been working so hard for will suddenly mean nothing.  All the contributions I've given to this country will be ignored and unrecognized by the government."

35.   Moreover, when given a scenario in which they no longer had DACA:[16]

a.   53% reported that they would be less likely to report a crime they witnessed;

b.   47% reported that they would be less likely to report a crime even if they were the victim;

c.   48% reported that they would be less likely to go to the hospital if they suffered an injury; and

d.   60% reported that they would be less likely to report wage theft by their employer.

36.   Moreover, many DACA recipients fear what the government will do with their personal information.

37.   Among respondents who were eligible to renew, but had not yet submitted a renewal application[17]:

a.   18% reported that fear of providing updated information to the government was a prohibitive factor[18]; and

b.   26% reported that fear that the government will use the information provided in the renewal application for immigration enforcement purposes was a prohibitive factor.

38.   Among respondents who were not yet eligible to renew,[19] 28% agreed or strongly agreed

---

[16] The question was worded, "If you no longer had DACA, would you be more or less likely to do the following…."

[17] This represents 11.2% of respondents.

[18] In my 2016 DACA survey, just 2% of respondents who were eligible to renew, but had not yet submitted a renewal application reported that that fear of providing updated information to the government was a prohibitive factor.

[19] This represents 46.9% of respondents.

18

with the statement, "I'm less likely to apply to renew my DACA status when I become eligible to do so because I fear that the government will use my information for immigration enforcement purposes."

39.     The prospect of going back into the shadows and fear about what the government will do with their personal information likely exacerbates the concerns that DACA recipients had when they first applied for DACA.

40.     In my 2014 DACA survey, the concerns that DACA recipients had when they first applied included:

    a.   79% reported being concerned about what would happen if DACA ended;

    b.   59% reported being concerned about letting the government know they were undocumented;

    c.   49% reported being concerned about revealing their personal information;

    d.   59% reported being concerned about revealing information about their family;

    e.   59% reported being concerned "that the information [they] revealed in [their] application would be used to put [them] or [their] family in detention and/or deportation proceedings"; and

    f.   32% reported hearing that "the government was not going to use the information in the DACA application for enforcement purposes (e.g., detention or deportation)."

**DACA Recipients by State**

41.     Below are examples of state-specific profiles of DACA recipients.  Data from the 2017 DACA survey are used to construct these profiles.

**DACA Recipients in the State of California**

42.     As of September 4, 2017, there were 197,900 active DACA recipients in the State of California.[20]

43.     Regarding employment and earnings:

---

[20]

https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf.

19

a.   An estimated 180,881 DACA recipients in the State of California are currently employed[21];

b.   Companies in the State of California who employ DACA recipients include: Apple, Best Buy, Coca-Cola, Google, McDonald's, Starbucks, Target, and Wal-Mart, among others;

c.   School districts across the State of California also employ DACA recipients, as well as community colleges, California State University, and the University of California[22];

d.   An estimated 10,687 DACA recipients in the State of California are business owners[23]; and

e.   The State of California's DACA recipients earn an estimated $6.6 billion annually, which translates into $406.3 million annually in Social Security contributions and $95.0 million annually in Medicare contributions.[24]

44.   Regarding normality in day-to-day life:

a.   An estimated 178,704 DACA recipients in the State of California got their driver's license or state identification card for the first time after receiving DACA.[25] As one Californian DACA recipient writes, "If taken away [driver's license], I may have to quit my job and it would be very difficult to meet all the traveling that nursing school requires (we have changing clinical sites throughout the semester)."  Another Californian DACA recipient writes, "Before having

---

[21] 91.4% of 197,900.

[22] There are 18 respondents who reported working for a University of California entity.  83.3% of these individuals (15 out of 18) reported getting their first job after receiving DACA.  55.7% (10 out of 18) reported getting a job with better pay.  61.1% (11 out of 18) reported getting a job that better fits their education and training.  61.1% (11 out of 18) also reported getting a job that better fits their long-term career goals. 72.2% (12 out of 18) reported, "I have been able to earn more money, which has helped me become financially independent." 55.6% (10 out of 18) reported, "I have been able to earn more money, which has helped my family financially." 66.7% of these individuals (12 out of 18) are in school. Average annual earnings for these individuals is $33,978.  The average number of hours worked per week is 33.6.  61.1% (11 out of 18) have either an American citizen sibling, spouse, or child.

[23] 5.4% of 197,900.

[24] 180,881 multiplied by $36,231.91. This translates into $406.3 million annually in Social Security contributions (6.2% per FICA) and $95.0 million annually in Medicare contributions (1.45% per FICA).

[25] 90.3% of 197,900.

---

20

DACA we had vehicles impounded during safety (DUI) checkpoints, not because we were driving under the influence, but for not having a driver's license."  Another Californian DACA recipient writes, "Having a driver's license has allowed me to take my mom, dad, and daughters to doctor's appointments."

    b.   An estimated 120,719 DACA recipients in the State of California opened a bank account after receiving DACA[26]; and

    c.   An estimated 130,020 DACA recipients in the State of California got their first credit card after receiving DACA.[27]

45.    Regarding education:

    a.   An estimated 88,857 DACA recipients in the State of California are currently in school[28];

    b.   Among those currently in school, an estimated 83,170 have "pursued educational opportunities that [they] previously could not" because of DACA[29]; and

    c.   An estimated 63,533 DACA recipients in the State of California are currently pursuing a bachelor's degree or higher.[30]

46.    Regarding American citizen family members:

    a.   An estimated 143,873 DACA recipients in the State of California have an American citizen sibling, spouse, or child.[31]

47.    In the survey, respondents were asked, "what you will lose if DACA ends."

    a.   One Californian DACA recipient writes, "If DACA ends, I will no longer have the opportunity to pursue my goal of becoming a doctor."

    b.   Another Californian DACA recipient writes, "If DACA ends, my dreams of pursuing

---

[26] 61.0% of 197,900.

[27] 65.7% of 197,900.

[28] 44.9% of 197,900.

[29] 93.6 % of 88,857.

[30] 71.5% of 88,857.

[31] 72.7% of 197,900.

a career as a registered nurse would end.  My goal is to graduate college and work in the medical field to help save lives, comfort those who are in pain, and educate patients on how to improve their overall health."

c.   Another Californian DACA recipient writes, "If DACA ended I would be really scared to be split up from my daughter and husband and family.  All of my family members, except my dad, are U.S. citizens so I would have no one in my country of birth."

d.   Another Californian DACA recipient writes, "I will lose my independence.  I'm going to graduate from college soon and will be looking for jobs.  If DACA is removed, all the hard work to pursue higher education will feel like it went to waste."

e.   Another Californian DACA recipient writes, "Ending the DACA program would be like putting an end to my American dream."

**DACA Recipients in the State of Minnesota**

48.   As of September 4, 2017, there were 5,500 active DACA recipients in the State of Minnesota.[32]

49.   Regarding employment and earnings:

a.   An estimated 5,027 DACA recipients in the State of Minnesota are currently employed[33];

b.   An estimated 297 DACA recipients in the State of Minnesota are business owners[34]; and

c.   The State of Minnesota's DACA recipients earn an estimated $182.1 million annually, which translates into $11.3 million annually in Social Security contributions and $2.6

---

[32] https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf.

[33] 91.4% of 5,500.

[34] 5.4% of 5,500.

million annually in Medicare contributions.[35]

50.     Regarding normality in day-to-day life:

a.   An estimated 4,967 DACA recipients in Minnesota got their driver's license or state identification card for the first time after receiving DACA.[36] As one Minnesotan DACA recipient writes, "After getting my driver's license I felt safe being able to drive to school, work and other places. I have been able to apply for jobs that require me to have a driver's license […] If my driver's license was taken, I would not be able to keep the job I currently have […] I would not be able to help my family financially as much as I am currently";

b.   An estimated 3,355 DACA recipients in Minnesota opened a bank account after receiving DACA[37]; and

c.   An estimated 3,614 DACA recipients in Minnesota got their first credit card after receiving DACA.[38] As one Minnesotan DACA recipient writes, DACA "helped me to apply for credit cards, which helped me build my credit in order to buy a house."

51.     Regarding education:

a.   An estimated 2,470 DACA recipients in Minnesota are currently in school[39];

b.   Among those currently in school, an estimated 2,311 have "pursued educational opportunities that I previously could not" because of DACA[40]; and

c.   An estimated 1,766 DACA recipients in Minnesota are currently pursuing a bachelor's degree or higher.[41]

52.     Regarding American citizen family members:

---

[35] 5,027 multiplied by $36,231.91. This translates into $11.3 million annually in Social Security contributions (6.2% per FICA) and $2.6 million annually in Medicare contributions (1.45% per FICA).

[36] 90.3% of 5,500.

[37] 61.0% of 5,500.

[38] 65.7% of 5,500.

[39] 44.9% of 5,500.

[40] 93.6 % of 2,470.

[41] 71.5% of 2,470.

a.   An estimated 3,999 DACA recipients in Minnesota have an American citizen sibling, spouse, or child.[42]

53.   In the survey, respondents were asked, "what you will lose if DACA ends."

a.   One Minnesotan DACA recipient writes, "I could lose my family, that's the most difficult thing to think about, being separated from my mom and my dad and my sisters. I could lose everything I have worked for, I finally have a job, I'm pursuing more education, I'm able to contribute in ways that would be impossible without DACA."

b.   Another Minnesotan DACA recipient writes, "I will lose my house, my job."

c.   Another Minnesotan DACA recipient writes, "All I know is America […] Having DACA has allowed me to follow my childhood dreams […] If I lose DACA, I lose everything I have worked for […] I'm truly terrified."

**DACA Recipients in the State of Maryland**

54.   As of September 4, 2017, there were 8,100 active DACA recipients in the State of Maryland.[43]

55.   Regarding employment and earnings:

a.   An estimated 7,403 DACA recipients in the State of Maryland are currently employed[44];

b.   An estimated 437 DACA recipients in the State of Maryland are business owners[45]; and

c.   The State of Maryland's DACA recipients earn an estimated $268.2 million annually, which translates into $16.6 million annually in Social Security contributions and $3.9 million

---

[42] 72.7% of 5,500.

[43]

https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf.

[44] 91.4% of 8,100.

[45] 5.4% of 8,100.

24

annually in Medicare contributions.[46]

56.     Regarding normality in day-to-day life:

a.   An estimated 7,314 DACA recipients in Maryland got their driver's license or state identification card for the first time after receiving DACA.[47] As one DACA recipient in Maryland writes, by having a driver's license, "I have been able to drive to and from work.  If it were taken away I wouldn't be able to drive to work as well as take my 3 kids to the doctor." Another DACA recipient in Maryland writes, by having a driver's license, "I have been able to help my community by becoming an Emergency Medical Technician at my local fire and rescue station";

b.   An estimated 4,941 DACA recipients in Maryland opened a bank account after receiving DACA;[48] and

c.   An estimated 5,322 DACA recipients in Maryland got their first credit card after receiving DACA.[49]

57.     Regarding education:

a.   An estimated 3,637 DACA recipients in Maryland are currently in school[50];

b.   Among those currently in school, an estimated 3,404 have "pursued educational opportunities that I previously could not" because of DACA[51]; and

c.   An estimated 2,600 DACA recipients in Maryland are currently pursuing a bachelor's degree or higher.[52]

58.     Regarding American citizen family members:

---

[46] 7,403 multiplied by $36,231.91.  This translates into $16.6 million annually in Social Security contributions (6.2% per FICA) and $3.9 million annually in Medicare contributions (1.45% per FICA).

