# EXHIBIT AA

STATE OF TENNESSEE

# Office of the Attorney General

HERBERT H. SLATERY III
ATTORNEY GENERAL AND REPORTER

P.O. BOX 20207, NASHVILLE, TN 37202
TELEPHONE (615)741-3491
FACSIMILE (615)741-2009

September 1, 2017

Senator Lamar Alexander
455 Dirksen Senate Office Building
Washington, D.C. 20510

Senator Bob Corker
425 Dirksen Senate Office Building
Washington, D.C. 20510

Dear Senator Alexander and Senator Corker:

On June 29, 2017, a coalition of state attorneys general, including Tennessee, sent a letter to U.S. Attorney General Jeff Sessions requesting the Trump administration phase out the Deferred Action for Childhood Arrivals (DACA) program. Created by executive order under President Obama, DACA confers lawful presence and work permits for approximately 800,000 people who are unlawfully present in the United States. The request made by the States did not ask the federal government to deport anyone or rescind DACA permits that have already been issued.

This request was made for many of the same reasons Tennessee successfully challenged the Deferred Action for Parents of Americans (DAPA) program. Notably, the leading sentences in that complaint were "This lawsuit is not about immigration. It is about the rule of law, presidential power, and the structural limits of the U.S. Constitution." While characterized often as anti-immigration, this action was really an attempt to preserve the authority of Congress to make policy and pass legislation. Stated simply, the executive branch lacks the authority to issue directives contrary to laws passed by Congress.

The States argued successfully that the executive branch by simply composing a written directive could not grant wholesale deferral of prosecution to over 4.5 million people who were not in the country legally. Prosecutorial discretion is exercised on a case by case basis, not with wholesale grants of years of immunity to a class, and prosecutors certainly have no authority to grant rights like work permits and lawful presence declarations. The federal district court granted

the nationwide injunction requested by the States; the Fifth Circuit Court of Appeals affirmed that decision; and last year the U.S. Supreme Court denied any further appeal.

We have every reason to believe the States' legal challenge to the DACA program would yield a similar outcome. It suffers from the same constitutional infirmities. Our Office has a track record of consistently challenging actions when we believe the federal executive branch has overreached its authority and adversely affected Tennessee's interests.

There is a human element to this, however, that is not lost on me and should not be ignored. Many of the DACA recipients, some of whose records I reviewed, have outstanding accomplishments and laudable ambitions, which if achieved, will be of great benefit and service to our country. They have an appreciation for the opportunities afforded them by our country.

As of the sending of this letter, the Administration has not agreed to rescind the June 15, 2012 DACA memorandum and order as requested by the coalition of States. At this time, our Office has decided not to challenge DACA in the litigation, because we believe there is a better approach that we outline below.

So the problem in immigration is that we have about 11.5 million people who are not legally living in the U.S. Over the years the executive branch has not enforced the existing laws; parents outside the U.S. have sent their children, often in very dangerous circumstances to the U.S.; and Congress has done virtually nothing.

There is another way: Your colleagues, Sen. Lindsey Graham (R- S.C) and Sen. Richard Durbin (D-Ill), have introduced legislation addressing the DACA program (S.1615). Whether this particular legislation is a viable solution is a matter for congressional debate. It is not a comprehensive answer to our immigration policy challenges, but it would be a very good start. As I have admired your careers over the years, I have perhaps been most impressed at how you take on difficult problems and lead us to a better place. I encourage your serious consideration of this proposed legislation.

It is my sincere hope that the important issues raised by the States will be resolved by the people's representatives in the halls of Congress, not in a courtroom. As always, thank you for your studied consideration and for your service to our state and our country.

Sincerely,

Herbert H. Slatery III

Herbert H. Slatery III

# EXHIBIT BB

.us

≡

(/)

OPEN LETTER FROM

# LEADERS OF AMERICAN INDUSTRY

*Entrepreneurs and business leaders from across the country and representing every major sector of the economy released an open letter calling on Congress to immediately pass the bipartisan Dream Act or legislation that provides Dreamers raised in our country the permanent solution they deserve. This is an update to the initial letter released prior to the administration's decision on DACA.*

New Dreamer Letter    Initial Letter

*August 31, 2017*
*To: President Donald J. Trump*
*To: Speaker Paul Ryan; Leader Nancy Pelosi; Leader Mitch McConnell; and Leader Charles E. Schumer*
As entrepreneurs and business leaders, we are concerned about new developments in immigration policy that threaten the future of young undocumented immigrants brought to America as children.
The Deferred Action for Childhood Arrivals (DACA) program, which allows nearly 800,000 Dreamers the basic opportunity to work and study without the threat of deportation, is in jeopardy. All DACA recipients grew up in America, registered with our government, submitted to extensive background checks, and are diligently giving back to our communities and paying income taxes. More than 97 percent are in school or in the workforce, 5 percent started their own business, 65 percent have purchased a vehicle, and 16 percent have purchased their first home. At least 72 percent of the top 25 Fortune 500 companies count DACA recipients among their employees.

Unless we act now to preserve the DACA program, all 780,000 hardworking young people will lose their ability to work legally in this country, and every one of them will be at immediate risk of deportation. Our economy would lose $460.3 billion from the national GDP and $24.6 billion in Social Security and Medicare tax contributions.
Dreamers are vital to the future of our companies and our economy. With them, we grow and create jobs. They are part of why we will continue to have a global competitive advantage.

We call on President Trump to preserve the DACA program. We call on Congress to pass the bipartisan DREAM Act or legislation that provides these young people raised in our country the permanent solution they deserve.

Signed,

(HTTPS://WWW.FACEBOOK.COM/SHARER.PHP?U=HTTPS%3A%2F%2FDREAMERS.FWD.US%2FBUSINESS-LETTER%3FUTM_SOURCE%3DFACEBOOK%26UTM_MEDI

(HTTPS://TWITTER.COM/INTENT/TWEET?TEXT=BUSINESS%20LEADERS%20ACROSS%20THE%20U.S

## Pledge to Stand With Dreamers

**Email:**

Email Address

**Zip:**

ZIP Code

SIGN UP

# Signers

Signatories who have signed both letters appear in ***bold and italic.*** Those who have signed the initial letter appear in plain text and those who have signed the updated, new letter (Dreamer letter) appear in *italic*.

Show 100 entries Search:

| Name | Title | Organization |
|---|---|---|
| Christopher "Chip" Paucek | Co-Founder & CEO | 2U |
| Audley Logan, Sr. | President | 3-C Technology, LLC |
| Paul Fox | Partner | 310 Architects & Interiors, Inc. |
| Joe Thomas | Owner | 4t Management and Maintenance |
| Luke Geiger | CEO | 6th Man Apps |
| Angela Stergis | CEO | 92Seven |
| William Barhydt | CEO | Abra |
| ***Julie Sweet*** | ***North American Chief Executive Officer*** | ***Accenture*** |
| Jack Armstong | President | Acumen, LLC |
| Rob Dhoble | CEO | Adherent Health |
| David Beck | CEO | ADI American Distributors LLC |
| ***Michael Dillon*** | ***EVP and General Counsel*** | ***Adobe Systems, Inc.*** |
| ***Aaron Bell*** | ***CEO*** | ***AdRoll*** |
| ***Francisco Torres-Aranda, Jr.*** | ***Founder & President*** | ***Advanced-Tec Materials, LLC*** |
| ***Max Levchin*** | ***Chairman & CEO*** | ***Affirm*** |
| ***Jeffrey S. Collins*** | ***Vice President and General Counsel*** | ***After School App*** |
| Mary Ellen Caron | CEO | After School Matters |
| Martin H. Richenhagen | President & CEO | AGCO Corporation |
| Dhawal Zatakia | President | AH Group |
| Shamilla Mansingh | President | AHM Contractors Corp |

| | | |
|---|---|---|
| ***Brian Chesky*** | ***Co-Founder, CEO, Head of Community*** | ***Airbnb*** |
| Pedro A. Freyre | Chair, International Practice | Akerman LLP |
| Claudia Mirza | CEO | Akorbi |
| *Brad Tilden* | *Chairman and CEO* | *Alaska Airlines* |
| Nikki Pava | | Alegria Partners |
| Kevin P. Ryan | Founder & Chairman | Alleycorp and MongoDB |
| *Reza Chowdhury* | *Founder and CEO* | *AlleyWatch* |
| Hyoun Park | CEO | Amalgam Insights |
| ***Jeff Bezos*** | ***CEO*** | ***Amazon*** |
| ***Jeffrey D. Epstein*** | ***Founder and CEO*** | ***Ambassador Software*** |
| Matt Doll | CEO | American Fire Glass |
| ***Tim Sullivan*** | ***President & CEO*** | ***Ancestry.com*** |
| Brad Jefferson | CEO | Animoto |
| Anthem Hayek Blanchard | CEO and Co-Founder | Anthem Vault, Inc. |
| Magdalena I. King | General Manager | Antlers at Vail |
| Stephen Howard | President & CEO | Appanite, Inc. |
| Howard Hecht | Principal | Appanite, Inc. |
| ***Myles Kleeger*** | ***President*** | ***Appboy*** |
| Tim Cook | | Apple |
| JT Kostman, PhD | CEO | Applied AI |
| ***Nithya Das*** | ***Chief Legal and People Officer*** | ***AppNexus*** |
| ***Brian O'Kelley*** | ***CEO*** | ***AppNexus*** |
| Alden Bruce Badger | Chairman and CEO | Aqueous Solutions Global |
| Nia Ogletree | CEO | Arielle Management Group, LLC |
| ***Gonzalo de la Melena Jr.*** | ***President & CEO*** | ***Arizona Hispanic Chamber of Commerc*** |
| ***Steven Zylstra*** | ***President & CEO*** | ***Arizona Technology Council*** |
| ***Shruti Gandhi*** | ***Founder and Managing Partner*** | ***Array Ventures*** |
| Dustin Moskovitz | CEO | Asana |
| ***Andrei Cherny*** | ***CEO*** | ***Aspiration*** |
| ***William C. Rudin*** | ***Chairman*** | ***Association for a Better New York*** |
| *Gary S. Cox* | *President* | *Association of Independent KY Colleges a. Universities* |
| Randall L. Stephenson | Chairman, CEO and President | AT&T |
| ***Laura Gómez*** | ***CEO*** | ***Atipica*** |

| | | |
|---|---|---|
| ***Mike Cannon-Brookes*** | ***Co-Founder & Co-CEO*** | ***Atlassian*** |
| ***Scott Farquhar*** | ***Co-Founder & Co-CEO*** | ***Atlassian*** |
| Jack Davis | Owner | Audit Resources, LLC |
| ***David M. Hornik*** | ***General Partner*** | ***August Capital*** |
| ***Barbary Brunner*** | ***CEO*** | ***Austin Technology Council*** |
| Andrew Anagnost | President and Chief Executive Officer | AutoDesk Inc. |
| Zaheer Faruqi | Owner | Aventure Aviation |
| Brandon Canty | COO | Avidity Digital |
| Alberto Aguilar | CEO | Avidity Digital |
| Robert Olsen | President | Axcess Point LLC |
| Oscar Monroy | CEO | Axistem Co. |
| Andrea Guzman | Owner | Ayuda Hispana LLC |
| ***Robert Cheetham*** | ***CEO*** | ***Azavea*** |
| Craig Chico | President & CEO | Back of the Yards Neighborhood Counc |
| ***Marjorie Baltazar*** | ***Principal*** | ***Baltazar Global LLC*** |
| Jay Steinmetz | CEO | Barcoding Inc. |
| Andrew Robertson | President and CEO | BBDO Worldwide |
| Susan Lyne | Managing Partner | BBG Ventures |
| *Vincent A. Forlenza* | *Chairman and CEO* | *BD* |
| Chet Pipkin | CEO | Belkin International (belkin, Linksys, WeMo, Phyn) |
| Ujjwal Gupta | Co-Founder/COO | BenchPrep |
| ***Jeremy Levine*** | ***Partner*** | ***Bessemer Ventures*** |
| ***Hubert Joly*** | ***Chairman & CEO*** | ***Best Buy*** |
| Tamara Drangstveit | DOJ Accredited Rep | Bethany Immigration Services |
| Rosalyn Ryan | CEO | Bicgen Foundation |
| Cindi Bigelow | President & CEO | Bigelow Tea |
| RIchard Basile | CEO | BioPontis Alliance for Rare Diseases |
| Katia Beauchamp | Co-Founder and CEO | Birchbox |
| *Chloe McKenzie* | *CEO* | *BlackFem, Inc.* |
| ***Karole Morgan-Prager*** | ***Chief Legal and Administrative Officer*** | ***BlackLine, Inc*** |
| Jeremy Weinstein | Founder and CEO | Blinkk |
| ***Matt Salzberg*** | ***CEO*** | ***Blue Apron*** |
| ***Ilia Papas*** | ***CTO*** | ***Blue Apron*** |

| | | |
|---|---|---|
| ***Abby Adlerman*** | ***CEO*** | ***Boardspan Inc.*** |
| Bernard Yoo | CEO | Bombfell Inc. |
| Jim Bartel | Managing Director | Bonfire Labs |
| Michael Tucker | President | Books Inc. |
| ***Elyse D. Cherry*** | ***CEO*** | ***Boston Community Capital, Inc*** |
| ***Henrik Johansson*** | ***CEO*** | ***Boundless Network*** |
| ***Aaron Levie*** | ***CEO*** | ***Box, Inc.*** |
| ***Seong-Hee Yoon*** | ***Founder*** | ***braillebot*** |
| ***Jim Breyer*** | ***President and CEO*** | ***Breyer Capital*** |
| Romish Badani | CEO | Bridge US |
| Andy Feinberg | CEO | Brightcove Inc. |
| Brit Morin | Founder and CEO | Brit + Co |
| ***Lloyd Carney*** | ***CEO*** | ***Brocade Communications Systems, Inc.*** |
| Charlie O'Donnell | Partner | Brooklyn Bridge Ventures |

