1 | **MICHAEL N. FEUER**, City Attorney - SBN 111529x
2 | **JAMES P. CLARK,** Chief Deputy City Attorney – SBN 64780
  | **LEELA A. KAPUR,** Executive Assistant City Attorney – SBN 125548
3 | **VALERIE L. FLORES**, Managing Senior Assistant City Attorney – SBN 138572
  | **MICHAEL DUNDAS**, Deputy City Attorney – SBN 226930
4 | **ALEXANDER FREEDMAN**, Deputy City Attorney – SBN 289181
  | 200 North Main Street, City Hall East, Suite 800
5 | Los Angeles, California 90012
  | Telephone:  (213) 978-8130
6 | Facsimile: (213) 978-8312
  | E-mail: mike.dundas@lacity.org

*Attorneys for Amicus Curiae City of Los Angeles*

*Additional Counsel for Amici Curiae Listed in Appendix*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| REGENTS OF UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California, | Case No.   3:17-cv-05211-WHA<br>Related Case Nos.   3:17-cv-05235-WHA<br>3:17-cv-05329-WHA<br>3:17-cv-05380-WHA<br>3:17-cv-05813-WHA |
| Plaintiffs, | |
| v. | **BRIEF OF AMICI CURIAE THE CITY OF LOS ANGELES, 25 ADDITIONAL CITIES AND COUNTIES AND THE UNITED STATES CONFERENCE OF MAYORS IN SUPPORT OF PLAINTIFFS' JOINT MOTION FOR PROVISIONAL RELIEF IN ALL RELATED DACA PROCEEDINGS** |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, | |
| Defendants. | |
| | Date:   December 20, 2017<br>Time:   8:00 a.m.<br>Dept:   Courtroom 8<br>Judge:   Honorable William Alsup |

1

# Table of Contents

**I.**     DEFENDANTS' UNLAWFUL ACTION TO RESCIND THE DACA PROGRAM SHOULD BE PERMANENTLY ENJOINED ............1

  A. Defendants' Actions to Terminate DACA Violate the APA ......................................................2

      1.     DHS's Sole Stated Reason for Ending the DACA Program Was Conclusory and Relies upon Flawed Legal Analysis ...........................................................................2

      2.     The Stated Policies for Ending DACA Have No Basis In Fact ....................................5

  B. Defendants' Actions Fail To Provide Due Process of Law ........................................................8

  C. Defendants Should Be Equitably Estopped From Terminating DACA ...................................12

      1.     Estoppel Has Been Applied in Immigration-Related Matters ....................................13

      2.     Plaintiffs Can Establish the Elements of Estoppel ....................................................14

**II.**     CONCLUSION .................................................................15

# Table of Authorities

Page(s)

**Cases**

*Am. Forest Resource Coun. v. Ashe,*
 946 F. ...................................................................................................................4

*Appalachian Power Co. v. EPA,*
 208 F.3d 1015 (D.C. Cir. 2000) ...........................................................................15

*Bd. of Regents v. Roth,*
 408 U.S. 564 (1972) .............................................................................................10

*Community for Creative Non-Violence v. Pierce,*
 786 F.2d 1199 (D.C. Cir. 1986) .............................................................................4

*Connell v. Higginbotham,*
 403 U.S. 207 (1926) .............................................................................................10

*Goldberg v. Kelly,*
 397 U.S. 254 (1970) .............................................................................................10

*Goldsmith v. Board of Tax Appeals,*
 270 U.S. 117 (1926) .......................................................................................10, 11

*Heckler v. Community Health Servs.,*
 467 U.S. 51 (1984) .........................................................................................11, 12

*Immigration and Public Safety*
 (2017) .....................................................................................................................7

*INS v. Hibi,*
 414 U.S. 5 ...........................................................................................................13

*Montana v. Kennedy,*
 366 U.S. 308 (1961) .............................................................................................13

*Morrissey v. Brewer,*
 408 U.S. 471 (1972) ...............................................................................................9

*Moser v. United States,*
 341 U.S. 41 (1951) ...............................................................................................13

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
 463 U.S. 29 (1983) ............................................................................................1, 8

*Mukherjee v. INS*,
   793 F.2d 1006 (9th Cir. 1986)......................................................................................13

*National Ins. Co. v. Tidewater Co.*,
   337 U.S. 582 (1949) (Frankfurter, J., dissenting) .......................................................8

*National Treasury Employees Union v. Cornelius*,
   617 F. Supp. 365 (D.D.C. 1985) ..................................................................................4

*Natural Resources Defense Council, Inc. v. Rauch*,
   244 F. Supp. 3d 66 (D.D.C. 2017) ...............................................................................4

*Podea v. Acheson*,
   179 F.2d 306 (2d Cir. 1986).................................................................................12, 13

*Raley v. Ohio*,
   360 U.S. 423 (1959)....................................................................................................12

*Reno v. American-Arab Anti-Discrimination Comm.*,
   525 U.S. 471 (1999)......................................................................................................3

*Salgado-Diaz v. Ashcroft*,
   395 F.3d 1158 (9th Cir. 2005)....................................................................................13

*Santiago v. INS*,
   526 F.2d 488 (9th Cir. 1975) (en banc)......................................................................13

*St. Regis Paper Co. v. United States*,
   368 U.S. 208 (1961)....................................................................................................12

*Texas v. United States*,
   787 F.3d 733 (5th Cir. 2015)....................................................................................2, 3

*United States v. Georgia-Pacific Co.*,
   421 F.2d 92 (9th Cir. 1970).........................................................................................15

