1    MAYER BROWN LLP

2    John Nadolenco (SBN 181128)
     350 South Grand Avenue
3    Los Angeles, CA 90071-1503
     Telephone: (213) 229-5173
4    jnadolenco@mayerbrown.com

5    Andrew J. Pincus (*pro hac vice* pending)
     1999 K Street, N.W.
6    Washington, D.C. 20006-1101
     Telephone: (202) 263-3000
7    apincus@mayerbrown.com

8    [Additional counsel on signature page]

9    *Counsel for* Amici Curiae

10

11              **UNITED STATES DISTRICT COURT**

12            **NORTHERN DISTRICT OF CALIFORNIA**

13                **SAN FRANCISCO DIVISION**

14

15

16   THE REGENTS OF THE UNIVERSITY OF
     CALIFORNIA and JANET NAPOLITANO, in
17   her official capacity as President of the
     University of California,
18                                                    Case No. 17-CV-05211-WHA
19              Plaintiffs,
                                                      ***AMICUS* BRIEF OF 108 COMPANIES IN**
20        v.                                          **SUPPORT OF PLAINTIFFS' MOTION**
                                                      **FOR PROVISIONAL RELIEF**
21   UNITED STATES DEPARTMENT OF
     HOMELAND SECURITY and ELAINE
22   DUKE, in her official capacity as Acting
     Secretary of the Department of Homeland
23   Security,

24              Defendants.

25

26

27

28

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA,<br><br>              Plaintiffs,<br><br>         v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA<br><br>             Defendants. | Case No. 17-CV-05235-WHA |
| CITY OF SAN JOSE, a municipal corporation,<br><br>             Plaintiff,<br><br>         v.<br><br>DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA,<br><br>             Defendants. | Case No. 17-CV-05329-WHA |
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMAL RAMIREZ, and JIRAYUT LATTHIVONGSKORN,<br><br>             Plaintiffs,<br><br>         v.<br><br>UNITED STATES OR AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security,<br><br>             Defendants. | Case No. 17-CV-05380-WHA |

1  COUNTY OF SANTA CLARA and SERVICE
   EMPLOYEES INTERNATIONAL UNION
2  LOCAL 521,                                    Case No. 17-CV-05813-WHA

3                    Plaintiffs,

4        v.

5  DONALD J. TRUMP, in his official capacity
   as President of the United States, JEFFERSON
6  BEAUREGARD SESSIONS, in his official
   capacity as Attorney General of the United
7  States; ELAINE C. DUKE, in her official
   capacity as Acting Secretary of the Department
8  of Homeland Security; and the U.S.
   DEPARTMENT OF HOMELAND
9  SECURITY,

10                   Defendants.

# TABLE OF CONTENTS

**Page**

INTEREST OF *AMICI CURIAE* ............................................................................ 1

INTRODUCTION ................................................................................................... 1

ARGUMENT .......................................................................................................... 2

I.     DACA'S RESCISSION WILL INFLICT SIGNIFICANT HARM ON U.S. COMPANIES AND THE ENTIRE ECONOMY ........................................... 2

     A.    Dreamers Contribute Directly to Our Nation's Economic Growth ...................... 3

     B.    Dreamers Help Grow The Economy by Filling Jobs for Which There Otherwise Would Not Be a Sufficient Supply of Workers .................................. 4

          1.    Permitting Dreamers to participate in the workforce expands, rather than reduces, the number of jobs .................................... 4

          2.    Dreamers fill critical labor shortages ........................................ 6

     C.    Rescinding DACA Will Inflict Enormous Harm on Individuals, Companies, and the Economy ......................................................... 8

II.    THE DECISION TO RESCIND DACA IS INVALID, BECAUSE IT IS ARBITRARY AND CAPRICIOUS AND CONTRARY TO LAW .............................. 10

     A.    Rescission of DACA Is a "Final Agency Action" Subject to Review Under the APA ........................................................................... 11

     B.    Rescission of DACA Is Arbitrary and Capricious .............................. 13

CONCLUSION ...................................................................................................... 15

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*Arizona v. United States,*
    567 U.S. 387 (2012)..........................................................................................13

5

6

*Barahona-Gomez v. Reno,*
    236 F.3d 1115 (9th Cir. 2001) .........................................................................12

7

*Bonilla v. Lynch,*
    840 F.3d 575 (9th Cir. 2016) ...........................................................................12

8

9

*Bowrin v. INS,*
    194 F.3d 483 (4th Cir. 1999) ...........................................................................11

10

11

*Edison Elec. Inst. v. EPA,*
    996 F.2d 326 (D.C. Cir. 1993) .........................................................................13

12

13

*F.C.C. v. Fox Television Stations,*
    556 U.S. 502 (2009).........................................................................................11

14

*Heckler v. Chaney,*
    470 U.S. 821 (1985)....................................................................................11, 12

15

16

*INS v. St. Cyr,*
    533 U.S. 289 ....................................................................................................12

17

18

*Johns v. DOJ,*
    653 F.2d 884 (5th Cir. 1981) ...........................................................................14

19

*Kenney v. Glickman,*
    96 F.3d 1118 (8th Cir. 1996) .......................................................................12-13

20

21

*Kucana v. Holder,*
    558 U.S. 233 (2010).........................................................................................12

22

23

*Mach Mining, LLC v. EEOC,*
    135 S.Ct. 1645 (2015)......................................................................................12

24

*Minard Run Oil Co. v. U.S. Forest Serv.,*
    670 F.3d 236 (3d Cir. 2011).............................................................................11

25

26

*Montana Air Chapter No. 29 v. Fed. Labor Relations Auth.,*
    898 F.2d 753 (9th Cir. 1990) ...........................................................................12

27

28

ii

*Nat'l Wildlife Fed'n v. EPA*,
  980 F.2d 765 (D.C. Cir. 1992) ........................................................................12

*Reno v. American Arab Anti-Discrimination Committee*,
  525 U.S. 471 (1999) ........................................................................11, 13, 14

*Safe Air For Everyone v. EPA*,
  488 F.3d 1088 (9th Cir. 2007) .......................................................................13

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015) .....................................................................12, 15


**Constitution, Statutes, and Regulations**

U.S. Const. art. II, § 3 .......................................................................................14

5 U.S.C. § 551 ...................................................................................................11

5 U.S.C. § 701 ...................................................................................................11

5 U.S.C. § 706 ...................................................................................................13

6 U.S.C. § 202 ...................................................................................................14

8 U.S.C. § 1103 .................................................................................................14

8 U.S.C. § 1154 .................................................................................................14

8 U.S.C. § 1252 ...........................................................................................11, 14

8 U.S.C. § 1324 .................................................................................................15

49 U.S.C. § 30301 .............................................................................................15

National Defense Authorization Act for Fiscal Year 2004, Pub. L. No. 108-136,
  § 1703(c)-(d), 117 Stat. 1392, 1694-1695 (2003) .........................................14

USA PATRIOT Act, Pub. L. No. 7 107-56, § 423(b), 115 Stat. 272, 361 (2001) .......................14

