Jeffrey M. Davidson (SBN 248620)
Alan Bersin (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the University
of California and Janet Napolitano, in her official
capacity as President of the University of California*

Theodore J. Boutrous, Jr. (SBN 132099)
Ethan D. Dettmer (SBN 196046)
Jesse S. Gabriel (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam
Gonzalez Avila, Saul Jimenez Suarez, Viridiana
Chabolla Mendoza, Norma Ramirez, and Jirayut
Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
Deputy Attorney General
1515 Clay Street, 20th Floor
Oakland, CA 94612-0550
Telephone: (510) 879-1247
E-mail: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

Joseph W. Cotchett (SBN 36324)
Justin T. Berger (SBN 250346)
COTCHETT, PITRE & McCARTHY, LLP
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: jberger@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

Jonathan Weissglass (SBN 185008)
Stacey M. Leyton (SBN 203827)
Eric P. Brown (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara
and Service Employees International Union
Local 521*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| REGENTS OF UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security,<br><br>Defendants. | CASE NO. 17-CV-05211-WHA<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Judge: Honorable William Alsup<br>Hearing: December 20, 2017, 8:00 a.m.<br>Courtroom: 8, 19th Floor |

STATE OF CALIFORNIA, STATE OF MAINE,
STATE OF MARYLAND, STATE OF MINNESOTA,

        Plaintiffs,

        v.

U.S. DEPARTMENT OF HOMELAND SECURITY,
ELAINE DUKE, in her official capacity as Acting
Secretary of the Department of Homeland Security, and
the UNITED STATES OF AMERICA,

        Defendants.

CASE NO. 17-CV-05235-WHA

---

CITY OF SAN JOSE, a municipal corporation,

        Plaintiff,

        v.

DONALD J. TRUMP, President of the United States, in
his official capacity, ELAINE C. DUKE, in her official
capacity, and the UNITED STATES OF AMERICA,

        Defendants.

CASE NO. 17-CV-05329-WHA

---

DULCE GARCIA, MIRIAM GONZALEZ AVILA,
SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA
MENDOZA, NORMA RAMIREZ, and JIRAYUT
LATTHIVONGSKORN,

        Plaintiffs,

        v.

UNITED STATES OF AMERICA, DONALD J.
TRUMP, in his official capacity as President of the
United States, U.S. DEPARTMENT OF HOMELAND
SECURITY, and ELAINE DUKE, in her official
capacity as Acting Secretary of Homeland Security,

        Defendants.

CASE NO. 17-CV-05380-WHA

---

COUNTY OF SANTA CLARA and SERVICE
EMPLOYEES INTERNATIONAL UNION LOCAL
521,

        Plaintiffs,

        v.

DONALD J. TRUMP, in his official capacity as
President of the United States, JEFFERSON
BEAUREGARD SESSIONS, in his official capacity as
Attorney General of the United States; ELAINE DUKE,
in her official capacity as Acting Secretary of the
Department of Homeland Security; and U.S.
DEPARTMENT OF HOMELAND SECURITY,

        Defendants.

CASE NO. 17-CV-05813-WHA

# TABLE OF CONTENTS

LEGAL STANDARD.................................................................................................. 3

ARGUMENT ............................................................................................................... 4

I.      Plaintiffs' Claims Are Justiciable. ................................................................. 4

        A.      The Rescission Is Not an Unreviewable Act of Agency Discretion. ..................... 4

        B.      Section 1252(g) of the INA Does Not Bar Judicial Review of This Case............. 9

        C.      The Entity Plaintiffs Have Standing. .................................................. 11

        D.      Plaintiffs Have Statutory Standing to Assert APA and RFA Claims. ................. 17

II.     Plaintiffs' Claims Are Adequately Pleaded. ................................................. 20

        A.      Plaintiffs Have Adequately Pleaded APA Claims. .............................. 20

        B.      Plaintiffs Have Adequately Pleaded Equal Protection Claims. ........................... 22

        C.      Plaintiffs Have Adequately Pleaded Substantive Due Process Claims. .............. 25

        D.      Plaintiffs Have Pleaded Equitable Estoppel Claims. ............................... 36

III.    Nationwide Injunctive and Declaratory Relief Is Permissible and Appropriate............... 40

CONCLUSION.............................................................................................. 40

# TABLE OF AUTHORITIES

**Cases**

*Abrams v. Heckler*,
   582 F. Supp. 1155 (S.D.N.Y. 1984)...............................................................................13

*Action Apartment Ass'n, Inc. v. Santa Monica Rent Control Bd.*,
   509 F.3d 1020 (9th Cir. 2007) ......................................................................................26

*Alabama v. U.S. Army Corps of Eng'rs*,
   424 F.3d 1117 (11th Cir. 2005) ....................................................................................13

*Alcaraz v. INS*,
   384 F.3d 1150 (9th Cir. 2004) ........................................................................................5

*Alexander v. Sandoval*,
   532 U.S. 275 (2001)......................................................................................................39

*Am. Rivers v. FERC*,
   201 F.3d 1186 (9th Cir. 1999) ......................................................................................13

*Appalachian Power Co. v. EPA*,
   208 F.3d 1015 (D.C. Cir. 2000)....................................................................................30

*Arce v. Douglas*,
   793 F.3d 968 (9th Cir. 2015) .............................................................................22, 23, 25

*Arevalo v. Ashcroft*,
   344 F.3d 1 (1st Cir. 2003).............................................................................................27

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)........................................................................................................3

*Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*,
   397 U.S. 150 (1970).................................................................................................17, 18

*ASSE Int'l, Inc. v. Kerry*,
   803 F.3d 1059 (9th Cir. 2015) ....................................................................................4, 9

*Ave. 6E Invs., LLC v. City of Yuma*,
   818 F.3d 493 (9th Cir. 2016) .............................................................................22, 23, 24

*Aziz v. Trump*,
   231 F. Supp. 3d 23 (E.D. Va. 2017) .............................................................................13

*Aziz v. Trump*,
   234 F. Supp. 3d 724 (E.D. Va. 2017) ...........................................................................23

*Batalla Vidal v. Duke*,
   Nos. 16-4756, 16-5228, 2017 WL 5201116 (E.D.N.Y. Nov. 9, 2017)................. *passim*

ii

*Bell v. Burson*,
402 U.S. 535 (1971)............................................................................................28

*Bi-Metallic Inv. Co. v. State Bd. of Equalization*,
239 U.S. 441 (1915)............................................................................................21

*Bishop Paiute Tribe v. Inyo Cty.*,
863 F.3d 1144 (9th Cir. 2017) ............................................................................3

*Bonilla v. Lynch*,
840 F.3d 575 (9th Cir. 2016) ...............................................................................9

*Bowen v. Mich. Acad. of Family Physicians*,
476 U.S. 667 (1986).............................................................................................4

*Bowsher v. Synar*,
478 U.S. 714 (1986)...........................................................................................12

*Bresgal v. Brock*,
843 F.2d 1163 (9th Cir. 1987) ...........................................................................40

*Brown v. Poole*,
337 F.3d 1155 (9th Cir. 2003) ...........................................................................34

*Buckley v. Terhune*,
441 F.3d 688 (9th Cir. 2006) .............................................................................34

*Califano v. Yamasaki*,
442 U.S. 682 (1979)...........................................................................................40

*Catholic Soc. Servs., Inc. v. INS*,
232 F.3d 1139 (9th Cir. 2000) ...........................................................................11

*Chief Prob. Officers of Cal. v. Shalala*,
118 F.3d 1327 (9th Cir. 1997) ...........................................................................18

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971).............................................................................................4

*Clark v. City of Lakewood*,
259 F.3d 996 (9th Cir. 2001) .............................................................................14

*Cox v. Louisiana*,
379 U.S. 559 (1965)......................................................................................33, 34

*Coyotl v. Kelly*,
No. 17-1670, 2017 WL 2889681 (N.D. Ga. June 12, 2017)................................11

*Crowley Caribbean Transp., Inc. v. Peña*,
37 F.3d 671 (D.C. Cir. 1994) ..............................................................................8

iii

*Ctr. for Biological Diversity v. Brennan,*
    571 F. Supp. 2d 1105 (N.D. Cal. 2007) ........................................................................17

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006) ...................................................................................................12

*Decker v. O'Donnell,*
    661 F.2d 598 (7th Cir. 1980) .....................................................................................40

*DeNieva v. Reyes,*
    966 F.2d 480 (9th Cir. 1992) .....................................................................................28

*Edison Elec. Inst. v. EPA,*
    996 F.2d 326 (D.C. Cir. 1993) ....................................................................................8

*Engquist v. Or. Dep't of Agric.,*
    478 F.3d 985 (9th Cir. 2007) ...............................................................................28, 30

*Fed'n for Am. Immigration Reform, Inc. v. Reno,*
    93 F.3d 897 (D.C. Cir. 1996) ....................................................................................19

*Fong Haw Tan v. Phelan,*
    333 U.S. 6 (1948) .......................................................................................................38

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) .....................................................................................................4

*Gallo v. U.S. Dist. Ct. for Dist. of Ariz.,*
    349 F.3d 1169 (9th Cir. 2003) ...................................................................................29

*Geneva Towers Tenants Org. v. Federated Mortg. Inv'rs,*
    504 F.2d 483 (9th Cir. 1974) ...............................................................................21, 27

*Gerhart v. Lake Cty.,*
    637 F.3d 1013 (9th Cir. 2011) ...................................................................................36

*Gonzales Torres v. U.S. Dep't of Homeland Sec.,*
    No. 17-1840, 2017 WL 4340385 (S.D. Cal. Sept. 29, 2017) ..............................11, 28

*Grace Towers Tenants Ass'n v. Grace Hous. Dev. Fund Co.,*
    538 F.2d 491 (2d Cir. 1976) ........................................................................................5

*Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Par.,*
    641 F. Supp. 2d 563 (E.D. La. 2009) ........................................................................23

*Hawaii v. Trump,*
    859 F.3d 741 (9th Cir. 2017), *vacated on other grounds by Trump v. Hawaii*, No. 16-
    1540, 2017 WL 4782860 (S. Ct. Oct. 24, 2017) ...................................................13, 18

iv

*Heartland Acad. Cmty. Church v. Waddle,*
    427 F.3d 525 (8th Cir. 2005) ......................................................................16

*Heckler v. Chaney,*
    470 U.S. 821 (1985)............................................................................ *passim*

*Hunt v. Wash. Apple Advert. Comm'n,*
    432 U.S. 333 (1977)....................................................................................17

*I.C.C. v. Bhd. of Locomotive Eng'rs (BLE),*
    482 U.S. 270 (1987).......................................................................................6

*INS v. St. Cyr,*
    533 U.S. 289 (2001).......................................................................................8

*Int'l Longshoremen's & Warehousemen's Union v. Meese,*
    891 F.2d 1374 (9th Cir. 1989) .....................................................................8

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock,*
    477 U.S. 274 (1986)..............................................................................16, 17

*Ixcot v. Holder,*
    646 F.3d 1202 (9th Cir. 2011) ...................................................................27

*James Madison Project v. Dep't of Justice,*
    No. 17-00144 (D.D.C. Jan. 23, 2017)........................................................25

*Johnson v. Newburg Enlarged Sch. Dist.,*
    239 F.3d 246 (2d Cir. 2001).................................................................32, 33

*Kansas ex rel. Hayden v. United States,*
    748 F. Supp. 797 (D. Kan. 1990) ...............................................................13

*Kenney v. Glickman,*
    96 F.3d 1118 (8th Cir. 1996) .......................................................................7

*Kwai Fun Wong v. United States,*
    373 F.3d 952 (9th Cir. 2004) .....................................................................11

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
    134 S. Ct. 1377 (2014) ...............................................................................18

*Lincoln v. Vigil,*
    508 U.S. 182 (1993).......................................................................................4

*Lopez-Valenzuela v. Arpaio,*
    770 F.3d 772 (9th Cir. 2014) ...............................................26, 28, 30, 31

*Lyng v. Payne,*
    476 U.S. 926 (1986).....................................................................................39

v

*Mach Mining, LLC v. EEOC,*
    135 S. Ct. 1645 (2015)...................................................................................4

*Mada-Luna v. Fitzpatrick,*
    813 F.2d 1006 (9th Cir. 1987) ....................................................................6

*Maldonado v. Fontanes,*
    568 F.3d 263 (1st Cir. 2009)......................................................................26

*Manzarek v. St. Paul Fire & Marine Ins. Co.,*
    519 F.3d 1025 (9th Cir. 2008) ..................................................................35

*Marsh v. Cnty. of San Diego,*
    680 F.3d 1148 (9th Cir. 2012) .............................................................26, 32

*Massachusetts v. EPA,*
    549 U.S. 497 (2007)............................................................................13, 14

*Massachusetts v. Mellon,*
    262 U.S. 447 (1923)...................................................................................13

*McCarthy v. United States,*
    850 F.2d 558 (9th Cir. 1988) ......................................................................3

*Md. Cas. Co. v. Pac. Coal & Oil Co.,*
    312 U.S. 270 (1941)...................................................................................40

*Mendez-Gutierrez v. Ashcroft,*
    340 F.3d 865 (9th Cir. 2003) ......................................................................5

*Michigan v. EPA,*
    213 F.3d 663 (D.C. Cir. 2000) ..................................................................19

*Michigan v. Thomas,*
    805 F.2d 176 (6th Cir. 1986) ....................................................................19

*Morrissey v. Brewer,*
    408 U.S. 471 (1972)...................................................................................28

*Municipality of Anchorage v. United States,*
    980 F.2d 1320 (9th Cir. 1992) ..................................................................20

*Munoz v. Ashcroft,*
    339 F.3d 950 (9th Cir. 2003) ....................................................................33

*Nat'l Fed'n of Fed. Emps. v. Weinberger,*
    818 F.2d 935 (D.C. Cir. 1987) ....................................................................6

*Nat'l Treasury Emps. Union v. Horner,*
    854 F.2d 490 (D.C. Cir. 1988) ....................................................................8

vi

*Nat'l Wildlife Fed'n v. EPA*,
  980 F.2d 765 (D.C. Cir. 1992) ...............................................................8

*Newman v. Sathyavaglswaran*,
  287 F.3d 786 (9th Cir. 2002) ..............................................................30

*Ng Fung Ho v. White*,
  259 U.S. 276 (1922).............................................................................38

*Noel v. Chapman*,
  508 F.2d 1023 (2d Cir. 1975)................................................................9

*Nozzi v. Hous. Auth. of L.A.*,
  806 F.3d 1178 (9th Cir. 2015) ................................................21, 28, 29

*Nunez by Nunez v. City of San Diego*,
  114 F.3d 935 (9th Cir. 1997) .........................................................30, 31

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,
  402 F.3d 846 (9th Cir. 2005) ..............................................................18

*Ohio Ass'n of Indep. Sch. v. Goff*,
  92 F.3d 419 (6th Cir. 1996) ................................................................16

*Organized Vill. of Kake v. U.S. Dep't of Agric.*,
  795 F.3d 956 (9th Cir. 2015) ................................................................5

*Pac. Shores Props., LLC v. City of Newport Beach*,
  730 F.3d 1142 (9th Cir. 2013) ............................................................23

*Padilla v. Kentucky*,
  559 U.S. 356 (2010).............................................................................33

*Padula v. Webster*,
  822 F.2d 97 (D.C. Cir. 1987) ................................................................6

*Parks Sch. of Bus., Inc. v. Symington*,
  51 F.3d 1480 (9th Cir. 1995) ..............................................................16

*Perales v. Casillas*,
  903 F.2d 1043 (5th Cir. 1990) ..............................................................6

*Perez v. Alta-Dena Certified Dairy, LLC*,
  647 F. App'x 682 (9th Cir. 2016) ........................................................26

*Perry v. Sindermann*,
  408 U.S. 593 (1972).............................................................................29

*Pickus v. U.S. Bd. of Parole*,
  543 F.2d 240 (D.C. Cir. 1976).............................................................22

*Pinnacle Armor, Inc. v. United States*,
    648 F.3d 708 (9th Cir. 2011) ....................................................................................10

*Powers v. Ohio*,
    499 U.S. 400 (1991)....................................................................................................16

*Raduga USA Corp. v. U.S. Dep't of State*,
    440 F. Supp. 2d 1140 (S.D. Cal. 2005)......................................................................18

*Raley v. Ohio*,
    360 U.S. 423 (1959)..............................................................................................33, 34

*Ramirez Medina v. U.S. Dep't of Homeland Sec.*,
    No. 17-0218, 2017 WL 5176720 (W.D. Wash. Nov. 8, 2017)........................11, 26, 29, 33

*Ray Charles Found. v. Robinson*,
    795 F.3d 1109 (9th Cir. 2015) ...................................................................................18

*Reno v. American-Arab Anti-Discrimination Comm.*,
    525 U.S. 471 (1999)....................................................................................................10

