Case 3:17-cv-05211-WHA Document 211 Filed 11/22/17 Page 1 of 28
Case: 17-72917, 11/16/2017, ID: 10667551, DktEntry: 35-1, Page 1 of 28

(1 of 28)

FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

NOV 16 2017

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| In re: UNITED STATES OF AMERICA; DONALD J. TRUMP; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, | No. 17-72917 |
| | D.C. Nos. 3:17-cv-05211-WHA 3:17-cv-05235-WHA 3:17-cv-05329-WHA 3:17-cv-05380-WHA 3:17-cv-05813-WHA |
| UNITED STATES OF AMERICA; DONALD J. TRUMP; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, | Northern District of California, San Francisco |
| Petitioners, | ORDER |
| v. | |
| UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO, | |
| Respondent, | |
| REGENTS OF THE UNIVERSITY OF CALIFORNIA; JANET NAPOLITANO, In her official capacity as President of the University of California; STATE OF CALIFORNIA; STATE OF MAINE; STATE OF MINNESOTA; STATE OF MARYLAND; CITY OF SAN JOSE; DULCE GARCIA; MIRIAM GONZALEZ AVILA; VIRIDIANA CHABOLLA | |

(2 of 28)

Case 3:17-cv-05211-WHA Document 211 Filed 11/22/17 Page 2 of 28
Case: 17-72917, 11/16/2017, ID: 10665451, DktEntry: 35-1, Page 2 of 28

MENDOZA; NORMA RAMIREZ;
COUNTY OF SANTA CLARA;
SERVICE EMPLOYEES
INTERNATIONAL UNION LOCAL 521;
JIRAYUT LATTHIVONGSKORN;
SAUL JIMENEZ SUAREZ,

         Real Parties in Interest.

Petition for Writ of Mandamus

Argued and Submitted November 7, 2017
Pasadena, California

Before:  WARDLAW, GOULD, and WATFORD, Circuit Judges.

WARDLAW and GOULD, Circuit Judges:

On September 5, 2017, the Acting Secretary of the Department of Homeland Security ("DHS"), Elaine Duke, announced the end of DHS's Deferred Action for Childhood Arrivals policy ("DACA"), effective March 5, 2018.  Begun in 2012, DACA provided deferred action for certain individuals without lawful immigration status who had entered the United States as children.  Several sets of plaintiffs sued to enjoin the rescission of DACA under the Administrative Procedure Act ("APA") and under various constitutional theories not relevant here.

The merits of those claims are not before us today.  The only issue is a procedural one, raised by the government's petition for a writ of mandamus.  The

2

government asks us to permanently stay the district court's order of October 17, 2017, which required it to complete the administrative record.[1] *See* Order re Motion to Complete Administrative Record, *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, No. C 17-05211 WHA, 2017 WL 4642324 (October 17, 2017) ("Order"). We have jurisdiction pursuant to the All Writs Act, 28 U.S.C. § 1651. Because the district court did not clearly err by ordering the completion of the administrative record, we hold that the government has not met the high bar required for mandamus relief.

One note at the outset: We are not unmindful of the separation-of-powers concerns raised by the government. However, the narrow question presented here simply does not implicate those concerns. We consider only whether DHS failed to comply with its obligation under the APA to provide a complete administrative record to the court—or, more precisely, whether the district court clearly erred in so holding. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) ("[R]eview is to be based on the full administrative record that was before the Secretary at the time he made his decision."). This obligation is

---

[1] Issues regarding supplementation—as opposed to completion—of the record and the propriety of discovery on the non-APA claims, including the propriety of depositions, are not properly before us at this time, and we do not address them here.

imposed to ensure that agency action does not become effectively unreviewable, for "[i]f the record is not complete, then the requirement that the agency decision be supported by 'the record' becomes almost meaningless." *Portland Audubon Soc'y v. Endangered Species Comm.*, 984 F.2d 1534, 1548 (9th Cir. 1993). Assuring that DHS complies with this requirement—imposed by the APA on all agencies and embodied in decades of precedent—is undoubtedly a proper judicial function.

