**Pages 1 - 163**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

REGENTS OF UNIVERSITY OF      )
CALIFORNIA, *et al.*,           )
                              )
          Plaintiffs,         )
                              )
  VS.                         )    **NO. C 17-05211 WHA**
                              )
UNITED STATES DEPARTMENT OF   )
HOMELAND SECURITY, *et al.*,    )
                              )
          Defendants.         )
_____)
STATE OF CALIFORNIA, *et al.*,  )
                              )
          Plaintiffs,         )
                              )
  VS.                         )    **NO. C 17-05235 WHA**
                              )
DEPARTMENT OF HOMELAND        )
SECURITY, *et al.*,             )
                              )
          Defendants.         )
_____)
CITY OF SAN JOSE,             )
                              )
          Plaintiff,          )
                              )
  VS.                         )    **NO. C 17-05329 WHA**
                              )
DONALD J. TRUMP, PRESIDENT OF )
THE UNITED STATES, IN HIS     )
OFFICIAL CAPACITY, *et al.*,    )
                              )
          Defendants.         )
_____)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

| | |
|---|---|
| DULCE GARCIA, *et al.*,    ) | |
|                  ) | |
|       Plaintiffs,    ) | |
|                  ) | |
|   VS.              ) | **NO. C 17-05380 WHA** |

```
UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

DULCE GARCIA, et al.,           )
                                )
           Plaintiffs,          )
                                )
   VS.                          )     NO. C 17-05380 WHA
                                )
UNITED STATES OF AMERICA, et    )
al.,                            )
                                )
           Defendants.          )
_____)
COUNTY OF SANTA CLARA and       )
SERVICE EMPLOYEES INTERNATIONAL )
UNION LOCAL 521,                )
                                )
           Plaintiffs,          )
                                )
   VS.                          )     NO. C 17-05381 WHA
                                )
DONALD J. TRUMP, in his         )
official capacity as President  )
of the United States, et al.,   )
                                )     San Francisco, California
           Defendants.          )     Wednesday, December 20, 2017
_____)
```

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs in C. 17-05211 WHA:
                     Covington & Burling LLP
                     One Front Street, 35th Floor
                     San Francisco, CA  94111-5356
                     (415) 591-6000
                     (415) 591-6091 (fax)
            **BY:  JEFFREY MICHAEL DAVIDSON**

Reported By:  Lydia Zinn, CSR No. 9223, FCRR, Official Reporter

**<u>APPEARANCES</u>**:

For Plaintiffs in C. 17-05211 WHA:
                         Covington & Burling LLP
                         One CityCenter
                         850 Tenth Street, NW
                         Washington, D.C.  20001-4956
                         (202) 662-6000
                    BY:  **ALEXANDER BERENGAUT**
                         **LANNY A. BREUER**
                         **MEGAN A. CROWLEY**
                         **MARK H. LYNCH**

For Plaintiffs in C. 17-05235 WHA:
                         California Department of Justice
                         Bureau of Children's Justice
                         1515 Clay Street, Suite 2000
                         Oakland, CA  94612
                         (510) 622-2239
                         (510) 622-2121 (fax)
                    BY:  **JAMES F. ZAHRADKA, II**

For Plaintiffs in C. 17-05329 WHA:
                         Cotchett Pitre & McCarthy LLP
                         840 Malcolm Road, Suite 200
                         Burlingame, CA  94010
                         (650) 697-6000
                         (650) 697-0577 (fax)
                    BY:  **BRIAN DANITZ**

For Plaintiffs in C. 17-05380 WHA:
                         Gibson, Dunn & Crutcher LLP
                         555 Mission Street
                         San Francisco, CA  94105-2933
                         (415) 393-8200
                         (415) 393-8206 (fax)
                    BY:  **ETHAN D. DETTMER**

```
 1   APPEARANCES:

 2   For Plaintiffs in C. 17-05380 WHA:
                          Public Counsel
 3                        610 South Ardmore Avenue
                          Los Angeles, CA  9005
 4                        (213) 385-2977
                          (213) 385-9089 (fax)
 5                BY:  MARK DALE ROSENBAUM

 6   For Plaintiffs in C. 17-05813 WHA:
                          Altshuler Berzon LLP
 7                        177 Post Street, Suite 300
                          San Francisco, CA 94108
 8                        (415) 421-7151
                          (415) 362-8064 (fax)
 9                BY:  ERIC PRINCE BROWN
                       JONATHAN DAVID WEISSGLASS
10
     For Defendants:
11                        U.S. Department of Justice
                          Civil Division, Federal Programs Branch
12                        20 Massachusetts Avenue NW, Room 6139
                          P.O. Box 883
13                        Washington, D.C.  20044
                          (202) 514-3374
14                        (202) 616-8460 (fax)
                  BY:  KATE BAILEY
15                     BRAD PRESCOTT ROSENBERG

16   For Defendants:
                          United States Department of Justice
17                        Civil Division, Federal Programs Branch
                          950 Pennsylvania Avenue, NW
18                        Washington, DC  20530
                          (202) 514-2331
19                BY:  BRETT A. SHUMATE

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | **Wednesday - December 20, 2017**                    **8:02 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | **---oOo---** |
| 4 | **THE COURT:**  Please be seated.  Welcome to everyone. |
| 5 | **THE CLERK:**  Calling In Re: DACA Cases, Civil Actions |
| 6 | 17-5211, 17-5235, 17-5329, 17-5380, 17-5813.  Counsel, please |
| 7 | state your appearances for the record. |
| 8 | **MR. DAVIDSON:**  Good morning, Your Honor. |
| 9 | Jeffrey Davidson, for the Regents of the University of |
| 10 | California. |
| 11 | **THE COURT:**  Welcome. |
| 12 | **MR. ZAHRADKA:**  Good morning, Your Honor. |
| 13 | James Zahradka, from the California Attorney General's Office, |
| 14 | on behalf of the States of California, Maine, Maryland, and |
| 15 | Minnesota. |
| 16 | **THE COURT:**  Great.  Welcome to you. |
| 17 | **MS. CROWLEY:**  Good morning, Your Honor. |
| 18 | Megan Crowley, for the Regents of the University of California, |
| 19 | and President Napolitano. |
| 20 | **THE COURT:**  Okay. |
| 21 | **MR. BROWN:**  Good morning, Your Honor.  Eric Brown, |
| 22 | for the County of Santa Clara, and SEIU Local 521. |
| 23 | **THE COURT:**  Thank you.  Welcome. |
| 24 | **MR. DETTMER:**  Good morning, Your Honor. |
| 25 | Ethan Dettmer, from Gibson Dunn, on behalf of the Garcia |

1  Plaintiffs.

2          **MR. ROSENBAUM:**  Good morning, Your Honor.  Mark

3  Rosenbaum, from Public Counsel, on behalf of the Garcia

4  Plaintiffs.

5          **THE COURT:**  Welcome to you, too.

6          **MR. DANITZ:**  Good morning, Your Honor.  Brian Danitz,

7  Cotchett Pitre & McCarthy, on behalf of the City of San Jose.

8          **THE COURT:**  Great.  Welcome to you.

9      Okay.  The Government.

10          **MR. SHUMATE:**  Good morning, Your Honor.

11  Brett Shumate, from the Department of Justice, on behalf of the

12  defendants.

13          **THE COURT:**  Okay.

14          **MR. ROSENBERG:**  Good morning, Your Honor.

15  Brad Rosenberg.  I'm from the Department of Justice, on behalf

16  of the United States.

17          **THE COURT:**  Thank you.

18          **MS. BAILEY:**  Good morning, Your Honor.  Kate Bailey,

19  also from the Department of Justice, on behalf of the

20  United States.

21          **THE COURT:**  All right.  Welcome to all of you.

22      We're here on a Motions to Dismiss, 12(b)(1), by the

23  Government; Motion to Dismiss, 12(b)(6), also by the

24  Government; and plaintiffs' Motion for Provisional Relief.  So

25  what I think we'll do is start with the Motion to Dismiss,

 1   under 12(b)(1).  And the Government will go first.

 2        But then before we get through, there are so many points,

 3   I think after you get to -- you make your basic point on, say,

 4   your first point, then whoever's going to be responding should

 5   respond.  So we'll kind of go back and forth on a

 6   point-by-point basis, rather than wait until the bitter end, in

 7   which case I might have forgotten some of the nuances.  So

 8   we'll do it while it's fresher in my memory.

 9        So who's going to respond for the plaintiffs on the Motion

10   to Dismiss?  We'll start with the "committed to agency

11   discretion by law" point.  Who's going to respond on that?

12             **MR. DAVIDSON:**  I'll be addressing that, Your Honor.

13             **THE COURT:**  All right.  So you can stand there.

14        And who's going to make that argument?

15             **MR. SHUMATE:**  I will, Your Honor.

16             **THE COURT:**  All right.  Okay.  The floor is yours.

17   Please proceed.

18        Overall, I think we'll take, I guess, an hour and a half

19   to two hours for all of the motions, but we'll have to see how

20   it goes.  So let's just jump right in.  And I find this to be a

21   very interesting set of briefs, and so I thank you all for the

22   good briefing.

23        All right.  Please proceed.

24             **MR. SHUMATE:**  Thank you, Your Honor.  I'll be

25   speaking on the jurisdictional issues.  Mr. Rosenberg will

 1  address the other issues -- 12(b)(6) and the response to the

 2  plaintiffs' motion -- just to let the Court know.

 3          **THE COURT:**  That's great.

 4          **MR. SHUMATE:**  The Court should dismiss this case

 5  because the Court lacks jurisdiction to review the Government's

 6  decision to end the deferred action policy known as "DACA."

 7      I'd like to focus on two reasons.

 8      First, Section 701(a)(2) of the APA strips the Court of

 9  jurisdiction because the denial of deferred action is an

10  exercise of prosecutorial discretion that is committed by law

11  to the Executive Branch.

12      Second, Section 1252(g) of the INA strips the Court of

13  jurisdiction to review the rescission of DACA, because Congress

14  intended to prevent courts from reviewing denials of deferred

15  action.

16      The plaintiffs try to circumvent these jurisdictional bars

17  with a number of arguments, and I'd like to respond to each of

18  them.

19      Now, primarily the rescission of DACA is not reviewable

20  simply because the Acting Secretary viewed DACA as illegal.

21  The Supreme Court addressed a situation just like this in the

22  *BLE* case.  It said that just because an agency gives a

23  reviewable reason for taking some act of prosecutorial

24  discretion does not make that action reviewable.

25      Here, the action that is being challenged --

PROCEEDINGS

1          **THE COURT:**  Okay.  Wait, wait.

2      What was the name of that case?

3          **MR. SHUMATE:**  *BLE*.  It's a Supreme Court case from

4  the 1980s, Your Honor.  We cite it in our briefs.

5          **THE COURT:**  Yeah.  All right.  So just go through the

6  fact pattern in that case for me.

7          **MR. SHUMATE:**  Sure.  This was a case in which the

8  agency's decision was challenged.  I believe there was a waiver

9  in that case.  The agency denied the request, and gave a reason

10  for that decision.

11      And the Supreme Court said just because the agency gave a

12  reviewable reason didn't make that exercise of prosecutorial

13  discretion something that the Court could review.

14      *Heckler* is also another example where.

15          **THE COURT:**  Wait, wait.  What's the *BLE*?

16      For a minute.

17      Which agency was it?

18          **MR. SHUMATE:**  I don't remember the name of the

19  agency, Your Honor.  It was a Justice Scalia opinion.  I don't

20  remember the precise petition that was filed, but the principle

21  that we cite the case for is that just because an agency gives

22  a reviewable reason for taking some act or prosecutorial

23  discretion does not then transmute that action into something

24  the Court can review.

25      *Heckler* is another example where -- that was a case

1   involving the FDCA.  That was a request to take enforcement

2   action against manufacturers of drugs used in capital

3   punishment.

4        And the Secretary in that case -- of the FDA -- decided:

5   We're not going to take that action.  And one of the bases for

6   that decision was there was concern about the agency's legal

7   authority to take that action.

8        In this case --

9             **THE COURT:**  I thought that was the *Casey* decision.

10            **MR. SHUMATE:**  No.  The *Heckler versus Chaney*.

11            **THE COURT:**  Oh, that's right.  The *Chaney* decision.

12   Yes.  Right.

13            **MR. SHUMATE:**  So in this case, it's important not to

14   confuse the action that's being challenged with the decision

15   given for that action.

16        So the decision being challenged is a denial of deferred

17   action.

18        The reason given for that action -- the reasons were based

19   on litigation risk, and concerns about the legality of the DACA

20   policy.

21        So they need to point to some standard in the INA that

22   would give the Court some meaningful basis to evaluate the

23   denial of deferred action.  Just because the Secretary gave a

24   reviewable reason, which is *DACA might be illegal*, is not a

25   basis to determine the denial of a deferred action into

 1  something that the Court can and should review.

 2      Imagine a situation with the --

 3          **THE COURT:**  Well, let me ask you this.

 4      Didn't we have some cases within the last three or four

 5  years in which -- I believe it was the EPA, but I could be

 6  wrong.  Seemed like there was an issue of whether or not EPA

 7  could regulate fossil fuels; and the agency decided, no, it did

 8  not have the power to do so.

 9      And somebody took it to the Court and said, *Yes, you do*

10  *have the power to do it*.  *You made a decision based on a flawed*

11  *legal premise that you don't have jurisdiction or authority to*

12  *regulate*.  *You do have authority to regulate*.  And seems like

13  they even got to the Supreme Court.

14      So that was held to be reviewable.  Right?

15          **MR. SHUMATE:**  That's right, Your Honor.  That's the

16  *Massachusetts versus EPA* case in which the agency denied a

17  petition for rulemaking.  And what the Supreme Court said in

18  that case was that those decisions are generally reviewable.

19      Now, judicial review of a denial of petition for

20  rulemaking is narrow, but it also distinguished *Heckler*, which

21  is a case involving the exercise of prosecutorial discretion.

22  Those decisions are presumptively unreviewable under the APA.

23  That's where we are.

24      It's quite clear that the denial of deferred action is an

25  exercise in prosecutorial discretion.

PROCEEDINGS

```
 1        That is different from a decision to deny a petition of a
 2   rulemaking based on --
 3        THE COURT:  Okay.  If we were dealing with an
 4   individual case --
 5        Let's say that some DACA recipient you determined was
 6   involved with a terrorist organization, and you wanted to end
 7   the deferred -- you removed them from the United States.  That
 8   would be an individual decision.  And that probably is
 9   unreviewable under 1252(g), for example.
10        But here we're talking about a whole program, an
11   across-the-board, nationwide program where people get to sign
12   up.  And so it's a program level, as opposed to an individual
13   level.  So how do you deal with that distinction?
14        MR. SHUMATE:  Sure.  I think it's a distinction
15   without a difference, Your Honor.
16        I would first point the Court to *Heckler*.  *Heckler*,
17   itself, involved a request to take an enforcement action
18   involving drugs used in capital punishment.  And the request
19   was to the effect that all manufacturers of drugs used for that
20   practice, as well as a number of states.
21        So -- but I think it's important to remember:  What is the
22   ultimate question?
23        The ultimate question under Section 701(a)(2) is whether
24   this action is committed to the agency's discretion by law.
25        And what the courts have said is that we have to find a
```

1  meaningful standard in the substantive statute to evaluate

2  whether this decision was reasonable or not, or some basis to

3  judge the agency's --

4          **THE COURT:**  But if the rationale was that the agency

5  didn't have -- in our case, did not have the authority --

6  because of a Fifth Circuit decision did not have the authority

7  to do DACA, that's a quintessential legal issue; isn't it?

8          **MR. SHUMATE:**  Well, it is a legal issue; but that,

9  again, confuses the reason given for the decision with the

10  action taken.  And it comes back to my point about *BLE*.

11      Just because she gave a reviewable reason -- and certainly

12  courts are competent to evaluate the legal questions, but that

13  does not mean that the denial of deferred action, which is

14  inherently an exercise of prosecutorial discretion, thus

15  becomes something the Court can review.

16      Now, just imagine a different scenario.  Imagine the

17  Acting Secretary had just issued a one-sentence memorandum

18  saying, "I hereby rescind the 2012 memorandum."  There would be

19  no discussion of the legal basis.  There would be nothing for

20  the Court to review.  It shouldn't change the result, just

21  because she gave a five-page explanation of the basis for her

22  decision.

23      We think we're in the wheelhouse of *BLE*.  *We're not like*

24  *in Massachusetts v. EPA case, where the agency denied a*

25  *petition for rulemaking, because it didn't think it had*

1    *jurisdiction to even address the questions.*

2          We're more like *BLE,* where the agency denied -- refuses to

3    take some act of prosecutorial discretion based on her own

4    reasons, but it doesn't matter what those reasons are.   She

5    could have rescinded the drug policy for any reason, or no

6    reason, at all.   *Just because she gave a reason doesn't make it*

7    *something that is reviewable.*

8          And if I could point the Court to two Ninth Circuit cases

9    which we think the Court should take a look at --

10              **THE COURT:**  All right.

11              **MR. DAVIDSON:**  So *Moda-Luna.*   This is 813 F. 2d.

12    1006.   1980.

13              **THE COURT:**  Wait.   Give me the name again.

14              **MR. DAVIDSON:**  It's *Mada-Luna versus Fitzpatrick,*

15    813 F. 2d 1006.   And that was a Ninth Circuit case from 1987.

16          And then *Romero versus Smith*, 773 F. 2d. 1021,

17    Ninth Circuit, 1985.

18          Both of these cases involved decisions by the INS to deny

19    deferred action status applications.   And what the

20    Ninth Circuit said in both of these cases is that District

21    Courts lack jurisdiction to review those decisions.   And the

22    Court cited Section 701(a)(2) of the APA, because this is

23    something that is committed to the agency's discretion by law.

24          And the plaintiffs have not pointed to anything in the INA

25    in this case that would give the Court a meaningful standard to

1  evaluate whether this decision was reasonable or not, so there

2  is just no standard by which the Court can evaluate whether

3  there decision is reviewable or not.

4       **THE COURT:**  All right.  Hold that thought, and don't

5  go away.

6     I want to hear, while it's fresh in my mind, what your

7  response is.

8       **MR. DAVIDSON:**  So Judge Garaufis, in New York,

9  rejected the Government's committed-to-agency-discretion-by-law

10  point.

11       **THE COURT:**  That's a District Court decision?

12       **MR. DAVIDSON:**  Correct.

13       **THE COURT:**  That doesn't get you very far.  You've

14  got to give me Court of Appeals or Supreme Court to be

15  persuasive.

16     The Government has cited U.S. Supreme Court decisions, and

17  says that --

18     Come on.  Give me something that -- I read his opinion.

19  Excellent job.  Nevertheless, it's not going to get you to the

20  finish line.  So you need to give me Supreme Court and/or

21  Ninth Circuit.

22       **MR. DAVIDSON:**  He had good reason for the decision,

23  which is -- he started that there is presumption of

24  reviewability under the APA that the Government bears a heavy

25  burden to overcome.  Now, that comes straight out of the APA,

PROCEEDINGS

1  because the APA says that the reviewing court shall hold

2  unlawful and set aside an agency action found to be arbitrary,

3  capricious, an abuse of discretion, or otherwise not in

4  accordance with the law.  The Supreme Court in *Overton Park*

5  said that the 701(a)(2) committed-to-agency-by-law exception is

6  a rare and narrow exception.  So that's the basic framework, is

7  that it should be very rare when a case is dismissed under

8  701(a)(2).

9       The basic question is whether there is law to apply to the

10  Court's decision, or whether it's merely reviewing a

11  standardless exercise of discretion.  I'd like to point the

12  Court to a DC Circuit case called *Robbins versus Reagan*, which

13  isn't binding on this Court, but has a very intelligent

14  discussion of the jurisdictional issue.

15          **THE COURT:**  What's the name of the case?

16          **MR. DAVIDSON:**  It's called *Robbins versus Reagan*.

17  And what it focuses on -- in that case, it involved the

18  government of the District of Columbia closing a homeless

19  shelter, which is a discretionary determination.

20       Nonetheless, because the agency was reversing a prior

21  policy, which was to renovate that homeless shelter, *Robbins*

22  *versus Reagan* said that when you're reversing a prior policy,

23  there's obviously law to apply, because you can look at the

24  prior policy and the rationale for it.  And that would be the

25  case, even in the absence of specific statutory guidelines

PROCEEDINGS

1    regulating the Government's use of discretion.

2        Additionally, there's law to apply, because the *State Farm*

3    case -- U.S. Supreme Court case -- found that even when there's

4    not a specific statutory set of factors that the agency needs

5    to look at, the Court can assess whether the agency is

6    undertaking a rational rulemaking process, and considering all

7    of the relevant factors.

8        Now let me address the Government's cases.

9        The *BLE* case involved the Interstate Commerce Commission,

10   which denied a Motion for Reconsideration of an earlier

11   decision that it had made; so denial of a Motion for

12   Reconsideration.  And the Court found that that kind of act was

13   quintessentially discretionary.  And the fact that the agency

14   may have relied on a legal rationale for that didn't convert it

15   into a nondiscretionary decision.

16       But this is completely different.  It's completely

17   different, because the agency here made a programmatic

18   decision.  It abolished the DACA program in its entirety.  It

19   wasn't a use of discretion; it was an abdication of discretion.

20   It was saying, *We're no longer going to exercise discretion*, so

21   it doesn't resemble the *BLE* case.

22       Nor does the situation resemble the *Heckler versus Chaney*

23   case.  *Heckler versus Chaney* stands for the proposition that

24   when an agency chooses not to take an individual enforcement

25   action, that's not reviewable, because it's a standardless

1  exercise of discretion.  There are lots of reasons why an

2  agency might not take a particular enforcement action.

3     But the Government has cited no cases in its brief

4  suggesting that a programmatic determination -- a decision to

5  abolish a program in its entirety -- can become nonjusticiable

6  under a *Heckler versus Chaney* kind of analysis.

7     And I heard the Government mention the *Mada-Luna*

8  Ninth Circuit case just now.  That case does not apply

9  Section 701(a)(2) of the APA, at all.  That's a case about

10 whether notice-and-comment rulemaking was required in the case

11 of an individual enforcement action.  So it's just not a

12 701(a)(2) case, at all.

13         THE COURT:  All right.  What about the *Romero* case?

14         MR. DAVIDSON:  I think that's similar, Your Honor.

15         THE COURT:  Okay.  Just a second.  It's not a 701?

16         MR. DAVIDSON:  The *Mada-Luna* case certainly is not.

17         THE COURT:  Okay.  Let me ask Mr. Shumate.  Is that

18 correct?

19         MR. SHUMATE:  That is not correct, Your Honor.  I

20 would point to the Court to page 1,011 of the *Mada-Luna* case.

21 I can read it to the Court.  In *Romero*, quote, *Where we held*

22 *that courts have no authority to review denial of deferred*

23 *action status petitions under the 1981 version of the*

24 *instruction*, citing *Romero*, and then, *See also 5 USC*

25 *Section 701(a)(2)*, quote, *Limiting judicial review.  Agency*

1   *actions where they have been*, quote, *committed to agency*

2   *discretion by law provision -- to apply in Romero.*

3        The other reference to *Mada-Luna* was that *Heckler* is

4   different.  That was an agency decision not to enforce.

5   Different actions' decisions are different.

6        Well, footnote 4 of *Mada-Luna* rejects that argument.  It

7   quotes from *Heckler*.  And then it says, quote, *Thus, the same*

8   *reasoning that supported the Supreme Court's decision in Chaney*

9   *would also support the Romero decision that denials of deferred*

10  *action status applications are not subject to judicial review*,

11  end quote.

12            **THE COURT:**  All right.  What do you say to that?

13            **MR. DAVIDSON:**  That's a see-also cite, Your Honor,

14  just as --

15       If you read *Mada-Luna* -- and I don't know if it's amenable

16  to do it while standing here -- what the Court is considering

17  is whether that individual enforcement decision required

18  notice-and-comment rulemaking; whether it was a change to

19  agency guidelines.

20       So the Court didn't deny jurisdiction --

21            **THE COURT:**  Yeah, but there was something about 701.

22  You said 701 wasn't involved.  It turns out that they mention

23  701.

24            **MR. DAVIDSON:**  They do mention 701, Your Honor,

25  but --

PROCEEDINGS

1           **THE COURT:**  That's not what you said.  You said it

2   was irrelevant.

3           **MR. DAVIDSON:**  It is irrelevant, Your Honor, because

4   the Court didn't decline jurisdiction in that case.  It

5   reviewed whether -- under the APA, whether the procedural

6   requirements of the APA had been satisfied.

7       So it doesn't rely on 701(a)(2).  It doesn't stand for the

8   proposition that 701(a)(2) bars review.

9           **THE COURT:**  Okay.  All right.  The Government, a

10  minute ago, made an argument that you did not answer, so I want

11  to give you a chance to answer it.  And it goes kind of like

12  this; that if the decision maker here had simply said, *We're*

13  *going to abolish DACA*.  Period.  Right?

14      In other words, there was an election.  New people come

15  in.  Old people go out.  The new people want to have a

16  different policy.  And they are going to have a different way

17  to administer deferred action.  And so they're going to go back

18  to the drawing boards.  And all programmatic DACA ended, as a

19  program; just ended.  No reason given.

20      I've got two parts to the question.

21      Isn't it true that in our country, in a democracy,

22  elections have consequences?  And if the side that wins wants

23  to do away with the old policy, that's their prerogative.

24  That's what elections are for.

25      And, secondly, what do you say about the specific example

1   that counsel gave; that the Secretary could have just said, *End*

2   *of program.*  No reason given, at all.

3        Okay.  What do you say to that?

4             **MR. DAVIDSON:**  The APA says that the agency needs to

5   undertake rational decision making justified by neutral

6   principles.  So the mere change of an administration absolutely

7   is not sufficient basis for an agency to change the prior

8   policy.

9             **THE COURT:**  All right.  So give me that citation.

10            **MR. DAVIDSON:**  So *Encino Motorcars* is the

11  Supreme Court case that I would cite.

12            **THE COURT:**  Wait, wait.  Give me the name again.

13            **MR. DAVIDSON:**  It's called *Encino Motorcars*.

14            **THE COURT:**  *Encino*.  All right.

15            **MR. DAVIDSON:**  And it is 136 Supreme Court 2117.

16  That's a 20 --

17            **THE COURT:**  Supreme Court 117 [sic].  Okay.

18            **MR. DAVIDSON:**  Sorry.  2117, Your Honor.

19            **THE COURT:**  2117.  All right.

20        So give me the fact pattern in the *Encino* case.

21            **MR. DAVIDSON:**  So that case involves the application

22  of federal wage-and-hour laws to certain car-dealership

23  employees.  And under a prior administration, there had been an

24  interpretation of that law which said that certain employees

25  were exempt from the wage-and-hour requirements.

PROCEEDINGS

1        Change in administration.  The agency changed its

2    interpretation of the law, and said, *No*.  *Those employees are*

3    *back within the protection of the wage-and-hour laws*.

4        And the Supreme Court -- Justice Kennedy, writing for the

5    Court, said, *That's not good enough*.  *You just can't change on*

6    *a dime, just because there's been a change in administration,*

7    *without giving reasons for it*.

8        The prior policy created powerful reliance interests in

9    that case, because the car dealerships had structured their

10   affairs based on the earlier interpretation.  And you can't

11   just pivot on a dime.

12        **THE COURT:**  Do you happen to have a copies of that

13   decision here?

14        **MR. DAVIDSON:**  I bet we do, Your Honor; but it may

15   take a while to gather.

16        **THE COURT:**  All right.  If one of your team has that,

17   I'd like to have that up here.  All right.  So here.  Looks

18   like somebody has found it pronto.  Very good.

19   (Whereupon a document was tendered to the Court.)

20        **THE COURT:**  Okay.  *Encino Motors*.  2016.

21        All right.  So roughly where would I find that language

22   about the turning on a dime?  Where would I find it?

23        **MR. DAVIDSON:**  "Turning on a dime" was my gloss on

24   it, Your Honor.

25        **THE COURT:**  Well, what is the closest that comes to

**PROCEEDINGS**