[47] 90.3% of 8,100.

[48] 61.0% of 8,100.

[49] 65.7% of 8,100.

[50] 44.9% of 8,100.

[51] 93.6 % of 3,637.

[52] 71.5% of 3,637.

a.   An estimated 5,889 DACA recipients in Maryland have an American citizen sibling, spouse, or child.[53]

59.   In the survey, respondents were asked, "what you will lose if DACA ends."

a.   One DACA recipient in Maryland writes, "If DACA ends, I will lose my business and my main source of income for me and my family."

b.   Another DACA recipient in Maryland writes, "I will lose everything and I'm afraid that I'll even lose my daughter."

c.   Another DACA recipient in Maryland writes, "My MBA degree would be of no use anymore."

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on October 27, 2017, at San Diego, California.

_____
Tom K. Wong, Ph.D.

---

[53] 72.7% of 8,100.

26

# EXHIBIT A

# TOM K. WONG, PH.D.

Email: tomkwong@ucsd.edu | Google Voice: (619) 354-9913
Website: www.tomwongphd.com | bit.ly/tomkwong_citations

## ACADEMIC APPOINTMENTS

**2017 -**    **ASSOCIATE PROFESSOR, POLITICAL SCIENCE**
University of California, San Diego

**2012 - 2017**    **ASSISTANT PROFESSOR, POLITICAL SCIENCE**
University of California, San Diego

## OTHER POSITIONS

**2013 -**    **DIRECTOR, INTERNATIONAL MIGRATION STUDIES PROGRAM MINOR**
University of California, San Diego

**2016**    **ADVISOR, IMMIGRATION PORTFOLIO**
**WHITE HOUSE INITIATIVE ON ASIAN AMERICANS AND PACIFIC ISLANDERS**

## EDUCATION

**2011**    **PH.D. IN POLITICAL SCIENCE**
University of California, Riverside
Focus in Comparative Politics, International Relations, and Research Methods
Dissertation: *Immigration Control in the Age of Migration*

**2005**    **B.A. IN POLITICAL SCIENCE**
University of California, Riverside
Focus in International Relations
*Magna Cum Laude*

## BOOKS

(2) Tom K. Wong. 2016. *The Politics of Immigration: Partisanship, Changing Demographics, and American National Identity.* Oxford University Press.
NPR, ABC News/Yahoo.com, LA Times, Univision, Monkey Cage

(1) Tom K. Wong. 2015. *Rights, Deportation, and Detention in the Age of Immigration Control.* Stanford University Press. Oxford Law blog

## JOURNAL ARTICLES

(7) Tom K. Wong, Angela Garcia, and Carolina Valdivia. *forthcoming.* "The Political Incorporation of Undocumented Youth," *Social Problems* (conditional accept).

(6) Tom K. Wong and Hillary Kosnac. 2017. "Does the Legalization of Undocumented Immigrants in the US Encourage Unauthorized Immigration from Mexico? An Empirical Analysis of the Moral Hazard of Legalization," *International Migration* vol. 55 no. 2: 159-173.

(5) Tom K. Wong and Angela Garcia. 2016. "Does Where I Live Affect Whether I Apply? The Contextual Determinants of Applying for Deferred Action for Childhood Arrivals (DACA)," *International Migration Review* vol. 50 no. 3: 699-727.
C-Span, Associated Press

(4) Tom K. Wong, Donald Kerwin, Jeanne M. Atkinson, and Mary Meg McCarthy. 2014. "Paths to Lawful Immigration Status: Results and Implications from the PERSON Survey," *Journal of Migration and Human Security* vol. 2 no 4: 287-304.
NBC News.com

(3) Tom K. Wong. 2014. "The Politics of Interior Immigration Enforcement," *California Journal of Politics and Policy* vol. 6 no 3: 381-399.

(2) Tom K. Wong and Justin Gest. 2013. "Organizing Disorder: Indexing Migrants' Rights and International Migration Policy," *Georgetown Immigration Law Journal* vol. 28 no 1: 257-269.

(1) Tom K. Wong. 2012. "The Politics of Interior Immigration Control in the United States: Explaining Local Cooperation with Federal Immigration Authorities," *Journal of Ethnic and Migration Studies* vol. 38 no. 5: 737-756.

## BOOK CHAPTERS

(4) Tom K. Wong. 2014. "Conceptual Challenges and Contemporary Trends in Immigration Control." In *Controlling Immigration: A Global Perspective* (3rd edition), edited by James F. Hollifield, Philip Martin, and Pia Orrenius. Stanford University Press.

(3) Tom K. Wong. 2014. "Nation of Immigrants or Deportation Nation? Analyzing Deportations and Returns in the United States, 1892-2010." In *The Nation and Its Peoples: Citizens, Denizens, and Migrants*, edited by John S.W. Park and Shannon Gleeson. Routledge.

(2) James F. Hollifield and Tom K. Wong. 2014. "The Politics of International Migration: How Can We 'Bring the State Back In'?" In *Migration Theory: Talking Across Disciplines* (3rd edition), edited by Caroline B. Brettell and James F. Hollifield. Routledge.

(1) Karthick Ramakrishnan and Tom K. Wong. 2010. "Partisanship, Not Spanish: Explaining Municipal Ordinances Affecting Undocumented Immigrants." In *Taking Local Control: Immigration Policy Activism in U.S. Cities and States*, edited by Monica W. Varsanyi. Stanford University Press.

## WORKS UNDER REVIEW/IN PROGRESS (SELECTED LIST)

Tom K. Wong and Justin Gest. "Looks Skin Deep: Do Immigrant Legislators Better Represent Immigrant Interests?"

Tom K. Wong and Carolina Valdivia. "In Their Own Words: A Nationwide Survey of Undocumented Millennials," Working Paper 191, Center for Comparative Immigration Studies.
New York Times, Washington Post, The Hill, La Opinión, Univision, NBC News.com

Tom K. Wong. "President Obama's Executive Actions on Immigration and the 2016 Presidential Election." This project uses a nationally representative survey of Latinos ($n = 820$) and Asians ($n = 950$) fielded in late to analyze how knowing someone who is undocumented and potentially eligible for legal

ii

**1525**

status via programs like DAPA affects the civic engagement of Latino and Asian citizens. The survey was fielded by GfK and commissioned w/Dan Hopkins and Efren Perez.

Tom K. Wong. "Mobilizing Low-Propensity Voters of Color" and "Governing Diversity." These projects examine how demographic changes are reshaping the American electorate and how policymakers are responding. The former project includes multiple voter mobilization experiments utilizing direct voter contact run during the 2016 presidential cycle. These experiments analyze interventions designed to convey the urgency of voting to Latino, Asian, and immigrant-origin voters using political discourse around immigration policy and refugee admissions.

w/Justin Gest. "International Migrants Bill of Rights." This project aims to create cross-national indicators on government respect for and recognition of the human rights of migrants. Funding from the World Bank (obtained by Gest) will be used to pilot a 58 item index across 5 countries.

## REPORTS

Tom K. Wong et al. 2017. *DACA Recipients' Economic and Educational Gains Continue to Grow*. Washington, D.C.: Center for American Progress.

Tom K. Wong. 2017. *The Effects of Sanctuary Policies on Crime and the Economy*. Washington, D.C.: Center for American Progress.

Tom K. Wong et al. 2016. *New Study of DACA Beneficiaries Shows Positive Economic and Educational Outcomes*. Washington, D.C.: Center for American Progress.

Tom K. Wong et al. 2015. *Results from a Nationwide Survey of DACA Recipients Illustrate the Program's Impact*. Washington, D.C.: Center for American Progress.

Tom K. Wong. 2014. *Statistical Analysis Shows that Violence, Not Deferred Action, Is Behind the Surge of Unaccompanied Children Crossing the Border*. Washington, D.C.: Center for American Progress.

Tom K. Wong et al. 2013. *Undocumented No More: A Nationwide Analysis of Deferred Action for Childhood Arrivals (DACA)*. Washington, D.C.: Center for American Progress.
C-Span, Associated Press

## OTHER PUBLICATIONS

Tom K. Wong. 2017. "The Effects of Sanctuary Policies on Crime and the Economy," *Migration and Citizenship: Newsletter of the American Political Science Association Organized Section on Migration and Citizenship* vol. 5 no. 2.

James F. Hollifield and Tom K. Wong. 2012/2013. "International Migration: Cause or Consequence of Political Change," *Migration and Citizenship: Newsletter of the American Political Science Association Organized Section on Migration and Citizenship* vol. 1 no. 1.

Tom K. Wong. 2012. "The Commission on Wartime Relocation and Internment of Civilians." In *The Encyclopedia of Transitional Justice*, edited by Lavina Stan and Nadya Nedelsky. Cambridge University Press.

Karthick Ramakrishnan, Dino Bozonelos, Louise Hendrickson, and Tom K. Wong. 2008. "Inland Gaps: Civic Inequalities in a High Growth Region," *Policy Matters* vol 2 no 1.

Karthick Ramakrishnan and Tom K. Wong. 2007. "Immigration Policies Go Local: The Varying Responses of Local Governments to Undocumented Immigration." Chief Justice Earl Warren Institute on Race, Ethnicity, and Diversity. Working Paper Series on Immigration.

## RESEARCH GRANTS (AS A FACULTY MEMBER)

- $341,127, Multiple Funders, "U.S. Immigration Policy in the 21st Century," 2017-2019
- $22,500, UCSD USMEX Fellowship, 2016-2017
- $16,000, UCLA Institute for Research on Labor and Employment, 2015-2016
- $365,000, MacArthur Foundation, 2015-2017 (partially awarded, terminated after the DAPA program was enjoined by the Supreme Court)
- $25,000, UCSD Frontiers of Innovation Scholars Program Grant, 2015-2016
- $15,000, UCSD Faculty Career Development Program Grant, 2014-2015
- $30,000, Unbound Philanthropy, 2014
- $100,000, Department of Homeland Security, 2013
- $30,000, Center for American Progress, 2013
- $10,000, UCSD Center for International, Comparative, and Area Studies Grant, 2013
- $10,000, UCSD Academic Senate, 2013
- $1,500, UCSD Diversity, Equity, and Inclusion Grant, 2013

## TEACHING AT UCSD

- Diversity, Equity, and Inclusion Teaching Award, 2014-2015
- The Politics of Immigration (upper-division, 280 students)
- International Human Rights Law: Rights of Migrants (upper-division, 200 students)
- The Politics of Multiculturalism (upper-division, 100 students)
- Immigration Politics and Policy (graduate seminar, 4 students)
- Undergraduate Honors Seminar (upper-division, 15 students)

## INVITED PRESENTATIONS (SELECTED)

2018 |     "Migrant Rights Database." Comparative Politics Workshop, University of Chicago, April 25, 2018.