Showing 1 to 100 of 807 entries

‹ Previous Next ›

.us

(https://www.fwd.us)

© 2013-2017 FWD.us

Privacy Policy (https://fwd.us/privacy_policy), Terms of Service (https://fwd.us/terms_of_use)

(http(shttp u=httpext%

# EXHIBIT CC

JUSTICE NEWS

## Attorney General Sessions Delivers Remarks on DACA

Washington, DC ~ Tuesday, September 5, 2017

---

**Remarks as prepared for delivery**

Good morning. I am here today to announce that the program known as DACA that was effectuated under the Obama Administration is being rescinded.

The DACA program was implemented in 2012 and essentially provided a legal status for recipients for a renewable two-year term, work authorization and other benefits, including participation in the social security program, to 800,000 mostly-adult illegal aliens.

This policy was implemented unilaterally to great controversy and legal concern after Congress rejected legislative proposals to extend similar benefits on numerous occasions to this same group of illegal aliens.

In other words, the executive branch, through DACA, deliberately sought to achieve what the legislative branch specifically refused to authorize on multiple occasions. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch.

The effect of this unilateral executive amnesty, among other things, contributed to a surge of unaccompanied minors on the southern border that yielded terrible humanitarian consequences. It also denied jobs to hundreds of thousands of Americans by allowing those same jobs to go to illegal aliens.

We inherited from our Founders—and have advanced—an unsurpassed legal heritage, which is the foundation of our freedom, safety, and prosperity.

As the Attorney General, it is my duty to ensure that the laws of the United States are enforced and that the Constitutional order is upheld.

No greater good can be done for the overall health and well-being of our Republic, than preserving and strengthening the impartial rule of law. Societies where the rule of law is treasured are societies that tend to flourish and succeed.

Societies where the rule of law is subject to political whims and personal biases tend to become societies afflicted by corruption, poverty, and human suffering.

To have a lawful system of immigration that serves the national interest, we cannot admit everyone who would like to come here. That is an open border policy and the American people have rightly rejected it.

Therefore, the nation must set and enforce a limit on how many immigrants we admit each year and that means all can not be accepted.

This does not mean they are bad people or that our nation disrespects or demeans them in any way. It means we are properly enforcing our laws as Congress has passed them.

It is with these principles and duties in mind, and in light of imminent litigation, that we reviewed the Obama Administration's DACA policy.

Our collective wisdom is that the policy is vulnerable to the same legal and constitutional challenges that the courts recognized with respect to the DAPA program, which was enjoined on a nationwide basis in a decision affirmed by the

Fifth Circuit.

The Fifth Circuit specifically concluded that DACA had not been implemented in a fashion that allowed sufficient discretion, and that DAPA was "foreclosed by Congress's careful plan."

In other words, it was inconsistent with the Constitution's separation of powers. That decision was affirmed by the Supreme Court by an equally divided vote.

If we were to keep the Obama Administration's executive amnesty policy, the likeliest outcome is that it would be enjoined just as was DAPA. The Department of Justice has advised the President and the Department of Homeland Security that DHS should begin an orderly, lawful wind down, including the cancellation of the memo that authorized this program.

Acting Secretary Duke has chosen, appropriately, to initiate a wind down process. This will enable DHS to conduct an orderly change and fulfill the desire of this administration to create a time period for Congress to act—should it so choose. We firmly believe this is the responsible path.

Simply put, if we are to further our goal of strengthening the constitutional order and the rule of law in America, the Department of Justice cannot defend this type of overreach.

George Washington University Law School Professor Jonathan Turley in testimony before the House Judiciary Committee was clear about the enormous constitutional infirmities raised by these policies.

He said: "In ordering this blanket exception, President Obama was nullifying part of a law that he simply disagreed with. ….If a president can claim sweeping discretion to suspend key federal laws, the entire legislative process becomes little more than a pretense…The circumvention of the legislative process not only undermines the authority of this branch but destabilizes the tripartite system as a whole."

Ending the previous Administration's disrespect for the legislative process is an important first step. All immigration policies should serve the interests of the people of the United States—lawful immigrant and native born alike.

Congress should carefully and thoughtfully pursue the types of reforms that are right for the American people. Our nation is comprised of good and decent people who want their government's leaders to fulfill their promises and advance an immigration policy that serves the national interest.

We are a people of compassion and we are a people of law. But there is nothing compassionate about the failure to enforce immigration laws.

Enforcing the law saves lives, protects communities and taxpayers, and prevents human suffering. Failure to enforce the laws in the past has put our nation at risk of crime, violence and even terrorism.

The compassionate thing is to end the lawlessness, enforce our laws, and, if Congress chooses to make changes to those laws, to do so through the process set forth by our Founders in a way that advances the interest of the nation.

That is what the President has promised to do and has delivered to the American people.

Under President Trump's leadership, this administration has made great progress in the last few months toward establishing a lawful and constitutional immigration system. This makes us safer and more secure.

It will further economically the lives of millions who are struggling. And it will enable our country to more effectively teach new immigrants about our system of government and assimilate them to the cultural understandings that support it.

The substantial progress in reducing illegal immigration at our border seen in recent months is almost entirely the product of the leadership of President Trump and his inspired federal immigration officers. But the problem is not solved. And without more action, we could see illegality rise again rather than be eliminated.

As a candidate, and now in office, President Trump has offered specific ideas and legislative solutions that will protect American workers, increase wages and salaries, defend our national security, ensure the public safety, and increase

the general well-being of the American people.

He has worked closely with many members of Congress, including in the introduction of the RAISE Act, which would produce enormous benefits for our country. This is how our democratic process works.

There are many powerful interest groups in this country and every one of them has a constitutional right to advocate their views and represent whomever they choose.

But the Department of Justice does not represent any narrow interest or any subset of the American people. We represent all of the American people and protect the integrity of our Constitution. That is our charge.

We at Department of Justice are proud and honored to work to advance this vision for America and to do our best each day to ensure the safety and security of the American people.

Thank you.

---

**Speaker:**
Attorney General Jeff Sessions

**Attachment(s):**
Download ag_letter_re_daca.pdf

**Topic(s):**
Immigration

**Component(s):**
Office of the Attorney General

*Updated September 5, 2017*

# EXHIBIT DD

Official website of the Department of Homeland Security

U.S. Department of Homeland Security

# Statement from Acting Secretary Duke on the Rescission Of Deferred Action For Childhood Arrivals (DACA)

**Release Date:** September 5, 2017

For Immediate Release
Office of the Press Secretary
Contact: 202-282-8010

WASHINGTON - This Administration's decision to terminate DACA was not taken lightly. The Department of Justice has carefully evaluated the program's Constitutionality and determined it conflicts with our existing immigration laws. Given the Supreme Court's decision on DAPA, they do not believe DACA is legally viable, and thus the program should be ended.

As a result of recent litigation, we were faced with two options: wind the program down in an orderly fashion that protects beneficiaries in the near-term while working with Congress to pass legislation; or allow the judiciary to potentially shut the program down completely and immediately. The Administration chose the least disruptive option.

I am very aware of the consequences of this action, and I sympathize with the DACA recipients whose futures may now be less certain. But I am also frustrated on their behalf. DACA was never more than deferred action—a bureaucratic delay—that never promised the rights of citizenship or legal status in this country. The program did not grant recipients a future, it was instead only a temporary delay until a day of likely expiration. And for that reason, DACA was fundamentally a lie.

I believe President Obama had genuine intentions for DACA, and was clearly frustrated by his inability to maneuver through the legislative process. But a Secretarial memo – even if

intended to be temporary - is not a substitute for a law passed by Congress and signed by the President.

For several years before becoming the Acting Secretary, I taught civics to people who were going through the naturalization process. I taught them the principles of American democracy, like the three branches of government, the separation of powers, and how our system of checks and balances works.

I taught them that the Constitution was the supreme law of the land.

And I taught them the rule of law: How everyone in our country must follow the law, no matter who they are.

The DACA program violates those basic civics lessons that are fundamental to our country and our citizens.

It is a dangerous precedent to systematically ignore the law, regardless of one's intent or purpose. It is also dangerous to encourage and reward illegal immigration.

We must find a better way. And we must do so within the Constitution of the United States.

If our current laws do not reflect our country's values, then I urge Congress to use its Constitutional authority to write and pass legislation that does. I believe the President shares my confidence in the Congress.

DHS would be glad to provide Congress with data and information to help them consider the situation, and find a legislative solution. There is much wrong with our current immigration system—not just DACA—and this is an opportunity to make it better, fairer, and more beneficial for the nation.

What this decision makes clear is that we are overdue for real answers. No more stopgap measures, no more temporary options, and no more kicking the tough decisions down the road in the hope they become too painful to ignore for someone else.

We need to do this the right way. And we need to do this now.

Topics: Border Security (/topics/border-security), Deferred Action (/topics/deferred-action)

Keywords: Acting Secretary Duke (/keywords/acting-secretary-duke), DACA (/keywords/daca), Deferred Action for Childhood Arrivals (/keywords/deferred-action-childhood-arrivals)

Last Published Date: September 5, 2017

# EXHIBIT EE

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California, ) Case No. 17-CV-05211-WHA

Plaintiffs,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security,

Defendants.

---

AND RELATED CASES.

---

\- - -

Tuesday, October 17, 2017

\- - -

Videotaped deposition of JAMES McCAMENT, taken at the offices of Gibson, Dunn & Crutcher, 1050 Connecticut Avenue NW, Washington, D.C., beginning at 9:14 a.m., before Nancy J. Martin, a Registered Merit Reporter, Certified Shorthand Reporter.

Q. Okay. Let me ask you what did you do to prepare for that testimony, the Senate testimony we just mentioned?

A. For the Senate testimony?

Q. Yes.

A. I met with members of the USCIS team. I reviewed the -- there's a hearing book, which has standard materials regarding the DACA program, as well as possible questions to be asked by members of Congress on other topics.

Q. Okay. The hearing -- I'm sorry. I didn't mean to cut you off.

A. So the hearing book, and I'm sure just other materials with respect to statistics on the DACA program, the wind-down.

Q. Okay. The hearing book that you just mentioned, was that assembled by members of your team?

A. It was.

Q. Okay. Do you have an estimate of how much time you spent preparing for that testimony?

A. I was -- I would estimate it was several hours. Actually, quite a few hours, I suppose. Probably about 8 to 12 hours, perhaps, over the two-week period from the time I was invited to testify to the hearing perhaps, approximately.

Q. And the topic of that hearing was the rescission of the DACA program; right?
A. Right.
Q. And just so we're all on the same page, you know what I'm talking about when I talk about "DACA"; right?
A. Yes.
Q. Deferred Action for Childhood Arrivals Program?
A. Yes.
Q. Let me ask you just a couple of questions around that testimony.
A. Uh-huh.
Q. First, do you agree that DACA holders are a benefit to our country?
A. Yes. I believe that the DACA holders, as I stated in my testimony, as well, are folks who have requested DACA over these last five years, are in various sectors, educational, business, and so they contribute to the economy and contribute to the sectors in which they work.
Q. Okay. And you agree that they make a valuable contribution to our society?
A. I agree, and I think, you know, all those -- many in the immigrant system, those in the immigrant

system make contributions across all sectors of society.