*United States v. Pennsylvania*,
   411 U.S 655 (1973).....................................................................................................12

*Zadvydas v. Davis*,
   533 U.S. 678 (2001)......................................................................................................8

**Constitution**

U.S. Const. amend. V ........................................................................................................8

**Statutes**

5 U.S.C. § 551(1) ..............................................................................................................1

5 U.S.C. § 551(13) ............................................................................................................1

5 U.S.C. § 704 ..................................................................................................................1

5 U.S.C. § 706(2)(D) ........................................................................................................2

8 U.S.C. § 1101 *et seq.* ....................................................................................................2

8 U.S.C. § 1103(a) ............................................................................................................3

**Other Authorities**

8 CFR § 274a.12(a)(11) ....................................................................................................3

CATO Institute, *The Economic and Fiscal Impact of Repealing DACA* (2017),
        Washington, D.C. ......................................................................................................6

Center for American Progress. DACA Recipients' Economic and Educational
        Gains Continue to Grow (2017) Washington, D.C. ..................................................6

DHS Frequently Asked Questions: Rescission of Deferred Action for Childhood
        Arrivals (DACA) ....................................................................................................11

DHS Memorandum titled Exercising Prosecutorial Discretion with Respect to
        Individuals Who Came to the United States as Children (June 15, 2012) .............9,11

DHS Memorandum titled Memorandum on Rescission of Deferred Action For
        Childhood Arrivals (September 5, 2017) ................................................................2

Johnson, Kirk, *A DACA Recipient with an American Life Considers the Future*,
        THE NEW YORKER (September 13, 2017) ............................................................7

Letter by Secretary Jeh Johnson dated December 30, 2016 ............................................10

Letter from Attorney General Sessions to DHS Acting Secretary Elaine Duke on
        the Rescission of DACA (September 4, 2017) ........................................................2

New American Economy, *Immigrants and the economy in: California District 12*
        (2017) ......................................................................................................................5

New American Economy, *Immigrants and the economy in: Philadelphia Metro Area* (2017) ..................................................................................................5

New American Economy, *New Americans in Los Angeles* (2017) ..................................5

REAL ID Act of 2005, Pub. L. No. 109-13 ...................................................................3

Remarks by President Obama. June 15, 2012...............................................................1

The Sentencing Project, *Immigration and Public Safety* (2017), Washington, D.C.........................7

Theodore, Nik, University of Chicago, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement* (May 2013) ...............................................7

Ulloa, Jazmine, *L.A. Police Chief Charlie Beck endorses 'sanctuary state' bill that Eric Holder hails as 'constitutional'*, THE LOS ANGELES TIMES (June 19, 2017) .........................................................................................................7

United States Bureau of Labor Statistics 2016 foreign-born labor force statistics...........................6

United States Census Bureau. Survey of Business Owners 2007-2012............................5

United States Citizenship and Immigration Services DACA Data dated "As of September 4, 2017"................................................................................6

United States Citizenship and Immigration Services DACA Frequently Asked Questions................................................................................9, 10

United States Citizenship and Immigration Services Instructions for Consideration of Deferred Action for Childhood Arrivals.......................................................9

United States v. Texas, 2015 U.S. Briefs 674 (Initial Brief of Appellant-Petitioner) (Mar. 1, 2016) ............................................................................4

## ARGUMENT

This litigation is about protecting young people who were brought here by their parents, often as infants. These children typically know no country besides the United States and often times speak no language besides English. They study in our schools, work in our economy and pledge allegiance to our flag. As President Obama stated the day the program was created, they "are Americans in their hearts, in their minds, in every single way but one: on paper."[1]

In terminating DACA, Defendants acted capriciously, failing to comply with the Administrative Procedure Act (APA). Neither the Department of Homeland Security (DHS) nor Attorney General exhibited reasoned decision-making in acting. To the contrary, Defendants provided no supportable rationale for their decision, in part because they failed to follow the APA's notice-and-comment process. To the extent Defendants did cite reasons for ending DACA, those are disproven by clear evidence.

*Amici*, twenty-six cities and counties and the United States Conference of Mayors, fully endorse Plaintiffs' APA theories in support of their Joint Motion for Provisional Relief. Given, however, that this may be the only opportunity to address this Court, *Amici* also want to address constitutional and equitable theories, which have been reserved for subsequent consideration.

## I.   DEFENDANTS' UNLAWFUL ACTION TO RESCIND THE DACA PROGRAM SHOULD BE PERMANENTLY ENJOINED

### A.   <u>Defendants' Actions to Terminate DACA Violate the APA</u>

DHS is an "agency" under the APA, 5 U.S.C. § 551(1), and the September 5, 2017 memorandum from Acting DHS Secretary Elaine Duke rescinding DACA is an "agency action" subject to judicial review. 5 U.S.C. §§ 551(13), 704. Accordingly, DHS must employ "reasoned decisionmaking" when taking a final agency action. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983). Any action taken "without observance of procedure" or that is "arbitrary" or "capricious" is

---

[1] Remarks by President Obama. June 15, 2012. http://tinyurl.com/Obama-6-15-12

"unlawful" and must be "set aside." 5 U.S.C. § 706(2)(D).

1. **DHS's Sole Stated Reason for Ending the DACA Program Was Conclusory and Relies upon Flawed Legal Analysis**

In the DHS memo rescinding DACA, Defendants state in a conclusory manner that it was "clear" DACA "should be terminated."[2] The memo presumes that because a Texas district court preliminarily enjoined a separate DHS program called Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) in 2015, DACA must suffer from "the same legal and constitutional defects."[3] In justifying this, the Rescission Memo leans entirely on a 362-word letter from the Attorney General.