Violence Against Women Act of 1994, Pub. L. No. 103-322, Tit. V, 108 Stat.
  1092 ................................................................................................................14


**Other Authorities**

8 C.F.R. § 274a.12(c)(14) .................................................................................14

iii

Am. Farm Bureau Federation, *Agricultural Labor – Immigration Reform* (Oct. 2016), https://goo.gl/WUAz3e;...........................................................................7

Ben Gitis & Jacqueline Varas, *The Labor and Output Declines From Removing All Undocumented Immigrants*, Am. Action Forum, May 5, 2016, https://goo.gl/UAt3dJ.................................................................................10

Bob Davis, *The Thorny Economics of Illegal Immigration*, Wall St. J., Feb. 9, 2010, https://goo.gl/j4dd7J...................................................................................9

Brad Smith, President and Chief Legal Officer, Microsoft, *DREAMers Make our Brad Smith, President and Chief Legal Officer, Microsoft, *DREAMers Make our Country and Communites Stronger*, Aug. 31, 2017, https://goo.gl/kJYDT3 ....................7

Buttonwood, *Keep on Trucking*, The Economist, Feb. 11, 2012....................................5

CHARLES GORDON ET AL., 6-72 IMMIGRATION LAW & PROC. rev. ed. (1981) ...............13

Ctr. for Am. Progress, *Results of Tom K. Wong, United We Dream, National Immigration Law Center, and Center for American Progress National Survey* (2016), https://goo.gl/pe2i17........................................................................6, 7

Ctr. for Am. Progress & FWD.us, *Study:  The Impact of Deferred Action for Childhood Arrivals (DACA) Program* (2017), https://goo.gl/P3DgPz...................8

David Bier, *Ending DACA Will Impose Billions in Employer Compliance Costs*, Cato Institute, Sept. 1, 2017, https://goo.gl/1FMidk; ..............................................9

David Bier, *Five Myths About DACA*, Cato Institue, Sept. 7, 2017, https://goo.gl/y1e8gb ...................................................................................5

Economics A-Z Terms Beginning With L, The Economist, https://goo.gl/BvRwKU .............................................................................4, 5

Giovanni Peri, *The Effect of Immigrants on U.S. Employment and Productivity*, Fed. Reserve Bank of San Francisco Economic Letter, Aug. 30, 2010, https://goo.gl/jK17fc ..................................................................................5, 7

H.R. Rep. No. 11-157 (2009).........................................................................14

Heather Boushey & Sarah Jane Glynn, *There Are Significant Business Costs to Replacing Employees*, Ctr. for Am. Progress, Nov. 16, 2012, https://goo.gl/ZSmRLq ...................................................................................9

*I Felt Like a Normal American Kid . . . Then Everything Changed*, THINKPolicy Blog, Oct. 9, 2017, https://goo.gl/oV9P7h.....................................................7

Ike Brannon & Logan Albright, *The Economic and Fiscal Impact of Repealing DACA*, Cato Institute, Jan. 18, 2017, https://goo.gl/jFXw4g.................................4, 8

Jacqueline Varas, *How Immigration Helps U.S. Workers and the Economy*, American Action Forum, Mar. 20, 2017, https://goo.gl/ovHQEh.............................5

Jose Magana-Salgado, Immigrant Legal Resources Center, *Money on the Table: The Economic Cost of Ending DACA* (2016), https://goo.gl/3ZwGVJ; ...............8, 9

Julia Boorstin, *Illegal Entrepreneurs: Maria Has No U.S. Visa, and Jose's Expires Soon. Yet They Own a Profitable California Factory, Pay Taxes, and Create Jobs*, CNNMoney, July 1, 2005, https://goo.gl/jq2Y1C..............................3

Kenneth Megan, *Immigration and the Labor Force*, Bipartisan Policy Ctr., Aug. 25, 2015, https://goo.gl/8p3SP8;...........................................................4, 5

ManpowerGroup, *2016/2017 Talent Shortage Survey: The United States Results*, https://goo.gl/rJTKs6 ...................................................................6

Mem. Op. for the Sec'y of Homeland Security and the Counsel to the President, 38 Op. Off. Legal Counsel 1 (Nov. 19, 2014), https://www.justice.gov/file/179206/download..............................13

Memorandum from Elaine C. Duke, Acting Secretary, Dep't of Homeland Security, on Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion With Respect to Individuals Who Came to the United States as Children" (Sept. 5, 2017) ...................................12

Memorandum from Janet Napolitano to David V. Aguilar Regarding Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012)...........................................10

Michael A. Clemens & Lant Pritchett, *Temporary Work Visas: A Four-Way Win for the Middle Class, Low-Skill Workers, Border Security, and Migrants*, Ctr. for Global Dev. Brief, Apr. 2013, https://goo.gl/p9NLuc ....................4, 7

Michael A. Clemens, *Does Kicking Out Mexicans Create Jobs?*, Politico Magazine, Feb. 15, 2017, https://goo.gl/XwLj1x ....................................10

Michael Greenstone & Adam Looney, *What Immigration Means for U.S. Employment and Wages* 1-2, The Hamilton Project (2012), https://goo.gl/bvC7AE; ...................................................................4

Mitra Toossi, *Consumer Spending: An Engine for U.S. Job Growth*, Monthly Labor Review (Nov. 2002) ........................................................4

*My American Dream, Minus the Paperwork*, THINKPolicy Blog, Oct. 3, 2017, https://goo.gl/876JDm...........................................................7

v

Nat'l Conference of State Legislatures, National Employment Monthly Update,
https://goo.gl/wZBJh8 (last accessed Oct. 31, 2017)................................................5

Natalie Kitroeff & Geoffrey Mohan, *Wages Rise on California Farms. Americans
Still Don't Want the Job*, Los Angeles Times, Mar. 17, 2017 ....................................7

Nicole Prchal Svajlenka et al., *A New Threat to DACA Could Cost States Billions
of Dollars*, Ctr. for Am. Progress, July 21, 2017, https://goo.gl/7udtFu; ...............8

Octavio Blanco, *The Worker Shortage Facing America's Farmers*, CNN Money,
Sept. 29, 2016, https://goo.gl/ZF2Tdx ....................................................................7

P'ship for a New Am. Economy, *Open for Business: How Immigrants Are
Driving Business Creation in the United States* 12 (Aug. 2012),
https://goo.gl/3mFkVz ...............................................................................................2

Paul Krugman, Opinion, *Lumps of Labor*, N.Y. Times, Oct. 7, 2003 ............................5

President's Council of Advisors on Science and Technology, *Report to the
President: Engage to Excel: Producing One Million Additional College
Graduates with Degrees in Science, Technology, Engineering, and
Mathematics* (Feb. 2012), https://goo.gl/v2YRVD...................................................6

Rachel Unruh & Amanda Bergson-Shilcock, Nat'l Skills Coalition, *Missing in
Action* (2015), https://goo.gl/gokfJW ......................................................................6