*Richardson v. Town of Eastover*,
    922 F.2d 1152 (4th Cir. 1991) ...................................................................................27

*Robbins v. Reagan*,
    780 F.2d 37 (D.C. Cir. 1985)...........................................................................5, 7, 20

*Romeiro de Silva v. Smith*,
    773 F.2d 1021 (9th Cir. 1985) ...................................................................................28

*Romer v. Evans*,
    517 U.S. 620 (1996)....................................................................................................24

*Runyon v. McCrary*,
    427 U.S. 160 (1976)....................................................................................................16

*Salgado-Diaz v. Gonzales*,
    395 F.3d 1158 (9th Cir. 2005) .............................................................................38, 39

*San Diego Air Sports Ctr., Inc. v. FAA*,
    887 F.2d 966 (9th Cir. 1989) .....................................................................................21

*Santobello v. New York*,
    404 U.S. 257 (1971)....................................................................................................34

*Santosky v. Kramer*,
    455 U.S. 745 (1982)....................................................................................................30

*Scenic Am., Inc. v. U.S. Dep't of Transp.*,
    836 F.3d 42 (D.C. Cir. 2016).....................................................................................30

viii

*Sec'y. of the Interior v. California*,
    464 U.S. 312 (1984)........................................................................................12

*Sessions v. Morales-Santana*,
    137 S. Ct. 1678 (2017)....................................................................................16

*Shaw v. Hunt*,
    517 U.S. 899 (1996)........................................................................................31

*Shroyer v. New Cingular Wireless Servs., Inc.*
    622 F.3d 1035 (9th Cir. 2010) .........................................................................3

*Singleton v. Wulff*,
    428 U.S. 106 (1976)........................................................................................16

*Snapp & Son, Inc. v. P.R. ex rel. Barez*,
    458 U.S. 592 (1982)........................................................................................13

*Snyder & Assocs. Acquisitions LLC v. United States*,
    859 F.3d 1152 (9th Cir. 2017) .........................................................................3

*Stauch v. City of Columbia Heights*,
    212 F.3d 425 (8th Cir. 2000) .........................................................................27

*Stevens v. GCS Serv., Inc.*,
    281 F. App'x 670 (9th Cir. 2008) ..................................................................39

*Taslimi v. Holder*,
    590 F.3d 981 (9th Cir. 2010) ...........................................................................9

*Texas v. United States*,
    787 F.3d 733 (5th Cir. 2015) ....................................................................6, 31

*Texas v. United States*,
    86 F. Supp. 3d 591 (S.D. Tex. 2015) ............................................................13

*Texas v. United States (Texas II)*,
    809 F.3d 134 (5th Cir. 2015) .............................................................11, 19, 40

*Thomas v. INS*,
    35 F.3d 1332 (9th Cir. 1994) .........................................................................34

*Thompson v. Washington*,
    497 F.2d 626 (D.C. Cir. 1973)........................................................................22

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
    137 S. Ct. 2012 (2017)....................................................................................31

*U.S. ex rel. Campie v. Gilead Scis., Inc.*,
    No. 11-0941, 2015 WL 106255 (N.D. Cal. Jan. 7, 2015)..............................36

*U.S. ex rel. Parco v. Morris*,
    426 F. Supp. 976 (E.D. Pa. 1977) ................................................................9, 21

*U.S. Telecomm. Ass'n v. F.C.C.*,
    400 F.3d 29 (D.C. Cir. 2005) ...........................................................................19

*United States v. Caceres*,
    440 U.S. 741 (1979)..........................................................................................33

*Velasco-Gutierrez v. Crossland*,
    732 F.2d 792 (10th Cir. 1984) .........................................................................28

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977).....................................................................................22, 24

*Villa-Anguiano v. Holder*,
    727 F.3d 873 (9th Cir. 2013) .............................................................................7

*Waldman v. Conway*,
    871 F.3d 1283 (11th Cir. 2017) .......................................................................26

*Wallis v. Spencer*,
    202 F.3d 1126 (9th Cir. 2000) .........................................................................28

*Walters v. Reno*,
    145 F.3d 1032 (9th Cir. 1998) .........................................................................11

*Washington v. Trump*,
    847 F.3d 1151 (9th Cir. 2017) ................................................................. *passim*

*Watkins v. U.S. Army*,
    875 F.2d 699 (9th Cir. 1989) .......................................................36, 37, 38, 39

*Webster v. Doe*,
    486 U.S. 592 (1988)............................................................................................6

*Wedges/Ledges of Cal., Inc. v. City of Phoenix*,
    24 F.3d 56 (9th Cir. 1994) ...............................................................................27

*Wenger v. Monroe*,
    282 F.3d 1068 (9th Cir. 2002) .........................................................................39

*Wyoming v. Oklahoma*,
    502 U.S. 437 (1992)..........................................................................................13

*Yassini v. Crosland*,
    618 F.2d 1356 (9th Cir. 1980) ...........................................................................9

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

**Statutes**

5 U.S.C. § 553 .................................................................................................20, 21

5 U.S.C. § 604(a) ......................................................................................................21

5 U.S.C. § 701(a)(2) .........................................................................................4, 5, 6, 9

5 U.S.C. § 702 ........................................................................................................4, 18

5 U.S.C. § 706(2)(A) ...............................................................................................9, 20

5 U.S.C. § 706(2)(B) ....................................................................................................5

8 U.S.C. § 1101(a)(15)(J) ..........................................................................................18

8 U.S.C. § 1601 .........................................................................................................19

8 U.S.C. § 1621(c) .....................................................................................................19

8 U.S.C. § 1641(b)(5) ................................................................................................19

8 U.S.C. § 1252(g) ........................................................................................4, 9, 10, 11

**Other Authorities**

28 Am. Jur. 2d *Estoppel and Waiver* § 27 (2017)...........................................................39

1

**INTRODUCTION**

2      The rescission of the DACA program breaks the promises that the federal government made to

3  hundreds of thousands of young Americans who were brought to this country as children and who have,

4  for the last five years, built their lives in reliance on DACA.  The record reflects that the government

5  rescinded the program without the slightest consideration of the devastating consequences it would have

6  for DACA recipients, their families, employers, schools, and communities.

7      The government's arbitrary action is illegal and unconstitutional.  The plaintiffs' complaints

8  collectively allege that the Rescission violated (1) the Administrative Procedure Act's requirements that

9  agency action not be arbitrary and capricious, an abuse of discretion, or otherwise not in accordance

10  with the law; (2) the APA's notice-and-comment procedural requirements; (3) the Equal Protection

11  component of the Fifth Amendment; (4) the Due Process Clause of the Fifth Amendment; and (5) the

12  principles of equitable estoppel.

13      The government contends that these actions are non-justiciable, that this Court lacks jurisdiction,

14  and that certain parties lack standing.  The government advanced identical arguments in related actions

15  in the Eastern District of New York—unsuccessfully.  *See Batalla Vidal v. Duke*, Nos. 16-4756, 16-

16  5228, 2017 WL 5201116 (E.D.N.Y. Nov. 9, 2017).  This Court should reject those same arguments here.

17      The government also contends that the plaintiffs' complaints should be dismissed for failure to

18  state legally viable claims.  To the contrary, and as set forth below, the complaints state well-supported

19  statutory and constitutional claims.  Both the APA and the Constitution limit the government's ability to

20  inflict arbitrary and massive harm for no supportable reason, and each renders the Rescission unlawful.

21

**BACKGROUND**

22      On June 15, 2012, the Department of Homeland Security created DACA through a memorandum

23  from then-Secretary Janet Napolitano (the "DACA Memorandum").  AR 1-3.[1]  Individuals who were

24  brought to the United States as children and who met certain criteria could apply for deferred action,

25  renewable every two years.  *Id.*  Deferred action under DACA, in addition to providing protection from

26

27  [1]      "AR" refers to the Administrative Record, Dkt. No. 64-1.

28

arrest, detention, and removal, led directly to the ability to obtain work authorization and the ability to apply for "advance parole" to travel overseas and lawfully return to the United States.  *See* App. at 1787-88 (USCIS Toolkit), App. at 1758-59 (USCIS FAQs).[2]  The government encouraged eligible individuals to apply for DACA, and, once approved, to renew every two years thereafter.  App. at 1756-57.  The government promised applicants that the information they provided as part of the DACA application process would be "protected" from use for immigration enforcement purposes.  App. at 1747, 1764, 1772.

In December 2016, then-Secretary of Homeland Security Jeh Johnson publicly stated that "representations made by the U.S. government, upon which DACA applicants most assuredly relied, must continue to be honored."  App. at 1822.  Even after the change in administrations, former Secretary of Homeland Security John Kelly in February 2017 specifically exempted DACA from the administration's broad repeal of other immigration directives and characterized DACA as a "commitment . . . by the government towards the DACA person."  App. at 1841.

One day prior to the Rescission, Attorney General Jefferson Sessions sent a one-page letter to Acting Secretary of Homeland Security Elaine Duke asserting that DACA "was effectuated . . . without proper statutory authority" and "was an unconstitutional exercise of authority by the Executive Branch," citing litigation surrounding another deferred action program, Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA").  AR 251.  The Attorney General's letter concluded that DACA was vulnerable "to the same legal and constitutional defects" as DAPA, and without further analysis said that "potentially imminent litigation would yield similar results with respect to DACA."  *Id.*  No court has ever held DACA to be illegal, and the Department of Justice had vigorously maintained the opposite in court.  Yet, on September 5, 2017, Acting Secretary Duke rescinded DACA based on a conclusory two-sentence paragraph stating:

> Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing [DAPA] litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated.  In the exercise of my

---

[2]     "App." refers to the Appendix of Exhibits submitted with the plaintiffs' motion for provisional relief, Dkt. No. 113, 117-19, 121, 124.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

authority in establishing national immigration policies and priorities, except for the purposes explicitly identified below, I hereby rescind the June 15, 2012 memorandum.

AR 255.

The rescission of DACA is inflicting immediate and irreparable harm on the nearly 700,000 current DACA recipients, who have been told to "prepare for and arrange their departure from the United States."  App. at 2199–2200.  The far-reaching consequences of the Rescission will also injure educational institutions and employers, cities, counties, states, and the national economy.  *See* App. 2201-10.

## LEGAL STANDARD

**Rule 12(b)(1).**  When a motion to dismiss challenges subject matter jurisdiction under Rule 12(b)(1), the party invoking the federal court's jurisdiction bears the burden of establishing jurisdiction. *Bishop Paiute Tribe v. Inyo Cty.*, 863 F.3d 1144, 1151 (9th Cir. 2017).  The factual allegations in the complaint are taken as true and all reasonable inferences must be drawn in favor of the party opposing dismissal.  *Snyder & Assocs. Acquisitions LLC v. United States*, 859 F.3d 1152, 1156-57 (9th Cir. 2017). When standing is challenged, plaintiffs may rely on the allegations in their complaint along with "whatever other evidence they submitted in support of their . . . motion to meet their burden." *Washington v. Trump*, 847 F.3d 1151, 1159 (9th Cir. 2017), *reh'g en banc denied*, 853 F.3d 933 (9th Cir. 2017), *superseded by* 858 F.3d 1168 (9th Cir. 2017); *see also McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988) (court may review affidavits and testimony to resolve factual disputes concerning the existence of jurisdiction).

**Rule 12(b)(6).**  A motion to dismiss under Rule 12(b)(6) may be granted only if the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory.  *Shroyer v. New Cingular Wireless Servs.*, *Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010).  The complaint need only plead sufficient facts to show that a claim is plausible on its face.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The factual allegations in the complaint are taken as true and all allegations are viewed in the light most favorable to the nonmoving party.  *Id.*

**ARGUMENT**

**I.    Plaintiffs' Claims Are Justiciable.**

The government's threshold justiciability arguments lack merit.  First, the government's decision to terminate DACA satisfies the predicates for APA review.  Second, section 1252(g) of the Immigration and Nationality Act does not strip this Court of jurisdiction.  Third, the states and local government plaintiffs, the University of California, and SEIU Local 521 have standing to challenge the Rescission.

**A.    The Rescission Is Not an Unreviewable Act of Agency Discretion.**

The APA exists to ensure that "federal agencies are accountable to the public and their actions subject to review by the courts."  *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992).  Consistent with this purpose, the APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.  There is a "strong presumption favoring judicial review" of agency actions, and the government must carry a "heavy burden" to establish that Congress intended to preclude judicial review.  *Mach Mining, LLC v. EEOC*, 135 S. Ct. 1645, 1651 (2015) (internal quotation marks omitted); *see also Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986) ("From the beginning our cases have established that judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." (quotation marks and brackets omitted)).

Although judicial review is unavailable for agency actions that are "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), this "very narrow exception" applies only in "rare instances." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971); *see also ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1071 (9th Cir. 2015) ("Section 701(a)(2) . . . has never been thought to put all exercises of discretion beyond judicial review.").

Section 701(a)(2) applies only where a court "would have no meaningful standard against which to judge the agency's exercise of discretion," *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993), and there is "no law to apply," *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).  Where, by contrast, there are "statutes, regulations, established agency policies, or judicial decisions that provide a meaningful standard against

4

1   which to assess" agency action, section 701(a)(2) does not bar judicial review.  *Mendez-Gutierrez v.*
2   *Ashcroft*, 340 F.3d 865, 868 (9th Cir. 2003).

3          In *Batalla Vidal*, the court considered the government's section 701(a)(2) argument and rejected
4   it, finding that "there is 'law to apply,' permitting meaningful judicial review of Plaintiffs' statutory
5   claims."  2017 WL 5201116, at *9.  As in *Batalla Vidal*, plaintiffs here assert procedural APA claims for
6   which "the relevant 'law to apply' is found in the APA and Regulatory Flexibility Act themselves, both
7   of which specify procedures that agencies must follow when engaging in 'substantive' or 'legislative'
8   rulemaking."  *Id.* (citing 5 U.S.C. §§ 553, 604).  After all, the "process by which an agency makes a rule
9   may be reviewed for compliance with applicable procedural requirements regardless of whether the
10  substance of the rule is itself reviewable."  *Id.* (citing *Vigil*, 508 U.S. at 195-98; *Am. Med. Ass'n v. Reno*,
11  57 F.3d 1129, 1134 (D.C. Cir. 1995); *N.Y.C. Emps.' Ret. Sys. v. SEC*, 45 F.3d 7, 11 (2d Cir. 1995)).

12         There also is "law to apply" to plaintiffs' substantive APA claims, since the purported
13  justification for the Rescission was a legal one—the legality of DACA or the "litigation risk" associated
14  with its continuation.  Rescission Memo, AR 254; *see also* Sessions Letter, AR 251.  The Court may
15  assess this justification "in light of, among other sources, the text of the INA and other statutes, the
16  history of the use of deferred action by immigration authorities, and the OLC Opinion" concluding that
17  DACA was lawful.  *Batalla Vidal*, 2017 WL 5201116, at *10; *see also Alcaraz v. INS*, 384 F.3d 1150,
18  1161 (9th Cir. 2004) (concluding that the "various memoranda" used by the Immigration and
19  Naturalization Service to implement an otherwise discretionary policy provided sufficient "law to
20  apply"); *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 970 (9th Cir. 2015) (reviewing
21  and rejecting agency's position based on assessment of litigation risk).  Moreover, because the
22  Rescission is an agency's termination of its own program, the DACA Memorandum itself supplies a
23  relevant benchmark in the analysis of whether the agency's reversal of course was reasonable and
24  reasonably explained.  *See Robbins v. Reagan*, 780 F.2d 37, 47 (D.C. Cir. 1985) (distinguishing *Chaney*
25  and explaining that "[r]escissions of prior obligations [are] clearly" reviewable).

26         Furthermore, where, as here, plaintiffs assert that agency action is "contrary to constitutional
27  right," 5 U.S.C. § 706(2)(B), the Constitution itself provides law to apply.  *See Grace Towers Tenants*
28  *Ass'n v. Grace Hous. Dev. Fund Co.*, 538 F.2d 491, 496 (2d Cir. 1976) (commitment to agency

5

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

1
2
3
4
5
6

discretion does not preclude review of "compliance with constitutional and statutory demands"); *Nat'l Fed'n of Fed. Emps. v. Weinberger*, 818 F.2d 935, 942 n.11 (D.C. Cir. 1987) ("there is 'clearly law to apply'—the Constitution").  Indeed, the Supreme Court has recognized that judicial review of constitutional claims is available even if an agency action is "committed to agency discretion" pursuant to section 701(a)(2).  *See, e.g.*, *Webster v. Doe*, 486 U.S. 592, 601-03 (1988); *Padula v. Webster*, 822 F.2d 97, 101 (D.C. Cir. 1987); *see also Batalla Vidal*, 2017 WL 5201116, at *11.