1.      "The writ of mandamus is a drastic and extraordinary remedy reserved only for really extraordinary cases." *In re Van Dusen*, 654 F.3d 838, 840 (9th Cir. 2011) (quoting *Ex parte Fahey*, 332 U.S. 258, 259–60 (1947) (internal quotation marks omitted)).  Indeed, "only exceptional circumstances amounting to a judicial usurpation of power or a clear abuse of discretion will justify the invocation of this extraordinary remedy." *Cheney v. U.S. Dist. Court*, 542 U.S. 367, 380 (2004) (internal quotation marks and citations omitted).  Ultimately, the issuance of the writ is "in large measure . . . a matter of the court's discretion." *Johnson v. Consumerinfo.com, Inc.*, 745 F.3d 1019, 1023 (9th Cir. 2014) (quoting *United States v. Sherman*, 581 F.2d 1358, 1361 (9th Cir. 1978)).

Our discretion is guided by the five factors laid out in *Bauman v. U.S. District Court*, 557 F.2d 650 (9th Cir. 1977).  However, we need not consider four

of those five factors here, because "the absence of factor three—clear error as a matter of law—will always defeat a petition for mandamus." *In re Bundy*, 840 F.3d 1034, 1041 (9th Cir. 2016) (quoting *In re United States*, 791 F.3d 945, 955 (9th Cir. 2015)). This factor—whether "[t]he district court's order is clearly erroneous as a matter of law," *Bauman*, 557 F.2d at 654–55—"is significantly deferential and is not met unless the reviewing court is left with a definite and firm conviction that a mistake has been committed." *In re Bundy*, 840 F.3d at 1041 (quoting *In re United States*, 791 F.3d at 955).

     2. The district court's order is not clearly erroneous as a matter of law. APA § 706 provides that arbitrary and capricious review shall be based upon "the whole record or those parts of it cited by a party." 5 U.S.C. § 706. The whole record "includes everything that was before the agency pertaining to the merits of its decision." *Portland Audubon*, 984 F.2d at 1548; *see also, e.g.*, *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996) ("The administrative record includes all materials compiled by the agency that were before the agency at the time the decision was made.") (internal quotation marks and citations omitted). More specifically, we have explained that the whole administrative record "consists of all documents and materials directly or *indirectly* considered by agency decision-makers and includes evidence contrary to the agency's position."

5

*Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989) (internal quotation marks omitted); *see also Bar MK Ranches v. Yuetter*, 994 F.2d 735, 739 (10th Cir. 1993) (same). The record is thus not necessarily limited to "those documents that the *agency* has compiled and submitted as 'the' administrative record." *Thompson*, 885 F.2d at 555 (internal quotation marks omitted).

At the initial case management conference before the district court, the government agreed to produce the complete administrative record on October 6, 2017. On that date, the government submitted as "the" administrative record fourteen documents comprising a mere 256 pages, all of which are publicly available on the internet. Indeed, all of the documents in the government's proffered record had previously been included in filings in the district court in this case, and 192 of its 256 pages consist of the Supreme Court, Fifth Circuit, and district court opinions in the *Texas v. United States* litigation.[2]

Faced with this sparse record, and on the plaintiffs' motion (opposed by the government), the district court ordered the government to complete the record to include, among other things, all DACA-related materials considered by

---

[2] That lawsuit challenged a related but distinct deferred action policy, Deferred Action for Parents of Americans and Lawful Permanent Residents, or DAPA. *See United States v. Texas*, 136 S. Ct. 2271 (2016); *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015); *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015).

subordinates or other government personnel who then provided written or verbal input directly to Acting Secretary Duke. The district court excluded from the record documents that it determined *in camera* are protected by privilege. Order at *8.

3.     The administrative record submitted by the government is entitled to a presumption of completeness which may be rebutted by clear evidence to the contrary. *Bar MK Ranches*, 994 F.2d at 740; *see also Thompson*, 885 F.2d at 555 (noting that the administrative record "is not necessarily those documents that the *agency* has compiled and submitted as 'the' administrative record."). The district court correctly stated this legal framework and concluded that the presumption of completeness had been rebutted here. Order at *5. This conclusion was not clear legal error: Put bluntly, the notion that the head of a United States agency would decide to terminate a program giving legal protections to roughly 800,000 people[3]

---

[3] *See* U.S. Citizenship and Immigration Services, *Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, by Fiscal Year, Quarter, Intake, Biometrics and Case Status Fiscal Year 2012–2017 (June 30)* (Sept. 20, 2017), goo.gl/UcGJww.