```
 1  "turning on a dime"?
 2          MR. DAVIDSON:  I would direct the Court to page
 3  2,126.
 4          THE COURT:  Ah, these pages are not numbered in that
 5  way.  So I see -- how about Roman Numeral IIA?  Is that
 6  anywhere near?
 7          MR. DAVIDSON:  Yep.  You're in the neighborhood.  So
 8  I would go to the end of IIA, right before IIB.
 9          THE COURT:  Okay.  All right.  So here's a paragraph.
10          MR. DAVIDSON:  First full paragraph before B starts
11  with --
12          THE COURT:  "Agencies are free."  Is that it?
13          MR. DAVIDSON:  Yes.
14          THE COURT:  (Reading.)  *Agencies are free to change*
15  *their existing policies, as long as they provide a reasoned*
16  *explanation for the change.  When an agency changes its*
17  *existing position, it need not always provide a more detailed*
18  *justification than what would suffice for a new policy created*
19  *on a blank slate, but the agency must at least display*
20  *awareness that it is changing position, and show that there are*
21  *good reasons for the new policy.*
22      *In explaining this changed position, an agency must also*
23  *be cognizant that longstanding policies may have engendered*
24  *serious reliance interests that must be taken into account.  In*
25  *such cases, it is not that further justification is demanded by*
```

1  *the mere fact of policy change, but that a reasoned explanation*

2  *is needed for disregarding facts and circumstances that*

3  *underlay or were engendered by the prior policy.  It follows*

4  *that an unexplained inconsistency in agency policy is a reason*

5  *for holding an interpretation to be an arbitrary and capricious*

6  *change from agency practice.  An arbitrary and capricious*

7  *regulation of this sort is, itself, unlawful and receives no*

8  *Chevron deference.*

9      And Part B says, *Applying these principles here, the*

10 *unavoidable conclusion is that the 2011 regulation was issued*

11 *without the reasoned explanation that was required, in light of*

12 *the Department's change in position and a significant reliance*

13 *interest involved.*

14      *In promulgating the 2011 regulation, the Department*

15 *offered barely any explanation.  A summary discussion may*

16 *suffice in other circumstances; but here, in particular,*

17 *because of decades of industry reliance on the Department's*

18 *prior policy, the explanation fell short of the agency's duty*

19 *to explain why it deemed it necessary to overrule its previous*

20 *position.*

21      All right.  Enough of -- I kind of got the idea.

22      All right.  You raise a good point.  So let's hear what

23 the Government has to say in response to this decision.

24      **MR. SHUMATE:**  Your Honor, it's quite noteworthy that

25 the only law to apply that they can point to is the arbitrary

1   and capricious standard of the APA.  Under Section 706, of

2   course, as the Court knows, the Court can set aside agency

3   actions that are arbitrary and capricious, contrary to law.

4        Section 701(a)(2) of the APA is an exception to that

5   standard that courts are to apply when there are agency actions

6   that are committed to the agency's discretion.

7        What they're trying to do is gut that entire exemption, by

8   applying the APA standard of review.  If that is the law to

9   apply, then Section 701(a)(2) is meaningless, because the Court

10  can always look to the APA.

11           **THE COURT:**  Well, fine.  Is that fair?  I thought

12  that the law that they were trying to apply is to say that the

13  agency, in fact, did have the authority to have a programmatic

14  grant of deferred action, and go through all of the history of

15  the INA, and the Supreme Court's giving its blessing to

16  deferred action, and so forth.  Even Congress has recognized

17  it.  So I don't think that's fair to say that their argument is

18  the arbitrary and capricious.

19        I think their argument is that there is a body of law to

20  look and see whether or not the Attorney General was correct

21  when he said that the Fifth Circuit was correct, and that the

22  Fifth Circuit would apply DAPA to DACA, and fold their tent,

23  and leave.

24        So, I mean, any judge could make that kind of a decision.

25  That's definitely something that judges decide all of the time.

1    So I think that's the law that they're trying to apply.

2  Right?

3            **MR. SHUMATE:**  I don't think so, Your Honor.  The way

4  I read all of their arguments in the Motion for Provisional

5  Relief was that this was an arbitrary and capricious decision,

6  because the agency didn't consider this factor, and that

7  factor, and reliance interests, and, you know, other

8  arbitrary-and-capricious-type arguments; but let me point the

9  Court to --

10           **THE COURT:**  No, but the Supreme Court, itself, has

11  said in this very decision that reliance interests should be

12  taken into account when you're reversing a policy.

13           **MR. SHUMATE:**  Well, if the APA supplies the law here,

14  then, of course, those arguments would have -- that standard

15  would apply.

16    But what *Heckler* said is that in a case involving

17  enforcement discretion, there's a presumption against

18  reviewability.  And to rebut that presumption, paragraph --

19  page 833 of *Heckler* says, The presumption -- well, *The*

20  *presumption may be rebutted, where a substantive statute has*

21  *provided guidelines for the agency to follow in exercising its*

22  *enforcement powers,* end quote.

23    So there is nothing that they can point to in the INA; no

24  particular statute, no regulation adopted by DHS for grants or

25  denials of deferred action.  That is the substantive standard

```
1   that they need to come forward with to rebut the presumption
2   that agency --
3           THE COURT:  Wait.  You say that the presumption is
4   against reviewability, but Bowlby and a second decision by the
5   Supreme Court that I'm blanking on say that there is a
6   presumption in favor of reviewability, and that the committed
7   of agency exception; the "rare exception" is the phrase.
8       So these are two different presumptions.  You're talking
9   about -- where did you get your language about presumption?
10  Where did that come from?
11          MR. SHUMATE:  Heckler and AADC establish it.
12          THE COURT:  All right.  Hand me up that decision, so
13  I can look at that language.
14          MR. SHUMATE:  The highlighted pink.
15  (Whereupon a document was tendered to the Court.)
16          THE COURT:  All right.  So I'll ignore all of your
17  underlines.
18      Sometimes they hand these up to me.  It says, "Oh, this is
19  bad."
20      (Laughter in the courtroom.)
21          MR. SHUMATE:  It all good for us, Your Honor.  The
22  highlighted pink language is what I'm referring to.
23          THE COURT:  I won't look at all of those notes.
24  Okay.
25          MR. SHUMATE:  So it talks about a presumption.  So
```

1    does the *AADC*.

2        **THE COURT:**   (Reading.)   *In so stating, we emphasize*

3    *that the decision is only presumptively unreviewable.   A*

4    *presumption may be rebutted where the substantive statute has*

5    *provided guidelines for the agency to follow in exercising its*

6    *enforcement powers.*

7        Let me -- it does say what you said, but I've got to get

8    the context here.   All right.   Let's look at the whole

9    paragraph.   This is in *Chaney* now.

10       **MR. DAVIDSON:**   I don't have access to Counsel's

11   highlighting, so if I could get a page cite, that would be

12   helpful.

13       Here.   Well, looks like 833.   Okay?

14       **THE COURT:**   (Reading.)   *We, of course, only list the*

15   *above concerns to facilitate understanding of our conclusion*

16   *that an agency decision not to take enforcement action should*

17   *be presumed immune from judicial review under 701(a)(2) for*

18   *good reason.   Such a decision has traditionally been committed*

19   *to agency discretion; and we believe that the Congress, in*

20   *enacting the APA, did not intend to alter that tradition.   In*

21   *so stating, we emphasize that the decision only*

22   *presumptively --*

23       No.   Okay.

24       *-- is only presumptively unreviewable.*

25       All right.   So what they're talking about here in this

1  paragraph, as I read the whole paragraph, is an agency decision

2  not to take enforcement action.

3      So the other side is going to say, *Well, that doesn't*

4  *apply here, because we have a program* -- and a nationwide

5  program -- *under which people are getting work permits.  And*

6  *therefore, that is different from an agency decision not to*

7  *take enforcement action*.

8           **MR. SHUMATE:**  So *Mada-Luna* spoke to that.  That's the

9  portion I read from the footnote, which -- this, again -- this

10  is the denial of the deferred status application.

11           **THE COURT:**  Hand that back (indicating).

12           **MR. SHUMATE:**  Footnote 4 talks about *Heckler*, and

13  then says that same reasoning in *Heckler* -- again, a decision

14  not to enforce -- applies foursquare in a decision to deny

15  deferred action.  And that is this case.

16      So just because this is a decision to deny deferred action

17  is not a meaningful distinction.  And it's also not a

18  meaningful distinction that this is a class-based decision

19  rather than an individualized decision.

20           **THE COURT:**  All right.  Hold that thought.

21      What do you say?  You still haven't answered that

22  question.  Why isn't this a decision to deny deferred action

23  across the board?  Why doesn't that fall within a decision not

24  to prosecute; not to regulate?

25           **MR. DAVIDSON:**  There is a critical distinction

1  between individual enforcement decisions, and programmatic

2  decisions.   The Government has not cited any case saying that a

3  programmatic decision -- a decision to deny a benefit to people

4  across the board -- is unreviewable under the APA.

5       *Heckler* versus *Chaney* involved an individual enforcement

6  decision.

7       *Mada-Luna*, while it doesn't apply --

8            **THE COURT:**   No.   Wait, wait, wait.   *Chaney* was a

9  petition by condemned inmates who wanted the FDA to regulate

10 the drugs used in executions.   Right?

11           **MR. DAVIDSON:**   They wanted -- they wanted --

12           **THE COURT:**   So that would have been across the board.

13 That would have been a programmatic regulation, not just for

14 one execution.   Right.

15           **MR. DAVIDSON:**   They wanted the FDA to undertake

16 enforcement actions against particular drug makers.   It wasn't

17 programmatic in that way.

18      It did involve multiple drug makers, to be sure.

19      But I think it's worthwhile to look -- to back up a little

20 bit about what's animating *Heckler versus Chaney*.   The question

21 here is:   Is there a role for the courts to play, or have they

22 been stripped of jurisdiction because there's nothing they can

23 do to apply the APA?

24      And so *Heckler versus Chaney* stands for the proposition

25 that if you're talking about a one-off or two-off or three-off

1   enforcement decision, there are so many reasons that the

2   Government could make that decision, that there's really

3   nothing for the Court to do.

4        But where a decision is programmatic, and especially where

5   the decision is reversing prior policy, there obviously is

6   something for the Court to do.  You can look at the concerns

7   that underlay the prior policy.  You can look at the legal

8   rationale for what the Government is doing.  In this case, you

9   can look at the OLC memo, which Judge Garaufis found to be a

10  source of law that you could apply.

11       And so the fundamental question is really whether there's

12  something for the Court to do.  And it's a rare circumstance

13  where you would cut the courts completely out of reviewing

14  agency action, which is why it's such a rare bird.

15            **THE COURT:**  What, in your view --

16       If the Government wanted to change the policy, and just

17  eliminate DACA, I assume that you would agree there ought to be

18  some way that the agency could do that?

19            **MR. DAVIDSON:**  Yes.

20            **THE COURT:**  Is that true?  I mean, do you at least

21  agree with that?

22            **MR. DAVIDSON:**  If they go through notice-and-comment

23  rulemaking like they're supposed to, and if they give reasons

24  for it, and if they consider the reliance interests of the

25  prior policy, and they make a nonarbitrary, noncapricious

1  decision, then they're entitled to do it; but they have to jump

2  through those hoops.  They have to satisfy the requirements of

3  the APA.

4       **THE COURT:**  All right.  So okay.  We'll come to the

5  notice-and-comment thing later, but -- still, help me

6  understand this.

7       The agency says, *We don't want to do across-the-board*

8  *deferrals anymore.*  *We're going to do them the way they were*

9  *done before DACA.*

10      So isn't that a decision --

11      It does seem like that has some elements of prosecutorial

12  discretion.

13      And is that -- usually, prosecutorial discretion is not

14  reviewable.

15      So they're doing it on a programmatic basis.  That's true.

16      But where is the decision that you have that says they

17  can't do it on a programmatic basis?

18      **MR. DAVIDSON:**  Well, the mere fact that they're

19  exercising discretion -- and I think this is an important

20  point -- doesn't mean that it becomes unreviewable.  In fact,

21  the APA explicitly says that you do need to review agency

22  action to see if it's an abuse of discretion.  So there's a

23  premise that the agency will be exercising discretion; but

24  nonetheless, it's reviewable.

25      **THE COURT:**  So wait.  What -- I thought the --

1    Is that right?  If the agency decided that they were going

2 to remove somebody from the country who was previously a DACA

3 recipient, is that reviewable for abuse of discretion?

4    **MR. DAVIDSON:**  That's a harder case, Your Honor, but

5 it may be reviewable.  There is one.  There's a District Court

6 that did review a decision like that.  I would point the Court

7 to the *Inland Empire* case, 2017 Westlaw 5900061.  So that's a

8 Court that found that the *Heckler* presumption that individual

9 enforcement actions are not reviewable was overcome, and that

10 there were sources of law to apply based on the parameters of

11 the DACA program.  So I think that's a harder case.

12    But in a case where a program is being abolished -- that's

13 a classic case that should be judicially reviewable.

14    And I would again direct the Court's attention to the

15 *Robbins versus Reagan* case from the D.C. Circuit, which stands

16 for the proposition that even when you've got a very

17 discretionary type of decision -- there, the allocation of

18 funds to renovate homeless shelters -- if you're reversing a

19 prior policy in its entirety, there is law to apply.  And 702

20 (a)(1) doesn't --

21    **THE COURT:**  Well, what if the United States Attorneys

22 Office here in our District, or the Justice Department, decided

23 that even though marijuana was a federal-law violation 24/7 --

24 every day of the week, every hour of the week it violates

25 federal law to have marijuana -- but nevertheless that on a

PROCEEDINGS

1   program level, they were not going to prosecute those cases.

2       Would that -- because it's a program, would that decision

3   be reviewable?

4       **MR. DAVIDSON:**  It would depend on how the program is

5   articulated.  It's case by case.  So if they --

6       **THE COURT:**  It's not even articulated.  They just do

7   it.  They send out a memo saying, *We're not going to enforce*

8   *the marijuana laws anymore.*

9       And then the new Administration comes in and says, *We are*

10  *going to enforce the marijuana laws now.*

11      I tell you.  I think that happens all of the time.  And

12  nobody ever challenges that as violating the APA.

13      **MR. DAVIDSON:**  Well, I would say that memo gets

14  pretty close to the *Massachusetts versus EPA* case, where the

15  EPA says, you know, *We're not going to regulate greenhouse*

16  *gasses.*

17      **THE COURT:**  No.  They did that because they thought

18  they couldn't.

19      This is different.  And the example I gave is where they

20  just say, as a matter of priorities, we either are or we aren't

21  going to --

22      You know, it's the same thing with child pornography.

23  Every time there's a new Administration, they come up with

24  their own priorities of what they want to prosecute.

25      White-collar crime.  Maybe somebody else won't prosecute

1   white-collar crime.

2       So usually, though, that's not -- I don't think anybody

3   would think those are reviewable by a judge.

4       **MR. DAVIDSON:**  So generally -- I think generally,

5   those types of statements are issued as non-binding policy

6   statements, where they say here.  *You know, here's our priority*

7   *and our general practice, which we may depart from in any*

8   *particular case*.  So there's a difference between abolishing a

9   program in its entirety, and setting forward a new guideline.

10       The rescission of DACA is a highly mandatory type of act.

11   If a DACA application came in on September 6th, it was

12   mandatory that it be denied.  If a renewal application came in

13   on October 6th, it was mandatory that it be denied.

14       If a DACA applicant wanted to leave the country and return

15   for advanced parole, the rescission memorandum says you need to

16   deny all of those applications, and return the fees.

17       So this is a mandatory type of program.  It's not a

18   general statement of policy that can be deviated from in any

19   particular case.

20       And I think it's important to look at the Government's

21   briefs.  They do not cite a case that found that a programmatic

22   type of decision like this is unreviewable under Section

23   702(a)(1).  It may not need notice and comment.  There are a

24   variety of exceptions to notice and comment, but that doesn't

25   mean that the courts have nothing to do, and should deny

PROCEEDINGS

1  jurisdiction.

2       **THE COURT:**  Okay.  The Government gets to have the

3  last word on this, and then I think we'll move to another

4  issue.

5       **MR. SHUMATE:**  Thank you, Your Honor.

6    I think your hypothetical is a good one.  Imagine the U.S.

7  Attorney out here issues a policy statement saying, *We're no*

8  *going longer going to charge drug crimes*.  And then four years

9  later, they withdraw that policy and say, *We are going to*

10  *charge drug crimes here in this District*.

11       That's no different than what is going on here.  First you

12  have the 2012 memo saying, *We're going to grant deferred action*

13  *status*.  In other words, we're going to grant reprieves or

14  stays of deportation.  And then four or five years later the

15  new Secretary says, *We're going to rescind that memorandum, and*

16  *we're not going to grant deferred action status anymore*.

17       It's very, very similar to that.

18       **THE COURT:**  There is one difference; and that is

19  under my example, the marijuana growers are not signing up, and

20  paying money, and revealing lots of personal identifying

21  information, and living within the limits of the program.

22       Whereas under DACA, they did sign up; they did pay money;

23  they did give information.  And the record seems to indicate

24  that they complied; that there's been -- like, 71 percent of

25  the DACA recipients are employed in the economy.  And, by the

1  way, they get these work authorizations so they can work, and

2  get a Social Security number, and pay taxes, and --

3      So there is a -- I don't think you can deny that there's a

4  huge programmatic component be to the DACA program.  It does

5  involve deferred action, but it also involves work

6  authorizations.  And so lots of people have built up reliance

7  on this program.  Wouldn't you at least agree with that?

8          MR. SHUMATE:  Well, I would point the Court to the

9  last paragraph in Secretary Napolitano's memo creating the DACA

10 policy.  And my colleague will, I'm sure, address this, as

11 well.

12     Again, the memorandum confers no substantive right,

13 immigration status, or pathway to citizenship.  Only Congress,

14 acting through its legislative authority, can confer those

15 rights.

16         THE COURT:  Exactly.  That's true.

17     But at least it built up expectations; don't you think?

18         MR. SHUMATE:  I think if that's true here, it would

19 be true in your hypothetical, as well.

20     If individuals are relying on it --

21         THE COURT:  Well, what was the Supreme Court then

22 talking about in this other case where the Labor Department had

23 a policy that built up expectations?  I guess they called it

24 "reliance" -- engendered serious reliance interests that must

25 be taken into account.

1      I think these people who signed up for DACA -- the same

2  thing could be said.

3           **MR. SHUMATE:**  Well, they certainly -- in that case

4  weren't talking about an exercise of prosecutorial discretion.

5      And what the *BLE* case had mentioned after that principle

6  where they said, *Just because a prosecutor gives a reviewable*

7  *reason doesn't turn the action into something that can be*

8  *reviewed* -- they gave the example of a prosecutor.

9      There are a number of cases, you can just imagine, where a

10  prosecutor might say, *We're not going to prosecute this crime,*

11  *because we don't think the law will sustain a conviction*.  That

12  is certainly a reviewable reason.  The Court is certainly

13  competent to evaluate that legal basis.

14      So, too, here.  Certainly, the Court might be competent to

15  evaluate whether DACA is lawful or not, but that does not

16  transmutate this decision to denying deferred action, into

17  something the Court can and should review, because, again,

18  there is no law to apply, and it doesn't matter that there is a

19  classwide decision or individualized basis.

20      And again, they say we can't point to a case involving,

21  you know, a programmatic decision that has not been reviewable;

22  but I don't think they've pointed to a case today that did

23  involve a programmatic decision involving prosecutorial

24  decision where a court did review that decision.

25           **THE COURT:**  All right.  I asked that question.  And I

1  think Government counsel is correct on that; that you have not

2  pointed to such a decision.

3          MR. DAVIDSON:  We certainly say --

4          THE COURT:  Let's make sure.  You did point to a

5  District Judge, but how about appellate decisions?

6          MR. DAVIDSON:  We certainly cited cases where

7  programmatic decisions were found to be not subject to

8  701(a)(2).  I don't have at my fingerprints whether those were

9  enforcement-discretion decisions.

10         THE COURT:  Well, it's a combination of program and

11 enforcement priorities.

12     I could give you another example, thinking about it.  The

13 U.S. Attorney's Office here, in the last four years, five

14 years, greatly curtailed the 1326 cases, which -- I don't know.

15 I am not privy to what goes on in the U.S. Attorney's Office,

16 but I could just look at it, and tell you from this point of

17 view that there have been very few of them.

18     Well, that was somebody's enforcement decision.  And yet

19 maybe that was an internal program.  I don't know.  It's

20 just -- it does involve prosecutorial discretion.

21         MR. DAVIDSON:  Your Honor, I'm not --

22         THE COURT:  So you don't have a case that says

23 program plus prosecutorial discretion is reviewable?

24         MR. DAVIDSON:  I don't have one at my fingerprints,

25 Your Honor.  We could track one down.

1      Let me address the hypothetical, because I think the Court

2    focused on something very important.  There's a difference

3    between saying, *We're not going to prosecute marijuana crimes*,

4    versus, *We are going to legalize marijuana, and we're going to*

5    *have a marijuana-growers program where you're going to sign up*

6    *and register your marijuana-growing operation with the federal*

7    *government, and pay an application fee, and get a license, and*

8    *pay taxes, and do all of that.*

9      And then the next day the Government says, *Oh, enforcement*

10   *discretion.  We're coming in, and not only are we shutting down*

11   *your business; we're going to prosecute you and throw you in*

12   *jail.*

13     I think in that sort of situation, that would not be

14   deemed an exercise of enforcement discretion.

15        **THE COURT:**  Well, that could be right.  I wish you

16   had a decision right on point.

17     I wish you had a decision right on point.

18     This is -- okay.

19        **MR. DAVIDSON:**  I think there's a reason there are not

20   decisions right on, point which is that it is very rare for the

21   Government to articulate something and give benefits to a huge

22   class of people, and then yank the rug right out from under

23   them, without giving any reason for it.  We've been fortunate

24   that the Government does not usually do that.

25     And in the cases where they do change policy -- the

1  *Encino Motorcars* case is one of them, but I would also cite the

2  Supreme Court's *State Farm* decision, and the *Fox Communications*

3  decision.  In those cases the Supreme Court just said, *You need*

4  *to give a reason for why it is that you're changing course.*

5  *We're not just going to assume that you're doing it for a good*

6  *reason.  We're going to exercise our judicial prerogatives to*

7  *review what's going on.*

8       It's because this policy is so unusual, I think, that

9  there's not a ton of cases addressing this exact scenario.

10       **THE COURT:**  All right.  Let's get a start on the

11  standing -- now, I don't think we've got time for 1252(g),

12  unless you want to add something more to that.  I think that's

13  the same argument we've been going over, so close enough.

14       So let's go to the standing questions.

15       **MR. SHUMATE:**  Could I say one brief thing on 1252(g),

16  Your Honor?  Just two decisions I just want to make sure the

17  Court's aware of.

18       **THE COURT:**  All right.  Go ahead.

19       **MR. SHUMATE:**  Seventh Circuit, the *Botezatu* decision.

20  And I'll just quote some language for the Court.  (Reading.)

21  *Review of refusal to grant deferred action is excluded from the*

22  *jurisdiction of the District Court*, end quote.  We cite that

23  case in our brief.

24       **THE COURT:**  What's the name of the decision?

25       **MR. SHUMATE:**  *Botezatu*.  It is -- versus INS, 195 F.

 1 │ 3d. 311.  Seventh Circuit 1999.  I've --

 2 │          THE COURT:  All right.

 3 │          MR. SHUMATE:  And then the Third Circuit, in *Vasquez*,

 4 │ says that courts do not have, quote, jurisdiction to review a

 5 │ denial of DACA relief, because that decision involves the

 6 │ exercise of a prosecutorial discretion not to grant a deferred

 7 │ action.

 8 │          THE COURT:  All right.  What's the cite to that?

 9 │          MR. ZAHRADKA:  It's not a published case, Your Honor.

10 │          THE COURT:  What?

11 │          MR. ZAHRADKA:  That is not a published case.

12 │          MR. SHUMATE:  That's correct.

13 │          THE COURT:  Well, then, what is their rule in the

14 │ Third Circuit?  Do they have a rule like ours, or we -- we can

15 │ in the Ninth Circuit.  I can cite to an unpublished decision.

16 │ Used to be you could not, but --

17 │          MR. SHUMATE:  I don't know the Third Circuit rule,

18 │ Your Honor; but it is -- it is unpublished.  It's a 639 Federal

19 │ Appendix 898 from 2016.

20 │          MR. ZAHRADKA:  We can advise on that rule, if you'd

21 │ like, Your Honor.

22 │          THE COURT:  Maybe.  I don't know.  We have so many

23 │ briefs already.  I don't know.  All right.  So --

24 │          MR. ZAHRADKA:  May I address the cases that counsel

25 │ just cited on 1252(g) issues briefly?

1        **THE COURT:**  Sure.

2        **MR. ZAHRADKA:**  I'll just say that Your Honor had it

3   right the first time, on October 19th, when you ruled that

4   1252(g) does not apply to this type of decision that we're

5   dealing with here.  And *Botezatu* and the unpublished case are

6   both individual determinations.

7        That's really at the core of what the Triple A DC decision

8   -- the Supreme Court decision -- was discussing when it talked

9   about the purpose of 1252(g), and the very particular types of

10  decisions to which it applies.

11       And, as the Court has ruled already in this case, that

12  simply doesn't apply here.  And that decision by this Court

13  should stand, unless it's a clearly erroneous or -- and would

14  manifest injustice.

15       The defendants have not made any showing of that, or even

16  argued that.  So you should stick with that ruling that you

17  already made.  It's narrowly construed.  Plenty doesn't apply

18  here.  And their interpretation is strained and inaccurate, to

19  quote your words in October.

20       **THE COURT:**  All right.  Now we'll go to standing.

21  Who's going to argue that for the Government?

22       **MR. SHUMATE:**  I will, Your Honor.

23       Just very briefly, I don't think we need to spend too much

24  time on this, because we haven't challenged the standing of the

25  individual plaintiffs.  We've challenged the standing of the

1  entity plaintiffs.  We don't believe they have standing,

2  because they have a generalized grievance with this policy.

3  And they shouldn't have --

4        **THE COURT:**  But if the Texans can sue in that Fifth

5  Circuit case, which -- you seem to love that decision -- why

6  can't California sue in this case?

7        **MR. SHUMATE:**  Well, it's -- the allegation that Texas

8  was making in that case is very different.  They were saying

9  that they were financially harmed by being compelled to grant

10 drivers' licenses to DACA recipients, and that was a financial

11 harm to the state.

12     I don't think they're alleging that type of harm here.

13 They're more challenging the incidental effects of a

14 prosecution policy.

15       **THE COURT:**  Well, what many of them say is that the

16 work authorizations that are available through the DACA program

17 are important to allow University of California, for example,

18 to hire, as employees, DACA recipients.  And they then become

19 fully employed, and pay taxes, and perform in a way that I wish

20 everybody -- we all wish that everyone in this country could

21 perform.  They're contributing to the country.

22     But it's that employment relationship that is important.

23 They're on the employer's side, but that's important to them,

24 as the employer.

25     Why isn't that good enough?

1          **MR. SHUMATE:**  Just think of the ramifications,

2    Your Honor, if an entity or a citizen could challenge the

3    prosecution of another individual.

4          We cited a case, *Linda versus Richard*, a Supreme Court

5    case from 1973.  That quote says, *A private citizen lacks a*

6    *judicially cognizable interest in the prosecution or*

7    *nonprosecution of another*.

8          Now just imagine.  If these entities have standing to

9    challenge the incidental effects of the enforcement of federal

10   immigration law, that would blow standing wide open.

11         It's very different than the *Texas* case, where there was

12   a -- a cognizable -- at least, the Fifth Circuit ruled there

13   was a cognizable injury to Texas, because they were financially

14   harmed by being required --

15         **THE COURT:**  How about payment of taxes?  Isn't that

16   enough?

17         **MR. SHUMATE:**  That is quite tangential, Your Honor.

18         **THE COURT:**  Why is that?  I mean, it helps contribute

19   to the tax base.  That's not taxpayers' standing.  It's the tax

20   recipient.  It's the Treasury that's harmed if DACA goes down

21   the drain.  So seems like that's a legitimate concern.

22         And one where I think you may have some traction is SEIU.

23   Who's going to speak for SEIU?

24         I think SEIU may be in trouble with me here.  I'd like you

25   to show me that the Constitution and/or Bylaws where it says

1   that standing up for DACA is part of the SEIU.  It's easy to

2   say that in a declaration.  That doesn't get you very far.  But

3   it's got to be in the Bylaws or the Constitution to satisfy me.

4   I think this is pretty far-fetched, to be honest, but you get

5   your -- you know, I'll give you a chance to justify SEIU's

6   existence in this case.

7            **MR. BROWN:**  Your Honor, I mean, we've alleged clearly

8   in the Complaint and put in, through the Declaration of

9   Riko Mendez, who's the Chief Elected Officer of SEIU Local 521,

10   the fact that the Union is committed to comprehensive

11   immigration reform.  It's part of the Union's -- one of the

12   basic policy positions the Union has consistently taken.

13            **THE COURT:**  Is it in the Constitution or the Bylaws?

14   No.  No, it's not.

15            **MR. BROWN:**  The Union set up a Committee on

16   Comprehensive Immigration Reform a couple of years ago, and has

17   consistently worked on this issue at both the local level --

18            **THE COURT:**  Would you answer my question?

19            **MR. BROWN:**  So --

20            **THE COURT:**  Is it in the Bylaws or the Constitution?

21            **MR. BROWN:**  Your Honor, the Mission Statement

22   incorporated in Local 521's Constitution provides that, *The*

23   *Union affirms that our Members shall be treated and accepted*

24   *equally with dignity and respect.  All members are open to our*

25   *Union and encouraged to participate, and shall not be*

PROCEEDINGS

1    *discriminated against on the basis of a number of factors,*

2    *including immigration status.*   That's in paragraph 8.   That

3    excerpt from the Union's Constitution is in paragraph 8 of the

4    Mendez Declaration that's part of the Record.   So, yes, it is

5    in the Union's Constitution.   The Union has worked on DACA

6    specifically.

7              **THE COURT:**   Where is that in your submission?

8          **MR. BROWN:**   So it's Docket Entry 119.   It's part of

9    the big -- a big packet of declarations that we submitted in

10   support of the Motion for Provisional Relief.   And

11   specifically, the declarations are consecutively paginated; and

12   that is at page 806.

13        So not only is it part of the Union's Constitution, and

14   not only has the Union worked on this from an advocacy

15   perspective, but the Union has worked on DACA, specifically.

16   The Union organized information sessions around the state to

17   encourage individuals to apply for DACA, and assisted

18   individuals with the application process; set up a website to

19   connect DACA-eligible individuals with resources.

20             **THE COURT:**   Is that in your record, too?

21         **MR. BROWN:**   It is.   That is also in the Mendez

22   Declaration.   It's page 807 in that consecutively paginated

23   packet of declarations.   That's at paragraph 11 of the Mendez

24   Declaration.   So --

25             **THE COURT:**   Hold that thought.

PROCEEDINGS