Author Meets Critics. Center for the Study of International Migration, UCLA, March 2, 2018.

2017 |     "The Future of U.S. Immigration Policy in the Age of Trump." Citizenship and Equality Colloquium, University of Colorado, November 16, 2017.

"The Determinants and Effects of Sanctuary Policies." Cornell University, November 9-10, 2017.

"The Determinants and Effects of Sanctuary Policies." Presentation at the 2017 APPAM Fall Research Conference, Chicago, IL, November 2-4, 2017.

"Immigration and the U.S. Constitution." Seminar at the Robert H. Smith Center for the Constitution at James Madison's Montpelier, Orange, VA, July 31-August 2, 2017.

"The Determinants of U.S. Immigration Policy." University of California, Santa Barbara, June 1, 2017.

"Paths to Legal Status for Undocumented Immigrants." Presentation at the CLINIC annual conference, Atlanta, GA, May 25, 2017.

"The Effects of Sanctuary Policies on Crime and the Economy." Presentation at the Sanctuary Cities Convening, New York City Council, New York, NY, March 27-28, 2017.

"The Future of U.S. Immigration Policy in the Age of Trump." Yankelovich Center for Social Science Research, University of California, San Diego, March 15, 2017.

"Child Migration." World Migration Report workshop, International Organization for Migration (IOM) Geneva, Switzerland, March 9-10, 2017.

"The Politics of Immigration." American Academy of Arts and Sciences, San Diego Program Committee, University of California, San Diego, February 9, 2017.

**2016 |**   "Post-Election Panel." Center for Comparative Immigration Studies (CCIS), University of California, San Diego, November 21, 2016.

"Mobilizing Immigrant Communities in the Age of Trump." Tulane University, October 14, 2016.

"Immigrant Integration and the Obama Administration: DACA, DAPA, and Implications for the 2016 Presidential Election." Institute for Research on Labor and Employment, UCLA, April 28, 2016.

"Mobilizing Low-Propensity Voters of Color: Towards an Electorate That Reflects a Changing America." Presentation at the Asian Americans Advancing Justice conference, Los Angeles, CA, March 31, 2016.

"Immigrants in American Society." Presentation at KPBS, San Diego, CA, March 21, 2016.

"Immigration Policy." Presentation to Mi Familia Vota, Riverside, CA, January 14, 2016.

**2015 |**   "The European Refugee Crisis." Center for Comparative Immigration Studies (CCIS), the European Studies Program, the Lifelong Learning Program of the EU, and the Scholars Strategy Network (SSN), University of California, San Diego, October 27, 2015.

"U.S. Immigration Politics and the 2016 Presidential Election." Presentation at the Wilson Center, Washington DC, October 26, 2015.

"The Political Incorporation of Undocumented Youth." Presentation at the "Challenging Borders" conference, University of California, Riverside, October 23, 2015.

"The Consequences of Inequality: Why Does it Matter and How." Symposium on Capital in the 21st Century with Thomas Piketty, University of California, San Diego, October 22, 2015.

"U.S. Immigration Politics and Policy." Presentation at the U.S. Consulate in Tijuana, October 13, 2015.

"UC National Summit on Undocumented Students." University of California Office of the President, May 7-8, 2015.

"Irregular Migration." Presentation at the "Politics and Policies of International Migration: Europe and the U.S." conference, Université Libre de Bruxelles, Belgium, April 28-29, 2015.

"Opportunities and Limits of the Executive Actions Proposed by President Obama." Presentation at the Mexican Ministry of Foreign Affairs, Mexico City, Mexico, April 13-14, 2015.

"Administrative Relief Implementation and Impact Project." Presentation at the Center for Migration Studies (CMS), New York, NY, March 25, 2015.

"Research Roundtable." Presentation at the "Ready America: Implementing Immigration Action" conference, Washington DC, February 9-11, 2015.

2014 |  "Insights from Implementing DACA for Administrative Relief." Presentation at the National Immigrant Integration Conference, Los Angeles, CA, December 16, 2014.

"Deferred Action for Childhood Arrivals." American Immigration Council (AIC), Washington, D.C., November 7, 2014.

"Immigration Policy and the November 2014 Midterm Elections." California Immigrant Policy Center (CIPC), October 29, 2014.

"The Many Paths to Legal Status: Results and Implications from the PERSON Survey." Presentation to the Center for Migration Studies (CMS), New York, NY, September 29, 2014.

"The Congressional Politics of Interior Immigration Enforcement." Presentation at the "Migration During Economic Downturns" workshop, German Historical Institute, Washington, DC, April 4-5, 2014.

"Mapping DACA Renewals." Presentation to U.S. Citizenship and Immigration Services (USCIS), March 13, 2014.

"Latino Politics: Left, Right, or Down the Middle?" Presentation at the Hispanic Radio annual conference, San Diego, CA, March 10, 2014.

2013 |  "Undocumented No More: A Nationwide Analysis of Deferred Action for Childhood Arrivals." Center for Comparative Immigration Studies (CCIS), University of California, San Diego, October 2, 2013.

"DACA Turns 1." Presentation at the Center for American Progress, Washington, DC, August 15, 2013. **[Televised on CSPAN]**

"The Prospects for Comprehensive Immigration Reform." Presentation at the Mexican Ministry of Foreign Affairs, Mexico City, Mexico, August 12, 2013.

"A Look at the Stats: How Will Congressional Representatives Vote on Comprehensive Immigration Reform?" Presentation at the "Changing Face of America" conference, University of California, Berkeley, May 3, 2013.

"Will Comprehensive Immigration Reform Pass? Predicting Legislative Support and Opposition to CIR." Center for Comparative Immigration Studies (CCIS), Univeristy of California, San Diego, April 29, 2013.

"Race, Ethnicity, the 2012 Elections, and the Politics of Comprehensive Immigration Reform." Presentation at the *Beyond the Headlines* speaker series, UCLA, February 26, 2013.

"International Migrants Bill of Rights (IMBR) Initiative." Georgetown Law School, Washington, DC, February 8-9, 2013.

**2012** | "Immigration Policy After the 2012 Elections." Center for the Study of International Migration, UCLA, November 16, 2012.

"PBS Need to Know 2012 Election Special: America by the Numbers." Presentation for KPBS at the Jo and Vi Jacobs Center, San Diego, CA, October 10, 2012.

"Immigrants in American Society." Presentation at the U.S. Citizenship and Immigration Services (USCIS) field office, Dallas, TX, March 6, 2012.

**2011** | "The Radical Right and the Politics of Immigration Control in Europe." University of Neuchâtel, Switzerland, June 16-17, 2011.

"Conceptual Challenges and Contemporary Trends in Immigration Control." Presentation at the "Immigration Policy in an Era of Globalization" conference at the Federal Reserve Bank of Dallas, TX, May 18-20, 2011.

"Enforcing Like a State: A Mixed-Methods Study of the Politics of Immigration Control." Presentation at the University of California Center for New Racial Studies conference, UCLA, April 21, 2011.

"Immigration Enforcement in the Age of Obama." Center for Ideas and Society, University of California, Riverside, March 8, 2011.

**2010** | "The Politics and Determinants of Immigration Control: Evidence from 25 Immigrant-Receiving Democracies." Department of Political Science and the Center for Research on Immigration, Population, and Public Policy, University of California, Irvine, December 1, 2010.

"States, Irregular Migrants, and a Theory of Selective Immigration Control: Evidence from European Gateway Cities." Presentation at the "Beyond Arizona: Laws Targeting Immigrants in the US and Europe" conference at the Warren Institute on Race, Ethnicity, and Diversity, University of California, Berkeley, October 25, 2010.

**2009** | "Immigration Control in Industrialized Democracies: What Explains Their Variations." Presentation at Metropolis, an initiative of Citizenship and Immigration Canada, Ottawa, Canada, December 2, 2009.

## PROFESSIONAL ACTIVITIES

- Reviewer: *National Science Foundation,* American *Journal of Political Science, American Politics Research, Du Bois Review, International Migration, International Migration Review, International Studies Quarterly, Journal of Ethnic & Migration Studies, Journal of Politics, Journal of Race, Ethnicity, and Politics, Law & Social Inquiry, Political Research Quarterly, Russell Sage Foundation, Social Identities, Social Problems*
- Advisory Board, Center for Comparative Immigration Studies (CCIS), 2012-present
- Advisory Board, Integrated Voter Engagement study, 2016-present
- Advisory Board, Unbound Philanthropy, 2015-2017
- APSA, Executive Committee, Migration and Citizenship Section, Treasurer, 2012-2015
- APSA, Migration and Citizenship Section Program Chair, 2018
- Editorial Board, Journal of Migration and Human Security (JMHS), 2014-present
- Editorial Board, Politics, Groups, and Identities (PGI), 2016-present
- Executive Committee, Center for Comparative Immigration Studies (CCIS), 2015-present
- MPSA, International Relations and Domestic Politics Section Program Chair, 2016
- WPSA, (Im)Migration and Citizenship Section Program Chair, 2015, 2017
- WPSA, Dissertation award committee, 2016

# EXHIBIT B

# Results from Tom K. Wong[1] et al., 2017 National DACA Study

Survey fielded 8/1/2017 to 8/20/2017
*n* = 3,063

| | | |
|---|---|---|
| Methodology | …………………………… | 1 |
| Economic Integration | …………………………… | 2-5 |
| Education | …………………………… | 6-7 |
| Inclusion and Belonging | …………………………… | 8-10 |
| DACA Post-November 2016 | …………………………… | 11-14 |
| Applying/Renewing DACA | …………………………… | 15-17 |

---

[1] Tom K. Wong is associate professor of political science at the University of California, San Diego. tomkwong@ucsd.edu

1533

**Methodology**

The questionnaire was administered to an online panel of DACA recipients recruited by the partner organizations. Several steps were taken to account for the known sources of bias that result from such online panels. To prevent ballot stuffing—one person submitting multiple responses—the authors did not offer an incentive to respondents for taking the questionnaire and used a state-of-the-art online survey platform that does not allow one IP address to submit multiple responses. To prevent spoiled ballots— meaning people responding who are not undocumented—the authors used a unique validation test for undocumented status. Multiple questions were asked about each respondent's migratory history. These questions were asked at different parts of the questionnaire. When repeated, the questions were posed using different wording. If there was agreement in the answers such that there was consistency regarding the respondent's migratory history, the respondent was kept in the resulting pool of respondents. If not, the respondent was excluded. In order to recruit respondents outside of the networks of the partner organizations, Facebook ads were also used. Because there is no phone book of undocumented immigrants, and given the nature of online opt-in surveys, it is not possible to construct a valid margin of error.