Q. Do you also agree that it makes sense to regularize their status through some legal means?

A. I think that the regularization of status as being discussed in Congress now, in the immigration system any time there's a capacity within the right bounds of laws and protections for regularization of status, that's to the benefit of our immigration system.

Q. And, in your view, why is that?

A. So our immigration history, our system back to the founding of the nations, and our immigrants have made many great contributions. And therefore, I think when immigrants are in a regularized status, it certainly contributes to society.

Secondly, for law enforcement purposes as well, it assists in the fact that the status is regularized, and therefore, we know, as we do with everyone in the immigrant system, we know who people are, they're identified, they're contributing to society.

Q. Okay. Any other reasons you can think of as you sit here today?

A. For the regularization of status?

Q. Right.
A. As I mentioned, the contribution to society, the legalization benefits overall, and I think generally, any time that we, as I said previously, that we have folks in the legal system, it helps us in USCIS, DHS, DOJ administer the immigration system more effectively.
Q. Let me switch gears a little bit.
A. Sure.
Q. Do you agree that rescinding DACA will create disruptions for the DACA holders?
A. To rescind DACA as we have, DHS, and USCIS have, absent another solution, leaves those DACA requesters and recipients without a future status as their employment authorization documents begin to expire. But for that reason, the hope is that Congress will provide a permanent solution for that population.
Q. Can you identify the disruptions that you see for the DACA holders. What are they, in your view?
A. So DACA is an act of prosecutorial discretion, deferring action on someone's case. So absent legislative action or permanent action to your previous question regarding regularization of status, as DACA holders begin to expire, or their EAD begins

to expire, they would not be able to work, or lawfully work.

In addition, they are -- the status that they held, if they held a status prior to the grant of DACA, they revert to that. And therefore, if that status begins to expire, then that's subject to law enforcement within appropriate bounds for ICE and other law enforcement agencies which are A, outside of my purview, USCIS, and B, subject to guidelines.

Q. And -- I'm sorry.

A. No. Sorry. So then I would say the other harm, to your question for DACA requesters and recipients as the benefits begin to expire, is that they are no longer -- they don't have that legal status, but they never really did. They had a deferred action that allowed them to have employment authorization.

If they don't, then that limits their options here in the United States, ultimately, for work, for employment and to really be in the legal immigration system, which I think is not wise and why we hope that there's a legislative solution, because that, statutorily, provides the only permanent protection or permanent status for them.

Q. Have you finished your answer?

communications originated?

A. As far as the E-mail type of conversation, we can speak to the -- later.

Q. Yes.

A. Again, I don't recall a direct E-mail sort of being forwarded on, but I don't want to misspeak that there isn't one. Just, there was a lot of discussion with the Secretary, you know, through the Secretary's office, et cetera. So I just don't recall one coming, like, forwarded on. Might be.

Q. I'm sorry.

A. Sure.

Q. What I was going to ask was whether or not you actually got an E-mail forwarded, you know, regardless of how the communication came. Was that ever tied to the identity of a White House staffer, so and so "wants to know about 'X'"?

A. Not that I recall. Not worded that way.

Q. Okay. Worded any way that gave you a name?

A. Not worded in a way that would give a name either.

Q. Okay.

A. Then again, that compares to other requests on other areas and issues.

Q. Okay. Just based on conversations that you

had or however you might have -- are you aware of people in the White House who were engaged on this issue on DACA?

A. From those E-mail conversations or --

Q. From any source.

A. Largely, those two sitting in one of the meetings or a meeting, and I remember those names. But I don't recall sort of a reference to an "X" person "wants this." And generally what I recall is if there was an ask, it was -- it may be "the White House is asking" type of question. Does that make sense?

Q. Yeah. So it sounds like, with respect to anything other than in-person -- it sounds like you had one in-person meeting on this issue while you were acting Secretary?

A. That's what I recall. Acting director.

Q. Sorry. Acting director. Thank you.

A. Please clarify.

Q. I gave you a promotion.

A. That's right.

Q. So you remember one meeting while you were acting director with White House people on the topic of DACA?

A. Yes. I remember one meeting being held in

completion on discussion of DACA.

Q. Okay. That you attended?

A. That I attended.

Q. Okay. Are you aware of other meetings that you did not attend?

A. I'm not aware of other meetings that I did not attend, but there may well have been.

Q. Okay.

A. I mean that's not unusual.

Q. Understood. And obviously, I'm, you know, just trying to get what you know.

A. Sure.

Q. Okay. So let's talk, then, about that meeting. Do you remember when it happened?

A. I believe it was August 24.

Q. August 24. Where did it happen?

A. The Roosevelt Room.

Q. Okay. Which is where?

A. In the White House, west wing.

Q. Okay. Who was there that you remember?

A. That I recall, Acting Secretary Duke, General Kelly, the chief of staff, the attorney general, Jeff Sessions. I'm reflecting around the table. Rachel Brand with Department of Justice. OMB Director Mulvaney. Deputy Secretary of State Sullivan.

Stephen Miller. I think Rob Porter. I believe I have that name right.

Q. What's Mr. Porter's role?

A. He is the staff -- I was going to say executive secretary, but it's that staff secretary or -- I probably have misapplied the title, but, in essence, who handles correspondence, I believe, for the White House, but I may have the title wrong.

Don McGhan. Kierstjen Nielsen, the deputy chief of staff to -- or currently the deputy chief of staff. I believe John Bash.

Q. Who's John Bash?

A. He's, I think, special counsel, and I believe also -- I have to double-check the title. I believe special assistant to the President as well. Marc Short, who is -- I'm sorry.

Q. Who is Mr. Short?

A. The head of the legislative, White House legislative affairs operation. It may be a more expanded title, but I think that he is the head of legislative affairs.

Q. Anybody else you can remember?

A. Gene Hamilton, the senior counsel to the Secretary. I believe Chad Wolf. There may have been a couple of others as well. I'm just trying to kind

of think through. Danielle Cutrona.

Q. How do you spell Cutrona?

A. I believe C-u-t-r-o-n-a.

Q. And who is she?

A. She works for the attorney general directly.

Q. Anyone else you remember?

A. I believe Andrew Bremberg as well.

Q. Who is that?

A. He also, I believe, is a special assistant to the President, but I might have the title adjusted incorrectly. I think there may have been one or two others, but I'm just not recalling at the moment.

Q. Okay. Do you remember how long the meeting lasted?

A. Approximately.

Q. How long, about, did it last?

A. Approximately an hour to an hour and a half.

Q. How did you come to be there? Did you get an E-mail invitation? Did you get a phone call?

A. I did receive --

Q. Okay. From whom?

A. As I recall, from the chief of staff. DHS chief of staff.

Q. Okay. And do you remember what that said? What did the E-mail say?

A. I recall generally what it said.

Q. What did it say?

A. As I recall, that there would be a meeting in the EEOB, or White House. I'm not sure which was said since they're adjacent. And that I would be attending. That was how I knew that was the case.

Q. Okay. Anything else in that E-mail? Did you -- well, anything else on that E-mail?

A. What I recall is that it was to discuss DACA.

Q. Was there an agenda attached?

A. No, not to that E-mail.

Q. Did you ever receive an agenda for that meeting?

A. I don't recall receiving an agenda. I received an invite.

Q. Okay. Did you receive any E-mail, whatever you were going to call it, anything like an agenda, anything that set forth what was to be discussed?

A. I don't recall receiving the agenda or a read-ahead before the meeting.

Q. You got a package of information at the meeting of some kind?

A. I recall receiving at the meeting what we would say is the read-ahead, but the agenda. I don't recall receiving anything prior. Could have been. I

know I'd say we'd finish, but --

A. Sure.

Q. -- and we'll obviously talk about this after lunch, you also mentioned the AG's letter. I think you've covered the other points that you mentioned.

A. Uh-huh.

Q. So what about the AG's letter, the U.S. AG's letter as a reason --

A. Certainly.

Q. -- in your mind for the rescission?

A. Certainly. It definitely was.

Q. And why? What about it?

A. Because the AG was providing guidance to the Department, that the Department of Justice did not feel that they could defend DACA, as I read the letter, against the Amended Complaint because it had some of the same -- or had the same failings -- that's not the word that was used in the AG's letter, and I apologize, but the same structural lack or lack of constitutionality that was applied to DAPA, the same underpinnings applied to DACA.

So therefore, you know, stating to the Secretary and recommending that she rescind the DACA memo of 2012 and implement an orderly and efficient wind-down. It was also, I think -- I can't speak for

the Secretary but with respect to her memo, indicates that also was a factor, which certainly seems to tie with those other points.

MR. DETTMER: Okay. All right. I'm only two minutes over. Should we break now, have some food and then we'll come back in an hour?

MR. GARDNER: That's fine.

MR. DETTMER: Want to say 1:30 or 45 minutes.

THE VIDEOGRAPHER: We're going off the record at 12:35 p.m.

(A recess was taken from 12:35 p.m. to 1:38 p.m.)

THE VIDEOGRAPHER: We are back on the record at 1:38 p.m.

BY MR. DETTMER:

Q. All right. Good afternoon.

A. Good afternoon.

Q. You know you're still under oath; right?

A. Yes.

Q. And on the record?

A. Yes.

Q. Are you aware of a meeting on the topic of DACA rescission that happened on August 21?

A. Yes. If I have the date correct.

Q. Were you at that meeting?

A. Can you specify as far as -- you mean as far as a White House meeting or at DHS?

Q. I'm not sure. As far as I know, it was a DHS only meeting. Are you aware --

A. Yes.

Q. -- of that?

A. Yes.

Q. Okay. And were you at that meeting?

A. Yes.

Q. Who else was at that meeting?

A. As I recall, the acting secretary, the Chief of Staff. I believe the Deputy Chief of Staff as well. Gene Hamilton. Joe Maher. Nader Baroukh, Dimple Shah, myself, of course. I believe Kathy Nuebel, Craig Symons, I believe our chief of counsel. I think as well Tom Homan. I'm trying to look around the room. I think one of his advisors was there, if I recall correctly, John Feere. I might be mispronouncing the last name. I think Kevin McAleenan was there from customs and border protection. But certainly, it was someone from his team, or two people, I think, from his team. And, I believe, Kevin was there. If not, it would have been Ron Vitiello. I'm not remembering exactly.

REPORTER MARTIN: Ron Vitiello?

THE WITNESS: Sorry. I apologize, Nancy. Ron Vitiello, who was the deputy -- acting Deputy Commissioner. So if it weren't Kevin, it would be Ron.

And also -- those are the names I recall. I mean I don't recall the two names from CVP, but it might have been Julie Core, who's one of the executive commissioners. Then probably a couple other people. It was a full room.

BY MR. DETTMER:

Q. Okay. How long did that meeting last?

A. What I recall, it was probably an hour. Somewhere between an hour and two hours.

Q. And where was it?

A. At the DHS headquarters.

Q. Who called that meeting? Who was the motivator in making that meeting happen?

A. I don't know the motivator, but I think the scheduling invite would have come from the Secretary's office.

Q. Okay. And did she lead the meeting?

A. Yes.

Q. And, you know, without getting into the substance, the topic was DACA rescission?

A. Yes.

Q. Okay. Were any decisions made at that meeting?
A. No, not that I recall.
Q. Was it sort of a preparatory-type meeting for the August 24 meeting?
A. So I don't -- no. As I recall, it was not preparatory for that meeting. It was to discuss the topic, potential DACA rescission.
Q. Who -- sorry.
A. Sorry. So as I recollect, it may have been in preparation for a forthcoming meeting. I don't remember it being set as that date for a meeting on the 24th, but it could have been.
Q. Who were the people who sort of spoke the most at that meeting? Who were the primary contributors?
A. The Secretary. I recall Joe Maher, Dimple. I think Nader was there. If he was, I think he spoke. I'm pretty sure he was. Myself. I think Tom Homan spoke. Again, if I'm not misremembering. We've had several meetings with the three immigration agencies, non DACA issues over the years, over the months, but I think Kevin McAleenan or his team were there speaking, and I believe Kathy and Craig spoke as well.
Q. Was there anyone there who was not there sort

of under the DHS umbrella, from other agencies or --
A. No. And I think I also -- if I didn't mention, Gene Hamilton was at the meeting, but I think he spoke as well.
Q. What was Gene's role again?
A. He was the senior counsel to the Secretary.
Q. Got you. Okay. Do you know Julie Kirchner?
A. Yes.
Q. To your knowledge, did Julie Kirchner have any role in all these discussions that we've been talking about today with respect to the rescission of DACA?
A. I don't recall her being at the meeting. And if I may ask and answer in a couple points. So with respect to the decisions we've discussed, she wasn't present.
Q. Okay. Are you aware of her having any role in the decision-making process on DACA rescission?
A. Excepting her official title and role, I'm not aware of that.
Q. And what do you mean "excepting her official title and role"?
A. So she is a citizenship and immigration services ombudsman.
Q. And so you would expect somebody in that

position to have some role in the decision making?