In his short letter, the Attorney General asserts – by fiat – that: 1) DACA is just like DAPA; 2) DAPA was preliminarily enjoined on "multiple legal grounds," and that injunction was affirmed by the Fifth Circuit; therefore, 3) DACA is "likely" to be similarly enjoined so DHS should rescind the program immediately.[4] But DACA is not just like DAPA. Even the Fifth Circuit opinion upholding the DAPA injunction, upon which the Attorney General singularly relies as the basis for his legal conclusions, clearly states that the two programs "are not completely analogous." *Texas v. United States*, 787 F.3d 733, 764 (5th Cir. 2015) (finding that "many more persons are eligible for DAPA"; "eligibility for DACA was restricted to a younger population"; and DAPA had different "discretionary criteria.").

Moreover, the Fifth Circuit reached an erroneous conclusion in finding that the states challenging DAPA were likely to succeed on the merits of their APA claim. First, the Fifth Circuit erred in focusing on the discretion DAPA afforded rank-and-file DHS agents. *Id.* At 764-65. Congress gave the DHS Secretary, not lower level employees, discretion to administer the Immigration and Nationality Act (INA). 8 U.S.C. § 1101 *et seq*. The INA tasks the Secretary "with the administration and enforcement" of

---

[2] DHS Memorandum titled *Memorandum on Rescission of Deferred Action For Childhood Arrivals* (Rescission Memo)(September 5, 2017), available at: http://tinyurl.com/2017Memo.
[3] *Id.*, quoting Letter from Attorney General Sessions to DHS Acting Secretary Elaine Duke on the Rescission of DACA (September 4, 2017) (Sessions Letter), available at: http://tinyurl.com/AG-Duke-Letter.
[4] Sessions Letter, supra, note 3.

immigration laws and with "directing" all DHS employees in removal proceedings. 8 U.S.C. § 1103(a). The Secretary's choices in defining DAPA reflects the very "discretion" vested in the Secretary by Congress.

Second, although acknowledging that DHS's DAPA policy "exudes discretion," the Fifth Circuit erred when it found that, in practice, federal officials considering applications rarely issued denials, suggesting they could not exercise discretion, and therefore the notice-and-comment rulemaking applied. *Texas,* 787 F.3d. at 764-765. This assumption – that relatively minimal application denials reflects a lack of discretion – ignores the fact that most applicants would only apply if they were confident they would meet the program criteria. Indeed, few individuals who were uncertain of eligibility would risk applying when an unsuccessful application could put them in danger of removal. Many *Amici* organized immigration workshops for DAPA and DACA applicants advising of such risks. Thus, the Fifth Circuit's ruling was based on faulty logic that disregards the obvious realities of the deferred action application process.

Third, the Fifth Circuit was mistaken in suggesting that DAPA is outside the scope of the INA. In fact, "Deferred action" is one of the well-established ways in which DHS exercises enforcement discretion. The Supreme Court has recognized that deferred action is "a regular practice" in which DHS exercises "discretion for humanitarian reasons or simply for its own convenience." *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483-84 (1999).

In fact, Congress has enacted legislation recognizing the DHS practice of granting deferred action. For example, the REAL ID Act of 2005, Pub. L. No. 109-13, allows states to issue driver's licenses to those with "approved deferred action status." Similarly, since 1981, federal regulations – created by notice and comment rulemaking - allow those "granted deferred action" to "apply for employment authorization." 8 CFR § 274a.12(a)(11). And Congress has yet to overturn this regulation in three-plus decades.

Congress has never appropriated funding sufficient to remove all undocumented immigrants. This is why DHS, and its predecessors, implemented more than 20 deferred

action policies over the last 50 years.[5]  Programs like DAPA enable DHS to focus resources on removing serious criminals by deferring action on low priorities. As the D.C. Circuit wrote in *Community for Creative Non-Violence v. Pierce*, 786 F.2d 1199, 1201 (D.C. Cir. 1986), "[t]he power to decide when to investigate, and when to prosecute, lies at the core of the [Executive] to see to the faithful execution of the laws."

The only reason DHS gave for rescinding the program was that DACA was "likely" to be unlawful. DACA, for the same reasons noted above, is lawful, which means that Defendants' actions are in violation of the APA if only because there is no other proffered agency justification for the rescission by DHS. *See Natural Resources Defense Council, Inc. v. Rauch*, 244 F. Supp. 3d 66, 96 (D.D.C. 2017) (stating "suffice it to say, it is arbitrary and capricious for an agency to base its decision on a factual premise that the record plainly showed to be wrong.").

Even if creating DACA required notice-and-comment to implement, DHS would, at the very least, be required to engage in a similar notice-and-comment process to rescind the program. *See, e.g., Am. Forest Resource Coun. v. Ashe*, 946 F. Supp. 2d 1, 26 (D.D.C. 2013) ("[O]rdinarily an agency rule may not be repealed unless certain procedures, including public notice and comment, are followed, and that this is true even where the rule at issue may be defective."); *National Treasury Employees Union v. Cornelius*, 617 F. Supp. 365, 371 (D.D.C. 1985).

## 2.    The Stated Policies for Ending DACA Have No Basis In Fact

Outside of the Rescission Memo, the only other reason or rationale Defendants offered to justify the DACA termination came in remarks by Attorney General Sessions in a speech delivered the same day DHS took action. In that speech, the Attorney General asserted that eliminating DACA was necessary to "protect the overall health and well-being of our Republic" and to "save lives, protect communities and taxpayers, and prevent human suffering."