Sarah Bohn et al., *Do E-Verify Mandates Improve Labor Market Outcomes of
Low-Skilled Native and Legal Immigrant Workers?* 17-18 (2014),
https://goo.gl/7UihSE .................................................................................................9

Sarah Elizabeth Richards, *How Fear of Deportation Puts Stress on Families*, The
Atlantic, Mar. 22, 2017, https://goo.gl/qDgeRf ........................................................9

Silva Mathema, *Assessing the Economic Impacts of Granting Deferred Action
Through DACA and DAPA*, Ctr. for Am. Progress, Apr. 2, 2015,
https://goo.gl/wxxek1.................................................................................................4

Tiziana Rinaldi & Angilee Shah, *Immigration Limbo Is a 'Tug of Emotions.' It's
Also a Mental Health Issue*, PRI's The World, Aug. 22, 2017,
https://goo.gl/WLXMZ4; ...........................................................................................8

Tom K. Wong et al., *DACA Recipients' Economic and Educational Gains
Continue to Grow* Ctr. for Am. Progress, Aug. 28, 2017,
https://goo.gl/dYJV1s ................................................................................................3

Tom K. Wong et al., *Results from 2017 National DACA Study*,
https://goo.gl/eyZ3VT......................................................................................3, 4, 6

Tony Romm, *IBM CEO Ginni Rometty Is in D.C. Urging Congress to Save DACA,* Recode.net, Sept. 19, 2017, https://goo.gl/NQeJUc;....................................................7

U.S. Dep't of Labor, Bureau of Labor Statistics, Economic News Release Table A-14 (Oct. 6, 2017), https://goo.gl/o8t39g; ...............................................................6

U.S. Dep't of Labor, Bureau of Labor Statistics, Job Openings and Labor Turnover Survey Highlights August 2017  (Oct. 11, 2017), https://goo.gl/H28XkL .............................................................................................6

U.S. Dep't of Labor, Bureau of Labor Statistics, Job Openings and Labor Turnover Survey, https://goo.gl/g4n9Ag (last accessed Oct. 31, 2017) ...................................5

The UndocuScholars Project, *In the Shadows of the Ivory Tower: Undocumented Undergraduates and the Liminal State of Immigration Reform* (2015), https://goo.gl/sEpx1K .............................................................................................7

World Health Org. & Int'l Labour Org., *Mental Health And Work: Impact, Issues and Good Practices* 1 (2000), https://goo.gl/ecH1Ut ...........................................8-9

## INTEREST OF *AMICI CURIAE*

*Amici* are 108 U.S.-based companies from every sector of the economy that collectively contribute hundreds of billions of dollars in annual revenue to the American economy. Many *amici* employ Dreamers—the young people who, under the Deferred Action for Childhood Arrivals (DACA) program, are able to live and work in the country that has been their home for most of their young lives. In addition, *amici*'s customers and end users are Dreamers; and *amici*'s businesses benefit from Dreamers' contributions to the overall economy through their tax payments, spending, and investments. Accordingly, *amici* have a strong interest in Dreamers' continued ability to work and participate in our country's economy and in society generally. A list of the *amici* is set forth in the Appendix.

## INTRODUCTION

The intangible benefits of the DACA program are undeniable and substantial: nearly 800,000 young people (Dreamers) who "were brought to this country as children and know only this country as home" may for the first time live in America and participate fully in all aspects of our society without the constant and crippling fear of deportation. Memorandum from Janet Napolitano to David V. Aguilar Regarding Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012). DACA is a concrete and essential example of America fulfilling its centuries-old promise to welcome people from around the world seeking a better and a freer life. And no group is more deserving of that welcome than the Dreamers.

In addition to these invaluable intangible benefits, DACA has produced—and is continuing to produce—important benefits for America's companies and for our economy as a whole. Most notably, DACA permits Dreamers to obtain work authorizations, thereby enabling them to obtain jobs. Employment is not a zero-sum game. Dreamers are filling vacancies at companies that cannot find enough workers to fill their needs. And Dreamers' wages lead to higher tax revenues and expansion of our national GDP—producing new jobs for all Americans.

DACA's rescission will inflict serious harm on U.S. companies, all workers, and the American economy as a whole. Indeed, our national GDP will lose $460.3 billion, and Social Security and Medicare tax contributions will be reduced by $24.6 billion, over the next decade.

The decision to rescind DACA did not rest on a policy choice by the Department of Homeland Security (DHS). Rather, DHS concluded that DACA exceeds DHS's statutory authority. That conclusion is plainly reviewable under the Administrative Procedure Act: Courts every day determine the scope of federal agencies' power under the applicable laws and regulations. And DHS's legal conclusion is wrong: DACA closely resembles deferred action programs adopted in the past, and complies fully with the applicable statute. The agency's rescission of DACA, predicated entirely on that erroneous legal conclusion, therefore cannot stand.

**ARGUMENT**

## I.   DACA'S RESCISSION WILL INFLICT SIGNIFICANT HARM ON U.S. COMPANIES AND THE ENTIRE ECONOMY.

Since the nation's founding, immigrants have been an integral part of the fabric of our country, enhancing the lives and prosperity of all Americans. Immigrants' contributions to the U.S. economy are well-recognized: For example, the businesses they own alone generate over $775 billion in revenue and employ one out of every 10 workers.[1] DACA enabled Dreamers—immigrants who were brought to the U.S. as children—to come out of the shadows, participate in the economy, and contribute to U.S. companies, which benefits all of us. Rescinding DACA harms not only individual Dreamers and their families, friends, and co-workers; but also the many U.S. businesses that count on them to help fuel continued innovation and economic growth.

---

[1]      P'ship for a New Am. Economy, *Open for Business: How Immigrants Are Driving Business Creation in the United States* 12, 14 (Aug. 2012), https://goo.gl/3mFkVz.

## A.    Dreamers Contribute Directly to Our Nation's Economic Growth.

In the five years since DACA was implemented, Dreamers have become essential contributors to American companies and the American economy. Prior to the DACA program, these young people—who have obtained at least a high school degree and, in many cases have finished college and obtained graduate degrees—would have been unable to obtain work authorization, and therefore unable to put their education and skills to use. DACA changed that, and as a result over 91% of the almost 800,000 Dreamers are employed and earn wages commensurate with their skill levels.[2] Permitting Dreamers to stay and work in the country in which they grew up not only benefits those individuals, but also benefits American companies and the American economy as a whole.

*First*, Dreamers directly contribute to the success of numerous U.S. companies. At least 72 percent of the top 25 Fortune 500 companies employ Dreamers—including IBM, Walmart, Apple, General Motors, Amazon, JPMorgan Chase, Home Depot, Wells Fargo, among others. Those companies alone generate almost $3 trillion in annual revenue.[3]

Many Dreamers are entrepreneurs who have created their own businesses: According to one survey, five percent of Dreamers started their own businesses after receiving DACA status. Among those respondents 25 years and older, the figure is eight percent—well above the 3.1% for all Americans.[4] These businesses create new jobs and provide goods and services that expand the economy.[5]

---

[2]    Tom K. Wong et al., *Results from 2017 National DACA Study* 3-4 ("Wong 2017 Results"), https://goo.gl/eyZ3VT.