7
8
9
10
11
12
13
14
15
16

The government ignores these sources of law and relies on *I.C.C. v. Bhd. of Locomotive Eng'rs (BLE)*, 482 U.S. 270, 283 (1987), in which the Court concluded that section 701(a)(2) precludes review even when "the agency gives a 'reviewable' reason for otherwise unreviewable action."  Opening Br. 14, 16-17 (Dkt. No. 114).  But *BLE* stands only for the unremarkable proposition that a categorically unreviewable agency action, such as an individualized non-prosecution decision, does not become reviewable merely because it rests on a "reviewable" basis, such as a determination that the conduct at issue might be lawful.  482 U.S. at 282-83.  Because the Rescission is a reviewable type of government action in the first place, *BLE* is inapplicable.  *See Batalla Vidal*, 2017 WL 5201116, at *10 (the government's *BLE* argument "simply begs the question . . . of whether the decision to rescind DACA is actually unreviewable").[3]

17
18
19
20
21
22
23

The government's argument that the Rescission is a "classic example of a discretionary determination that is entrusted to the agency alone," Opening Br. 16, rests heavily on *Heckler v. Chaney*, 470 U.S. 821, but that case does not govern here.  In *Chaney*, plaintiff prison inmates sought to require the FDA to take enforcement actions to preclude the use of certain drugs in human executions.  *Id.* at 823–25, 830–33.  The Supreme Court found the FDA's non-enforcement decision to be non-justiciable, because decisions *not* to take enforcement actions (1) do not implicate the agency's exercise of

24
25
26
27
28

[3]  The government also cites *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006 (9th Cir. 1987), in which the court considered whether a set of agency "operating instructions" was properly promulgated.  But the court in that case did not decline jurisdiction under section 701(a)(2); it instead considered a procedural APA claim on the merits.  *See id.* at 1015.  *Perales v. Casillas*, 903 F.2d 1043 (5th Cir. 1990), relies on a dated, out-of-circuit rule limiting APA review to cases involving interpretation of "statutory or regulatory provisions," a principle rejected by the Fifth Circuit itself in *Texas v. United States*, 787 F.3d 733, 761 (5th Cir. 2015).

"*coercive* power of an individual's liberty or property rights, and thus do[] not infringe upon areas that courts often are called to protect," *id.* at 832, and (2) "often involve[] a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," *id.* at 831.  Accordingly, courts have limited *Chaney* to (3) "individual, case-by-case determinations of when to enforce existing regulations rather than permanent policies or standards."  *Kenney v. Glickman*, 96 F.3d 1118, 1123 (8th Cir. 1996).  None of these factors applies here.

*First*, *Chaney* involved a challenge to an "agency's refusal to take requested enforcement action."  470 U.S. at 831.  The government's rescission of DACA, by contrast, is an affirmative act that *revokes* the availability of prosecutorial discretion and subjects hundreds of thousands of DACA recipients to the prospect of removal—an indisputable exercise of "coercive state authority."  *See Batalla Vidal*, 2017 WL 5201116, at *11; *Villa-Anguiano v. Holder*, 727 F.3d 873, 881 n.9 (9th Cir. 2013) ("In contrast [to *Chaney*], where, as here, an agency has taken or is proposing to take action, that action itself provides a focus for judicial review.") (internal quotation marks omitted); *Robbins*, 780 F.2d at 47 ("rescissions of commitments, whether or not they technically implicate liberty and property interests as defined under the fifth and fourteenth amendments, exert much more direct influence on the individuals or entities to whom the repudiated commitments were made").

*Second*, the Rescission involves none of the "complicated balancing of a number of factors" that rendered the non-enforcement decision in *Chaney* unreviewable.  The Rescission appears to rest only on a determination that DACA was either unlawful or would result in intolerable litigation risk, with no assessment of any other factors.  As the *Batalla Vidal* court explained, "Defendants stated that they were required to rescind the DACA program because it was unlawful, which suggests both that Defendants did not believe that they were exercising discretion when rescinding the program and that their reasons for doing so are within the competence of this court to review."  2017 WL 5201116, at *11.

*Third*, the Rescission is not an individualized enforcement decision like in *Chaney*—it is a decision to rescind an entire program that will affect hundreds of thousands of individuals, families, and communities.  None of the plaintiffs are challenging the government's decision to grant or deny DACA to any particular individual.  Thus, defendants' argument that grants or "denials of deferred action are . . . committed to agency discretion," Opening Br. 15–16, is inapposite.

7

1    An agency's "major policy decision" is "quite different from day-to-day agency nonenforcement

2  decisions," and the "appropriate starting point" in such a case is the "APA presumption of

3  reviewability."  *Nat'l Treasury Emps. Union v. Horner*, 854 F.2d 490, 496-97 (D.C. Cir. 1988).

4  Because programmatic decisions do not involve "the sort of mingled assessments of fact, policy, and

5  law that drive an individual enforcement decision," *Crowley Caribbean Transp., Inc. v. Peña*, 37 F.3d

6  671, 676-77 (D.C. Cir. 1994), they do not present *Chaney*'s concern that courts should avoid intrusion

7  into such decisions.

8    Judged against these standards, the Rescission is unquestionably programmatic and justiciable.

9  Using categorical terms, the Rescission requires that DHS "reject all DACA initial requests and

10  associated applications for Employment Authorization Documents filed after [September 5, 2017]," and,

11  after October 5, 2017, reject all "DACA renewal requests and associated applications for Employment

12  Authorization Documents."  AR 255.  The Rescission also prohibits the approval of "any" applications

13  for advance parole "under standards associated with the DACA program" and requires DHS to

14  "administratively close all pending . . . applications."  *Id.*  Through these pronouncements, the

15  Rescission operates as an "affirmative decision to constrain DHS's prosecutorial discretion," *Batalla*

16  *Vidal*, 2017 WL 5201116, at *11, that does not resemble the individualized, fact-specific exercise of

17  non-enforcement discretion the Supreme Court found unreviewable in *Chaney*.  *See* 470 U.S. at 831-85.

18  Courts reviewing programmatic decisions like the Rescission routinely find that there is law to apply

19  and conduct APA review.  *See Edison Elec. Inst. v. EPA*, 996 F.2d 326, 333 (D.C. Cir. 1993) (reviewing

20  statement of EPA enforcement policy regarding storage of toxic waste); *Nat'l Wildlife Fed'n v. EPA*,

21  980 F.2d 765, 772–75 (D.C. Cir. 1992) (reviewing "a facial challenge" to enforcement regulations, in

22  contrast to "a particular enforcement decision"); *Int'l Longshoremen's & Warehousemen's Union v.*

23  *Meese*, 891 F.2d 1374, 1378–79 (9th Cir. 1989) (permitting judicial review of advisory opinion and

24  policy statement because they were based on agency's interpretation of its organic statute).

25    Finally, the government contends that the *Chaney* "presumption of nonreviewability applies with

26  particular force when it comes to immigration."  Opening Br. 15, 17.  But "the Supreme Court has

27  repeatedly and explicitly rejected the notion that the political branches have unreviewable authority over

28  immigration."  *Washington v. Trump*, 847 F.3d at 1162; *see INS v. St. Cyr*, 533 U.S. 289, 298 (2001)

8

1   (applying "strong presumption in favor of judicial review of administrative action" in the immigration

2   context).  Although immigration enforcement involves agency discretion, so do many other

3   administrative actions.  Indeed, the mandate of the APA is for courts to overturn actions that are

4   "arbitrary, capricious, *an abuse of discretion*, or otherwise not in accordance with law."  5 U.S.C.

5   § 706(2)(A) (emphasis added); *see ASSE*, 803 F.3d at 1071 ("The [APA's] abuse of discretion

6   standard . . . is a standard of review, not a bar to review.").  Accordingly, courts routinely conduct APA

7   review in the immigration context.  *See Bonilla v. Lynch*, 840 F.3d 575, 588 (9th Cir. 2016) (reviewing

8   BIA's denial of *sua sponte* reopening for legal and substantive error); *Taslimi v. Holder*, 590 F.3d 981,

9   984 (9th Cir. 2010) (reviewing BIA's interpretation of regulatory standard in asylum case).  Indeed,

10  courts have on several occasions conducted APA review of decisions to create or abandon immigration

11  deferred action programs.  *See, e.g.*, *Noel v. Chapman*, 508 F.2d 1023, 1030–31 (2d Cir. 1975) (rejecting

12  application of section 701(a)(2) and considering substantive and procedural APA challenges to

13  rescission of program permitting immigration officials to suspend indefinitely the voluntary departure

14  date of certain categories of aliens); *U.S. ex rel. Parco v. Morris*, 426 F. Supp. 976, 983 (E.D. Pa. 1977)

15  (considering substantive and procedural APA challenges to cancellation of extended voluntary departure

16  program).[4]

17      **B.      Section 1252(g) of the INA Does Not Bar Judicial Review of This Case.**

18          The government also argues that section 1252(g) of the INA, which provides that "no court shall

19  have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or

20  action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders,"

21  strips this Court of jurisdiction to hear this case.  Opening Br. 18.  As this Court correctly ruled in

22  denying the government's stay motion, however, this contention is wholly without merit.  *See* Order re

23  Mot. to Stay Proceedings , at 2 (Dkt. No. 85) ("section 1252(g)] has been 'narrowly construed' and is

24  plainly inapplicable to this action").  Judge Garaufis similarly rejected the government's argument that

25

26  _____
    [4]    Contrary to the government's assertion, Opening Br. 38, *Yassini v. Crosland* assumed that group
27  immigration decisions were subject to APA review, 618 F.2d 1356 (9th Cir. 1980), but found that the
    "good cause" and "foreign affairs" exceptions to the APA applied with respect to the particular program
28  at issue.

section 1252(g) strips the court of jurisdiction to hear a challenge relating to DACA's rescission. *Batalla Vidal*, 2017 WL 5201116, at \*12 ("Plaintiffs bring broad, programmatic challenges to Defendants' decisions (1) to end the DACA program; (2) to provide limited notice of that decision to DACA recipients; and (3) to change DHS's information-use policy.  None of those constitutes a 'decision or action . . . to commence proceedings, adjudicate cases, or execute removal orders against any alien.'").

Jurisdiction-stripping provisions like section 1252(g) must be construed narrowly, and "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review."  *Pinnacle Armor, Inc. v. United States*, 648 F.3d 708, 718 (9th Cir. 2011) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 140–41 (1967)).  Section 1252(g) therefore should be limited to its terms: it applies only to a "'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'"  *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999) (quoting 8 U.S.C. § 1252(g)).  This lawsuit involves none of the discrete decisions addressed by section 1252(g).  Plaintiffs do not challenge the government's decision to commence proceedings against any individual, to adjudicate a case against any individual, or to execute a removal order against any individual.  Instead, plaintiffs challenge the government's decision to rescind a deferred action program.

The government attempts to avoid the plain text of section 1252(g) by arguing that the Rescission is an "ingredient" to the commencement of enforcement proceedings at some future date, and that plaintiffs cannot "singl[e] out that single step for preemptive challenge."  Opening Br. 19.  But that argument is foreclosed by *AADC*.  525 U.S. at 482.  There, the Supreme Court resolved an apparent conflict between section 1252(g) and another provision of the INA by rejecting the government's argument that section 1252(g) was "a sort of 'zipper' clause that says 'no judicial review in deportation cases unless this section provides judicial review.'"  *Id*.  Instead, the Court held that "[t]he provision applies only to [the] three discrete actions" specifically identified in the text.  *Id*.  While "[t]here are of course many other decisions or actions that may be part of the deportation process," the Court found that "[i]t is implausible that the mention of three discrete events along the road to deportation was a

1   shorthand way of referring to all claims arising from deportation proceedings."  *Id.*  The government's

2   argument relies on precisely this type of improper "shorthand."

3          The decision in *Batalla Vidal* is only the latest in a long line of cases rejecting the government's

4   invocation of section 1252(g) to block challenges to enforcement policies.  *See Catholic Soc. Servs., Inc.*

5   *v. INS*, 232 F.3d 1139, 1150 (9th Cir. 2000) (concluding that section 1252(g) does not limit jurisdiction

6   to grant injunctive relief in a class action challenging the INS's advance parole policy); *Walters v. Reno*,

7   145 F.3d 1032, 1052 (9th Cir. 1998) ("By its terms, [section 1252(g)] does not prevent the district court

8   from exercising jurisdiction over plaintiffs' due process claims [because such claims] constitute 'general

9   collateral challenges to unconstitutional practices and policies used by the agency.'"); *Ramirez Medina*

10   *v. U.S. Dep't of Homeland Sec.*, No. 17-0218, 2017 WL 5176720, at *8 (W.D. Wash. Nov. 8, 2017)

11   (concluding that section 1252(g) does not strip the court of jurisdiction over claim that defendants did

12   not follow their own policies and procedures).[5]  Even the Fifth Circuit in *Texas* found that section

13   1252(g) did not apply to a challenge to a programmatic decision of DHS, there the DAPA program.

14   *Texas v. United States (Texas II)*, 809 F.3d 134, 164 (5th Cir. 2015) (although Congress had "expressly

15   limited or precluded judicial review of many immigration decisions, including some that are made in the

16   Secretary's 'sole and unreviewable discretion,' [] DAPA is not one of them").  This Court has

17   jurisdiction to conduct judicial review.

18          **C.      The Entity Plaintiffs Have Standing.**

19          The government does not challenge the standing of the individual plaintiffs, but does challenge

20   the standing of the states and local governments, the University of California, and SEIU Local 521 (the

21   "entity plaintiffs").  A party establishes standing by showing "a concrete and particularized injury that is

22

23   ---

   [5]      Consistent with the presumption in favor of judicial review, courts have declined to apply section
24   1252(g) even to many kinds of *individual* determinations.  *See Kwai Fun Wong v. United States*, 373
   F.3d 952, 963-64 (9th Cir. 2004) (rejecting the government's argument that section 1252(g) forecloses
25   the Court's review of challenges to an individual's claims arising before a decision to commence
   proceedings against the individual); *Gonzales Torres v. U.S. Dep't of Homeland Sec.*, No. 17-1840,
26   2017 WL 4340385, at *4 (S.D. Cal. Sept. 29, 2017) (section 1252(g) does not bar judicial review of
   whether the termination of an individual's DACA grant complied with the DACA Standard Operating
27   Procedures); *Coyotl v. Kelly*, No. 17-1670, 2017 WL 2889681, at *9 (N.D. Ga. June 12, 2017) (section
   1252(g) does not bar judicial review of whether defendants complied with their own procedures in
28   revoking plaintiff's DACA grant).

1   either actual or imminent, that the injury is fairly traceable to the defendant, and that it is likely that a

2   favorable decision will redress that injury." *Washington v. Trump*, 847 F.3d at 1159 (quoting

3   *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007)).  Although standing must be assessed claim by claim,

4   *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006), the presence of any plaintiff with standing is

5   sufficient to confer jurisdiction on this Court.  *See Bowsher v. Synar*, 478 U.S. 714, 721 (1986) (standing

6   of one plaintiff in consolidated cases sufficient to satisfy Article III); *Sec'y. of the Interior v. California*,

7   464 U.S. 312, 376 (1984) (same); *see also Batalla Vidal*, 2017 WL 5201116, at *14 (applying the same

8   rule in related cases).  Because the government does not dispute that the individual plaintiffs in the

9   *Garcia* action have standing to assert all of the claims at issue, the challenge to the standing of the entity

10  plaintiffs is irrelevant.

11          Moreover, in nearly identical circumstances, the Ninth Circuit has recently affirmed the standing

12  of government and university entities to challenge federal immigration policy affecting them.  *See*

13  *Washington v. Trump*, 847 F.3d at 1151.  As Judge Garaufis found in *Batalla Vidal*, the Rescission's

14  "sweeping, adverse effects on states and state-run institutions" supports the standing of these plaintiffs

15  to sue.  2017 WL 5201116, at *17.  For the reasons set forth below, the government, university, and

16  union plaintiffs have standing to pursue their claims.

17          **States and local governments.**  The states and local governments have clear injury resulting

18  from the rescission of DACA.  First, California, Maryland, San Jose, and the County of Santa Clara—all

19  of which employ DACA recipients—will be directly injured by the loss of work authorization for their

20  employees.  *States* Compl. ¶¶ 26-27, 32, 53 (Case No. 17-cv-05235); *San Jose* Compl. ¶¶ 49-50 (Case

21  No. 17-cv-05329); *Cnty. of Santa Clara* Compl. ¶ 32 (Case No. 17-cv-05813); *see also* App. at 0706-07

22  (Lee Decl. ¶¶ 3-6); App. at 0011 (Aguilar Decl. ¶ 6); App. at 1575-76 (Wells Decl. ¶ 11); App. at 0096-

23  07 (Oakley Decl. ¶ 8); App. at 0095-97 (Carrizales Decl. ¶¶ 8-11); App. at 0798 (Melvoin Decl. ¶¶ 16-

24  17).  As a direct result of the Rescission, these plaintiffs will be forced to forfeit their investment in

25  hiring, training, and managing DACA employees (many of whom were hired because of specialized

26  skills or qualifications) and to expend additional resources to find, hire, and train replacement

27  employees.  *States* Compl. ¶¶ 32, 53; App. at 0706-07 (Lee Decl. ¶¶ 5-6).