7

based solely on 256 pages of publicly available documents is not credible, as the

district court concluded.[4]

The district court identified several specific categories of materials that were

likely considered by the Acting Secretary or those advising her, but which were not

included in the government's proffered record.  For example, the record contains

no materials from the Department of Justice or the White House—other than a one-

page letter from Attorney General Jefferson B. Sessions—despite evidence that

both bodies were involved in the decision to end DACA, including the President's

own press release taking credit for the decision.[5]  Nor does the proffered record

include any documents from Acting Secretary Duke's subordinates; we agree with

the district court that "it strains credulity" to suggest that the Acting Secretary

decided to terminate DACA "without consulting one advisor or subordinate within

DHS."  Order at *4.  And the proffered record contains no materials addressing the

change of position between February 2017—when then-Secretary John Kelly

affirmatively decided *not* to end DACA—and Acting Secretary Duke's September

---

[4] The dissent agrees that "a policy shift of that magnitude presumably would
not have been made without extensive study and analysis beforehand."  Dissent at
1.

[5] *See* Press Release, White House Office of the Press Secretary, President
Donald J. Trump Restores Responsibility and the Rule of Law to Immigration
(Sept. 5, 2017), https://www.whitehouse.gov/the-press-office/2017/09/05/
president-donald-j-trump-restores-responsibility-and-rule-law.

2017 decision to do the exact opposite, despite the principle that reasoned agency decision-making "ordinarily demand[s] that [the agency] display awareness that it *is* changing position" and "show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

At oral argument, the government took the position that because the Acting Secretary's stated justification for her decision was litigation risk, materials unrelated to litigation risk need not be included in the administrative record. Simply put, this is not what the law dictates. The administrative record consists of all materials "*considered by* agency decision-makers," *Thompson*, 885 F.2d at 555 (emphasis added), not just those which support or form the basis for the agency's ultimate decision. *See also, e.g.*, *Amfac Resorts, LLC v. U.S. Dep't of Interior*, 143 F. Supp. 2d 7, 12 (D.D.C. 2001) ("[A] complete administrative record should include all materials that 'might have influenced the agency's decision,' and not merely those on which the agency relied in its final decision.") (quoting *Bethlehem Steel v. EPA*, 638 F.2d 994, 1000 (7th Cir. 1980)). And even if the record were properly limited to materials relating to litigation risk, the district court did not clearly err in concluding that it is implausible that the Acting Secretary would make a litigation-risk decision "without having generated any materials analyzing

the lawsuit or other factors militating in favor of and against the switch in policy." Order at *4.

It was therefore not clear error for the district court to conclude that the presumption of regularity that attaches to the government's proffered record is rebutted, and that ordering completion of the record was necessary and appropriate.

4.  Nor did the district court clearly err in identifying the materials that should have been included within the scope of the complete administrative record. The government challenges the decision to include materials considered by subordinates who then briefed the Acting Secretary, but this decision was not clear legal error. We have held that the record properly includes "all documents and materials directly or *indirectly* considered by agency decision-makers," *Thompson*, 885 F.2d at 555, but have not yet clarified the exact scope of "indirectly considered." District courts in this and other circuits, however, have interpreted that phrase to include materials relied on by subordinates who directly advised the ultimate decision-maker. *See, e.g.*, *Nat. Res. Def. Council v. Gutierrez*, No. C 01-0421 JL, 2008 WL 11358008, at *6 (N.D. Cal. Jan. 14, 2008) ("To the extent [the government argues] that only those documents that reached [the agency's] most senior administrators were in fact 'considered,' courts have rejected that view as contrary to the Ninth and other Circuits' pronouncements . . . .");

10

*GeorgiaCarry.org, Inc. v. U.S. Army Corps of Eng'rs*, 212 F. Supp. 3d 1348, 1352 (N.D. Ga. 2016) ("Documents and materials indirectly considered by agency decision-makers are those that may not have literally passed before the eyes of the decision-makers, but were so heavily relied on in the recommendation that the decisionmaker constructively considered them."); *Amfac Resorts*, 143 F. Supp. 2d at 12 ("[I]f the agency decisionmaker based his decision on the work and recommendations of subordinates, those materials should be included as well.").[6]

Moreover, as noted in the district court's October 17 order, a Department of Justice guidance document directs agencies compiling the administrative record to "[i]nclude all documents and materials prepared, reviewed, or received by agency personnel and used by or available to the decision-maker, *even though the final decision-maker did not actually review or know about the documents and materials*." U.S. Dep't of Justice, Env't and Nat. Res. Div., Guidance to Federal Agencies on Compiling the Administrative Record 3 (Jan. 1999) (emphasis added). It further provides that the administrative record should include "communications

_____

[6] We also note that the government has conceded in other cases that documents relied on by subordinates are properly part of the administrative record. *See Oceana, Inc. v. Pritzker*, No. 16-cv-06784-LHK (SVK), 2017 WL 2670733, at *4 (N.D. Cal. June 21, 2017) ("Defendants acknowledge . . . that a decision-maker can be deemed to have 'constructively considered' materials that, for example, were relied on by subordinates . . . .").

the agency received from other agencies . . . documents and materials that support *or* oppose the challenged agency decision . . . minutes of meetings or transcripts thereof . . . [and] memorializations of telephone conversations and meetings, such as a memorandum or handwritten notes." *Id.* at 3–4. The district court's October 17 order complies with this Department of Justice guidance; the government's proffered record does not.