```
 1        All right.  What do you say to that?  It sounds like the
 2   Union has -- the Local has a committee.  They go out.  They try
 3   to get DACA enrollees to enroll.  And then if the DACA program
 4   is terminated, then all of that effort will be for naught.  So
 5   why isn't that enough for standing?
 6          MR. SHUMATE:  It's still not enough, Your Honor,
 7   because they don't have a personal stake in the outcome of the
 8   controversy.  They are just challenging incidental effects of
 9   the enforcement of federal immigration law.
10        If these plaintiffs have standing, then any employer could
11   challenge the Government for enforcing a law against any of
12   their employees.  That just -- it doesn't make sense.
13          THE COURT:  Well, I thought they did have standing --
14   employers.  Don't employers have standing, too?
15          MR. SHUMATE:  To challenge the removal of one of
16   their employees?  I don't think so, Your Honor.
17          MR. BROWN:  And to --
18          THE COURT:  But it's the work authorization.  I mean,
19   the employer could say, *Look*.  *This work authorization is*
20   *important.*  *We can't employ this guy unless he's got a work*
21   *permit.*  *And if you're going to get rid of the work-permit*
22   *program, then we can't employ him.*  Seems like that ought to be
23   enough for standing for an employer.
24          MR. SHUMATE:  Respectfully disagree, Your Honor.
25        Again, this is a decision to deny deferred action.
```

PROCEEDINGS

```
 1        Work authorization is a collateral benefit of an

 2   individual who has --

 3        THE COURT:  That's a huge benefit.  It's not

 4   collateral.  It's -- maybe the heart of this whole program is

 5   the work permit.

 6        MR. SHUMATE:  It is certainly a collateral

 7   consequence.  I don't deny that it may be important; but the

 8   decision here was a decision to denied deferred action, which

 9   essentially commences a removal proceeding.

10        So if these employers have standing to challenge the

11   removal -- the decision to remove individuals from this

12   country -- then it's hard to see why any employer wouldn't have

13   standing to challenge any enforcement of federal law against

14   any individual who they may have a connection with.