# Economic Integration

**Check all that apply. After my DACA application was approved, I...**
(*n* = 3,063)

|  |  |  | ≥ 25 |
|---|---|---:|---:|
| Got my first job | ........................................ | 54.2% | 35.3% |
| Got a job with better pay | ........................................ | 68.5% | 77.7% |
| Got a job that better fits my education and training | ........................................ | 54.2% | 59.6% |
| Got a job that better fits my long-term career goals | ........................................ | 53.9% | 61.4% |
| Got a job with health insurance or other benefits | ........................................ | 57.3% | 66.9% |
| Got a job with improved work conditions | ........................................ | 56.2% | 64.4% |
| Started my own business | ........................................ | 5.4% | 7.9% |
| I have been able to earn more money, which has helped me become financially independent | ........................................ | 69.0% | 73.4% |
| I have been able to earn more money, which has helped my family financially | ........................................ | 70.8% | 73.7% |
| Opened a bank account | ........................................ | 61.0% | 47.3% |
| Got my first credit card | ........................................ | 65.7% | 67.9% |
| Bought my first car | ........................................ | 64.5% | 67.2% |
| Bought a home | ........................................ | 15.7% | 23.5% |

Note: percentages do not sum to 100 as individuals may select all that apply. *n* = 1,662 for all respondents 25 years and older.

---

**Are you currently employed?**
(*n* = 3,063)

|  |  |  | ≥ 25 |
|---|---|---:|---:|
| Yes | ........................................ | 91.4% | 93.3% |
| No | ........................................ | 8.6% | 6.7% |
| No response | ........................................ | 0.0% | 0.0% |

Note: percentages may not sum to 100 due to rounding. *n* = 1,662 for all respondents 25 years and older.

- 3 -

**1535**

····· **Please indicate your average hourly wage OR annual salary.**

(*n* = 2,800, which represents the 91.4% of all respondents who are currently employed)

|  |  |  | ≥ 25 |
|---|---|---:|---:|
| Average hourly wage | ........................................ | $17.46 | $20.05 |
| Median hourly wage | ........................................ | $15.34 | $17.90 |
| Average annual earnings | ........................................ | $36,231.91 | $41,621.48 |
| Median annual earnings | ........................................ | $32,000.00 | $37,595.03 |

Note: percentages may not sum to 100 due to rounding. *n* = 1,551 for respondents 25 years and older and currently employed.
Figures exclude the bottom 1st and top 99th percentiles

---

····· **On average, how many hours do you work per week?**

(*n* = 2,800, which represents the 91.4% of all respondents who are currently employed)

|  |  |  | ≥ 25 |
|---|---|---:|---:|
| Average hours worked per week | ........................................ | 37.9 | 39.9 |
| Median hours worked per week | ........................................ | 40.0 | 40.0 |

Note: percentages may not sum to 100 due to rounding. *n* = 1,551 for respondents 25 years and older and currently employed.
Figures exclude the bottom 1st and top 99th percentiles

---

····· **Were you employed before DACA?**

(*n* = 2,800, which represents the 91.4% of all respondents who are currently employed)

|  |  |  | ≥ 25 |
|---|---|---:|---:|
| Yes | ........................................ | 43.9% | 60.7% |
| No | ........................................ | 55.9% | 38.9% |
| No response | ........................................ | 0.3% | 0.4% |

Note: percentages may not sum to 100 due to rounding. *n* = 1,551 for respondents 25 years and older and currently employed.

---

- 4 -

1536

····· **Please indicate your average hourly wage OR annual salary before DACA.**
(*n* = 1,229, which represents the 43.9% of respondents who are currently employed and were also employed before DACA)

|  |  |  | ≥ 25 |
|---|---|---|---|
| Average hourly wage | ........................................ | $10.29 | $10.87 |
| Median hourly wage | ........................................ | $9.59 | $10.00 |
| Average annual earnings | ........................................ | $20,068.49 | $21,950.47 |
| Median annual earnings | ........................................ | $19,000.00 | $20,857.16 |

Note: percentages may not sum to 100 due to rounding. *n* = 942 for respondents 25 years and older, currently employed, and were employed before DACA. Figures exclude the bottom 1st and top 99th percentiles

····· **On average, how many hours did you work per week before DACA?**
(*n* = 1,229, which represents the 43.9% of respondents who are currently employed and were also employed before DACA)

|  |  |  | ≥ 25 |
|---|---|---|---|
| Average hours worked per week | ........................................ | 37.7 | 39.2 |
| Median hours worked per week | ........................................ | 40.0 | 40.0 |

Note: percentages may not sum to 100 due to rounding. *n* = 1,551 for respondents 25 years and older, currently employed, and were employed before DACA. Figures exclude the bottom 1st and top 99th percentiles.

····· **Does your employer know that you have DACA?**
(*n* = 2,800, which represents the 91.4% of all respondents who are currently employed)

| | | |
|---|---|---|
| Yes | ........................................ | 50.0% |
| No | ........................................ | 11.4% |
| Not applicable | ........................................ | 37.7% |
| No response | ........................................ | 0.9% |

Note: percentages may not sum to 100 due to rounding.

- 5 -

**1537**

····· **Are you bilingual?**
(*n* = 2,800, which represents the 91.4% of all respondents who are currently employed)

| | | |
|---|---|---|
| Yes | ........................................ | 98.1% |
| No | ........................................ | 1.9% |
| No response | ........................................ | 0.1% |

Note: percentages may not sum to 100 due to rounding.

····· **Do you agree or disagree with the following statement: "My being bilingual has been an asset to my employer."**
(*n* = 2,746, which represents the 98.1% of respondents who are currently employed and are bilingual)

| | | |
|---|---|---|
| Strongly agree | ........................................ | 80.1% |
| Agree | ........................................ | 12.5% |
| Neither agree nor disagree | ........................................ | 6.1% |
| Disagree | ........................................ | 0.8% |
| Strongly disagree | ........................................ | 0.4% |
| No response | ........................................ | 0.2% |
| | | |
| Agree/strongly agree | ........................................ | 92.6% |
| Neither agree nor disagree | ........................................ | 6.1% |
| Disagree/strongly disagree | ........................................ | 1.2% |
| No response | ........................................ | 0.2% |

Note: percentages may not sum to 100 due to rounding.

# Education

**Check all that apply. After my DACA application was approved, I...**
(*n* = 3,063)

|  | | | ≥ 25 |
|---|---|---|---|
| Pursued educational opportunities that I previously could not | ......................................... | 65.3% | 54.2% |
| I haven't pursued more education yet, but I plan to | ......................................... | 33.3% | 42.7% |
| I don't plan to pursue more education | ......................................... | 3.3% | 5.1% |
| Paid off some/all of my student loans | ......................................... | 18.4% | 18.3% |

Note: percentages do not sum to 100 as individuals may select all that apply. *n* = 1,662 for all respondents 25 years and older.

**Are you currently in school?**
(*n* = 3,063)

|  | | | ≥ 25 |
|---|---|---|---|
| Yes | ......................................... | 44.9% | 30.6% |
| No | ......................................... | 55.0% | 69.3% |
| No response | ......................................... | 0.1% | 0.1% |

Note: percentages may not sum to 100 due to rounding. *n* = 1,662 for all respondents 25 years and older.

...... **What degree are you currently pursuing?**
(*n* = 1,374, which represents 44.9% of all respondents who are currently in school)

|  | | | ≥ 25 |
|---|---|---|---|
| GED or equivalent | ......................................... | 0.9% | 2.2% |
| High-school diploma | ......................................... | 2.7% | 0.6% |
| Trade/technical/vocational degree or certificate | ......................................... | 4.3% | 6.3% |
| Associate's degree | ......................................... | 19.4% | 18.5% |
| Bachelor's degree | ......................................... | 52.5% | 42.2% |
| Master's degree | ......................................... | 13.1% | 21.0% |
| Professional degree above a master's degree | ......................................... | 2.3% | 3.1% |
| Doctorate degree | ......................................... | 3.6% | 4.9% |
| No response | ......................................... | 1.2% | 1.2% |
|  |  |  |  |
| Bachelor's degree or higher | ......................................... | 71.5% | 71.2% |

Note: percentages may not sum to 100 due to rounding. *n* = 509 for respondents 25 years and older who are currently in school.

1539

**What is the highest degree or level of school you have completed?** *If you are currently enrolled in school, what is the highest degree you have received thus far?*
(*n* = 3,063)

|  |  |  | ≥ 25 |
|---|---|---:|---:|
| GED or equivalent | ........................................ | 3.4% | 5.4% |
| High-school diploma | ........................................ | 24.0% | 18.1% |
| Trade/technical/vocational degree or certificate | ........................................ | 3.6% | 4.3% |
| Associate's degree | ........................................ | 15.7% | 15.0% |
| Some college | ........................................ | 23.9% | 20.7% |
| Bachelor's degree | ........................................ | 23.2% | 27.3% |
| Master's degree | ........................................ | 4.4% | 7.3% |
| Professional degree above a master's degree | ........................................ | 0.3% | 0.4% |
| Doctorate degree | ........................................ | 0.3% | 0.5% |
| No response | ........................................ | 1.3% | 0.9% |
|  |  |  |  |
| Bachelor's degree or higher | ........................................ | 28.2% | 35.5% |

Note: percentages may not sum to 100 due to rounding. *n* = 1,662 for all respondents 25 years and older.

1540

## Inclusion and Belonging

**Check all that apply. After my DACA application was approved, I...**
(*n* = 3,063)

|  |  |  | ≥ 25 |
|---|---|---|---|
| Got my driver's license for the first time | ........................................ | 79.7% | 80.4% |
| Got a state identification card for the first time | ........................................ | 55.1% | 51.1% |
| Became an organ donor | ........................................ | 48.7% | 49.8% |
| Donated blood for the first time | ........................................ | 17.8% | 13.7% |

Note: percentages do not sum to 100 as individuals may select all that apply. *n* = 1,662 for all respondents 25 years and older.

---

**Please indicate the immigration status of your immediate family members, meaning a parent, sibling, spouse, or child. (select all that apply)**
(*n* = 3,063)

| | | |
|---|---|---|
| American citizen spouse | ........................................ | 16.6% |
| American citizen child | ........................................ | 25.7% |
| American citizen sibling | ........................................ | 58.9% |
| American citizen spouse, child, or sibling | ........................................ | 72.7% |

Note: percentages do not sum to 100 as individuals may select all that apply.

---

**Do you have an immediate family member, meaning a parent, sibling, spouse, or child, who is a U.S. citizen and is 18 years or older?**
(*n* = 3,063)

| | | |
|---|---|---|
| Yes | ........................................ | 44.6% |
| No | ........................................ | 55.0% |
| No response | ........................................ | 0.4% |

Note: percentages may not sum to 100 due to rounding.

...... **Are any of your immediate family members who are U.S. citizens and are 18 years or older registered to vote?**

(*n* = 1,365, which represents 44.6% of all respondents who have immediate relatives who are U.S. citizens that are 18 years or older)

| | | |
|---|---|---|
| Yes | ........................................ | 81.5% |
| No | ........................................ | 18.3% |
| No response | ........................................ | 0.2% |

Note: percentages may not sum to 100 due to rounding.