A. Not necessarily, but I can explain.

Q. Please do.

A. So the ombudsman has by the definition the title of ombudsman, oversees partners with our agency, and so therefore, has opinions on our operations and involves themselves appropriately with the work or operations on decisions sometimes may, usually does not from a guidance perspective.

Q. Okay. Well, just to go through the formalities, what was discussed at that August 21 meeting?

MR. GARDNER: Objection. Calls for disclosure of information subject to deliberative process privilege as well as the attorney-client privilege.

I instruct the witness not to answer.

THE WITNESS: And I follow my counsel's lead.

MR. DETTMER: If I didn't say that I'm going to observe the formalities, you think I could have slipped that through?

MR. GARDNER: I think so. I'm still in a lunch coma right now.

THE WITNESS: Looking at these different options to keep it going.

BY MR. DETTMER:

Q. Was there any follow-up to that August 21 meeting that you were part of?

A. Yes.

Q. Can you describe that.

MR. GARDNER: Objection. Calls for disclosure of information and subject to the deliberative process privilege and potentially the attorney-client privilege.

I instruct the witness not to answer.

BY MR. DETTMER:

Q. So --

A. I agree. I concur, yes.

Q. So let me just back off of that just a little bit --

A. Sure.

Q. -- and ask you without divulging the substance of the follow-up conversations, how many were there, who were they with, when did they happen?

MR. GARDNER: Objection. Compound. Can we do it question by question? I'm not trying to --

MR. DETTMER: No. Sure.

Q. I'm trying to do it in a way that --

A. Understood.

Q. How many follow-up conversations do you

remember having? Excuse me, follow-up communications do you remember having to that August 21 meeting?

A. A handful. A few.

Q. Okay. Less than five?

A. What is the time parameter when you say, "follow-up"?

Q. Well, you know, it's hard to say. I mean it depends on what you mean by "follow-up." I mean --

A. That's why I was asking.

Q. -- if it's a communication that you understood was sort of a follow-up on that meeting, that's what I'm curious about. And I don't --

A. Right.

Q. I can't see it in your mind.

A. I can explain a bit of the parameters of why I asked the question.

Q. Sure.

A. So following any conversation with the Secretary or principal from that then role, or even this one, usually, on whatever the topic is there may be a variety of different types of communication or follow-up. So it could be E-mail or calls asking for data. Sometimes decisions are ultimately made. Sometimes they aren't. So sorry. I was trying to set the --

Q. No. No. Understood. And I'm sorry. It is a little vague just by nature.

A. So I would say between the 21st and the 24th, meaning that that meeting then occurred at the White House. There was, I think, a handful, maybe a couple -- I don't recall exactly -- follow-up on what was discussed.

Q. And do you remember who those communications, those follow-up communications were with?

A. Some.

Q. Tell me what you remember.

A. So follow-up on the discussions at the meeting for further information.

Q. Do you remember with whom?

A. So I recall Gene Hamilton would be one. I don't recall if it came through other channels or not. It might have.

Q. Were those requests for additional data? Was that sort of the nature of the --

A. Additional data. I think data would be correct overall.

Q. Okay.

A. If I may amend an earlier answer. At the meeting as well, I believe on the 21st was Ambassador Nealon. James Nealon as well. Assistant secretary in

the policy office.

Q. Okay. Do you remember whether Mr. Nealon made -- was a participant in the conversation?

A. I remember him speaking, but I don't remember the specifics given a lot of folks were discussing. So...

Q. Okay. I think I'm going to sort of switch gears and take you back to earlier in your time at USCIS and ask you a few questions about earlier in the DACA program. Sort of starting back in 2012-2013 time period --

A. Okay.

Q. -- and moving forward from there.

We had talked a little bit this morning about the roll-out of DACA --

A. Uh-huh.

Q. -- which you had some role in, it sounds, like, based on your position. I'm going to show you a few of the documents that were put out by USCIS around the DACA program and just ask you a few questions about those if that makes sense.

A. Sure.

Q. Let me ask you one thing, though. So for sort of a general question. For the sort of official, you know, guidance documents that USCIS puts out, is

skills?

A. I went to law school. So...

Q. Do you have enough familiarity with the adjudication process to just know whether that rings true to you? Does that ratio seem appropriate, in your experience?

A. Specifically with respect to DACA?

Q. Yes.

A. I believe so. That's around the number I was going to say.

MR. DETTMER: Okay.

(Deposition Exhibit 16 was marked for identification.)

BY MR. DETTMER:

Q. All right. Let me show you Exhibit 16. While you're looking at that, Exhibit 16 is another printout from the USCIS website. It's a four-page document. Title is I-821D, "Consideration of Deferred Action for Childhood Arrivals." Actually, what I -- well, actually, one other thing. On the last page it indicates that this document was last reviewed or updated on October 6, 2017, which is two weeks ago more or less. Not quite.

I want to ask you about the first page. In the box sort of right in the middle of that first page

in red letters it says, "DACA is ending."

The first bullet point says, "We are no longer accepting initial or renewal requests for deferred action for childhood arrivals. We will consider DACA requests received from residents of the U.S. Virgin Islands and Puerto Rico on a case-by-case basis." Do you see where I read that there?

A. Yes.

Q. When was the decision made to consider DACA requests from residents of the U.S. Virgin Islands and Puerto Rico on a case-by-case basis?

A. As I recall, a few days prior to the October 5 expiration.

Q. And why was that decision made?

MR. GARDNER: Objection. Calls for disclosure of privileged information. Subject to the deliberative process privilege.

Instruct the witness to not answer.

THE WITNESS: And I will follow the advice of my counsel.

BY MR. DETTMER

Q. You know, unfortunately, the fact of the matter is, as we all know in this room, that there have been an awful lot of horrible, natural, and manmade disasters recently. Maybe you have the same

instruction, but what's the reason for these being given additional consideration, and not Houston, Napa Sonoma, Las Vegas?

MR. GARDNER: You are correct. Same objection. Same instruction.

BY MR. DETTMER:

Q. Okay. Let me ask you maybe a slightly different question. You can answer "yes" or "no." Is consideration being given to similar treatment for residents of some of these other affected areas?

MR. GARDNER: Same objection. Same instruction.

THE WITNESS: I'll follow the advice of counsel.

MR. DETTMER: Really what I'm trying to get in that last one is just whether there is consideration going on or not.

MR. GARDNER: I understand, and if we can try to parse it a different way. What I'm trying to do is avoid disclosing the deliberative process while giving you the ability to obtain factual information. So I think that last question, unfortunately, in my judgement crosses the line. I'm not trying to speechify. I'm trying to figure out a way we could get you the information you need without intruding on

the privilege.

MR. DETTMER: I guess I just -- I mean the question goes to whether there is a deliberative process on that issue. If the answer is "no," then there's no privilege to give.

MR. GARDNER: That's correct.

MR. DETTMER: If the answer is "yes," then, you know, obviously, I can't get into the substance of it.

MR. GARDNER: I think as a high level topical matter he can answer the question is there being consideration. I think when we get to the substance, obviously then we're getting closer. I think we can proceed maybe that way if you understand.

So why don't you re-ask the question. I apologize.

BY MR. DETTMER:

Q. Is USCIS considering whether or not to give similar consideration to other geographic areas that are also subject to natural disasters?

A. Other than what is represented as U.S. VI and Puerto Rico, no.

Q. I'll just ask the question just to preserve the record. Why did USCIS decide to extend the deadline, at least on a case-by-case basis, for people

from the U.S. Virgin Islands and Puerto Rico and not other geographic areas also affected by natural disasters?

MR. GARDNER: Objection. Calls for disclosure of information subject to deliberative process privilege.

I instruct the witness not to answer.

THE WITNESS: I'll follow that advice, or instruction.

MR. DETTMER: All right. Let's dive into this. This was marked as Exhibit 3 at a deposition last week.

THE WITNESS: Okay.

MR. DETTMER: And it is the administrative record that was produced in our case, and I think in your cases as well. And it is a 256-page document or, I guess, compilation of documents.

(Previously marked Exhibit 3 was handed to the witness.)

MR. DETTMER: And it has Bates numbers on it AR1 through AR256.

MR. GARDNER: You might want to take the binder clip off. Just don't --

THE WITNESS: Yep.

BY MR. DETTMER:

the program?

A. My personal view was that it was quite high with respect -- my apologies. With respect to continuing the program. That for the reasons earlier described, there was a significant or high litigation risk.

Q. And to unpack that a little bit more, what factors went into your personal assessment of that litigation risk? You mentioned the Texas litigation, the letter from the attorney general. Was there anything else that went into that evaluation?

A. My personal evaluation, my personal view? I mean in addition, the attorney general's letter indicated DACA as we administered had some of the same risks that DAPA had and the underlying foundation.

Q. And was use of government resources a consideration? DHS resources?

MR. GARDNER: Objection. Vague. Consideration by him?

BY MS. CROWLEY:

Q. Yes, by you. Was that part of the consideration, the litigation risk?

A. I'm sorry. Just to be clear, so the use of our USCIS resources as part of the litigation risk.

Q. In assessing the litigation risk --

A. Yeah.

Q. -- was there consideration -- did you consider the amount of -- the number of government resources, DHS resources that would be used to either continue the program or rescind the program?

A. I mean to answer clearly, I saw if the program -- so consideration of resources in the sense if the program continued we would presumptively, absent other challenges, use the same resources we've been using to administer it.

So then I can answer the second part to your question, if the program were rescinded, you know, particularly actively by a court injunction, then there would be, from my view at the time, thinking through additional resources, depending upon how a court action would play out, again, linking back to DAPA or the injunction of DAPA.

Q. In assessing the litigation risk of continuing or rescinding -- continuing the program, did you consider the likelihood of being sued for a rescission of the program? Was this lawsuit contemplated?

A. So again, just to reiterate, this was my personal review -- personal view, looking at the factors. I wouldn't necessarily call it a formal

analysis nor documented as such. But we've been sued both directions. If you're asking my opinion now, it is if we were being sued requires an expenditure of resources as well, but yet, the expenditure of resources to perhaps unilaterally return approximately 100,000 requests or employment authorization documents and rescind them to the tune of several hundred thousand is also significant.

Q. Were you involved in the decision to rescind the deferred action for parents of Americans and lawful permanent residents or DAPA in June 2017?

A. You mean Secretary Kelly's memo?

Q. Yes.

A. I don't recall being involved on that. If I may add, there's a memo from the Secretary to several of us; right? But DAPA was never operational. So it's a different analysis or involvement point, from my view.

Q. Do you know whether litigation risk was a factor that was considered in ending DAPA?

MR. GARDNER: Objection. Calls for the disclosure of information subject to the deliberative process privilege. Instruct the witness not to answer.

THE WITNESS: I will follow counsel's advice.

BY MS. CROWLEY:

Q. Were you in any meetings in which litigation risk associated with the rescission of DAPA was discussed?

MR. GARDNER: Same objection. Same instruction.

THE WITNESS: And the same response.

BY MS. CROWLEY:

Q. When did you first learn that litigation risk was a relevant factor in rescinding DACA?

A. Attorney General Paxton's letter laid out litigation risk.

Q. I understand that, in your opinion, litigation risk is a proper consideration in evaluating the rescission of a government program such as DACA; is that correct?

A. Based upon the unique parameters of DACA.

Q. So do you think that litigation risk is a factor that should be considered when evaluating the continuation of all government programs?

MR. GARDNER: Objection. Calls for speculation. Hypothetical. Vague.

THE WITNESS: So could you repeat the question, sorry, to make sure I have it clearly.

BY MS. CROWLEY:

implement or run.

Q. Let me rephrase.

A. Sure.

Q. In determining -- are you part of helping determine the department's policy goals?

A. As part -- as deputy director, among many others, I would say yes with respect to those that touch USCIS.

Q. And in determining the department's policy goals, would it be fair to say that you weigh the costs and benefits of various policy options as a general matter?