---

[5] *United States v. Texas*, 2015 U.S. Briefs 674 (Initial Brief of Appellant-Petitioner at 5) (Mar. 1, 2016).

Not only do the Attorney General's misstatements undermine the core values of *Amici* cities and counties, the true facts contradict his own stated purposes for this action. Foreign-born residents make up almost half of Los Angeles' workforce; they contribute over $3 billion in state and local taxes each year; they own businesses that generate $3.5 billion in annual income for city residents; and, they have local spending power of almost $30 billion a year.[6] Eliminating DACA will negatively impact any and all American citizens living in Los Angeles by removing tens of thousands of these foreign-born workers, business owners and taxpayers from the city's economy.

The same economic harm would befall other *Amici*. More than 51% of all of New York City's business owners are foreign-born and foreign-born residents are responsible for 32% ($100 billion) of all income earned by New York City residents. New York City families that include immigrant members pay an estimated $8 billion in city and state personal income taxes and approximately $2 billion in city property taxes.[7] Similarly, 35% of business owners in San Francisco are immigrants, including 12,756 foreign-born entrepreneurs.[8] Entrepreneurs in the Philadelphia metro region, of which 40,171 are foreign-born, are 43.1% more likely to be immigrants than native-born.[9] This entrepreneurship creates jobs and increases the tax base.

Comparable statistics can be shown for other *Amici* and these statistics cannot be discounted as generalizations. DACA recipients are an important and thriving subset of the large foreign-born populations that are critical to the economy of *Amici* cities and counties. The DACA program has provided deferred action to some 800,000 applicants, 91% of whom are employed, which equates to 1 in 33 (3%) of *all foreign-born persons*

---

[6] New American Economy, *New Americans in Los Angeles* (2017) available at: http://www.newamericaneconomy.org/wp-content/uploads/2017/02/LA_Brief_V8.pdf
[7] NYC Comptroller Report, *Our Immigrant Population Helps Power NYC Economy* (January 11, 2017), available at: http://tinyurl.com/NYC-Comptroller-Report
[8] United States Census Bureau. Survey of Business Owners 2007-2012; New American Economy, *Immigrants and the economy in: California District 12* (2017) available at: http://www.newamericaneconomy.org/locations/california/california-district-12/
[9] New American Economy, *Immigrants and the economy in: Philadelphia Metro Area* (2017) available at: http://www.newamericaneconomy.org/city/philadelphia/

1   in the United States labor force.[10]

2       Studies show that DACA recipients across the board obtain higher earnings and

3   have a higher employment rate, and higher tax compliance rate than similarly-situated

4   undocumented immigrants.[11]   Therefore, it is clear that the best way to "protect

5   taxpayers" – a stated purpose of the Attorney General – is to maintain DACA.

6   Eliminating the program will result in decreased tax contributions, reduced employment

7   rates and lower effective tax rates for our resident populations. There is a sociological

8   term for this type of economic retrenchment by achieving young immigrant populations;

9   the "transition to illegality."

10       According to Harvard Assistant Professor Roberto Gonzales, author of the book

11   "Lives in Limbo: Undocumented and Coming of Age in America," terminating the

12   DACA program and returning people to undocumented status, will force DACA

13   recipients to negatively adjust their expectations of what they can achieve in life.

14   Gonzales' own studies show that most will regress (i.e., move backward) in their

15   schooling and careers, in part because they will have been disavowed by the only

16   government they have ever known. Put in economic terms that directly contradict the

17   Attorney General's statements and negatively impacts *Amici*, ending DACA would

18   reduce the United States gross national product by $460 billion over the next ten years

19   and result in $60 billion in lost federal, state and local tax revenues during that same

20   time.[12]

21       Moreover, despite the Attorney General's assertion that terminating DACA will

22   "save lives," ending the program will only make communities less safe by pushing

23   recipients deep into the shadows. Numerous academic studies examining the impact of

24

25   [10] See U.S. Citizenship and Immigration Services DACA Data dated "As of September 4, 2017" (USCIS DATA), available at: http://tinyurl.com/USCIS-data; Center for American Progress. *DACA Recipients' Economic and Educational Gains*

26   *Continue to Grow* (2017) (CAP Study) Washington, D.C., available at: http://tinyurl.com/CAPDACAstudy; US Bureau of Labor Statistics 2016 foreign-born labor force statistics, available at: http://tinyurl.com/BLS-foreignborn

27   [11] CAP Study, supra, note 10.
[12] *Id.*; see also *The Economic and Fiscal Impact of Repealing DACA* (2017), CATO Institute, Washington, D.C, available

28   at: http://tinyurl.com/CATODACAstudy

immigrants on their adopted communities reveal that communities with large immigrant populations, like *Amici*, have, at a bare minimum, shared in and, often, outpaced the nationwide crime drop over the past 30 years.[13]

But because they had to provide personal and biometric data to DHS to qualify for DACA, recipients will feel subject to deportation at any moment, making them statistically less likely to report crimes or come forward to assist in criminal investigations being conducted by our local sheriffs and police departments.[14]  The same helplessness can result in unreported code enforcement and wage theft violations, crimes which are enforced by *Amici*.  Slum landlords and sweatshop owners are likely to prey upon former DACA recipients if the program is terminated, resulting in unsafe and unhealthy conditions in the workplace and at home.