[3]    *Id.*

[4]    Wong 2017 Results, *supra* n.2, at 3; Tom K. Wong et al., *DACA Recipients' Economic and Educational Gains Continue to Grow*, Ctr. for Am. Progress, Aug. 28, 2017, https://goo.gl/dYJV1s.

[5]    *See* Julia Boorstin, *Illegal Entrepreneurs: Maria Has No U.S. Visa, and Jose's Expires Soon. Yet They Own a Profitable California Factory, Pay Taxes, and Create Jobs*, CNNMoney, July 1, 2005, https://goo.gl/jq2Y1C.

*Second*, Dreamers pay taxes to federal, state, and local governments.[6] The Cato Institute estimated that over 10 years, DACA recipients will increase tax revenues by $60 billion.[7]

*Third*, Dreamers have used their earnings—and the increased stability and security resulting from their DACA status—to make purchases and investments that grow our nation's economy. Nearly two-thirds of Dreamers reported purchasing their first car in 2017, and 16% reported purchasing a first home.[8] These and other types of personal consumption expenditures are important drivers of the economy: they "account[] for the largest share of GDP [and] are the main generator of employment in the economy."[9]

**B.    Dreamers Help Grow The Economy by Filling Jobs for Which There Otherwise Would Not Be a Sufficient Supply Of Workers.**

Studies have consistently found that immigrants do not displace U.S.-born workers. They instead help grow the economy and create more opportunities for U.S.-born workers by filling positions that otherwise would remain vacant because of a shortage of qualified workers.[10]

**1.    Permitting Dreamers to participate in the workforce expands, rather than reduces, the number of jobs.**

"[O]ne of the best-known fallacies in economics" is the "lump of labour fallacy."[11] Economists from across the policy and political spectrum have discredited the notion that "there

[6]    *See* Silva Mathema, *Assessing the Economic Impacts of Granting Deferred Action Through DACA and DAPA*, Ctr. for Am. Progress, Apr. 2, 2015, https://goo.gl/wxxek1.

[7]    Ike Brannon & Logan Albright, *The Economic and Fiscal Impact of Repealing DACA*, Cato Institute, Jan. 18, 2017, https://goo.gl/jFXw4g.

[8]    Wong 2017 Results, *supra* n.2, at 3.

[9]    Mitra Toossi, *Consumer Spending: An Engine for U.S. Job Growth*, Monthly Labor Review 12 (Nov. 2002), https://goo.gl/iyTkdR.

[10]    *See* Michael Greenstone & Adam Looney, *What Immigration Means for U.S. Employment and Wages* 1-2, The Hamilton Project (2012), https://goo.gl/bvC7AE; Kenneth Megan, *Immigration and the Labor Force*, Bipartisan Policy Ctr., Aug. 25, 2015, https://goo.gl/8p3SP8; Michael A. Clemens & Lant Pritchett, *Temporary Work Visas: A Four-Way Win for the Middle Class, Low-Skill Workers, Border Security, and Migrants* 4, Ctr. for Global Dev. Brief, Apr. 2013, https://goo.gl/p9NLuc.

[11]    Economics A-Z Terms Beginning With L, The Economist, https://goo.gl/BvRwKU.

is a fixed amount of work to be done—a lump of labour"—such that an increase in the number of workers reduces the number of available jobs.[12] Rather, the clear reality is that jobs beget more jobs. "[W]hen people work for a living they earn money. They spend that money on goods and services that are produced by other people, young and old, male and female."[13] The greater demand for goods and services creates new jobs.

The facts are indisputable. "From 1970 to 2017, the U.S. labor force doubled.  Rather than ending up with a 50 percent unemployment rate, U.S. employment doubled."[14] Another study showed that countries with high employment levels of older workers also had high employment levels of young workers; in other words, high employment levels in one group benefited the other group, rather than depriving the other of employment opportunities.[15] And yet other studies have shown that increased immigration levels in the U.S. in the past have had largely *positive* impacts on the employment levels and income of U.S.-born workers.[16]

These findings hold true today. The unemployment rate has been cut almost in half since 2012, when DACA was created.[17] The number of total job openings has increased.[18] And Dreamers are spending money and starting businesses—which help grow the economy and create more jobs.

[12]   *Id.*; *see also* Paul Krugman, Opinion, *Lumps of Labor*, N.Y. Times, Oct. 7, 2003, https://goo.gl/GyYTG5.

[13]   Buttonwood, *Keep on Trucking*, The Economist, Feb. 11, 2012, https://goo.gl/x8vqaL; *see also* Megan, *supra* n.10 ("[A] breadth of research indicates that immigration can be complementary to native born employment, as it spurs demand for goods and services"); Giovanni Peri, *The Effect of Immigrants on U.S. Employment and Productivity*, Fed. Reserve Bank of San Francisco Economic Letter, Aug. 30, 2010, https://goo.gl/jK17fc.

[14]   David Bier, *Five Myths About DACA*, Cato Inst., Sept. 7, 2017, https://goo.gl/y1e8gb.

[15]   Buttonwood, *supra* n.13.

[16]   *See* Jacqueline Varas, *How Immigration Helps U.S. Workers and the Economy*, American Action Forum, Mar. 20, 2017, https://goo.gl/ovHQEh.

[17]   *See* Nat'l Conference of State Legislatures, National Employment Monthly Update, https://goo.gl/wZBJh8 (last accessed Oct. 31, 2017).

[18]   U.S. Dep't of Labor, Bureau of Labor Statistics, Job Openings and Labor Turnover Survey, https://goo.gl/g4n9Ag (last accessed Oct. 31, 2017).

## 2.    Dreamers fill critical labor shortages.

The jobs being filled by Dreamers post-DACA are largely jobs for which there is a shortage of qualified workers—*not* the jobs that are or could be filled by U.S.-born workers. In a recent survey of U.S. employers, 46 percent of respondents reported difficulty filling jobs—particularly in skilled labor positions, such as teachers, accounting and finance staff, nurses, and engineers.[19] Almost a quarter of employers reported a lack of available applicants; another 34 percent cited a shortage of applicants with necessary skills.[20] In 2012, the President's Council of Advisors on Science and Technology warned that within ten years, the U.S. could face a shortfall of nearly one million professionals in the science, technology, engineering, and mathematics (STEM) fields.[21] Even putting aside the skills mismatch, it is unlikely that there are enough available workers to fill the openings: The U.S. unemployment rate is currently quite low, and the number of job openings is high.[22]

Dreamers help fill this gap. They all have a high school degree or equivalent—and a large percentage of Dreamers are pursuing or have received college or post-college degrees and therefore qualify for highly-skilled jobs.[23] In 2016, almost a quarter of Dreamers were employed in the educational or health services industry.[24] Many others work in technology, science, and

[19]    *See* ManpowerGroup, *2016/2017 Talent Shortage Survey: The United States Results* ("ManpowerGroup 2016/2017"), https://goo.gl/rJTKs6; *see also* Rachel Unruh & Amanda Bergson-Shilcock, Nat'l Skills Coalition, *Missing in Action* 3-4 (2015), https://goo.gl/gokfJW ("In 2012, middle-skill jobs accounted for 54 percent of the U.S. labor market, but only 44 percent of the country's workers were trained to the middle-skill level.").