28

1

2

3

4

5

6

7

8

9

10

11

Second, the states and local government plaintiffs will lose significant tax revenue. *States*

*Compl.* ¶¶ 28-30, 37, 49-50, 70-71; *San Jose* Compl. ¶ 51; *Cnty. of Santa Clara* Compl. ¶¶ 43-44.  One

expert projects that California will suffer more than $71 billion in economic losses and $19 billion in

fiscal costs over a 10-year window as a result of the Rescission.  App. at 0073 (Brannon Decl. ¶ 14).

Employers throughout the plaintiff states—including small businesses, nonprofits, public entities, and

large companies such as Apple and Univision—rely on the contributions of DACA recipients.  *States*

*Compl.* ¶¶ 31, 39, 72; *San Jose* Compl. ¶¶ 28-29; *of Santa Clara* Compl. ¶ 41; *see also* App. at 1071

(O'Brien Decl. ¶¶ 5-8); App. at 1334-36 (Schwartz Decl. ¶¶ 4, 7-9); App. at 0706 (Lee Decl. ¶¶ 3-5);

App. at 1455 (Tellefson Decl. ¶ 11); App. at 0028 (Arevalo Decl. ¶ 11); App. at 1302 (Salas Decl. ¶ 19);

App. at 1268 (J. Smith Decl. ¶ 8); App. at 1289 (Rosen Decl. ¶ 7); App. at 0060 (Blazar Decl. ¶¶ 3-5);

App. at 1557-58 (Yaffe Decl. ¶¶ 7-8).[6]

12

13

Third, the state and local government plaintiffs allege injury to their sovereign and quasi-

sovereign interests.[7]  The state and local governments have an interest in the physical and mental health

14

15

16

17

18

[6]    Although vague allegations of economic harm do not support standing, *see Wyoming v.
Oklahoma*, 502 U.S. 437, 448 (1992), the specific allegations here, supported by expert evidence, are
clearly sufficient.  *See Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1130 (11th Cir. 2005)
(downstream environmental and economic effects of federal mismanagement are sufficient to grant
states standing against the federal government); App. at 0906-07 (Oakley Decl. ¶¶ 8, 10); App. at 1574-
76 (Wells Decl. ¶¶ 4, 6, 11).

19

20

21

22

23

24

25

26

27

[7]    The government argues that *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923), and *Snapp
& Son, Inc. v. P.R. ex rel. Barez*, 458 U.S. 592, 610 n.16 (1982), prevent states from bringing *parens
patriae* actions against federal defendants.  Opening Br. 21 n.6.  Plaintiffs need not rely on *parens
patriae* standing where, as here, the government's conduct imposes direct injury on plaintiffs and their
employees and students.  *Hawaii v. Trump*, 859 F.3d 741, 765 (9th Cir. 2017), *vacated on other grounds
by Trump v. Hawaii*, No. 16-1540, 2017 WL 4782860, at *1 (S. Ct. Oct. 24, 2017).  In any event, the
Supreme Court has rejected the view that *Mellon* and *Snapp* "cast significant doubt on a State's standing
to assert a quasi-sovereign interest . . . against the Federal Government," *Massachusetts v. EPA*, 549
U.S. at 520 n.17, observing that "*Mellon* itself disavowed any such broad reading when it noted that the
Court had been 'called upon to adjudicate, not the rights of person or property, not rights of dominion
over physical domain, [and] *not quasi-sovereign rights actually invaded or threatened*.'"  *Id.* (quoting
*Mellon*, 262 U.S. at 484-85) (emphasis original).  Moreover, courts have repeatedly held that states may
rely on their *parens patriae* standing where, as here, they sue the federal government "to enforce a
federal statute and to enjoin agency action allegedly in contravention of that statute."  *Abrams v.
Heckler*, 582 F. Supp. 1155, 1160 (S.D.N.Y. 1984); *see, e.g.*, *Am. Rivers v. FERC*, 201 F.3d 1186, 1205
(9th Cir. 1999) (standing to enforce provisions of the Federal Power Act); *Aziz v. Trump*, 231 F. Supp.

28

1   of their residents, including their access to health care.  By providing work authorization, DACA has

2   improved access to employer-based health care, which helps reduce health costs for the states' residents

3   as a whole.  *States* Compl. ¶¶ 51, 62; *Cnty. of Santa Clara* Compl. ¶¶ 45-46, 50; *see also* App. at 0789-

4   90 (McLeod Decl. ¶¶ 2, 4).  Termination of DACA, including the concern that information supplied to

5   the government as part of the DACA application will be misused for enforcement purposes, threatens

6   direct harm to DACA recipients' mental and physical health, with corresponding impacts to plaintiff

7   states and local governments' public health programs.  *States* Compl. ¶¶ 24, 63;  *Cnty. of Santa Clara*

8   Compl. ¶ 50; *see also* App. at 0815-16 (Mendoza Decl. ¶¶ 6-8).  The Rescission also threatens to erode

9   the public safety benefits that followed when DACA removed a significant obstacle to immigrants

10  approaching law enforcement for assistance when they have been victimized by crimes or have

11  witnessed crimes.  Without such protection, victims and witnesses may be dissuaded from reporting,

12  thereby frustrating the state and local government plaintiffs' ability to enforce their criminal laws.

13  *States* Compl. ¶ 23; *Cnty. of Santa Clara* Compl. ¶¶ 51-52; *see also* App. at 0343 (Gascón Decl. ¶ 12);

14  App. at 1289 (Rosen Decl. ¶ 8); App. at 1119 (O'Malley Decl. ¶¶ 14-15).

15          In addition to their proprietary standing, the states and San Jose also claim third-party standing to

16  assert the rights of their employees.  *San Jose* Compl. ¶ 10; *States* Compl. ¶¶ 32, 53.  *See also, e.g.*,

17  *Clark v. City of Lakewood*, 259 F.3d 996, 1009–1011 (9th Cir. 2001) (employer has third-party standing

18  to assert employees' constitutional rights where their interests are sufficiently aligned).  This Court has

19  recognized that individual DACA recipients reasonably may be reticent to bring these claims directly for

20  fear of publicly exposing the details of their immigration status and experience in the immigration

21  system.  Order Re Anonymity, at 2 (Dkt. No. 181).  As a result, the states and San Jose bring claims to

22  effectuate their employees' rights.

23

24  3d 23, 32-33 (E.D. Va. 2017) (states have sufficiently pleaded both propriety and *parens patriae*

25  standing to challenge defendants' "travel ban"); *Kansas ex rel. Hayden v. United States*, 748 F. Supp.
    797, 802 (D. Kan. 1990) (plaintiffs have standing to enforce provisions of the federal Disaster Relief

26  Act); *cf. Texas v. United States*, 86 F. Supp. 3d 591, 626 (S.D. Tex. 2015) (observing that states may

27  rely on *parens patriae* against the federal government "to *enforce* the rights guaranteed by a federal
    statute"); *Massachusetts v. EPA*, 549 U.S. at 520 n.17 (observing that a state has standing "to assert its

28  rights under federal law").

1
2
3
4
5

Finally, in *Washington v. Trump*, the Ninth Circuit recognized state government standing where there was a "concrete and particularized injury to [] public universities, which the parties do not dispute are branches of the States under state law."  847 F.3d at 1159.  Because, as set forth below, the University of California also has such injuries here, it follows a fortiori that the state plaintiffs have standing as well.

6
7

**The University of California.**  The University of California has both proprietary standing based on harm to the University itself, and third-party standing based on harm to its students and faculty.

8
9
10
11
12
13
14
15
16
17
18
19
20
21

The University of California has established significant proprietary injuries supporting its standing.  Just like the travel ban at issue in *Washington v. Trump*, the rescission of DACA, including its abolition of advance parole, has rendered University students unable to travel internationally for research and educational conferences.  *UC* Compl. ¶ 38; *see also, e.g.*, App. at 1322-23 (Sati Decl. ¶¶ 39-41).  Multiple DACA recipients have already decided to cancel their enrollment at the university because the Rescission forecloses their ability to work during and after their education.  App. at 0512-13 (Holmes-Sullivan Decl. ¶ 18).  Existing DACA students are at risk of dropping out because the Rescission will cause them to lose the jobs that fund their education.  App. at 0890 (Napolitano Decl. ¶ 15); App. at 0513 (Holmes-Sullivan Decl. ¶ 19).  For the University, losing these students also means losing research assistants, instructors, and collaborators, which will impair ongoing academic work.  *UC* Compl. ¶ 4, 35; App. at 0006-07 (Abrams Decl. ¶ 13); App. at 0633-34 (Jones Decl. ¶¶ 6-11); App. at 1462-63 (Treseder Decl. ¶ 16); App. at 0066 (Braddock Decl. ¶ 6).  This harm to research injures the University itself, whose reputation "depend[s] on the success of [its] professors' research."  *UC* Compl. ¶ 34-35; *Washington v. Trump*, 847 F.3d at 1160.[8]

22
23
24
25
26
27
28

---

[8]    The government asserts in a footnote that it is "unclear" whether both the University of California and the State of California can sue based on injuries to the University.  Opening Br. 21 n.5.  There is no principle of standing that precludes multiple plaintiffs from suing on related injuries, and in any event the states can readily establish standing based on injuries to other state-run educational institutions, including the California State University, California Community Colleges, St. Mary's College of Maryland, the University of Minnesota, and the Minnesota State system.  *States* Compl. ¶¶ 27, 55, 64-66; App. at 1500-01 (Jordan Decl. ¶¶ 7, 10); App. at 0021 (R. Anderson Decl. ¶¶ 5, 7); App. at 0906-07 (Oakley Decl. ¶¶ 8, 10); App. at 1574-76 (Wells Decl. ¶¶ 4, 6, 10).

15

The University also has third-party standing to assert the interests of its more than 1,000 DACA students, who are clearly injured by the Rescission.  Litigants that have suffered injury in fact, as the University has here, are permitted to bring actions on behalf of third parties when there is a close relationship with the third party and there is a hindrance to the third party's ability to protect his or her own interest.  *Powers v. Ohio*, 499 U.S. 400, 410–11 (1991); *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1689 (2017).  Schools regularly have been permitted to assert the rights of their students.  *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1487–88 (9th Cir. 1995) (college had standing to assert the rights of its students, who were being preventing from attending school); *Heartland Acad. Cmty. Church v. Waddle*, 427 F.3d 525, 533 (8th Cir. 2005) (school had standing to assert rights of removed students); *Runyon v. McCrary*, 427 U.S. 160, 175 & n.13 (1976) ("It is clear that the schools have standing to assert these arguments . . . on behalf of their patrons."); *Ohio Ass'n of Indep. Sch. v. Goff*, 92 F.3d 419, 422 (6th Cir. 1996) (same).

The University plainly has a close relationship with its DACA students sufficient to support third-party standing.  *See Washington v. Trump*, 847 F.3d at 1160 (the "interests of the States' universities are aligned with their students," as the educational success of students is "inextricably bound up" with the universities' capacity to teach those students).  And DACA students are hindered in their ability to bring suit on their own behalf because of their precarious immigration situations.  The Rescission has placed DACA students in fear of arrest and deportation.  App at. 0510 (Holmes-Sullivan Decl. ¶ 10) (Rescission causing fear among DACA recipients that they will be deported and will be unable to continue their studies).  The parents and family members of DACA students are often undocumented, creating an even greater impediment to DACA students' assertion of their rights.  App. at 2206, Topic 11.  A reasonable desire to shield private information from the publicity of court proceedings has been recognized as sufficient justification for third-party standing.  *See Singleton v. Wulff*, 428 U.S. 106, 117-18 (1976) (allowing physicians to bring suit to assert patients' abortion rights).  And in granting a request by a University of California student to participate anonymously in this case, the Court has already recognized that DACA recipients may be impaired in openly asserting their own rights.  Order Re Anonymity (Dkt. No. 181).  That leaves the University as a proper proponent of these students' rights.  *See Singleton*, 428 U.S. at 115-16.

16

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

1    **SEIU Local 521.**  The government cannot seriously contest SEIU Local 521's associational

2    standing to assert the interests of its members who are current DACA recipients.  *See Int'l Union,*

3    *United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock,* 477 U.S. 274, 281-86 (1986)

4    (labor union has associational standing to assert members' interests if members would themselves have

5    standing; members' interest is germane to union's purposes; and neither the claim asserted nor relief

6    requested requires participation of individual members in action); *see also Hunt v. Wash. Apple Advert.*

7    *Comm'n*, 432 U.S. 333, 343 (1977).  Here, the Union has standing because its members will be injured

8    by the rescission of DACA, that interest is germane to the Union's purposes, and neither the Union's

9    claims nor the relief requested will require the participation of its individual members.  *Cnty. of Santa*

10   *Clara* Compl. ¶¶ 18-20; App. at 0806-09 (Mendez Decl. ¶¶ 8-19); *see also Brock*, 477 U.S. at 286-88

11   (participation of individual union members not required when no damages sought so individualized

12   proof not required).  Because the Union stands in the shoes of its individual members, the government's

13   failure to challenge the standing of the *Garcia* plaintiffs establishes that the Union has standing to bring

14   all of the claims asserted in its complaint.

15                                        *       *       *

16         Each entity plaintiff has alleged injury-in-fact sufficient to support standing.  The remaining

17   standing requirements are readily satisfied.  In each instance, the asserted injuries to the entity plaintiffs

18   are directly traceable to the government's decision to rescind DACA.  But for that decision, DACA

19   recipients would continue to enjoy the benefits of DACA and would continue to serve as productive

20   members of their communities, obviating the harms described above.  It is equally clear that these harms

21   are redressable by this action; the requested injunctive and declaratory relief would restore the DACA

22   program to the status quo prior to the Rescission.

23         **D.    Plaintiffs Have Statutory Standing to Assert APA and RFA Claims.**

24         The entity plaintiffs likewise have statutory standing to bring APA claims pursuant to the "zone

25   of interests" test.  The zone of interests test for APA claims is "not meant to be especially demanding,"

26   and forecloses suit only when "interests are so marginally related to or inconsistent with the purposes

27   implicit in the statute that it cannot be reasonably assumed that Congress intended to permit the suit."

28   *Batalla Vidal*, 2017 WL 5201116, at *20 (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi*

1   *Indians v. Patchak*, 567 U.S. 209, 224 (2012)).  The entity plaintiffs therefore may establish statutory

2   standing based on a showing that their interests share a "plausible relationship" to the policies

3   underlying the relevant legislation or Constitutional provision.  *Ctr. for Biological Diversity v. Brennan*,

4   571 F. Supp. 2d 1105, 1120 (N.D. Cal. 2007); *see also Ass'n of Data Processing Serv. Orgs., Inc. v.*

5   *Camp*, 397 U.S. 150, 156 (1970) ("The question of standing . . . concerns . . . whether the interest sought

6   to be protected by the complainant is arguably within the zone of interests to be protected or regulated

7   by the statute or constitutional guarantee in question"); *Ray Charles Found. v. Robinson*, 795 F.3d 1109,

8   1120 (9th Cir. 2015) (same); *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 861 (9th

9   Cir. 2005).  In applying this test, courts must resolve "any doubt" in the plaintiff's favor, *id.*, and a

10  plaintiff "need only be 'arguably' within the zone [of interests]" to establish standing.  *Chief Prob.*

11  *Officers of Cal. v. Shalala*, 118 F.3d 1327, 1331 n.2 (9th Cir. 1997).  This "lenient approach" preserves

12  "the APA's omnibus judicial-review provision, which permits suit for violations of numerous statutes of

13  varying character that do not themselves include causes of action for judicial review."  *Lexmark Int'l,*

14  *Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1389 (2014); *see also Camp*, 397 U.S. at 156

15  ("we have construed [the APA] not grudgingly but as serving a broadly remedial purpose").

16      The gravamen of plaintiffs' statutory claims is whether the Rescission was a substantively or

17  procedurally valid exercise of DHS's rulemaking authority under the Immigration and Nationality Act;

18  the INA is therefore the "relevant statute" within the meaning of 5 U.S.C. § 702. *See* Opening Br. 21.

19  To the extent the entity plaintiffs rely on third-party standing to assert the rights of their employees and

20  students who are DACA recipients, they satisfy the zone of interests test just as the individual *Garcia*

21  plaintiffs do.  The same is true of the Union, which stands in the shoes of its members, including

22  individual DACA recipients and their family members.