We recognize that such guidance is not binding; we nevertheless find it persuasive as a statement by the Department of Justice as to what should be included in a complete administrative record. We also note that the guidance document DHS failed to comply with here was inexplicably rescinded the very same day that the government filed this petition for a writ of mandamus.

Given that the district court's interpretation of *Thompson* is consistent with the rulings of other district courts, comports with the Department of Justice's guidance on administrative records, and is not foreclosed by Ninth Circuit authority, we cannot say that the district court's interpretation was clearly erroneous as a matter of law. *See In re Swift Transp. Co.*, 830 F.3d 913, 916–17 (9th Cir. 2016) ("It is well established that '[t]he absence of controlling precedent

12

weighs strongly against a finding of clear error [for mandamus purposes].'")

(quoting *In re Van Dusen*, 654 F.3d at 845).[7]

    5.    The district court's order that the government complete the record

with documents considered by former DHS Secretary John Kelly in the course of

deciding not to terminate DACA in February 2017 also withstands mandamus

scrutiny.  This is not because of some freestanding requirement that all the

materials underlying a previous decision on a similar subject are always part of the

administrative record; rather, it simply recognizes that both decisions were part of

an ongoing decision-making process regarding deferred action:  In February 2017,

Secretary Kelly ended other prioritization programs, but left DACA and DAPA in

place; in June 2017, Secretary Kelly ended DAPA but left DACA intact; finally, in

September 2017, Acting Secretary Duke ended DACA.  The materials considered

by Secretary Kelly in the course of deciding against ending DACA in February

---

    [7] There is tension within our decisions about whether controlling Ninth
Circuit precedent is a *necessary* precondition to finding clear error as a matter of
law.  *Compare In re Swift Transp. Co.*, 830 F.3d at 917 ("If 'no prior Ninth Circuit
authority prohibited the course taken by the district court, its ruling is not clearly
erroneous.'") (quoting *In re Morgan*, 506 F.3d 705, 713 (9th Cir. 2007)), *with
Perry v. Schwarzenegger*, 591 F.3d 1147, 1159 (9th Cir. 2010) ("[T]he necessary
clear error factor does not *require* that the issue be one as to which there is
established precedent.") (emphasis added).  At a minimum, however, the lack of
such authority "weighs strongly" against finding clear error.  *In re Swift Transp.
Co.*, 830 F.3d at 916.

2017 did not cease to be "before the agency" for purposes of the administrative record during that seven-month evolution in policy. *Thompson*, 885 F.2d at 555–56. The district court's decision to order their inclusion in the record was therefore not clear legal error.

6.     Finally, the government makes two categorical arguments with respect to privilege.[8] First, it contends that *Cheney v. U.S. District Court*, 542 U.S. 367 (2004), bars the completion of the administrative record with any White House materials, because requiring White House officials to search for and assert privilege as to individual documents would be an unwarranted intrusion into executive decision-making. *Cheney*, of course, did not involve an administrative agency's obligation under the APA to provide the court with the record underlying its decision-making. It instead involved civil discovery requests that the Supreme Court described variously as "overbroad" and as "ask[ing] for everything under the sky." *Id.* at 383, 387. We do not read *Cheney* as imposing a categorical bar against requiring DHS to either include White House documents in a properly-

---

[8] The government also appears to challenge the district court's individual privilege determinations, but it has provided little in the way of argument regarding the specific documents ordered disclosed by the district court. We are unable to conclude that the government has met its burden of showing that the district court's privilege analysis was clearly erroneous as a matter of law.

defined administrative record or assert privilege individually as to those documents.

Moreover, the reasoning of *Cheney* appears to be based substantially on the fact that the Vice President himself was the subject of discovery. *See id.* at 381 ("Here, however, the Vice President and his comembers on the NEPDG are the subjects of the discovery orders."), 382 ("These separation-of-powers considerations should inform a court of appeals' evaluation of a mandamus petition involving the President or the Vice President."). Here, although the government is of course correct that the President is named as a defendant in some of the underlying lawsuits, there is no indication that either his documents or those of the Vice President would fall within the completed administrative record as ordered by the district court. *Cheney* therefore does not render the district court's order clearly erroneous.