15        THE COURT:  All right.  What do you say to that?

16        MR. BROWN:  To be clear, Your Honor, I'll let my

17   co-counsel speak to the situation of employers; but the Union

18   here is not akin to an employer.  The Union is asserting

19   associational standing by which it stands in the shoes of its

20   members.  And we've clearly alleged that the Union has members

21   who are DACA recipients who will personally be subject to

22   deportation, who will personally lose work-authorization

23   status.  The Union is actually much more akin to the individual

24   plaintiffs in the *Garcia* case than it is the employers bringing

25   claims.
```

1       And we've cited a number of Supreme Court cases supporting

2   the idea of the Union's associational standing, which is very

3   distinct from the standing --

4       **THE COURT:**  What do you say to association, like

5   *Sierra Club versus Morton*, and all of those cases where you

6   have an association, and the members have an interest in the

7   individual program, and therefore there's associational

8   standing?

9       **MR. SHUMATE:**  Well, I don't know if they've

10  identified the specific members.  Maybe they have.  I just --

11  but I think an associational-standing case, to identify injury

12  to the members, you have to identify the members.  And we do

13  have the Garcia Plaintiffs.  I don't know if the Union has

14  identified the specific members of the Union who are DACA

15  recipients who were affected by this.  I think that would be a

16  prerequisite to associational standing.  They may have done

17  that.  Just -- I'm not sure about that.

18      **THE COURT:**  All right.  We're going to take a break

19  here for about 15 to 20 minutes, and come back, and go to

20  Motion for Provisional Relief.

21      Now let me just make -- before we end, as I see this, the

22  Motion for Provisional Relief is, of course, tied indirectly to

23  what we've been talking about so far; but it is not tied into

24  the 12(b)(6), except for the APA part.

25      In other words, the, quote, "Motion for Provisional

1  Relief" is directed only to the APA.  It does not cover the

2  constitutional claims.  So everything that deals with 12(b)(6)

3  on Equal Protection, Due Process, Equitable Estoppel -- all of

4  that is -- you don't need to get to, for purposes of

5  provisional relief.  Or do I have that right, or not?  Somebody

6  want to add or subtract?

7          **MR. DAVIDSON:**  Yes, Your Honor.  The Motion for

8  Provisional Relief just focuses on the APA claims.

9          **THE COURT:**  Is that right?

10          **MR. ROSENBERG:**  That is correct.  Although we would

11  take the position that the Court should resolve the 12(b)(6)

12  issues before it gets to --

13          **THE COURT:**  Well, we'll just stick to the APA claims.

14  I think I have to do that.

15          **MR. ROSENBERG:**  Yes.

16          **THE COURT:**  Haven't we already covered that in the

17  discussion this morning?  Was there more to say there?

18          **MR. ROSENBERG:**  I think there may be a little more to

19  say there.

20          **THE COURT:**  Maybe we will cover that more to say when

21  we come back.  Okay?  All right.  Fifteen to twenty minutes.

22  Thank you.

23  (Recess taken from 9:04 a.m. until 9:25 a.m.)

24          **THE COURT:**  Okay.  Welcome back.  Let's go back to

25  work.  Let's on the 12(b)(6) let's address the notice and

1   comment point.

2       Let me ask first of all on the plaintiffs' side who's

3   going to address this.

4           MR. DAVIDSON:  I will, Your Honor.

5           THE COURT:  How can you justify saying that there

6   should have been notice and comment for the rescission, when

7   there was not notice and comment for the institution of DACA?

8   So if it's good for the goose, it's good for the gander.  What

9   do you say to that point?

10          MR. DAVIDSON:  I think it's fairly straightforward,

11  Your Honor.  There's a difference between -- the cornerstone of

12  when notice and comment is required is when there's a binding

13  rule that's put in place.

14      The creation of DACA was not the creation of a binding

15  rule.  It was the creation of a set of guidelines that

16  qualified applicants for an exercise of enforcement discretion.

17  In each individual case, there remained discretion with the

18  Department of Homeland Security whether or not to give someone

19  a DACA grant.  So it's discretionary.  And that kind of

20  nonbinding policy statement doesn't require notice and comment.

21      The rescission is quite different.  It is not an exercise

22  of discretion.  It's an abdication of discretion.  It's a

23  destruction of discretion.

24      If the Department of Homeland Security receives that DACA

25  application on September 6th, they have to deny it.

1          THE COURT:  Well, but they have to deny it as a DACA,

2   yes, because the DACA won't exist anymore; but on the other

3   hand, they still will be deciding, case by case, on a

4   discretionary basis whether or not to allow somebody to have

5   deferred action.

6      I don't think even the Government is saying that they're

7   going to immediately deport 600,000 people, or even one of the

8   600,000 people.  I think the Government is saying they're still

9   going to exercise discretion, but they're going do it case by

10  case, like they did before DACA.  So why isn't that okay?

11          MR. DAVIDSON:  Well --

12          THE COURT:  Why does that require notice and comment?

13  I mean --

14          MR. DAVIDSON:  Well, let me resist the premise a

15  little bit, Your Honor.  They did tell DACA recipients that

16  they should prepare for and arrange their departure from the

17  United States, and so their intentions are not totally clear.

18          THE COURT:  When did they say that?

19          MR. DAVIDSON:  Let me get the cite.  It was in the

20  Talking Points that were circulated in connection with the DACA

21  program.  It's in the neighborhood of 2,200 of our appendix,

22  and I'll get the exact number.  It's at our Appendix of

23  Evidence, page 2,199.

24          THE COURT:  And what Talking Points are you talking

25  about?

1        **MR. DAVIDSON:**  It was -- it's a document that's

2   labeled "Talking Points."  They were talking points that were

3   purportedly put out by the Acting Secretary of Homeland

4   Security.

5        **THE COURT:**  Do we know that they actually were put

6   out?

7        **MR. DAVIDSON:**  They're in public circulation.  We --

8   so, yeah.

9        **THE COURT:**  Well, let me ask.  Does the Government

10  know what the Talking Points are?

11       **MR. ROSENBERG:**  I believe I have a faint recollection

12  of it.  I don't know the exact status of how they are in public

13  circulation.  I think it's neither here nor there.

14       **THE COURT:**  Well, wait.  No.  Help me understand.

15  Were DACA recipients told that they should pack their bags and

16  be ready to go?

17       **MR. ROSENBERG:**  I think that for somebody who lacks

18  lawful presence in this country, which would be true of any

19  individual whose DACA status has expired and who does not

20  otherwise have deferred action, the default would be that they

21  would be removable, absent discretion exercised by DHS.  And

22  that discretion does still exist in a post-DACA world.

23       **THE COURT:**  Yes, possibly.

24       But Counsel is saying that your agency, when DACA got

25  eliminated, told recipients, *Pack your bags and be ready to go*,

1    or something close to that.  So did that occur, or not?

2             MR. ROSENBERG:  So I have -- my colleague has passed

3    up to me -- I believe this was in the appendix that plaintiffs

4    filed.  There is a document that does say "Talking Points."

5    And I believe that language is IN there.  I do not know the

6    status of that.

7             THE COURT:  Could I see that for a second?

8             MR. ROSENBERG:  Sure.

9    (Whereupon a document was tendered to the Court.)

10            THE COURT:  Exhibit EEE.

11       Which one of these many Talking Points is it?

12            MR. DAVIDSON:  It's the one at the very bottom of

13   2,199, Your Honor.

14            THE COURT:  All right.  That says, *The Department of*

15   *Homeland Security urges DACA recipients to use the time*

16   *remaining on their work authorizations to prepare for and*

17   *arrange for their departure from the United States, including*

18   *proactively seeking travel documentation, or to apply for some*

19   *other immigration benefits for which they may be eligible.*

20       All right.  So was this actually communicated to --

21       How was this, if at all, communicated to recipients?

22            MR. ROSENBERG:  I'm not aware of how it was, if it

23   was, at all.  Maybe --

24       I mean, plaintiffs' counsel attached this to their

25   filings, so perhaps they can identify where they obtained the

 1  document.

 2        **THE COURT:**  Well, what use was actually made of these

 3  Talking Points?  Were they publicly -- was this publicly stated

 4  someplace?

 5        **MR. DAVIDSON:**  It was, Your Honor.  It was circulated

 6  to the -- to the media.  Page 1,932 of the appendix is a news

 7  article that indicates that.

 8        **THE COURT:**  All right.  Okay, but nevertheless, isn't

 9  it still the fact that on any given case, even though the bags

10  are packed, the Government could decide not to enforce

11  deportation against somebody, and still give deferred action on

12  an individual basis?

13        **MR. DAVIDSON:**  It is true, Your Honor, that there is

14  residual discretion to defer action in any individual case; but

15  I don't think that changes the fact that this is a binding rule

16  of rescinding DACA.

17        So the way I would think about it is before the

18  rescission, there were two avenues by which a DACA recipient

19  could get deferred action.  One was DACA.  The other was

20  residual discretion that could apply in any case.

21        The Federal Government abolished one of those.  So with

22  respect to the main way that these 700,000 people were able to

23  access enforcement discretion, that's been abolished.

24        **THE COURT:**  But why wasn't it then required to have

25  notice and comment when DACA was created in the first instance?

1          **MR. DAVIDSON:**  So DACA -- for any individual DACA

2    applicant, you had to meet the threshold criteria; but then

3    there was a case-by-case evaluation made for every single one

4    of the 800,000 people who applied.  And there was an individual

5    decision to give them the benefits of the DACA program.

6          So that's a discretionary program.  It didn't give anybody

7    an entitlement.  It wasn't binding on the agency, because in

8    any individual case they didn't have to grant DACA.  So that's

9    a nonbinding policy statement that usually doesn't receive

10   notice and comment.

11         Now, I would say that even if the Court disagreed with me

12   on that, and found that notice and comment was required for the

13   DACA program, the APA is very clear that the repeal of a rule

14   stands in the same shoes as the issuance of a rule.  So even if

15   the rule is defectively promulgated in the first instance, or

16   has a defect, that doesn't mean you can ignore notice and

17   comment.  You still have to do notice and comment.

18         **THE COURT:**  Where is the decision that says that?  I

19   thought there was some case somebody cited that said if it

20   wasn't done by notice and comment to start, then you don't need

21   notice and comment to end.

22         **MR. DAVIDSON:**  I don't -- I am not familiar with that

23   case, Your Honor.

24         **THE COURT:**  Which is your case that goes the other

25   way?

PROCEEDINGS

1      **MR. DAVIDSON:**  We cited three cases in our brief,

2  Your Honor.  One is *Consumer Energy versus FERC*.  That's 673

3  Fed. 2d., 425.  That's a DC Circuit case from 1982.

4      In the Ninth Circuit -- this isn't a holding; this is

5  dicta -- but *Mada-Luna*, which is 813 Fed. 2d., at 1017.

6  Footnote 12 makes clear that the Ninth Circuit was very

7  skeptical of the Government's argument in that case that

8  because the policy had been put forward without notice and

9  comment, that that meant that it could be repealed without

10  notice and comment.

11      And then the other case I would point the Court to is the

12  *Parco* case, 426 Fed. Supp., 976.  That was from Judge Becker in

13  the Eastern District of Pennsylvania at 1977.  I wouldn't

14  ordinarily cite that case to the Court, except that case is, as

15  far as anyone is aware, the only time in which the termination

16  of a deferred action program has been analyzed for purposes of

17  notice-and-comment rulemaking under the APA.

18      And in that case the enforcement policy -- it involves

19  third-preference visas -- was not promulgated through notice

20  and comment; but nonetheless, Judge Becker found that the

21  abolition of that program did need to go through

22  notice-and-comment rulemaking.  And he set aside the abolition

23  of that program as a result.

24      **THE COURT:**  That was 426 F. Supp. what?

25      **MR. DAVIDSON:**  976.

 1            THE COURT:  Not 2d., but just F. Supp.?

 2            MR. DAVIDSON:   F. Supp.  It's a venerable case.

 3            THE COURT:  All right.  What do you say to those

 4   decisions?

 5            MR. ROSENBERG:  So I could start with *Parco*, Your

 6   Honor, which is an older, out-of-Circuit District Court opinion

 7   that, in fact, did not involve deferred action.  And it's

 8   factually distinguishable from the situation that we have here.

 9       That was a habeas corpus case involving an individual

10   petitioner regarding the refusal of the Government to extend

11   that individual's voluntary departure privilege, which is a

12   different form of relief, as I understand it, from deferred

13   action, which is entirely discretionary.

14       There was also a factual difference in that case, in that

15   the Court relied upon a stipulation that the petitioner's

16   application would have been approved, but for a change of

17   policy, which put it into a different situation than what we

18   have here, which is a rescission memo that is entirely -- that

19   reflects entirely discretionary policy.

20       And the Court does have it correct that in a post-DACA

21   world, there is still prosecutorial discretion to grant

22   deferred action to individuals on a case-by-case basis.  And

23   it's that nature of discretion which fundamentally undercuts

24   any notion that notice and comment is necessary, because this

25   is not a binding rule.

1    If anything, Your Honor, the rescission memo reverts to

2    the status quo that existed before the DACA policy came in to

3    existence; and that status quo was that DHS exercised

4    discretion on a case-by-case basis.  And that's the opposite of

5    a binding rule that would require notice and comment.

6        **THE COURT:**  All right.  Let me ask you both this

7    question.  It's kind of the flip side of what we've been

8    talking about.  Under DACA, if someone is accepted into the

9    program, isn't it still the case that the Government in any

10   individual case concerning a recipient of DACA can nevertheless

11   decide they're going to deport them, notwithstanding that

12   they're in DACA, you know, and commence a proceeding to do so?

13   Do you both agree that that's the way the DACA works?

14       It may be rare that that happens; but nevertheless, the

15   authority is still there to do that.  True?

16       **MR. ROSENBERG:**  That is my understanding.

17       And the reason I have that understanding and I think the

18   reason that the Court is correct about that is because it's

19   inherent in the very nature of deferred action.  It is an

20   exercise of prosecutorial discretion by the Government.  And

21   that exercise of discretion can be revoked at any time.  And,

22   indeed, the various memos that create the DACA policy note that

23   deferred action in DACA can be rescinded at any time for any

24   reason.

25       **THE COURT:**  Do you agree, as well?

**PROCEEDINGS**

1    **MR. DAVIDSON:**  There certainly was authority to

2  rescind an individual's DACA status.  Certainly, if they -- if

3  they committed a crime, for instance, that made them not

4  eligible.

5        **THE COURT:**  It doesn't even have to be that.  Of

6  course, if they committed a crime.

7      But I think in the documentation that creates DACA, it

8  flat-out says that the Government can revoke -- I have

9  forgotten the word that was used, but -- can decide to remove

10  somebody, even though they had complied with the DACA program.

11        **MR. DAVIDSON:**  I agree that it already existed,

12  Your Honor.

13      I don't know that it's unreviewable discretion, even in

14  that case, though.  There have been several courts that have

15  considered revocations of individual DACA status that have

16  nonetheless proceeded to review DACA.

17        **THE COURT:**  Well, I'm not getting into whether it's

18  reviewable.

19      I'm just saying -- I'm just asking:  Do you both agree

20  that once you're in the program, you're still subject to the

21  possibility that the DHS could decide to deport you?

22        **MR. DAVIDSON:**  Yes.

23        **THE COURT:**  All right.  And you?

24        **MR. ROSENBERG:**  On that, Your Honor, actually I do

25  have some documentation on that.  USCIS Frequently Asked

1  Questions.

2      Question Number 27 asks:  Can a deferred action under the

3  DACA process be terminated before it expires?

4      Answer:  Yes.  DACA is an exercise of prosecutorial

5  discretion.  And deferred action may be terminated at any time,

6  with or without a notice of intent to terminate, at DHS's

7  discretion.

8          **THE COURT:**  What record is that in?

9          **MR. ROSENBERG:**  This is Document 12-4 on the docket.

10  I believe it is one of the Frequently Asked Questions that's

11  been put before --

12      That's actually -- I'm sorry.  Let me take that back.

13          **THE COURT:**  Is that in the Administrative Record, or

14  is that in some other record?

15          **MR. ROSENBERG:**  You know, this looks like it is a

16  Frequently Asked Question.  I'm sure that it's in -- in --

17  before the Court here.  And I do have a current version of

18  Frequently Asked Questions that I can --

19          **THE COURT:**  Well --

20          **MR. ROSENBERG:**  -- provide.  And it looks like that

21  was filed in the New York litigation.

22          **THE COURT:**  Well, give me one that's in this case.

23          **MR. ROSENBERG:**  Give me one second, Your Honor.

24          **THE COURT:**  Do you know?  Do you know where that

25  document is in our record?

PROCEEDINGS

1          MR. DAVIDSON:  I think it is attached to our Motion

2    for Provisional Relief.  And I'm sure my colleagues will be

3    able to track it down.

4          THE COURT:  Maybe one of the many lawyers over there

5    will leap to the occasion.

6          MR. ROSENBERG:  It is also supplemented.  Even if

7    it's not, it would not be part of the Administrative Record.  I

8    believe it probably has been filed with the Court; but even if

9    it has not, it's something of which this Court can take

10   judicial notice.

11         THE COURT:  Well, I'd just like to be able to find

12   it.  Can you give me a copy right now?

13         MR. ROSENBERG:  Of course.

14   (Whereupon a document was tendered to the Court.)

15         THE COURT:  Okay.  So it's been handed up to me.

16         MR. DAVIDSON:  I think we've got the record cited.

17   It would be in our Appendix of Exhibits at 1,756.

18         THE COURT:  Okay.  Thank you.

19      Question 27.

20      All right.  But there were other places -- some other

21   place that I think is in the Administrative Record where

22   something similar to that was said.

23      Well, anyway, here's why I ask that question.  Under --

24   under pre-DACA, discretion was exercised on an individual

25   basis.

PROCEEDINGS

1      Under DACA, it's a programmatic thing; but nevertheless,

2   it could be revoked on an individual basis.

3      So isn't the principal difference between the two regimes

4   that under DACA, the recipient signs up and gets a work permit;

5   whereas under the preëxisting regime, there was no work permit?

6   So that's -- and the work permit allows the recipient to get a

7   Social Security number, pay taxes, help the economy, help the

8   country.  So isn't that the main difference here between the

9   two universes --

10          **MR. DAVIDSON:**  I don't know if that --

11          **THE COURT:**  -- is the work authorization?

12          **MR. DAVIDSON:**  I don't know if that's quite right

13   Your Honor I think if you get deferred action, you are eligible

14   for a work authorization under even under the residual -- the

15   residual discretionary authority.

16      The way I would think --

17          **THE COURT:**  Wait.  Say that again.  You mean even

18   before DACA, you could get a work permit?

19          **MR. DAVIDSON:**  Yeah.  The work permit comes from the

20   Code of Federal Regulations.  And it ties the availability of a

21   work permit to getting deferred action through any of the

22   authorities by which you could get deferred action.

23          **THE COURT:**  But let's say before DACA, if you weren't

24   signed -- how would you even sign up for deferred action?

25          **MR. DAVIDSON:**  Well, you might -- you might sign up

1  for it under one of the many other deferred action programs

2  that exists, you know.  For instance, victims of domestic

3  violence.

4          **THE COURT:**  Well, let's say you don't qualify for any

5  of those other deferred action programs.

6          **MR. DAVIDSON:**  Yeah.

7          **THE COURT:**  How would you get it then?

8          **MR. DAVIDSON:**  There would not be a sign-up process.

9      I take it that, in general, deferred action would be

10  issued as part of an enforcement proceeding where the

11  Government says, *Actually, we're going to not enforce against*

12  *you, and you can stay*.  And that could be for a number of

13  reasons, such as you have U.S.-citizen children, and maybe we

14  don't want to remove you right now.

15      The way I would think about this, Your Honor, is that the

16  creation of the DACA program created a new form of discretion;

17  a programmatic exercise of discretion.

18      And by taking that away, you take away the main route for

19  these particular individuals to get access to that discretion.

20      A clear consequence of that -- just to show one area where

21  there's a complete lack of discretion -- advanced parole.  The

22  ability to petition the Government in advance to leave the

23  country, but be able to return.

24      The day that DACA was rescinded, the directive was:  All

25  pending advanced parole applications will be denied, and the

1  fees will be returned.  Any future advanced parole applications

2  will be rejected.

3      And we've put in a factual record showing that that is

4  exactly what happened.  So one of our UC students, Joel Santi

5  (phonetic), was going to go to an academic conference in

6  Europe.  Prior to the rescission he had applied for advanced

7  parole.  And then once DACA was rescinded, that was rejected.

8      That's nondiscretionary.  And that's the kind of binding

9  act that requires notice-and-comment rulemaking.

10         **THE COURT:**  All right.  You get the last word.

11         **MR. ROSENBERG:**  A couple of points, Your Honor.

12      First of all, I have a couple of additional citations for

13  the discretionary nature of deferred action.  The same FAQs

14  appear at Docket Entry 121-1, page 174; but I think the Court

15  may also have been thinking about the 2014 memorandum from

16  J. Johnson that expanded DACA and created DAPA.  And in that

17  memorandum, which is found in the Administrative Record,

18  Document 64-1, on page 38, the memo notes that as an act of

19  prosecutorial discretion, deferred action is legally available,

20  as long as it is granted on a case-by-case basis.  And it may

21  be terminated at any time at the agency's discretion.

22         **THE COURT:**  That's, I think, what I am remembering;

23  but I think there was something in 2012 that said the same

24  thing.

25         **MR. ROSENBERG:**  It may very well have said the same

PROCEEDINGS

 1  thing.  That agency has been quite consistent in its position

 2  regarding the discretionary nature of DACA, which is part of

 3  why we believe that plaintiffs have failed to state a claim

 4  under the APA or under any of their constitutional claims.

 5       **MR. DAVIDSON:**  May I just mention one thing,

 6  Your Honor, which is that the *Texas* case, which the Government

 7  loves, rejected the exact argument that they're making now.

 8  The *Texas* case found that the creation of the DAPA program did

 9  require notice-and-comment rulemaking.

10       **THE COURT:**  Did?

11       **MR. DAVIDSON:**  It did.

12       **THE COURT:**  Well, yes, but that was the creation.  So

13  why wouldn't that also apply to the creation of DAPA -- DACA?

14       **MR. DAVIDSON:**  All right.  Well, I think that the

15  *Texas* Court didn't get things completely right in a lot of

16  dimensions, but that's just to say that it's not an

17  uncontestable proposition that the rescission of the deferred

18  action programs or the creation of deferred action programs can

19  be done without notice and comment.

20       **THE COURT:**  Okay.  We've got to move on.  Let's go to

21  the preliminary injunction, provisional relief, and 701,

22  arbitrary, capricious, not otherwise in accordance with law.

23     So let's hear -- are you arguing that, too?

24       **MR. DAVIDSON:**  Yes, Your Honor.

25       **THE COURT:**  All right.  So please go ahead.

1          **MR. DAVIDSON:**  Agency action must be set aside if

2     it's arbitrary and capricious, or an abuse of discretion.

3     Agencies are required to consider the relevant factors, and

4     they have to articulate a rational connection between the facts

5     that they find and the action that they take.

6          I want to focus on an important dimension of the

7     rescission, which is that it is a 180-degree reversal of a

8     prior policy.  And it's not just reversing the prior

9     Administration's policy.  It's reversing this own

10    Administration's policy in February 2017 to leave DACA intact.

11         What that means is that the agency needed to consider the

12    considerations that prompted DACA to be created in the first

13    place, as well as the reliance interests that had accrued to

14    its beneficiaries over time.

15         Now, we have already gone through the case law about the

16    import of agencies considering reliance interests.  And the

17    fundamental case is a case about employees of car dealerships.

18    And, with due respect to the interests of the car dealerships,

19    the reliance interests here are the most profound you can

20    possibly imagine.  There are 700,000 people in the

21    United States who have restructured their lives in fundamental

22    ways in reliance on the existence of the DACA program.

23         Just a few examples.

24         DACA recipients have enrolled in degree programs,

25    including medical school or law school, in reliance on the fact

1  that they would have deferred action, and would be able to

2  become practicing lawyers and practicing physicians in the

3  United States.

4      They have taken out student loans -- in some cases,

5  hundreds of thousands of dollars of student loans -- in order

6  to obtain those degrees.

7      They've taken on new jobs.  The statistics are that

8  54 percent of DACA recipients became employed for the first

9  time in reliance on the work authorizations that DACA provided.

10  They made fundamental decisions about marriage, and whether to

11  have children.  They bought cars and they bought homes.  They

12  started businesses, and are employing other people.

13      Even aside from DACA recipients, themselves, the schools

14  that educate them, the employers that employ them have invested

15  time, money, training resources into the DACA recipients, in

16  reliance on the existence of the program.

17      The Government considered none of this, at all, when they

18  decided to rescind DACA.  And it's symptomatic of the

19  rescission's failure to consider any of the policy factors that

20  would be relevant to a decision of this magnitude.

21      There was zero consideration given to the fundamental

22  issue of the welfare of the DACA recipients, themselves.  There

23  was zero consideration given to the welfare of the children of

24  DACA recipients or their families.  There are 200,000

25  U.S.-citizen children of DACA recipients who are facing the

PROCEEDINGS

1  choice between departing the country of their citizenship, or

2  losing their parent.

3      There was zero consideration of the effects on employers

4  or educational institutions.

5      There was zero consideration of the effects on our

6  national economy or on the Treasury.

7      And you don't need to take my word for it that they didn't

8  consider any of these factors.  In their Reply Brief at the

9  Supreme Court, the Government said -- and I quote -- "The

10 decision was not based on any factual findings or particular

11 evidentiary record."  That's their Reply Brief in support of

12 their stay, on the first page.

13     In our Motion for Provisional Relief we have robustly

14 documented the horrific consequences of the rescission, and the

15 failure of the Government to consider any of those consequences

16 when they undertook the rescission.  And so we would ask for

17 factual findings that the Government completely failed to

18 consider those factors, and that those factors needed to be

19 considered in order for there to be rational agency action.

20 When an agency doesn't consider the relevant factors to its

21 decision, that decision needs to be set aside.

22     Let me focus on another element of what the Government

23 didn't consider, at all, in rescinding DACA, which is

24 alternative policies that were available.  Now here, the

25 Government's supposed problem with the DACA program was that it

1  was vulnerable to litigation risk from the Fifth Circuit.

2      Now, the Fifth Circuit found that the DAPA policy that it

3  was considering was defective for very specific reasons.  They

4  found that the DAPA policy was not discretionary enough.  And

5  the Court gave two reasons.

6      It said, number one, there was a standardized form -- a

7  kind of a checklist -- which was used to guide agents'

8  discretion in awarding DAPA, or not.

9      And then it said that the DACA process was undertaken at

10  service centers rather than at DHS Field Offices, and that

11  in-person interviews were not conducted.

12      So if those were the problems that led the Fifth Circuit

13  to conclude that DAPA was illegal, because it didn't have

14  enough discretion, there's an obvious alternative policy.  Do

15  it at the Field Offices.  Don't do it at the service centers.

16  Don't use the checklists, or use a shorter checklist that has

17  more discretionary elements.  Do an in-person interview.

18      Those are obvious alternative policies that might have

19  been able to preserve, if not all, most of the benefits of the

20  DACA policy, without confronting anywhere near the same

21  litigation risk that the policy -- that the Government's

22  decision is supposedly based on.

23      And a failure to consider alternative policies is, alone

24  sufficient to set aside the rescission as an irrational

25  exercise of the agency's authority.

PROCEEDINGS

1          THE COURT:  Now, what's the law that says that?

2          MR. DAVIDSON:  Let me give you a couple of cases,

3     Your Honor.  One is *State Farm*, 463 U.S. 29.  That's a 1985

4     decision.  And there, the question was passive restraints in

5     vehicles.  And the Government found that automatic seat belts

6     are not a useful passive restraint.  And the policy -- and

7     decided we're not going to have any passive-restraint

8     regulation.

9          And the Supreme Court said, *Wait a second.  You didn't*

10    *consider an obvious alternative policy, which is airbags*.  And

11    the Supreme Court said, and I quote, *At the very least, this*

12    *alternative way of achieving the objectives of the Act should*

13    *have been addressed, and adequate reasons given for its*

14    *abandonment*.

15         And let me give you a Ninth Circuit case, as well:

16    *Mt. Diablo Hospital versus Shalala*, 3 Fed. 3d. 1226.  And the

17    quotation -- I don't have the pin cite, but we can get it for

18    you -- is, quote, *Agency actions cannot be sustained where the*

19    *agency has failed to consider significant alternatives*.

20         THE COURT:  Now, are those cases where there was a

21    statute, and the statute called out balancing of factors, or

22    risks and benefits; costs and benefits?  Some statutes do that.

23    And I can see the Supreme Court saying, *Okay.  You failed to do*

24    *what Congress said, because you were supposed to do all of this*

25    *weighing.  Weighing.*

PROCEEDINGS

 1        But we don't have a statute like that in our problem.   So
 2   is that the way -- was that the context of those decisions?
 3        MR. DAVIDSON:   It certainly was not in *State Farm*,
 4   Your Honor.   In *State Farm* it was the Motor Vehicle Safety Act,
 5   which said that the Government should basically promulgate
 6   reasonable regulations to promote vehicle safety.   So it wasn't
 7   a statute that explicitly said, for example, you have to
 8   consider cost or compliance.
 9        THE COURT:   Well, what was the word in the statute
10   that was the hook that the Supreme Court used to say you have
11   to consider alternatives?
12        MR. DAVIDSON:   Well, *State Farm* is interesting.   It
13   doesn't use the statutory hook to come to that conclusion.   It
14   says that an element of a rational decision-making process that
15   can withstand arbitrary and capricious review is that you have
16   to consider obvious alternatives.   So it didn't rely --
17        THE COURT:   Read that language to me.   That would be
18   very good for you, if that is, in fact, what it says, without
19   any hook in the statute.
20        MR. DAVIDSON:   That's my gloss on it, Your Honor.
21        The point I'm trying to make is that it doesn't -- if you
22   read the case, it doesn't rely on a particular -- it doesn't
23   say the statute requires you to consider all alternative
24   possibilities, and you didn't do that.
25        It found it as a result of procedural rationality.

PROCEEDINGS

1          THE COURT:  That's what I want to hear.  Maybe your

2     team can give me a copies of that decision.  Here it comes.

3     (Whereupon a document was tendered to the Court.)

4          MR. DAVIDSON:  Very good.  It's page 48 of the

5     decision, Your Honor.

6          THE COURT:  This is -- this is the U.S. Reports?

7          MR. DAVIDSON:  This is the U.S. Reports.

8          THE COURT:  I got handed something.  So I have to

9     figure out where the -- one of those things where -- okay.

10    Here's 45.  What page?  Forty-eight?

11         MR. DAVIDSON:  Forty-eight, Your Honor.

12         THE COURT:  All right.  I may have it.  Looks like I

13    have it.  Okay.  What --

14         MR. DAVIDSON:  I would start with, *Given the effect*.

15    It's in the second paragraph.

16         THE COURT:  Yeah.  I see that.  All right.

17       (Reading.)  *Given the effectiveness described to the*

18    *airbag technology by the agency, the mandate of the Safety Act*

19    *to achieve traffic safety would suggest that the logical*

20    *response to the faults of detachable seatbelts would be to*

21    *require the installation of airbags.  At the very least, this*

22    *alternative way of achieving the objectives of the Act should*

23    *have been addressed, and adequate reasons given for its*

24    *abandonment; but the agency not only did not require compliance*

25    *through airbags.  It did not even consider the possibility in*

1    *its 1981 rulemaking.*

2        Now, one sentence of the rulemaking statement discusses

3    the airbags-only option, because, as the Court of Appeals

4    stated, NHTSA's analysis of airbags was nonexistent.  What we

5    said in *Burlington* is apropos here.

6        Then there's a long quotation.  The long quotation says,

7    *There are no findings and no analysis here to justify the*

8    *choice made; no indication of the basis on which the agency*

9    *exercised its expert discretion.  We're not prepared to and the*

10   *APA will not permit us to accept such practice.  Expert*

11   *discretion is the lifeblood of the administrative process, but*

12   *unless we make the requirements for administrative action*

13   *strict and demanding, expertise, the strength of modern*

14   *government, can become a monster which rules us with no*

15   *practical limits on its discretion.*

16       Sounds like a Frankfurter decision.  Who wrote that

17   decision?

18              **MR. ROSENBERG:**  I believe it was Justice White.

19              **THE COURT:**  Okay.  So all right.  So what do you say?

20   What does the Government say to the proposition that when you

21   have APA review --

22       Now I know you say we shouldn't have APA review; but at

23   this point we're assuming for the sake of argument that you've

24   lost that point, and we're in the realm of arbitrary and

25   capricious.  So within that realm of arbitrary and capricious,

PROCEEDINGS

1   these quotations seem to be indicating that you've got to do

2   some -- you've got to explain the pros and cons and exercise

3   expert discretion, and show that you're the expert, and not

4   just say to the world, *You've got to take our word for it.*

5       Okay.  Go ahead.

6       **MR. ROSENBERG:**  Sure, Your Honor.  Let's go back to

7   page 48, and the paragraph that you just read.  And I would

8   direct the Court to the language indicating that the mandate of

9   the Act is to achieve traffic safety.  All right?  So this is

10  the an APA case under a statute that has a specific directive

11  of achieving traffic safety.

12      And then if you turn to page 43 of the opinion, where the

13  Court sets forth the standard, in looking at the Supreme Court

14  Reporter version of this case, left-hand side of the two

15  columns, it says, *Normally an agency rule would be arbitrary*

16  *and capricious if the agency has relied on factors which*

17  *Congress has not intended to consider, entirely failed to*

18  *consider an important aspect of the problem, offered an*

19  *explanation that runs counter*, et cetera.

20      Presumably, plaintiffs here are relying upon that second

21  clause, *entirely failed to consider an important aspect of the*

22  *problem*.

23      While in *State Farm* the substantive statute sets forth the

24  the problem:  Automobile safety.  And the Court found that the

25  agency failed to consider an important aspect of that problem.

1    Here, there is nothing in the INA that addresses deferred

2  action; certainly not in this context.  It's not something that

3  the agency could -- was required to consider, when plaintiff

4  discusses all of the economic and other effects of the

5  rescission of deferred action.

6    And I'd direct the Court to the case *State of New York*

7  *versus Riley*.  I have a copy of the decision if the Court would

8  like it, but that's 969 F. 2d. 1147.

9  (Whereupon a document was tendered to the Court.)

10    **THE COURT:**  All right.  Go ahead.  Make your point.

11    I would like --

12    Is it a clean copy, though?  I don't want a --

13    **MR. ROSENBERG:**  It does have a few highlights, but

14  not any margin notes.

15    **THE COURT:**  Why don't you say out loud what you want

16  me to consider?