# DACA Post-November 2016

**Thinking about immigration enforcement under the Trump administration, how concerned are you about the following:**

(*n* = 3,063)

### Your family's safety

| | | |
|---|---|---|
| Very concerned | ................................. | 77.1% |
| Concerned | ................................. | 11.6% |
| Somewhat concerned | ................................. | 3.9% |
| Not concerned at all | ................................. | 2.3% |
| No response | ................................. | 5.1% |

### Your finances

| | | |
|---|---|---|
| Very concerned | ................................. | 70.9% |
| Concerned | ................................. | 15.7% |
| Somewhat concerned | ................................. | 5.0% |
| Not concerned at all | ................................. | 1.7% |
| No response | ................................. | 6.7% |

### Your property

| | | |
|---|---|---|
| Very concerned | ................................. | 60.0% |
| Concerned | ................................. | 17.3% |
| Somewhat concerned | ................................. | 10.8% |
| Not concerned at all | ................................. | 5.5% |
| No response | ................................. | 6.5% |

### Your future

| | | |
|---|---|---|
| Very concerned | ................................. | 85.1% |
| Concerned | ................................. | 5.7% |
| Somewhat concerned | ................................. | 2.1% |
| Not concerned at all | ................................. | 0.8% |
| No response | ................................. | 6.4% |

Note: percentages may not sum to 100 due to rounding.

**Do you agree or disagree with the following statement: "Since the November 2016 presidential election, I've become more political active and engaged."**
(*n* = 3,063)

| | | |
|---|---|---|
| Strongly agree | ......................................... | 37.3% |
| Agree | ......................................... | 32.5% |
| Neither agree nor disagree | ......................................... | 24.0% |
| Disagree | ......................................... | 3.8% |
| Strongly disagree | ......................................... | 1.4% |
| No response | ......................................... | 0.9% |
| | | |
| Agree/strongly agree | ......................................... | 69.8% |

Note: percentages may not sum to 100 due to rounding.

**Did you know that the Texas Attorney General, along with the attorney generals of 9 other states (Alabama, Arkansas, Idaho, Kansas, Louisiana, Nebraska, South Carolina, Tennessee, and West Virginia) recently sent a letter to the Trump administration demanding an end to DACA?**
(*n* = 3,063)

| | | |
|---|---|---|
| Yes | ......................................... | 81.7% |
| No | ......................................... | 18.1% |
| No response | ......................................... | 0.3% |

Note: percentages may not sum to 100 due to rounding.

**If DACA ended in the state that you currently live in, but continued in other states, how likely is it that you would move to another state that still had DACA?**
(*n* = 3,063)

| | | |
|---|---|---|
| Very likely | ......................................... | 52.9% |
| Likely | ......................................... | 21.2% |
| Neither likely nor unlikely | ......................................... | 14.5% |
| Unlikely | ......................................... | 7.6% |
| Very unlikely | …...................................... | 3.2% |
| No response | …...................................... | 0.6% |
| | | |
| Likely/very likely | ......................................... | 74.1% |

Note: percentages may not sum to 100 due to rounding.

**How likely are you to leave the country if DACA ends?**
($n = 3,063$)

| | |
|---|---|
| Very likely | ........................................ 9.8% |
| Likely | ........................................ 12.5% |
| Neither likely nor unlikely | ........................................ 27.1% |
| Unlikely | ........................................ 18.2% |
| Very unlikely | …..................................... 31.5% |
| No response | …..................................... 0.8% |
| | |
| Likely/very likely | ........................................ 22.3% |

Note: percentages may not sum to 100 due to rounding.

**If DACA ends, would you be willing to participate in protest actions (e.g., rallies, marches, and demonstrations)?**
($n = 3,063$)

| | |
|---|---|
| Yes | ........................................ 84.9% |
| No | ........................................ 12.9% |
| No response | ........................................ 2.1% |

Note: percentages may not sum to 100 due to rounding.

**If DACA ends, would you be willing to engage in civil disobedience?**
($n = 3,063$)

| | |
|---|---|
| Yes | ........................................ 34.6% |
| No | ........................................ 60.7% |
| No response | ........................................ 4.7% |

Note: percentages may not sum to 100 due to rounding.

**If you no longer had DACA, would you be more or less likely to do the following:**
(*n* = 3,063)

### Report a crime
### you witnessed

| | |
|---|---|
| More likely | 13.7% |
| Neither more nor less likely | 32.1% |
| Less likely | 53.2% |
| No response | 0.9% |

### Report a crime
### if you were the victim

| | |
|---|---|
| More likely | 20.6% |
| Neither more nor less likely | 31.5% |
| Less likely | 46.9% |
| No response | 0.9% |

### Go to the hospital
### if you suffered an injury

| | |
|---|---|
| More likely | 14.9% |
| Neither more nor less likely | 35.7% |
| Less likely | 48.3% |
| No response | 1.0% |

### Report wage theft
### by your employer

| | |
|---|---|
| More likely | 14.7% |
| Neither more nor less likely | 24.4% |
| Less likely | 59.8% |
| No response | 1.1% |

Note: percentages may not sum to 100 due to rounding.

# Applying/Renewing DACA

**Did you receive any assistance when you first applied for DACA? (select all that apply)**
(*n* = 3,063)

| | |
|---|---:|
| No, I filed on my own | 21.2% |
| I attended an information session put on by an organization, but filed on my own | 9.9% |
| I applied with the assistance of an organization | 22.7% |
| I applied with the assistance of a private attorney/immigration lawyer | 49.5% |

Note: percentages do not sum to 100 as individuals may select all that apply.

**Have you applied to renew your DACA status anytime between January 20, 2017 to present?**
(*n* = 3,063)

| | |
|---|---:|
| Yes | 41.3% |
| No: I'm eligible to renew, but I haven't submitted my renewal application yet | 11.2% |
| No: I'm not eligible to submit my renewal application yet | 46.9% |
| No response | 0.6% |

Note: percentages may not sum to 100 due to rounding.

**What is the status of your DACA renewal?**
(*n* = 1,266, which represents the 41.3% of all respondents who have applied to renew)

| | |
|---|---:|
| Approved | 76.1% |
| Pending | 23.8% |
| Denied | 0.0% |
| Request for evidence (RFE) | 0.2% |

Note: percentages may not sum to 100 due to rounding.

..... **Was your DACA renewal approved after your initial DACA status expired?**
(*n* = 978, which represents the 76.1% of respondents who have applied to renew and have been approved)

| | | |
|---|---|---|
| Yes | ........................................ | 57.8% |
| No | ........................................ | 41.7% |
| No response | ........................................ | 0.5% |

Note: percentages may not sum to 100 due to rounding.

..... **How long was the gap between when your DACA renewal was approved and when your initial DACA status expired?**
(*n* = 565, which represents the 57.8% of respondents who have applied to renew and were approved after their DACA status expired)

| | | |
|---|---|---|
| Less than 1 week | ........................................ | 28.7% |
| Between 1-2 weeks | ........................................ | 12.4% |
| Between 2-3 weeks | ........................................ | 8.7% |
| Between 3-4 weeks | ........................................ | 12.4% |
| More than 1 month | ........................................ | 35.4% |
| No response | ........................................ | 2.5% |

Note: percentages may not sum to 100 due to rounding.

..... **Did this delay affect your ability to get or keep a job?**
(*n* = 565, which represents the 57.8% of respondents who have applied to renew and were approved after their DACA status expired)

| | | |
|---|---|---|
| Yes | ........................................ | 22.5% |
| No | ........................................ | 57.2% |
| Not applicable | ........................................ | 19.5% |
| No response | ........................................ | 0.9% |

Note: percentages may not sum to 100 due to rounding.

······   **Why have you not submitted your renewal application? (select all that apply)**
(*n* = 343, which represents the 11.2% of all respondents who are eligible to renew, but haven't yet)

| | |
|---|---|
| I already have another immigration application that I'm waiting on | 24.2% |
| It's too expensive: I don't know about a fee waiver | 20.7% |
| It's too expensive: I don't meet the requirements for a fee waiver | 3.8% |
| It's too expensive: I applied for a fee waiver, but was denied | 0.6% |
| Fear of providing updated information to the government | 18.1% |
| Fear that government will use information for immigration enforcement purposes | 25.7% |
| Criminal record | 0.3% |

Note: percentages do not sum to 100 as individuals may select all that apply.

······   **Do you agree or disagree with the following statement: "I'm less likely to apply to renew my DACA status when I become eligible to do so because I fear that the government will use my information for immigration enforcement purposes."**
(*n* = 1,436, which represents the 46.9% of all respondents who are not eligible to renew yet)

| | |
|---|---|
| Strongly agree | 10.9% |
| Agree | 16.7% |
| Neither agree nor disagree | 25.1% |
| Disagree | 26.7% |
| Strongly disagree | 20.5% |
| No response | 0.1% |
| Agree/strongly agree | 27.6% |

Note: percentages may not sum to 100 due to rounding.

**What state do you currently live in?**
(*n* = 3,063)

|  | | | % Poll | % DACA |
|---|---|---|---|---|
| California | ........................................ | | 24.3% | 28.3% |
| Texas | ........................................ | | 17.4% | 15.8% |
| New York | ........................................ | | 4.8% | 5.3% |
| Illinois | ........................................ | | 4.4% | 5.4% |
| Arizona | ........................................ | | 4.1% | 3.5% |
| Florida | ........................................ | | 3.3% | 4.2% |
| North Carolina | ........................................ | | 3.1% | 3.5% |
| Colorado | ........................................ | | 2.8% | 2.2% |
| Washington | ........................................ | | 2.7% | 2.3% |
| Georgia | ........................................ | | 2.6% | 3.1% |
| New Jersey | ........................................ | | 1.9% | 2.8% |
| Utah | ........................................ | | 1.9% | 1.2% |
| Tennessee | ........................................ | | 1.5% | 1.1% |
| Oregon | ........................................ | | 1.3% | 1.4% |
| Maryland | ........................................ | | 1.3% | 1.2% |
| Michigan | ........................................ | | 1.3% | 0.8% |
| New Mexico | ........................................ | | 1.2% | 0.9% |
| Massachusetts | ........................................ | | 1.2% | 1.0% |
| Kansas | ........................................ | | 1.1% | 0.9% |
| Pennsylvania | ........................................ | | 1.1% | 0.7% |
| Virginia | ........................................ | | 1.1% | 1.5% |
| Minnesota | ........................................ | | 1.0% | 0.8% |
| Nevada | ........................................ | | 1.0% | 1.7% |
| Oklahoma | ........................................ | | 1.0% | 0.9% |
| South Carolina | ........................................ | | 1.0% | 0.8% |
| Arkansas | ........................................ | | 1.0% | 0.6% |
| Other | ........................................ | | 10.6% | 8.1% |

Note: percentages may not sum to 100 due to rounding.