A. Whether implemented or not, or not yet implemented, those are some -- I would say that's a consideration.

Q. You talked with Ethan about some of the benefits that DACA recipients received from DACA. You remember that?

A. Uh-huh.

Q. You also talked about some of the benefits that DACA may have had for USCIS. Do you remember that?

A. With respect to some of the general goals and policy principles --

Q. Yes.

A. -- that's to what you refer?
Q. Yes. Were those benefits considered in evaluating whether DACA should be continued?
MR. GARDNER: Objection. Calls for the disclosure of information such as deliberative process privilege.
I instruct the witness not to answer.
THE WITNESS: I'll follow counsel's advice.
BY MS. CROWLEY:
Q. Let me break that down a little bit more, then. To your knowledge, were any of those benefits considered in connection with the decision to rescind DACA?
MR. GARDNER: Objection. Calls for the disclosure of information subject to deliberative process privilege.
I instruct the witness not to answer.
THE WITNESS: I follow my counsel.
BY MS. CROWLEY:
Q. Are you aware that DACA recipients are employees of companies in this country?
A. Yes.
Q. To your knowledge, were any of their employers consulted in connection with the decision to rescind DACA?

A. Not to my knowledge.
Q. Are you aware that DACA recipients are employers of other individualss in this country, that they employ people?
A. It's possible. I mean probably. I mean I just don't know for sure.
Q. But it stands to reason?
A. Yes. It's a possibility.
Q. Are you aware of whether any of their employees were consulted in connection with the decision to rescind DACA?
A. I'm not aware that they were. They may have been.
Q. Are you aware that DACA recipients are students in this country?
A. Yes.
Q. To your knowledge, were any of their schools consulted in connection with the decision to rescind DACA?
A. I'm not aware that they were. They may have been. I'm not aware.
Q. Are you aware that DACA recipients are teachers in this country?
A. Yes.
Q. And are you aware -- to your knowledge, were

any of the employees of those teachers consulted in the connection with the decision to rescind DACA?

A. The employees?

Q. The employers.

A. I'm not aware if they were.

Q. Okay. I want to shift a little bit and just ask you one last set of questions. Am I correct in understanding that after March 5, 2018 DHS will no longer adjudicate renewal applications from current DACA recipients?

A. No. We'll still have it. We will still have renewals under adjudication.

Q. But you will not be accepting new renewal applications?

A. Not accepting, that's correct, as of October -- after October 5.

Q. Are you aware of any discussions within DHS regarding whether to extend that deadline, the March 5 deadline?

A. I'm not aware of any.

Q. To your knowledge, has anyone from the Department of Justice provided input into whether the March 5 deadline should be extended?

A. Not to my knowledge.

Q. To your knowledge, has anyone from the White

House provided input into whether the March 5 deadline should be extended?

A. Not to my knowledge.

Q. And to your knowledge, has anyone from other organizations within the executive branch weighed in or provided input into whether the March 5 deadline should be extended?

A. Within the executive branch, not to my knowledge.

Q. In your opinion, does DHS have the authority to extend the March 5 deadline?

MR. GARDNER: Objection. Calls for a legal conclusion.

THE WITNESS: Right. I can't advise on that. I'm not in a practicing attorney role.

BY MS. CROWLEY:

Q. Do you personally see any benefits of extending the March 5 deadline?

A. My personal opinion, no, I don't. We have -- I would like to explain, if I may.

Q. Uh-huh.

A. As in my testimony a couple of weeks ago and the questions asked by members, I think congressional action and statutory enactment is what will provide a permanent status, or could, for this population.

C E R T I F I C A T E

I do hereby certify that the aforesaid testimony was taken before me, pursuant to notice, at the time and place indicated; that said deponent was by me duly sworn to tell the truth, the whole truth, and nothing but the truth; that the testimony of said deponent was correctly recorded in machine shorthand by me and thereafter transcribed under my supervision with computer-aided transcription; that the deposition is a true and correct record of the testimony given by the witness; and that I am neither of counsel nor kin to any party in said action, nor interested in the outcome thereof.

Nancy J. Martin, RMR, CSR

Dated: October 18, 2017

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying shorthand reporter.)

# EXHIBIT FF

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------x

MARTIN JONATHAN BATALLA VIDAL, et al.,

Plaintiffs,

v

ELAINE C. DUKE, Acting Secretary Department of Homeland Security JEFFERSON BEAUREGARD SESSION III, Attorney General of the United States, and DONALD J TRUMP, President of the UNITED STATES,

Defendants.

---------------------------x

Case Nos.
1:16-CV-04756(NGG)(JO)
3:17-CV-05211

Deposition of GENE HAMILTON
Washington, DC
Friday, October 20, 2017
9:17 a.m.

Job No.: 37567
Pages: 1 - 233
Reported by: Donna Marie Lewis, RPR, CSR (HI)

deliberative process privilege. I instruct the witness not to answer.

BY MS. TUMLIN:

**Q Okay. Did Attorney General Sessions direct the decision to terminate DACA?**

MR. GARDNER: Objection. Vague.

THE WITNESS: What do you mean by direct?

BY MS. TUMLIN:

**Q Did Attorney General Sessions provide a strong recommendation to Acting Secretary Duke that he felt the DACA program should be terminated?**

MR. GARDNER: Objection. Vague.

THE WITNESS: What do you mean by recommendation? Let me tell you, the attorney general sent a letter that said that the program was, generally speaking, illegal and unconstitutional. I don't know what other course of action you would expect for him to advocate if that's his legal conclusion about the program.

BY MS. TUMLIN:

Q Was the -- did you participate in any meetings to determine whether or not the DACA program should be terminated?

A Yes.

Q When is the first meeting that you remember participating in to discuss whether the DACA program should be terminated?

A When is the first meeting with whom? Internal to DHS?

Q Let's start with that. Let's start with the first internal to DHS only meeting that you participated in in which the question of whether DACA should be terminated was discussed?

A Sometime in August.

Q August, mid August?

A Mid to late August.

Q And who was at that meeting?

MR. GARDNER: You can answer. All she is asking is identity, not substance.

THE WITNESS: To the best of my recollection the attendees at that meeting were

the acting secretary; chief of staff, Chad Wolf; deputy chief of staff, Elizabeth Neumann; myself; our acting under secretary for policy strategy and plans, Jim Nealon; potentially his acting chief of staff, Brianna Petgill (phonetic). I believe Dimple Shah, deputy general counsel OJC. Acting Director Homan from ICE; his principal legal adviser, Tracy Short. I believe his special adviser, John Theory. Acting Commissioner Kevin MacAleenan. I don't remember her title, one of his attorneys, Julie Cooler (phonetic). Potentially, I don't recall if his chief of staff was there. James McCament, the acting now deputy director of USCIS, but was the acting director. Francis Cissna in his former capacity as director of immigration policy at DHS. There may have been assistant secretary of legislative affairs, Ben Cassidy. And potentially our assistant secretary for public affairs, Jonathan Hoffman. I don't recall specifically.

BY MS. TUMLIN:

**Q Was that an in-person or a telephone**

meeting?

A In person.

Q Was that at DHS headquarters?

A It was.

Q Approximately how long did that meeting last?

A I don't know. Maybe an hour or so.

Q Who convened the meeting?

A I don't recall.

Q Did anybody organize or suggest that the meeting be held?

A Yes.

Q Who was that?

A I don't recall. It may have been the chief of staff.

Q Chad Wolf --

A -- Or may have been the secretary or it may have been me. I just don't recall who did it.

Q How would that meeting have been organized? Would an email have gone out telling folks to show up at a certain place at a certain time?

A There likely would have been an email invitation to a meeting that would have went out. And I just don't remember who organized it principally from the get-go in terms of calling the meeting, that specific meeting.

**Q Got it. And would that have been something like an Outlook -- Outlook calendar invite that went out?**

A Yes.

**Q Okay. Would an agenda have gone out for that meeting?**

A I believe so.

**Q Who would have composed that agenda?**

A Typically several individuals, but I know that I did certainly on that one.

**Q You helped compose that agenda?**

A I did.

**Q What do you remember about what you put on the agenda?**

MR. GARDNER: Objection. You can describe that at a high level of generality without revealing deliberative pre-decision

material.

THE WITNESS: Generally outlined the situation as it stood with respect to DACA at the time and weighed out various potential options.

BY MS. TUMLIN:

**Q So your agenda would have presented potential options for terminating or keeping the DACA program?**

A Yes.

**Q Okay. Do you remember how many options you presented for terminating, keeping or something else with respect to the DACA program?**

A No.

**Q More than two?**

A I don't know.

**Q Would that agenda have included an option of keeping the DACA program in place as it stood prior to September 5, 2017?**

MR. GARDNER: Objection. Calls for disclosure of information subject to deliberative process privilege. Instruct the witness not to answer.

BY MS. TUMLIN:

**Q Would that agenda have included an option for the full scale termination of the DACA program with no wind down period?**

MR. GARDNER: Objection. Calls for disclosure of information subject to deliberative process privilege. Instruct the witness not to answer.

BY MS. TUMLIN:

**Q Okay. Would that agenda have been sent around as an attachment to the Outlook calendar invite?**

A I don't know. Maybe.

**Q Could it have gone around on an email?**

A Probably.

**Q Would you have printed -- would someone at the Department of Homeland Security have printed hard copies for meeting attendees?**

MR. GARDNER: Objection. Calls for speculation.

THE WITNESS: Probably. I don't know. I'm really not sure.

MS. TUMLIN: Okay.

THE WITNESS: You are asking me to guess.

BY MS. TUMLIN:

**Q Were notes taken of that meeting?**

A I don't know.

**Q Either by hand or on computer?**

A I don't know.

**Q Did you take any notes at the meeting?**

A I might have.

**Q By hand?**

A I generally take notes by hand.

**Q Okay. Okay. That was sometime in mid to late August and it was an internal DHS meeting on whether to terminate the DACA program. Was there a meeting subsequent to that meeting that was still internal only to DHS to consider the question of whether to terminate the DACA program? So after this meeting we just discussed and before November the 5th?**

A I don't recall if there was or if there wasn't.

**Q Was there a meeting after the meeting we just discussed but prior to November the 5th on whether or not to terminate the DACA program that included individuals in the federal government outside of the Department of Homeland Security?**

MR. GARDNER: For clarification you said November 5? Is that right?

MS. TUMLIN: I did say that according to the transcript and I meant September 5. I apologize.

MR. GARDNER: That's what I thought. Just wanted to be clear about that.

THE WITNESS: So if you could --

MS. TUMLIN: -- Absolutely.

THE WITNESS: -- just say that one more time?

BY MS. TUMLIN:

**Q So the meeting that we have been talking about internal only at DHS I think you put at about mid to late August?**

A I did.

**Q Of 2017?**

A Uh huh.

**Q So after that meeting but before the announcement of the termination of the DACA program on September 5, 2017 was there another meeting considering the question of whether to terminate the DACA program that you were a part of?**

A Yes.

**Q When approximately was that meeting?**

A Around the same time, a few days later.

**Q A few days later? Late August?**

A Yes.

**Q Who was at that meeting?**

MR. GARDNER: You can answer the identity of individuals that attended.

THE WITNESS: There was a meeting in the Roosevelt Room of the White House at which chief of staff, John Kelly was present. Principal deputy chief of staff, Kirstjen Nielsen, was present. Deputy chief of staff, Rick Dearborn, was present. Senior policy adviser to the president, Stephen Miller, was present. I believe

the staff secretary, Rob Porter, was present. White House counsel, Don McGahn, was present. I believe the assistant or the director of White House legislative affairs, Mark Short, was present at least for a time. The director of the Office of Management and Budget, Mick Mulvaney, was present. I was present. Acting Secretary Duke was present. Acting Director McCament was present. Acting chief of staff, Chad Wolf, was present. The attorney general was present. His chief of staff, Jody Hunt, was present. The associate attorney general, Rachel Brand, was present. Counsel to the attorney general, Danielle Cutrona was present. And I don't recall anyone else. Oh, I'm sorry. Deputy secretary of state, John Sullivan, was present, I believe. Fairly certain. Could be wrong.

BY MS. TUMLIN:

**Q That's a lot of people. You may have already said this, but was John Bash present?**

**(Court reporter requested clarification.)**

MS. TUMLIN: Bash.

THE WITNESS: I think he -- I don't recall specifically, but he may have been there. I believe that there were one or two staffers from the White House counsel as well as -- I apologize, the director of the Domestic Policy Council, Andrew Bremberg, was present. Potentially one or two of his staff was, but I don't remember. I may be -- at that point I may be conflating meetings. There's many on other issues.