*Amici*'s law enforcement leadership consistently remind us that all communities are safer when victims and witnesses of crime, irrespective of immigration status, cooperate with law enforcement. For example, Los Angeles Police Department (LAPD) Chief Charlie Beck has routinely stated that his department depends on "immigrant communities, not only to keep them safe but to keep [the public] safe. Without that cooperation we all suffer."[15]

Because of the security provided by the program, DACA recipients have consistently demonstrated important contributions to public safety. In May 2014, a DACA recipient residing in Los Angeles confronted an armed intruder in her apartment complex, who struck her in the head with a steel baton.[16]  After the intruder fled, the DACA recipient helped LAPD identify the assailant, who was subsequently arrested. LAPD reported that associates of the intruder were looking for the victim, which

[13] *Immigration and Public Safety* (2017), The Sentencing Project, Washington, D.C., available at http://www.sentencingproject.org/wp-content/uploads/2017/03/Immigration-and-Public-Safety.pdf
[14] *See, e.g.,* Theodore, Nik, University of Chicago, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement* (May 2013), available at: http://tinyurl.com/ChicagoPoliceStudy
[15] Ulloa, Jazmine, *L.A. Police Chief Charlie Beck endorses 'sanctuary state' bill that Eric Holder hails as 'constitutional',* THE LOS ANGELES TIMES (June 19, 2017), available at: http://tinyurl.com/Beckstory
[16] Johnson, Kirk, *A DACA Recipient with an American Life Considers the Future,* THE NEW YORKER (September 13, 2017), available at: http://tinyurl.com/crimereporting

1  resulted in her being placed in witness protection. *Id.* Without the protection DACA

2  program, those looking for the victim would simply need to report her to Immigration

3  and Customs Enforcement (ICE) for removal, simply because she cooperated.

4         Ending DACA will make recipients much less likely to report criminal activity to

5  law enforcement for fear they could place themselves at risk of deportation. That will

6  cause crimes to go unreported and limit the success of police investigations, thereby

7  greatly undermining public safety for all of our residents in each our communities. An

8  agency rule must be found to be arbitrary and capricious "if the agency … offered an

9  explanation for its decision that runs counter to the evidence before the agency, or is so

10  implausible that it could not be ascribed to a difference in view or the product of agency

11  expertise." *Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 43. The explanations offered by

12  Defendants in seeking to end DACA are just "so implausible."

**B.      Defendants' Actions Fail To Provide Due Process of Law**

14         To quote Justice Frankfurter, "due process of law" and "liberty" are "great

15  [constitutional] concepts . . . purposely left to gather meaning from experience. … They

16  relate to the whole domain of social and economic fact, and the statesmen who founded

17  this Nation knew too well that only a stagnant society remains unchanged." *National*

18  *Ins. Co. v. Tidewater Co.*, 337 U.S. 582, 646 (1949) (Frankfurter, J., dissenting).

19         Thus, the harm to *Amici* in rescinding DACA is only amplified when the federal

20  government fails to afford the most basic protections guaranteed by the Constitution.

21  Such actions send a message to our immigrant residents that their government, including

22  *Amici*, is not to be trusted. When in reality *Amici* are fighting to protect these most basic

23  rights, because any person present in the United States, including every DACA recipient

24  living in our respective cities and counties, is guaranteed procedural due process before

25  he or she may be deprived of a liberty interest. U.S. Const. amend. V; *Zadvydas v. Davis*,

26  533 U.S. 678, 693-94 (2001).

27         In this instance, "liberty" includes not just freedom from detention or deportation,

28  but the freedom to enjoy the very benefits conferred by the DACA program, such as the

freedom to work, own a home, raise a family, serve your country and to form the "enduring attachments of normal life." *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972).

These benefits flow directly from the dual promises of the DACA program, i.e., the ability to renew one's DACA status every two years and the prohibition on use of personal information for immigration enforcement. But for these two promises, the risks to a DACA-eligible person of identifying oneself to the immigration enforcement agency would have far outweighed any short-term benefit earned, which is why the 2012 DHS memo implementing DACA made clear in multiple paragraphs that DACA status was "*subject to renewal*" and the official USCIS form application instructions state that "information provided" is "protected from disclosure to ICE and U.S Customs and Border Protection (CBP) for the purpose of immigration enforcement proceedings unless the requestor meets the criteria for the issuance of a Notice To Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance."[17]

In order to renew one's DACA status, USCIS sets forth three "guidelines" that "must be met" for renewal: 1) do not depart the United States on or after August 15, 2012, without advance parole; 2) continue to reside in the United States after having submitted your previously approved DACA application; and 3) do not get convicted of a felony, a significant misdemeanor, or three or more misdemeanors, or otherwise pose a threat to national security or public safety.[18]

DHS's detailed DACA policies, together with the Napolitano Memo and the remarks of the President of the United States – delivered with the purpose of "lifting the shadow of deportation" – gave DACA recipients a liberty interest in the dual promises of the DACA program (i.e., renewal and confidentiality). Consistently, Supreme Court cases have found liberty interests in the continued receipt of welfare payments or of a

---

[17] DHS Memorandum titled *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* (June 15, 2012) (Napolitano Memo), available at: http://tinyurl.com/2012Memo; see also USCIS Instructions for Consideration of Deferred Action for Childhood Arrivals, at pg. 13, available at: http://tinyurl.com/USCISInstructions

[18] USCIS DACA Frequently Asked Questions (USCIS DACA FAQ), at Question 51, available at: https://www.uscis.gov/archive/frequently-asked-questions

public school teaching position despite lack of tenure protections or employment contract because of an "implied promised of continued employment." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972) (citing *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970) and *Connell v. Higginbotham*, 403 U.S. 207, 208 (1971)).