[20]    ManpowerGroup 2016/2017, *supra* n.19.

[21]    President's Council of Advisors on Science and Technology, *Report to the President: Engage to Excel: Producing One Million Additional College Graduates with Degrees in Science, Technology, Engineering, and Mathematics* 1 (Feb. 2012), https://goo.gl/v2YRVD.

[22]    *See* U.S. Dep't of Labor, Bureau of Labor Statistics, Economic News Release Table A-14 (Oct. 6, 2017), https://goo.gl/o8t39g; U.S. Dep't of Labor, Bureau of Labor Statistics, Job Openings and Labor Turnover Survey Highlights August 2017 charts 1 & 2 (Oct. 11, 2017), https://goo.gl/H28XkL.

[23]    Wong 2017 Results, *supra* n.2, at 7-8.

[24]    Ctr. for Am. Progress, *Results of Tom K. Wong, United We Dream, National Immigration Law Center, and Center for American Progress National Survey* 4 (2016), https://goo.gl/pe2i17.

finance,[25] and more still are majoring in STEM fields.[26] *Amici*'s experiences confirm this: For example, Microsoft employs 27 Dreamers as "software engineers with top technical skills; finance professionals driving [its] business ambitions forward; and retail and sales associates connecting customers to [its] technologies."[27] IBM has identified at least 31 Dreamers within the company who work in areas such as software development and client support.[28] One IBM Dreamer provided critical remote technical support to ensure continuity of IBM's Cloud services when Hurricane Harvey flooded Houston. Lyft employs at least one Dreamer as a software engineer, who serves as one of the tech leads of the team driving critical data projects.

Even Dreamers with lesser-skilled jobs are filling positions for which there is an insufficient labor supply. "Among less-educated workers, those born in the United States tend to have jobs in manufacturing or mining, while immigrants tend to have jobs in personal services and agriculture."[29] The latter industries in particular "face[] a critical shortage of workers every year, as citizens are largely unwilling to engage in these physically demanding activities"[30]— even when companies increase wages the maximum amount financially feasible.[31]

---

[25]    *Id.*

[26]    The UndocuScholars Project, *In the Shadows of the Ivory Tower: Undocumented Undergraduates and the Liminal State of Immigration Reform* 8 (2015), https://goo.gl/sEpx1K.

[27]    Brad Smith, President and Chief Legal Officer, Microsoft, *DREAMers Make our Country and Communities Stronger*, Aug. 31, 2017, https://goo.gl/kJYDT3.

[28]    *See* Tony Romm, *IBM CEO Ginni Rometty Is in D.C. Urging Congress to Save DACA*, Recode.net, Sept. 19, 2017, https://goo.gl/NQeJUc; *My American Dream, Minus the Paperwork*, THINKPolicy Blog, Oct. 3, 2017, https://goo.gl/876JDm; *I Felt Like a Normal American Kid . . . Then Everything Changed*, THINKPolicy Blog, Oct. 9, 2017, https://goo.gl/oV9P7h.

[29]    Peri, *supra* n.13.

[30]    Am. Farm Bureau Federation, *Agricultural Labor – Immigration Reform* (Oct. 2016), https://goo.gl/WUAz3e; *see also* Clemens & Pritchett, *supra* n.10, at 3, (predicting that increase in low-skill jobs in the care industry will be more than the total increase in the 25-54 labor force).

[31]    *See, e.g.,* Natalie Kitroeff & Geoffrey Mohan, *Wages Rise on California Farms. Americans Still Don't Want the Job*, Los Angeles Times, Mar. 17, 2017, https://goo.gl/r1cH9Z; Octavio Blanco, *The Worker Shortage Facing America's Farmers*, CNN Money, Sept. 29, 2016, https://goo.gl/ZF2Tdx.

1    In sum, Dreamers are filling jobs that otherwise would remain vacant and are increasing

2    demand for goods and services, which helps to grow the entire economy.

3    **C.    Rescinding DACA Will Inflict Enormous Harm on Individuals, Companies,
            and the Economy.**

4

5    All of the above benefits—and more—will be lost if DACA's rescission is permitted to

6    stand. Over the next decade, our country's GDP will lose $460.3 billion; and Social Security and

7    Medicare tax receipts will drop $24.6 billion.[32]

8    This economic contraction results directly from Dreamers' loss of work authorization.

9    The approximately 700,000 employed Dreamers would all lose their jobs over the next two

10   years—an average of 1,400 people losing jobs every single business day.[33] In addition to the

11   obvious harm to Dreamers themselves, the loss of so many workers will have severe

12   repercussions for U.S. companies and workers.

13   The impending March 2018 deadline—and threat of job loss and being forced into a life

14   in the shadows, unable to participate in society, and facing forced removal from the only country

15   they have ever known—is already impacting Dreamers and, by extension, the companies for

16   which they work. The fear for the future that is now a daily part of life for Dreamers and their

17   families affects both physical and mental health.[34] That, in turn, negatively affects employee

18   productivity and performance, illness and absenteeism, accidents, and turnover.[35]

---

19   [32]    *See* Nicole Prchal Svajlenka et al., *A New Threat to DACA Could Cost States Billions of
20   Dollars*, Ctr. for Am. Progress, July 21, 2017, https://goo.gl/7udtFu; Jose Magana-Salgado,
     Immigrant Legal Resources Center, *Money on the Table: The Economic Cost of Ending DACA* 4,
21   6-7 (2016), https://goo.gl/3ZwGVJ; *see also* Brannon & Albright, *supra* n.7 (estimating cost of
     "immediately eliminating the DACA program and deporting its participants" to be $283 billion
22   reduction in economic growth and over $60 billion reduction to tax revenues over 10 years).

23   [33]    Ctr. for Am. Progress & FWD.us, *Study: The Impact of Deferred Action for Childhood
     Arrivals (DACA) Program* 3 (2017), https://goo.gl/P3DgPz.

24   [34]    *See* Tiziana Rinaldi & Angilee Shah, *Immigration Limbo Is a 'Tug of Emotions.' It's Also
25   a Mental Health Issue*, PRI's The World, Aug. 22, 2017,   https://goo.gl/WLXMZ4; Sarah
     Elizabeth Richards, *How Fear of Deportation Puts Stress on Families*, The Atlantic, Mar. 22,
26   2017, https://goo.gl/qDgeRf.

27   [35]    *See* World Health Org. & Int'l Labour Org., *Mental Health And Work: Impact, Issues and*

28

Once Dreamers' work authorizations begin expiring in March 2018, companies will face an estimated $6.3 billion in costs to replace Dreamers—if they can find new employees to fill the empty positions.[36] Companies will forfeit the money they invested in training those employees, and will incur costs recruiting and training new employees, who will be less experienced and therefore less productive.[37] These costs are particularly burdensome for small businesses.