23      Furthermore, the interests that support the entity plaintiffs' Article III standing also satisfy the

24  zone of interests test.  *See Hawaii*, 859 F.3d at 765 (holding that the loss of student enrollment and

25  research at universities conferred statutory standing on plaintiff states), *vacated on other grounds by*

26  *Trump v. Hawaii*, 2017 WL 4782860, at *1 (S. Ct. Oct. 24, 2017) (dismissed as moot); *see also Raduga*

27  *USA Corp. v. U.S. Dep't of State*, 440 F. Supp. 2d 1140, 1148 (S.D. Cal. 2005) (statutory standing

28  granted based on harm to employers from delay in processing employees' immigration status).  These

18

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

1   interests are congruent with interests identified in the INA itself in its provisions for work and student

2   visas.  *See* 8 U.S.C. § 1101(a)(15)(J) (identifying students, scholars, trainees, teachers, professors,

3   research assistants, specialists, or leaders in fields of specialized knowledge or skill); *id.* §

4   1101(a)(15)(H) (identifying aliens coming to perform services in a specialty occupation); *id.* §

5   1101(a)(15)(O) (identifying aliens with extraordinary abilities in the sciences, arts, education, business,

6   or athletics).  Similarly, consistent with the federal policy promoting "self-sufficiency" as a component

7   of immigration policy, 8 U.S.C. § 1601, the INA confirms the states' prerogative to provide employment

8   authorization and educational opportunity for undocumented residents.  *See Texas II*, 809 F.3d at 163;

9   *see also* 8 U.S.C. §§ 1621(c), 1641(b)(5).  Even the *Texas* court recognized "the importance of

10   immigration policy to the states" in finding the zone of interests test satisfied there.  809 F.3d at 163.

11       The government's lone citation to support its contention that the entity plaintiffs in this case do

12   not fall within the INA zone of interests relates to a completely different type of plaintiff—a private

13   anti-immigration organization—whose members were not individually affected by the immigration

14   policy at issue.  *See Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897 (D.C. Cir. 1996).

15   That case has no bearing on the governmental interests at issue here, nor the interests of the University

16   of California, the states and local governments, and SEIU Local 521 in asserting the interests of their

17   affected employees, students, faculty, and union members.

18       The government's argument that plaintiffs lack standing for their RFA claims is similarly

19   meritless.  The *Garcia* plaintiffs allege that Rescission threatens the small law firm Garcia has built,

20   *Garcia* Compl. ¶¶ 54, 128, 185-191 (Case No. 17-cv-05380); *see also* App. at 0267-68 (Garcia Decl.

21   ¶ 68).  Plaintiff states have standing under the RFA to represent the interests of their political

22   subdivisions, including school districts and other small government entities.  *Cf. U.S. Telecomm. Ass'n

23   v. F.C.C.*, 400 F.3d 29, 43 (D.C. Cir. 2005) (RFA claim brought by national association representing

24   small carriers); *Michigan v. EPA*, 213 F.3d 663, 688 (D.C. Cir. 2000) (reaching merits of state's RFA

25   claim); *Michigan v. Thomas*, 805 F.2d 176, 188 (6th Cir. 1986) (same).  Terminating DACA will

26   adversely affect small governmental jurisdictions in the states, and its impact on small businesses

27   generally will have a corresponding indirect effect on the states' economies.  *States* Compl. ¶¶ 4, 28, 49,

28   88, 156-63; *see also* App. at 0267-68 (Garcia Decl. ¶ 68); App. at 0011 (Aguilar Decl. ¶¶ 1-8); App. at

19

1    0025-29 (Arevalo Decl. ¶¶ 1-2, 7-8, 11-14); App. at 1455 (Tellefson Decl. ¶ 11); App. at 1502-03

2    (Wong Decl. ¶ 16) (nearly 8 percent of DACA recipients ages 25 and older have started a business).

3    **II.    Plaintiffs' Claims Are Adequately Pleaded.**

4        **A.    Plaintiffs Have Adequately Pleaded APA Claims.**

5        Plaintiffs assert substantive and procedural APA claims.  As set forth in plaintiffs' motion for

6    provisional relief, Dkt. No. 111, both are adequately pleaded and likely to succeed on the merits.

7            **1.    Plaintiffs Have Adequately Pleaded That the Rescission Was Arbitrary and Capricious Under the APA.**

8

9        Plaintiffs have adequately pleaded that the Rescission was arbitrary and capricious in violation of

10   5 U.S.C. § 706(2)(A).[9]  The APA requires courts to set aside agency action that is "arbitrary, capricious,

11   an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  This standard

12   requires agency action to be both reasonable and reasonably explained.  *Robbins*, 780 F.2d at 47.  As

13   explained at length in plaintiffs' motion for provisional relief, the Rescission is neither.  Dkt. No. 111, at

14   15-31.  The Rescission is arbitrary and capricious and contrary to law because: (1) the government failed

15   to explain the basis for the Rescission; (2) the government failed to consider all relevant factors and

16   articulate a rational connection between the facts found and the decision made; (3) the government

17   failed to offer a reasoned explanation for its reversal of policy; (4) the Rescission relies on a false legal

18   premise; and (5) the announced reason for the Rescission was pretextual.  *Id.*  The Rescission is also

19   contrary to law, and void under the APA, because it is unconstitutional.  *See* Sections II.B-C.

20           **2.    Plaintiffs Have Adequately Pleaded That the Rescission Is a Substantive Rule That Did Not Comply with the APA and RFA's Notice and Comment Requirements.**

21

22       Plaintiffs also have adequately pleaded that the Rescission fails to meet the APA's procedural

23   requirements.[10]  As explained in plaintiffs' motion for provisional relief, the Rescission constitutes a

24   substantive rule subject to the APA's notice and comment requirements, 5 U.S.C. § 553.  *See* Dkt. No.

25   111, at 31-34.  The Rescission is a substantive rule requiring notice and comment because it (a) binds

26

27   [9]        This claim is asserted in Case Nos. 17-cv-05211, 17-cv-05235, 17-cv-05813, and 17-cv-05380.

28   [10]       This claim is asserted in Case Nos. 17-cv-05211, 17-cv-05235, 17-cv-05329, and 17-cv-05380.

20

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

1    DHS and limits its discretion; (b) categorically bans DACA recipients from applying for and traveling

2    on advance parole; and (c) appears to rest on a determination of law.  *See Municipality of Anchorage v.*

3    *United States*, 980 F.2d 1320, 1325 (9th Cir. 1992) (the ultimate question in identifying a substantive

4    rule "is the agency's intent to be bound").  In its motion to dismiss, the government effectively concedes

5    that the Rescission is a substantive rule, stating that "[t]he rescission of DACA falls squarely in" the

6    category of "policy-based deprivations of the interests of a class" because it "applies across-the-board to

7    a large number of people."  Opening Br. 37-38.  Under the APA, substantive rules, or repeals of rules,

8    must go through notice and comment rulemaking before they become effective.  *San Diego Air Sports*

9    *Ctr., Inc. v. FAA*, 887 F.2d 966, 971 (9th Cir. 1989).  The Regulatory Flexibility Act further requires that

10   notice and comment rulemaking include an assessment of the impact on small entities.  5 U.S.C. §

11   604(a).  Because the Rescission indisputably did not abide by any of these requirements, it must be set

12   aside.

13           Plaintiffs' procedural due process claim is an important complement to their procedural APA

14   claim.  As demonstrated in Section II.C.2 below, DACA recipients have constitutionally protected

15   property and liberty interests, and plaintiffs allege that they have been deprived of these interests without

16   due process of law.

17           Contrary to the government's assertions, Opening Br. 37-38, plaintiffs do not contend that each

18   individual affected by the Rescission has a right to an individualized hearing.  However, they do contend

19   that the notice and comment requirements of the APA provide a measure of due process to parties

20   affected by the Rescission.  As demonstrated above in Section I.A, cancellations of government

21   programs—including extended voluntary departure programs, *see Parco*, 426 F. Supp. at 983—have

22   been held to be subject to the APA's notice and comment requirements.  This result is consistent with a

23   long line of cases holding that when a government agency issues a legislative rule that affects a large

24   group of people such that individual notice and opportunity to be heard are infeasible, *Bi-Metallic Inv.*

25   *Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915), procedural due process is satisfied by the

26   type of notice and comment procedures afforded by section 553 of the APA.  *See Nozzi v. Hous. Auth. of*

27   *L.A.*, 806 F.3d 1178, 1190-98 (9th Cir. 2015) (20,000 recipients of Section 8 vouchers had a protected

28   property interest in their housing benefits that gave them a procedural due process right to notice prior to

a policy change that would require them to pay higher rents); *Geneva Towers Tenants Org. v. Federated Mortg. Inv'rs*, 504 F.2d 483, 492 (9th Cir. 1974) (tenants entitled to notice and an opportunity to submit written comments on proposed rent increase in federally funded housing project); *Pickus v. U.S. Bd. of Parole*, 543 F.2d 240, 245 (D.C. Cir. 1976) ("The general principle that notice and comment rule making is constitutionally sufficient for policy decisions is applicable, at least in the absence of extraordinary circumstances."); *Thompson v. Washington*, 497 F.2d 626, 639 (D.C. Cir. 1973) (presence of substantial constitutional claim to procedural due process "informed" court's construction of statutory procedures).

### B.    Plaintiffs Have Adequately Pleaded Equal Protection Claims.

The government ignores the applicable standard for evaluating plaintiffs' equal protection claim articulated in *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977), and subsequent Ninth Circuit decisions.  Instead, the government attempts to recast plaintiffs' equal protection claim as a selective prosecution claim.  Opening Br. 32-35.  But this case challenges a policy decision to rescind the DACA program, not individual prosecution decisions, and plaintiffs have pleaded facts showing discriminatory intent and discriminatory treatment that violate the Constitution's equal protection guarantee.[11]

Under *Arlington Heights*, a plaintiff must "produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated the defendant and that the defendant's actions adversely affected the plaintiff in some way."  *Ave. 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 504 (9th Cir. 2016) (quoting *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1158 (9th Cir. 2013)).  A plaintiff does not have to prove "that the discriminatory purpose was the sole purpose of the challenged action, but only that it was a 'motivating factor.'"  *Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015).

Plaintiffs' factual allegations, which must be taken as true, establish each of *Arlington Heights*' intent factors, recognized by the Ninth Circuit in *Arce*:

The Supreme Court articulated the following, non-exhaustive factors that a court should

---

[11]    This claim is asserted in Case Nos. 17-cv-05235, 17-cv-05329, 17-cv-05813, and 17-cv-05380.

1

2

> consider in assessing whether a defendant acted with discriminatory purpose: (1) the
> impact of the official action and whether it bears more heavily on one race than another;
> (2) the historical background of the decision; (3) the specific sequence of events leading to
> the challenged action; (4) the defendant's departures from normal procedures or
> substantive conclusions; and (5) the relevant legislative or administrative history.

3

4

793 F.3d at 977 (citing *Arlington Heights*, 429 U.S. at 266); *see also Ave. 6E Invs.*, 818 F.3d at 504.

5

Plaintiffs have pleaded facts establishing all five of these factors.

6

*First*, plaintiffs have alleged that "individuals of Mexican heritage, and Latinos . . . together

7

account for 93 percent of approved DACA applications." *See, e.g.*, *Garcia* Compl. ¶¶ 99, 100, 151.

8

Thus there is no question that "the impact of the official action . . . bears more heavily on one race than

9

another." *Arce*, 793 F.3d at 977 (citing *Arlington Heights*, 429 U.S. at 266).

10

*Second*, plaintiffs allege that "[t]he historical background of the decision" to rescind DACA

11

shows invidious discriminatory animus against Mexican and other Latino immigrants. *Garcia* Compl.

12

¶¶ 99, 100, 151; *see also Pac. Shores Props.*, 730 F.3d at 1159. Because "officials . . . seldom, if ever,

13

announce . . . that they are pursuing a particular course of action because of their desire to discriminate

14

against a racial minority," it is appropriate to examine "whether they have 'camouflaged' their intent."

15

*Arce*, 793 F.3d at 978 (quoting *Smith v. Town of Clarkton*, 682 F.2d 1055, 1064, 1066 (4th Cir. 1982));

16

*see also Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Par.*, 641 F. Supp. 2d 563, 571

17

(E.D. La. 2009) ("The references to 'ghetto,' 'crime,' 'blight,' and 'shared values' are similar to the

18

types of expressions that courts in similar situations have found to be nothing more than 'camouflaged

19

racial expressions.'").

20

Here, the "pattern of bias against Mexicans and Latinos" began with President Trump's pre-

21

election statements. Among other things, he characterized Mexican immigrants as "rapists," "killers,"

22

and criminals, including in the speech launching his campaign.[12] *Garcia* Compl. ¶¶ 101-03, 109; *see*

23

*also Washington v. Trump*, 847 F.3d at 1167 (allegations concerning President's statements support

24

_____

25

[12]   The Ninth Circuit has considered President Trump's statements as evidence of discriminatory
intent, indicating that "[i]t is well established that evidence of purpose beyond the face of the challenged

26

law may be considered in evaluating . . . Equal Protection Clause claims." *Washington v. Trump*, 847

27

F.3d at 1167; *see also Aziz v. Trump*, 234 F. Supp. 3d 724, 734–35 (E.D. Va. 2017) (considering
President Trump's statements regarding the "travel ban" as part of the historical context of the order,

28

which "can include statements by relevant policymakers").

1  claim of discriminatory intent); *Garcia* Compl. ¶¶ 101–09.  This pattern of discriminatory statements

2  continued after he took office.  *See Garcia* Compl. ¶¶ 110–12.  And at a rally in Arizona on August 22,

3  2017—at the time the administration was deliberating the rescission of DACA—President Trump

4  described unauthorized immigrants as "animals" who bring "the drugs, the gangs, the cartels, the crisis

5  of smuggling and trafficking."  *Garcia* Compl. ¶ 111.  Within days of that speech, he pardoned

6  Maricopa County Sheriff Joseph Arpaio, who had been convicted of criminal contempt for intentionally

7  disobeying a federal court order to end a "pervasive culture of discriminatory bias against Latinos."  *Id.*

8  ¶ 112.  The President stated that Sheriff Arpaio had been "convicted for doing his job."  *Id.*[13]

9  The government argues that President Trump's statements "have no connection" to the

10  Rescission because he has "show[n] support for DACA recipients."  Opening Br. 34.  But despite

11  President Trump's occasional statements of reassurance to DACA recipients, he has also frequently

12  voiced animus against Mexicans, including *after* his statements of reassurance.[14]  Indeed, the Rescission

13  has proven false the President's statements of reassurance; by contrast, he has never repudiated his

14  comments regarding Mexican and Latino immigrants.[15]

15  As to the third, fourth, and fifth *Arlington Heights* intent factors, plaintiffs allege that the

17  [13]  While these allegations are drawn from the *Garcia* complaint, the *County of Santa Clara* and *San

18  Jose* complaints each allege the same or similar pattern of bias.  *Cnty. of Santa Clara* Compl. ¶¶ 9, 75, 76; *San Jose* Compl. ¶¶ 30–36, 54.

19  [14]  Even assuming that President Trump and his administration "do not personally hold such views,"

20  courts have held that "the presence of community animus can support a finding of discriminatory motives by government officials."  *Ave. 6E Invs.*, 818 F.3d at 504.  Plaintiffs have alleged repeated

21  public communications reflecting President Trump's response to and cultivation of anti-Mexican and Latino animus among his supporters.  *Garcia* Compl. ¶¶ 101–12; *Cnty. of Santa Clara* Compl. ¶¶ 9, 75,

22  76; *San Jose* Compl. ¶¶ 30–36, 54.  Thus, the government's argument fails for the alternative reason that the decision to rescind DACA may also have been a response to constituents' bias.  *See also Romer v.*

23  *Evans*, 517 U.S. 620, 635 (1996) (rejecting state's argument that challenged law was justified by, among other things, "respect for other citizens' freedom of association, and in particular the liberties of

24  landlords or employers who have personal or religious objections to homosexuality").