Second, the government argues that it was clear legal error to require a privilege log and to evaluate documents allegedly protected by the deliberative process privilege on an individual basis, since "deliberative" materials are not properly within the administrative record at all. As noted above, the district court reviewed *in camera* each of the documents as to which the government asserted the deliberative process privilege, and ordered the inclusion of only those documents

15

that met the balancing standard laid out in *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984). The court stated that it would similarly review *in camera* any additional documents as to which the government claims privilege in the future. Order at *8.

As the government acknowledges, we have not previously addressed whether assertedly deliberative documents must be logged and examined or whether the government may exclude them from the administrative record altogether. However, many district courts within this circuit have required a privilege log and *in camera* analysis of assertedly deliberative materials in APA cases. *See, e.g.*, *Ctr. for Food Safety v. Vilsack*, No. 15-cv-01590, 2017 WL 1709318, at *5 (N.D. Cal. May 3, 2017)*; Inst. for Fisheries Res. v. Burwell*, No. 16-cv-01574 VC, 2017 WL 89003, at *1 (N.D. Cal. Jan. 10, 2017); *California* ex rel. *Lockyer v. U.S. Dep't of Agric.*, No. C05-03508 EDL, 2006 WL 708914, at *4 (N.D. Cal. March 16, 2008). Again, "the absence of controlling precedent" and the practice of the district courts "weigh[] strongly against a finding of clear error" for purposes of mandamus. *In re Swift Transp. Co.*, 830 F.3d at 916–17 (citation omitted).

We further note that the "deliberative" materials at issue in the main case cited by the government, *San Luis Obispo Mothers for Peace v. U.S. Nuclear*

16

Case 3:17-cv-05211-WHA Document 211 Filed 11/22/17 Page 17 of 28
Case 3:17-cv-05211-WHA, ID: 10665511, DktEntry: 2-1, Page 17 of 28
(17 of 28)

*Regulatory Comm'n*, 789 F.2d 26 (D.C. Cir. 1986) (en banc), were transcripts of literal deliberations among the members of a multi-member agency board. *See id.* at 44. Where—as in *Mothers for Peace*—an agency is headed by a multi-member board, the deliberations among those members are analogous to the internal mental processes of the sole head of an agency, and thus are generally not within the scope of the administrative record. *Cf. Portland Audubon*, 984 F.2d at 1549 (distinguishing *Mothers for Peace* as involving "the internal deliberative processes of *the agency* [and] the mental processes of *individual agency members*") (emphases added). No such deliberations among a multi-member agency are at issue here. The district court's decision to require a privilege log and evaluate claims of privilege on an individual basis before including documents in the record was not clearly erroneous as a matter of law.

\* \* \*

The district court's October 17, 2017 order represents a reasonable approach to managing the conduct and exigencies of this important litigation—exigencies which were dictated by the government's March 5, 2018 termination date for DACA. In order for the government to prevail in its request for the extraordinary remedy of mandamus, we must be "left with a definite and firm conviction that a mistake has been committed." *In re Bundy*, 840 F.3d at 1041 (quoting *In re United*

17

(18 of 28)

Case 3:17-cv-05211-WHA Document 211 Filed 11/22/17 Page 18 of 28
Case: 17-72917, 11/16/2017, ID: 10665551, DktEntry: 35-1, Page 18 of 28

*States*, 791 F.3d at 955).  We are left with no such conviction here, and mandamus relief is therefore not appropriate.

Accordingly, the stay of proceedings entered on October 24, 2017 is lifted.

**PETITION DENIED.**

(19 of 28)

Case 3:17-cv-05211-WHA Document 211 Filed 11/22/17 Page 19 of 28
Case: 17-72917, 11/16/2017, ID: 10663755, DktEntry: 85-2, Page 1 of 28

FILED

*In re United States of America*, No. 17-72917

NOV 16 2017

WATFORD, Circuit Judge, dissenting:

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

I understand why the district court ordered the Department of Homeland Security (DHS) to provide a more fulsome administrative record. The agency's decision to rescind DACA will profoundly disrupt the lives of hundreds of thousands of people, and a policy shift of that magnitude presumably would not have been made without extensive study and analysis beforehand. But the desire for greater insight into how DHS arrived at its decision is not a legitimate basis for ordering the agency to expand the administrative record, unless the plaintiffs make a threshold factual showing justifying such action. They have not done so here. As a result, I think the district court's order constitutes "a clear abuse of discretion," and the burden imposed by the order is exceptional enough to warrant the extraordinary remedy of mandamus. *Cheney v. United States District Court for the District of Columbia*, 542 U.S. 367, 380 (2004).