17    **MR. ROSENBERG:**  Page 1,150 of the decision, the Court

18  noted that because Congress did not assign the specific weight

19  the administrator should accord each of these factors that were

20  being considered in the context of this APA challenge, the

21  administrator is free to exercise his discretion in the area.

22  And here, as my colleague --

23    **THE COURT:**  Wait, wait.  Give me that cite.

24    **MR. ROSENBERG:**  Sure.  It's *State of New York versus*

25  *Riley*, 969 F. 2d. 1147.  It's a DC Circuit opinion from 1992.

PROCEEDINGS

1    And the particular language -- and we quote this in our

2 brief -- one of our briefs -- appears on page 1,150.

3         THE COURT:  Well, still, though, the quotation from

4 Justice White seemed to be tied into the APA, though, and what

5 it requires, saying expert discretion is the lifeblood of the

6 administrative process.  And the word "expertise" is

7 italicized, for emphasis.

8    In saying that there's got -- we're going to have judges

9 review under the APA the agency has got to actually exercise

10 its expertise.  And the way they do that is through a reasoned

11 analysis.

12    And here, this was a very abbreviated analysis.  Right?

13         MR. ROSENBERG:  Well, let me address that.  And there

14 are a couple of different layers that I'd like to address, if I

15 could have a few moments, from the specific to the more

16 general.

17         THE COURT:  All right.  Please take -- go ahead.

18         MR. ROSENBERG:  So, you know, on the specific

19 analysis -- and this, again, you know, echoes the argument of

20 my colleague.  The fundamental problem here is that the

21 analysis that plaintiffs would like the agency or this Court

22 directing the agency to undertake are entirely made up, because

23 there's no substantive standard that they can point to in the

24 underlying statute -- the INA -- that requires the agency to

25 analyze the very points that plaintiffs have made.

PROCEEDINGS

 1          Now, they have some very creative arguments that they've

 2    set forth in their brief as to all sorts of different factors

 3    that they would have liked the agency to consider, but all of

 4    those factors are completely unmoored from any standard that

 5    the agency would have been required to apply in the first

 6    instance.   And so that puts this Court in the position of

 7    having to second-guess the agency's action, without applying

 8    any standard.

 9          And, of course, as this Court is aware, the arbitrary and

10    capricious standard is a very narrow standard.   It's a very

11    high threshold that the Court would have to find for the agency

12    to have acted arbitrarily and capriciously.   And we don't think

13    that the agency's done so here.

14          Taking a step back, in terms of the analysis, we would

15    posit that there actually is analysis within the rescission

16    memorandum regarding the impacts of the policy.   One of the

17    arguments that plaintiffs have made that they've criticized the

18    Government for is the fact that the decision was made to allow

19    current DACA recipients to retain their status until the end of

20    their current terms, as well as applying -- allowing

21    individuals whose DACA status would expire before March 6th a

22    30-day window with which to seek one last renewal.

23          But that policy -- implicit in that policy and explicit in

24    that policy is the notion that, in winding down the program,

25    there are a lot of additional challenges, and that individuals

1   who currently have DACA status are enjoying that status.

2       And so, in fact, the agency did take into account the

3   considerations that plaintiffs are arguing here that it would

4   be disruptive to individuals' lives, by not winding down the

5   policy immediately, but allowing any individual who currently

6   has DACA status to retain that status through the end of their

7   current term.  And so in that sense, certainly, when you look

8   at the memo and the manner in which the policy is coming down,

9   it does take into account many of the factors that plaintiffs

10  have identified.

11      **THE COURT:**  Let's make sure I understand.  I think I

12  was confused on this very point, myself.

13      March 5 is what was said to be the termination date when

14  this termination was announced; but I think what you're saying

15  is that on March 30 -- just to take a random date, on

16  March 30th there will still be a lot of DACA recipients who'll

17  have the protection of DACA.  And gradually, as their DACA

18  periods -- their two-year periods run out, they will continue

19  to do that.  So even through the end of this coming year, to

20  the end of 2018, there will be some number of DACA recipients

21  who will still be in the program.  Is that true, or not?

22      **MR. ROSENBERG:**  There will be quite large -- that is

23  true, but we refer to it as a policy, and not a program.  But

24  that is true.

25      And, in fact, there will be quite a large number of DACA

1  recipients who'll continue to enjoy employment authorizations

2  in 2018, and in 2019, and likely in 2020, because an individual

3  whose status expires -- whose status will have expired between

4  September 5th and March 5th had a 30-day opportunity to seek

5  renewal of their DACA status; one last opportunity.

6      Let's say that that request was approved by USCIS today,

7  December 20th, 2017.  That means that that individual will then

8  retain that new DACA status through December 20th, 2019.

9      And, importantly, no individual who currently has DACA

10  status is having that status being taken away from them as a

11  result of the rescission policy.

12      So to the extent that plaintiffs are arguing that the

13  policy doesn't take into account various interests that

14  individuals may have, we would say that the way that the policy

15  was structured and the wind-down of the policy, which, in

16  essence, is an entirely discretionary policy in the first

17  place, did try to take that -- those factors into account.

18      But I think, taking a step back more generally -- and this

19  is --

20          THE COURT:  Wait.  What is it that happens on

21  March 5, then?  What --

22          MR. ROSENBERG:  So somebody whose --

23          THE COURT:  What happens on March 5 that is so

24  important?

25          MR. ROSENBERG:  So on September 5th, the wind-down

1   was announced.  Individuals whose DACA status expires, for

2   example, on March 6th would not have an opportunity or would

3   not have had an opportunity to renew their status.  And so

4   starting after March 5, individuals whose DACA status would

5   expire -- you know, their status will expire.  And it will be a

6   slow wind-down, because each additional day, some additional

7   individuals' status will expire over time.

8        THE COURT:  All right.  So take a concrete example.

9   Let's say somebody's -- some DACA recipient was approved for

10  the program -- for the policy.  And their expiration date was

11  in April of next year.  So they would not be able to renew.  Is

12  that correct?

13       MR. ROSENBERG:  That is correct.

14       THE COURT:  And so, come April, they will be out of

15  the policy?

16       MR. ROSENBERG:  That is correct.

17       THE COURT:  All right.  Now I think I've got it.

18      So there will be a -- not a total cliff of hundreds of

19  thousands; but there will be a wind-down for about 680,000

20  people over a two-year period?

21       MR. ROSENBERG:  That is correct.

22       THE COURT:  All right.  Still, if we're in the realm

23  of, *It is reviewable* --

24      I know you say it's not reviewable; but let's say you lose

25  that, and it is reviewable.

**PROCEEDINGS**

1    The reason that was given was that the program was illegal

2    to begin with, under the Fifth Circuit.  And the

3    Attorney General said it was an unconstitutional exercise of

4    the President's authority.  And --

5        So can't the judge -- a judge can review that.

6            **MR. ROSENBERG:**  So let me -- let me -- let me take a

7    step back on that.  And this was something, I believe, that we

8    discussed at the last time I was here.

9        The principal reason that was provided for the wind-down

10   of DACA was litigation risk.  That -- the DACA -- expanded DACA

11   and DAPA policies were challenged in the Southern District of

12   Texas, by Texas and a group of other states.

13       The District Court Judge in the Southern District of Texas

14   entered a nationwide preliminary injunction that was appealed

15   to the Fifth Circuit.  The Fifth Circuit affirmed.  And the

16   Supreme Court, in a 4-4 decision, because it was -- at the time

17   we lacked a ninth Justice -- affirmed, leaving the

18   Fifth Circuit's decision in place.  That is, for all intents

19   and purposes, binding precedent on the Government.

20       Texas had threatened to bring -- to amend its Complaint.

21   It's not even a new lawsuit.  It would have amended its

22   Complaint that was currently in front of the same

23   District Court judge.

24           **THE COURT:**  Oh, wait.  Let's be clear.  Stop there

25   for a second.

1        There was 10 states, out of the 26?

2            **MR. DAVIDSON:**  Nine states, Your Honor.

3            **THE COURT:**  All right.  Let's say nine states out of

4    the twenty six wrote that letter.

5        And why wouldn't laches have been a problem?

6        See, for DAPA -- D-A-P-A -- there was no laches problem,

7    because they sued right away.

8        But for DACA, which had been on the books for five years,

9    doesn't the APA recognize laches as a basis for denying relief?

10   I think it does, but you tell me.

11           **MR. ROSENBERG:**  Okay.  So a couple of points on

12   laches.  A big-picture point:  Plaintiffs present a series of

13   arguments that they claim that the Government could have made

14   in the Southern District of Texas.

15       It is not our burden in this case to disprove all of the

16   arguments that plaintiffs have made.  The standard is whether

17   or not the Acting Secretary's decision confronting the

18   litigation risk presented by the Texas AG's letter was

19   arbitrary and capricious.  And in light of the substantial

20   litigation that the Government would have faced to predict

21   whether or not a laches argument would have been successful is

22   beside the point.

23       But as to the laches argument, itself, what that argument

24   ignores is an interchange of intervening circumstances, which

25   is between the time that Texas brought the DAPA lawsuit and the

1    time that it threatened to amend its Complaint to bring a claim

2    regarding DACA, Texas had obtained a very favorable opinion

3    from a District Court Judge in Texas, as well as a subsequent

4    opinion from the Fifth Circuit.  And so in that regard, the

5    circumstances would have been changed, such that --

6        THE COURT:  Well, what so favorable?  Tell me.

7    Because didn't both judges say this is -- this opinion concerns

8    DAPA, D-A-P-A, not DACA.  I think I read that in both

9    decisions.

10        MR. ROSENBERG:  So that answer's a little bit more

11    complicated.  It does primarily involve DAPA; but also before

12    the Court was what was called "expanded DACA," which was the

13    subject of --

14        THE COURT:  Okay.  Three limited things.  Throwing

15    out the baby with the bathwater, but we're -- the other side

16    concedes the 2014 year.  We're talking about the 2012.

17        MR. ROSENBERG:  Right, but at the end of the day the

18    Fifth Circuit -- the District Court Judge entering a

19    preliminary injunction relied, and the Fifth Circuit affirmed,

20    relying upon a finding of a lack of discretion in the exercise

21    of DACA.

22        And that's the problem in terms of the administration

23    of -- of the DACA policy, is that the Government would have had

24    to argue, notwithstanding the Fifth Circuit's decision that the

25    Government's assertions that the exercise of discretion was

1  pretextual, that the District Court should ignore that

2  Fifth Circuit holding, which would have been binding precedent

3  in front of a District Court Judge who had already enjoined

4  expanding DACA.

5         **THE COURT:**  It's been a few days since it read it,

6  but I did read the Fifth Circuit decision.  And I could have

7  sworn there were statements in there that would have given a

8  lot of hope to the Government that DACA would be treated

9  differently.

10     No?  Am I -- maybe I'm remembering something else.

11         **MR. ROSENBERG:**  No.

12         **THE COURT:**  Isn't that true?

13         **MR. ROSENBERG:**  I don't think so.  At least, I don't

14  read the opinion, perhaps, the same way as the Court did.

15  Certainly, the Government and the Department of Justice don't

16  read the opinion the same way that the Court did.

17     The Court rejected the argument.  And we made the

18  arguments, Your Honor.  We argued forcefully and strenuously

19  that DACA was an exercise of prosecutorial discretion that was

20  actually administered in a discretionary manner.  And those

21  arguments were rejected.  Those arguments were rejected by the

22  District Court Judge.

23         **THE COURT:**  Read to me where the Fifth Circuit

24  rejected that argument.

25         **MR. ROSENBERG:**  I believe it might be footnote 191 of

PROCEEDINGS

1   the *Texas* opinion.  If you give me a moment, I could find it.

2                THE COURT:  Is this in the Court of Appeals?

3                MR. ROSENBERG:  Yes.

4                THE COURT:  I don't have that up here with me.

5   Maybe, again, somebody could hand that up.

6                MR. DAVIDSON:  Do you have the Administrative Record,

7   Your Honor?  It's in there.

8                THE COURT:  I do have that.  Okay.  Where should I

9   look?

10               MR. DAVIDSON:  All right.  You should look starting

11  at Administrative Record 130.

12               MR. ROSENBERG:  It's not footnote 191, but we're

13  looking for it right now.

14               THE COURT:  I'm sorry.  What page should I look at?

15               MR. ROSENBERG:  So, Your Honor, if you look at page

16  173.

17               THE COURT:  Of the --

18               MR. ROSENBERG:  Of the *Texas* Fifth Circuit opinion

19  809 F. 3d. 134.

20               THE COURT:  But in the Administrative Record, is that

21  173?

22               MR. ROSENBERG:  Yeah.  It would be the same page.

23               THE COURT:  173 of the Administrative Record.

24               MR. ROSENBERG:  It's page 173 of the opinion.

25               THE COURT:  Oh.  All right.

PROCEEDINGS

1          **MR. ROSENBERG:**  Which is AR 169.

2          **THE COURT:**  Okay.  All right.  So I'm at 169.  Now,

3     I've got so many footnotes.

4          **MR. ROSENBERG:**  Yeah.  It's actually the headnote 35,

5     the DACA and DAPA memos.

6          **THE COURT:**  All right.  Here we go.  I'll read it out

7     loud.

8          (Reading.)  *The DACA and DAPA memos comport to grant*

9     *discretion, but a rule can be binding if it is applied by the*

10    *agency in a way that indicates it is binding.  And there was*

11    *evidence from DACA's implementation that DAPA's discretionary*

12    *language was pretextual.  For a number of reasons, any*

13    *extrapolation from DACA must be done carefully.  First, DACA*

14    *involved issuing benefits to self-selecting applicants, and*

15    *persons who expected to be denied relief would seem unlikely to*

16    *apply; but the issue of self-selection is partially mitigated*

17    *by the finding that the Government has publicly declared that*

18    *it will make no attempt to enforce the law against even those*

19    *who are denied deferred action, absent extraordinary*

20    *circumstances.*

21        *Second, DACA and DAPA are not identical.  Eligibility for*

22    *DACA was restricted to a younger and less-numerous population.*

23    *We'd suggest that DACA applicants are less likely to have*

24    *backgrounds that would warrant discretionary denial.  Further,*

25    *the DAPA memo contains additional discretionary extra criteria.*

1  *Applicants must not be an enforcement priority, as reflected in*

2  *the prioritization memo, and must present no other factors*

3  *that, in the exercise of discretion, make the grant of deferred*

4  *action inappropriate.*

5      *But despite those differences, there are important*

6  *similarities.  The Secretary directed USCIS to establish a*

7  *process similar to DACA for exercising prosecutorial*

8  *discretion.  And there was evidence that the DACA application*

9  *process, itself, did not allow for discretion, regardless of*

10 *the rates of approval and denial.  Instead, in relying solely*

11 *on the lack of evidence that any DACA application has been*

12 *denied for discretionary reasons, the District Court found*

13 *pretext for additional reasons, and observed that the operating*

14 *procedures for implementation of DACA contain nearly 150 pages*

15 *of specific instructions for granting or denying deferred*

16 *action to applicants, and that denials are recorded in a*

17 *check-the-box standardized form, which USCIS personnel are*

18 *provided templates.  Certain denials of DACA must be sent to --*

19      It goes on and on and on, so I'm not going to --

20      So tell me.  The Government should.  What is your point on

21 this?  Remind me of what your point is.

22      **MR. ROSENBERG:**  The point, Your Honor -- there's also

23 some language for the Court's awareness on page 175.

24      **THE COURT:**  All right.  Let's read that.

25      **MR. ROSENBERG:**  Footnote 140.

1        THE COURT:  Let's read that.  140.

2        (Reading.)  *The states properly maintain that these*

3   *denials were not discretionary, but instead were required*

4   *because of failures to meet DACA's objective criteria.  For*

5   *example, Newfeld averred that some discretionary denials*

6   *occurred because applicants posed a public safety risk, were*

7   *suspected of gang membership or gang-related activity, and had*

8   *a series of arrests without convictions, or ongoing criminal*

9   *investigations.  As the District Court aptly noted, however,*

10  *those allegedly discretionary grounds fell squarely within*

11  *DACA's objective criteria, because DACA explicitly incorporated*

12  *enforcement priorities articulated in the DACA operational*

13  *instructions, and the memorandum-style policies,* et cetera, et

14  cetera.

15        I don't understand what your point there is.

16        MR. ROSENBERG:  Well, I mean, the point on that

17  footnote is that it was not discretionary.

18        And then on page 172, footnote 130, the last paragraph

19  notes that USCIS could not produce any applications that

20  satisfied all of the criteria, but were refused deferred action

21  by an exercise of discretion.  And then there's a citation

22  to -- looks like the District Court's opinion.

23        THE COURT:  I'm sorry.  Where are you reading from?

24        MR. ROSENBERG:  This is page 172, footnote 130, last

25  paragraph.  And then there's a -- I'll read that again.

1      (Reading.)  *USCIS could not produce any applications that*

2   *satisfied all of the criteria, but were refused deferred action*

3   *by an exercise of discretion.*

4      And then there's the cite.  See it at 669.  Looks like

5   that's probably the District Court's opinion.

6         **THE COURT:**  I just still am not finding it.  Are you

7   in the text?

8         **MR. ROSENBERG:**  No.  It's at page 172, footnote 130,

9   last paragraph.

10         **THE COURT:**  Yeah.  Oh.

11      (Reading.)  *USCIS could not produce any applications that*

12   *satisfied all of the criteria, but were refused deferred action*

13   *by an exercise of discretion.  All were denied for failure to*

14   *meet the criteria, or rejected for filing errors, errors in*

15   *filling out the form, or lying on the form, and failures to pay*

16   *the fees, or for fraud.  Given that the Government offered no*

17   *evidence as to the bases for other denials, it was not error,*

18   *clear or otherwise, for a District Court to conclude that DHS*

19   *issued DACA denials under mechanical formulae.*

20      All right.  Is that your point?  So you're saying that in

21   light of that language, that you felt like you were going to

22   lose if you let them amend?

23      And then -- I don't know.  Why wouldn't the Court --

24         **MR. ROSENBERG:**  This was a factual finding on a

25   preliminary injunction by a District Court regarding the DAPA

1  policy, as well as expanded DACA, both of which were

2  preliminarily enjoined.

3      Texas had threatened to amend its lawsuit; file an amended

4  Complaint in the same Court in front of the same Judge

5  regarding DACA.

6          **THE COURT:**  All right.

7          **MR. ROSENBERG:**  And these findings were made by this

8  District Court Judge as to how DACA was administered.  And the

9  District Court Judge found that, notwithstanding language in

10  the implementation memos regarding DACA about discretion, it

11  was not administered in a discretionary manner.

12          **THE COURT:**  All right.  What do you say?  What do you

13  say to that point?

14          **MR. DAVIDSON:**  Well, let me -- there's basic --

15          **THE COURT:**  Before you answer that point, first,

16  before you --

17          **MR. DAVIDSON:**  Yeah.

18          **THE COURT:**  -- veer off --

19      And I'll let you veer off into something else.

20          **MR. DAVIDSON:**  Okay.

21          **THE COURT:**  Help me understand.  The Government's

22  point is that there was a -- given the findings about no

23  discretion in the way that DACA has been administered, that

24  that same District Judge was likely to rule against the

25  Government.  So what do you say to that point?

1        **MR. DAVIDSON:**  A few points.  So this is all

2   provisional.  This is on provisional relief.  There's no final

3   adjudication that is occurring in the *Texas* case.  That's the

4   first point.

5        Second point.  The District Judge, himself -- one of the

6   factors that he relied on in granting the preliminary

7   injunction was that DAPA had not yet been enacted.  Knob had

8   yet gotten the benefits of the DAPA program.  And that District

9   Judge said that that was a factor in favor of provisional

10  relief, because if he allowed DAPA to go into effect, the

11  policy would become, quote, "virtually irreversible," end

12  quote, and he would then confront an effort to, quote,

13  "unscramble the egg," unquote.

14        **THE COURT:**  Where can I find that in this

15  Administrative Record?

16        **MR. DAVIDSON:**  It would be in the -- it would be in

17  the Texas District Court decision, which begins at page 42 of

18  the Administrative Record.  And the language I'm quoting from

19  is on page 124 of the Administrative Record.

20        **THE COURT:**  Okay.  I'm there.  So what part?

21        **MR. DAVIDSON:**  So if you look at headnote 74, it

22  says --

23        **THE COURT:**  Wait, wait.  Administrative Record, 124,

24  is page 673 of the actual Fed. Supp.  Right?

25        **MR. DAVIDSON:**  Correct.  And if you're in the left

1  column at the paragraph break --

2      THE COURT:  Yeah.

3      MR. DAVIDSON:  -- it says plaintiffs additionally

4  allege that legalizing the presence of millions of people is a,

5  quote, "virtually irreversible action, once taken."

6      The Court agrees.

7      And then later on, if you go into the second column at the

8  paragraph break there, it says, *The Court agrees that without a*

9  *preliminary injunction, any subsequent ruling that finds DAPA*

10 *unlawful after it is implemented would result in the states*

11 *facing the substantially difficult if not impossible task of*

12 *retracting any benefits or licenses already provided to DAPA*

13 *beneficiaries.  This genie would be impossible to put back into*

14 *the bottle.*

15     And up above he uses the "unscramble the egg" metaphor.

16     THE COURT:  Where is that?

17     MR. DAVIDSON:  That is above the paragraph break.

18 And around the middle of the paragraph it says, *Once defendants*

19 *make such determinations, the states accurately allege that it*

20 *will be difficult or even impossible for anyone to*, quote,

21 "unscramble the egg."

22     THE COURT:  So your point is that for DACA, the egg

23 was already scrambled.  So --

24     MR. DAVIDSON:  The equities would have pointed

25 180 degrees the opposite direction, because rather than

1   stopping a program from being incepted, the District Court

2   would be called upon to enjoin 700,000 people from having

3   benefits that had already been conferred to them.

4        **THE COURT:**  All right.  So what do you say?  What

5   does the Government say to that point?

6        **MR. ROSENBERG:**  We're in the exact opposite situation

7   here, Your Honor.

8        In the *Texas* case, Texas and the other states brought a

9   preliminary injunction, because they were alleging that they

10  would be irreparably harmed by, for example, having to provide

11  licenses to individual recipients.  And that was a harm that

12  you cannot unscramble after the absence of a preliminary

13  injunction.

14       If you were to take away at some later point in time the

15  benefits that these individuals were receiving, Texas and the

16  other states would have still been in a situation where they

17  would have had to provide these benefits in the first

18  circumstance.  And that instance it cannot be unscrambled.

19       Here, for an orderly wind-down of the DACA policy, it's

20  actually relatively easy to unscramble the egg.  If individual

21  states, including the state plaintiffs here, wish to consider

22  providing benefits in the future to the individuals, I'm not

23  aware of anything that would prevent them from doing so.  All

24  that is happening is that their deferred action through the

25  framework of DACA will, over time, be taken away.  And their

1  employment authorizations will expire when their deferred

2  action expires.

3       **THE COURT:**  That's an important thing.  Those work

4  authorizations are very important.  You're going to throw

5  people on the unemployment rolls.  They won't even be on the

6  unemployment rolls.  Instead of being productive members of the

7  economy, they will now be unable to work legally in the

8  country.

9       **MR. ROSENBERG:**  So that's -- that's -- that's a

10  policy decision.  And that's a policy decision that,

11  respectfully, is not one for this Court to make.

12       **THE COURT:**  Well, no.  I disagree.

13     Look.  You've got the Judge.  You go off on this, because

14  the Judge in Texas was balancing equities and said, "Unscramble

15  the egg," and that sort of thing.  All right.

16     So if there has been an amendment, let's say that -- you

17  know, I don't know where nine -- nine states get to amend for

18  twenty-six, without bringing a brand new lawsuit; but let's say

19  they got by that procedural hurdle.  And let's say they got by

20  the laches problem.  Then this Judge would have to consider the

21  hardship being imposed on the DACA recipients who are now going

22  to lose their work authorization because of your policy -- your

23  change in policy.

24     And that's 680,000 people in a real -- that's palpable.

25  That's a real thing.

1      Whereas in this case, DAPA -- D-A-P-A -- had not yet taken

2   effect.  So the Judge was saying, *Let's stop it before it gets*

3   *started*.

4      But for DACA, it had already been in effect for five

5   years.  Isn't that a real --

6      I don't know.  Seems like an important difference.

7           **MR. ROSENBERG:**  Four separate responses to that,

8   Your Honor.  Let me start.

9      I -- I've had the opportunity and privilege of appearing

10  in front of many District Court Judges across the country.  As

11  this Court may understand -- likely understands -- different

12  District Court Judges approach problems in different ways.

13     What we do know in this situation is that this is a

14  District Court Judge who had already entered an injunction

15  regarding DAPA and expanded DACA.

16     Now, I take the point about the defenses and other

17  arguments that plaintiffs claim that the Government could have

18  made; but respectfully, that's going down a rabbit hole,

19  because for us to prevail in this case on a preliminary

20  injunction where plaintiffs have the burden of proof, we need

21  not show that the defenses of the other arguments that

22  plaintiffs would like for the Department of Justice to make

23  would have been or would not have been bound.

24     The question is whether the Acting Secretary's

25  determination of litigation risk was arbitrary and capricious.

1    And it can't be arbitrary and capricious to defer to a Fifth

2    Circuit opinion.

3        **THE COURT:**  But you say it was a determination of

4    litigation risk.  Isn't that a recharacterization?  He flat-out

5    said it was illegal.  That's what the Attorney General said.

6    He didn't say "litigation risk."  He said, *In my opinion, this*

7    *is illegal.*  All right.  We all have to respect the

8    Attorney General.  And I do respect the Attorney General.

9        But nevertheless, if a District Judge, and the Court of

10   Appeals, and the Supreme -- they may say he's wrong on that; he

11   did have the authority.  Isn't that a -- that's a legal issue.

12       **MR. ROSENBERG:**  So he said -- he actually said both;

13   but I think you have to look at the statement in context.

14       So if we look at the Attorney Generals' letter to

15   Acting Secretary Duke, which is at AR 251 --

16       **THE COURT:**  Okay.  All right.  Where is that?

17       **MR. ROSENBERG:**  Let me know when you're there.

18       Okay.  Second paragraph.  I'll read from the beginning to

19   the end, because I think the context of this paragraph is

20   important.  The Attorney General starts off by saying, *DACA was*

21   *effectuated by the previous Administration through executive*

22   *action without proper statutory authority, and with no*

23   *established end date, after Congress' repeated rejection of*

24   *proposed legislation that would have accomplished a similar*

25   *result.  Such an open-ended circumvention of immigration laws*

PROCEEDINGS

1  *was an unconstitutional exercise of authority by the*

2  *Executive Branch*.  So that set of sentences goes to the

3  legality issue.

4      But then you get to the bottom of the paragraph; that

5  conclusory section of the paragraph that starts with the word

6  "Because."  And it says, *Because the DACA policy has the same*

7  *legal and constitutional defects that the courts recognized as*

8  *to DAPA, it is likely that potentially imminent litigation*

9  *would yield similar results with respect to DACA*.

10     So that's the litigation risk.  And I think that they do

11 have to be read together, although at the same time, litigation

12 risk, by itself, would provide a valid basis for the

13 rescission.

14     Judges sometimes make mistakes.  I mean, we hope this that

15 Court won't, but judges sometimes make mistakes.  And let's

16 assume, for example, that this Court believes that DACA is

17 lawful.  That's neither here nor there, because a different

18 District Court Judge in Texas had issued an opinion as to DAPA

19 and expanded DACA that went the other way.  And based on that

20 as well as the Fifth Circuit's decision, it is certainly

21 reasonable to conclude that there is a substantial litigation

22 risk, which is reflected in the Acting Secretary's memo.

23     So even if it were legal --

24         **THE COURT:**  That's what I'm asking you.

25     This is one sentence; one sentence in something that is

1   much more complicated in trying to predict whether or not that

2   Judge really would have enjoined on a nationwide basis the DACA

3   program, without considering the kind of things that you, as a

4   good lawyer -- and every good lawyer here -- would have had

5   page after page of analysis.  And instead, there's a cryptic

6   one-sentence thing there.

7          Is that -- is that --

8          Now, if we're in the realm of arbitrary and capricious,

9   and it's reviewable, don't we insist on more than that

10  conclusory statement?

11         **MR. ROSENBERG:**  I don't think that there's much more

12  than that that needs to be said.

13         Plaintiffs have criticized the Government for the

14  Administrative Record.  And this Court, obviously, has opined

15  on that.  But the Administrative Record, as a whole, reflects a

16  litigation-risk analysis.

17         These were the documents that the Acting Secretary

18  considered -- came from her DACA file -- when she was

19  considering what to do with the policy.  And they consist of,

20  you know, some documents that candidly are helpful to

21  plaintiffs.

22         And I know early on this Court indicated that the

23  Administrative Record should include unhelpful documents, from

24  the Government's perspective.  We included those documents; the

25  OLC memo, which, in a footnote, noted that they gave

1   preliminary oral advice.

2       But the fact is the Record also includes the preliminary

3   injunction opinion by the District Court Judge; the Fifth

4   Circuit's opinion; and the Supreme Court's affirmance on a 4-4

5   split.  That is, in essence, a component of a litigation-risk

6   analysis.

7       But even if you set aside litigation risk for a moment,

8   you can also independently look at the Attorney General's

9   statement, because it's clear that the Attorney General does

10  believe that DACA is unlawful.

11      And if that's the case, that raises questions as to how

12  would the DACA lawsuit be defended in the Southern District of

13  Texas, because it's the Department of Justice's obligation to

14  defend lawful statutes and lawful policies.

15      But you know, it's difficult to predict-- and that's why

16  this is a rabbit hole -- what arguments we would have been able

17  to make, if we would have been able to make arguments, at all,

18  in defense of a policy that the Government had concluded, based

19  on a Fifth Circuit opinion -- a binding Fifth Circuit

20  opinion -- is unlawful.

21      And so where does that get plaintiffs, if we wound up

22  litigating the *Texas* case, and weren't able to present valid

23  defenses because of the illegality of DACA as it was

24  administered?  And then the District Court enters an injunction

25  that winds down the program very, very quickly.

 1          **THE COURT:**  Well, but there's nothing in our

 2   Administrative Record that addresses the laches point.  Right?

 3          **MR. ROSENBERG:**  Well, that's a point that plaintiffs

 4   made up.

 5          **THE COURT:**  No.  I didn't even get it from them.  I

 6   thought of it, myself.  The first time I read this I said that

 7   the DAPA program was fresh off the books, and the DACA had been

 8   there for five years.  And where were these plaintiffs all of

 9   the time, letting the program get started, when so many people

10   rely on it?

11          **MR. ROSENBERG:**  So let me -- let me --

12      You know, for the last few minutes there's a big-picture

13   point that I've very much wanted to make.  And I think that

14   that goes to the laches argument.  I'll address laches very

15   briefly, but I'd like to -- I think the Court does need to take

16   a step back, and look at what this policy's fundamentally

17   about.

18      Regarding laches, we think that there is -- was a change

19   of circumstance; that, you know, obviously, plaintiffs in Texas

20   were seeking prospective equitable relief.  So it's unclear to

21   the extent to which laches would apply in that context.

22      And certainly if the District Court Judge in Texas had

23   found that DACA was unlawful, there would be no justification

24   that would require the Government to continue that policy.

25      Under any circumstance of continued litigation, it is

1   likely if not virtually certain that DACA would have been wound

2   down much more quickly, whether it be through a preliminary

3   injunction, early summary judgment, or a judgment on the merits

4   based on binding Fifth Circuit precedent, than the orderly

5   wind-down that the Acting Secretary provided for the DACA

6   rescission.

7        But to speculate on hypothetical arguments that plaintiffs

8   believe that the Government should have made, I think, really

9   does place this Court -- and has this Court go down a rabbit

10  hole that's inappropriate.

11       But I do think -- and this is --

12           **THE COURT:**  You --

13       Look.  The new Administration has regularly taken appeals.

14       The District Judges have ruled against you in other kinds

15  of cases, like the travel ban, and so forth.  And you haven't

16  rolled over when that has happened.  You've gone to the Court

17  of Appeals, and you've gone to the Supreme Court, and you

18  vigorously have litigated those issues.

19           **MR. ROSENBERG:**  And we did so here.  And we lost in

20  front of the Fifth Circuit, and we lost in the front of the

21  Supreme Court.

22           **THE COURT:**  But you didn't lose on DACA.  You lost on

23  DAPA.

24           **MR. ROSENBERG:**  But we lost on expanded DACA, which

25  was enjoined.  And we also -- and we also --

1        And plaintiffs have never pointed out a matter in which

2    DACA could be distinguished from --

3            **THE COURT:**  Yeah.  I'm pointing one out.  Laches, for

4    starters.

5            **MR. ROSENBERG:**  Well, that's -- that's a defense.

6        That is not a way to distinguish the underlying policy,

7    Your Honor.

8        And that also still doesn't address the fact that there

9    was a change in circumstances; that Texas had very favorable

10   opinion from the Fifth Circuit that would have justified their

11   amendment to the Complaint.

12       And the fact that they were seeking only prospective

13   relief, I think, means that the equitable doctrine of laches

14   wouldn't apply.

15       I'm not sure.  I'm not sure, actually.  I'm not aware of

16   case law regarding the application of laches in the context of

17   the APA versus, you know, statute of limitations.

18       And certainly Texas' argument probably would have been

19   that the harms associated with the DACA policy as it was being

20   administered would continue to accrue to the state, which might

21   undercut any laches argument, because they are suffering a

22   continuing harm; or at least, that's what they would likely

23   say.

24       But I do want to take a step back -- and this does relate

25   to the laches argument, as well -- because I don't think that

 1  laches would apply in the context of the individuals here.  And

 2  this goes back to probably the fundamental disagreement between

 3  the parties about this case.  And the reason why we're here is

 4  we have very different conceptions of what DACA was about.

 5      And I think how this Court views DACA is likely to have

 6  substantial impact on whether it agrees that plaintiffs have

 7  failed to state a claim, and whether it agrees that plaintiffs

 8  are unlikely to succeed on the merits.

 9      And it's important to remember that DACA --

10      You know, plaintiffs come up here -- our friends -- and

11  they say, you know, this is a program that conferred rights;

12  that individuals relied upon their DACA grants; that they

13  benefited from these DACA grants.

14      But it's important to remember that when President Obama

15  created the DACA policy --

16      He didn't create it.  The Secretary of DHS did.

17      But when President Obama spoke to reporters on DACA, he

18  said -- and I'm going to read.  This is from the appendix that

19  plaintiffs have submitted to the Court.  It's Exhibit Q to the

20  very long declaration.  And it appears on their appendix at

21  pages 1,739 to 1,740.