1550

**What is your race/ethnicity?**
(*n* = 3,063)

| | | |
|---|---|---:|
| White | ........................................ | 1.7% |
| Black | ........................................ | 1.1% |
| Hispanic/Latino | ........................................ | 92.6% |
| Asian or Pacific Islander | ........................................ | 3.5% |
| Other | ........................................ | 0.9% |
| No Response | ........................................ | 0.2% |

Note: percentages may not sum to 100 due to rounding.

| | | % Poll | % DACA |
|---|---|---:|---:|
| Hispanic/Latino | ........................................ | 92.8% | 93.5% |
| Other | ........................................ | 7.2% | 6.5% |

**How old are you?**
(*n* = 3,063)

| | | |
|---|---|---:|
| Average | ........................................ | 25.2 |
| Median | ........................................ | 25 |
| 16 | ........................................ | 0.4% |
| 17 | ........................................ | 1.6% |
| 18 | ........................................ | 3.0% |
| 19 | ........................................ | 4.4% |
| 20 | ........................................ | 5.2% |
| 21 | ........................................ | 6.6% |
| 22 | ........................................ | 7.6% |
| 23 | ........................................ | 8.9% |
| 24 | ........................................ | 8.0% |
| 25 | ........................................ | 7.1% |
| 26 | ........................................ | 8.6% |
| 27 | ........................................ | 7.6% |
| 28 | ........................................ | 7.3% |
| 29 | ........................................ | 6.2% |
| 30 | ........................................ | 5.3% |
| 31 | ........................................ | 3.6% |
| 32 | ........................................ | 3.3% |
| 33 | ........................................ | 2.2% |
| 34 | ........................................ | 1.8% |
| 35 | ........................................ | 1.4% |

Note: percentages may not sum to 100 due to rounding.

**How old were you when you first came to the U.S.?**
(*n* = 3,063)

| | |
|---|---|
| Average ........................................ | 6.5 |
| Median ........................................ | 6 |
| | |
| 0 ........................................ | 4.5% |
| 1 ........................................ | 7.6% |
| 2 ........................................ | 8.3% |
| 3 ........................................ | 9.7% |
| 4 ........................................ | 8.0% |
| 5 ........................................ | 8.7% |
| 6 ........................................ | 7.4% |
| 7 ........................................ | 7.4% |
| 8 ........................................ | 6.5% |
| 9 ........................................ | 6.2% |
| 10 ........................................ | 5.6% |
| 11 ........................................ | 5.0% |
| 12 ........................................ | 3.9% |
| 13 ........................................ | 3.5% |
| 14 ........................................ | 4.1% |
| 15 ........................................ | 3.7% |

Note: percentages may not sum to 100 due to rounding.

# EXHIBIT 104

JEFFREY M. DAVIDSON (SBN 248620)
ALAN BERSIN (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the*
*University of California and Janet Napolitano, in*
*her official capacity as President of the*
*University of California*

THEODORE J. BOUTROUS, JR. (SBN 132099)
ETHAN D. DETTMER (SBN 196046)
JESSE S. GABRIEL (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam*
*Gonzalez Avila, Saul Jimenez Suarez, Viridiana*
*Chabolla Mendoza, Norma Ramirez, and Jirayut*
*Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and*
*Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security,<br><br>Defendants. | CASE NO. 17-CV-05211-WHA<br><br>**DECLARATION OF IAN YAFFE** |

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA,<br><br>        Plaintiffs,<br><br>        v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA,<br><br>        Defendants. | CASE NO. 17-CV-05235-WHA |
| CITY OF SAN JOSE, a municipal corporation,<br><br>        Plaintiffs,<br><br>        v.<br><br>DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA,<br><br>        Defendants. | CASE NO. 17-CV-05329-WHA |
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN,<br><br>        Plaintiffs,<br><br>        v.<br><br>UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security,<br><br>        Defendants. | CASE NO. 17-CV-05380-WHA |

| | |
|---|---|
| COUNTY OF SANTA CLARA and SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 521, | CASE NO. 17-CV-05813-WHA |

Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS, in his official capacity as Attorney General of the United States; ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security; and U.S. DEPARTMENT OF HOMELAND SECURITY,

Defendants.

I, Ian Yaffe, Executive Director of Hand in Hand / Mano en Mano of Milbridge, Maine, declare and state as follows:

1. My name is Ian Yaffe. I am the Executive Director of Hand in Hand/Mano en Mano ("Mano en Mano") of Milbridge, Maine. I have been employed by Mano en Mano since 2010.

2. Mano en Mano works with immigrant and farmworker communities across Maine, particularly a Latino community based in Washington County, Maine. We have a close relationship with seven families of DACA recipients, all of whom are pillars in our small community. The DACA program has allowed these individuals the opportunity to go to school, live, drive, work, and save money without fear of deportation, effectively allowing them to settle, put down roots, and thrive here in Maine. It is important to highlight not only the damage rescinding DACA will have on these individuals, but the repercussions that will adversely affect and be felt by their families, Maine schools, our greater Milbridge community, and local employers.

3. Rescinding DACA will mean that local DACA beneficiaries will lose their work authorization, and therefore have to move out of our community. If DACA recipients are forced out of our community, they would move along with green-card holding and undocumented family members as well as children and spouses who are U.S. citizens. Otherwise, these mixed status families would be separated across state or even national borders. All local DACA recipients grew up in Downeast Maine and refer to Maine and the United States, not their country of birth, as their home. DACA provided these community members an opportunity to truly settle here.

4. In addition, local DACA recipients are all graduates of the local school systems. They remain involved with the schools through supporting school programs and now as parents. At a time when public schools are closing and consolidating, the local elementary schools in the Downeast region are full of immigrant youth and the

2

1  children of immigrants. The termination of DACA would not only end these

2  students' dreams of attending secondary school in Maine, but the harms would also

3  affect the revenues and enrollments of state institutions of higher education they are

4  eager to attend.

5  5.  The negative effects the rescission of DACA would have on the local community

6  cannot be overstated. DACA recipients have planned annual community events,

7  participated in community workshops and potlucks, shared their stories during

8  community meetings, supported undocumented immigrant advocacy, and spoken on

9  immigration issues to state legislators. In addition, because these families have been

10  in Downeast Maine for longer than many local immigrant families, they have been

11  integral in welcoming and introducing more recent immigrants to community

12  members and resources.

13  6.  The Latino community in Downeast Maine includes Mexican, Central American,

14  and Caribbean immigrants.  Although sometimes it seems like these groups remain

15  disparate, local DACA recipients have been able to bring groups of immigrants

16  together socially and at community events in a way that is both invaluable and

17  unreplaceable due to their deep roots here in Milbridge, their multiculturalism,

18  multilingualism, and connections through work, openness, and compassion.  Local

19  DACA recipients also have strong relationships and connections with non-

20  immigrant locals, including actively participating in volunteer opportunities and

21  internships with local social services providers, community organizations, and

22  churches.

23  7.  Local employers would also be adversely affected by the rescission of DACA.  In

24  rural Downeast Maine, demographics trend older as younger people move away for

25  opportunities elsewhere in the state or in other parts of the country.  There is a

26  shortage of able-bodied workers able to support fishing, aquaculture, and

27  agricultural industries.  Local DACA recipients all stated that they would be unable

28  to continue in their current positions or advance if the program is terminated.  In

3

1   addition, they would move away from the area with family members, costing these

2   small local businesses additional workers.

3   8.  Mano en Mano regularly fields calls from employers asking for connections to

4   workers able to work in these positions. Steady employees are sometimes hard for

5   employers to find. Through the DACA program, these individuals have been able to

6   secure the work authorization that allowed local businesses to employ them. In

7   addition, two DACA recipients said they dream of opening their own small

8   businesses.  Not only would the rescission of DACA negatively affect current local

9   businesses, but it would prevent young entrepreneurs from creating future economic

10  and employment opportunities in the area.

11  9.  Community members remember the day they received DACA and the feeling of

12  becoming a new person, someone who could fully participate in life and who was

13  no longer invisible.  They remember hiding in the bathroom in elementary school

14  when police officers came for show and tell, and the daily fear of leaving their

15  homes.  DACA provided these individuals with freedom, options, a choice, and a

16  simple and stress-free way of living that they had never experienced before.

17  10. One DACA recipient expressed that he has a life now with DACA, and that without

18  it his life here is as good as over.  DACA recipients also expressed betrayal that they

19  had given all their information for the opportunity to stay here and develop the

20  community, and now it seems like it was for nothing.  They are scared to go back to

21  the days of being always worried and afraid, and feeling like they are in the shadows

22  and that they do not belong. For these community members, DACA was

23  transformative and they continue to hope for the opportunity to call Maine home, a

24  place that has always been their home.

25

26

27

28

4

1

2          I declare under penalty of perjury under the laws of the United States that the foregoing is

3   true and correct and that this declaration was executed on October 3, 2017 in Augusta, Maine

4

5

6          IAN YAFFE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

5

Declaration
Case #17-5235



# EXHIBIT 105

1  JEFFREY M. DAVIDSON (SBN 248620)
   ALAN BERSIN (SBN 63874)
2  COVINGTON & BURLING LLP
   One Front Street, 35th Floor
3  San Francisco, CA 94111-5356
   Telephone: (415) 591-6000
4  Facsimile: (415) 591-6091
   Email: jdavidson@cov.com,
5  abersin@cov.com
   *Attorneys for Plaintiffs The Regents of the*
6  *University of California and Janet Napolitano, in*
   *her official capacity as President of the*
7  *University of California*

8  THEODORE J. BOUTROUS, JR. (SBN 132099)
   ETHAN D. DETTMER (SBN 196046)
9  JESSE S. GABRIEL (SBN 263137)
   GIBSON, DUNN & CRUTCHER LLP
10  333 South Grand Avenue
   Los Angeles, CA 90071-3197
11  Telephone: (213) 229-7000
   Facsimile: (213) 229-7520
12  Email: tboutrous@gibsondunn.com,
   edettmer@gibsondunn.com,
13  jgabriel@gibsondunn.com
   *Attorneys for Plaintiffs Dulce Garcia, Miriam*
14  *Gonzalez Avila, Saul Jimenez Suarez, Viridiana*
   *Chabolla Mendoza, Norma Ramirez, and Jirayut*
15  *Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and
Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California, <br><br>         Plaintiffs, <br><br>         v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, <br><br>         Defendants. | CASE NO. 17-CV-05211-WHA <br><br> **DECLARATION OF GEOFFREY H. YOUNG, PhD** |

---

DECLARATION OF GEOFFREY H. YOUNG, PhD
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

| | |
|---|---|
| 1 | STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA, | CASE NO. 17-CV-05235-WHA |

STATE OF CALIFORNIA, STATE OF
MAINE, STATE OF MARYLAND, and
STATE OF MINNESOTA,

              Plaintiffs,

        v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, ELAINE DUKE, in her official
capacity as Acting Secretary of the Department
of Homeland Security, and the UNITED
STATES OF AMERICA,

              Defendants.

CASE NO. 17-CV-05235-WHA

CITY OF SAN JOSE, a municipal corporation,

              Plaintiffs,

        v.

DONALD J. TRUMP, President of the United
States, in his official capacity, ELAINE C.
DUKE, in her official capacity, and the
UNITED STATES OF AMERICA,

              Defendants.