BY MS. TUMLIN:

**Q Approximately how long did that meeting last?**

A Might have been an hour and a half.

**Q Okay. Do you know who convened that meeting?**

A What do you mean convened?

**Q Who invited people to come to the meeting?**

A Who sent out the physical invitations or who called the meeting in a pulled it together?

**Q Who -- both? Who sent out the physical**

**invitation first?**
A I don't know.
**Q Who brought the meeting together, made it happen?**
A I don't know.
**Q Did anybody facilitate the meeting?**
A Define facilitate?
**Q Lead or preside over the meeting?**
A To the best of my recollection the White House chief of staff and Stephen Miller both had lead at various points in the meeting.
**Q Was there an agenda for the meeting?**
A Yes, I believe so.
**Q Was that sent out to meeting attendees electronically in any form?**
A I believe so.
**Q Via email?**
A Fairly certain.
**Q Was it also provided in hard copy to meeting attendees?**
A I don't remember.
**Q What do you remember as being on that**

**agenda?**

MR. GARDNER: You can describe that in a high level of generality unless disclosing contents will reveal deliberative pre-decisional information.

THE WITNESS: I don't recall specifically other than just general things about DACA and potential decisions.

BY MS. TUMLIN:

**Q Were there various options for what to do with the DACA program on that agenda?**

A I don't specifically recall. There might have been.

**Q Was the goal of the meeting to reach a tentative decision on whether or not to terminate the DACA program?**

A My understanding of the meeting was to develop at least a tentative path forward with respect to what to do with the program known as Deferred Action for Childhood Arrivals.

**Q Was a tentative decision to terminate the DACA program reached at that meeting?**

A A tentative decision by whom?

**Q Acting Secretary Duke?**

A I don't know if you call it a tentative decision, but maybe.

**Q Did Acting Secretary Duke express in that meeting that her present inclination was to terminate the DACA program?**

MR. GARDNER: Objection. Calls for disclosure of information subject to deliberative process privilege. I instruct the witness not to answer.

BY MS. TUMLIN:

**Q After this meeting in the Roosevelt Room of the White House were there any other meetings that you were part of before September 5 considering the question of whether or not to terminate the DACA program?**

A Yes.

**Q Approximately when was the next meeting?**

A I don't remember.

**Q Do you remember where that meeting was?**

A The White House.

**Q Where at the White house?**

A The Roosevelt Room.

**Q Approximately how long did meeting number two at the Roosevelt Room last?**

A It never really happened. I think it was -- we were waiting to get it started and it kind of got canceled.

**Q Understood. Okay. So was that just a couple of days after this meeting that did happen?**

A I mean, when you say a couple, I presume two. And I'm not really sure. It was several, at least several days after.

**Q Okay. Who organized that meeting?**

A I don't know.

**Q Do you recall getting an invitation of some kind to show up at that meeting?**

A Certainly.

**Q Do you recall who that was from?**

A Nope.

**Q And how did you learn that the meeting was being canceled?**

A We were sitting around the table and one

of the chief of staff's aides came in the room and said that the meeting was being canceled.

**Q Did they -- pardon me. Did that aide provide any reason for why the meeting was being canceled?**

A No.

**Q Was that meeting ever rescheduled?**

A If it was I wasn't there. I don't know.

**Q After that meeting which was canceled in the Roosevelt Room did you attend any other meetings regarding the termination of the DACA program before September the 5th?**

A I don't recall any formal meetings. Certainly it was discussed, but I don't recall formal meetings.

**Q When do you remember finding out a final decision had been made to terminate the DACA program?**

A As I indicated earlier my perspective on things is that there is no final decision until there is ink on paper, so it was sometime on September 5.

**Q So is it your opinion that you found out about the final decision to terminate the DACA program -- or let me correct that.**

**Did you watch the press conference with Attorney General Sessions announcing the termination of the DACA program?**

A I seem to recall watching some of it, yes.

**Q Is that when you found out about the decision to termination the DACA program in your opinion?**

A Well, the attorney general did not terminate the DACA program, so no. And he did not sign the memo that canceled, that rescinded the 2012 memo, so no.

**Q But he was the spokesperson for the administration announcing that?**

A The attorney general held a press conference in which he stated his legal position about the program and his general suppositions about the way that the program, what might happen to it.

**the DACA program had been made. Correct?**

A That -- that is generally correct, although I will say again, no final decision is ever made until there is ink on paper. That is the fundamental difference. There may have been tentative decision, but until a secretary of a cabinet department makes a decision in writing or in whatever method is appropriate for the circumstance the decision is technically not final.

**Q Was there a substantively alternative version of a DACA memorandum that was circulating prior to September the 5th that could have been signed by Acting Secretary Duke?**

MR. GARDNER: Objection. Calls for disclosure of information subject to deliberative process privilege. I instruct the witness not to answer.

BY MS. TUMLIN:

**Q Okay. Does DHS have a policy on how to deal with litigation risk?**

A Do we have a policy on how to deal with litigation risk?

**Q Uh huh.**

A Nothing in writing.

**Q Okay. So there is -- is there any policy on how to deal with threats to sue by state or local officials?**

A No. And that sounds like the craziest policy you could ever have in a department. You could never do anything if you were always worried about being sued.

**Q Are you familiar with the executive order issued by President Trump with respect to sanctuary jurisdictions?**

A That -- I believe that is in Executive Order 13768. I am familiar.

**Q And are you aware that several municipalities have sued the federal government on the basis of that executive order?**

A In general I am, yes.

**Q Are you aware that some of these lawsuits have successfully blocked parts of the**

**executive order?**
A On a temporary basis.
**Q And as a result has DHS considered rescinding any of that executive order?**
MR. GARDNER: Objection. Calls for disclosure of information subject to deliberative process privilege, plus the attorney/client privilege. I instruct the witness not to answer.
BY MS. TUMLIN:
**Q Okay. Have you ever requested that anyone within DHS provide metrics or statistics about DACA recipients?**
A I have.
**Q And when you ask for information they generally give it to you. Is that correct?**
A Correct.
**Q Did you ever request metrics about how many DACA recipients who subsequent to their receipt of DACA were arrested, detained or removed?**
MR. GARDNER: Objection. Calls for disclosure of information subject to deliberative

REPORTER'S CERTIFICATE

I, DONNA M. LEWIS, RPR, Certified Shorthand Reporter, certify;

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness, Gene Hamilton, was put under oath by me;

That the testimony of the witness, the questions propounded and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

I declare that I am not of counsel to any of the parties, nor in any way interested in the outcome of this action.

As witness, my hand and notary seal this 22nd day of October, 2017.

Donna M Lewis

Donna M. Lewis, RPR
Notary Public

DONNA M. LEWIS
MY COMMISSION EXPIRES
MAR. 14, 2018
NOTARY PUBLIC

My Commission expires:
March 14, 2018

# EXHIBIT GG

POLITICS SEP 5 2017, 10:50 PM ET

# Trump Administration Memo: DACA Recipients Should Prepare for 'Departure'

by KRISTEN WELKER and DANIEL ARKIN

WASHINGTON — Trump administration talking points distributed on Tuesday had a blunt message for DACA recipients: They should "prepare for and arrange their departure."

That guidance appeared in a memo (.pdf) that was sent to stakeholders in the immigration debate by the Department of Homeland Security, just hours after the Trump administration announced it would end DACA, the Obama-era program that has shielded hundreds of thousands of undocumented immigrants from deportation. President Trump is giving Congress six months to come up with a legislative fix before the federal government drops the program.

The document, titled "Talking Points — DACA Rescission," included 12 bullet points on the program. The tenth bullet contained stark advice for current DACA recipients:

> The Department of Homeland Security urges DACA recipients to use the time remaining on their work authorizations to prepare for and arrange their departure from the United States — including proactively seeking travel documentation — or to apply for other immigration benefits for which they may be eligible.

The memo was first obtained and reported by CNN.

A senior White House official told NBC News that the talking points were being distributed to various stakeholders in the immigration battle. The official argued that the talking points "are rational and appropriate as the president tries to find a compassionate, honorable and constitutional way to address this very real issue."

**Related: What Is DACA? Here's What You Need to Know About the Program Trump Is Ending**

The senior official also noted that the advice to "prepare for departure" is standard for anyone who lacks legal status — and not a specific message to DACA recipients.

Attorney General Jeff Sessions announced the administration decision Tuesday morning, calling DACA unconstitutional and criticizing it as "unilateral executive amnesty."

The federal government will not accept any new applications for the program, Sessions said. But the administration will allow DACA recipients with work permits set to expire before March 5, 2018, the opportunity to apply for a two-year renewal. Those final expirations would then be pushed back until after the 2018 midterms, which could potentially reshape Congress.

# EXHIBIT HH

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California, | ) Case No. 17-CV-05211-WHA |
| Plaintiffs, | ) |
| v. | ) |
| U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, | ) |
| Defendants. | ) |

\- - -

Friday, October 13, 2017

\- - -

Videotaped deposition of JAMES D. NEALON, taken at the offices of Covington & Burling, 850 Tenth Street NW, One City Center, Washington, D.C., beginning at 7:32 a.m., before Nancy J. Martin, a Registered Merit Reporter, Certified Shorthand Reporter.

would it be fair to say you weigh the costs and benefits of policy options?
A. Generally speaking, yes.
Q. And the more the benefits of an option outweigh the costs, the better a policy it is?
A. Oftentimes, yes.
Q. Are there any times when a policy option is worse even though its benefits outweigh its costs more than any other option?
A. Well, there may be. I don't know. Political science discussion.
Q. In your career in government, have you ever encountered such a situation?
A. Generally speaking, you try to do the right thing.
Q. I appreciate that. My question was about whether you'd ever encountered a situation when in weighing different policy options the best option was one where its costs exceeded its benefits more than any other option?
A. Maybe. I don't recall a specific incident like that. I'm sure you're going to take me there.
Q. So in considering the rescission of DACA, one policy option was to rescind DACA; is that correct?
MR. GARDNER: Objection. Calls for

disclosure of information subject to deliberative process privilege.

Instruct the witness not to answer.

BY MR. BERENGAUT:

Q. Prior to the rescission of DACA, DACA was a policy of the DHS. Is that fair to say?

A. Yes.

Q. Did that policy have policy benefits and costs?

MR. GARDNER: Objection. Calls for speculation. Lack of foundation.

THE WITNESS: Repeat the question, please.

BY MR. BERENGAUT:

Q. Did DACA as a policy have costs and benefits?

A. Those are matters of opinion.

Q. Let me ask my question again. Did DACA as a policy have costs and benefits?

MR. GARDNER: Same objections.

THE WITNESS: I'm sure it did.

BY MS. CHUANG:

Q. Do you have an understanding of what some of the benefits of DACA as a policy are?

A. So there were clear benefits of DACA to the beneficiaries of DACA.

Q. Right. You already testified about the

specific benefits that were conveyed to the beneficiaries of the program. I'm asking about DACA as a policy --

A. Right.

Q. -- in connection with this cost and benefit analysis that we were talking about a minute ago. My question is do you have an understanding of whether DACA has policy benefits?

MR. GARDNER: Objection. Lack of foundation.

THE WITNESS: Yeah. I don't have a clear understanding of what those policy benefits might be. I certainly understand the human benefits of DACA to the beneficiaries of the program.

BY MR. BERENGAUT:

Q. Well, let me give you an example. Are you aware that DACA beneficiaries are employed often?

A. Yes.

Q. And through their employment they contribute economic activity to this country?

A. Yes.

Q. Would you say that that economic activity is a benefit of the DACA program?

A. Yes.

Q. Can you think of any other policy benefits of the DACA program?

MR. GARDNER: Objection. Lack of foundation.

THE WITNESS: No, not at the moment.

BY MR. BERENGAUT:

Q. Do you have an understanding of any policy costs of the DACA program?

A. Yes.

Q. What is that understanding?

A. Again, you have a large body of people who are in legal limbo, and that's not a good policy.

Q. Do you have an understanding of any other policy costs of the DACA program?

A. No. I'd be happy to answer questions, but I don't, off the top of my head, know.

Q. Now, this policy cost that you described of individuals being in legal limbo, have you seen any documents relating to that policy cost?

A. No.

Q. Have you had any communications with anyone else at DHS relating to that policy cost?

A. No.

Q. To your knowledge, was that policy cost considered in connection with the decision to rescind DACA?

MR. GARDNER: Objection. Calls for disclosure of information subject to deliberative

process privilege.