In *Bd. of Regents v. Roth*, the Supreme Court reasoned that to have a protected interest in a benefit, a person clearly must have "more than an abstract need." The person "must, instead, have a legitimate claim of entitlement to it." *Id.* DACA recipients have earned their "claim of entitlement" to renewal and confidentiality. Put plainly, DACA recipients' self-identification to DHS was likely an *irreversible* action taken at the behest and encouragement of the federal government. DACA applicants would not have taken the risk of sharing intimate factual details and biometric data about themselves and their families – serving up removal from the country on a platter – without the promises made by Defendants. Former Secretary of Homeland Security Jeh Johnson confirmed as much in a letter to Congresswoman Judy Chu when he wrote, "DACA applicants most assuredly relied" upon the "representations made by the U.S. government."[19]

Defendants may choose to highlight that USCIS retained "discretion to determine whether deferred action is appropriate in any given case even if the guidelines are met."[20] But the fact that DHS retained "discretion" in granting DACA status does not cure Defendants' unconstitutional actions. The Supreme Court has held that having discretion over the issuance of benefits does not eliminate the need to provide Due Process. See *Goldsmith v. Board of Tax Appeals*, 270 U.S. 117, 123 (1926).

In *Goldsmith,* the petitioner was a lawyer who had been refused admission to practice before the United States Board of Tax Appeals. The Board had published rules, which provided "that the Board may in its discretion deny admission to any applicant, or suspend or disbar any person after admission." *Id.* at 119. Under its discretionary power,

---

[19] Letter by Secretary Jeh Johnson dated December 30, 2016, available at: http://tinyurl.com/JehJohnsonLetter
[20] USCIS DACA FAQ, at Question 51, supra note 18.

the Board denied admission to the petitioner without a hearing or stating a reason for the denial. The Supreme Court stated that the rules gave the petitioner an interest and claim to practice before the Board to which procedural due process requirements applied. Specifically, the Board's discretionary power "must be construed to mean the exercise of a discretion to be exercised after fair investigation, with such a notice, hearing and opportunity to answer for the applicant as would constitute due process." *Id.*, at 123.

Assuming arguendo that Defendants are correct in stating that the Napolitano Memo did not grant any substantive rights, i.e., the memo simply set forth the criteria under which DHS had the discretion to grant deferred action on a case-by-case basis, this does not justify Defendants' attempt to terminate deferred action and rescind the valuable work authorizations from 690,000 active-DACA recipients in a blanket fashion without a hearing or similar individualized determination for each and every DACA-recipient. In other words, even if the Napolitano Memo did not alter one's lawful status, across-the-board revocation of deferred action certainly does.

Therefore, Defendants' actions in: 1) terminating the program – depriving DACA recipients of their right to renew along with all of the ensuing benefits that come with DACA status – and; 2) opening recipients' personal information to use by ICE in removal proceedings,[21] violates the Due Process rights of DACA recipients and Plaintiffs in these related actions, who, like *Amici,* have employed, educated, invested in and provided services to our DACA residents.

**C.   Defendants Should Be Equitably Estopped From Terminating DACA**

The United States Supreme Court has recognized that, although rare, the federal government may be estopped from enforcing the law when the estoppel is required to serve "some minimum standard of decency, honor and reliability in … dealing with [the federal] Government." *Heckler v. Community Health Servs.*, 467 U.S. 51, 59-61 (1984)

---

[21] DHS posted Frequently Asked Questions about the "rescission" of DACA on September 5, 2017. In that FAQ, DHS states that information previously "protected from disclosure," see, Napolitano Memo, supra n. 17, would now, "generally" speaking, "not be <u>proactively</u> provided to ICE and CBP" (emphasis added). DHS *Frequently Asked Questions: Rescission of Deferred Action for Childhood Arrivals (DACA)*, at Question 8, available at: http://tinyurl.com/DHS-DACA-FAQ

("Estoppel is an equitable doctrine invoked to avoid injustice in particular cases."),
citing *St. Regis Paper Co. v. United States*, 368 U.S. 208, 229 (1961) ("Our Government
should not, by picayunish haggling over the scope of its promise, permit one of its arms
to do that which, by any fair construction, the Government has given its word that no
arm will do."). *See also U.S. v. Pennsylvania*, 411 U.S 655 674- 675 (1973) (estopping
government from criminally charging a company relying on representations from the
Army Corps of Engineers that permit was not needed for river discharges); *Raley v.
Ohio*, 360 U.S. 423, 438 (1959) ("indefensible entrapment of state" to entertain a fifth
amendment privilege against self-incrimination and then prosecute witnesses for
exercising the privilege against self-incrimination).

As governmental subdivisions themselves, *Amici* do not lightly embrace a claim
of estoppel against the federal government. But the compelling circumstances here
present the rare case where it is appropriate. As noted, the federal government has
induced hundreds of thousands of undocumented young persons to irrevocably change
their position by identifying themselves to the government—including with biometric
data. These enrollees were further encouraged to "come out of the shadows" and
fundamentally rearrange their lives—acts that are irrevocable or reversible only at
substantial human cost. And these acts were not the just the foreseeable effects of the
federal government's guidance but rather what the guidance was at its core designed to
induce. Under these exceptional circumstances, holding the United States to the dual
promises of the DACA program – renewability of enrollment and confidentiality of
information – is necessary to ensure "some minimum standard of decency, honor and
reliability in … dealing with the Government." *Heckler*, 467 U.S. at 59-61.