The numbers are relevant, but numbers alone do not come close to capturing Dreamers' contributions and the tremendous harm that will result from their loss. People are the heart of every business; and every company's goal is to create teams that work seamlessly together—teams in which colleagues support each other both within and outside the workplace. Ripping Dreamers out of their jobs hurts not only Dreamers, but other employees who lose friends and colleagues, and companies that lose trusted members of their teams.

History shows that forcing Dreamers out of the workforce and into the shadows will also reduce job growth and harm the U.S. economy. After Arizona passed the Legal Arizona Workers Act in 2007, which targeted the use of unauthorized workers, its population of undocumented workers dropped by 40%. Economic growth fell, reducing job opportunities: The state's total employment was 2.5% less than what it would have been without the laws, and its GDP was reduced by an average of 2% a year between 2008 and 2015.[38]

Similarly, in 1964, the U.S. expelled Mexican *braceros*, who were previously permitted to work temporarily in the U.S., mostly on farms. A recent study revealed that excluding the

*Good Practices* 1 (2000), https://goo.gl/ecH1Ut.

[36]     *See* David Bier, *Ending DACA Will Impose Billions in Employer Compliance Costs*, Cato Institute, Sept. 1, 2017, https://goo.gl/1FMidk; *see also* Magana-Salgado, *supra* n.32, at 4, (estimating turnover costs due to DACA termination to be $3.4 billion).

[37]     Heather Boushey & Sarah Jane Glynn, *There Are Significant Business Costs to Replacing Employees*, Ctr. for Am. Progress, Nov. 16, 2012, https://goo.gl/ZSmRLq.

[38]     *See* Bob Davis, *The Thorny Economics of Illegal Immigration*, Wall St. J., Feb. 9, 2010, https://goo.gl/j4dd7J; *see also* Sarah Bohn et al., *Do E-Verify Mandates Improve Labor Market Outcomes of Low-Skilled Native and Legal Immigrant Workers?* 17-18, 21, 24-25 (2014), https://goo.gl/7UihSE (finding that employment rates of U.S.-born men—both Hispanic and non-Hispanic white men—dropped post-LAWA).

Mexican *braceros* "did not affect the wages or employment of U.S. farmworkers."[39] Instead, farms responded by *eliminating* the jobs—often by moving production abroad or going out of business.[40]

Removing Dreamers from the workforce is likely to have the very same negative effect on U.S. employment levels as companies are unable to fill critical jobs. That effect will be exacerbated as Dreamers are forced to shutter businesses that employ other workers and other companies lose the income that has helped drive demand and production of goods and services provided by U.S.-born workers.[41] And the harm will be much more far-reaching: Just as DACA sent a powerful message of inclusion, its rescission tells the immigrants who have been integral to the growth and development of our society and economy for decades that they are no longer welcome here. As a result, DACA's rescission will reduce the future ability of U.S. companies to attract individuals from around the world to support America's continued economic growth and prosperity.

## II.   THE DECISION TO RESCIND DACA IS INVALID, BECAUSE IT IS ARBITRARY AND CAPRICIOUS AND CONTRARY TO LAW.

DHS's decision to rescind DACA rested solely on its conclusion that the DACA program is unlawful. That legal conclusion is wrong, and DHS's rescission of DACA based on it is therefore arbitrary and capricious in violation of the APA.

---

[39]    Michael A. Clemens, *Does Kicking Out Mexicans Create Jobs?*, Politico Magazine, Feb. 15, 2017, https://goo.gl/XwLj1x.

[40]    *Id.*

[41]    *Cf.* Ben Gitis & Jacqueline Varas, *The Labor and Output Declines From Removing All Undocumented Immigrants*, Am. Action Forum, May 5, 2016, https://goo.gl/UAt3dJ (concluding that removing undocumented immigrants from the workforce would cause private sector employment to decline by 4 to 6.8 million workers, would reduce real private sector output by $381.5 to $623.2 billion, and would have further negative economic impacts through the loss of consumption, investments, and entrepreneurship).

**A.  Rescission of DACA Is a "Final Agency Action" Subject to Review Under the APA.**

The rescission of DACA is unquestionably a final agency action—it is "an agency statement of general or particular applicability and future effect designed to implement, interpret or prescribe . . . [DHS's] policy." 5 U.S.C. § 551(4).[42]  As such, it is subject to judicial review under the APA unless it falls within one of two narrow exceptions: "(1) statutes preclude judicial review; or (2) [the] agency action is committed to agency discretion by law." *Id.* § 701(a); *accord Heckler v. Chaney*, 470 U.S. 821, 828-29 (1985). Neither exception applies.

First, there is no statute precluding judicial review of the rescission of DACA. The government has previously argued that 8 U.S.C. § 1252(g)[43] barred review of its creation of a related program, Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA). *See* Br. for Pet'rs at 41, *United States v. Texas*, No. 15-674 (2017). But the Supreme Court explained in *Reno v. American Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999) *("AAADC")*, that 8 U.S.C. § 1252(g) "applies only to three discrete actions that the Attorney General may take: her 'decision or action' to 'commence proceedings, adjudicate cases, or execute removal orders.'" *Id.* at 479 (emphases in original). Plaintiffs in these cases challenges no such action, and Section 1252(g) therefore does not apply.[44]

---

[42]     *See, e.g.*, *F.C.C. v. Fox Television Stations*, 556 U.S. 502, 514-15 (2009) (applying APA to rescission of prior action); *Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 247-48 (3d Cir. 2011) (U.S. Forest Service's change in policy to impose a moratorium on drilling was a "final agency action").

[43]     Section 1252(g) provides that, subject to certain exceptions, "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter."

[44]     *See, e.g.*, *INS v. St. Cyr*, 533 U.S. 289, 293 & 311 n.34 (2001) (holding that § 1252(g) did not apply to challenge to "Attorney General['s] interpret[ion]" of statutes); *United States v. Texas*, 809 F.3d 134, 165 (5th Cir. 2015) (§ 1252(g) did not apply to challenge to DAPA); *Barahona-Gomez v. Reno*, 236 F.3d 1115, 1118-19 (9th Cir. 2001) (§ 1252(g) did not apply and bar judicial review of a challenge to directives issued by the BIA Chairman and the Chief Immigration Judge that were based on legal interpretations); *Bowrin v. INS*, 194 F.3d 483, 488 (4th Cir. 1999) ("We read the Court's *AADC II* ruling . . . to hold that § 1252(g) does not apply

Second, the rescission of DACA does not fall within the "very narrow" exception for actions committed to agency discretion by law. *Chaney*, 470 U.S. at 830 (internal quotation marks omitted). The rescission decision did not rest on fact-specific exercise of enforcement discretion, as in *Heckler v. Chaney*, 470 U.S. 821 (1985). Rather, revocation is predicated on the legal conclusion that DACA "was effectuated . . . without proper statutory authority" and therefore "was an unconstitutional exercise of authority by the Executive Branch." Memorandum from Elaine C. Duke, Acting Secretary, Dep't of Homeland Security, on Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion With Respect to Individuals Who Came to the United States as Children" (Sept. 5, 2017).