25  [15]  Although the government also argues that President Trump's statements are not connected to the

26  "relevant decision-maker (the Acting Secretary)," this argument mischaracterizes plaintiffs' allegations—the *Garcia* plaintiffs, for instance, allege that President Trump himself took responsibility

27  for the decision to rescind DACA.  *Garcia* Compl. ¶ 124.

government created a pretext for its discriminatory animus in "[t]he specific sequence of events leading up to the challenged decision," in "the defendant's departures from its normal procedures or substantive conclusions," and in the "relevant . . . administrative history." *Arce*, 793 F.3d at 977 (citing *Arlington Heights*, 429 U.S. at 266). In a little over six months, the government, indeed, the same Administration, went from maintaining that it was committed to DACA to calling DACA "fundamentally a lie." *Garcia* Compl. ¶¶ 45–47, 122, 154. Only the thinnest of justifications was offered for this about-face: "litigation risk." *Id.* at ¶¶ 116–20. But on the same day the rescission of DACA was announced, President Trump was unconcerned about litigation risk, writing on Twitter: "If [Congress] can't [act], I will revisit this issue!"[16]

Moreover, in the rescission memorandum, the Acting Secretary cited only the Attorney General's one-page letter, while failing to provide (a) any legal analysis of the purported litigation risk; (b) any acknowledgment of the widespread benefits of the DACA program; or (c) any analysis of the foreseeable harms to the hundreds of thousands who relied on DACA's benefits. *Id.* at ¶¶ 121–23.[17] Plaintiffs have plausibly alleged that racial animus, and not the stated pretext, was the primary motivation for the government's decision to rescind DACA.

## C. Plaintiffs Have Adequately Pleaded Substantive Due Process Claims.

Plaintiffs also have stated claims under substantive Due Process Clause of the Fifth Amendment.[18] The substantive component of due process prevents the government from infringing on

---

[16]  @realDonaldTrump, Twitter (Sept. 5, 2017, 5:38 PM), https://twitter.com/realDonaldTrump. According to the government, President Trump's tweets are official statements of the President of the United States. *See, e.g.*, Def.'s Suppl. Submission & Further Resp. to Pl.'s Post-Briefing Notices at 4, *James Madison Project v. Dep't of Justice*, No. 17-00144 (D.D.C. Jan. 23, 2017) ("[T]he government is treating the President's statements . . . whether by tweet, speech, or interview—as official statements of the President of the United States.").

[17]  *See also Cnty. of Santa Clara* Compl. ¶¶ 55–58, 77; *San Jose* Compl. ¶¶ 30–44; *States* Compl. ¶¶ 101–16. Senior Administration decisionmakers, including President Trump, also exhibited their bias through unfounded assertions scapegoating DACA recipients and accusing them of hurting the country. *States* Compl. ¶¶ 111-16, 175-76.

[18]  Substantive due process claims are asserted in Case Nos. 17-cv-05380, 17-cv-05235, and 17-cv-05813.

1   important interests unless the infringement is narrowly tailored to serve a compelling governmental

2   interest.[19]  *See, e.g.*, *Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 780 (9th Cir. 2014).[20]  It also prohibits

3   government conduct that "shocks the conscience" or interferes with rights implicit in the concept of

4   ordered liberty.  *Marsh v. Cnty. of San Diego*, 680 F.3d 1148, 1155 (9th Cir. 2012).

5           **1.**      **The government effectively concedes that plaintiffs have adequately alleged a substantive due process claim.**

6         The government's motion to dismiss plaintiffs' substantive due process claim focuses

7   exclusively on allegations regarding changes to the government's "policy on the use of information

8   contained in DACA requests," Opening Br. 38, and ignores the claim in the *Garcia* and *County of Santa*

9   *Clara* complaints that "*[r]escission of the DACA program* violated the Due Process Clause."  *Cnty. of*

10  *Santa Clara* Compl. ¶ 65 (emphasis added); *Garcia* Compl. ¶¶ 142–46 ("The government's arbitrary

11  termination of the DACA program and deprivation of the opportunity to renew DACA status violates

12  the due process rights of Plaintiffs and other DACA recipients.").  By failing to address these

13  allegations, the government effectively concedes that plaintiffs have adequately alleged a substantive

14  due process claim as to the overall rescission of DACA.  *See Perez v. Alta-Dena Certified Dairy, LLC*,

15  647 F. App'x 682, 685 (9th Cir. 2016) (reversing dismissal where movant sought only "to dismiss

16  [certain] 'pieces' of the two causes of action"); *Ramirez Medina*, 2017 WL 5176720, at *9 ("failure to

17  address" certain allegations "defeats [defendants'] assertion that [plaintiff] failed to state a claim"

18  regarding DACA revocation).

---

[19]  Even under rational basis review, the Rescission does not pass muster.  As set forth more fully in plaintiffs' motion for provisional relief, the government's action here is wholly arbitrary, *see* Dkt. No. 111, at 15–29, and not rationally related to any legitimate governmental objective.

[20]  The government's assertion that substantive due process claims are narrowly limited to certain "fundamental liberty interest[s]," Opening Br. 40, is inconsistent with precedent recognizing that deprivations of liberty *and* property can serve as a basis for such claims.  *E.g.*, *Action Apartment Ass'n, Inc. v. Santa Monica Rent Control Bd.*, 509 F.3d 1020, 1026 (9th Cir. 2007) (citing *Nunez v. City of Los Angeles*, 147 F.3d 867, 871 (9th Cir. 1998)); *see also Waldman v. Conway*, 871 F.3d 1283, 1292 (11th Cir. 2017) (Even "[w]here a fundamental liberty interest does not exist, substantive due process nonetheless protects against the arbitrary and oppressive exercise of government power."); *Maldonado v. Fontanes*, 568 F.3d 263, 272–73 (1st Cir. 2009).  And in any event, rescission of DACA implicates many essential liberty interests that are protected by substantive due process.  *See* Section II.C.2II.C.2.

1

### 2. The Rescission implicates multiple constitutionally protected interests.

2

3

The government's argument that "DACA recipients have no protected liberty or property interest in deferred action entitling them to due process protections," Opening Br. 36, is wrong.

4

5

6

7

8

9

10

11

12

13

14

15

16

*First*, the government's narrow focus on "deferred action" misconstrues the protected interest here, which is not the initial, discretionary grant of deferred action, but rather the plaintiffs' protected liberty and property interests that flow from a DACA grant and its renewal. *Garcia* Compl. ¶¶ 27–32, 138, 140; *UC* Compl. ¶¶ 69–70; *Cnty. of Santa Clara* Compl. ¶¶ 7, 60–63. The ability to renew DACA was "one of the main benefits used to induce Dreamers to step forward, subject themselves to a rigorous background investigation, and share sensitive personal information with the government." *Garcia* Compl. ¶¶ 22–26, 141; *UC* Compl. ¶¶ 3–5, 25, 29, 69–70; *Cnty. of Santa Clara* Compl. ¶¶ 5, 28, 60, 72, 80, 82; *see also States* Compl. ¶¶ 78, 99. The program would have been irrational and unsuccessful if it had extended only for two years, and indeed, the government consistently represented that applicants would have the opportunity to apply for renewal and would be eligible for renewal if they met certain requirements. *Garcia* Compl. ¶¶ 22–26; *Cnty. of Santa Clara* Compl. ¶¶ 5, 28. It is well established that an individual may have a protected interest in the renewal or retention of government benefits, including eligibility for immigration relief, even if the benefits were discretionary when first conferred.[21]

17

18

19

20

Other protected liberty and property interests flowing from DACA and its renewal include (i) freedom from government custody or detention; (ii) the right to live with and care for family members; (iii) the right to practice a chosen profession; (iv) the right to travel internationally; (v) public benefits; (vi) work authorization; and (vii) professional licenses. *Garcia* Compl. ¶¶ 27–32, 54, 73, 128;

21

22

23

24

25

26

27

---

[21]     *See, e.g.*, *Stauch v. City of Columbia Heights*, 212 F.3d 425, 430 (8th Cir. 2000) (finding "a protected property interest in the renewal of [plaintiff's] rental licenses"); *Wedges/Ledges of Cal., Inc. v. City of Phoenix*, 24 F.3d 56, 64 (9th Cir. 1994) (finding "a protect[a]ble property interest in retaining [] existing license tags"); *Richardson v. Town of Eastover*, 922 F.2d 1152, 1157 (4th Cir. 1991) ("entitlement to a renewal may be implied . . . from policies, practices, and understandings"); *Geneva Towers*, 504 F.2d at 489 (plaintiffs "have a legitimate, objectively justifiable claim . . . that they will continue to receive" government benefits); *see also Ixcot v. Holder*, 646 F.3d 1202, 1213 (9th Cir. 2011); *Arevalo v. Ashcroft*, 344 F.3d 1, 14 (1st Cir. 2003) ("[A]pplications for discretionary [immigration] relief, once made, often become a source of expectation and even reliance.").

28

27

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

*UC* Compl. ¶¶ 29–38, 46–49, 69–70; *Cnty. of Santa Clara* Compl. ¶¶ 30, 38–49, 60–63; *see also States* Compl. ¶¶ 5–6, 83–87, 137–40.  These benefits have "enable[d] [DACA recipients] to do a wide range of things open to [citizens]. . . .  Subject to the conditions of [the program], [they] can be gainfully employed and [are] free to be with family and friends and to form the other enduring attachments of normal life."  *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972) (holding that revocation of parole requires due process and noting that parolees "relied on at least an implicit promise that parole [would] be revoked only if [they] failed to live up to the parole conditions").  The government does not dispute that these interests are entitled to constitutional protection under established precedent.[22]

*Second*, the two cases cited by the government for the proposition that there is no protectable interest in obtaining "deferred action" are easily distinguished.  Opening Br. 37 (citing *Romeiro de Silva v. Smith*, 773 F.2d 1021 (9th Cir. 1985), and *Velasco-Gutierrez v. Crossland*, 732 F.2d 792 (10th Cir. 1984)).  Both cases addressed early INS operations instructions—which, unlike the programmatic exercise of discretion embodied by DACA, involved "unfettered discretion" rather than published eligibility criteria and established procedures.  *Compare Romeiro de Silva*, 773 F.2d at 1024, *and Velasco-Gutierrez*, 732 F.2d at 797, *with Gonzalez Torres*, 2017 WL 4340385, at *4 (requiring DHS to follow the DACA standard operating procedures).

Moreover, and of particular significance here, the plaintiffs in the government's cases had not yet been granted deferred action, whereas DACA recipients have organized their lives around DACA, including the ability to renew their DACA grants, and relied on its many protections and benefits.  *Garcia* Compl. ¶¶ 32, 41–42, 53–55, 72–75, 78–81, 94–98, 128, 130, 170, 195–96; *UC* Compl. ¶¶ 3–5, 35–38, 69–70; *Cnty. of Santa Clara* Compl. ¶¶ 1, 3, 7, 30–31, 38, 48, 72, 83; *States* Compl. ¶¶ 5–6, 87– 88, 168.  Once DACA was conferred, beneficiaries developed interests protected by the Constitution.

---

[22]  *E.g.*, *Nozzi*, 806 F.3d at 1190–91 (finding protected property interest in government benefits); *Lopez-Valenzuela*, 770 F.3d at 781 ("freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause") (citation and quotations omitted); *Engquist v. Or. Dep't of Agric.*, 478 F.3d 985, 997–98 (9th Cir. 2007) (due process protects "the right to pursue a chosen profession"); *Wallis v. Spencer*, 202 F.3d 1126, 1136, 1141 (9th Cir. 2000) (ability to live with and care for close family members is "an essential liberty interest" protected by the Due Process Clause); *DeNieva v. Reyes*, 966 F.2d 480, 485 (9th Cir. 1992) (the "right to international travel [is] a liberty interest that is protected by the Due Process Clause of the Fifth Amendment.").

1    *See, e.g.*, *Bell v. Burson*, 402 U.S. 535, 539 (1971) ("[o]nce [driver's] licenses are issued, . . . their

2    continued possession may become essential in the pursuit of a livelihood," and they cannot "be taken

3    away without" due process); *Gallo v. U.S. Dist. Ct. for Dist. of Ariz.*, 349 F.3d 1169, 1179 (9th Cir.

4    2003) ("Our case law holds that a professional license, once conferred, constitutes an entitlement subject

5    to constitutional protection."); *Ramirez Medina*, 2017 WL 5176720, at *9 (denying government's

6    motion to dismiss and finding that "the representations made to applicants for DACA cannot and do not

7    suggest that no process is due to them, particularly in Plaintiff's case where benefits have already been

8    conferred").

9         *Third*, the government's argument regarding agency discretion does not disturb the conclusion

10   that DACA implicates protected interests.  *See* Opening Br. 36–37.  The Ninth Circuit has repeatedly

11   explained that the property interests protected by the Due Process Clause "extend beyond tangible

12   property and include anything to which a plaintiff has a 'legitimate claim of entitlement.'"  *Nozzi*, 806

13   F.3d at 1191 (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 576–77 (1972)).

14   "A legitimate claim of entitlement is created 'and [its] dimensions are defined by existing rules or

15   understandings that stem from an independent source such as state law—rules or understandings that

16   secure certain benefits and that support claims of entitlement to those benefits.'"  *Id.* (quoting *Roth*, 408

17   U.S. at 577).  This independent source may be a statute, regulation, "explicit contractual provisions,"

18   "implied" agreements, or "rules or mutually explicit understandings."  *Perry v. Sindermann*, 408 U.S.

19   593, 601–02 (1972) ("A person's interest in a benefit is a 'property' interest for due process purposes if

20   there are such rules or mutually explicit understandings that support his claim of entitlement to the

21   benefit").

22        Here, plaintiffs have alleged a legitimate claim of entitlement to the continuation of the benefits

23   conferred under DACA.  DHS's rules and the government's operation of the program, the government's

24   communications with plaintiffs regarding DACA renewals, and the public promises of government

25   officials of both political parties, together created an understanding that DACA recipients were entitled

26   to the continued benefits of the program so long as they met the renewal criteria.  *Garcia* Compl. ¶¶ 16,

27   22–26, 33–34, 41–47, 114, 138–41; *UC* Compl. ¶¶ 3–5, 25–32, 39, 70–71; *Cnty. of Santa Clara* Compl.

28   ¶¶ 5, 7, 25–28, 38–40, 60–63, 72, 80–83; *States* Compl. ¶¶ 90–100, 165–68.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Finally, the language in the 2012 DACA Memorandum stating that it "confers no substantive right" does not disturb DACA recipients' entitlement to protection.  *See* Opening Br. 37.  As the Ninth Circuit has explained, the "identification of property interests under constitutional law turns on the substance of the interest recognized, not the name given that interest by the state."  *Newman v. Sathyavaglswaran*, 287 F.3d 786, 797 (9th Cir. 2002) (finding a protected property interest despite the government's "labeling of the interests" otherwise).  Here, the Court must look beyond the federal government's statements to determine the legal effect of its actions.  *See, e.g., Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42, 56 (D.C. Cir. 2016) (agency action was "final" despite disclaimer that agency "may provide further guidance in the future as a result of additional information"); *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000) (agency action was "final" despite disclaimer that action "[did] not represent final Agency action, and cannot be relied upon to create any rights enforceable by any party").

### 3. The Rescission fails to serve a compelling state interest.

The government's motion to dismiss underscores that the rescission violated the Due Process Clause because it is not "narrowly tailored to serve a compelling state interest."  *Lopez-Valenzuela*, 770 F.3d at 780.  The government must meet this heightened standard because the Rescission infringes on fundamental liberty interests, including (i) freedom from government custody or detention; (ii) the right to live with and care for close family members; and (iii) the right to practice a chosen trade or profession.  *See e.g., id.* (freedom from detention is a "fundamental liberty interest" held by undocumented immigrants); *Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 944, 951 (9th Cir. 1997) (rights to "free movement" and "to rear children without undue governmental interference" are both "fundamental"); *Engquist*, 478 F.3d at 996–97 (pursuing occupation of one's choice is covered by substantive due process protection of "rights implicit in the concept of ordered liberty") (internal quotation marks omitted); *see also Santosky v. Kramer*, 455 U.S. 745, 753 (1982) ("freedom of personal choice in matters of family life" including "care, custody, and management of" children is a "fundamental liberty interest").

1
2

The Rescission fails to pass constitutional muster under strict scrutiny for two independent reasons.[23]

3
4
5
6
7
8

*First*, the government maintains that the Rescission was based entirely on minimizing purported "litigation risk," Opening Br. 24–26, a justification that cannot rise to the level of a compelling state interest.  *See Shaw v. Hunt*, 517 U.S. 899, 908 n.4 (1996) ("avoiding the litigation . . . could not be a compelling interest"); *see also Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2024 (2017) (state's "policy preference for skating as far as possible from religious establishment concerns . . . cannot qualify as compelling").

9
10
11
12
13
14
15
16
17
18

*Second*, even if the government could identify some compelling state interest, its blanket revocation of benefits from nearly 700,000 people—each of whom has been individually adjudged to meet certain criteria—is the opposite of narrowly tailored.  *See Lopez-Valenzuela*, 770 F.3d at 783, 784, 788 (law categorically denying bail to undocumented immigrants was not narrowly tailored because it "employ[ed] an overbroad, irrebuttable presumption rather than an individualized hearing to determine whether a particular arrestee poses an unmanageable flight risk"); *Nunez,* 114 F.3d at 952 (curfew ordinance that failed to provide exceptions for legitimate activities violated substantive due process). And to the extent the government truly had concerns about the legality of DACA, it could have addressed specific elements of the program or altered its administration going forward, rather than eliminating the program outright.[24]

19

### 4.	The Rescission is fundamentally unfair.

20
21

The Rescission also violates substantive due process because it punishes nearly 700,000 young people who were brought to the United States as children.  The government does not contest that

22
23
24
25
26
27
28

---

[23]	The government's assertion that the rescission is legislative in character and "applies across-the-board to a large number of people," Opening Br. 38, underscores that it is subject to strict scrutiny under the "familiar . . . substantive due process standard" outlined in *Lopez-Valenzuela*.  770 F.3d at 780.