The district court's order violates two well-settled principles governing judicial review of agency action under the Administrative Procedure Act. The first is that a court ordinarily conducts its review "based on the record the agency presents to the reviewing court." *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985); *see also Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam). If the record compiled by the agency is inadequate to support the

(20 of 28)

Case 3:17-cv-05211-WHA Document 211 Filed 11/22/17 Page 20 of 28
Case 1:17-cv-05211-WHA Document 906855 Entry: 35-2, Page 2 of 28

Page 2 of 6

challenged action, the reviewing court will usually be required to vacate the

agency's action and remand for additional investigation or explanation. *Florida*

*Power*, 470 U.S. at 744. So in most cases the agency bears the risk associated with

filing an incomplete record, not the challengers.

The second principle is that documents reflecting an agency's internal

deliberative processes are ordinarily not part of the administrative record. *See In re*

*Subpoena Duces Tecum Served on the Office of the Comptroller of the Currency*,

156 F.3d 1279, 1279–80 (D.C. Cir. 1998); *Kansas State Network, Inc. v. FCC*, 720

F.2d 185, 191 (D.C. Cir. 1983). An agency generally has no obligation to include

documents that were prepared to assist the decision-maker in arriving at her

decision, such as memos or emails containing opinions, recommendations, or

advice. These pre-decisional materials are not deemed part of the administrative

record because they are irrelevant to the reviewing court's task. The court's

function is to assess the lawfulness of the agency's action based on the reasons

offered by the agency, *Motor Vehicle Manufacturers Association of the United*

*States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 50

(1983), not to "probe the mental processes" of agency decision-makers in reaching

their conclusions. *Morgan v. United States*, 304 U.S. 1, 18 (1938). Requiring

routine disclosure of deliberative process materials would also chill the frank

Page 3 of 6

discussions and debates that are necessary to craft well-considered policy. *See Assembly of the State of California v. Department of Commerce*, 968 F.2d 916, 920 (9th Cir. 1992); *San Luis Obispo Mothers for Peace v. Nuclear Regulatory Commission*, 789 F.2d 26, 45 (D.C. Cir. 1986) (en banc) (plurality opinion).

There are exceptions to these general rules. First, expansion of the record may be required when the agency fails to make formal findings and thus leaves the reviewing court unable to discern the agency's reasons for taking the action that it did. *See Public Power Council v. Johnson*, 674 F.2d 791, 793–94 (9th Cir. 1982). (This exception doesn't apply here because the memo issued by the Acting Secretary explicitly states her asserted reason for rescinding DACA: concern that the program would be invalidated in threatened litigation.) Second, the record may be expanded if there is evidence that the agency cherry-picked the materials it included by omitting factual information undermining the conclusions it reached. *See Portland Audubon Society v. Endangered Species Committee*, 984 F.2d 1534, 1548 (9th Cir. 1993). And third, documents reflecting an agency's internal deliberations may on occasion be made part of the record, but only if the challengers make "a strong showing of bad faith or improper behavior" on the part of agency decision-makers. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971), *abrogated on other grounds by Califano v. Sanders*, 430

(22 of 28)

Case 3:17-cv-05211-WHA Document 211 Filed 11/22/17 Page 22 of 28
Case 3:17-cv-05211-WHA Document 106-5 Filed 11/17/17 Page 4 of 28

Page 4 of 6

U.S. 99 (1977); *In re Subpoena Duces Tecum*, 156 F.3d at 1279–80.

The plaintiffs have not made the showing necessary to trigger either of the latter two exceptions. They have not shown any likelihood that factual information considered by the Acting Secretary and relevant to her decision has been omitted from the record. Indeed, it would be implausible to think that any such material exists, given the nature of the reason asserted by the Acting Secretary for rescinding DACA. Concern over the program's vulnerability to legal challenge would rest not on factual information but on the legal analysis of lawyers. Documents analyzing DACA's potential legal infirmities, prepared to assist the Acting Secretary in assessing the gravity of the litigation risk involved, fall squarely within the category of deliberative process materials mentioned above. They are presumptively outside the scope of what must be included in the administrative record (and may be privileged in any event).