22      He said, *Now let's be clear*.  *This is not amnesty*.  *This*

23  *is not immunity*.  *This is not a path to citizenship*.

24      This is the important part.

25      *It's not a permanent fix*.  *This a temporary, stopgap*

1   *measure that lets us focus our resources wisely, while giving a*

2   *degree of relief and hope to talented, driven, and patriotic*

3   *young people.*

4        So when this policy was created --

5             **THE COURT:**  And that's the way I view it; exactly

6   what you just read.

7        So you -- but nevertheless, it -- it gives people who

8   otherwise wouldn't be able to work in the legitimate economy --

9   it gives them a work permit, and allows them to be

10  contributing, taxpaying members of the economy, as opposed to

11  doing something, you know, that might be illegal, or not report

12  their taxes.  And I don't know why you wouldn't have taken that

13  into account.

14       That's -- isn't that a huge thing to have?

15            **MR. ROSENBERG:**  So --

16            **THE COURT:**  To have so many people being a legitimate

17  part of the economy?

18            **MR. ROSENBERG:**  So let's talk about, though, while

19  that may be a policy rationale that this Court believes is

20  valid, the underlying question is:  What is the nature of the

21  policy, itself?  What was it intended to do?

22       From the moment that the policy was created, according to

23  President Obama, it was not intended to be a permanent fix.

24            **THE COURT:**  Correct.

25            **MR. ROSENBERG:**  So when plaintiffs come here and they

1  say there are individuals who'll have their DACA status taken

2  away from them, and that they're relying upon that status -- it

3  was never intended to be permanent.

4       And, in fact, their status isn't being taken away from

5  them, because every DACA recipient will continue to enjoy the

6  benefits of DACA through the end of their two-year term,

7  whenever it may end after March 5th.

8       But indeed when you look at President Obama's statement

9  about the creation of DACA, and then you compare it to the

10 statement issued by Acting Secretary Duke at the rescission of

11 DACA, it shows, if anything, that the rescission was entirely

12 consistent with the original purpose of DACA.

13      And so this is also in plaintiffs' appendix.  It's

14 Exhibit DD at ECF Number 121-2.  And this is a statement that

15 the Acting Secretary issued contemporaneously with the

16 rescission of DACA.  And she notes, as she does in the

17 rescission memo, that the Government was faced with two

18 options:  Wind the program down in an orderly fashion that

19 protects beneficiaries in the near term, while working with

20 Congress to pass legislation; or allow the Judiciary to

21 potentially shut down the program completely and immediately.

22      So, just like President Obama, who noted that DACA was

23 intended only to be a temporary fix while Congress works on a

24 congressional fix, because that's where the protection for

25 individual DACA recipients ultimately has to come from -- it

1   has to come from Congress.  And those policy decisions that the

2   Court is contemplating are policy decisions that Congress has

3   to weigh.  And that's something that's fundamental to the

4   nature of -- of, you know, the type of relief that plaintiffs

5   are -- are seeking here.

6        And so the Acting Secretary says that DACA was never more

7   than deferred action of bureaucratic delay that never promised

8   the rights of citizenship or legal status in the country.  The

9   program did not grant recipients a future.  It was, instead,

10  only a temporary delay until a day of likely expiration.

11       Again, that is entirely consistent with President Obama's

12  statement regarding creation of this policy.

13       So perhaps it's worthwhile for Congress to consider the

14  benefits of providing some form of relief to these individuals.

15  Perhaps congressional relief might relieve this Court of some

16  of its obligations in this current lawsuit; but at the end of

17  the day, the rescission of DACA was entirely consistent with

18  the creation of DACA.

19       And so when we discuss issues like the individual DACA

20  recipients, who have alleged that they will be harmed through

21  the rescission of the policy, and the steps that they've taken,

22  they would say, in reliance upon that policy, it was never

23  intended, from Day One, to provide the type of relief that

24  plaintiffs would ascribe to it.

25       And as the Court reviews the APA claims, the Equal

PROCEEDINGS

1  Protection claims, the Due Process claims, and the equitable

2  estoppel claims, it needs to look to how the policy was

3  originally intended to be when it was created just five short

4  years ago.

5       **THE COURT:**  All right.  All right.  What does the

6  other side say?  What do you say to the point that --

7       Okay.  Assume for the sake of argument that everyone will

8  now agree that it was perfectly lawful to have the DACA

9  program.  Nevertheless, Counsel makes the point that the

10  Attorney General thought there was a significant litigation

11  risk that the Judge in Texas might have allowed the amendment;

12  might have overruled laches; it might have enjoined the DACA

13  program on a stop-it-right-now basis; and that discretion was

14  the better part of valor.  And so let's just phase out the DACA

15  program now, rather than litigate it.  So -- and the Government

16  does that all of the time.  They decide whether to fight, or

17  fold their tent.  And this is just another one of those

18  decisions to cut their losses.

19       So what do you say to that point?

20       **MR. DAVIDSON:**  I would say the Government gets sued

21  all of the time; and for that reason, the Courts in this

22  Circuit have on multiple occasions rejected

23  litigation-risk-type rationales.

24       We cited the *Organized Village of Kake* case in our brief.

25  That's a Ninth Circuit case.

PROCEEDINGS

1          **THE COURT:**  How can that be?  How can that be, that

2     litigation risk is not a legitimate factor?  Tell me about that

3     decision.  I'm unaware of that decision.

4          **MR. DAVIDSON:**  That's a case involved something

5     called the "Roadless Rule," which was a regulation having to do

6     with whether you could put roads in roadless areas of National

7     Parks.

8          **THE COURT:**  What was the name of the decision?

9          **MR. DAVIDSON:**  It was called *Organized Village of*

10    *Kake versus USDA*.  It's 795 Fed. 3d. 956.  And the portion we

11    cite in our brief is page 970.  That's a 2015 opinion of the

12    Ninth Circuit.

13          **THE COURT:**  Read that to me, please.

14          **MR. DAVIDSON:**  So the quotation I have is the

15    Department of Agriculture asserted that, quote, "Litigation

16    over the last two years," unquote, related to the Roadless Rule

17    justified a reversal of their policy.  And what the

18    Ninth Circuit said was it rejected that rationale, and said,

19    quote, "At most, the Department deliberately traded one lawsuit

20    for another," unquote.  So the Ninth Circuit was not persuaded

21    by litigation-risk rationale that didn't address the merits of

22    the decision.

23          I would also say I want to be precise about what the

24    litigation risk at issue is.  The Government in this case has

25    said that the litigation risk was an abrupt, imminent,

1    nationwide injunction.  That was what they were worried about,

2    and so they were really doing DACA recipients a favor, by

3    winding down the program in the way that they did.

4         There is nothing the record, whatsoever, suggesting that

5    there would be an immediate and abrupt nationwide injunction.

6         The letter they rely on from the Texas Attorney General,

7    which is at Administrative Record 239, does not threaten an

8    injunction.  It does not say anything about seeking an imminent

9    nationwide injunction.  In fact, it requested a phase-out of

10   the DACA program.  And it said explicitly that this request,

11   quote, "does not require the Executive Branch to immediately

12   rescind DACA, or expand DACA permits that have already been

13   issued," unquote.

14        So the Texas Attorney General is not threatening an

15   immediate, abrupt, nationwide injunction.  And it's hard to

16   imagine any court of equity anywhere in the United States

17   ordering a stop to DACA more abrupt than the rescission

18   memorandum, itself.

19        Now, in addition to the points that the Court has already

20   made --

21        THE COURT:  Well, but let's say that that's right,

22   for a moment.  The Government's position is that they have to

23   have the authority to manage litigation, and decide what is the

24   best way to get through the thicket of lawsuits.  And so they

25   make -- let's assume they make a decision in good faith.  And

1   it's not the decision that you would have made, but it's the

2   decision that they make.  Don't we have to accept that, as long

3   as it's rational, and even if we disagree with it?

4        I've got to read this can't-trade-one-lawsuit-for-the-

5   other thing.  That's a good line, by the way.  I like that.

6   But it cuts completely contrary to the idea that the Government

7   gets to manage its litigation docket.

8        **MR. DAVIDSON:**  The Government can consider litigation

9   risk.

10       What it can't do is make an arbitrary and capricious

11  decision in the context of the overall decision.  It can't

12  ignore all of the other factors, and focus exclusively on

13  litigation risk.

14       That's why it's a very dangerous argument that the

15  Government is making.  They get to sued all the time over

16  everything.  And if they were allowed to simply say, *All right.*

17  *We're going to surrender on lawsuits that challenge policies*

18  *that we don't like*, then that gets rid of the APA.  There's no

19  review, then, on the policy merits, which is what the

20  Government is supposed to consider.

21       I'd also like to suggest that the litigation risk that's

22  being presented in this courtroom is completely overblown.  So

23  even if you look at the Fifth Circuit, itself, there were four

24  Judges on the Fifth Circuit who looked at the DAPA program,

25  because there was a Stay Motion, and there was a Preliminary

**PROCEEDINGS**

1    Injunction Motion.

2        Two judges were in the majority both times, and said that

3    DAPA was unlawful.

4        There were two different dissenters.  So even on the Fifth

5    Circuit, itself, it's a 2-2 split.

6        Moreover, there was a decision in the Fifth Circuit called

7    the *Crane versus Johnson* case, 783 Fed. 3d. 244, looking at the

8    DACA program, and considered a challenge by DHS agents who said

9    that they shouldn't be required to grant DACA permits.  And in

10   that case -- the *Crane* case -- there were three Judges,

11   including one of the dissenters from *United States versus*

12   *Texas*, who found that the DACA program was discretionary, and

13   was case by case.  It made different determinations and

14   different findings from what the DAPA Court had done.

15       So if the Government were reading the tea leaves in any

16   kind of rational way, in the Fifth Circuit, it would have had

17   to consider the that there was a 2-2 split, even on the DAPA

18   program.  It would have had to consider this *Crane* case.  And

19   there's no evidence that they considered any of that.

20       I'd also say that on a formal level, the DACA program is

21   different from DAPA, and involves a different population of

22   people.  And so DAPA was not binding.  It was not a forgone

23   conclusion that DACA would go the way of the Fifth Circuit, you

24   know, the same way as the DAPA policy did.  And there's a

25   really important distinction between the two.

1        So DAPA involved a population of immigrants who had an

2   alternative pathway to lawful permanent residence.  So because

3   it was parents of people who were already lawful permanent

4   residents, there was a pathway to citizenship in the INA.

5        Now, it was a long pathway and an impractical pathway, but

6   the Fifth Circuit said that because Congress had set forth the

7   pathway in the INA, itself, that that created a problem for

8   DAPA, because it was potentially in conflict with what Congress

9   had done.

10       That is not true for DACA.  The DACA population does not

11   have an alternative pathway, as a group, to lawful status.

12   Indeed, it's a requirement of the DACA program that you not

13   have that.

14       So the cases are legally distinguishable, and they're

15   factually distinguishable.

16       The DAPA program involved provisional fact-finding at the

17   preliminary-injunction stage.  And in a subsequent theoretical

18   DACA lawsuit, if it had happened, if it had overcome the laches

19   bar, if the State Attorneys General had actually asked for some

20   kind of an injunction, the District Court would have been free

21   to make different fact findings on a completely different

22   record.

23       And so the litigation-risk analysis -- in order for the

24   Government to be able to rely on the litigation-risk analysis,

25   it needs to be a rational one.  It needs to consider the

1  relevant factors.  And I think the most important factor is

2  this.  It's litigation risk.

3      There are some risks that are worth taking.  And I would

4  submit to the Court that for the Federal Government of the

5  United States to risk some kind of litigation, there could be

6  no better reason than to try to preserve the protections for

7  these 700,000 people.  Any litigation risks that they might

8  have confronted needs to be weighed against the interests that

9  are on the other side of the ledger, including, for example,

10 200,000 U.S.-citizen children who face the loss of their

11 parents.

12     So this sterile term, "litigation risk," as a

13 get-out-of-jail-free card to allow the Government to rescind

14 any policy that it wants, is just a way to get out of

15 considering the policy merits that they're required to consider

16 under the APA.

17     And I think this segues me into another point that I'd

18 like to address, which is the pretextual character of the

19 Government's rationale in this case.  We've asked in our

20 briefing for a finding that the Government's stated rationale

21 for the rescission is a pretextual rationale.  It's not the

22 real rationale.

23     Now, the Government doesn't come out and announce when

24 it's acting pretextually, so we have to build a case with

25 evidence and a series of points, which we have done.

PROCEEDINGS

1           The first justification for why the Government's decision

2    is pretextual is their total failure to consider any

3    alternatives that might have mitigated the litigation risk.  So

4    if you assume that some litigation risk existed, could that

5    have been mitigated possibly by getting rid of the checklist;

6    possibly by moving the DACA determinations to the Field

7    Offices?

8           The Government never considered those, at all.  And the

9    failure to consider those gives rise to an inference that the

10   litigation-risk rationale is pretextual.

11          There's also a shifting explanation in the Record.  The

12   Attorney General asserted a legality rationale.  He asserted

13   that DACA was illegal; an unconstitutional exercise of the

14   Executive Branch's powers.

15          The Government is not asserting illegality in this

16   litigation.  They've pivoted to a litigation-risk rationale.

17   And I would note that that litigation-risk rationale is nowhere

18   to be found in the rescission memorandum, itself.  It's never

19   articulated as such.  And so we've seen shifting positions from

20   the Government, which gives rise to the inference that its

21   stated positions are not the real ones.

22          I would add that the President, himself, tweeted the day

23   of the rescission -- and that is at our appendix, 1,958 -- that

24   if Congress doesn't do something, he would revisit the policy.

25          Well, if the litigation risks were so severe, if it was a

 1  losing cause that, as the Government says, would be quixotic to

 2  oppose, what is the President doing revisiting the issue?

 3       That suggests that the Government is acting pretextually.

 4       The Attorney General, when he gave his press conference on

 5  the day of the rescission, gave totally different rationales

 6  for the rescission, beyond litigation risk.  He talked about

 7  the surge of minors at the border.  He talked about jobs for

 8  American citizens.  He talked about crime.  He talked about

 9  terrorism.

10       There's no -- nothing in the Record, at all, supporting

11  those considerations or articulating those considerations, yet

12  clearly they were on the mind of the Attorney General.  That

13  gives rise to the inference that litigation risk is a pretext.

14       And I would also say that the Government didn't

15  immediately terminate the program that they thought created

16  untenable litigation risk.  They kept it in place for a while,

17  and phased it out.

18       Well, if it created intolerable litigation risks or was

19  illegal, why would they do that?

20       Finally, I would say that the Government has asserted in

21  this case a variety of defenses and a variety of positions

22  that, if they were accepted, would have -- would have reduced

23  to a minimum any litigation risk from the *Texas* case.  So in

24  the *Texas* case, they said that deferred action programs weren't

25  justiciable under the APA.

1          Well, doesn't that diminish the litigation risk?

2          They said that there was a jurisdictional bar to

3    consideration, based on Section 1252(g) of the INA.

4          Doesn't that reduce the litigation risk?

5          They say in this case that notice and comment was not

6    needed.  That's different from what the *Texas* Court held.

7          And they say that DACA was an exercise of prosecutorial

8    discretion.  They say that on page 1 of their opposition to our

9    Motion for Provisional Relief.  That makes it presumptively

10   lawful.

11         Doesn't that decrease litigation risk?

12         They have standing defenses.

13         Wouldn't those have decreased the litigation risk?

14         So how is it possible that there could have been

15   intolerable litigation risk in the Fifth Circuit, in Texas,

16   when they had all of those defenses available to them?

17         All of this, taken together, suggests that the stated

18   rationale -- this litigation-risk rationale -- is a pretext;

19   that there's something else going on; that there's an unstated

20   reason for what the Government did.

21         And so we would request that this Court make a factual

22   finding that pretext has been shown; at least, the likelihood

23   of success on that point.

24         And because the Government is not allowed to act on the

25   basis of pretext, that is, alone, a reason for setting aside

1   the rescission memorandum.

2           THE COURT:  All right.  What does the Government say

3   to that?

4       MR. ROSENBERG:  There are a lot of specific points

5   I'd like to respond to.

6       I'd like to start with the *Crane* decision, which

7   plaintiffs cited at the beginning of their colloquy.  The *Crane*

8   decision was an appeal of a grant of a Motion to Dismiss for

9   lack of subject-matter jurisdiction, and so I don't believe

10  that the substance of DACA was before the Court.  It was a

11  jurisdictional issue.

12      Regarding the Judges on the Fifth Circuit, plaintiffs have

13  noted that there were two Judges out of the four who would have

14  approved DACA.  They were both in the dissent in both opinions.

15  And I'm not an appellate lawyer, but I believe --

16          THE COURT:  Did you say "DAPA" or "DACA"?

17      MR. ROSENBERG:  I'm sorry.  You're correct.  Expanded

18  DACA, and DAPA.

19      But I believe that the Fifth Circuit actually has pretty

20  strict rules regarding the precedential nature of its

21  decisions.

22      Regarding the *Organized Village of Kake versus USDA*, on

23  page 970, that case is distinguishable.  That involved a

24  situation with a National Forest, where exceptions were being

25  made for that National Forest, and the litigation impacts in

1  other National Forests.

2       And in that case, reading from the page that plaintiffs

3  have summarized, the Court states that, *Alaska candidly*

4  *conceded in its Opening Brief that the Tongass Extension*, which

5  is for that particular National Forest, *obviously will not*

6  *remove all uncertainty about the validity of the Roadless Rule*

7  --

8       (Reporter requests clarification.)

9          **MR. ROSENBERG:**  -- *about the validity of the Roadless*

10  *Rule, as it is the subject of a nationwide dispute and*

11  *nationwide injunctions*, unquote.

12      These other lawsuits involved forests other than the

13  Tongass; completely different situations.  So it's impossible

14  to discern how an exemption for the Alaska forest which was at

15  issue in that case would affect them.

16      And the Department could not have rationally expected that

17  the Tongass exemption, which, again, was subject to that -- the

18  litigation here -- would even have brought certainty to

19  litigation about that particular forest.

20      Here, by contrast, we have a situation that's directly --

21          **THE COURT:**  What were you saying about the

22  trade-one-lawsuit-for-another thing?  Isn't that the same case?

23          **MR. ROSENBERG:**  I believe that is the same case, but

24  it's factually distinguishable, because there were multiple

25  lawsuits, as I understand it, involving, you know, different

PROCEEDINGS

1    forests.

2         And, you know, unlike here, where you have a lawsuit about

3    a set of policies that are closely tied together, there, you

4    have, you know, different factual circumstances giving rise to

5    different lawsuits, again, based on my review of the case right

6    now.

7         The Court, of course, is welcome to review that lawsuit --

8    that case.  That is a case that plaintiffs have cited in their

9    brief.

10        I do want to address the arguments that plaintiffs have

11   again made regarding the defenses that the Government could

12   have made.  And in hearing plaintiff's argument, again, I think

13   this is a rabbit hole, but it's become clear that the reason

14   that this is a rabbit hole is what this has now become is a

15   challenge to the Department of Justice's litigation judgment.

16   That's what this really is, at its core.

17        When plaintiffs say the Department of Justice could have

18   presented this defense or could have presented this argument,

19   they are now challenging the Department of Justice's litigation

20   decisions.  And that is a remarkable position.  It would create

21   litigation on litigation, if this Court were to hold that that

22   is a valid -- that is a valid basis for a claim, because every

23   time that the Department of Justice makes a litigation

24   decision, and the Department of Justice, as the Court is aware,

25   has the responsibility for defending the interests of the

 1   United States, and those litigation decisions may be decision s

 2   in particular litigation matters.  It may be decisions to

 3   refrain from litigation.  It may be decisions about the context

 4   of a particular litigation.

 5        Is that going to be subject to some sort of challenge,

 6   where a plaintiff can say, *Well, the Department of Justice*

 7   *should have made this argument that we have thought of; and*

 8   *because it didn't or it chose not to, that gives rise to some*

 9   *sort of claim*.  Because that's really what plaintiffs are

10   saying here.  And that's, I think, a remarkable position for

11   plaintiffs to take.

12        Plaintiffs state that the -- they have had argued pretext.

13   And they have stated that the litigation risk was not in the

14   Acting Secretary's decision.

15        I believe this is something that we addressed at the last

16   hearing when I was here, regarding the scope of the

17   Administrative Record.

18        And if the Court turns to page AR 254, which is the

19   rescission memo, as well as AR 255, looking at the last

20   paragraph on page 254 and the first paragraph on page 255, I

21   won't read it here, but these were the key paragraphs of the

22   rescission memo.

23        The Acting Secretary of DHS refers to the Attorney

24   General's letter.  And, as we discussed previously, the

25   Attorneys Generals' letter to DHS noted both the legal

1    infirmity of DACA, as well as the litigation risk.

2        And then, under the heading "Rescission of the June 15th

3    2012 DACA Memorandum" at the top of page 255, the Acting

4    Secretary says, *Taking into consideration the Supreme Court's*

5    *and the Fifth Circuit's rulings in the ongoing litigation, and*

6    *the September 4th, 2017, letter from the Attorney General, it*

7    *is clear that the June 15th, 2012, DACA program should be*

8    *terminated*.

9        She's referencing the -- the adverse decisions that have

10   been handed down against the Government in a materially

11   identical program in a manner that was binding on the

12   Government.  That is litigation risk.  That is also legality.

13       The Government has been consistent about its position.  It

14   was the same position that I explained to the Court when I was

15   here last, regarding the scope of the Administrative Record.

16       And so there's no basis for pretext here.  There's no

17   confusion regarding this.

18       This policy was rescinded for the two reasons that are

19   stated in the Attorney General's letter and the Acting

20   Secretary's memo.  And those reasons are pretty

21   straightforward.

22       Regarding the presidential statements that plaintiffs rely

23   upon, you know, the President obviously was not the decision

24   maker here.

25       And, you know, in terms of references to revisiting the

PROCEEDINGS

1  policy, that doesn't mean that the President had an opinion one

2  way or another about the legality of DACA.  In fact, you know,

3  the Government has determined that DACA, as it was

4  administered, was unlawful.

5      But indeed, based on, at least, press reports that I've

6  read last night and this morning, there have been discussions

7  about trying to find a Congressional fix to DACA; the DACA

8  situation.

9      You know, parties can be optimistic that there would be

10  such a congressional fix; but again, that is entirely

11  consistent with the Acting Secretary's rescission memo about

12  how Congress needs to step in and weigh these policy issues

13  that the Court has identified.  And that's also consistent with

14  President Obama's statement regarding DACA.

15      And, indeed, regarding the various policy judgments that

16  plaintiffs would have this Court make, tellingly, they have not

17  tied a single one of them to the operative statute that's at

18  issue here, which is the INA.

19      Finally, plaintiffs have -- you know, after I said that

20  plaintiffs have tended to criticize the Government for an

21  orderly wind-down of DACA, now plaintiffs have raised the

22  argument, *Well, if it's illegal, how could there be an orderly*

23  *wind-down?*

24      As a threshold matter, and very colloquially, this is a

25  no-good-deed-goes-unpunished argument.

1          But beyond that, you know, that is, in fact, an exercise

2     of prosecutorial discretion.  The Acting Secretary was

3     confronted with a situation where the Attorney General had

4     determined that DACA was unlawful as it was administered; that

5     the Texas Attorney General had threatened to bring a lawsuit.

6          And so, unlike the DACA policy that had existed, with

7     continuing renewals, the Acting Secretary exercised discretion

8     to say, you know, *For those individuals who are current*

9     *recipients, because of the circumstances that we find ourselves*

10    *in where we need an orderly wind-down of the policy, we can,*

11    *you know, allow this policy to wind down in a structured*

12    *manner*.

13         That's discretion.

14         That's also a one-time use of that discretion, which is

15    part of the problem that was found with the original DACA

16    policy.  So there's nothing improper about that.  And so in

17    that sense, as well, you know, this policy of winding down DACA

18    reflects the discretion exercised by the Acting Secretary.

19         And going back to the Court's original questions about

20    what happens to DACA recipients after the wind-down, deferred

21    action on a discretionary basis does still remain available for

22    individuals.

23              **THE COURT:**  All right.  We need to take a break, but

24    let me ask for your advice on -- I could give you about another

25    half hour after a break, if you want it; but we've been going

1  now for more than three hours, and there's no way we can cover

2  every point made in your briefs.  So do the lawyers wish to

3  come back to say whatever else you want to say, in about 20

4  minutes; or do you want to bring it to an end now?  What's your

5  view?

6          **MR. DAVIDSON:**  I think from the perspective of the

7  Motion for Provisional Relief, I think we've said what we have

8  to say.

9      There are the constitutional things which my colleagues

10 were planning on addressing.

11         **MR. ROSENBAUM:**  We would like to be heard on those

12 claims, Your Honor.

13         **THE COURT:**  Okay.  We'll come back, but it will be

14 brief.

15     And we're done with the provisional relief.

16     We'll just focus on -- what is it? -- Due Process.  Equal

17 Protection.

18         **MR. ROSENBAUM:**  That's correct, Your Honor.

19         **THE COURT:**  All right.  Each side will get about 10

20 minutes.

21         **MR. ROSENBERG:**  Your Honor, in terms of provisional

22 relief, though, we do need to address irreparable harm.  We do

23 not believe plaintiffs made a showing of irreparable harm.

24         **THE COURT:**  You continue on that.  You can use your

25 10 minutes on that, but we're going to bring it to -- we can't

 1  cover everything.  So we've been going three hours.  Each side

 2  will get about 10 minutes.

 3      All right.  15-minute break.  Thank you.

 4  (Recess taken from 11:10 a.m. until 11:28 a.m.)

 5      **THE COURT:**  What we'll do is go through the

 6  constitutional arguments.  I really can only give each side

 7  about 10 minutes.  And you can use it any way you want.  You

 8  can go back to irreparable injury, if you wish; but let's mere

 9  about the constitutional issues.

10      **MR. ROSENBAUM:**  Good morning, Your Honor.

11  Mr. Dettmer will be covering the Equal Protection and estoppel

12  arguments.  I'm going to move quickly through the Due Process

13  arguments.

14      I'm pleased, obviously, to answer any questions the Court

15  has.  I will supply the Clerk with case cites that I utilize

16  along the way, for the Court's convenience.

17      I want to touch on three important points with respect to

18  the Due Process -- the substantive Due Process argument here.

19  And I specifically want to cover some of the points that you

20  had some of the conversations you had with counsel in the

21  earlier part of the argument.

22      First, DACA violates the Due Process -- the rescission of

23  DACA violates the Due Process Clause in two distinct ways.

24      First, the DACA program, itself, as set out in the 2012

25  Napolitano memorandum, emancipated a discrete group of young

1    persons who had entered the United States, as children.

2        By virtue of the *Zadvydas* case, for example, at page 690,

3    the emancipation that took place, the liberation that took

4    place, removed any threat of arrest, detention, or removal, by

5    virtue of illegal entry, and afforded these young people

6    renewable protections that, in exchange --

7        **THE COURT:**  How can you say that?  Because the

8    documents said flat-out there were no rights conferred, and in

9    addition reserved the right, even for people enrolled in DACA,

10   to decide to go ahead and deport them.

11       **MR. ROSENBAUM:**  That is the essence of our argument,

12   Your Honor.  And let me explain why.

13       The memorandum, itself, said it would not confer legal

14   status.

15       That's not contested.

16       Would not create a pathway for citizenship.

17       That is not contested.

18       It did not create a right within the context of a right --

19   a legislation that Congress passed.  Counsel is exactly right.

20   That's what the Obama statement was.  And that was what the

21   process was -- described.

22       But the methodology and the substance of what was created,

23   itself -- the emancipation of individuals so that they would

24   not be prosecuted by virtue of illegal entry; the fact that

25   individual autonomy was created so that, as Your Honor stated

 1   this morning, individuals could apply for work; they could

 2   pursue their lives with respect to any trade, profession, or

 3   job; they could pursue a higher education; they could pursue

 4   any sort of education to meet their dream; that they could, in

 5   fact, raise a family, raise children, have children raise

 6   children, without fear of governmental -- without fear of

 7   governmental intervention with respect to enforcement.

 8        That creates, under the *Morrissey* case, under all sorts of

 9   cases --

10            THE COURT:  I'm sorry.  Which case?

11            MR. ROSENBAUM:  *Morrissey versus Brewer*, at page 48;

12   the *Obergefell* case, at page 2,597 to 2,5999, and page 2,601 --

13   those are basic liberty interests.  The *Zadvydas* case, at 690,

14   refers to these as "central"; as the central, core interests

15   under the liberty clause.

16        And no statements by any executive member -- member of the

17   Executive Branch can construe what are liberty created

18   interests.

19        What the Chief Justice, Chief Justice Roberts, stated at

20   the *Osborne* case at page 68 -- those are state-created liberty

21   interests.

22        And, Your Honor, that disclaimer point --

23        And I want to refer to Judge Fisher's decision in the

24   *Newman* case at page 797, where the Government in that case --

25   or a party in that case -- the Government in that case said,

**PROCEEDINGS**

1    *Well, these are just quasi-property interests.*

2        And Judge Fisher said, *No.  You are not in the position* --

3    the Government -- *to use these boilerplate phrases to say that*

4    *a constitutional interest is not created.*

5        Why is that?

6        It's -- again, I don't think there's any inconsistency,

7    because there was no congressional right created.  The

8    congressional right that was created had to do with the pathway

9    to citizenship.  And that is not contested; but it is all the

10   way back to *Roth* and *Sindermann* in 1972; the *Gauss* case; the

11   other cases that I'm describing.

12       If a liberty interest is created -- a state-created

13   liberty interest; that's Chief Justice Roberts' words, at page

14   68 of the *Osborne* case -- that is a matter for this Court or

15   the Judiciary to determine.  That goes all the way back to

16   *Marbury versus Madison.*

17           **THE COURT:**  Wait.  Wait.  Let me give you a

18   hypothetical.  Let's say you don't have a program.  You have

19   one person.

20       And the Government -- DHS -- brings in -- let's say it's

21   someone; an alien who comes here as a two-year-old, and is now

22   20 years old.  And the Government says to that one person,

23   *Listen.  We're going to give you deferred action, but you got*

24   *to realize that we could revoke it at any time.  And you ought*

25   *to be on your best behavior.  Go get a college degree, and then*

1  *we'll see where we are when you get your college degree. But*
2  *remember, we can revoke this at any time.*

3        So they go enroll in college, and do great.  And then the
4  Government revokes it.  Say -- whatever reason.

5        They -- you're saying there's -- that that is -- sounds
6  like you're saying that has created some kind of emancipation
7  which is constitutionally protected.

8              **MR. ROSENBAUM:**  No, Your Honor.

9        What I'm saying is this.  And this is what our Complaint
10  states at Allegations 33 through 47.  What our Complaint says
11  was that a program was created that, in fact, said to
12  individuals, *As long as you play by the rules, the rules won't*
13  *change.*  And the rules were that you pass a background check;
14  that you not commit crimes; all of the sort of matters that
15  Your Honor's extremely familiar with.

16        Under those circumstances, where, in comparison, for
17  example, to work permits, which actually have an expiration
18  date, but where, in fact, both the policy and the practice did
19  not put any termination date as to the program, itself, and
20  told individuals -- in fact, it sold itself that it would be
21  renewable.

22        Who in the their right mind would come out from the
23  shadows, if they knew that they only had two years to get it
24  done?  Who would take out loans?  Who would open up businesses?
25  Who would go to college?  Who would raise a family, if they

1  knew it could go like that?

2          THE COURT:  Well, maybe some would, and maybe some

3  wouldn't.

4          MR. ROSENBAUM:  But Your Honor --

5          THE COURT:  Maybe some would take that chance, and

6  others wouldn't.

7          MR. ROSENBAUM:  I don't think, Your Honor, that --

8          THE COURT:  We don't know that, for sure.  Could we?

9          MR. ROSENBAUM:  But the Complaint in this case -- and

10 we're at a Motion to Dismiss stage -- was that the Government

11 calculated that individuals would not do it, and, in fact, had

12 an aggressive campaign, an aggressive outreach campaign,

13 because they knew they had a hard sell as to this particular

14 matter that said, *As long as you play by these particular*

15 *rules, you will have the DACA status*.

16     The Napolitano memo, itself, doesn't list -- it lists all

17 of their criteria.  This is page 1 of it.  All the criteria.

18     And it doesn't have at the end a catchall, saying, *And, by*

19 *the way, we can take it up at our discretion, whenever we*

20 *choose, for whatever reason we choose, because you* --

21         THE COURT:  I think it did say something pretty close

22 to that.

23         MR. ROSENBAUM:  No, it did not, Your Honor; not

24 the -- not the Napolitano memo, itself.

25     The FAQs which Counsel talked about were taken --

**PROCEEDINGS**

1        First of all, the FAQs not are not a law.

2        Secondly, they're not regulations.

3            **THE COURT:**  Well, the memo's not regulations.  The

4   memo's --

5            **MR. ROSENBAUM:**  No, but this is what went out in

6   terms of the defining the program, itself.  It is the

7   memorandum that defines the program, itself.  And none of

8   that's mentioned.

9        And the context of the FAQs, themselves, are in the

10  context of the particular rules.

11       We are prepared to show at trial, Your Honor, that the

12  understanding of the Government, itself, is precisely what I'm

13  saying; and that, in fact, there are no examples of a

14  hypothetical that Counsel raised; no examples where individuals

15  lost their DACA status for reasons that are unrelated to what

16  the criteria are, itself.

17       And we're entitled to prove that case.  Those were the

18  representations made.  As I said, the -- the reality was that

19  that's the way the position was sold.

20       On April 21st of this year, President Trump, who is, after

21  all, the head of the Executive -- and it's a unitary executive

22  under Article II of the Constitution.  President Trump said