CASE NO. 17-CV-05329-WHA

DULCE GARCIA, MIRIAM GONZALEZ
AVILA, SAUL JIMENEZ SUAREZ,
VIRIDIANA CHABOLLA MENDOZA,
NORMA RAMIREZ, and JIRAYUT
LATTHIVONGSKORN,

              Plaintiffs,

        v.

UNITED STATES OF AMERICA, DONALD
J. TRUMP, in his official capacity as President
of the United States, U.S. DEPARTMENT OF
HOMELAND SECURITY, and ELAINE
DUKE, in her official capacity as Acting
Secretary of Homeland Security,

              Defendants.

CASE NO. 17-CV-05380-WHA

| | |
|---|---|
| 1 | COUNTY OF SANTA CLARA and<br>SERVICE EMPLOYEES INTERNATIONAL<br>UNION LOCAL 521, | CASE NO. 17-CV-05813-WHA |
| 2 | | |
| 3 | Plaintiffs, | |
| 4 | v. | |
| 5 | DONALD J. TRUMP, in his official capacity | |
| 6 | as President of the United States, JEFFERSON<br>BEAUREGARD SESSIONS, in his official<br>capacity as Attorney General of the United | |
| 7 | States; ELAINE DUKE, in her official<br>capacity as Acting Secretary of the Department | |
| 8 | of Homeland Security; and U.S.<br>DEPARTMENT OF HOMELAND | |
| 9 | SECURITY, | |
| 10 | Defendants. | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

I, GEOFFREY H. YOUNG, PhD, DECLARE:

1.      I am Senior Director, Student Affairs and Programs, at the Association of American Medical Colleges ("AAMC"). I have held this position since 2011. In this role, I am responsible for the program and services directed to the medical school student affairs community. I oversee AAMC's efforts to optimize the professional and educational development and informed decision making of medical school professionals and learners (from aspiring physicians to medical residents) through the development and delivery of programs, learning opportunities, resources, and other sources of support, as well as the collection, analysis, and sharing of data within the medical education continuum. I have personal knowledge of the facts set forth in this declaration, and if called as a witness, I could and would competently testify to them.

2.      I earned my B.A. from Hampton University, Hampton VA, and my M.A. and PhD in clinical psychology at the Ohio State University. I began my clinical career in 1990 at the University of Medicine and Dentistry of New Jersey-University Behavioral Healthcare (now Rutgers University Behavioral Health Care) treating adults and children living in underserved communities. I joined the faculty at the UMDNJ-Robert Wood Johnson Medical School (now Rutgers University Robert Wood Johnson Medical School) in 1995 and was appointed Assistant Dean for Student and Multicultural Affairs in 1996. I served as Assistant Dean for Student Affairs at RWJMS between 1999 and 2004. I served as the Associate Dean for Student Affairs at the Medical College of Virginia Campus of Virginia Commonwealth University between 2004 and 2007 where I was the principal student affairs officer and primary spokesperson with students, parents, faculty, and administrators about student-related issues on the campus. I joined the AAMC after serving as the Associate Dean for Admissions at the Medical College of Georgia at Georgia Regents University (now Medical College of Georgia at August University). AAMC is a not-for-profit association dedicated to transforming health care through innovative medical education, cutting-edge patient care, and groundbreaking medical research.

3.      AAMC's members comprise all 147 accredited U.S. medical schools, nearly 400 major teaching hospitals and health systems, and more than 80 academic societies. Through these institutions and organizations, the AAMC serves the leaders of America's medical schools and teaching hospitals

1

1563

and their nearly 167,000 full-time faculty members, 88,000 medical students, and 124,000 resident physicians.

4.    Prior to the establishment of the DACA program, through my contacts with university and medical school officials, I learned of college students who wished to attend medical school and become physicians but who were unable to do so because of their undocumented status.  Once the DACA program was established I was advised that students with DACA students were successful in gaining admission and matriculating at medical schools throughout the country.

5.    Currently there are approximately 100 medical students and medical resident physicians with Deferred Action for Childhood Arrivals ("DACA") status in AAMC member medical schools and teaching hospitals.  These individuals, in qualifying for DACA status and pursuing a medical education, have demonstrated a commitment to acquiring the skills and professional attributes of a physician to improve the health of Americans throughout the country.

6.    With the nation's population growing and becoming more diverse, it is crucial that our physician workforce is prepared to mitigate racial, ethnic, and socioeconomic health disparities. Aspiring physicians with DACA status help our country produce a diverse and culturally responsive health care workforce to meet the needs of underserved populations, improve cultural awareness, and promote health equity.  As an example, research demonstrates that concordance in race-ethnicity and language between physician and patient can overcome stigma associated with conditions like mental illness, with minority patients demonstrating a greater willingness to seek care from physicians of similar backgrounds.

7.    Research demonstrates that diversity in the health professions leads to improvements in access to care for the underserved and in quality care overall.  We have found that diversity contributes to increased exposure to divergent perspectives, enhances cognitive complexity, promotes civic engagement and facilitates more inclusive teaching and educational content.  Diverse medical school classes enhance the ability of the entire health professional workforce to provide culturally competent care to individuals regardless of their background.  Diversity in health professional teams has contributed to greater productivity, creativity and innovation, with positive implications for advancing science and health care.

DECLARATION OF GEOFFREY H. YOUNG, PhD
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

1564

8.      To become a licensed physician, an individual must complete four years of medical school and between three and seven years in a medical residency program, pass national medical knowledge and clinical skills examinations, and thereafter meet the standards set by state licensing boards for eligibility to practice medicine. Revoking an aspiring or practicing physician's authorization to live and work in the United States will result in the loss of a multi-year investment by medical schools and teaching hospitals in these highly-qualified learners and leave significant gaps in our country's healthcare workforce, to the detriment of hospitals, health systems, patients, and communities throughout the United States.

9.      Because numerous medical schools require applicants to possess lawful immigration status, loss of status will prevent aspiring physicians from attending those schools.  This will keep high-achieving and highly-motivated individuals from entering the physician pipeline.

10.      Medical residency programs are required to complete I-9 Employment Eligibility Verification forms for all individuals who serve as physicians in their residency programs.  For medical school graduates who have been selected for residency, rescission of DACA status (and the corresponding loss of work permit) will in all likelihood disqualify them from residency positions, which will be highly detrimental to their careers and likely prevent them from serving as physicians in the American medical profession altogether.

11.      The DACA program also made it possible for medical students and residents to participate in training through rotations at Veteran Administration medical centers.  Rescission of DACA status will likely disqualify such trainees from VA rotations.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on __10/26_____, 2017, in Washington, D.C.


Geoffrey H. Young, PhD

3

1565



# EXHIBIT 106

JEFFREY M. DAVIDSON (SBN 248620)
ALAN BERSIN (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the University of California and Janet Napolitano, in her official capacity as President of the University of California*

THEODORE J. BOUTROUS, JR. (SBN 132099)
ETHAN D. DETTMER (SBN 196046)
JESSE S. GABRIEL (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez, and Jirayut Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and Service Employees International Union Local 521*

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, <br><br> Defendants. | CASE NO. 17-CV-05211-WHA <br><br> **DECLARATION OF XIANZHAN ZHENG** |

1566

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA, | CASE NO. 17-CV-05235-WHA |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN, | CASE NO. 17-CV-05380-WHA |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security, | |
| Defendants. | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COUNTY OF SANTA CLARA and
SERVICE EMPLOYEES INTERNATIONAL
UNION LOCAL 521,

                Plaintiffs,

        v.

DONALD J. TRUMP, in his official capacity
as President of the United States, JEFFERSON
BEAUREGARD SESSIONS, in his official
capacity as Attorney General of the United
States; ELAINE DUKE, in her official
capacity as Acting Secretary of the Department
of Homeland Security; and U.S.
DEPARTMENT OF HOMELAND
SECURITY,

                Defendants.

CASE NO. 17-CV-05813-WHA

I, Xianzhan "Perry" Zheng, declare and state as follows:

1. I arrived in the United States in 1999 when I was 9 years old. I lived in New York City, then moved to Augusta, Georgia 3 years later, in 2002, when I was 12 years old. I moved to Louisville, KY in senior year of my high when I was 17 years old.

2. I then went to Duke University in 2006 and graduated in 2010 with a double major in Computer Science and Economics and a minor in mathematics.

3. I first applied for Deferred Action for Childhood Arrivals ("DACA") in 2012 and received it in 2013.

4. After receiving work authorization, I was able to work as a software engineer at Amazon, where I migrated a legacy cache system to a more distributed system. I next worked as a software engineer at Twitter in San Francisco, where I worked on the ads analytics team to improve efficiencies. Then I moved to work as a software engineer at Lyft, where I became one of the tech leads in my team and the in-house expert in Amazon Redshift, an analytics database that we used.

5. As a DACA recipient with employment authorization, I was also able to apply for a Social Security number ("SSN").

6. Receiving a SSN was incredibly important for me and my parents. I was able to apply for a car loan and a bank credit card to build my credit.

7. As a frugal entrepreneur and investor, I paid off my car loan in 15 months to avoid the high interest rate and have kept my used car since 2013. Every year, I pay about $350 in car tab costs to the Washington Department of Licensing.

8. More recently, my credit has allowed me to purchase homes for me and my parents in San Francisco, California and Seattle, Washington. Since 2015 I have also purchased 4 additional multi-unit properties.

9. According to my files, I will pay $12,000 and $13,000 in property taxes to San Francisco County, California and King and Pierce Counties, Washington, respectively in 2017. Going forward, my property taxes will be approximately $13,000 and $15,000, respectively, per year.

10. I pay between $80,000 to $120,000 in local, state, and federal income taxes each year.

DECLARATION OF XIANZHAN ZHENG
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380)

1

11. I have renewed my DACA status twice since I first applied. My current DACA status expires in March 2019.

12. Having disclosed my personal identifying information to the U.S. government as part of the DACA application, I fear that this information might be used in enforcement efforts against me and/or my parents.

13. I also have a dream of becoming a real estate investor and investing in bigger multi-family properties. With DACA expiring soon, I am afraid lenders will not be able to lend to me due to my immigration status.

14. And without work authorization, I would lose employment and be unable to support myself and my parents. Even in a short time, I have been able to accomplish a lot in my career and I derive a large part of my self-identity, as well as great meaning and joy, from my job. Taking that away would leave me feeling empty.

15. I also fear the stigma of going back to being undocumented. Before receiving my DACA status, my life was very different from other Americans' lives. Not only was I unable to do basic things like drive a car or work, but I could not even talk about my inability to do those things. DACA allowed me to emerge from the shadows.

16. Unfortunately, my parents still live in the shadows and live in a constant state of fear. Their whole lives depend on me, so losing my DACA status impacts more than just me.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on October 18, 2017, in Seattle, Washington.