I instruct the witness not to answer.

MR. BERENGAUT: Sorry. I was receiving a note to adjust the microphone on my tie.

MR. GARDNER: Everyone's a critic.

MR. BERENGAUT: Is that better?

THE VIDEOGRAPHER: Yes. Thank you.

MR. BERENGAUT: Thank you.

Q. Let me ask you about some other policy benefits of DACA. Are you aware that DACA recipients serve in this country's armed forces?

A. Yes.

Q. Would you say their service is a policy benefit of DACA?

A. We certainly thank them for their service, and anyone who serves in our military deserves our gratitude.

BY MR. BERENGAUT:

Q. Can you think of any other -- now that we've had a couple of other examples, any other policy benefits of DACA?

A. Not off the top of my head.

Q. Do you have an understanding of what "litigation risk" is?

A. Some understanding.

Q. What is your understanding?
A. Simply that. That policy may be at the risk of litigation.
Q. And when you earlier described what you called the "threat to DACA," would that be an example of litigation risk, in your understanding?
A. That's what I was referring to.
Q. Setting aside DACA, are you aware of any other existing policy in your service in government that was rescinded because of litigation risk?
A. Nothing occurs to me.
Q. Are you aware of administration policy goals in the immigration context apart from the rescission of DACA?
A. Yes.
Q. What understanding do you have of those goals?
A. I think the administration's general goals related to administration emphasize the enforcement of our laws. That's the best way to describe the administration's approach towards immigration.
Q. Are you aware of an administrative -- administration policy goal of constructing a wall on the border between the United States and Mexico?
A. I am.

Q. To your knowledge, were these other administration goals in the immigration context considered in connection with the decision to rescind DACA?

MR. GARDNER: Objection. Calls for disclosure of information subject to deliberative process privilege.

Instruct the witness not to answer.

BY MR. BERENGAUT:

Q. To your knowledge, was the administration goal of constructing a wall on the border between the United States and Mexico considered in connection with the decision to rescind DACA?

MR. GARDNER: Objection. Calls for disclosure of information subject to deliberative process privilege.

I instruct the witness not to answer.

BY MR. BERENGAUT:

Q. If we could go back to the administrative record exhibit, which I believe is Exhibit 1. It's the document you have right in front of you. And if we could go back to what --

MR. GARDNER: Exhibit 3?

MR. BERENGAUT: I'm sorry. Was the administrative record Exhibit 3? Yeah. Exhibit 3.

BY MR. BERENGAUT:

Q. Have you seen any documents relating to the rescission of DACA that referenced political goals?

A. No. I don't recall any such document.

Q. Are you aware -- this goes back to what I was asking about the administration's policy objectives in the immigration context. As part of those policy objectives, the administration has an agenda for legislation with, like, Congress to enact; is that correct?

A. Yes.

Q. To your knowledge, did the administration's legislative agenda before Congress come up in any discussions relating to the rescission of DACA?

MR. GARDNER: Objection. Calls for disclosure of information subject to deliberative process privilege.

Instruct the witness not to answer.

BY MR. BERENGAUT:

Q. Have you seen any document relating to the rescission of DACA that discusses the administration's legislative agenda?

A. No.

Q. Earlier in your deposition you talked about the voices within DHS that fed into the

decision-making process. Do you remember that?
A. I do.
Q. Let me ask you about a few other voices. Are you aware that DACA recipients are employees of companies in this country?
A. I am.
Q. To your knowledge, were any of their employers consulted in connection with the decision to rescind DACA?
A. I'm not aware of that.
Q. Are you aware that DACA recipients are employers of other individuals in this country?
A. Stand to reason.
Q. Are you aware of any -- are you aware of whether any of their employees were consulted in connection with the decision to rescind DACA?
A. I'm not aware of any such consultation.
Q. Are you aware that DACA recipients are students in this country?
A. I am.
Q. To your knowledge, were any of their schools consulted in the decision to rescind DACA?
A. Not to my knowledge.
Q. Are you aware that DACA recipients are teachers in this country?

A. I'm not aware of specific cases, but again, stand to reason.

Q. To your knowledge, were any of their students consulted in connection with the decision to rescind DACA?

A. Not to my knowledge.

Q. Are you aware that DACA recipients are members of faith communities in this country?

A. Again, not specifically, but stands to reason.

Q. To your knowledge, were any of those other faith communities consulted in connection with the decision to rescind DACA?

A. Not that I'm aware of.

Q. Are you aware that DACA recipients are doctors in this country?

A. Again, not specifically, but may well be.

Q. To your knowledge, were any of their patients consulted in connection with their decision to rescind DACA?

A. Not to my knowledge.

Q. You mentioned earlier that you're aware that DACA recipients serve in this country's armed forces?

A. Yes.

Q. To your knowledge, were any of their military

commanders consulted in connection with the decision to rescind DACA?
A. Not to my knowledge.
Q. Are you aware that DACA recipients are members much families in this country?
A. That would stand to reason.
Q. To your knowledge, were any of their family members consulted in connection with the decision to rescind DACA?
A. Not to my knowledge.
Q. Do you have an understanding of whether DACA recipients receive mental -- let me strike that.
Do you have an understanding of whether any DACA recipients in this country receive mental health counseling in connection with anxiety?
A. I'm not aware of that, no.
Q. What about other mental health conditions?
A. I'm not aware of that.
Q. Do you have any reason to doubt that some DACA recipients in this country receive mental health counseling for anxiety and other mental health conditions?
A. I would have no reason to doubt that.
Q. To your knowledge, were any mental healthcare providers consulted in connection with the decision to

rescind DACA?

A. Not to my knowledge.

Q. Do you have an understanding of whether the rescission of DACA will have an effect on the U.S. GDP?

MR. GARDNER: Objection. Calls for speculation. Lack of foundation.

THE WITNESS: I don't have a deep understanding of what the impact of a rescission of DACA would be on the U.S. GDP.

BY MR. BERENGAUT:

Q. That would be something an economist would probably study; is that right?

A. That would stand to reason.

Q. To your knowledge, were any economists who study the aggregate effect of DACA on the U.S. economy consulted in connection with the rescission of DACA?

A. Not to my knowledge.

MR. BERENGAUT: Thanks. I have no further questions. I appreciate your time.

THE VIDEOGRAPHER: We're going off the record at 11:28.

(A recess was taken from 11:28 a.m. to 11:34 a.m.)

THE VIDEOGRAPHER: We're now on the record at

11:34 a.m.

EXAMINATION

BY MS. MORRISSON:

Q. Hi. Good morning. My name is Haley Morrisson, and I represent the Garcia plaintiffs. Is it your practice to use a calendar to keep track of meetings and other appointments that you attend in a professional capacity?

A. Yes.

Q. Do you personally maintain that calendar?

A. No.

Q. You said you have an office manager?

A. Correct.

Q. What is your office manager's name?

A. Laquon Cuevas.

Q. And does your office manager maintain your calendar?

A. She does.

Q. Is there anyone else who maintains or has access to your calendar?

A. There's nobody else who maintains it. There are many people who have access to it.

Q. Do you review your calendar on a daily basis?

A. Absolutely.

C E R T I F I C A T E

I do hereby certify that the aforesaid testimony was taken before me, pursuant to notice, at the time and place indicated; that said deponent was by me duly sworn to tell the truth, the whole truth, and nothing but the truth; that the testimony of said deponent was correctly recorded in machine shorthand by me and thereafter transcribed under my supervision with computer-aided transcription; that the deposition is a true and correct record of the testimony given by the witness; and that I am neither of counsel nor kin to any party in said action, nor interested in the outcome thereof.

Nancy J. Martin, RMR, CSR

Dated: October 14, 2017

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying shorthand reporter.)

# EXHIBIT II

AMERICAN IMMIGRATION COUNCIL

COMMUNITY EDUCATION CENTER · IMMIGRATION POLICY CENTER · INTERNATIONAL EXCHANGE CENTER · LEGAL ACTION CENTER

October 2014

**Executive Grants of Temporary Immigration Relief, 1956-Present**

Much has been made of President Obama's Deferred Action for Childhood Arrivals (DACA) program, through which he deferred deportation for young adults brought to the U.S. as children. But as immigration legal scholar Hiroshi Motomura has noted, the president has broad executive authority to shape the enforcement and implementation of immigration laws, including exercising prosecutorial discretion to defer deportations and streamline certain adjudications.[1] In fact, a look at the history books reveals that President Obama's action follows a long line of presidents who relied on their executive branch authority to address immigration challenges.

A chart of these decisions [below] makes clear that presidents have ample legal authority—and abundant historical precedent—to exercise their discretion in immigration matters. Since at least 1956, every U.S. president has granted temporary immigration relief to one or more groups in need of assistance. This chart collects 39 examples, which span actions large and small, taken over many years, sometimes by multiple administrations.[2] Some presidents announced programs while legislation was pending. Other presidents responded to humanitarian crises. Still others made compelling choices to assist individuals in need when the law failed to address their needs or changes in circumstance.

Perhaps the most striking historical parallel to today's immigration challenges is the "Family Fairness" policy implemented by Presidents Ronald Reagan and George Bush, Sr. The story behind the fairness policy begins on November 6, 1986, when President Reagan signed the 1986 Immigration Reform and Control Act (IRCA), which gave up to 3 million unauthorized immigrants a path to legalization if they had been "continuously" present in the U.S. since January 1, 1982. But the new law excluded their spouses and children who didn't qualify and forced them to wait in line, creating "split-eligibility" families, as they were called. The U.S. Catholic bishops and immigration groups criticized President Reagan for separating families.

In 1987, Reagan's Immigration and Naturalization Service (INS) commissioner announced a blanket deferral of deportation (logistically similar to today's DACA program) for children under 18 who were living in a two-parent household with both parents legalizing, or with a single parent who was legalizing. Then, in July 1989, the Senate passed legislation to protect a bigger group—prohibiting deportation of all spouses and children of those who were legalizing under IRCA.

But the legislation stalled in the House, and in 1990 President Bush Sr. administratively implemented the Senate bill's provisions. His INS commissioner, saying "We can enforce the law humanely," expanded the blanket deferral to as many as 1.5 million spouses and children of immigrants who were legalizing, provided they met certain criteria. President Bush thus protected over 40 percent of the then-unauthorized population from deportation. The House then passed legislation, and President Bush signed it later that year.

AMERICAN IMMIGRATION COUNCIL

COMMUNITY EDUCATION CENTER · IMMIGRATION POLICY CENTER · INTERNATIONAL EXCHANGE CENTER · LEGAL ACTION CENTER

The Family Fairness program is only one example of the common characteristics of presidential decisions to act on immigration. Several decisions were large-scale actions potentially affecting hundreds of thousands or millions of immigrants. Some presidents focused on the necessity of keeping families together. And other presidents acknowledged the absurdity of trying to deport people for whom major legislation in Congress was pending. Some of these examples include:

- **Large-scale actions**: In addition to Family Fairness, other large-scale actions include paroles of up to 600,000 Cubans in the 1960s and over 300,000 Southeast Asians in the 1970s, President Carter's suspension of deportations for over 250,000 visa-holders, and President Reagan's deferral of deportations for up to 200,000 Nicaraguans.

- **Family-based actions:** Other actions to protect families include the suspended deportations of families of visa-holders (Carter), parole of foreign-born orphans (Eisenhower, Obama), deferred action to widows of U.S. citizens and their children (Obama), and parole-in-place to families of military members (Obama).

- **Actions while legislation was pending**: Other actions taken while legislation was pending include parole of Cuban asylum seekers fleeing Castro (Nixon, Kennedy, Johnson), deferred action to battered immigrants whom the Violence Against Women Act (VAWA) would protect (Clinton), parole of orphans (Eisenhower), and DACA (Obama).

## Endnotes

[1] Hiroshi Motomura, *The President's Discretion, Immigration Enforcement, and the Rule of Law* (Washington, DC: American Immigration Council, August 2014), http://immigrationpolicy.org/perspectives/president%E2%80%99s-discretion-immigration-enforcement-and-rule-law.