### 1.   Estoppel Has Been Applied in Immigration-Related Matters

The United States Supreme Court has applied estoppel or anti-entrapment
"fairness" doctrines in immigration cases. *See INS v. Hibi*, 414 U.S. 5, 8-9; *Montana v.
Kennedy*, 366 U.S. 308, 314-315 (1961), citing *Podea v. Acheson*, 179 F.2d 306 (2d Cir.
1950) (holding that U.S. citizen conscripted into Romanian army while studying abroad

was wrongfully denied repatriation due to erroneous advice from State Department).

In *Moser v. United States*, 341 U.S. 41, 47 (1951), although the Supreme Court expressly declined to apply "estoppel" to the federal government, it nevertheless held that "fairness" precluded the application of a federal debarment statement that would have rendered ineligible for citizenship a Swiss man who claimed exemption from United States military service. The relevant statute provided that anyone who applied for relief from service on the basis of foreign citizenship would be debarred from becoming a United States citizen. Mr. Moser had received erroneous advice from the Swiss Legation, which misled him into believing his application for exemption would not foreclose his later application for United States Citizenship. The *Moser* court held:

> Petitioner did not knowingly and intentionally waive his rights to citizenship. In fact, because of the misleading circumstances of this case, he never had an opportunity to make an intelligent election between the diametrically opposed courses required as a matter of strict law. . . . [T]o bar petitioner, nothing less than an intelligent waiver is required by elementary fairness.

*Id. (citation omitted).*

Lower courts, too, have held that estoppel against the government is available in an immigration context, when warranted. *See Salgado-Diaz v. Ashcroft*, 395 F.3d 1158, 1165 (9th Cir. 2005) (government estopped from relying on evidence of violation of immigration laws which it caused individual to commit); *Mukherjee v. INS*, 793 F.2d 1006, 1008-09 (9th Cir. 1986) (outlining elements of equitable estoppel against the government); *Santiago v. INS*, 526 F.2d 488, 492 (9th Cir. 1975) (en banc) ("believe[ing] that estoppel is available in such cases where the particular facts warrant it.").

## 2.   Plaintiffs Can Establish the Elements of Estoppel

The elements of estoppel require a showing that:"1) the party to be estopped knows the facts; 2) the party intends that his or her conduct will be acted on; 3) the claimant must be ignorant of the true facts; 4) and the claimant must detrimentally rely on the other party's conduct." *Salgado-Diaz, supra,* 395 F.3d at 1166.

Here, Plaintiffs satisfy the elements of estoppel. First, the federal government

established a deferred action program aimed at minors and young adults who were brought here before they were old enough to consent to entry. The program, by design, applied to vulnerable residents who lived in the United States but could not legally work, attend college or travel. The government further knew that DACA would confer significant benefits, and, if taken away, recipients would suffer severe consequences.

Second, the federal government intended for, and outright encouraged, undocumented individuals to request deferred action and then rearrange their lives around the opportunities DACA presented. President Trump himself gave repeated assurances to recipients that the benefits they obtained would not be taken away. For example, in January 2017, President Trump promised DACA recipients that "[t]hey shouldn't be very worried. I do have a big heart. We're going to take care of everybody." Further, after DHS announced it was terminating DACA, President Trump tweeted that if Congress does not act to protect DACA recipients, he "will revisit the issue!"[22] Thus, current DACA recipients and individuals applying for the first time continued to be induced by the country's chief executive.

Third, DACA recipients could not reasonably have been aware that Defendants would terminate the program if they continued to comply with the rules. President Obama, in enacting the program, stated that DACA's goal was to have talented young people "get right with the law" and "come out of the shadows." Use of these terms is telling, in that there was a reason the DACA-eligible were hiding in the shadows. These were aspirational applicants desperate for legitimacy. And they were young, some still minors, and few of them had attorneys. Clearly, they believed the Defendants' dual promises that their status would be "renewable" and their information "protected."

Fourth, DACA recipients relied on the federal government's representation to their detriment. DACA recipients put themselves at significant risk of removal by admitting to unlawful entry and disclosing information about themselves and their

---

[22] Available at: https://twitter.com/realDonaldTrump/status/905228667336499200

family. Recipients also made significant changes to their lives after receiving deferred action, including investing substantial amounts of time and money in education, home ownership and the pursuit of professional opportunities, including military service, all of which could be rendered useless. To be sure, the DACA memo included a statement that applicants had no right to rely on it, but such boilerplate disclaimers do not always carry the day when they clash with guidance's broader substance and purpose. *See, e.g., Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022-23 (D.C. Cir. 2000). Here, the recipients were vulnerable parties whose substantial reliance on the Memo's assurances was all but certain – and indeed intended – as a practical matter.

In addition, it should be highlighted that fairness and justice are fundamental to the concept of estoppel. As the Ninth Circuit has stated, "[E]quitable estoppel is a doctrine … based upon consideration of justice and good conscience. … Equitable estoppel is a rule of justice." *United States v. Georgia-Pacific Co.*, 421 F.2d 92 (9th Cir. 1970). Hundreds of thousands of *Amici*'s residents rearranged their lives to take advantage of their first opportunity to establish stable lives in the United States. They had every reason to assume that they would continue to be eligible for DACA so long as they continued to respect the law and program eligibility requirements. A great injustice would result if hundreds of thousands of our residents are stripped of the great benefits of the program after they put their trust in the federal government.

## II.    CONCLUSION

*Amici* respectfully urge the Court to issue a nationwide injunction preventing Defendants from terminating DACA or using information obtained from DACA recipients for removal proceedings.