Several courts, including the Ninth Circuit, have held that agency action resting solely on such a legal determination is reviewable. Such actions do not implicate the "complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," nor do they present a situation where there is "no law to apply." *Chaney*, 470 U.S. at 831. There accordingly is no basis for disregarding the "strong" and "well-settled presumption" favoring review of executive determinations like the rescission of DACA. *Mach Mining, LLC v. EEOC*, 135 S.Ct. 1645, 1651 (2015); *Kucana v. Holder*, 558 U.S. 233, 251 (2010).[45]

---

to agency interpretations of statutes as these decisions do not fall into any of the three categories enumerated in § 1252(g).").

[45]    *See, e.g.*, *Bonilla v. Lynch*, 840 F.3d 575, 587 (9th Cir. 2016) (holding reviewable BIA's decision not to exercise its *sua sponte* authority to open the petitioner's motion to reopen his order of removal where the BIA did not deny the motion "as an exercise of discretion," but rather based on the "conclu[sion] that it lacked the *authority* to reopen"); *Montana Air Chapter No. 29 v. Fed. Labor Relations Auth.*, 898 F.2d 753 (9th Cir. 1990) (holding *Chaney* does not apply to decisions "based on a belief that the agency lacks jurisdiction" and "agency statutory interpretations made in the course of nonenforcement decisions"); *Edison Elec. Inst. v. EPA*, 996 F.2d 326, 333 (D.C. Cir. 1993) ("[I]nterpretation [of] the substantive requirements of the law . . . is not the type of discretionary judgment concerning the allocation of enforcement resources that [*Chaney*] shields from review."); *Nat'l Wildlife Fed'n v. EPA*, 980 F.2d 765, 773 (D.C. Cir. 1992) (holding reviewable EPA's nonenforcement decision where plaintiff challenged agency's "statutory interpretation embodied in [the regulation], and does not contest a particular enforcement decision"); *see also Chaney*, 470 U.S. at 833 n.4 (suggesting exception would not apply if case involved "a refusal by the agency to institute proceedings based solely on the belief that it lacks jurisdiction"); *Kenney v. Glickman*, 96 F.3d 1118, 1123 (8th Cir. 1996) (interpreting

---

12

**B.  Rescission of DACA Is Arbitrary and Capricious.**

Because DACA's rescission rests solely on a legal question—the interpretation of the relevant statutes—DHS's decision stands or falls on the correctness of that legal determination. If DHS got the law wrong, its action is not supported by a valid justification and therefore is arbitrary and capricious in violation of the APA. *See* 5 U.S.C. § 706(2)(A); *Safe Air For Everyone v. EPA*, 488 F.3d 1088, 1101 (9th Cir. 2007) ("Because [EPA's flawed legal interpretation] is fundamental to EPA's determination that [the State] did not contravene [the Clean Air Act], EPA's outcome on those statutory interpretation questions is 'arbitrary, capricious, or otherwise not in accordance with law' for the purposes of our review."). DHS's legal interpretation was plainly erroneous.

DACA confers two related benefits: deferral of government action to remove the individual from the United States (known as "deferred action") and eligibility for work authorization.  Both elements have long been recognized in U.S. immigration law.

*First*, granting "deferred action" is a long-established practice engaged in by Administrations of both parties and expressly recognized by the Supreme Court. *See AAADC*, 525 U.S. at 483-85 (describing "regular practice" of "deferred action").[46] The decision to defer removal proceedings is an exercise of prosecutorial discretion that falls squarely within the Executive Branch's constitutional authority to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

In the immigration context, moreover, Congress has codified that discretion. Until 1940, "the deportation statute unyieldingly demanded that an alien illegally in the United States be deported." *Johns v. DOJ*, 653 F.2d 884, 890 n.12 (5th Cir. 1981). Now, however, the *Chaney* as applying "to individual, case-by-case determinations of when to enforce existing regulations rather than permanent policies or standards").

[46]  *See also Arizona v. United States*, 567 U.S. 387, 396 (2012) ("A principal feature of the removal system is the broad discretion exercised by immigration officials."); CHARLES GORDON ET AL., 6-72 IMMIGRATION LAW AND PROC. § 72.03 (Matthew Bender, rev. ed.); Mem. Op. for the Sec'y of Homeland Security and the Counsel to the President, 38 Op. Off. Legal Counsel 1, 13-18 (Nov. 19, 2014), https://www.justice.gov/file/179206/download.

immigration laws specifically charge the secretary of Homeland Security with "establishing national immigration enforcement policies and priorities." 6 U.S.C. § 202(5), and to carry out the "administration and enforcement of th[e INA] and all other laws relating to the immigration and naturalization of aliens," 8 U.S.C. § 1103(a); *see also* H.R. Rep. No. 11-157, at 8 (2009) ("[R]ather than simply rounding up as many illegal immigrants as possible, which is sometimes achieved by targeting the easiest and least threatening among the undocumented population, DHS must ensure that the government's huge investments in immigration enforcement are producing the maximum return in actually making our country safer.").

Congress has on several occasions *expanded* deferred action to certain categories of individuals.[47] And it enacted 8 U.S.C. § 1252(g), which the Supreme Court explained was intended to preserve the INS's exercise of discretion in granting deferred action while "giv[ing] some measure of protection to 'no deferred action' decisions." *AAADC*, 525 U.S. at 484-85.

*Second*, conferring eligibility for work authorization has a similarly lengthy pedigree. A regulation promulgated in the 1980s provides that individuals who receive deferred action are eligible to apply for work authorization. *See* 8 C.F.R. § 274a.12(c)(14) (providing eligibility to apply for work authorization to "[a]n alien who has been granted deferred action"). Congress has legislated on the basis of this regulation, enacting a law prohibiting employers from hiring unauthorized aliens, but expressly excluded from that category individuals "authorized to be so employed by . . . the Attorney General." 8 U.S.C. § 1324a(h)(3); *cf.* 49 U.S.C. § 30301 note (providing that certain states may issue driver's licenses to aliens with "approved deferred action status.").

---

[47] *See, e.g.*, 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV) (providing that certain aliens who self-petition for relief under the Violence Against Women Act of 1994, Pub. L. No. 103-322, Tit. V, 108 Stat. 1092, are eligible to request "deferred action"); USA PATRIOT Act, Pub. L. No. 107-56, § 423(b), 115 Stat. 272, 361 (2001) (providing that certain family members of lawful permanent residents killed on September 11, 2001, or of citizens killed in combat, are "eligible for deferred action"); National Defense Authorization Act for Fiscal Year 2004, Pub. L. No. 108-136, § 1703(c)-(d), 117 Stat. 1392, 1694-1695 (2003) (same).