[24]	On October 18, 2017, the Attorney General testified to Congress that DACA could be legal under *Texas v. United States* if it were implemented "on an individualized basis."  *Oversight of the U.S. Dep't of Justice: Hearing before the S. Comm. on the Judiciary*, 115th Cong. (2017) (testimony of Jefferson B. Sessions, Att'y Gen. of the United States), goo.gl/NoUWCp.

31

1    fundamentally unfair government action "may rise to the level of a substantive due process violation."

2    Opening Br. 40.

3         The Due Process Clause forbids the government from depriving individuals of liberty or property

4    in a manner that "shock[s] the conscience" and "offend[s] the community's sense of fair play and

5    decency." *Marsh*, 680 F.3d at 1155 (quoting *Rochin v. California*, 342 U.S. 165, 172–73 (1952)).

6    While "the measure of what is conscience-shocking is no calibrated yard stick," *Johnson v. Newburg*

7    *Enlarged Sch. Dist.*, 239 F.3d 246, 252 (2d Cir. 2001) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S.

8    833, 847 (1998)), the Ninth Circuit has found that government conduct that needlessly causes "fear" and

9    "severe emotional distress" or "is likely to cause [a] family profound grief" may shock the conscience

10   and violate the Due Process Clause. *Marsh*, 680 F.3d at 1155 (concluding that a prosecutor's delivery of

11   a child's autopsy photograph to the press, without any legitimate governmental purpose, violated

12   mother's substantive due process rights).

13        Plaintiffs' complaints underscore how the Rescission will destroy the personal, professional, and

14   familial aspirations of nearly 700,000 young people and uproot them from the only home most have ever

15   known. *See, e.g.*, *Garcia* Compl. ¶¶ 128–32; *Cnty. of Santa Clara* Compl. ¶¶ 35, 39, 50; *UC* Compl. ¶¶

16   46–49; *States* Compl. ¶¶ 52, 63, 168.  The government's broken promises—and the profound

17   consequences from this breach of trust—"shock the conscience and offend the community's sense of fair

18   play and decency." *Marsh*, 680 F.3d at 1155.  This is doubly so because of the government's cruel bait-

19   and-switch:  after being promised certainty, security, and opportunity, DACA recipients made life-

20   changing decisions such as purchasing homes, enrolling in graduate programs, and starting families.

21   *See, e.g.*, App. at 2201-03, Topics 1, 2, 4, 5.  Now, the government says those promises were

22   "fundamentally a lie," and plaintiffs face deportation, financial ruin, and the prospect of lengthy—or

23   even permanent—separation from family, friends, and community.  *Garcia* Compl. ¶¶ 4–9, 32, 128–30,

24   170, 196; *Cnty. of Santa Clara* Compl. ¶¶ 3–4, 29–31, 35, 38–39, 45–50, 61–65, 72, 80–83; *UC* Compl.

25   ¶¶ 1–6, 28, 38, 46–49; *see also States* Compl. ¶¶ 119, 125, 130–31, 165–68.  The targeting of young

26   immigrants who arrived in the United States through no choice of their own "shock[s] the conscience"

27

28

32

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

1   and is antithetical to "our fundamental democratic notions of fair play, ordered liberty and human

2   decency." *Johnson*, 239 F.3d at 252.[25]

3          The government's motion fails to address plaintiffs' allegations regarding the government's

4   broken promises and its "unconstitutional bait-and-switch." *Garcia* Compl. ¶¶ 143–46.  The Due

5   Process Clause is implicated where, as here, "an individual has reasonably relied on [government

6   representations made] for his guidance or benefit and has suffered substantially because of their

7   violation by the [government]." *United States v. Caceres*, 440 U.S. 741, 752–53 (1979).  The

8   government promised DACA recipients that it would provide them with renewable protection from

9   deportation, and the opportunity to live and work in the United States, so long as they played by the

10  rules. *Garcia* Compl. ¶ 169.  After providing assurances of confidentiality, protection, and opportunity,

11  the government changed the rules, depriving plaintiffs of the benefit of their bargain and leaving them

12  exposed and even more vulnerable to deportation—a "particularly severe" sanction "intimately related

13  to the criminal process." *Padilla v. Kentucky*, 559 U.S. 356, 365 (2010).  This is precisely the type of

14  "unconstitutional bait-and-switch" that is forbidden by the Due Process Clause. *Garcia* Compl. ¶ 143;

15  *see Raley v. Ohio*, 360 U.S. 423, 425–26 (1959) (holding that prosecuting an individual for conduct that

16  state officials advised was legal violated due process); *Cox v. Louisiana*, 379 U.S. 559, 568–69 (1965)

17  (same).

18         The government also does not deny that the Due Process Clause "forbids the government from

19  breaking its promises" where, as here, individuals have been induced to undertake actions with

20  significant implications for their personal liberty. *Garcia* Compl. ¶ 144.  This includes situations where

21

22  _____

    [25]    The government asserts that *Munoz v. Ashcroft*, 339 F.3d 950 (9th Cir. 2003), forecloses
23  plaintiffs' substantive due process claim, but that case is readily distinguishable.  Opening Br. 40-41.
    *Munoz* rejected a claim by an undocumented immigrant (who was ineligible for immigration relief) that
24  the length of his stay and his relationships with family and friends in the United States gave him a right
    to remain.  *Id.* at 954.  Here, by contrast, the government established and vigorously promoted DACA,
25  offering vulnerable young people explicit permission to live and work in the United States if they
    stepped forward, disclosed sensitive personal information, paid a considerable fee, passed a rigorous
26  DHS background check, and were admitted to the program in the government's discretion.  Hundreds of
    thousands of individuals accepted this explicit quid pro quo and made life-changing decisions in reliance
27  on the government's promises.  *Ramirez Medina*, 2017 WL 5176720, at *9.

28

33

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

the government has offered immigration benefits in exchange for certain conduct, *see, e.g.*, *Thomas v. INS*, 35 F.3d 1332, 1337 (9th Cir. 1994) (principles of plea bargaining entitled noncitizen "to performance by the government of its promise" not to oppose his motion for relief from deportation), as well as other circumstances where the government offers a quid pro quo, such as plea bargain agreements and cooperation agreements, *e.g.*, *Santobello v. New York*, 404 U.S. 257, 262 (1971); *Buckley v. Terhune*, 441 F.3d 688, 699 (9th Cir. 2006) (en banc); *Brown v. Poole*, 337 F.3d 1155 (9th Cir. 2003).[26]

### 5.    Plaintiffs have alleged due process claims as to the government's information-sharing policies.

The government's attacks on plaintiffs' information-sharing claims also fail.  The principles articulated in *Cox* and *Raley*, discussed above—i.e., that the government may not punish people for engaging in conduct that the government itself has encouraged or permitted—apply squarely to plaintiffs' claims relating to information misuse.  *See Raley*, 360 U.S. at 437-39; *Cox*, 379 U.S. at 568-71.  In particular, the government's assertion that "no Plaintiff alleges facts sufficient to show that there actually has been a substantive change in policy regarding information sharing," Opening Br. 39, misstates both the standard for a motion to dismiss and plaintiffs' allegations.  Contrary to the government's assertion, plaintiffs allege that the government has "backtrack[ed]" on its "prior repeated assurances" and changed the standard for when information provided in a DACA request will be provided to ICE and CBP for immigration enforcement proceedings:  "Now, rather than affirmatively

---

[26]    Courts have held that "specific performance" is "the only viable remedy" for such due process violations.  *Brown*, 337 F.3d at 1161–62 (ordering specific performance and explaining that "fundamental fairness demands that the [government] be compelled to adhere to" its promises where the individual had "met the terms of the agreed-upon bargain" and rescission of the agreement was "impossible under [the] circumstances").  And any argument that the government should be permitted to break its promise to plaintiffs on account of its sudden revelation that DACA is purportedly unlawful is easily dismissed; the Ninth Circuit has rejected that same argument on at least two separate occasions.  *E.g.*, *Buckley*, 441 F.3d at 699 (rejecting the state's argument that its prior offer was not "lawful" and explaining that "it is now too late for the state to argue that it was not in a position" to make such an offer after the individual in question already had "fulfilled his promises"); *Brown*, 337 F.3d at 1161 (rejecting the government's argument that it need not honor a plea deal that the prosecutor "had no right to offer" as any such lack of authority "may be a problem for the state, but not for [the defendant]," who "had no reason to know that the prosecutor's promises were improper").

1   'protect[ing] [this information] from disclosure,' the government represents only that such sensitive

2   information '*will not be proactively provided* to ICE and CBP for the purpose of immigration

3   enforcement proceedings.'"  *Garcia* Compl. ¶ 126 (quoting DACA FAQs); *Cnty. of Santa Clara* Compl.

4   ¶ 58; *UC* Compl. ¶ 28; *States* Compl. ¶ 122.  Plaintiffs have further alleged that through a series of new

5   policies that eliminate privacy protections applicable to DACA data and significantly broaden DHS's

6   enforcement priorities, DACA recipients are now at risk of being placed in removal proceedings based

7   on information they provided in reliance on DHS's promises.  *States* Compl. ¶¶ 126-31.

8       The government's assertion that its prior policy remains unchanged—notwithstanding the

9   significant changes to its public guidance—cannot overcome plaintiffs' allegations to the contrary.

10  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) (a court must "accept

11  factual allegations in the complaint as true and construe the pleadings in the light most favorable to the

12  nonmoving party").  To the extent the government seeks to defeat plaintiffs' information-use claim by

13  taking the position that it has not and never will use information provided by DACA applicants for

14  immigration enforcement purposes (absent special circumstances), it must offer more than a vague

15  litigation assertion that the prior policy "currently remains in effect."  Opening Br. 39.  This is especially

16  true given the government's failure to honor its other promises regarding DACA.

17      Nor can the government defeat plaintiffs' information-use claims by relying on language in the

18  DACA FAQs that, if credited, would render meaningless the government's repeated public

19  representations about information sharing.  *See* Opening Br. 39 (asserting that the government's

20  information-sharing "policy 'may be modified, superseded, or rescinded at any time'").  This statement

21  does not nullify the government's contrary "represent[ations] to applicants, Congress, and the general

22  public" about the limits on the use of information provided by DACA applicants.  *Garcia* Compl. ¶ 35.

23  Indeed, Secretary Jeh Johnson explained last year that "[s]ince DACA was announced in 2012, DHS has

24  consistently made clear that information provided by applicants . . . will not later be used for

25  immigration enforcement purposes except where it is independently determined that a case involves a

26  national security or public safety threat, criminal activity, fraud, or limited other circumstances," and

27  that this approach was the "long-standing and consistent practice of DHS (and its predecessor INS)" for

28  "decades."  App. at 1822 (Johnson Letter); *see also Garcia* Compl. ¶¶ 36–37; *States* Compl. ¶ 98, Exh.

35

H.  As Secretary Johnson acknowledged, "DACA applicants most assuredly relied" upon "these representations" and the government's "consistent practice."  *Id.*[27]

### D.  Plaintiffs Have Pleaded Equitable Estoppel Claims.

Equitable estoppel "will be applied against the government" where "justice and fair play require it."  *Watkins v. U.S. Army*, 875 F.2d 699, 706 (9th Cir. 1989) (en banc) (citation omitted), *cert. denied*, 498 U.S. 957 (1990).  Plaintiffs have alleged each of the elements necessary to bring estoppel claims against the government.[28]  The government does not even seriously challenge that the four traditional estoppel elements are met.[29]  Instead, it attacks only the "two additional elements . . . beyond those required for traditional estoppel," which require that (1) the government engaged in "affirmative misconduct going beyond mere negligence," and (2) that "the government's wrongful act will cause a serious injustice, and the public's interest will not suffer undue damage" by application of estoppel.  *Id.* at 707.  Plaintiffs' claims easily meet these standards.

*First*, the government asserts that plaintiffs have "not identified any governmental misconduct, let alone extraordinary misconduct," Opening Br. 44, and, in particular, that plaintiffs failed to plead "an affirmative misrepresentation or affirmative concealment of a material fact by the government."  *Id.* at 43.  The government ignores that Acting Secretary Duke—who purportedly made the decision to rescind DACA—stated at the time that "DACA was fundamentally a lie."  *Garcia* Compl. ¶ 122.  And if this

---

[27]     Far from supporting the government's flawed theory, *Gerhart v. Lake Cty.*, 637 F.3d 1013 (9th Cir. 2011)—which was decided on a motion for summary judgment—underscores the viability of plaintiffs' claims.  In *Gerhart*, the court held that a property owner's unilateral "belief" did not give rise to a protected interest where there was no "evidence or allegation of a mutual understanding that he was otherwise entitled to a permit."  *Id.* at 1020–21.  Here, by contrast, the government expressly, repeatedly, and recently promised to protect applicants' information and acknowledged widespread reliance on those promises.  *Garcia* Compl. ¶¶ 33–47; *UC* Compl. ¶ 28; *Cnty. of Santa Clara* Compl. ¶¶ 4, 29, 64, 72, 80–82; *States* Compl. ¶¶ 118–25, 165–68.

[28]     This claim is asserted in Case Nos. 17-cv-05235, 17-cv-05813, and 17-cv-05380.

[29]     Without citing any case law or otherwise attempting to support their argument, the government asserts in a footnote that plaintiffs have failed to plead the traditional elements for estoppel.  *See* Opening Br. 44 n.16.  "[S]uch a conclusory argument [is not] sufficient to actually present a ground for dismissing a cause of action."  *U.S. ex rel. Campie v. Gilead Scis., Inc.*, No. 11-0941, 2015 WL 106255, at *18 n. 9 (N.D. Cal. Jan. 7, 2015).  Regardless, plaintiffs have satisfied their pleading burden with respect to these elements.  *See, e.g.*, *States* Compl. ¶¶ 3,11, 164–71; *Garcia* Compl. ¶¶ 192–99; *Cnty. of Santa Clara* Compl. ¶¶ 10, 79–86.

---

36

were not enough, the government also mischaracterizes the affirmative misconduct element and what plaintiffs allege.  Plaintiffs need only allege that the government has engaged in "affirmative misconduct going beyond mere negligence"—*not* extraordinary misconduct.  *See Watkins*, 875 F.2d at 707.  And "affirmative misconduct . . . require[s] an affirmative misrepresentation"; it "does not require that the government *intend* to mislead a party."  *Id.* (emphasis added).  Plaintiffs have more than satisfied their burden of alleging that the government engaged in affirmative misconduct:

- The government made many representations about DACA's terms that it is now violating, including "that DACA was lawful and that information collected in connection with the DACA program would not be used for immigration enforcement purposes absent special circumstances," *Garcia* Compl. ¶ 126; *States* Compl. ¶ 165 (similar); *Cnty. of Santa Clara* Compl. ¶ 80 (similar), and that "DACA recipients would have the opportunity to apply for renewed deferred action status at the end of their respective two-year authorization periods."  *Cnty. of Santa Clara* Compl. ¶ 80; *see also Garcia* Compl. ¶¶ 14–26, 33–47; *States* Compl. ¶ 78; *Cnty. of Santa Clara* Compl. ¶ 28.

- In January 2017, the government eliminated privacy protections applicable to DACA information and is now requiring agencies like DHS to ensure that their privacy policies exclude individuals who are not U.S. citizens or lawful permanent residents.  *Garcia* Compl. ¶ 125; *States* Compl. ¶ 126 (similar); *Cnty. of Santa Clara* Compl. ¶ 58 (similar).

- The government issued the rescission memo and released Acting Secretary Duke's statement that "DACA was fundamentally a lie," along with DHS guidance altering the government's prior assurances that "'[i]nformation provided in [a DACA] request is protected from disclosure to ICE and CBP.'"  *Garcia* Compl. ¶¶ 118–22, 126 (footnotes omitted); *see also States* Compl. ¶¶ 126, 130; *Cnty. of Santa Clara* Compl. ¶ 58.

The government's misconduct here is analogous to the facts in *Watkins*, where the Army was estopped from denying re-enlistment to a soldier because it had made "ongoing active misrepresentations" to the soldier over a multi-year period indicating he was eligible to re-enlist even though he was gay.  875 F.2d at 706-08.  The Ninth Circuit concluded that "the Army did not stand aside while Watkins reenlisted or accepted a promotion; it plainly acted affirmatively in admitting, reclassifying, reenlisting, retaining, and promoting Watkins."  *Id.* at 708.