Nor have the plaintiffs attempted at this stage of the case to show bad faith or improper behavior on the part of the Acting Secretary. To be sure, they assert in their brief that they suspect her stated reason for rescinding DACA is pretextual. But bare assertions of that sort fall far short of the showing needed to overcome the presumption that agency decision-makers have acted for the reasons they've given.

Because the plaintiffs have failed to establish that any of these exceptions

Page 5 of 6

apply, I don't think the district court's order can stand. The court directed DHS to
include in the administrative record all DACA-related "emails, letters, memoranda,
notes, media items, opinions, and other materials" considered by the Acting
Secretary, and all such materials considered by any other government
official—including officials from the Department of Justice and the White
House—who provided the Acting Secretary with written or verbal input on the
decision to rescind DACA. The court further expanded the record to include "all
comments and questions propounded by Acting Secretary Duke to advisors or
subordinates or others regarding the actual or potential rescission of DACA and
their responses."

In my view, the district court exceeded the scope of its lawful authority to
expand the administrative record. The order sweeps far beyond materials related to
the sole reason given for rescinding DACA—its supposed unlawfulness and
vulnerability to legal challenge. The order requires the inclusion of all documents
mentioning DACA-related issues of any sort, and is overbroad for that reason
alone. But even if the order had been limited to documents analyzing the risk that
DACA might be invalidated, those materials are deliberative in character and thus
could not be made part of the administrative record absent a showing of bad faith
or improper behavior. And to the extent the order will compel the production of

Case 3:17-cv-05211-WHA Document 211 Filed 11/22/17 Page 24 of 28
Case: 17-cv-05211, 11/16/2017, ID: 10663455, DktEntry: 35-2, Page 6 of 28

(24 of 28)

Page 6 of 6

communications between the Acting Secretary and high-level officials in the White House—including, potentially, the President himself—the order raises the same sensitive separation-of-powers concerns that made mandamus relief appropriate in *Cheney*. *See* 542 U.S. at 389–90.

These departures from settled principles are enough to establish that the district court's order is "clearly erroneous as a matter of law," which is the most important of the factors we consider when deciding whether to grant mandamus relief. *In re Bundy*, 840 F.3d 1034, 1041 (9th Cir. 2016). The other factors weigh in favor of granting relief as well. The order isn't immediately appealable, and if relief is denied the harm inflicted will be immediate and irreparable. As the declarations submitted by the government attest, the search for documents responsive to the court's order will be burdensome and intrusive, given the large number of government officials who may have provided written or verbal input to the Acting Secretary. And the damage caused by public disclosure of otherwise privileged materials can't be undone following an appeal from the final judgment.

This strikes me as a classic case in which mandamus relief is warranted, and I would therefore grant the writ.



*the WHITE HOUSE* · *PRESIDENT DONALD J. TRUMP*

HOME · BRIEFING ROOM · STATEMENTS & RELEASES

## From the Press Office

Speeches & Remarks

Press Briefings

**Statements & Releases**

Nominations & Appointments

Presidential Actions

Legislation

Disclosures

**The White House**

Office of the Press Secretary

cited in USA v. USDC-CASF
No. 17-72917 archived on November 20, 2017

For Immediate Release                                    September 05, 2017

# President Donald J. Trump Restores Responsibility and the Rule of Law to Immigration

*"I believe that real and positive immigration reform is possible, as long as we focus on the following goals: To improve jobs and wages for Americans; to strengthen our nation's security; and to restore respect for our laws." – President Donald J. Trump*

**RESPONSIBLY ENDING UNLAWFUL IMMIGRATION POLICY: Today, the Trump Administration is rescinding the previous Administration's memorandum creating the unlawful Deferred Action for Childhood Arrivals (DACA) program and has begun to end the program responsibly.**