23  that it is the policy of the Administration that DACA

24  individuals can remain, and that, in fact, they are safe.  That

25  was precisely what the policy was.  In fact, the sort of

1    exceptions that Your Honor stated did not exist.

2         Moreover, this isn't the case of just one individual.

3    It's the case of hundreds of thousands of individuals who came

4    out of the shadows, with the recognition -- with the

5    understanding that they could build a life.  That's the liberty

6    interest in this case.  And equal dignity what Justice Kennedy

7    says at 2,597 through 2,599, and 2601.  When you are able to

8    seek jobs, to go to college, to raise a family, to know that

9    law enforcement is not going to be threatening you by means of

10   physical restraint, or taking you into custody, or putting you

11   under arrest, or putting you into detention, that is the

12   essence of what liberty means.  That's what the dignity,

13   itself, means.

14        Moreover, the process, itself -- and this is the Second

15   argument, Your Honor.  The process, itself, is one that shocks

16   the conscience.

17        Now, I use that very advisedly.  I know that there are not

18   a lot of case law on that; but if there was ever a case that

19   raised the due process issue here, this is the case.

20        At page 857 of Justice Souter's decision in the *County of*

21   *Sacramento* case, Justice Souter described for the entire Court

22   that the conscience is shocked when the actions of the

23   Government do not comport with our ideas of fair play and

24   decency.

25        What is the -- what are we alleging?  And what is the

1  Record in this particular case?

2      On the same day, September 5th, that the memorandum was

3  issued, the President of the United States said, I reserve the

4  right, if Congress doesn't get it act together in six months,

5  to do that?  What does that mean?

6      It means that the very reason that is being give in is

7  being undermined -- is being contradicted -- by the President,

8  himself.  This is a bait and switch.

9      Come out of the shadows.  Make yourself available.  Give

10  intimate information which you would no way give otherwise

11  under these sorts of circumstances, with an understanding that

12  it's going to be treated securely.  And then -- boom! -- all of

13  a sudden, that goes.

14          **THE COURT:**  All right.  Your 10 minutes is up.

15          **MR. ROSENBAUM:**  One more comment, Your Honor.

16          **THE COURT:**  Yes, all right.

17          **MR. ROSENBAUM:**  Nine days later, the President of the

18  United States then said, We are -- this matter's in front of

19  Congress.  Nothing was done.  Massive border security.

20      In other words, he was saying maybe DACA can be

21  reinstated, but it has to be part of a package; which means

22  that these individuals -- these hundreds of thousands of

23  individuals -- were being used as a bargaining chip, in order

24  to get another policy through.  Individuals should not be

25  treated that way.  A system should not be utilized that way.

 1  And that is also a separate violation of the due process

 2  clause.

 3      I'm prepared to deal with the disclaimer.

 4          **THE COURT:**  I wish we hadn't taken so much time on

 5  the APA.  These are all interesting points.  Let's hear from --

 6  who's going to argue the Equal Protection?

 7          **MR. ROSENBAUM:**  Mr. Dettmer.

 8          **THE COURT:**  Let hear about Equal Protection.

 9          **MR. DETTMER:**  Thank you, Your Honor.  I will be very

10  brief.  Ethan Dettmer, for the Garcia Plaintiffs.

11      So I'm glad we're finishing with Equal Protection, because

12  what we talked about at length this morning was:  What's the

13  bigger picture here, and what are the reasons behind this

14  rescission?

15      As Your Honor knows, the Equal Protection Clause prohibits

16  singling out a single -- a particular racial group for

17  unfavorable treatment.  That's what racial animus is.

18      The test --

19          **THE COURT:**  Isn't there law that's in the

20  Supreme Court that, where you come to immigration, that the

21  very essence of being able to say some people from certain

22  countries are going to come in more frequently than others --

23  the alienage, I think, is the term they use -- that

24  Supreme Court, itself, has said that does not violate Equal

25  Protection?  What am I thinking of?

1          **MR. DETTMER:**  I don't know that case, Your Honor.

2      I do know that the any Government policy cannot be based

3  on a racial classification.  It may be based on the

4  classification of a country.

5          **THE COURT:**  I think the Supreme Court said you can

6  discriminate in immigration, based on where -- what country

7  people come from.

8          **MR. DETTMER:**  But not based on their race,

9  Your Honor.

10          **THE COURT:**  Well, maybe that's right.  But alienage,

11  I think, is -- in other words, what country they're from.  So

12  if Congress wanted to say we will not accept anybody from a

13  part of the world that maybe they think is a dangerous part of

14  the world, I think the Supreme Court said that's okay; isn't

15  it?

16          **MR. DETTMER:**  Your Honor, I think you're right that

17  if the Supreme Court said we don't want to accept people --

18      I'm sorry.  If --

19          **THE COURT:**  Let's say North Korea.  We don't want

20  people coming from North Korea.  Okay?

21          **MR. DETTMER:**  I think that's probably right,

22  Your Honor.

23          **THE COURT:**  Is that okay?

24          **MR. DETTMER:**  But if the executive said, *We don't*

25  *want Asian people coming into the country*, that would not be

PROCEEDINGS

1  permissible.

2          THE COURT:  What's your decision that says that?

3          MR. DETTMER:  I think there are a number of --

4          THE COURT:  Again, from an Equal Protection point of

5  view, that would be correct.  If you're talking about any kind

6  of domestic policy, no question.

7      However, we're talking about immigration, which, by

8  definition, involves geographic parts of the world.  So --

9          MR. DETTMER:  Your Honor, I just --

10          THE COURT:  I would like for you to give me a

11  Supreme Court decision that says that; that the Government

12  can't discriminate in immigration, based upon what country you

13  come from.

14          MR. DETTMER:  That's not the argument we're making,

15  Your Honor.

16          THE COURT:  What is your argument?

17          MR. DETTMER:  The argument is that you can't

18  discriminate on the basis of someone's race.  And that's a

19  different argument.

20          THE COURT:  DACA applies to everybody.  Why do you

21  think it's based on race?

22          MR. DETTMER:  Well, because 93 percent of the people

23  who are DACA recipients -- this is alleged in our Complaint at

24  paragraph 120.  I'm sorry.  At paragraph 9, I believe.

25      93 percent of the people who are DACA holders are of

1  Hispanic -- of Latino heritage.  93 percent.  In a -- in a --

2          THE COURT:  Well, does it also apply to the other

3  7 percent?

4      In other words, is everyone --

5      Okay.  That's a good point.  93 percent.  But I thought

6  that rescission applied to the 100 percent; not just to the 93.

7          MR. DETTMER:  Well, it does, Your Honor; but the

8  *Arlington Heights* case from the Supreme Court, as applied in

9  the Ninth Circuit, and the *Arce versus Douglas* case -- and

10  that's A-r-c-e -- holds that in that case, it was 80 percent of

11  the people who were affected by a particular Government policy

12  were Latino.  And the Ninth Circuit said that that was enough

13  to hold that the whole policy was subject to an Equal

14  Protection challenge, based on race.

15          THE COURT:  Well, I'll have to look at that, but you

16  know, look.  We're in California.  Any change in our

17  immigration policy in this country is going to

18  disproportionately affect Mexico, who's our nearest border.  I

19  mean, it just stands to reason.  That's our nearest border.

20  Canada, too.

21      So how do I -- how can we square that with -- your

22  argument would lead to the conclusion that every adverse --

23  everything that cuts back on immigration in this country is

24  going to be illegal.

25          MR. DETTMER:  No, that's not the argument,

1    Your Honor.  And I'm glad you asked, because -- because the

2    *Arlington Heights* case and the *Arce versus Douglas* case are the

3    two cases that give you the test that you need to apply.

4             **THE COURT:**  And what is that test?

5             **MR. DETTMER:**  So on page 266 of *Arlington Heights* the

6    Supreme Court said, *Determining whether invidious*

7    *discriminatory purpose was a motivating factor* --

8         And that's all that's necessary.  It doesn't need to be

9    the sole factor.  It only needs to be a motivating factor for

10   the policy.

11            -- *demands a sensitive inquiry into such circumstantial*

12   *and direct evidence of intent as may be available*.

13            **THE COURT:**  Was that an immigration case?

14            **MR. DETTMER:**  No.  No, Your Honor, it wasn't.  It was

15   a housing case.

16            **THE COURT:**  Give me an immigration case.  That

17   Ninth Circuit case -- I think you had one where you said it was

18   an immigration case.  Right?

19            **MR. DETTMER:**  Well, the Ninth Circuit case is not an

20   immigration case, but I think it is determinative here.

21        And let me just go a little bit further.  That

22   Ninth Circuit case said -- and I'm quoting from page 977, 978

23   of Volume 793 of the Federal Reporter 3d.  *A plaintiff need*

24   *provide very little such evidence of discriminatory intent to*

25   *raise a genuine issue of fact.  Any indication of*

1   *discriminatory motive may suffice to raise a question that can*

2   *only be resolved by a fact finder.*

3       And, you know, I'll point out, as Your Honor notes --

4           **THE COURT:**  What is our fact here?  I thought this

5   was a case where the President was giving us tweets that he

6   wanted the DACA program.

7           **MR. DETTMER:**  Well, he did do that, Your Honor.  And

8   I think the series of cases, as the Supreme Court and the

9   Ninth Circuit say, you have to look at all of the

10  circumstances.

11          **THE COURT:**  What is the circumstance you're alleging

12  in the Complaint?

13          **MR. DETTMER:**  So the circumstances are many.  They

14  begin.  And I'll just hit the highlights, for -- in the

15  interests of time.

16      The circumstances begin with, as Your Honor knows,

17  President Trump, when he announced his campaign, said that

18  Mexico is sending rapists and killers over the border, and made

19  a number of other comments in that same vein.  And these are in

20  our Complaint at paragraphs 101, 103, and 109.  There were a

21  series of similar comments throughout the campaign.  He

22  reaffirmed those initial comments in 2016.

23      In 2017, on August 22nd, just less than two weeks before

24  the rescission was announced, he said, in a rally in Arizona,

25  that unauthorized immigrants are, quote, "animals who bring the

PROCEEDINGS

1   drugs, the gangs, the cartels, the crisis of smuggling and

2   trafficking."  That's at page 111 in our Complaint.

3       Three days after that he pardoned Sheriff Joe Arpaio.

4   This is, again, within days of the rescission being announced.

5   And, as you know, Sheriff Arpaio was convicted of criminal

6   contempt for harassment, intimidation -- systemic harassment

7   and intimidation of Latino people in Arizona.  When he pardoned

8   him, President Trump said that Sheriff Arpaio was, quote, "An

9   American patriot who was," quote, "convicted for doing his

10  job."

11      So these comments -- if you look at the *Arce* case from the

12  Ninth Circuit that I mentioned earlier, which also came out of

13  Arizona, it went through the same sensitive inquiry, and

14  actually reversed a summary judgment ruling by the District

15  Court, on Equal Protection grounds.

16      The types of comments that --

17          THE COURT:  All right.  This is an immigration case

18  you're talking about now?

19          MR. DETTMER:  No.  This is the -- what the *Arce* case

20  was, was it was a case where there was an ethnic -- a

21  Mexican-American Studies program in the public schools.

22          THE COURT:  It involved these same comments by the

23  President?

24          MR. DETTMER:  Not the same.  It involved, actually,

25  much more tame comments by local legislators who passed this

1  rule.

2         THE COURT:  Oh, somebody else.  All right.

3         MR. DETTMER:  Right.

4         THE COURT:  I thought you were saying it was a

5  President Trump case.  Okay.  All right.

6         MR. DETTMER:  No.  But if you read this decision,

7  Your Honor, the types of comments that the Ninth Circuit uses

8  to overrule a summary judgment ruling by the District Court are

9  much more tame than the comments that I just read to you.

10        THE COURT:  All right.  Well, okay.  We've got to

11 bring it to a close here.

12    What do you say?

13        MR. ROSENBERG:  All right.  Let me start with --

14        THE COURT:  You get -- maybe not 20 minutes.  You get

15 20 minutes to say what you would like.

16        MR. ROSENBERG:  I do want to make sure I reserve time

17 for scope of relief and irreparable harm.  So I can be very

18 brief on this.

19    Let me start with Due Process, since that's where

20 plaintiff started.  Plaintiffs have conceded their procedural

21 Due Process claim.  We noted that in our Reply Brief.  And they

22 have not addressed that here.  So clearly those claims need to

23 be dismissed.

24    Regarding substantive Due Process, plaintiffs fail to come

25 to grips with the standard for substantive Due Process.  It is

1   not enough to simply show that there is a liberty or property

2   interest at stake, although there is no such liberty or

3   property interest at stake here.  Plaintiffs must show that the

4   shocks the conscience.

5       And so I would start where I left off previously, which is

6   President Obama's statement about the nature of DACA, which was

7   that it was a temporary fix.  That's all it was.  So when

8   plaintiffs come up here and then they say that individual DACA

9   recipients have relied upon their DACA status, and that it

10  would be bad for their DACA status to be taken away from them,

11  that is inconsistent with the statements that were made at the

12  creation of the program.

13      Indeed, as the Court has noted Secretary Napolitano, when

14  she created the DACA program through -- or DACA policy for the

15  DACA memo explicitly noted that this memorandum confers no

16  substantive right, immigration status, or pathway to

17  citizenship.  So the documents that created the policy and the

18  statements that were made surrounding the policy undercut any

19  notion that there was a Due Process, liberty, or property

20  interest at stake.  And plaintiffs can point to none in the

21  context of this specific case.

22      But even if they could show --

23      Oh, before I get to that, plaintiffs also alluded to

24  information that DACA recipients have provided to USCIS.  And

25  again, USCIS has been consistent that its information-sharing

1   policy, while it has not changed -- and there are actually new

2   Frequently Asked Questions that demonstrate that it has not

3   changed; and I can provide those to the Court now, if it wishes

4   to put that issue to rest.  But it does retain its discretion

5   to change that policy in the future, and it has always been

6   clear about that.

7       Indeed, USCIS I-821D, which is the form that is used by

8   DACA provide individuals to request DACA status, and which is

9   signed under penalty of perjury by the individual requester,

10  explicitly notes that information-sharing policies may be

11  modified, superseded, or rescinded at any time, without notice,

12  and is not intended to, does not, and may not be relied upon to

13  create any right or benefit.

14      So clearly there is no liberty or property interest at

15  stake here, either regarding the DACA policy generally, or

16  regarding information sharing; but even if there were,

17  plaintiffs failed to address how this is conscience shocking.

18      And I would direct the Court to the *County of Sacramento*

19  *versus Lewis* case.  It's a Supreme Court case from 1998.  523

20  US 833.  And in that decision on page 849, conscience-shocking

21  behavior, you know, that creates a substantive Due Process

22  right is described as behavior that -- or conduct that is

23  intended to injure in some way, unjustifiable by any government

24  interest, at all.

25      I mean, that is -- that is what plaintiffs need to -- to

1   show or need to allege at this stage in order to state a

2   substantive Due Process claim.  And in light of the nature of

3   the policy generally, in light of all of the other issues that

4   we've discussed, candidly, we don't think that they've made

5   that showing; but perhaps most telling is the fact that they

6   have not addressed binding Ninth Circuit precedent that's

7   directly on point on that issue.

8        And if there's any one case that this Court reads

9   regarding substantive Due Process, it's this one; it's the

10  *Munoz versus Ashcroft* case, which was cited in our briefs it's

11  at 339 F. 3d. 950.  And it involved an individual who was a

12  Guatemalan citizen who was brought to the United States at one

13  years old.  And at approximately the age of 24 he was deported.

14  And he brought a substantive Due Process claim, alleging that

15  his substantive Due Process rights were being violated.

16       He was an individual, like many of the DACA recipients

17  here, who was brought to this country as a child, and who, in

18  all material respects, matched the types of plaintiffs that are

19  bringing the claims in these lawsuits.

20       And in that case the Ninth Circuit stated that the

21  substantive Due Process argument fails, because in the

22  immigration context courts have long recognized the power to

23  expel or exclude aliens as a fundamental sovereign attribute

24  exercised by the government's political departments, largely

25  immune from judicial control.  And then they have a long series

PROCEEDINGS

1    of citations.  And then at the end, the Court concludes that

2    notwithstanding the individual plaintiff's unique

3    circumstances, he has no substantive Due Process right to stay

4    in the United States.

5         At bottom, that is what plaintiffs' complaints are about.

6    It's about substantive Due Process right to stay in the

7    United States; but especially in the immigration context, there

8    are no such rights.  And plaintiffs don't meaningfully address

9    this Ninth Circuit precedent.

10        Regarding Equal Protection, we have provided the Court

11   with immigration cases.  And instead, plaintiffs have provided

12   this Court primarily with zoning cases.  We don't think that

13   these zoning case are applicable here, because of the unique

14   context in which the Equal Protection Clause applies -- or

15   really, in many respects, does not apply -- in the immigration

16   context.

17        One set of cases the Court should read is the *Armstrong*

18   case, which we've cited repeatedly; but in particular I want to

19   point the Court's attention to *Reno versus AADC*, which is the

20   Supreme Court case at 525 US 4771.  This is an immigration

21   case.  And in that case, toward the conclusion of its opinion

22   on page 491 -- I will direct the Court to that general text of

23   the case.  It notes the incredibly broad authority that the

24   Executive has in the immigration context, including, for

25   example, that the Executive can make decisions in the

PROCEEDINGS

1    immigration context about who to deport based on, you know,

2    selective treatment, which is essentially the issue that was

3    being litigated in that case.

4        If the Executive has such broad authority in the

5    immigration context, you know, plaintiffs have to be able to

6    demonstrate -- and they cannot demonstrate, and certainly have

7    not alleged -- that they can meet the standard of showing not

8    only disparate --

9            **THE COURT:**  What did the Supreme Court say about

10   Equal Protection in that case?

11           **MR. ROSENBERG:**  So in that case, I don't know if the

12   words "Equal Protection" appear literally in the *AADC*, but it

13   relied on the *Armstrong* case, which was a selective-prosecution

14   case in the Equal Protection context.  And *Armstrong* did do an

15   Equal Protection analysis.

16       And under *Armstrong* -- this is where the cases are

17   similar.

18           **THE COURT:**  Tell me about *Armstrong*.

19           **MR. ROSENBERG:**  So in *Armstrong* -- that was a

20   selective-prosecution case.  It involved criminal discovery.

21   And the individual plaintiffs, who were the criminal

22   defendants, alleged that they were being selectively prosecuted

23   based on their race.  And, you know, they were all African

24   Americans.  And they argued that of all of the cases that had

25   been closed, I believe, by the local District Attorney or

 1  U.S. Attorney -- I think it was a U.S. Attorney's Office.

 2  During the past year, all 24 cases involved African Americans.

 3          THE COURT:  That was in our District.

 4      MR. ROSENBERG:  I think it -- I know it came out of

 5  the Ninth Circuit.  I think it might have been Central District

 6  of California.

 7          THE COURT:  All right.  We had that very problem in

 8  this District.  And -- but I don't remember.  It goes to the

 9  Court of Appeals.  Our District dismissed all of those cases.

10      MR. ROSENBERG:  It went to the Supreme Court.  And

11  this is a case -- I mean, I can save the Court some time.  You

12  can review our briefs on this.  But the Court said that

13  obviously disparate impact is not enough, especially in the

14  context of prosecution, where there is a special province of

15  the Executive, and you shouldn't be second-guessing decisions

16  about the discretion that a prosecutor is exercising in

17  enforcing the laws.  You have to overcome a very high standard.

18      And then in *AADC*, the Supreme Court applies *Armstrong* in

19  the context of deferred action and the 1252(g) statute and, you

20  know, discusses the issues that my colleague had addressed

21  regarding, you know, justiciability; but it also, toward the

22  end of the decision, around page 491, does address the

23  substance of the claim.  And the Court says the Executive

24  should not have to disclose its real reasons for deeming

25  naturals of a particular country a special threat.

1          (Reporter requests clarification.)

2          **MR. ROSENBERG:**  -- for deeming nationals of a

3    particular country a special threat, or, indeed, for wishing to

4    antagonize a particular foreign country by focusing on that

5    country's nationals.  And even if it did disclose them to a

6    court, it would be ill equipped to determine their

7    authenticity, and utterly unable to assess their adequacy.

8          And ultimately the Court notes that, you know, in these

9    cases, and in deportation context generally, if anything, the

10   Equal Protection-type arguments are weaker than in a criminal

11   prosecution case, because deportation is not a criminal

12   punishment for anyone.  It's simply a form of relief that

13   removes somebody who is unlawfully in the United States from

14   the United States.  And as long as they're in the

15   United States, it's a continuing violation.

16         So certainly at the President has the ability and the

17   Government has the ability, as this Court has noted, to provide

18   references based on nationality, and to --

19         **THE COURT:**  Well, but you didn't cite the decision

20   for me.  I thought there was such a decision, but nobody seems

21   to know what I'm talking about.

22         **MR. ROSENBERG:**  I don't have the case handy.  My

23   understanding is that identifying individuals on the basis of

24   nationality, such as whether somebody, for example, is Mexican,

25   is okay; but identifying or discriminating on the basis of

1   national origin -- for example, whether somebody is Hispanic or

2   the example, you know, Asian -- is not okay.

3        **THE COURT:**  So let's say that the Administration

4   decided to deport everyone who was Hispanic.  And you would

5   agree that would be a violation of Equal Protection?

6        **MR. ROSENBERG:**  If I identified -- I don't know if it

7   would be -- using the colloquial language that I've used, that

8   would not be consistent with governing case law.  Certainly,

9   based on national origin, you know, that could be an Equal

10  Protection violation; but nationality, which is, you know,

11  whether somebody's from a particular country, is, of course,

12  fine, because, you know, we have historically made distinctions

13  based on nationality.

14       But here, going back to the issue at hand, if you look at

15  the *Armstrong* case and you look at the *AADC* case, it makes

16  clear the Executive has incredibly broad discretion in the

17  context of the execution of the immigration laws.

18       **THE COURT:**  You've got about five more minutes to

19  address irreparable injury, if you want to do that.

20       **MR. ROSENBERG:**  Yeah.  Let me go ahead and do that,

21  Your Honor, and the scope of relief, although we don't think

22  any relief is appropriate.

23       So we're here on a Preliminary Injunction Motion.  We need

24  to be crystal clear about this.  We do not think that

25  plaintiffs are likely to succeed on the merits, and haven't met

1    any of the other factors; but they certainly have not met a

2    showing for irreparable injury, at least, at this point.  You

3    know.  It's December 20th, as we discussed previously.

4         THE COURT:  They look lose their work permits.  Isn't

5    that injury, right there?

6         MR. ROSENBERG:  Well, whether an individual loses a

7    work permit might be an injury, but that's not going to happen

8    until March 5th.

9         THE COURT:  Okay.  That's pretty soon.

10        MR. ROSENBERG:  That's two months away.  And so the

11   question is whether --

12        THE COURT:  What are they supposed to do?  Wait until

13   March 4th?

14        MR. ROSENBERG:  Before we get to that, though, we

15   also need to address whether or not any preliminary relief that

16   this Court might consider providing.  And again, we don't think

17   any preliminary relief is appropriate, at all; but to the

18   extent the Court is contemplating relief, would that solve the

19   injuries of which plaintiffs complain?

20       And if you look at their Complaints and you look at the

21   declarations that they've submitted, it is based largely on

22   either anxiety, or plaintiffs' inability to make long-term

23   plans, such as enrolling in college, buying a house, getting

24   married.  I think plaintiffs have discussed some of these very

25   issues in the last few minutes.

 1          Preliminary injunctive relief that will last only through

 2     the end of this lawsuit will not do anything to solve the harms

 3     of which plaintiffs complain.  This Court's entering of a PI

 4     will not cause somebody to go out and buy a house, because this

 5     Court's PI will only last, at most, for a couple of months.  It

 6     may ultimately be reversed on the merits by this Court, if the

 7     Court ultimately issues a decision on the merits.  If the

 8     Government were to appeal, it may be stayed or reversed by a

 9     Court of Appeals.  And so none of the temporary relief that

10     plaintiffs are seeking here actually addresses the primary

11     injuries of which plaintiffs complain.

12          And so for that reason, we don't think that plaintiffs

13     have made a showing of irreparable injury that's sufficient to

14     carry their burden on a preliminary injunction.  And for that

15     reason, alone, that would be a basis to deny the preliminary

16     injunction; but even if they were to make such a showing, we

17     think -- the Government thinks that it is premature for this

18     Court to contemplate a preliminary injunction at this point in

19     time, because the effect of the rescission won't happen until

20     March 5th.

21          **THE COURT:**  Wait.  While we're on that subject -- it

22     has a little to do with it -- what is the schedule in the

23     Supreme Court on the mandamus petition?

24          **MR. ROSENBERG:**  I believe that it -- I do not know.

25     It's on the Supreme Court's calendar.  And I wouldn't want to

1  hazard a guess as to what the Supreme Court's current schedule

2  is.

3          THE COURT:  Has it been fully briefed?

4          MR. ROSENBERG:  Yeah.  Mandamus has been fully

5  briefed.

6          THE COURT:  So you're waiting for --

7      Well, would they normally argue mandamus, or is that

8  something submitted on the briefs?

9          MR. ROSENBERG:  It's a somewhat unique circumstance,

10 Your Honor.  I don't know that we are anticipating an oral

11 argument, although it could be possible.

12     The petition is also written in the alternative as a

13 Petition for Writ of Certiorari.  And so, you know, that may

14 raise the possibility of an argument.  The Court has not

15 indicated to us, certainly, that it wants to hear argument.

16         THE COURT:  All right.  All of the briefs are in?

17         MR. ROSENBERG:  All of the briefs are in.

18     I do also want to address the scope of relief, because

19 that does go to the issue of irreparable injury.  If you look

20 at plaintiffs' Proposed Order, they have requested that this

21 Court enter an order that would essentially reinstate the

22 entire DACA policy.

23     Under no circumstances should this Court issue such an

24 order.  That is far broader than any injury of which plaintiffs

25 complain.  And, indeed, that has the possibility of "scrambling

1    the egg," so to speak, that plaintiffs were complaining about

2    earlier, because if this Court on a temporary basis were to

3    order the Government to reinstate the entire policy as it

4    existed prior to September 5th, even though plaintiffs cannot

5    show any injury for any of the clients that they represent;

6    individuals who would have applied for DACA after

7    September 5th -- so in that sense, it's too broad.

8        But beyond that issue, because of the temporary nature of

9    the order, the Government cannot predict and cannot make any

10   assurances as to how those applications would be treated if the

11   Government would obtain ultimate relief on the merits, either

12   from this Court, or from some sort of subsequent appeal.

13           THE COURT:  All right.  All right.  I've got to bring

14   it to a close.  I'll give you just two minutes on your side to

15   respond.  You did have -- you had more time than the

16   Government, so -- but I'll give you two minutes now.  Go ahead.

17           MR. DAVIDSON:  On irreparable harm, two things.

18       The Government's position is that, essentially, because

19   preliminary relief would not cure every problem that's been

20   asserted in that case, that you can't cure any of the problems.

21   That's not right.

22       Second, we have shown that between now and March, there

23   are going to be irreparable harms that accrue.  Just for

24   example, we've shown that there are people who are planning to

25   travel overseas on advanced parole in January, who won't be

1    able to do so because of the rescission.

2        We've shown that there are people who are dropping out of

3    degree programs right now, because they don't think that

4    they're going to have work permits in March.  That's happening

5    right now.  And those harms will accrue between now and March.

6        We have students who can't match to medical residencies.

7    That process is going to happen in mid February and mid March.

8        And so all of that is an ample showing that the status quo

9    ought to be preserved between now and final judgment.

10           **THE COURT:**  In the hierarchy of benefits, I see these

11   benefits.

12       One.  Work permit.

13       Two.  Discretionary deferral.

14       Three.  The overseas parole.

15       And then I guess four doesn't count for -- what is it?

16   Unlawful presence?  Is that the right phrase?

17           **MR. DAVIDSON:**  Correct.

18           **THE COURT:**  Unlawful presence.

19       So seems like those are the four benefits.

20       But is the parole thing really as important as the work

21   permit, when we're talking about balancing equities, and so

22   forth?

23           **MR. DAVIDSON:**  Well, we're here asking for

24   provisional relief that will protect us between now and final

25   judgment.  So certainly travel --

1      **THE COURT:**  I've got to take into account a lot of

2    the -- I'm going to do a careful balancing of equities, even if

3    we give provisional relief.  And a blanket, across-the-board

4    you win everything is possible; but I also have to consider the

5    possibility that I do some fine calibration.  So I'm asking

6    you:  Would you rather have the work permits, or would you

7    rather have parole to go home for vacation?

8      **MR. DAVIDSON:**  I don't think we'd like to be put to

9    that choice, Your Honor, because it --

10      **THE COURT:**  Oh, no.  You're not helping me.

11      **MR. DAVIDSON:**  The equities are --

12      **THE COURT:**  All right.  Okay.  Let me go to the --

13      Did you want to say something about the Due Process?

14      **MR. ROSENBAUM:**  I do, Your Honor.  I'll -- I'll --

15      **THE COURT:**  Because you've used up a lot of time, so

16    I'll give you one minute to respond.

17      **MR. ROSENBAUM:**  I'll just make two points,

18    Your Honor.

19      With respect to the standard that Counsel said with

20    respect to liberty, I don't know of any case in the history of

21    the Republic that says that an individual must show both an in

22    impairment of liberty interests, as well as a shock to

23    conscience.  They're two separate Due Process arguments.

24      I refer the Court specifically to the *Morrissey* case at

25    482, where the description of the liberty for a parolee

 1  actually tracks, almost verbatim, what we're talking about.

 2          **THE COURT:**  Read it to me.

 3          **MR. ROSENBAUM:**  Sure.  (Reading.)  *The liberty of a*

 4  *parolee enables him to do a wide range of things open to*

 5  *persons who have never been convicted of any crime, subject to*

 6  *the conditions parole.  He can be gainfully employed; is free*

 7  *to be with his family and friends, to form other enduring*

 8  *attachments of a normal life.*

 9          We're not asking for citizenship.  We're not asking for

10  legal status.  We're asking for the capacity -- the

11  opportunity -- to maintain what was a reasonable expectation in

12  the pursuit of those matters.

13          Secondly, with respect to the use of the *Munoz* case, the

14  *Zadvydas* case specifically says that aliens enjoy liberty

15  interest.  There's a legion of cases that say that.  Munoz was

16  an individual who lived 24 years in this country without any

17  legal status, whatsoever.  Zero.  He crossed the country

18  illegally as a two-year-old, and just stayed here.  Of course,

19  he did not accrue any liberty interest as result of any

20  federal- or state-created right, itself.

21          The back of that opinion which Counsel referred to refers

22  to suspension of deportation cases.  Same point there,

23  Your Honor.  Nobody has an entitlement -- a specific

24  entitlement, a reasonable entitlement -- to suspension.

25          In our case, the Government specifically sets out the *quid*

1   *pro quo* and says individuals can be gainfully employed, can

2   seek education, can otherwise involve in productive, normal

3   lives.  *Munoz* actually supports our case because, by contrast,

4   we have precisely those sorts of entitlements and those sorts

5   of interests.

6          **THE COURT:**  All right.  Thank you.

7      Did you want to respond on Equal Protection for one

8   minute?

9          **MR. DETTMER:**  Thank you, Your Honor.  I appreciate

10  your indulgence.

11     So just really quickly, the *AADC* case, the *Armstrong*

12  case -- those are both selective-prosecution cases for an

13  individual.  What we're doing here, as Your Honor knows, is

14  challenging, on a whole host of grounds, including Equal

15  Protection, the rescission of a policy; a policy that affects

16  hundreds of thousands of people, and on which hundreds of

17  thousands of people relied.

18     And I'll just finish by saying that reliance involved much

19  more than just anxiety at the rescission of this policy.  And,

20  you know, there are clients of mine in this room who would --

21  and I'm sure did -- just recoil at that word.  This goes far

22  beyond anxiety.  It's a life-changing blow of --

23         **THE COURT:**  If you have clients here, why don't you

24  introduce them to the Court?  I didn't realize you had any

25  here.

 1          **MR. DETTMER:**  I apologize, Your Honor.  Dulce Garcia

 2  is here --

 3          **THE COURT:**  Welcome to the court.  Thank you for

 4  coming.

 5          **MR. DETTMER:**  -- as is Jirayut Latthivongskorn, who

 6  is also here.

 7          **THE COURT:**  Again, welcome to the court.  Thank you

 8  for coming.

 9          **MR. DETTMER:**  I appreciate you welcoming them,

10  Your Honor.  And, you know, they were welcomed by the country

11  in a way when DACA was put into place that, if you read their

12  Declarations that were submitted in connection with this

13  motion, is hard for people like you and me, who are born here

14  to, understand.  And it's a change in their relationship to

15  this country that is hard for us to --

16          **THE COURT:**  Listen.  I agree with that.  It's hard to

17  understand that.

18      For 18 and a half years on the criminal side, I've had

19  over a hundred cases that involved this fact pattern in various

20  many different scenarios, so I have been exposed to this

21  problem.  It's not like I'm not -- I don't understand it.  It's

22  something you don't practice, but I see it every week in the

23  criminal calendar, so I do have some appreciation for it.

24          **MR. DETTMER:**  And I would suggest nothing to the

25  contrary, Your Honor.

1        And I would say -- and I have not had a chance to consult

2   with my co-counsel on the question you asked at the end about

3   your calibration of the injunction, should you enter it.

4        I guess what I would say for my clients is that the two

5   things that are most important, should you make that

6   evaluation, were the work permit, as you mentioned, and the

7   protection from removal.  I mean, those are really the core

8   issues.

9             THE COURT:  Seems to me that those are the biggest

10  items.

11            MR. ROSENBERG:  Thirty seconds, just to respond.

12            THE COURT:  Well, no.  All right.  Go ahead.  Thirty

13  seconds.

14            MR. ROSENBERG:  I'm done here.  We fully appreciate

15  the situation that the DACA recipients find themselves in.  And

16  I want to be absolutely clear about that with the Court and

17  with the recipients who are in this courtroom.

18       Unfortunately, the DACA policy that plaintiffs have

19  described today and in their filings is inconsistent with the

20  policy that actually existed.  And if the Court looks at the

21  documents that created and described that policy, you know,

22  which it should do, the legal conclusions, I think, are clear

23  there.

24            THE COURT:  All right.  You did do that in 30

25  seconds.  All right.

PROCEEDINGS