Xianzhan Zheng

DECLARATION OF XIANZHAN ZHENG
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380)

2

1570



# EXHIBIT 107

JEFFREY M. DAVIDSON (SBN 248620)
ALAN BERSIN (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the
University of California and Janet Napolitano, in
her official capacity as President of the
University of California*

THEODORE J. BOUTROUS, JR. (SBN 132099)
ETHAN D. DETTMER (SBN 196046)
JESSE S. GABRIEL (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam
Gonzalez Avila, Saul Jimenez Suarez, Viridiana
Chabolla Mendoza, Norma Ramirez, and Jirayut
Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and
Service Employees International Union Local 521*

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security,<br><br>Defendants. | CASE NO. 17-CV-05211-WHA<br><br>**DECLARATION OF BRAD WELLS** |

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA,<br><br>        Plaintiffs,<br><br>        v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA,<br><br>        Defendants. | CASE NO. 17-CV-05235-WHA |
| CITY OF SAN JOSE, a municipal corporation,<br><br>        Plaintiffs,<br><br>        v.<br><br>DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA,<br><br>        Defendants. | CASE NO. 17-CV-05329-WHA |
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN,<br><br>        Plaintiffs,<br><br>        v.<br><br>UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security,<br><br>        Defendants. | CASE NO. 17-CV-05380-WHA |

COUNTY OF SANTA CLARA and
SERVICE EMPLOYEES INTERNATIONAL
UNION LOCAL 521,

               Plaintiffs,

         v.

DONALD J. TRUMP, in his official capacity
as President of the United States, JEFFERSON
BEAUREGARD SESSIONS, in his official
capacity as Attorney General of the United
States; ELAINE DUKE, in her official
capacity as Acting Secretary of the Department
of Homeland Security; and U.S.
DEPARTMENT OF HOMELAND
SECURITY,

               Defendants.

CASE NO. 17-CV-05813-WHA

I, Brad Wells, declare:

1.      I am the current Associate Vice Chancellor, Business and Finance for the California State University ("CSU").  The CSU is the State of California acting in its higher education capacity.  The CSU Board of Trustees is vested by statute with the authority to manage, administer and control the CSU's institutions of higher learning.

2.      The CSU joined the University of California, the California Community Colleges, the Association of Independent California Colleges and Universities, and the California Department of Education in communicating the message that ending the Federal Deferred Action for Childhood Arrivals ("DACA") program unnecessarily punishes hundreds of thousands of bright young people who are contributing members of American society.  Our letter to the California Congressional Delegation can be found        here:        https://www2.calstate.edu/attend/student-services/resources-for-undocumented-students/Documents/daca-ca-ed-leaders-letter-9-5-17.pdf.  As stated in that letter, it is the CSU's position that ending DACA would not only derail the futures of those participating in the program, but would also deprive the State of California of revenue and of the contributions of the program participates to the California workforce, now and in the future.

3.      Since the announcement of the DACA rescission, and in anticipation of the severe negative potential effect of that rescission on DACA participants who are students and employees, as well as the potential negative effect on the entire CSU community, the CSU has expended significant employee time.  Evidence of the work involved in the CSU's response to DACA rescission can be found here: https://www2.calstate.edu/attend/student-services/resources-for-undocumented-students/Pages/rescission-of-daca.aspx.

4.      In my role as Associate Vice Chancellor, Business and Finance, I have determined that DACA rescission would likely cause the CSU to lose revenue, due to the loss of tuition and fees currently paid by students participating in the DACA program.

5.      Actual CSU student headcount enrollment for fiscal year 2016-17 was 472,427.  Actual CSU annual tuition and fees collected for fiscal year 2016-17 totaled $2,838,185,912.00.  Tuition and fees include state university tuition, as well as other mandatory fees required of resident students who enroll in or attend the university.  Tuition and fees do not include fees such as student housing or parking, which

are optional, or non-resident tuition.  The average annual tuition and fees per student headcount enrollment for fiscal year 2016-17 was calculated by dividing the annual tuition and fees by actual student headcount enrollment.  The resulting figure is $6,008.00 per student.

6.      For the fiscal year 2016-17, the CSU collected an average of $6,008.00 in annual tuition and fees per enrolled student.  This figure, multiplied by the number of students affected by the rescission of DACA would yield a potential revenue loss to the CSU of $6,008.00 for each student or potential student participating in the DACA program who would be unable to enroll due to rescission of the DACA program.

7.      Under Section 68130.5 of the California Education Code, certain non-resident students are exempt from paying non-resident tuition.  This section of the statute became law after Assembly Bill 540 ("AB540") was signed.  The CSU has a significant number of students who meet the AB540 guidelines, which include not holding a valid immigrant visa.  Many of the AB540 students at CSU are undocumented.

8.      CSU does not collect data according to DACA status.  However, it is likely that a large number of current CSU students are participating in the DACA program.  The CSU Director of Student Programs provided relevant fall 2016 enrollment data that I reviewed.  The total number of AB540 students who earned a degree from CSU in 2016-17 was 2,016.  Of those, 1,440 were undocumented.

9.      Many of the AB540 and undocumented students at CSU are enrolled in academic programs that lead to a state license.  These degree programs include the following: Nursing, Teacher Education, Counseling, Occupational Therapy, Physical Therapy, Social Work, Landscape Architecture, and Architecture.  According to data provided by the CSU Director of Student Programs, as of Fall 2016, there were AB540 and undocumented students enrolled in these degree programs.  In Fall 2016, 1,049 AB540 students were enrolled at CSU in academic programs that lead to a state license.  Of those, 763 students were undocumented.

10.      If the DACA program is eliminated, the State of California would likely lose trained and qualified students in license programs and would likely lose people who have already obtained licenses in important areas of need in California.

11.      I have also reviewed data provided by the CSU Associate Vice Chancellor, Human Resources, which shows there are more than 700 current CSU employees who are potentially DACA

participants.  If DACA is eliminated, it is likely that the CSU would lose current employees who we have invested in and trained.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on October 31, 2017, at Long Beach, California.

_____
Brad Wells



# EXHIBIT 108

JEFFREY M. DAVIDSON (SBN 248620)
ALAN BERSIN (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the*
*University of California and Janet Napolitano, in*
*her official capacity as President of the*
*University of California*

THEODORE J. BOUTROUS, JR. (SBN 132099)
ETHAN D. DETTMER (SBN 196046)
JESSE S. GABRIEL (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam*
*Gonzalez Avila, Saul Jimenez Suarez, Viridiana*
*Chabolla Mendoza, Norma Ramirez, and Jirayut*
*Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and*
*Service Employees International Union Local 521*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California, | CASE NO. 17-CV-05211-WHA<br><br>**DECLARATION OF JONATHAN JAYES-GREEN** |

Plaintiffs,

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY and ELAINE DUKE, in her
official capacity as Acting Secretary of the
Department of Homeland Security,

Defendants.

STATE OF CALIFORNIA, STATE OF
MAINE, STATE OF MARYLAND, and
STATE OF MINNESOTA,

Plaintiffs,

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, ELAINE DUKE, in her official
capacity as Acting Secretary of the Department
of Homeland Security, and the UNITED
STATES OF AMERICA,

Defendants.

CITY OF SAN JOSE, a municipal corporation,

Plaintiffs,

v.

DONALD J. TRUMP, President of the United
States, in his official capacity, ELAINE C.
DUKE, in her official capacity, and the
UNITED STATES OF AMERICA,

Defendants.

DULCE GARCIA, MIRIAM GONZALEZ
AVILA, SAUL JIMENEZ SUAREZ,
VIRIDIANA CHABOLLA MENDOZA,
NORMA RAMIREZ, and JIRAYUT
LATTHIVONGSKORN,

CASE NO. 17-CV-05235-WHA

CASE NO. 17-CV-05329-WHA

CASE NO. 17-CV-05380-WHA

DECLARATION OF JONATHAN JAYES-GREEN
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

1578

Plaintiffs,

v.

UNITED STATES OF AMERICA, DONALD
J. TRUMP, in his official capacity as President
of the United States, U.S. DEPARTMENT OF
HOMELAND SECURITY, and ELAINE
DUKE, in her official capacity as Acting
Secretary of Homeland Security,

Defendants.

COUNTY OF SANTA CLARA and
SERVICE EMPLOYEES INTERNATIONAL
UNION LOCAL 521,

              Plaintiffs,

     v.

DONALD J. TRUMP, in his official capacity
as President of the United States, JEFFERSON
BEAUREGARD SESSIONS, in his official
capacity as Attorney General of the United
States; ELAINE DUKE, in her official
capacity as Acting Secretary of the Department
of Homeland Security; and U.S.
DEPARTMENT OF HOMELAND
SECURITY,

              Defendants.

CASE NO. 17-CV-05813-WHA

I, Jonathan Jayes-Green, declare and state as follows:

1.     I am a DACA recipient.

2.     Participating in the DACA program has without question changed my life. The program allowed me to access financial capital, pursue job opportunities in my fields of interest and it gave me a sense of stability that has now been snatched away.

3.     I was granted DACA status in March of 2013 when I was a junior in college. I was on the verge of dropping out because of my inability to pay tuition and fees. Having DACA allowed me to apply and receive a private student loan from a commercial bank to pay the remaining balance of my debt to Goucher College. It also allowed me to work full time to finish my Bachelor's degree in the summer of 2014. Moreover, the program allowed me to fulfill a

graduation requirement to study abroad: I studied Spanish and Environmental Studies in Ecuador the summer of 2014.

4. Upon graduation, because of the DACA program and the work authorization, I was able to accept a job offer in the public service field working in the Maryland Governor's office. I was able to put my passion for community service and justice to use at the state level working to make Maryland a more inclusive and fair state in policy and practice for all of us.

5. Afterwards, I accepted a job at a women-owned small business in Baltimore doing community and business development. In this position, I was able to learn about the business world, challenge myself professionally and support one of the many small businesses that are the engine of our economy.

6. I have also been able to access capital beyond my student loans. In the fall of 2013, I was able to purchase a car to travel to work, attend school and move around with more ease.

7. In 2015 I was able to purchase my first home. I obtained a mortgage from a commercial bank without a cosigner and took advantage of the homeownership incentives offered by the City of Baltimore believing that I would be in this country to meet my financial obligations - in this case the 30 year duration of my mortgage.

8. Now that DACA has been repealed, my options are limited. I recently attempted to apply for another car loan given that I gave my parents my car because their car had broken down. The financial institution—the same one that financed the car I currently own—informed me the loan length would be determined by the duration of my work authorization. Now that DACA has been repealed and there's no hope of extension, I have a set expiration date of

DECLARATION OF JONATHAN JAYES-GREEN
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

January 2019. There is no way I can finance a reliable new or moderately used car and pay the entirety of the note in a little over a year.

9.     Now that I have a set expiration date of my work authorization, I am really concerned about my ability to work in this country and to continue to make my mortgage payments. I cannot return to traditional public service or small business jobs given my uncertain status. I am worried about the financial commitment I made to my lender but I am more concerned about the commitment I made to the City of Baltimore and the state of Maryland to be a part of the City's growth and fabric for years to come.

10.     Lastly, but certainly not least, the rescission of DACA has had a huge toll on my mental and physical health. The increased instability of my status has been manifesting on my lower back with newfound aches and migraines that were not a part of my life before. And it has exacerbated my anxiety and depression due to the state of fear and uncertainty of the future this decision has caused.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


Executed on 10/31/17_____ in Baltimore, Maryland.


Jonathan Jayes-Green