[2] This data is compiled from Marshall Fitz, *What the President Can Do on Immigration If Congress Fails to Act* (Washington, DC: Center for American Progress, July 2014), http://www.americanprogress.org/issues/immigration/report/2014/07/01/93042/what-the-president-can-do-on-immigration-if-congress-fails-to-act/; Andorra Bruno, Todd Garvey, Kate Manuel, and Ruth Ellen Wasem, *Analysis of June 15, 2012 DHS Memorandum, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* (Washington, DC: Congressional Research Service, July 13, 2012), http://edsource.org//wp-content/uploads/Deferred-Action-Congressional-Research-Service-Report.pdf; Arthur C. Helton, "Immigration Parole Power: Toward Flexible Responses to Migration Emergencies," *Interpreter Releases* 71, no. 1637 (December 12, 1994); John W. Guendelsberger, "Family Fairness: A Status Report," *In Defense of the Alien* 15 (1992):45-57, http://www.jstor.org/stable/23143114; and other media reports, press releases, and articles, linked to here where publicly available.

AMERICAN IMMIGRATION COUNCIL

COMMUNITY EDUCATION CENTER · IMMIGRATION POLICY CENTER · INTERNATIONAL EXCHANGE CENTER · LEGAL ACTION CENTER

## Executive Grants of Temporary Immigration Relief, 1956-Present

| Year(s) | 1956 | 1956-58 | 1959-72 | 1962-65 | 1975-79 |
|---|---|---|---|---|---|
| **Relief Covered:** | 923 orphans were paroled into the custody of military families seeking to adopt them, pending Congressional legislation providing them permanent resident status | Parole of Hungarians who escaped after 1956 uprising against Soviets failed | Parole for Cuban asylum seekers fleeing Cuban revolution | Executive parole of Chinese who fled to Hong Kong in early 1962 | Executive parole of Indochinese from Vietnam, Cambodia, and Laos, in 10 authorizations or extensions from 1975-79 |
| **# Affected:** | 923 | 31,915 granted parole. | 621,403 received, vast majority granted parole | 15,100 paroled | 360,000 arrived in US, most under parole authorization |
| **President(s):** | Eisenhower | Eisenhower | Eisenhower, Kennedy, Johnson, Nixon | Kennedy, Johnson | Ford, Carter |
| **Other Notes:** | Press release, Oct. 26, 1956: "The Secretary of State and the Attorney General have just reported to me that this can be done." | | Legislation was pending during this time (i.e. the Cuban Adjustment Act of 1966). In FY 1972, a total of 17,109 Cuban asylum seekers were paroled into the U.S. via airlift | | Some also eligible under conditional entry, but since not enough entries statutorily available, most were paroled. Most of 130,000 refugees who were evacuated during 1975 U.S. withdrawal from Vietnam were paroled |

AMERICAN IMMIGRATION COUNCIL

COMMUNITY EDUCATION CENTER • IMMIGRATION POLICY CENTER • INTERNATIONAL EXCHANGE CENTER • LEGAL ACTION CENTER

| Year(s) | 1976 | 1977 | 1977-82 | 1977-1980 | 1978 |
|---|---|---|---|---|---|
| **Relief Covered:** | Extended Voluntary Departure (EVD) for Lebanese | AG temporarily suspended expulsion of "*Silva* letterholders," who were suing because the State Department incorrectly calculated a visa cap, while their litigation and legislation moved forward | Extended Voluntary Departure (EVD) for Ethiopians | Parole for Soviet refugees | Extended Voluntary Departure (EVD) for Ugandans |
| **# Affected:** | Unknown (although 14,000 fled Lebanon to US) | Ultimately 250,000 (500,000 including dependents) | 15,000+ | 50,000 + (9,000 in Jan. and Dec. 1977; 12,000 in June 1978; 36,000 in 1979) | Unknown |
| **President(s):** | Ford | Carter | Carter, Reagan | Carter | Carter |
| **Other Notes:** | Extended Voluntary Departure (EVD) is an administrative process by which designated nationals of a country were protected from deportation and provided work authorization. *See* 563 F. Supp. 157 (D.D.C. 1983) | | Reagan extended this policy in 1982, after Reps. Dixon (D-CA) and Kemp (R-NY) cosponsored resolution | From 1972-on, parole was used frequently for Soviet refugees when not enough conditional entries were statutorily available | |

AMERICAN IMMIGRATION COUNCIL

COMMUNITY EDUCATION CENTER • IMMIGRATION POLICY CENTER • INTERNATIONAL EXCHANGE CENTER • LEGAL ACTION CENTER

| Year(s) | 1979 | 1979 | 1980 | 1980 | 1981-1987 |
|---|---|---|---|---|---|
| **Relief Covered:** | Extend Voluntary Departure (EVD) for Nicaraguans | Extended Voluntary Departure (EVD) for Iranians | Extended Voluntary Departure (EVD) for Afghans | Parole of Cubans and Haitians during Mariel boatlift | Extended Voluntary Departure (EVD) for Poles |
| **# Affected:** | 3,600 | Unknown | Unknown | 123,000 paroled in US by 1981 | 7,000 (as of 1987) |
| **President(s):** | Carter | Carter | Carter | Carter | Reagan |
| **Other Notes:** | | In response to Iranian Revolution against Shah. | | | In response to Polish Communist government declaring martial law in 1981, after crackdown on Solidarity strikes. Initiated in 1981, extended in 1984 and 1987 |

AMERICAN IMMIGRATION COUNCIL

COMMUNITY EDUCATION CENTER • IMMIGRATION POLICY CENTER • INTERNATIONAL EXCHANGE CENTER • LEGAL ACTION CENTER

| Year(s) | 1987 | 1987 | 1989 | 1989 | 1990 |
|---|---|---|---|---|---|
| **Relief Covered:** | AG Meese directed INS not to deport Nicaraguans and to grant them work authorizations, if they demonstrated a "well-founded fear of persecution," even if denied asylum | Unauthorized children of some noncitizens who applied to legalize after 1986 immigration reform | Executive directive of deferred action for Chinese nationals following Tiananmen Square | Parole of Soviets and Indochinese, even though denied refugee status | Further executive order formalizing Deferred Enforced Departure (DED) for Chinese nationals following Tiananmen Square |
| **# Affected:** | Up to 200,000 | More than 100,000 families | 80,000 | 2,225 Indochinese in 1989; 5,000 Soviets as of 1989 | 80,000 |
| **President(s):** | Reagan | Reagan | Bush Sr. | Bush Sr. | Bush Sr. |
| **Other Notes:** | Legislation was pending. Ultimately, the Nicaraguan Adjustment and Central American Relief Act (NACARA) passed | Reagan's AG Meese also authorized INS to defer deportation proceedings for "compelling or humanitarian factors" | Visa overstays had to report to INS to benefit from deferred action and apply for work authorization. Bush: "I reemphasize my commitment… to never allow any action that would force the return of Chinese students if their lives or liberty are at risk." | | "Deferred Enforced Departure" is a stay of deportation, and often provision of work authorization, within the President's foreign relations power. Bush's executive order suspended deportations, provided work authorization for all Chinese nationals in the US as of 6/5/89, and waived a regulation to allow adjustment of status |

AMERICAN IMMIGRATION COUNCIL

COMMUNITY EDUCATION CENTER · IMMIGRATION POLICY CENTER · INTERNATIONAL EXCHANGE CENTER · LEGAL ACTION CENTER

| Year(s) | 1990 | 1991 | 1992 | 1994 | 1997 |
|---|---|---|---|---|---|
| **Relief Covered:** | Deferred deportation of unauthorized spouses *and* children of individuals legalized under 1986 Immigration Reform and Control Act (IRCA) | President directed AG to grant deferred enforced departure (DED) to Persian Gulf evacuees who were airlifted to US after 1990 Kuwait invasion | Bush Administration granted DED to certain El Salvadorans, even though and because their statutory TPS grant expired | Parole of further Cubans into the US. | Deferred Enforced Departure (DED) for Haitians in the US since before 1995 |
| **# Affected:** | Up to 1.5 million | 2,227 | 190,000 | ~28,000 | 40,000 |
| **President(s):** | Bush Sr. | Bush Sr. | Bush Sr., Clinton | Clinton | Clinton |
| **Other Notes:** | Bush INS Commissioner issued blanket "Family Fairness" policy, and dropped "compelling or humanitarian factors" requirement in prior executive action. Legislation had passed the Senate, but not the House, providing similar relief | Criteria: Those who had US citizen relatives or harbored US citizens during the invasion. Allowed evacuees to apply for permanent residency. A Kuwaiti doctor said, "I feel the President has finally put a happy ending on this tragic story." | President Clinton subsequently extended the DED grant until Dec. 31, 1994 | Included Cubans on the immigrant visa waiting list, unmarried sons and daughters of Cubans issued immigrant visas or granted refugee status, and family members who reside in the same household. Also paroled Cubans detained at Guantanamo and Panama | Legislation was pending to help these Haitians (Haitian Refugee Immigration Fairness Act of 1998 allowed these Haitians to obtain green card) |

AMERICAN IMMIGRATION COUNCIL

COMMUNITY EDUCATION CENTER • IMMIGRATION POLICY CENTER • INTERNATIONAL EXCHANGE CENTER • LEGAL ACTION CENTER

| Year(s) | 1997 | 1998 | 1999 | 2002 | 2005 |
|---|---|---|---|---|---|
| **Relief Covered:** | Deferred action to noncitizens who might gain relief through Violence Against Women Act (VAWA), if it passed | Attorney General temporarily suspended deportations to El Salvador, Guatemala, Honduras, and Nicaragua, in response to Hurricane Mitch | Deferred Enforced Departure (DED) for Liberians for 1 year | Executive order of expedited naturalization for green card holders who enlisted in military | Deferred action for foreign academic students who were affected by Hurricane Katrina |
| **# Affected:** | Unknown | 150,000 | 10,000 | Unknown | Unknown |
| **President(s):** | Clinton | Clinton | Clinton | Bush | Bush |
| **Other Notes:** | VAWA legislation was pending. Criteria: Battered noncitizens with approved LPR self-petitions, and their derivative children | | | Order eliminated a three-year wait, let the soldiers seek citizenship immediately and applied to anyone on active duty as of Sept. 11, 2001. Included Lance Cpl. José Gutiérrez, a Guatemalan who received U.S. status through SIJ and died in Iraq | Bush also suspended employer verification rules. Congress was considering legislation at the time |

AMERICAN IMMIGRATION COUNCIL

COMMUNITY EDUCATION CENTER • IMMIGRATION POLICY CENTER • INTERNATIONAL EXCHANGE CENTER • LEGAL ACTION CENTER

| Year(s) | 2006 | 2007 | 2009 | 2009 | 2010 |
|---|---|---|---|---|---|
| **Relief Covered:** | Established Cuban Medical Parole Program, to allow Cuban doctors conscripted abroad to apply for parole at US embassies | Deferred Enforced Departure (DED) for Liberians in 2007, whose TPS had statutorily expired | Extended Deferred Enforced Departure (DED) for qualified Liberians | Extended deferred action to widows and widowers of U.S. citizens, and their unmarried children under 21 | Parole-in-place to spouses, parents, and children of U.S. citizen military members |
| **# Affected:** | 1,574, as of Dec. 2010 | 3,600 | Unknown | Unknown | Unknown |
| **President(s):** | Bush | Bush | Obama | Obama | Obama |
| **Other Notes:** | Program still in place | | | | Granted on case-by-case basis. First grant of parole-in-place was under Bush Administration |

AMERICAN IMMIGRATION COUNCIL

COMMUNITY EDUCATION CENTER • IMMIGRATION POLICY CENTER • INTERNATIONAL EXCHANGE CENTER • LEGAL ACTION CENTER

| Year(s) | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|
| **Relief Covered:** | Parole to Haitian orphans who were in the process of being adopted by U.S. citizens | Extended Liberian DED through March 2013 | Deferred action for childhood arrivals (DACA) | Revised parole-in-place policy to spouses, parents, and children of U.S. citizen military members |
| **# Affected:** | Unknown | 3,600 | Up to 1.8 million | Unknown |
| **President(s):** | Obama | Obama | Obama | Obama |
| **Other Notes:** | Actions followed Haitian earthquake on January 12, 2010 | | Legislation was pending (i.e. the DREAM Act). Provided for a two-year renewable reprieve from deportation, and work authorization, for those meeting certain criteria. USCIS took significant actions to process applications | Revised policy so that "ordinarily" granted |

# EXHIBIT JJ

**Donald J. Trump**
@realDonaldTrump

Follow

Congress now has 6 months to legalize DACA (something the Obama Administration was unable to do). If they can't, I will revisit this issue!

5:38 PM - 5 Sep 2017

**24,097** Retweets **92,451** Likes

40K 24K 92K

Tweet your reply

**Rangappa nayak** @nayak_rangappa · Oct 18
Replying to @realDonaldTrump @Swamy39




**Sharon Gooding** @SharonGooding3 · Oct 18
Replying to @realDonaldTrump