Dated:  November 1, 2017   **MICHAEL N. FEUER**, City Attorney

By: _____

**MICHAEL N. FEUER,** City Attorney
*Attorneys for Amicus Curiae City of Los Angeles*
*Additional Counsel for Amici Curiae Listed in Appendix*

15

1
2
                                      **APPENDIX**
3                           *Additional Counsel for Amici Curiae*
4
5
6       ANNE L. MORGAN                          EUGENE O'FLAHERTY
        City Attorney, City of Austin           Corporation Counsel for the City of
7       MICHAEL SIEGEL                          Boston
        Assistant City Attorney, City of Austin One City Hall Square, Room 615
8       PO Box 1546                             Boston, MA 02201
        Austin, TX 78767                        *Attorney for the City of Boston*
9       *Attorneys for the City of Austin*

10      NANCY E. GLOWA                          CHERYL WATSON FISHER
        City Solicitor                          City Solicitor of the City of Chelsea
11      795 Massachusetts Avenue                500 Broadway, Room 307
        Cambridge, MA 02139                     Chelsea, MA 02150
12      *Attorney for the City of Cambridge*    *Attorney for the City of Chelsea*

13
14      EDWARD N. SISKEL                        KIMBERLY M. FOXX
        Corporation Counsel of the City of Chicago States Attorney for Cook County
15      30 N. LaSalle Street, Suite 800         69 W. Washington, 32nd Floor
        Chicago, IL 60602                       Chicago, IL 60602
16      *Attorney for the City of Chicago*      *Attorney for Cook County*

17      KRISTIN M. BRONSON                      KARL A. RACINE
        City Attorney of the City and County of Attorney General, District of Columbia
18      Denver                                  One Judiciary Square
        1437 Bannock St., Room 353              441 4th Street NW, Suite 1100 South
19      Denver, CO 80202                        Washington, DC 20001
        *Attorney for the City and County of Denver* *Attorney for the District of Columbia*
20
21      DONNA Y. L. LEONG                       RONALD C. LEWIS
        Corporation Counsel                     City Attorney of the City of Houston
22      530 S. King St., Room 110               900 Bagby, 4th Floor
        Honolulu, HI 96813                      Houston, Texas 77002
23      *Attorney for City and County of Honolulu* *Attorney for the City of Houston*
24
25      DANIEL T. SATTERBERG                    SUSAN SEGAL
        King County Prosecuting Attorney        Minneapolis City Attorney
26      516 Fourth Avenue, W400                 350 S. Fifth St. - Room #210
        Seattle, WA 98104                       Minneapolis, MN 55415
27      *Attorney for King County*              *Attorney for the City of Minneapolis*
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ZACHARY W. CARTER
Corporation Counsel of the City of New York
100 Church Street
New York, NY 10007
*Attorney for the City of New York*

BARBARA J. PARKER
City Attorney, City of Oakland
One Frank H. Ogawa Plaza, Sixth Floor
Oakland, CA 94612
*Attorney for the City of Oakland*

SOZI PEDRO TULANTE
City Solicitor of the City of Philadelphia
1515 Arch Street, 17th Floor
Philadelphia, PA 19102
*Attorney for the City of Philadelphia*

TRACY P. REEVE
City Attorney of the City of Portland
1221 SW Fourth Avenue, Suite 430
Portland, OR 97240
*Attorney for the City of Portland*

JEFFREY DANA
City Solicitor of the City of Providence
444 Westminster Street, Suite 220
Providence, RI 02903
*Attorney for City of Providence*

BRIAN F. CURRAN
Corporation Counsel of the City of Rochester
30 Church Street, Room 400A
Rochester, NY 14614
*Attorney for the City of Rochester*

MATTHEW D. RUYAK
Interim City Attorney of the City of
Sacramento
915 I Street, Fourth Floor
Sacramento, CA 95814
*Attorney for the City of Sacramento*

DENNIS J. HERRERA
City Attorney for the City and County of
San Francisco
City Hall Room 234
One Dr. Carlton B. Goodlett Pl.
San Francisco, CA 94102
*Attorney for the City and County of San Francisco*

LANE DILG
City Attorney of the City of Santa Monica
1685 Main Street
Santa Monica, CA 90401
*Attorney for the City of Santa Monica*

PETER S. HOLMES
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
*Attorney for City of Seattle*

FRANCIS X. WRIGHT, JR.
City Solicitor of the City of Somerville
93 Highland Avenue
Somerville, MA 02143
*Attorney for the City of Somerville*

MIKE RANKIN
City Attorney of the City of Tucson
P.O. Box 27210
Tucson, AZ 85726
*Attorney for the City of Tucson*

MICHAEL JENKINS
City Attorney of the City of West Hollywood
Jenkins & Hogin LLP
1230 Rosecrans Avenue, Ste 110
Manhattan Beach, CA 90266
*Attorney for the City of West Hollywood*

JOHN DANIEL REAVES
General Counsel
The U.S. Conference of Mayors
1200 New Hampshire Avenue NW, Suite 800
Washington, DC 20036
*Attorney for the U.S. Conference of Mayors*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 1, 2017, a copy of the foregoing Administrative Motion for Leave to File Amicus Brief of 26 Cities and Counties and the United States Conference of Mayors; the Amicus Brief of 26 Cities and Counties and the United States Conference of Mayors; and a Proposed Order were filed and served pursuant to the Court's electronic filing procedures using CM/ECF.

Dated:   November 1, 2017   **MICHAEL N. FEUER,** City Attorney

By: _____

**MICHAEL N. FEUER,** City Attorney
*Attorneys for Amicus Curiae City of Los Angeles*
*Additional Counsel for Amici Curiae Listed in Appendix*