In concluding that DACA was an unconstitutional exercise of authority, DHS claimed that DACA suffered from the defect identified by the Fifth Circuit in a case challenging a separate deferred action program, DAPA. But the plaintiffs in that earlier case did *not* challenge the authority of the Executive Branch to exercise its discretion to defer removal with respect to certain undocumented immigrants, even on a categorical basis. Instead, the dispute centered on a statement in the memorandum implementing DAPA that "for a specified period of time, an individual [covered by DAPA] is permitted to be lawfully present in the United States." *See Texas v. United States*, 809 F.3d 134, 147-49, 166, 179-84 (5th Cir. 2015). The claim was that DHS lacked the authority to confer "lawful[] presen[ce]" and the Fifth Circuit agreed. The memorandum establishing DACA contains no such language, and the Fifth Circuit's rationale is therefore inapplicable.

In short, ample constitutional and statutory authority exists for DACA. DHS's rescission of DACA based on a contrary legal conclusion is accordingly unfounded and should be vacated.

## CONCLUSION

For the foregoing reasons, *amici* urge the Court to grant the relief requested in Plaintiffs' motions.

Dated: November 1, 2017

Of Counsel:

WILMER CUTLER PICKERING
   HALE AND DORR LLP

Seth P. Waxman (*pro hac vice* pending)
Patrick J. Carome (*pro hac vice* pending)
Ari Holtzblatt (*pro hac vice* pending)
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
Telephone:  (202) 663-6000
Facsimile:  (202) 663-6363
seth.waxman@wilmerhale.com
patrick.carome@wilmerhale.com
ari.holtzblatt@wilmerhale.com

Janine M. Lopez (*pro hac vice* to be filed)

MAYER BROWN LLP

By: */s/ John Nadolenco*

John Nadolenco
350 South Grand Avenue
Los Angeles, CA 90071-1503
Telephone: (213) 229-5173
jnadolenco@mayerbrown.com

Andrew J. Pincus (*pro hac vice* pending)
1999 K Street, N.W.
Washington, D.C. 20006-1101
Telephone: (202) 263-3000
apincus@mayerbrown.com

Lauren R. Goldman (*pro hac vice* pending)
Karen W. Lin (*pro hac vice* pending)
1221 Avenue of the Americas
New York, NY 10020-1001

15

60 State Street
Boston, MA  02109
Telephone:  (617) 526-6000
Facsimile:  (617) 526-5000
janine.lopez@wilmerhale.com

*Counsel for* Amici Curiae *Airbnb, Inc.,
Square, Inc., Twitter, Inc., and Yelp Inc.*

Telephone: (212) 506-2500
lrgoldman@mayerbrown.com
kwlin@mayerbrown.com

*Counsel for* Amici Curiae

16

**APPENDIX:  LIST OF *AMICI***

1.      6Sense Insights, Inc.

2.      A Medium Corporation

3.      Adobe Systems Incorporated

4.      AdRoll, Inc.

5.      Affirm, Inc.

6.      Airbnb, Inc.

7.      Alation, Inc.

8.      Ampush Media, Inc.

9.      Andela, Inc.

10.     Appboy, Inc.

11.     AppNexus, Inc.

12.     Asana, Inc.

13.     Atlassian Corp. Plc

14.     Azavea Inc.

15.     Bigtooth Ventures

16.     Box, Inc.

17.     Brightcove Inc.

18.     Brocade Communications Systems,  Inc.

19.     CareZone Inc.

20.     CartoDB Inc.

21.     Casper Sleep Inc.

22.     Castlight Health, Inc.

23.     Cavium, Inc.

24.     Chegg, Inc.

25.     Chobani, LLC

| | | |
|---|---|---|
| 26. | Civis Analytics, Inc. |
| 27. | Citrix Systems, Inc. |
| 28. | ClassPass Inc. |
| 29. | Cloudera, Inc. |
| 30. | Cloudflare Inc. |
| 31. | Codecademy |
| 32. | Color Genomics, Inc. |
| 33. | Credit Karma, Inc. |
| 34. | Disqus, Inc. |
| 35. | DoorDash, Inc. |
| 36. | Dropbox, Inc. |
| 37. | eBay Inc. |
| 38. | Edmodo, Inc. |
| 39. | EquityZen Inc. |
| 40. | Facebook, Inc. |
| 41. | General Assembly Space, Inc. |
| 42. | Glassdoor, Inc. |
| 43. | Google Inc. |
| 44. | Greenhouse Software, Inc. |
| 45. | Hewlett Packard Enterprise |
| 46. | Homer Logistics, Inc. |
| 47. | IBM Corporation |
| 48. | IDEO LP |
| 49. | Imgur Inc. |
| 50. | Indiegogo, Inc. |
| 51. | Kargo |

1    52.    Knotel

2    53.    Lam Research Corporation

3    54.    Levi Strauss & Co.

4    55.    LinkedIn Corporation

5    56.    Lithium Technologies, LLC

6    57.    Lyft, Inc.

7    58.    Lytro, Inc.

8    59.    Mapbox

9    60.    Marin Software Incorporated

10   61.    Medidata Solutions, Inc.

11   62.    Microsoft Corporation

12   63.    Molecule Software, Inc.

13   64.    MongoDB, Inc.

14   65.    Motivate International Inc.

15   66.    NETGEAR, Inc.

16   67.    NewsCred, Inc.

17   68.    NIO U.S.

18   69.    Oath Inc.

19   70.    Patreon, Inc.

20   71.    PayPal Holdings, Inc.

21   72.    Pinterest, Inc.

22   73.    Pixability, Inc.

23   74.    Postmates Inc.

24   75.    Quantcast Corp.

25   76.    RealNetworks, Inc.

26   77.    Reddit, Inc.

27

28

| | | |
|---|---|---|
| 78. | Redfin Corporation | |
| 79. | salesforce.com inc. | |
| 80. | Scopely, Inc. | |
| 81. | Shutterstock, Inc. | |
| 82. | Singularity University | |
| 83. | Sizmek, Inc. | |
| 84. | SpaceX | |
| 85. | Spokeo, Inc. | |
| 86. | Spotify USA Inc. | |
| 87. | Square, Inc. | |
| 88. | Squarespace, Inc. | |
| 89. | Strava, Inc. | |
| 90. | SurveyMonkey Inc. | |
| 91. | Tesla, Inc. | |
| 92. | The Copia Institute | |
| 93. | Thumbtack | |
| 94. | TripAdvisor, Inc. | |
| 95. | Tumblr, Inc. | |
| 96. | Turo Inc. | |
| 97. | Twilio Inc. | |
| 98. | Twitter Inc. | |
| 99. | Uber Technologies, Inc. | |
| 100. | Udacity Inc. | |
| 101. | Upwork Inc. | |
| 102. | Verizon Communications Inc. | |
| 103. | Via | |

104.   Warby Parker

105.   Work & Co.

106.   Workday, Inc.

107.   Yelp Inc.

108.   Zendesk, Inc.

*AMICUS* BRIEF OF 108 COMPANIES;
CASE NOS. 17-CV-05211; 17-CV-05235; 17-CV-05329; 17-CV-05380; 17-CV-05813