Just as in *Watkins*, the government's conduct here has gone "far beyond a mere failure to inform or assist."  *Id.*  The government made repeated representations over many years about DACA to recipients in various official DHS forms and other publications and actively encouraged individuals to apply for and renew their DACA grants.  *See Garcia* Compl. ¶¶ 14–26, 33–41; *States* Compl. ¶¶ 7, 90-99, 125, 130-31; *Cnty. of Santa Clara* Compl. ¶¶ 29, 80-83.  The government's reversal, coupled with the implementation of its new information-sharing policies, strips DACA recipients of their expectations

37

1    and places them at risk of being removed based on personal, confidential information that the applicants

2    gave to the government based on an assurance that it would not be used for enforcement.  These actions

3    are undoubtedly "affirmative misconduct."[30]

4        *Second*, the government's argument that there can be no "serious injustice" caused by the

5    rescission of a "discretionary policy" cannot be credited.  Opening Br. 44.  At its core, this argument

6    challenges the reasonableness of plaintiffs' reliance on DACA and on the government's representations

7    about the terms of the program.  But plaintiffs' reliance is irrelevant as to this element, which requires

8    "the person seeking estoppel against the government . . . [to] show that the potential injustice to him

9    outweighs the possibility of damage to the public interest."  *Salgado-Diaz*, 395 F.3d at 1167.  Plaintiffs

10   have met that standard by specifically alleging how the Rescission harms them now and will harm them

11   in the future.  *See Garcia* Compl. ¶¶ 4–9, 128–32; *States* Compl. ¶¶ 1, 4-5, 10, 27, 29-30, 35-41, 47-56,

12   60, 64, 66, 70-74, 177; *Cnty. of Santa Clara* Compl. ¶¶ 15, 20, 60-63.  The government offers no

13   response to these allegations.

14       Likewise, the government does not deny that the use of DACA recipients' information for

15   enforcement purposes would lead to serious injustice:  "[D]eportation is a drastic measure and at times

16   the equivalent of banishment or exile."  *Fong Haw Tan v. Phelan*, 333 U.S. 6, 10 (1948); *see also Ng*

17   *Fung Ho v. White*, 259 U.S. 276, 284 (1922) (deportation "may result [] in loss of . . . all that makes life

18   worth living").  Nor can the government plausibly assert that equitable estoppel would damage the

19   public interest, since DACA recipients have passed rigorous government background checks and made

20   significant contributions to this country.  *See Garcia* Compl. ¶¶ 19–21, 48–98; *States* Compl. ¶¶ 4, 7, 26,

21   30-32, 37-38, 49, 55, 69-70, 72; *Cnty. of Santa Clara* Compl. ¶¶ 27-29, 32-34, 51; *see also Watkins*, 875

22   F.2d at 709.

23

24

25   [30]    As in *Salgado-Diaz v. Gonzales*, 395 F.3d 1158, 1166–67 (9th Cir. 2005), plaintiffs seek to estop
26   the government from using the information collected from them for immigration enforcement purposes.
     In that case, the Ninth Circuit found that the affirmative misconduct prong was satisfied because, like
27   here, the government obtained information from the petitioner under false pretenses and in violation of
     constitutional protections.  *Id.*; *see also id.* at 1166 ("the government cannot rely on the post-expulsion
28   events its own misconduct set in motion" as a basis to remove petitioner from the United States).

38

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The government's remaining arguments are equally meritless.  Contrary to the government's assertion that equitable estoppel is not a cause of action, the Ninth Circuit recognizes that an affirmative "claim for equitable estoppel lies only where the party to be estopped has engaged in conduct that causes justifiable reliance by the party asserting the claim."  *Wenger v. Monroe*, 282 F.3d 1068, 1076–77 (9th Cir. 2002), *as amended on denial of reh'g and reh'g en banc* (Apr. 17, 2002) (noting availability of equitable estoppel claim against government but affirming dismissal where plaintiff failed to plead justifiable reliance).[31]  Plaintiffs have sufficiently pleaded justifiable reliance, among the other required elements, and thus the claim is proper under *Wenger.  See Garcia* Compl. ¶¶ 53, 55, 59, 72, 78, 85, 94-95, 194; *States* Compl. ¶¶ 8, 99, 139, 166-68.

The government's argument that equitable estoppel does not apply to its "policy decisions" is not the law in this Circuit.  In *Watkins*, for example, the Ninth Circuit affirmed the district court's order estopping the Army from refusing to reenlist plaintiff "despite [the Army's] longstanding policy that homosexuality was a nonwaivable disqualification for reenlistment."  875 F.2d at 701, 711.  Any concern about the impact on policy decisions is considered under the public interest prong.  *See id.* at 708–09; *see also Salgado-Diaz*, 395 F.3d at 1166–67 (applying equitable estoppel in immigration context).

Finally, the government's unsupported argument that equitable estoppel is "only available for individualized claims," Opening Br. 44 n.15, is incorrect.  Courts may entertain arguments for equitable estoppel in non-individualized cases, including in class actions.  *See Lyng v. Payne*, 476 U.S. 926, 929, 935 (1986) (stating that 2,500-member class would not have prevailed on an equitable estoppel theory because of inability to demonstrate detrimental reliance—not because estoppel was categorically unavailable to them); *see also Stevens v. GCS Serv., Inc.*, 281 F. App'x 670, 671 (9th Cir. 2008) (similar).

---

[31]     The government's reliance on *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) is misplaced.  *Alexander* concerned private rights of action to enforce federal legislation, which is not at issue in these cases.  *Id.*  And even if equitable estoppel were not an independent cause of action, it is well recognized as a "judicial remedy."  28 Am. Jur. 2d *Estoppel and Waiver* § 27 (2017).

**III.     Nationwide Injunctive and Declaratory Relief Is Permissible and Appropriate.**

This Court has full authority to issue a nationwide injunction.  *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (injunction's scope "is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class"); *Bresgal v. Brock*, 843 F.2d 1163, 1171 (9th Cir. 1987) (holding that "[c]lass-wide relief may be appropriate even in an individual action," and injunction against federal agency "could hardly" be "on anything other than a nationwide basis").  Nationwide relief is appropriate where, as here, the challenged federal government action is invalid on its face.  *See Decker v. O'Donnell*, 661 F.2d 598, 618 (7th Cir. 1980).

Indeed, in the *Texas* DAPA litigation, the Fifth Circuit held that the importance of uniform application of the immigration laws made a nationwide injunction appropriate even though the plaintiffs there had not established nationwide injury.  *Texas II*, 809 F.3d at 187-88.  The Ninth Circuit cited that opinion approvingly in affirming nationwide provisional relief blocking the Administration's initial version of the travel ban.  *Washington v. Trump*, 847 F.3d at 1166-67.  Here, there is nationwide injury to nearly 700,000 people, their families, employers, and communities, and the interest in the uniform application of the immigration laws remains.  Accordingly, a nationwide injunction is even more appropriate here than in the *Texas* litigation.

Moreover, a declaration that DACA is lawful is appropriate relief.  Given that the stated basis for the Rescission is "litigation risk" arising from the supposed unlawfulness of DACA, which plaintiffs dispute, the government cannot credibly argue that there is no "actual controversy" concerning the lawfulness of DACA.  Opening Br. 45 (quoting 28 U.S.C. § 2201(a)).  Indeed, the government, in its motion to dismiss, and plaintiffs, in their motion for provisional relief, have both briefed whether DACA is lawful.  Dkt. No. 111, at 23-27; Opening Br. 27-28.  Thus, "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941).

**CONCLUSION**

For the foregoing reasons, this Court should deny the government's motion to dismiss.

1

2

Dated: November 22, 2017                                  Respectfully submitted,

3

COVINGTON & BURLING LLP                         XAVIER BECERRA
                                                 Attorney General of California
4                                                MICHAEL L. NEWMAN
/s/ Jeffrey M. Davidson                          Supervising Deputy Attorney General
Jeffrey M. Davidson (SBN 248620)
5    Alan Bersin (SBN 63874)
One Front Street, 35th Floor                     /s/ James F. Zahradka II
6    San Francisco, CA 94111-5356                JAMES F. ZAHRADKA II (SBN 196822)
Telephone: (415) 591-6000                        Deputy Attorney General
7    Facsimile: (415) 591-6091
Email: jdavidson@cov.com                         CHRISTINE CHUANG
8                                                REBEKAH A. FRETZ
Lanny A. Breuer (*pro hac vice*)                 RONALD H. LEE
9    Mark H. Lynch (*pro hac vice*)              KATHLEEN VERMAZEN RADEZ
Alexander A. Berengaut (*pro hac vice*)          SHUBHRA SHIVPURI
10   Megan A. Crowley (*pro hac vice*)           1515 Clay Street, 20th Floor
Ashley Anguas Nyquist (*pro hac vice*)           Oakland, CA 94612-0550
11   Jonathan Y. Mincer (Bar No. 298795)         Telephone: (510) 879-1247
Ivano M. Ventresca (*pro hac vice*)
12   COVINGTON & BURLING LLP                     *Attorneys for Plaintiff State of California*
One CityCenter
13   850 Tenth Street, NW                        JANET T. MILLS
Washington, DC 20001-4956                        Attorney General of Maine
14   Telephone: (202) 662-6000                   SUSAN P. HERMAN (*pro hac vice*)
Facsimile: (202) 662-6291                        Deputy Attorney General
15   E-mail: lbreuer@cov.com, mlynch@cov.com,    6 State House Station
aberengaut@cov.com, mcrowley@cov.com,            Augusta, Maine 04333
16   anyquist@cov.com, jmincer@cov.com,          Telephone: (207) 626-8814
iventresca@cov.com                               Email: susan.herman@maine.gov
17
Mónica Ramírez Almadani (SBN 234893)             *Attorneys for Plaintiff State of Maine*
18   COVINGTON & BURLING LLP
1999 Avenue of the Stars                         BRIAN E. FROSH
19   Los Angeles, CA 90067-4643                  Attorney General of Maryland
Telephone: (424) 332-4800                        STEVEN M. SULLIVAN (*pro hac vice*)
20   Facsimile: (424) 332-4749                   Solicitor General
Email: mralmadani@cov.com                        200 Saint Paul Place, 20th Floor
21                                               Baltimore, Maryland 21202
Erika Douglas (SBN 314531)                       Telephone: (410) 576-6325
22   COVINGTON & BURLING LLP                     Email: ssullivan@oag.state.md.us
333 Twin Dolphin Drive, Suite 700
23   Redwood Shores, CA 94061-1418               *Attorneys for Plaintiff State of Maryland*
Telephone: (650) 632-4700
24   Facsimile: (650) 632-4800
Email: edouglas@cov.com
25
Charles F. Robinson (SBN 113197)
26   Margaret Wu (Bar No. 184167)
Julia M. C. Friedlander (SBN 165767)
27   Sonya Sanchez (SBN 247541)

28

1   Norman Hamill (SBN 154272)
2   Harpreet Chahal (SBN 233268)
    Michael Troncoso (SBN 221180)
3   University of California
    Office of the General Counsel
4   1111 Franklin Street, 8th Floor
    Oakland, CA 94607-5200
5   Telephone: (510) 987-9800
    Facsimile: (510) 987-9757
6   Email: charles.robinson@ucop.edu

7   *Attorneys for Plaintiffs The Regents of the*
    *University of California and Janet Napolitano,*
8   *in her official capacity as President of the*
    *University of California*
9

10  GIBSON, DUNN & CRUTCHER LLP

11  /s/ Theodore J. Boutrous, Jr.

12  THEODORE J. BOUTROUS, JR., SBN 132099
    tboutrous@gibsondunn.com
13  KATHERINE M. MARQUART, SBN 248043
    kmarquart@gibsondunn.com
14  JESSE S. GABRIEL, SBN 263137
    jgabriel@gibsondunn.com
15  333 South Grand Avenue
    Los Angeles, CA 90071-3197
16  Telephone: (213) 229-7000
    Facsimile: (213) 229-7520
17

18  ETHAN D. DETTMER, SBN 196046
    edettmer@gibsondunn.com
19  555 Mission Street
    San Francisco, CA 94105
20  Telephone: (415) 393-8200
    Facsimile: (415) 393-8306
21

22  PUBLIC COUNSEL
    MARK D. ROSENBAUM, SBN 59940
23  mrosenbaum@publiccounsel.org
    JUDY LONDON, SBN 149431
24  jlondon@publiccounsel.org
    610 South Ardmore Avenue
25  Los Angeles, CA 90005
    Telephone: (213) 385-2977
26  Facsimile: (213) 385-9089

27  BARRERA LEGAL GROUP, PLLC
    LUIS CORTES ROMERO, SBN 310852
28  lcortes@barreralegal.com

LORI SWANSON
Attorney General State of Minnesota
JULIANNA F. PASSE (*pro hac vice*)
Assistant Attorney General
445 Minnesota Street, Suite 1100
St. Paul, Minnesota 55101-2128
Telephone: (651) 757-1136
Email: julianna.passe@ag.state.mn.us

*Attorneys for Plaintiff State of Minnesota*

COTCHETT, PITRE & McCARTHY, LLP
OFFICE OF THE CITY ATTORNEY
/s/ *Justin T. Berger*

JUSTIN T. BERGER
BRIAN DANITZ (SBN 247403)
bdanitz@cpmlegal.com
TAMARAH P. PREVOST (SBN 313422)
tprevost@cpmlegal.com
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA  94010
Telephone:  (650) 697-6000
Facsimile:   (650) 697-0577

RICHARD DOYLE (SBN 88625)
NORA FRIMANN (SBN 93249)
OFFICE OF THE CITY ATTORNEY
200 East Santa Clara Street, 16th Floor
San José, California 95113
Telephone: (408) 535-1900
Facsimile: (408) 998-3131
Email Address: cao.main@sanJoséca.gov

*Attorneys for Plaintiff City of San Jose*

19309 68th Avenue South, Suite R102
Kent, WA 98032
Telephone: (253) 872-4730
Facsimile: (253) 237-1591

LAURENCE H. TRIBE, SBN 39441
larry@tribelaw.com Harvard Law School
*Affiliation for identification purposes only*
1575 Massachusetts Avenue
Cambridge, MA 02138
Telephone: (617) 495-1767

ERWIN CHEMERINSKY, *pro hac vice*
forthcoming
echemerinsky@law.berkeley.edu
University of California, Berkeley School of Law
*Affiliation for identification purposes only*
215 Boalt Hall
Berkeley, CA 94720-7200
Telephone: (510) 642-6483

LEAH M. LITMAN, *pro hac vice*
forthcoming llitman@law.uci.edu
University of California, Irvine School of Law
*Affiliation for identification purposes only*
401 East Peltason Drive Irvine, CA 92697
Telephone: (949) 824-7722

*Attorneys for Plaintiffs DULCE GARCIA,*
*MIRIAM GONZALEZ AVILA, SAUL*
*JIMENEZ SUAREZ, VIRIDIANA CHABOLLA*
*MENDOZA, NORMA RAMIREZ, and JIRAYUT*
*LATTHIVONGSKORN*

1

2 /s/ James R. Williams                         /s/ Eric P. Brown

3 JAMES R. WILLIAMS, County Counsel             JONATHAN WEISSGLASS
  GRETA S. HANSEN                               jweissglass@altber.com
4 LAURA S. TRICE                                STACEY M. LEYTON
  laura.trice@cco.sccgov.org                    sleyton@altber.com
5 MARCELO QUIÑONES                              ERIC P. BROWN
  marcelo.quinones@cco.sccgov.org               ebrown@altber.com
6 OFFICE OF THE COUNTY COUNSEL                  ALTSHULER BERZON LLP
  COUNTY OF SANTA CLARA                         177 Post St., Suite 300
7 70 West Hedding Street                        San Francisco, CA 94108
  East Wing, Ninth Floor                        Telephone: (415) 421-7151
8 San Jose, CA 95110-1770
  Telephone: (408) 299-5900                     *Attorneys for Plaintiffs COUNTY OF SANTA
9 Facsimile: (408) 292-7240                     CLARA AND SERVICE EMPLOYEES
                                                INTERNATIONAL UNION LOCAL 521*
10
  *Attorneys for Plaintiff COUNTY OF SANTA CLARA*
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## ATTESTATION

I, Jeffrey M. Davidson, hereby attest, pursuant to Civil L.R. 5-1, that I have received authorization to electronically sign and file this document from each of the persons identified in the signature block.

Dated: November 22, 2017

        /s/ Jeffrey M. Davidson
        Jeffrey M. Davidson

*Counsel for Plaintiffs The Regents of the University of California and Janet Napolitano, in her official capacity as President of the University of California*