- Attorney General Jeff Sessions sent a letter to the Department of Homeland Security explaining that DACA was not statutorily authorized and was therefore an unconstitutional exercise of discretion by the executive branch.
  - Attorney General Sessions found that DACA, given pending litigation, would likely face the same outcome as the Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) program, which was enjoined by the courts.
- The Trump Administration is taking responsible action to wind down DACA in an orderly and minimally disruptive manner.
  - If President Trump allowed DACA to go to court, it is likely that the court would abruptly enjoin the program.
    - If President Trump had refused to act, many States were prepared to pursue litigation to end DACA by court order.
  - Under the change announced today, current DACA recipients generally will not be impacted until after March 5, 2018, six months from now. That period of time gives Congress the opportunity to consider appropriate legislative solutions.
- DHS's enforcement priorities remain in place. However, absent a law enforcement interest—which is largely the standard that has been in place since the inception of the program—the Department will generally not take actions to remove active DACA recipients.
  - DACA recipients range from ages 15 to 36, with the overwhelming majority being of adult age.
- Initial requests for Employment Authorization Documents under DACA properly filed and accepted through today will be processed.
  - Additional DACA initial applications filed after today will not be accepted.
- Renewal applications for DACA Employment Authorization Documents properly filed and accepted by October 5, 2017, for people whose current Employment Authorization Documents expire between today and March 5, 2018, will be processed.
  - Any such requests filed after October 5, 2017 will not be accepted.
- Currently approved applications for advance parole for DACA recipients will generally be honored, but new applications will not be approved.
  - All pending applications for advance parole by DACA recipients will be closed and associated fees will be refunded.

**RESTORING LAW AND ORDER TO OUR IMMIGRATION SYSTEM:** The DACA program was never intended to be permanent—even President Obama admitted it was a temporary, extraordinary measure. And President Obama repeatedly recognized that such unilateral actions were in excess of the Executive's appropriate role.

- President Obama admitted publicly on at least a 22 occasions that creating a DACA-like program was beyond his authority. President Obama said:
  - In 2011, that "there are enough laws on the books by Congress that are very clear in terms

of how we have to enforce our immigration system that for me to simply through Executive order ignore those congressional mandates would not conform with my appropriate role as President."

- In 2010, that providing people in America illegally with legal status and ignoring the laws on the books "would be both unwise and unfair."

- President Obama admitted in 2012 that DACA, implemented in an election year, was "a temporary stopgap measure."

- Partly because of DACA, the United States saw a surge in illegal immigration by minors in 2013-2014, because they hoped to take advantage of the program.
  - President Obama knew this would be a problem, admitting in 2010 that a DACA-like policy "could lead to a surge in illegal immigration."

- President Trump refuses to allow criminal activity to dominate our immigration system, taking action to restore the law and protect all Americans.
  - One of President Trump's first Executive orders informed sanctuary jurisdictions that failure to fully abide by Federal immigration laws would jeopardize access to certain Federal grant money.
    - As a result, Miami-Dade County reversed its years-long sanctuary policy.
  - The DOJ issued new charging guidelines in April to bring to an end the previous Administration's catch-and-release policies by prioritizing criminal immigration enforcement.
  - Since President Trump's inauguration, illegal immigration on the southwest border is down by 47 percent compared to the same period last year.
  - Illegal alien removals resulting from to U.S. Immigration and Customs Enforcement (ICE) arrests have increased by over 32 percent.
  - So far in Fiscal Year 2017, ICE has arrested at least 3,641 criminal gang members compared to 2,057 criminal gang members in all of Fiscal Year 2016.

**REFORMING IMMIGRATION TO MAKE AMERICA GREAT AGAIN: DACA made it impossible for President Trump to pursue the reforms needed to restore fairness to our immigration system and protect American workers.**

- President Trump's highest obligation is to uphold the laws of the United States. So long as the unlawful policies of the previous Administration remain—especially those that incentivize further illegal immigration—there is no realistic chance of achieving principled pro-worker immigration reform. His priorities include:
  - **Controlling the Border:** President Trump intends to secure the southwest border with a border wall and a robust law enforcement presence on the border.
  - **Improving Vetting and Immigration Security:** Our immigration system, including our asylum and refugee system, make the United States potentially exposed to terrorist and public safety threats. We need to improve vetting and set limits that allow for proper

President Donald J. Trump Restores Responsibility and the Rule of Law to Immigration | whitehouse.gov

(28 of 28)

Case 3:17-cv-05211-WHA Document 271 Filed 11/22/17 Page 28 of 28
Case 1:17-cv-2942, 11/16/2017, ID: 10631551, DktEntry: 35-3, Page 4 of 28

vetting.

- **Enforcing Our Laws:** President Trump supports the swift removal of those who illegally enter the United States or violate the conditions of their visas.

- **Protecting Our Workers:** President Trump is working to encourage companies to raise wages and recruit American workers. This means stopping the practice of hiring illegal workers who unlawfully deprive American workers of jobs and higher wages.

- **Establishing a Merit-Based System for Entry:** President Trump supports efforts to prioritize immigrants based on skills and thereby prevent the displacement of American workers.

cited in USA v. USDC, CASF
No. 17-72917 archived on November 20, 2017