```
 1        I want to thank both sides for your massive briefs.
 2   They're massive because we've got a lot of issues.  And I'm not
 3   criticizing you for the length of the briefs in this case.  I
 4   think you both tried hard.  Both sides are trying very hard.
 5        I don't have as many lawyers on the case as you do.  And
 6   it will take me some time to get this done, but I'm going to
 7   start.  I have been working on it, so don't -- it's not like I
 8   haven't been, but I'm going to continue working on it.  I can't
 9   give you a prediction for when this will be -- an Order will
10   come out.
11        Earlier, you had suggested at that maybe you'd want to
12   submit something.  I don't want you to submit anything more.
13   Unless you could think of something that is burning in your
14   memory that you've just got to fix, I would prefer that this be
15   under submission now.
16        MR. ROSENBERG:  That's fine with us, Your Honor.
17        MR. DETTMER:  Submitted.
18        THE COURT:  All right.  Done.  It will be submitted
19   on the Record that I have now.  And if I do decide I need more
20   input, I will ask you; but right now I'm going to possibly just
21   decide it on the Record we have.
22        I thank everyone out there who came.  And anybody who is a
23   party or directly involved in this, thank you very much for
24   coming.  And we sometimes get issues of grave importance here
25   in the courtroom, and this has been one of them.  So thank you
```

1   for attending.  All right.  We're in recess.

2        (At 12:15 p.m. the proceedings were adjourned.)

3   I certify that the foregoing is a correct transcript from the

4   record of proceedings in the above-entitled matter.

5

6

7   _____    December 21, 2017
    Signature of Court Reporter/Transcriber    Date

8   Lydia Zinn

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25