United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

THE REGENTS OF THE UNIVERSITY OF
CALIFORNIA and JANET NAPOLITANO,
in her official capacity as President of the
University of California,

        Plaintiffs,

   v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY and KIRSTJEN
NIELSEN, in her official capacity as Secretary
of the Department of Homeland Security,

        Defendants.

_____/

No. C 17-05211 WHA
No. C 17-05235 WHA
No. C 17-05329 WHA
No. C 17-05380 WHA
No. C 17-05813 WHA

**ORDER DENYING
FRCP 12(b)(1) DISMISSAL
AND GRANTING
PROVISIONAL RELIEF**

**INTRODUCTION**

      In these challenges to the government's rescission of the Deferred Action for Childhood

Arrivals program, plaintiffs move for provisional relief while the government moves to dismiss

for lack of jurisdiction. For the reasons below, dismissal is **DENIED** and some provisional relief

is **GRANTED**.

**STATEMENT**

      In 2012, the United States Department of Homeland Security adopted a program to

postpone deportation of undocumented immigrants brought to America as children and, pending

action in their cases, to assign them work permits allowing them to obtain social security

numbers, pay taxes, and become part of the mainstream economy. This program received the

1  title "Deferred Action for Childhood Arrivals" — DACA for short.  In 2017, however, after the

2  national election and change in administrations, the agency eventually reversed itself and began

3  a phase-out of DACA.  All agree that a new administration is entitled to replace old policies

4  with new policies so long as they comply with the law.  One question presented in these related

5  actions is whether the new administration terminated DACA based on a mistake of law rather

6  than in compliance with the law.

7       1.     **HISTORY OF DEFERRED ACTION.**

8       At the core of these cases is an administrative practice known as "deferred action."

9  A primary question presented concerns the extent to which the Department of Homeland

10 Security could lawfully use deferred action to implement DACA, and so it is important to review

11 the history of deferred action as well as of other features of the DACA program.

12      Congress has the constitutional power to "establish an uniform Rule of Naturalization."

13 Art. I, § 8, cl. 4.  Pursuant thereto, Congress has established a comprehensive scheme governing

14 immigration and naturalization through the Immigration and Nationality Act.  8 U.S.C. §§ 1101,

15 *et seq*.  The Secretary of Homeland Security is "charged with the administration and enforcement

16 of [the INA] and all other laws relating to the immigration and naturalization of aliens."

17 8 U.S.C. § 1103(a)(1).  The Secretary is further charged with "establishing national immigration

18 enforcement policies and priorities."  6 U.S.C. § 202(5).

19      One of the key enforcement tools under the INA is removal, *i.e.*, deportation.  In turn,

20 "[a] principal feature of the removal system is the broad discretion exercised by immigration

21 officials."  *Arizona v. United States*, 567 U.S. 387, 396 (2012).  As an initial matter, in any given

22 case, immigration officials "must decide whether it makes sense to pursue removal at all."  *Ibid.*

23 At each stage of the removal process, they have "discretion to abandon the endeavor."  *Reno v.*

24 *Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483 (1999) ("*AADC*").

25      Beginning as early as 1975, one way to exercise this discretion became "deferred action."

26 By deferred action, immigration officials could postpone, seemingly indefinitely, the removal of

27 individuals unlawfully present in the United States "for humanitarian reasons or simply for [the

28

**United States District Court**
For the Northern District of California

2

United States District Court

For the Northern District of California

Executive's] own convenience." *Id*. at 483–84.  Immigration officials could also grant parole, temporary protected status, deferred enforced departure, or extended voluntary departure.

Some of these discretionary powers have flowed from statute.  Parole, for example, has allowed otherwise inadmissible aliens to temporarily enter the United States "for urgent humanitarian reasons or significant public benefit."  8 U.S.C. § 1182(d)(5)(A).  Temporary protected status, also created by statute, has been available to nationals of designated foreign states affected by armed conflicts, environmental disasters, and other extraordinary conditions. 8 U.S.C. § 1254a.

Some of these discretionary powers, however, have flowed from nonstatutory powers. Deferred enforced departure had no statutory basis but, instead, grew out of "the President's constitutional powers to conduct foreign relations."  USCIS, *Adjudicator's Field Manual* § 38.2(a) (2014).  Nor has extended voluntary departure been anchored in any statute.  Rather, it has been recognized as part of the discretion of the Attorney General.  *Hotel & Restaurant Employees Union, Local 25 v. Smith*, 846 F.2d 1499, 1510 (D.C. Cir. 1988) (en banc).

Deferred action, originally known as "nonpriority" status, also began "without express statutory authorization" but has since been recognized by the Supreme Court as a "regular practice."  *AADC*, 525 U.S. at 484.  Congress has also acknowledged deferred action by explicit reference to it in the INA (8 U.S.C. § 1227(d)(2)):

> The denial of a request for an administrative stay of removal under this subsection shall not preclude the alien from applying for a stay of removal, deferred action, or a continuance or abeyance of removal proceedings under any other provision of the immigration laws of the United States.

Another federal statute, the REAL ID Act, also acknowledged deferred action.  REAL ID Act of 2005, Pub. L. No. 109-13, div. B, 119 Stat. 231.  This law provided that states could issue a temporary driver's license or identification card to persons who can demonstrate an "authorized stay in the United States."  *Id.* §§ 202(c)(2)(C)(i)–(ii).  Persons with "approved deferred action status" were expressly identified as being present in the United States during a "period of authorized stay," for the purpose of issuing state identification cards.  *Id.* §§ 202(c)(2)(B)(viii), (C)(ii).

United States District Court

For the Northern District of California

Congress has also given the Executive Branch broad discretion to determine when noncitizens may work in the United States. *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1062 (9th Cir. 2014) ("*Brewer I*"); *see* 8 U.S.C. § 1324a(h)(3) (defining an "unauthorized alien" not entitled to work in the United States as an alien who is neither a legal permanent resident nor "authorized to be . . . employed by [the INA] or by the [Secretary of Homeland Security]"). Pursuant to this statutory authority, regulations promulgated in the 1980s allowed recipients of deferred action to apply for work authorization if they could demonstrate an "economic necessity for employment." 8 C.F.R. § 274a.12(c)(14).

The George W. Bush Administration began to use deferred action to mitigate a harsh statutory provision involving "unlawful presence." The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 created three- and ten-year bars on the admission of aliens who departed or were removed from the United States after periods of "unlawful presence" of between 180 days and one year, or more than one year, respectively. 8 U.S.C. § 1182(a)(9)(B)(i). It also imposed a permanent bar on the admission of any alien who, without being admitted, entered or attempted to reenter the United States after having been unlawfully present for an aggregate period of more than one year. 8 U.S.C. § 1182(a)(9)(C)(i). Beginning in 2007, however, DHS regulations and policy guidance provided that deferred action recipients did not accrue "unlawful presence" for purposes of the INA's bars on re-entry. 8 C.F.R. § 214.14(d)(3); 28 C.F.R. § 1100.35(b)(2); Memorandum for Field Leadership, from Donald Neufeld, Acting Associate Director, Domestic Operations Directorate, USCIS, *Re: Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(i) of the Act* at 42 (May 6, 2009). DHS excluded recipients of deferred action from being "unlawfully present" because their deferred action is a period of stay authorized by the government. *Brewer I*, 757 F.3d at 1059 (citing 8 U.S.C. § 1182(a)(9)(B)(ii)). This nonaccrual practice arose well before DACA.[1]

---

[1] Undocumented aliens do not begin to accrue "unlawful presence" for purposes of Section 1182(a)(9)(B)(i) until they reach the age of eighteen. 8 U.S.C. § 1182(a)(9)(B)(iii).

4

United States District Court

For the Northern District of California

DACA grew out of a long agency history of discretionary relief programs.  In 1956, the Eisenhower Administration paroled roughly one thousand foreign-born orphans who had been adopted by American citizens but were precluded from entering the United States because of statutory quotas.  That same administration later granted parole to tens of thousands of Hungarian refugees after the unsuccessful Hungarian revolution.  Both programs flowed from presidential statements, and the programs later ended (in 1959 and 1958, respectively) when Congress passed laws enabling the paroled individuals to become lawful permanent residents (App. 1602–03, 1948–57; AR 33).[2]

In 1987, President Ronald Reagan instituted the Family Fairness Program, a non-statutory program that provided extended voluntary departure to children whose parents were in the process of legalizing their immigration status under the Immigration Reform and Control Act of 1986.  President George H.W. Bush extended the non-statutory program in 1990 to cover spouses of such legalized aliens, and the program ultimately provided immigration relief to approximately 1.5 million people.  The need for the program ended with the passage of the Immigration Act of 1990 (App. 1607, 1612–13, 1703).

On at least four occasions prior to the creation of DACA, immigration officials have extended deferred action programs to certain classes of aliens, none of which programs was expressly authorized by statute:

- In 1997, INS established a deferred action program for individuals self-petitioning for relief under the Violence Against Women Act of 1994.  This program is still in place today.  As originally enacted, the Act did not mention deferred action, but instead provided a pathway to lawful permanent residency.  Deferred action allowed applicants to remain in the country pending a decision on their applications.

---

[2] "App." refers to the appendix submitted in support of plaintiffs' motion for provisional relief (Dkt. Nos. 113, 117–19, 121, 124).  In connection with their motion for provisional relief, plaintiffs seek judicial notice of thirty-nine exhibits submitted with the appendix (Dkt. No. 111-2).  The request is unopposed. These exhibits consist of congressional testimony and government publications, memoranda, and press releases. Plaintiffs' request for judicial notice is **GRANTED**.

United States District Court

For the Northern District of California

Congress later expanded the deferred action program in the 2000
VAWA reauthorization legislation (App. at 1640–46).

•   In 2002 and 2003, INS issued memoranda instructing officers to make
deferred action assessments for T visa applicants (victims of human
trafficking) and U visa applicants (victims of crimes such as domestic
violence) (App. 1650–58).  These programs have since been codified in
regulations promulgated by INS and DHS. 8 C.F.R. §§ 214.11(k)(1),
(k)(4), (m)(2); 8 C.F.R. § 214.14(d)(2).

•   After Hurricane Katrina in 2005, USCIS announced a deferred action
program for certain foreign students (F-1 visa holders) who, because of
the hurricane, could not satisfy the requirements of their student visas.
In announcing the program, USCIS stated that "[t]he interim relief
[would] remain in effect until February 1, 2006" (App. 1661–62).

•   In 2009, to fill a gap under the law, USCIS established a deferred
action program for widowed spouses who had been married to United
States citizens for less than two years.  Congress later eliminated the
statutory requirement that an alien be married to a United States citizen
for at least two years at the time of the citizen's death to retain
eligibility for lawful immigration status, and USCIS accordingly
withdrew the deferred action program as "obsolete" (App. 1664–82).

In sum, by the time DACA arrived in 2012, deferred action programs had become a
well-accepted feature of the executive's enforcement of our immigration laws, recognized as
such by Congress and the Supreme Court.

**2.     DACA.**

On June 15, 2012, Secretary of Homeland Security Janet Napolitano issued a
memorandum establishing Deferred Action for Childhood Arrivals.  Under DACA, immigrants
brought to the United States as children could apply for deferred action for a two-year period,
subject to renewal.  To qualify for DACA, an individual must:  (1) have come to the United

6

United States District Court

For the Northern District of California

1  States before the age of sixteen and been under the age of thirty-one on June 15, 2012;

2  (2) have been present in the United States on June 15, 2012; (3) have been continuously residing

3  in the United States for at least the prior five years; (4) have been enrolled in school, graduated

4  from high school, obtained a GED, or been honorably discharged from the United States military

5  or Coast Guard; and (5) not pose a threat to national security or public safety (AR 1).

6          The 2012 DACA memo described the program as an exercise of "prosecutorial

7  discretion."  Secretary Napolitano found leniency "especially justified" for the DACA-eligible,

8  whom she described as "productive young people" who "have already contributed to our country

9  in significant ways."  The memo further stated that these individuals "lacked the intent to violate

10  the law" and were low priority cases for deportation (AR 1–2).

11          DACA applicants had to pass a DHS background check and applications had to be

12  "decided on a case by case basis."  To apply for DACA, eligible individuals completed USCIS

13  Form I-821D.  The application called for substantial personal information, such as biographical

14  information, date of entry into the United States, immigration status or lack thereof, educational

15  history, and all prior residential addresses since entering the United States.

16          Form I-821D also required substantial documentary support, including proof of identity

17  and proof of continuous residence in the United States through rent receipts, utility bills,

18  employment documents, or similar records.  Applicants also appeared at a USCIS field office

19  to provide fingerprints, photographs, and signatures.  The form's instructions stated (App. 1820):

20              Information provided in this request is protected from disclosure
             to ICE and U.S. Customs and Border Protection (CBP) for the
21              purpose of immigration enforcement proceedings unless the
             requestor meets the criteria for the issuance of a Notice To Appear
22              or a referral to ICE under the criteria set forth in USCIS' Notice to
             Appear guidance (www.uscis.gov/NTA).  The information may be
23              shared with national security and law enforcement agencies,
             including ICE and CBP, for purposes other than removal,
24              including for assistance in the consideration of deferred action for
             childhood arrivals request itself, to identify or prevent fraudulent
25              claims, for national security purposes, or for the investigation or
             prosecution of a criminal offense.  The above information sharing
26              clause covers family members and guardians, in addition to the
             requestor.

27

28

7

The form's instructions also stated (App. 1808):

> Individuals who receive deferred action will not be placed into removal proceedings or removed from the United States for a specified period of time, unless the Department of Homeland Security (DHS) chooses to terminate the deferral.

DACA applicants also submitted a Form I-765, Application for Employment Authorization, a Form I-765WS, Worksheet, and the accompanying fees. To determine an applicant's eligibility for work authorization, USCIS reviewed the applicant's current annual income, current annual expenses, and the total current value of his or her assets (App. 1762, 1801–21, 2067–87).

If approved, the recipient received a Form I-797, Notice of Action, stating (App. 585):

> USCIS, in the exercise of its prosecutorial discretion, has decided to defer action in your case. Deferred action is an exercise of prosecutorial discretion by USCIS not to pursue the removal of an individual from the United States for a specific period. Deferred action does not confer or alter any immigration status.

Significantly, DHS could terminate a recipient's deferred action at any time, at the agency's discretion, and DACA paved no pathway to lawful permanent residency, much less citizenship (App. 1774, 1808). Secretary Napolitano concluded her DACA memorandum (AR 1–3):

> This memorandum confers no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights. It remains for the executive branch, however, to set forth policy for the exercise of discretion within the framework of the existing law. I have done so here.

But DACA did provide important benefits. *First,* under pre-existing regulations, DACA recipients became eligible to receive employment authorization for the period of deferred action, thereby allowing them to obtain social security numbers and to become legitimate taxpayers and contributing members of our open economy. 8 C.F.R. § 274a.12(c)(14). *Second*, deferred action provided a measure of safety for a period of two years from detention and removal, albeit always subject to termination at any time in any individual case. *Third,* DACA recipients could apply for "advance parole" to obtain permission to travel overseas and be paroled back into the United States. 8 C.F.R. § 212.5(f). *Fourth*, also pursuant to pre-existing regulations, DACA recipients

United States District Court

For the Northern District of California

1   avoided accrual of time for "unlawful presence" under the INA's bar on re-entry.  8 U.S.C.

2   § 1182(a)(9)(B)–(C) (establishing three-year, ten-year, and permanent bars on the admission

3   of aliens after specified periods of "unlawful presence").

4       USCIS "strongly encourage[d]" DACA recipients to submit renewal requests between

5   120 and 150 days before the expiration date-stamped on the recipient's Form I-797.  According

6   to the "Frequently Asked Questions" posted on the agency's website, recipients were eligible for

7   renewal under DACA so long as they:  (1) did not depart the United States on or after August 15,

8   2012, without advance parole; (2) continuously resided in the United States since submitting

9   their most recent DACA request; and (3) had not received criminal convictions (with minor

10  exceptions).  Renewal requests did not require additional documentary support (App. 1756–57).

11      The agency adopted DACA without any notice or opportunity for public comment.

12      According to data published by USCIS, 793,026 applicants received deferred action

13  under DACA since its inception.  As of September 2017, there remained approximately 689,800

14  active DACA recipients.  Their average age was 23.8.  Based on a survey completed by

15  Associate Professor Tom K. Wong in August 2017, 91 percent of DACA recipients had jobs,

16  and 45 percent of DACA recipients were enrolled in school (App. 1494–1522, 1533–52).

17      **3.    THE DAPA LITIGATION**.

18      In 2014, DHS announced a different deferred action program for parents of United States

19  citizens or lawful permanent residents, titled "Deferred Action for Parents of Americans and

20  Lawful Permanent Residents" — shortened to the confusingly-similar acronym DAPA.

21      For our purposes, DAPA is important because the United States Court of Appeals for

22  the Fifth Circuit promptly held that DAPA exceeded the statutory authority of DHS, a holding

23  that eventually moved Attorney General Jeff Sessions to rule that DACA too had exceeded the

24  agency's authority.  *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015).

25      The 2014 DAPA memo directed USCIS "to establish a process, similar to DACA, for

26  exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis,"

27  for aliens who had a son or daughter who was a United States citizen or lawful permanent

28  resident and:  (1) were not an enforcement priority under DHS policy; (2) had continuously

9

1   resided in the United States since before January 1, 2010; (3) had been physically present in the

2   United States both when DHS announced DAPA and at the time of application to the program;

3   and (4) presented "no other factors that, in the exercise of discretion, [made] the grant of

4   deferred action inappropriate" (AR 37–41).

5         That same 2014 announcement also expanded DACA in three minor ways:  (1) allowing

6   otherwise eligible immigrants to apply for DACA even if they were older than 31 on the day

7   DACA was earlier announced; (2) extending DACA renewals and work authorizations from

8   two- to three-year periods; and (3) adjusting DACA's date-of-entry requirement from June 15,

9   2007, to January 1, 2010 (AR 37–41).

10        DAPA was also adopted without notice or opportunity for public comment.

11        A coalition of twenty-six states immediately filed suit in the United States District Court

12  for the Southern District of Texas to challenge DAPA.  The district court preliminarily enjoined

13  its implementation on the ground that DHS had failed to comply with the APA's

14  notice-and-comment requirements.  *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015).

15  The district court's order stated that "with three minor exceptions," the case did not involve

16  DACA (*id.* at 606):

> The Complaint in this matter does not include the actions taken by
> Secretary Napolitano, which have to date formalized the status of
> approximately 700,000 teenagers and young adults.  Therefore,
> those actions are not before the Court and will not be addressed
> by this opinion.  Having said that, DACA will necessarily be
> discussed in this opinion as it is relevant to many legal issues in
> the present case.  For example, the States maintain that the DAPA
> applications will undergo a process identical to that used for
> DACA applications and, therefore, DACA's policies and
> procedures will be instructive for the Court as to DAPA's
> implementation.

23        In holding that DAPA violated notice-and-comment procedures, the district court held

24  that it constituted "a new rule that substantially change[d] both the status and employability of

25  millions" and inflicted "major costs on both states and federal government."  It therefore should

26  have been issued, the district court held, after notice and opportunity for public comment.  *Id.* at

27  671.  Though the order focused on DAPA, it also preliminarily enjoined everything in the 2014

28

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1   memorandum, including the three minor ways in which DACA had been modified (but left alone

2   the 2012 DACA program).

3        The Fifth Circuit affirmed in a split decision but added a further ground for affirmance.

4   *Texas*, 809 F.3d at 178.  Over a dissent, the appellate panel added the ground that DAPA was

5   substantively foreclosed by statute because the INA contained "an intricate process for illegal

6   aliens to derive a lawful immigration classification from their children's immigration status,"

7   and that DAPA, by providing "the benefits of lawful presence" to undocumented immigrants

8   "solely on account of their children's immigration status," was inconsistent with this statutory

9   scheme, which provided its own pathway for lawful presence to parents of children lawfully

10  in the United States.  *Id.* at 179–80, 186.  The Fifth Circuit's holding was also based on its

11  observation that "the INA does not grant the Secretary discretion to grant deferred action and

12  lawful presence on a class-wide basis to 4.3 million otherwise removable aliens."  *Id.* at 186

13  n.202.  The decision was later affirmed without opinion by an equally divided Supreme Court.

14  *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam).[3]

15       In February 2017, DHS Secretary John Kelly issued guidance regarding the Trump

16  Administration's immigration enforcement priorities.  Although the guidance rescinded "all

17  existing conflicting directives, memoranda, or field guidance regarding the enforcement of our

18  immigration laws and priorities for removal," the 2012 DACA memo and 2014 DAPA memo

19  were explicitly left in place.  The guidance also said that the 2014 DAPA memo would "be

20  addressed in future guidance" (AR 229–34).

21       In June 2017, Secretary Kelly rescinded the 2014 DAPA memo, which rescission

22  included the 2014 expansions of DACA.  He explained:

> I have considered a number of factors, including the preliminary
> injunction in this matter, the ongoing litigation, the fact that DAPA
> never took effect, and our new immigration enforcement priorities.
> After consulting with the Attorney General, and in the exercise of
> my discretion in establishing national immigration enforcement
> policies and priorities, I hereby rescind the November 20, 2014,
> memorandum.

---

[3] Such an affirmance has no precedential value.  *Neil v. Biggers*, 409 U.S. 188, 192 (1972).

11

1    Again, however, Secretary Kelly declared that the 2012 DACA memo would remain in effect

2    (AR 235–37).

3        **4.    RESCISSION OF DACA.**

4        Also in June 2017, ten of the twenty-six plaintiffs from the DAPA litigation wrote to

5    Attorney General Jeff Sessions to demand rescission of the 2012 DACA memo.  Their letter

6    stated that if DACA was rescinded by September 5, they would dismiss the still-pending DAPA

7    litigation.  Otherwise, the letter threatened to try to amend their complaint to additionally

8    challenge the legality of DACA (AR 238–40).

9        A day before the deadline, the Attorney General advised Acting Secretary of Homeland

10   Security Elaine Duke via a short letter that the Obama Administration had created DACA

11   "without proper statutory authority and with no established end-date, after Congress' repeated

12   rejection of proposed legislation that would have accomplished a similar result," and that

13   therefore the program was an "unconstitutional exercise of authority by the Executive Branch."

14   The Attorney General's letter also referenced the preliminary injunction against DAPA, then

15   stated that "[b]ecause the DACA policy has the same legal and constitutional defects that the

16   courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar

17   results with respect to DACA" (AR 251).

18       The following day, without prior notice, the Acting Secretary rescinded DACA.

19   The rescission was not based on any policy criticism.  Instead, it was based on the legal

20   determination by the Attorney General.  The Acting Secretary explained that after "[t]aking into

21   consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and

22   the September 4, 2017, letter from the Attorney General, it is clear that the June 15, 2012,

23   DACA program should be terminated."  She said that "[r]ecognizing the complexities associated

24   with winding down the program," DHS would "provide a limited window" in which it would

25   adjudicate certain requests, but that new DACA requests and applications for employment

26   authorization would be rejected starting immediately.  DHS would adjudicate, on a case-by-case

27   basis, DACA renewal requests received within thirty days from beneficiaries whose DACA

28   status would expire before March 5, 2018.  She also instructed DHS to immediately stop

United States District Court

For the Northern District of California

12

United States District Court
For the Northern District of California

approving new applications for advance parole.  The rescission left in place all extant grants of deferred action and work authorizations for the remainder of their validity periods (AR 252–56). Consequently, starting in March 2018, the DACA population will, over two years, dwindle down to zero.

On the night of the rescission, President Trump called upon Congress specifically to enact DACA, tweeting, "Congress now has 6 months to legalize DACA (something the Obama Administration was unable to do).  If they can't, I will revisit this issue!"  During an interview earlier in 2017, President Trump had stated "we are not after the dreamers, we are after the criminals" and that "the dreamers should rest easy" (App. 1852–53, 1958).

In sum, the new administration didn't terminate DACA on policy grounds.  It terminated DACA over a point of law, a pithy conclusion that the agency had exceeded its statutory and constitutional authority.  An important question now presented is whether that conclusion was a mistake of law.

### 5.    THE INSTANT LITIGATION.

Plaintiffs herein filed five related non-class lawsuits in this district, all now before the undersigned judge.  The first commenced on September 8, brought by The Regents of the University of California, on its own behalf and on behalf of its students, and Janet Napolitano, in her official capacity as President of the University.  UC Plaintiffs allege they have invested considerable resources in recruiting students and staff who are DACA recipients, and that these individuals make important contributions to the University.  As DACA recipients lose their work authorizations, UC Plaintiffs allege that the University will lose significant intellectual capital and productivity.  They further allege that students who lose DACA protections will be unable "to plan for the future, apply for and obtain internships and certain financial aid and scholarships, study abroad, or work to pay their tuition and other expenses," and as a result may withdraw from the University altogether (UC Compl. ¶¶ 4–6, 34–37, 48–49).[4]

---

[4] Two additional DACA lawsuits proceed in the Eastern District of New York before Judge Nicholas Garaufis, *State of New York v. Trump*, Case No. 17-cv-05228 NGG, and *Vidal v. Baran*, Case No. 16-cv-04756 NGG.

On September 11, the States of California, Maine, Maryland, and Minnesota filed suit. Plaintiff States allege that they are home to more than 238,000 DACA recipients, and that the loss of their residents' DACA status and work authorizations will injure their public colleges and universities, upset the States' workforces, disrupt the States' statutory and regulatory interests, cause harm to hundreds of thousands of their residents, damage their economies, and hurt companies based in Plaintiff States (States Compl. ¶¶ 1–10).

The City of San Jose, on its own behalf and on behalf of its employees who are DACA recipients, filed its action on September 14.  San Jose alleges that it has hired DACA recipients into vital City jobs, that substantial resources were invested in training these employees, and that the City will be harmed when these employees are forced to leave the workforce (when they lose their work authorizations).  San Jose further alleges that it will continue to lose tax revenue as DACA recipients lose work authorizations and can no longer contribute to the City's tax base (San Jose Compl. ¶¶ 10, 28, 49–51).

On September 18, Individual DACA recipients Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez, and Jirayut Latthivongskorn brought suit to challenge the termination of DACA.  Individual Plaintiffs work and study in the fields of law, medicine, education, and psychology.  They allege that the loss of DACA will frustrate their professional goals and accomplishments.  They further allege that as a result of the rescission, they will lose access to numerous federal and state benefits, and may not be able to reside in the United States with their families.  They applied for DACA in reliance on the government's representations that information provided under the program would not be used for purposes of immigration enforcement (Garcia Compl. ¶¶ 4–9, 55, 59, 72, 78, 85, 95, 128).

Finally, the County of Santa Clara and the Service Employees International Union Local 521 filed their complaint on October 10.  The County alleges that it employs DACA recipients, including union members, in key positions, such as in its In-Home Supportive Services Program and New Americans Fellowship Program.  The County alleges that it has expended time and money in training these employees, and that it relies on them to provide important services.

As DACA recipients leave the workforce, the County will lose important employees, will incur harm to its economy and suffer decreased tax revenue, and will incur the costs of increased dependency on subsidized health care and other County services.  Local 521 sues as an associational plaintiff on behalf of its members who are DACA recipients, and alleges that the Union's organizational mission is to organize, represent, and empower employees, as well as mobilize immigration reform (Santa Clara Compl. ¶¶ 1, 15–20, 32, 37, 43–52).

Collectively, plaintiffs assert the following claims:

- The rescission violated the Administrative Procedure Act because it was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law (UC Compl. ¶¶ 50–58; State Compl. ¶¶ 152–55; Garcia Compl. ¶¶ 165–84; Santa Clara Compl. ¶¶ 67–73).

- The rescission violated the APA because it was a substantive rule that did not comply with the APA's notice-and-comment requirements or the Regulatory Flexibility Act's mandate under 5 U.S.C. § 604 that an agency publish analysis of a rule's impact on small businesses (UC Compl. ¶¶ 59–66; State Compl. ¶¶ 146–63; San Jose Compl. ¶¶ 59–63; Garcia Compl. ¶¶ 177–84).

- The rescission deprived DACA recipients of constitutionally-protected property and liberty interests without due process of law.  Plaintiffs also allege that the rescission violated due process because the government changed its policy regarding agency use of DACA-related information (UC Compl. ¶¶ 67–73; State Compl. ¶¶ 141–45; Garcia Compl. ¶¶ 133–47; Santa Clara Compl. ¶¶ 59–66).

- The rescission violates equal protection of the law because it was motivated by discriminatory animus and because it deprived DACA grantees of their substantial interests in supporting themselves and furthering their education (State Compl. ¶¶ 172–77; San Jose Compl. ¶¶ 52–58; Garcia Compl. ¶¶ 148–59; Santa Clara Compl. ¶¶ 74–78).

United States District Court

For the Northern District of California

- • The rescission violates equitable estoppel.  DACA recipients provided
  detailed personal information to the government and rearranged their
  lives based on the government's representations, but now face the
  possibility of removal.  Plaintiffs argue that the government should
  therefore be equitably estopped from terminating DACA or from using
  their DACA information for immigration enforcement purposes (State
  Compl. ¶¶ 164–71; Garcia Compl. ¶¶ 192–99; Santa Clara Compl.
  ¶¶ 79–86).

- • Plaintiffs seek a declaration that the rescission was unlawful and an
  order restoring DACA (UC Compl. at 16, State Compl. at 35–36;
  San Jose Compl. at 15–16; Garcia Compl. at 43; Santa Clara Compl.
  at 26–27).

On September 21, an initial case management conference occurred for all DACA actions in our district.  At the conference, all counsel, including government counsel, presented a joint proposal whereby the government would file the administrative record by October 13. Significantly, although the government argued that discovery would be premature, it agreed to submit the administrative record without any condition that it be done before any decision on its threshold jurisdictional motion (presumably because it knew its jurisdictional motion would be premised on the administrative record) (*see* Dkt. No. 114 at 16; Tr. at 17:3, 22:2).  The Court made only slight revisions to the joint proposal, all in aid of a stated goal of providing a full record and final decision for our court of appeals prior to the March 5 expiration date.  Pursuant to FRCP 26, a case management order then set a October 6 deadline for the government to file the administrative record, set a briefing schedule for the parties' motions to dismiss, for provisional relief, or for summary judgment, and permitted the parties to proceed with reasonable, limited, and narrowly-directed discovery (Dkt. No. 49).

The government filed an administrative record on October 6.  It was merely, however, fourteen documents comprising 256 pages of which 187 consisted of published opinions from the DAPA litigation, and all of which already resided in the public domain.  All non-public

16

United States District Court

For the Northern District of California

materials, some eighty-four documents, actually reviewed by the Acting Secretary remained withheld as privileged (Dkt. No. 71).  In other words, of the ninety-eight DACA-related documents personally considered by the decisionmaker, all but the fourteen already known to the public were withheld as privileged.  Although government counsel further indicated, upon inquiry by the district judge, that the decisionmaker had also likely received verbal input, nothing was included in the administrative record to capture this input.  Nor were there any materials regarding the agency's earlier, recent decisions to leave DACA in place.

On October 9, plaintiffs moved to require the government to complete the administrative record, seeking all materials considered directly or indirectly by the Acting Secretary in reaching her decision to rescind DACA, which motion was granted in part and denied in part. The government, having earlier consented to filing the administrative record, was ordered to keep its word and to file a complete administrative record (Dkt. Nos. 65, 79–80).

Instead, the government filed a petition for writ of mandamus with our court of appeals, seeking relief from having to complete the administrative record until after its jurisdictional arguments were determined, a turnabout from its earlier voluntary proposal and stipulation to file the administrative record as part of an agreed-upon schedule.  After full briefing and oral argument, our court of appeals denied the government's mandamus petition and vacated the stay (over one dissent).[5]

The government was again ordered to complete the administrative record, this time by November 22, later extended to December 22 to accommodate the government's claim of burden.  On December 1, however, the government filed a petition for writ of mandamus and application for a stay in the United States Supreme Court.  Ultimately, the Supreme Court did not reach the merits of the government's petition but required that defendants' jurisdictional defenses be adjudicated prior to consideration of discovery or completing the administrative

---

[5]  Recently, the United States Court of Appeals for the Second Circuit denied the government's petition for a writ of mandamus to stay an order to supplement the same administrative record.  The court of appeals found that there was "a strong suggestion that the record before the District Court was not complete" and, noting that nearly 200 pages of the record consisted of published opinions from various federal courts, "[i]t is difficult to imagine that a decision as important as whether to repeal DACA would be made based upon a factual record of little more than 56 pages, even accepting that litigation risk was the reason for repeal."  *In Re: Kirstjen M. Nielsen*, No. 17-3345 (2d. Cir. Dec. 27, 2017).

1  record (Dkt. Nos. 86, 188, 197, 214, 224), a decision the district judge himself might have made

2  at the outset save for the government's own proposal and agreement to file the administrative

3  record in October.

4         Consequently, this action has proceeded on the incomplete administrative record

5  initially filed by the government.  Plaintiffs have been forced to draw on other materials.

6  Ironically, even the government in these motions relies on material outside of the administrative

7  record to defend the agency decision (Dkt. No. 204 at 10, 12, 19–20).  The parties have now

8  fully briefed motions to dismiss and a motion for provisional relief, all argued on December 20

9  (Dkt. Nos. 111, 114).  This order now follows.

**ANALYSIS**

11     **1.**    **MOTION TO DISMISS.**

12         Defendants raise three jurisdictional arguments under FRCP 12(b)(1).  *First*, they argue

13  that the decision to rescind DACA was a discretionary act barred from judicial review under

14  the APA.  *Second*, they contend that the INA bars judicial review.  *Third*, although defendants

15  concede that Individual Plaintiffs have standing, they contend that no others do.  Each is

16  now addressed in turn.  A separate order will consider defendants' motion to dismiss under

17  FRCP 12(b)(6).

      **A.**    **The DACA Rescission Was Not Committed
            To Agency Discretion by Law.**

20         Congress has instructed our district courts to review and set aside agency action found

21  to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

22  5 U.S.C. § 706(2)(A).  Under the APA, however, our district courts lack subject-matter

23  jurisdiction to review agency action that is "committed to agency discretion by law."  5 U.S.C.

24  § 701(a)(2).

25         In *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971), the

26  Supreme Court explained that the jurisdictional bar of Section 701(a)(2) is "very narrow" and

27  "applicable in those rare instances where statutes are drawn in such broad terms that in a given

28  case there is no law to apply."  The Supreme Court held that because the statute there at issue

contained "clear and specific directives" guiding the agency's decision, there was "'law to

apply,' so the exemption for action 'committed to agency discretion' [was] inapplicable." *Id.* at 411–13 (quotations and citations omitted).

When it next revisited the exception in *Heckler v. Chaney*, 470 U.S. 821, 830 (1985), the Supreme Court reiterated that the exception applies only where "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." There, condemned inmates asked the FDA to bring an enforcement action to prevent purported violations of the Federal Food, Drug, and Cosmetic Act through the administration of death-penalty drugs. The FDA Commissioner, however, refused to do so on the ground that the FDA lacked jurisdiction and otherwise should not interfere with the state criminal justice system. Skipping over the agency jurisdiction issue, the Supreme Court held that such decisions not to prosecute or initiate enforcement actions are generally not reviewable as they are "committed to an agency's absolute discretion." *Id.* at 824–25, 831.

*Chaney* identified several characteristics of non-enforcement decisions as key to its holding. *First*, non-enforcement decisions require a complicated balancing of factors "peculiarly within [the agency's] expertise," including whether "resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and . . . whether the agency has enough resources to undertake the action at all." *Id.* at 831. *Second*, in refusing to act, an agency "does not exercise its coercive power over an individual's liberty" and accordingly "does not infringe upon areas that courts often are called upon to protect." *Id.* at 832. When an agency *does* act to enforce, however, that action itself provides a focus for judicial review, inasmuch as the agency must have exercised its power in some manner. *Third*, a refusal to institute enforcement proceedings is similar to a prosecutor's decision not to indict, which decision "has long been regarded as the special province of the Executive Branch." *Ibid.*

Our case is different from *Chaney.* There, the agency simply refused to initiate an enforcement proceeding. Here, by contrast, the agency has ended a program which has existed for five years affecting 689,800 enrollees. Importantly, major policy decisions are "quite different from day-to-day agency nonenforcement decisions." *National Treasury Employees*

19

United States District Court

For the Northern District of California

*Union v. Horner*, 854 F.2d 490, 496 (D.C. Cir. 1988). Rather, broad enforcement policies "are more likely to be direct interpretations of the commands of the substantive statute rather than the sort of mingled assessments of fact, policy, and law that drive an individual enforcement decision." *Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 677 (D.C. Cir. 1994). Even defendants concede that where "the agency's interpretation of a statute is embedded in a non-reviewable enforcement policy, the former may be reviewable as such" (Dkt. No. 218 at 3 n.4). Although they contend that the rescission memorandum "does not contain an embedded interpretation of the INA," that assertion is incompatible with the Acting Secretary's explicit references to the INA and the Attorney General's determination that DACA was effectuated without "statutory authority." The first and third *Chaney* factors, accordingly, do not apply to the instant case.[6]

   *Chaney* is also distinguishable because, unlike there, here the government reversed course after five years of inviting DACA recipients out of the shadows. In contrast to nonenforcement decisions, "rescissions of commitments, whether or not they technically implicate liberty and property interests as defined under the fifth and fourteenth amendments, exert much more direct influence on the individuals or entities to whom the repudiated commitments were made." *Robbins v. Reagan*, 780 F.2d 37, 47 (D.C. Cir. 1985). Through DACA, the government has invited undocumented aliens who meet threshold criteria to step forward, disclose substantial personal information, pay a hefty fee, and comply with ongoing conditions, all in expectation of (though not a right to) continued deferred action. DACA allows enrollees to better plan their careers and lives with a reduced fear of removal. DACA work authorizations, for example, allow recipients to join in the mainstream economy (and pay taxes). DACA covers a class of immigrants whose presence, seemingly all agree, pose the least, if any, threat and allows them to sign up for honest labor on the condition of continued good behavior. This has become an important program for DACA recipients and their families, for

---

[6] Contrary to defendants, *Perales v. Casillas*, 903 F.2d 1043, 1050 (5th Cir. 1990), is distinguishable on its facts. There, the Fifth Circuit addressed a class action stemming from the Immigration and Naturalization Service's failure to adjudicate requests for voluntary departure. The court of appeals determined that the district court had improperly issued an injunction directing INS to consider particular grounds in deciding individual requests for voluntary departure and employment authorization. *Id.* at 1046.

United States District Court

For the Northern District of California

1   the employers who hire them, for our tax treasuries, and for our economy.  An agency action to

2   terminate it bears no resemblance to an agency decision not to regulate something never before

3   regulated.

4         Finally, there *is* law to apply.  The main, if not exclusive, rationale for ending DACA

5   was its supposed illegality.  But determining illegality is a quintessential role of the courts.[7]

6                        **B.      The INA Does Not Bar Review.**

7         The principle that courts owe substantial deference to the immigration determinations of

8   the political branches is important and undisputed.  *Washington v. Trump*, 847 F.3d 1151, 1162

9   (9th Cir. 2017).  That deference, however, does not remove the decision to rescind DACA from

10  the ambit of judicial review.  Rather, the Supreme Court has applied the "strong presumption

11  in favor of judicial review of administration action" in the immigration context.  *See INS v.*

12  *St. Cyr*, 533 U.S. 289, 298–99 (2001).

13        In this connection, defendants raise two arguments.  *First*, they contend that review

14  of discretionary enforcement decisions results in the inappropriate delay of removal, and

15  accordingly prolongs violations of our immigration laws.  This argument, however, again

16  ignores that plaintiffs do not challenge any particular removal but, rather, challenge the abrupt

17  end to a nationwide deferred-action and work-authorization program.  In any individual case,

18  DACA allows DHS to revoke deferred status and to deport.  *Second*, defendants assert that

19  review of such decisions may involve disclosure of law enforcement priorities and

20  foreign-policy objectives.  Neither concern is implicated here, as defendants' stated reasons

21  for the rescission all relate to the across-the-board cancellation of DACA based on supposed

22  illegality, not to the facts particular to any proposed removal.

23

24

25

26  ───────────────

27        [7]  Defendants are correct, of course, that a presumptively unreviewable agency action does not become reviewable simply because "the agency gives a reviewable reason for otherwise unreviewable action."  *ICC v. Bhd. of Locomotive Eng's*, 482 U.S. 270, 283 (1987).  As discussed above, however, the rescission of DACA

28  was not such an unreviewable decision.

1   Nor does Section 1252(g) bar judicial review of the agency action in question.  8 U.S.C.

2   § 1252(g) provides:

3           Except as provided in this section and notwithstanding any other
            provision of law (statutory or nonstatutory) . . . no court shall have
4           jurisdiction to hear any cause or claim by or on behalf of any alien
            arising from the decision or action by the Attorney General to
5           commence proceedings, adjudicate cases, or execute removal
            orders against any alien under this chapter.

6

7   As explained by the Supreme Court, this provision applies only to the three discrete

8   decisions or actions named in Section 1252(g).  *AADC*, 525 U.S. at 482.  Plaintiffs' claims do

9   not involve such decisions, but rather the challenge here is to the across-the-board cancellation

10  of a nationwide program.[8]

11          Defendants recognize that these actions were brought prior to the commencement of

12  any removal proceedings.  Nevertheless, they argue that Section 1252(g) precludes review of

13  plaintiffs' claims because the decision to discontinue deferred action is "an ingredient to the

14  commencement of enforcement proceedings."  It is true that eliminating DACA draws its

15  enrollees one step closer to deportation, but the Supreme Court rejected the argument that

16  Section 1252(g) somehow precludes review of the "many other decisions or actions that may be

17  part of the deportation process."  As *AADC* emphasized, "[i]t is implausible that the mention of

18  three discrete events along the road to deportation was a shorthand way of referring to all claims

19  arising from deportation proceedings."  *Ibid*.

20          Defendants cite two decisions.  *Importantly, however, both stemmed from already-

21  commenced deportation or removal proceedings*.  *See Botezatu v. I.N.S.*, 195 F.3d 311, 312

22  (7th Cir. 1999) (declining to review a decision to deny deferred action after plaintiff had been

23  found deportable); *Vasquez v. Aviles*, 639 F. App'x 898, 899–900 (3d Cir. 2016) (district court

24  lacked jurisdiction to hear habeas corpus petition that claimed plaintiff was improperly denied

25  DACA relief).

26          By comparison, our court of appeals has held, following *AADC*, that Section 1252(g)

27  does not bar review of actions that occur "prior to any decision to 'commence proceedings.'"

28          _____

            [8]  The district court in *Batalla Vidal* also concluded that Section 1252(g) did not bar judicial review of
     challenges to the DACA rescission.  *Batalla Vidal v. Duke*, 2017 WL 5201116, at *13.

United States District Court
For the Northern District of California

1    *Kwai Fun Wong v. United States*, 373 F.3d 952, 965 (9th Cir. 2004).  The claims in *Kwai Fun*

2    *Wong* challenged the revocation of the plaintiff's parole without first deciding her application

3    for immigration relief, conduct which "*resulted in* the INS's decision to commence removal

4    proceedings and ultimately to remove" the plaintiff from the United States.  *Id.* at 959, 964.

5    Contrary to defendants, it is immaterial that *Kwai Fun Wong* did not involve deferred action,

6    as both the revocation of parole and the revocation of deferred action are "an ingredient" to the

7    commencement of enforcement proceedings.  The jurisdictional limits of Section 1252(g) were

8    instead "directed at the deconstruction, fragmentation, and hence prolongation of removal

9    proceedings."  *AADC*, 525 U.S. at 482.

10                         **C.    Most Plaintiffs Have Standing.**

11          To establish standing, Article III of the United States Constitution requires plaintiffs

12   to show "(1) they suffered an injury in fact, (2) that is fairly traceable to the challenged conduct

13   of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo,*

14   *Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555,

15   560–61 (1992)).  The standing inquiry is focused on whether the plaintiff has a sufficient

16   personal stake in the outcome of the controversy to ensure that the parties will be truly adverse

17   and their legal presentations sharpened.  *Massachusetts v. EPA*, 549 U.S. 497 (2007).  Standing

18   must be assessed on a claim-by-claim basis.  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352

19   (2006).

20          Defendants do not dispute that the Individual Plaintiffs have standing.  Rather, they argue

21   in brief that the entity plaintiffs (the state and local governments, UC Plaintiffs, and SEIU Local

22   521) lack Article III standing because the rescission does not regulate or restrict them in any

23   way.  Defendants therefore posit that the entity plaintiffs' claimed injuries are due only to

24   "incidental effects" of the rescission, which defendants contend are insufficient to establish

25   injury-in-fact.  As set forth below, these arguments lack merit.

26          *First*, California, Maryland, the City of San Jose, and the County of Santa Clara each

27   employ DACA recipients, in connection with whom they have invested substantial resources

28   in hiring and training.  Plaintiffs allege that they will not only lose these employees as work

authorizations expire, but that they will also need to expend additional resources to hire and train replacements.  San Jose further alleges that as a result of the rescission, the City has had decreased productivity, and that it has had to expend time and resources to deal with decreased employee morale (States Compl. ¶¶ 26–27, 32, 53; San Jose Compl. ¶¶ 49–50; Santa Clara Compl. ¶¶ 32–37; App. 11, 95–97, 706–07, 798, 1575–76).

*Second*, Plaintiff States, including Maine and Maryland, stand to lose significant tax revenue as a result of the rescission (States Compl. ¶¶ 28–30, 37, 49–50, 70–71).  Although general allegations of injury to a state's economy and the associated decline in general tax revenues may not be sufficient to establish standing, here, Plaintiff States sufficiently allege a "direct injury in the form of a loss of specific tax revenues." *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992).  They allege, for example, that Maine stands to lose $96,000 in annual state and local taxes as DACA recipients leave the workforce (States Compl. ¶¶ 30, 38).  Evidence submitted by plaintiffs supports these allegations, and demonstrates that DACA's rescission would reduce state and local tax contributions by DACA-eligible individuals by at least half (App. 68–74, 218–30).

*Third*, the University of California has also established that it will suffer injury to its proprietary interests.  As declarations submitted by the University demonstrate, the rescission has harmed the University in multiple ways.  Because DACA recipients can no longer seek advance parole, these students are unable to travel outside of the United States for research and educational conferences.  DACA recipients have also decided to cancel their enrollment in the University, and additional recipients are at risk of dropping out, because they would not be able to pay the cost of attendance without work authorizations. The University has also invested resources in recruiting and retaining DACA recipients as employees in various roles, including as teaching assistants and health care providers.  Such investments would be lost should these employees lose their ability to work in the United States.

California, Maryland, and Minnesota also allege injury to their public universities through harm to their educational missions and the loss of students and teachers.  According to the declarations filed by plaintiffs, the rescission, and the resulting loss of work authorization

United States District Court

For the Northern District of California

1    and potential for deportation, will adversely impact the diversity of the talent pool of potential

2    students, which will make it more difficult for the universities to fulfill their missions of

3    increasing diversity (States Compl. ¶¶ 27, 55, 64–66; App. 12–16, 496–514, 884–90).  Our court

4    of appeals recently affirmed the standing of two state governments to challenge an immigration

5    policy that similarly harmed the plaintiffs' public universities.  *Washington v. Trump*, 847 F.3d

6    1151, 1160–01 (9th Cir. 2017).  These injuries accordingly give the University of California and

7    the States of California, Maryland, and Minnesota Article III standing.  *Ibid.* (citing *Singleton v.*

8    *Wulff*, 428 U.S. 106, 114–16 (1976)).[9]

9         *Fourth*, State Plaintiffs Maryland and Minnesota further allege that the rescission will

10   negatively impact their public health programs.  In particular, Maryland and Minnesota allege

11   that rescinding DACA will cause many DACA grantees to lose their employer-based health

12   insurance, imposing higher healthcare costs on the state (State Compl. ¶¶ 51, 62).  These injuries

13   are also sufficient to confer Article III standing.[10]

14        *Finally*, SEIU Local 521 has associational standing to bring its claims on behalf of its

15   members who are DACA recipients.  An association has standing to bring suit on behalf of its

16   members when:  (1) its members would otherwise have standing to sue in their own right;

17   (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the

18   claim asserted nor the relief requested requires the participation of individual members in the

19   lawsuit.  *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*,

20

21        [9]  The public universities of California, Maryland, and Minnesota are branches of the states under state
22   law.  *Campbell v. Regents of Univ. of California*, 35 Cal. 4th 311, 321 (2005)*; Hanauer v. Elkins*, 217 Md. 213,
     219, 141 A.2d 903, 906 (Md. 1958)*; Univ. of Minn. v. Raygor*, 620 N.W.2d 680, 683 (Minn. 2001).

23        [10]  Although not discussed by the parties, the District of Columbia Circuit held that Joe Arpaio, Sheriff
24   of Maricopa County, Arizona, lacked Article III standing to challenge DACA.  *Arpaio v. Obama*, 797 F.3d 11
     (D.C. Cir. 2015).  While the court of appeals found that the plaintiff's alleged harm — increased spending on
     criminal investigation, apprehension, and incarceration — was sufficiently concrete, his theory that DACA
25   would lead to an increased number of undocumented immigrants committing crimes in his jurisdiction was too
     speculative.  *Id.* at 19–20.  Here, by contrast, plaintiffs allege that the rescission will cause DACA recipients to
26   lose their work authorizations, and that plaintiffs will lose employees and students, suffer decreased tax revenue,
     and otherwise incur increased costs as a direct result.  This case is also different from *Crane v. Johnson*,
27   783 F.3d 244, 252 (5th Cir. 2015), where the Fifth Circuit held that Mississippi lacked standing to challenge
     DACA because it failed to submit evidence that DACA eligible immigrants resided in the state.  Defendants do
28   not dispute State Plaintiffs' allegations that hundreds of thousands of DACA recipients live in Plaintiff States.

477 U.S. 274, 282 (1986) (quoting *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)).  SEIU has established all three elements here.  SEIU has members who are DACA recipients.  Its constitution states that part of its mission is to provide its members with a voice in the larger community, and that its members should be treated equally with dignity regardless of immigration status or national origin.  SEIU has also formed a Committee on Comprehensive Immigration Reform, a member-based committee that engages in organizing, advocacy, and education to help undocumented workers.  Its members' interests in these actions are therefore germane to SEIU's stated purpose (App. 801–09).  Furthermore, this action does not require the participation of SEIU's individual members.

Defendants, in arguing that the entity plaintiffs lack standing, rely solely on *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973).  There, the plaintiff lacked standing to challenge a Texas state court's interpretation of a child support statute.  *Ibid.*  The Supreme Court held that, although the plaintiff had alleged an injury, she had not shown "a direct nexus between the vindication of her interest and the enforcement of the State's criminal laws" because the relationship between the state's decision not to prosecute and the father's decision not to pay under the statute could "at best, be termed only speculative." *Id.* at 618–19.  *Linda R.S.* has no application here.  As explained above, the entity plaintiffs have alleged harm to their proprietary interests as a direct result of defendants' decision to terminate the DACA program, most notably through its termination of work authorizations.  Accordingly, the entity plaintiffs have sufficiently alleged injury-in-fact traceable to the termination of DACA, and have demonstrated that these harms are redressable by their requested relief.[11]

Turning to prudential standing under the APA, a plaintiff must show that it has suffered or will suffer sufficient injury-in-fact, and that "the interest[s] sought to be protected by the complainant [are] arguably within the zone of interests to be protected or regulated by the statute . . . in question."  *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 488 (1998).

---

[11]  Because defendants' conduct imposes direct injury on the State Plaintiffs' proprietary interests, this order need not reach defendants' argument that the State Plaintiffs lack standing as *parens patriae.*

United States District Court

For the Northern District of California

1       A plaintiff that is not itself the subject of the contested regulatory action lacks prudential

2   standing only where its interests "are so marginally related to or inconsistent with the purposes

3   implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the

4   suit." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987).  This test is "not meant to be

5   especially demanding," and must be applied "in keeping with Congress's evident intent when

6   enacting the APA to make agency action presumably reviewable."  *Match-E-Be-Nash-She-Wish*

7   *Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (quotations and citations

8   omitted).

9       The parties' briefs include only a cursory discussion of plaintiffs' prudential standing

10  under the APA.  Again, defendants do not dispute that the Individual Plaintiffs also have

11  statutory standing.  SEIU, which asserts the rights of its members who are DACA recipients,

12  likewise seeks the protection of interests regulated by the INA.  Not all of the entity plaintiffs,

13  however, have established prudential standing to proceed on their APA claims.

14      Plaintiffs primarily rely on our court of appeals' recent decision in *Hawaii v. Trump*,

15  859 F.3d 741, 765 (9th Cir. 2017), as well as on various provisions of the INA which provide for

16  student- and employment-related immigrant visas.  Plaintiffs do not contend, however, that their

17  DACA-recipient students or employees qualify for such visas.  Nor do plaintiffs point to

18  any provisions of the INA which indicate a protected interest in enrolling students with deferred

19  action in their schools or universities.  Plaintiffs are also unable to point to any provision of the

20  INA indicating that Congress intend to protected Plaintiff States' interests in maintaining income

21  tax revenue or avoiding increased healthcare costs.

22      By contrast, local and state governments San Jose, Santa Clara, California, and

23  Maryland, as well as the University of California, have all identified injuries resulting from their

24  status as employers, and allege harm caused by their employees' future loss of deferred action

25  and associated work authorization.  The INA gives the Executive Branch broad discretion to

26  determine when noncitizens may work in the United States, 8 U.S.C. § 1324a(h)(3), and

27  regulations promulgated pursuant to this authority allow recipients of deferred action to apply

28  for work authorization if they can demonstrate an "economic necessity for employment."

8 C.F.R. § 274a.12(c)(14).  Moreover, the INA contains detailed provisions which subject

employers to criminal and civil liability for knowingly hiring unauthorized aliens, *see* 8 U.S.C.

§ 1324a(a)(1)(A), and for "continu[ing] to employ the alien in the United States knowing

the alien is (or has become) an unauthorized alien with respect to such employment," *id.*

§ 1324a(a)(2).  The work authorization document that the agency issues to DACA recipients

is one of the documents that is acceptable for Form I-9, Employment Eligibility Verification,

which employers must complete and retain for each individual they hire for employment in the

United States (App. 2061–62).  Plaintiffs' interest in their employees' continued authorization

to work in the United States is therefore "arguably within the zone of interests" that the INA

protects.  *Hawaii*, 859 F.3d at 765*; Nat'l Credit Union Admin.*, 522 U.S. at 488.[12]

Accordingly, even though the zone of interests inquiry is not demanding, this order

concludes that Maine and Minnesota's interests are "so marginally related" to the purposes

implicit in the INA that it cannot reasonably be assumed that Congress intended to permit the

suit.  Maine and Minnesota's APA claims are accordingly **DISMISSED WITH LEAVE TO AMEND**.

The remaining entity plaintiffs, however, have established that their interests that support

Article III standing also satisfy the APA's zone of interests test.

\*               \*               \*

Apart from the holding that Maine and Minnesota do not have statutory standing, the

foregoing rejects all of the government's jurisdictional arguments to dismiss plaintiffs'

challenges under the Administrative Procedure Act.

### 2.    PROVISIONAL RELIEF.

Plaintiffs seek a preliminary injunction to restore DACA.  To support a preliminary

injunction, plaintiffs must establish four elements:  (1) likelihood of success on the merits;

(2) irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in

---

[12]  Defendants' sole argument against the entity plaintiffs' prudential standing is that no provision of the INA protects the entity plaintiffs from "bearing the incidental effects" of a denial of deferred action. The case on which defendants rely, however, dealt with a private anti-immigration organization whose members were not impacted by the immigration policy at issue.  *See Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 899 (D.C. Cir. 1996).

their favor; and (4) that the injunction is in the public interest.  *Winter v. Natural Resources Defense Council Inc*., 555 U.S. 7, 20 (2008).  As now explained, the record warrants most of the provisional relief requested.

### A.     Likelihood of Success on the Merits.

Plaintiffs have shown a likelihood of success on their claim that the rescission was arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law.  Specifically, plaintiffs are likely to succeed on their claims that:  (1) the agency's decision to rescind DACA was based on a flawed legal premise; and (2) government counsel's supposed "litigation risk" rationale is a post hoc rationalization and would be, in any event, arbitrary and capricious.

#### (1)     *The Rescission was Based on a Flawed Legal Premise.*

The agency action was "not in accordance with law" because it was based on the flawed legal premise that the agency lacked authority to implement DACA.  When agency action is based on a flawed legal premise, it may be set as aside as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *See Massachusetts*, 549 U.S. at 532 (setting aside the EPA's denial of a petition for rulemaking under the Clean Air Act for supposed lack of authority); *Safe Air for Everyone v. EPA*, 488 F.3d 1088, 1101 (9th Cir. 2007).  This order holds that DACA fell within the agency's enforcement authority.  The contrary conclusion was flawed and should be set aside.

The administrative record includes the 2014 determination of the Office of Legal Counsel of the United States Department of Justice that programmatic deferred action is a permissible exercise of DHS's enforcement discretion.  OLC noted that deferred action programs such as DACA are permissible so long as immigration officials retain discretion to evaluate each application on an individualized basis and so long as the concerns animating the program were consistent with the types of concerns that have customarily guided the exercise of immigration enforcement discretion.  OLC recognized that the "practice of granting deferred action date[d] back several decades," and that "Congress has long been aware of the practice of granting deferred action, including in its categorical variety, and of its salient features; and it has never

United States District Court

For the Northern District of California

1   acted to disapprove or limit the practice."  Indeed, not only has Congress not limited the practice,

2   but it has "enacted several pieces of legislation that have either assumed that deferred action

3   would be available in certain circumstances, or expressly directed that deferred action be

4   extended to certain categories of aliens" (AR 15–27).

5        As explained in OLC's opinion, each feature of the DACA program is anchored in

6   authority granted or recognized by Congress or the Supreme Court.  Because this is the heart

7   of the problem, and with apology for some repetition, this order will now examine each feature

8   in turn.

9        The Secretary of Homeland Security is responsible under the INA for "establishing

10   national immigration enforcement policies and priorities."  6 U.S.C. § 202(5).  The Secretary is

11   also charged with the administration and enforcement of the INA.  8 U.S.C. § 1103.  In making

12   immigration enforcement decisions, the executive "considers a variety of factors such as the

13   danger posed to the United States of an individual's unlawful presence, the impact of removal

14   on the nation's international relations, and the 'human concerns' of whether the individual 'has

15   children born in the United States, long ties to the community, or a record of distinguished

16   military service.'"  *Arpaio v. Obama*, 797 F.3d 11, 16 (D.C. Cir. 2015) (citing *Arizona v. United*

17   *States*, 132 S. Ct. 2492, 2499 (2012)).  In instituting DACA, Secretary Napolitano explained that

18   the program was "necessary to ensure that [DHS's] enforcement resources are not expended on

19   [] low priority cases but are instead appropriately focused on people who meet our enforcement

20   priorities" (AR 1).[13]

21        As set forth above, deferred action originated without any statutory basis apart from the

22   discretion vested by Congress in connection with the agency's enforcement of the immigration

23   laws.  Over the decades, however, deferred action became such a fixture that Congress referred

24   to it by name in several INA amendments.  *See*, *e.g.*, 8 U.S.C. § 1227(d)(2) (stating that U visa

25   and T visa applicants who were denied an administrative stay of removal were not precluded

26   from applying for "deferred action"); 8 U.S.C. § 1154(a)(1)(D)(i)(II) (stating that eligible

27

28        [13]  The United States Court of Appeals for the District of Columbia Circuit did not reach the merits of
Sheriff Joe Arpaio's challenges to DACA and DAPA but instead dismissed the case for lack of Article III
standing.  *Arpaio*, 797 F.3d at 15.

derivatives of VAWA petitioners were eligible for "deferred action" and work authorization); 8 U.S.C. § 1151 note (stating that certain immediate family members of certain United States citizens "shall be eligible for deferred action"). Congress has also acknowledged deferred action in enactments outside of the INA. *See*, *e.g.*, 49 U.S.C. § 30301 note (specifying that evidence of lawful status includes proof of "deferred action status"); USA PATRIOT Act of 2001, Pub. L. No. 107-56, § 423(b), 115 Stat. 272, 361 (stating that immediate family members of legal permanent residents killed on September 11, 2001 "may be eligible for deferred action"). Congress has been free to constrain DHS's discretion with respect to granting deferred action, but it has yet to do so.

The Supreme Court has recognized the authority of DHS to grant relief from removal, *Arizona*, 567 U.S. at 396, and has specifically recognized deferred action as a way to exercise that discretion — "for humanitarian reasons or simply for [the Executive's] own convenience." *AADC*, 525 U.S. at 484. Notably, our court of appeals has said that "the exercise of prosecutorial discretion in deferred action flows from the authority conferred on the Secretary by the INA." *Arizona Dream Act Coal. v. Brewer*, 855 F.3d 957, 968 (9th Cir. 2017) ("*Brewer II*").[14]

In extending programmatic deferred action to DACA enrollees, the agency acted within the scope of this long and recognized practice. In the exercise of its enforcement discretion and policy-making, the agency simply found that DACA enrollees represented low priority cases for removal and instituted DACA to manage that population while it redirected its resources elsewhere. Even for enrollees approved under the program, DHS expressly retained the authority to terminate their deferred action at any time, in the agency's discretion. DACA provided no guarantee against removal.

Nevertheless, DACA has provided recipients with a major benefit, namely work authorizations for the period of deferral upon a demonstration of economic need. This has

---

[14] In *Brewer II*, our court of appeals denied a petition for rehearing en banc. Circuit Judge Kozinski, joined by five other Circuit Judges, filed a dissent to the denial of the petition, expressing the view that DACA did not preempt Arizona's law refusing to issue drivers' licenses to DACA recipients. 855 F.3d at 958–62.

United States District Court

For the Northern District of California

1    allowed DACA recipients to become part of the mainstream workforce and contribute openly

2    to our economy.  Significantly, Section 1324a(h)(3) defines an "unauthorized alien" not entitled

3    to work in the United States as an alien who is neither a legal permanent resident nor "authorized

4    to be . . . employed by [the INA] or by the [Secretary of Homeland Security]."  In turn, the

5    Secretary of Homeland Security has allowed work authorizations in cases of deferred action

6    under 8 C.F.R. § 274a.12(c)(14).  As our court of appeals has stated, "the Executive Branch has

7    determined that deferred action recipients — including DACA recipients — are ordinarily

8    authorized to work in the United States."  *See Brewer I*, 757 F.3d at 1062.

9          It is also within the lawful authority of the agency to determine that DACA recipients

10   do not accrue "unlawful presence" for purposes of the INA's bars on re-entry.  Pursuant to

11   pre-existent DHS regulations and policy guidance, deferred action recipients already avoided

12   accrual of "unlawful presence."  8 C.F.R. § 214.14(d)(3); 28 C.F.R. § 1100.35(b)(2);

13   Memorandum for Field Leadership, from Donald Neufeld, Acting Associate Director, Domestic

14   Operations Directorate, USCIS, *Re: Consolidation of Guidance Concerning Unlawful Presence*

15   *for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(i) of the Act* at 42 (May 6, 2009).

16   Importantly, DHS excludes recipients of deferred action from being "unlawfully present"

17   because their deferred action is considered a period of stay authorized by the government.  *See* 8

18   U.S.C. § 1182(a)(9)(B)(ii) (an alien is deemed to be unlawfully present if the alien is present "in

19   the United States after the expiration of the period of stay authorized by the Attorney General

20   [and now the Secretary of Homeland Security]"); *Brewer I*, 757 F.3d at 1059.

21         Allowing DACA recipients to apply for and obtain advance parole to travel overseas and

22   return to the United States is also in accord with pre-existing regulations.  8 C.F.R. § 212.5(f);

23   8 U.S.C. § 1182(d)(5)(A) (the Attorney General [and now the Secretary of Homeland Security]

24   may "in his discretion parole into the United States temporarily under such conditions as he

25   may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public

26   benefit").

27         In short, what exactly is the part of DACA that oversteps the authority of the agency?

28   Is it the granting of deferred action itself?  No, deferred action has been blessed by both the

United States District Court
For the Northern District of California

1   Supreme Court and Congress as a means to exercise enforcement discretion.  Is it the granting

2   of deferred action via a program (as apposed to ad hoc individual grants)?  No, programmatic

3   deferred action has been in use since at least 1997, and other forms of programmatic

4   discretionary relief date back to at least 1956.  Is it granting work authorizations coextensive

5   with the two-year period of deferred action?  No, aliens receiving deferred action have been able

6   to apply for work authorization for decades.  Is it granting relief from accruing "unlawful

7   presence" for purposes of the INA's bars on reentry?  No, such relief dates back to the George

8   W. Bush Administration for those receiving deferred action.  Is it allowing recipients to apply for

9   and obtain advance parole?  No, once again, granting advance parole has all been in accord

10  with pre-existing law.  Is it combining all these elements into a program?  No, if each step is

11  within the authority of the agency, then how can combining them in one program be outside its

12  authority, so long as the agency vets each applicant and exercises its discretion on a case-by-case

13  basis?

14      Significantly, the government makes no effort in its briefs to challenge any of the

15  foregoing reasons why DACA was and remains within the authority of the agency.  Nor does the

16  government challenge any of the statutes and regulations under which deferred action recipients

17  obtain the foregoing benefits.

18      Instead, the administrative record shows that the Attorney General told the Acting

19  Secretary that DACA was illegal.  *First*, the Attorney General said that DACA had been

20  improperly adopted by the Obama Administration after "Congress' repeated rejection of

21  proposed legislation that would have accomplished a similar result."  But the proposals rejected

22  by Congress markedly differ from DACA.  *Importantly, while the proposed legislation would

23  have offered Dreamers the ability to become lawful permanent residents, no comparable

24  pathway was offered by DACA.*  Our court of appeals recognized this distinction, noting that "the

25  DREAM Act and the DACA program are not interchangeable policies because they provided

26  different forms of relief."  *Brewer II*, 855 F.3d at 976 n.10.  In fact, the 2012 DACA memo

27  made explicit that DACA offered no pathway to lawful permanent residency, much less

28  citizenship.  Secretary Napolitano concluded her memo by stating that DACA "confer[ed] no

United States District Court

For the Northern District of California

1   substantive right, immigration status or pathway to citizenship." To claim that DACA was

2   rejected by Congress, therefore, is unfair.[15]

3       *Second*, another criticism of DACA was that applications received mechanical, routine

4   approval without individualized consideration. In her rescission memorandum, the Acting

5   Secretary indicated that "[United States Citizenship and Immigration Services] has not been

6   able to identify specific denial cases where an applicant appeared to satisfy the programmatic

7   categorical criteria as outlined in the [original DACA] memorandum, but still had his or her

8   application denied based solely upon discretion." The simple answer to this, if true, would be

9   for the agency to instruct its adjudicators to exercise discretion, on a individualized basis, to

10  make sure applicants do not pose a threat to national security or public safety and are otherwise

11  deserving of deferred action.

12      It appears, moreover, that the Acting Secretary was in error when she said that USCIS

13  has been unable to identify discretionary denials of DACA applications. She cited no evidence

14  for this fact, and none is found in the administrative record. Possibly, the Acting Secretary relied

15  on findings made in the DAPA litigation. There, the majority panel noted that USCIS could not

16  produce any applications that satisfied the guidelines of the original DACA memorandum but

17  were nonetheless refused through an exercise of discretion. *Texas*, 809 F.3d at 172. As the

18  dissent pointed out, however, the district court may have conflated *rejections* of DACA

19  applications with *denials*, and as a result suggested that most denials were made for mechanical,

20  administrative reasons. *Id.* at 210 (King, J., dissenting). A declaration submitted in that case by

21  Donald Neufeld, then-Associate Director for Service Center Operations for USCIS, pointed to

22  several instances of discretionary denials. *Id.* at 175. That same declaration explained that while

23  a DACA application was *rejected* when it was "determined upon intake that the application [had]

24  a fatal flaw," an application was *denied* when a USCIS adjudicator, on a case-by-case basis,

25  determined that the requestor either had not demonstrated that they satisfied the guidelines for

26

27      [15] *See*, *e.g.*, S. 1291, 107th Congress (2001); S. 1545, 108th Congress (2003); S. 2075, 109th Congress (2005); H.R. 5131, 109th Congress (2006); H.R. 1275, 110th Congress (2007); S. 2205, 110th Congress (2007);

28  H.R. 1751, 111th Congress (2009); S. 3827, 111th Congress (2010); S. 3962, 111th Congress (2010); S. 3992, 111th Congress (2010); H.R. 6497, 111th Congress (2010); S. 952, 112th Congress (2011).

34

United States District Court

For the Northern District of California

DACA *or* when an adjudicator determined that deferred action should be denied even though the threshold guidelines were met. *Id.* at 210–11 (dissent).  The United States District Court for the District of Columbia, in addressing nearly identical statistics, recognized the distinction. The district court noted that as of December 2014, 36,860 requests for deferred action under DACA were denied and another 42,632 applicants were rejected as not eligible, and concluded that such statistics "reflect that [] case-by-case review is in operation."  *Arpaio*, 27 F. Supp. 3d at 209 n.13.  The administrative record tendered in our case completely fails to explain this apparent discrepancy.

*Third*, the main ground given by the Attorney General for illegality was the Fifth Circuit's decision in the DAPA litigation.  DACA, the Attorney General said, suffered from the same "legal and constitutional defects" leveled against DAPA in *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015).  Upon consideration of the full history of that case, however, this was an overstatement.

In the DAPA litigation, the district court held that DAPA violated the APA's notice-and-comment procedures because it constituted "a new rule that substantially change[d] both the status and employability of millions" and inflicted "major costs on both states and federal government."  The district court found that the discretionary aspects of DAPA were "merely pretext," based on its finding that DACA had been implemented in such a mechanical way as to prevent the exercise of discretion on a case-by-case basis, and DAPA would therefore be implemented in the same manner.  Notice and opportunity for public comment, it held, should have accordingly been given. *Texas,* 86 F. Supp. 3d at 671.

Although the Fifth Circuit recognized that "there was conflicting evidence on the degree to which DACA allowed discretion," because the government had failed to produce any applications that satisfied all of the criteria but were refused deferred action by an exercise of discretion, it was "not error — clear or otherwise —" for the district court to have concluded that DHS had only issued denials under mechanical formulae.  The appellate court also pointed to DACA's Operating Procedures, which contained "nearly 150 pages of specific instructions for

United States District Court

For the Northern District of California

1  granting or denying deferred action," as supporting the conclusion that DACA did not leave the

2  agency free to exercise discretion.

3       It cautioned, however, that "*[f]or a number of reasons, any extrapolation from DACA*

4  *must be done carefully.*"  *Texas*, 809 F.3d at 173 (emphasis added).  In particular, the appellate

5  court recognized that DACA involved self-selecting applicants, and those who expected to be

6  denied relief were unlikely to apply.  *Id*. at 174.  The court also recognized that "*DACA and*

7  *DAPA are not identical*" and that because eligibility for DACA was restricted to a younger and

8  less numerous population, DACA applicants were less likely to have backgrounds that would

9  warrant a discretionary denial.  *Ibid.*

10      In addition to affirming the notice-and-comment holding (over one dissent), two of the

11  judges on the Fifth Circuit panel went a large step further and held that DAPA conflicted with

12  the INA.  The majority pointed out that the INA already had a specific provision through which

13  aliens could derive lawful status from their children's immigration status.  *Id.* at 180 n.167

14  (citing 8 U.S.C. §§ 1151(b)(2)(A)(i), 1182(a)(9)(B)(i)(II), 1201(a), 1255).  DAPA, the majority

15  said, circumvented this statutory pathway.

16      The Fifth Circuit also pointed out that the INA had specific provisions through which

17  aliens could be classified as "lawfully present," could obtain discretionary relief from removal,

18  or could obtain eligibility for work authorization.  Because DAPA could make 4.3 million

19  removable aliens eligible for lawful presence, employment authorization, and associated

20  benefits, the Fifth Circuit concluded that DAPA implicated "questions of deep 'economic and

21  political significance' that are central to [the INA's] statutory scheme," and therefore had

22  Congress wished to assign that decision to an agency, "it surely would have done so expressly."

23      The Fifth Circuit rejected the argument that various provisions of the INA, such as the

24  broad grant of authority to the agency in 6 U.S.C. § 202(5) (providing that the Secretary "shall

25  be responsible for establishing national immigration enforcement policies and priorities"),

26  provided the authority to implement DAPA.  Rather, it found that such grants of authority could

27  not reasonably be construed as assigning the agency decisions of such massive "economic and

28  political significance."  Such an interpretation, the majority said, would allow the agency to

36

United States District Court

For the Northern District of California

1    grant lawful presence and work authorization to any illegal alien in the United States.  It

2    concluded that "even with 'special deference' to the Secretary," the INA did not permit the

3    reclassification of 4.3 million aliens as "lawfully present," thereby making them newly eligible

4    for a host of federal and state benefits, including work authorization.

5        The majority also rejected the argument that DAPA was moored in historical practice,

6    finding that such historical practice "does not, by itself, create power," and that in any event,

7    previous deferred-action programs were not analogous to DAPA because most discretionary

8    deferrals had been done on a country-specific basis, usually in response to war, civil unrest, or

9    natural disasters, or had been bridges from one legal status to another.  It found that "[n]othing

10   like DAPA, which alters the status of more than four million aliens, has ever been contemplated

11   absent direct statutory authorization."

12       The majority concluded that Congress had "directly addressed the precise question

13   at issue" in DAPA because the INA "prescribes how parents may derive an immigration

14   classification on the basis of their child's status and which classes of aliens can achieve deferred

15   action and eligibility for work authorization."  *Texas*, 809 F.3d at 186.  Because it found that

16   DAPA was foreclosed by Congress's "careful plan," the majority held that the program was

17   "manifestly contrary to the statute."

18       While at least some of the majority's reasons for holding DAPA illegal would apply to

19   DACA, fairness requires saying that DACA and DAPA were different, as the panel opinion

20   stated.  An important criticism against DAPA would *not* apply against DACA, namely the fact

21   that Congress had already established a pathway to lawful presence for alien parents of citizens

22   (so that DAPA simply constituted a more lenient substitute route).  DACA, by contrast, has no

23   such analogue in the INA.  And, there is a difference between 4.3 million and 689,800.  Finally,

24   the criticism that DACA had been mechanically administered without the exercise of discretion

25   in individual cases, if true, could be fixed by simply insisting on exercise of discretion.  In sum,

26   the DAPA litigation was not a death knell for DACA.

27       This order holds that, in light of our own court of appeals' reasoning in *Brewer I* and

28   *Brewer II*, in light of the analysis of the Office of Legal Counsel of the United States Department

United States District Court
For the Northern District of California

1  of Justice, and the reasoning set forth above, our court of appeals will likely hold that DACA

2  was and remains a lawful exercise of authority by DHS.  Plaintiffs are therefore likely to succeed

3  on the merits of their claim that the rescission was based on a flawed legal premise and must be

4  set aside as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

5  law." *Massachusetts*, 549 U.S. at 528; *Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 94

6  (1943); *Safe Air for Everyone*, 488 F.3d at 1101.[16]

> ### (2)   Government Counsel's Alternative Rationale Is Post Hoc and, in Any Event, Arbitrary, Capricious, and an Abuse of Discretion.

9  Government counsel now advances an alternative rationale for the Secretary's decision to

10  rescind DACA.  Counsel contends that DHS acted within its discretion in managing its litigation

11  exposure in the Fifth Circuit, weighing its options, and deciding on an orderly wind down of the

12  program so as to avoid a potentially disastrous injunction in the Fifth Circuit.  This, they say,

13  constituted a reasonable judgment call involving management of litigation risk and agency

14  resources.

15  Courts, of course, may not accept post hoc rationalizations for agency action, *see*

16  *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962), nor may they "supply a

17  reasoned basis for the agency's action that the agency itself has not given."  *Bowman Transp.,*

18  *Inc. v. Ark.-Best Freight Sys.*, 419 U.S. 281, 285–86 (1974); *see also Cal. Pub. Util. Comm'n v.*

19  *Fed. Energy Regulatory Comm'n*, No. 16-70481 at 15 (9th Cir. Jan. 8, 2018).  Rather, "an

20  agency's action must be upheld, if at all, on the basis articulated by the agency itself."  *Motor*

21  *Vehicle Mfrs. Ass'n. of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50

22  (1983).

---

[16]  Defendants argue that if the Acting Secretary *had relied* on DACA's purported illegality in terminating the program, that reliance should be presumed to be a "reasonable policy judgment that immigration decisions of this magnitude should be left to Congress."  This argument finds no support in the administrative record.  In *Syracuse Peace Council v. F.C.C.*, upon which defendants rely, the agency explicitly based its decision on the independent grounds that a policy was both unconstitutional and contrary to the public interest. 867 F.2d 654, 656 (D.C. Cir. 1989).  Although the court of appeals elected to review only the agency's policy determination under the APA, it noted that "if the Commission had written its opinion in purely constitutional terms, we would have no choice but to address the constitutional issue."  *Id.* at 659.

United States District Court
For the Northern District of California

The reason actually given in the administrative record for the rescission was DACA's purported illegality.  The Attorney General's letter and the Acting Secretary's memorandum can only be reasonably read as stating DACA was illegal and that, *given that DACA must, therefore, be ended,* the best course was "an orderly and efficient wind-down process," rather than a potentially harsh shutdown in the Fifth Circuit.  Nowhere in the administrative record did the Attorney General or the agency consider whether defending the program in court would (or would not) be worth the litigation risk.  The new spin by government counsel is a classic post hoc rationalization.  That alone is dispositive of the new "litigation risk" rationale.

Significantly, the INA itself makes clear that once the Attorney General had determined that DACA was illegal, the Acting Secretary had to accept his ruling as "controlling."  Section 1103(a)(1) of Title 8, a provision that allocates immigration power and duties among the Secretary of Homeland Security, the Secretary of State, and the Attorney General, provides that "determinations and rulings by the Attorney General with respect to all questions of law shall be controlling."  Therefore, once the Attorney General advised the Acting Secretary that DACA was illegal, that ruling became "controlling" upon her.  She had no choice other than to end DACA.  She had no room to push back with arguments for the program, to weigh litigation risks, or to consider whether DACA recipients warranted fighting for.  The ruling of law by the Attorney General, controlling upon her, made all such considerations moot.  Therefore, the new spin by government counsel that the decisionmaker here indulged in a litigation risk assessment and, out of caution, chose not to fight for the program in favor of an orderly wind-down is foreclosed by the INA itself.  Her wind-down references plainly presuppose that DACA had to end and the only question was how.

Nevertheless, this order now indulges government counsel's new explanation and addresses whether it holds up even if taken as authentic.  In that event, two major criticisms can and should be made of the "litigation risk management" rationale.

*First*, even as to the risk in the Fifth Circuit, the administrative record mentions only similarities between DAPA and DACA (and even then only in an exceedingly conclusory way).  No mention appears concerning the *differences* between DAPA and DACA that might have led

United States District Court

For the Northern District of California

to a different result. In addition to the distinctions made above, one powerful consideration should have been the doctrine of laches. Unlike the DAPA challenge filed immediately after DAPA was announced, the threatened DACA challenge by ten states would have come *five years after the program began and after hundreds of thousands of young adults had enrolled and entered the workforce. See Abbott Labs., Inc. v. Gardner*, 387 U.S. 136, 155 (1967) (adopting laches in APA context); *see also Arpaio v. Obama*, 27 F. Supp. 3d 185, 210 (D.D.C. 2014), aff'd, 797 F.3d 11 (D.C. Cir. 2015) (noting that even if plaintiff did have standing he could not demonstrate irreparable harm since he waited two years to challenge DACA). Another difference was that DACA was precisely the kind of interstitial program of deferred action seemingly approved even by the Fifth Circuit, *Texas*, 809 F.3d at 185, given that both sides of the aisle and our two most recent presidents have called for Dreamer legislation. Nor was there any mention of our own circuit's more recent decision in *Brewer II* that favored DACA, or of recognition by the district court in the District of Columbia that DACA had, contrary to the Fifth Circuit, involved discretionary denials of DACA relief.

*Second*, if we are to indulge the spin that the decision to end DACA rested on a litigation-management assessment (rather than on a ruling of illegality), then the Acting Secretary committed a serious error. Against the litigation risk the Acting Secretary should have — but did not — weigh DACA's programmatic objectives as well as the reliance interests of DACA recipients. *Encino Motorcars, LLC v. Navarro*, — U.S. —, 136 S. Ct. 2117, 2126–27 (2016). This responsibility lay with the Acting Secretary, not the Attorney General. That is, once the Acting Secretary was informed of the supposed litigation risk, it remained her responsibility to balance it against competing policy considerations. It remained her responsibility to recognize the litigation risk, yet still ask whether the program was worth fighting for. The administrative record is utterly silent in this regard.

The agency reversed over five years of DHS policy, did so only one day after the Attorney General's letter, and did so just three months after Secretary Kelly had continued the program (despite the Fifth Circuit's decision and affirmance). The Acting Secretary failed to provide a "reasoned explanation" as to why she was "disregarding facts and circumstances

United States District Court

For the Northern District of California

1    which underlay or were engendered by the prior policy." *See F.C.C. v. Fox Television Stations,*

2    *Inc.*, 556 U.S. 502, 516 (2009).

3         *Encino Motorcars* seems very close on point.  There, the Supreme Court addressed the

4    Department of Labor's reversal of an interpretive regulation construing the Fair Labor Standard

5    Act's minimum wage and overtime provisions for car dealership employees.  Our court of

6    appeals gave *Chevron* deference to the new interpretation.  The Supreme Court reversed.

7    In determining whether the regulation was "procedurally defective" — and accordingly whether

8    the agency's regulation warranted *Chevron* deference — the Supreme Court evaluated whether

9    the agency had given adequate reasons for its decision to reverse course.  *Encino Motorcars*,

10   136 S. Ct. at 2125 (citing *Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 43).  The Supreme Court

11   explained (at page 2126) that while agencies are free to change their existing policies, they must

12   provide a reasoned explanation for a change (quotes and citations omitted):

13            In explaining its changed position, an agency must also be
              cognizant that longstanding policies may have engendered serious
14            reliance interests that must be taken into account.  In such cases
              it is not that further justification is demanded by the mere fact
15            of policy change; but that a reasoned explanation is needed for
              disregarding facts and circumstances that underlay or were
16            engendered by the prior policy.  It follows that an unexplained
              inconsistency in agency policy is a reason for holding an
17            interpretation to be an arbitrary and capricious change from agency
              practice.
18
19   Because the agency "gave almost no reason at all" for its change in position, the Supreme Court

20   concluded that the agency had failed to provide the sort of reasoned explanation required in light

21   of the "significant reliance issues involved."  *Id.* at 2126–27.

22        So too here.

23        As there, the agency here reversed its interpretation of its statutory authority.  As there,

24   the administrative record here includes no analysis of the "significant reliance issues involved."

25   The parallel is striking.  In terminating DACA, the administrative record failed to address the

26   689,800 young people who had come to rely on DACA to live and to work in this country.

27   These individuals had submitted substantial personal identifying information to the government,

28   paid hefty fees, and planned their lives according to the dictates of DACA.  The administrative

United States District Court
For the Northern District of California

1   record includes no consideration to the disruption a rescission would have on the lives of DACA

2   recipients, let alone their families, employers and employees, schools and communities.[17]

3        Ironically, government counsel now cite material *outside* of the administrative record in

4   an attempt to show the Acting Secretary considered the plight of DACA recipients (Dkt. 204 at

5   10, 12, 19–20).  This press release came after the fact and was not part of the administrative

6   record, and therefore cannot now rescue the agency.  In that respect, *Cal. Pub. Util. Comm'n*,

7   No. 16-70481 at 17 n.4 is analogous.  There, our court appeals refused to consider an agency's

8   position which was not advanced in connection with the decision under review but, rather, was

9   offered for the first time afterwards.

10        Defendants next argue that because no statute here dictated the factors for an agency to

11   consider in granting or rescinding deferred action, the agency need not have given weight to the

12   benefits of the DACA program or the harm that would be caused to its recipients upon its

13   rescission.  The Supreme Court has recognized, however, that "[c]onsideration of cost reflects

14   the understanding that reasonable regulation ordinarily requires paying attention to the

15   advantages *and* the disadvantages of agency decision." *Michigan v. EPA*, — U.S. —, 135 S. Ct.

16   2699, 2707 (2015).  While defendants attempt to distinguish *Michigan* on the ground that the

17   text of the statute required regulation there to be "appropriate and necessary," they ignore that a

18   change in agency policy requires the agency to have "good reasons for it." *Fox TV Stations,*

19   *Inc.*, 556 U.S. at 515.

20        Defendants, of course, are correct that when an agency reverses policy it "need not

21   demonstrate to a court's satisfaction that the reasons for the new policy are better than the

22   reasons for the old one." *Ibid*.  Where, however, an agency abruptly changes course and

23   terminates a program on which so many people rely, the APA requires "a more detailed

24   justification." *Ibid*.  Indeed, "[i]t would be arbitrary and capricious to ignore such matters."

25   *Ibid*.  In such cases, "it is not that further justification is demanded by the mere fact of policy

26   change; but that a reasoned explanation is needed for disregarding facts and circumstances that

27

28        [17] Here, perhaps in light of *Encino Motors*, the government does not argue that *Chevron* deference
should be afforded to the Attorney General's legal conclusion that DACA exceeded the agency's authority.

42

United States District Court

For the Northern District of California

1    underlay or were engendered by the prior policy." *Id.* at 515–16.  Defendants' attempt to portray

2    DACA as a program that did not generate reliance interests is unconvincing.  As plaintiffs'

3    evidence shows, DACA recipients, their employers, their colleges, and their communities all

4    developed expectations based on the possibility that DACA recipients could renew their deferred

5    action and work authorizations for additional two-year periods.

6         In sum, government counsel's alternative spin on the administrative record is just a post

7    hoc rationalization.  But, even if it had been the actual rationale, it was arbitrary, capricious, and

8    an abuse of discretion under *Encino Motors*.

9                              *                    *                    *

10        Accordingly, plaintiffs have shown that they are likely to succeed on the merits of their

11   claim that the rescission was arbitrary and capricious and must be set aside under the APA.

12                        **B.    Irreparable Harm.**

13        Plaintiffs have clearly demonstrated that they are likely to suffer serious irreparable harm

14   absent an injunction.  Before DACA, Individual Plaintiffs, brought to America as children, faced

15   a tough set of life and career choices turning on the comparative probabilities of being deported

16   versus remaining here.  DACA gave them a more tolerable set of choices, including joining the

17   mainstream workforce.  Now, absent an injunction, they will slide back to the pre-DACA era and

18   associated hardship.

19        The University of California and other entity plaintiffs have also demonstrated that they

20   face irreparable harm as they begin to lose valuable students and employees in whom they have

21   invested, and that loss of DACA recipients from the workforce will have a detrimental impact on

22   their organization interests, economic output, public health, and safety.

23        Our court of appeals recently confirmed that "prolonged separation from family

24   members" and "constraints to recruiting and retaining faculty members to foster diversity and

25   quality within the University community" are harms which are not compensable with monetary

26   damages and therefore weigh in favor of finding irreparable harm.  *Hawaii v. Trump*,

27   No. 17-17168, 2017 WL 6554184, at *22 (9th Cir. Dec. 22, 2017).  These showings accordingly

28

demonstrate that preliminary relief is appropriate. *Ibid.*; *see also Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013).

Defendants do not dispute that plaintiffs are likely to suffer such harms. Rather, they argue that these harms will not happen *before* the phase-out begins on March 5, 2018, the date by which the undersigned judge had wanted to present a final record and final decision for appellate review.

Delays in this case, however, have made it impossible to send a final judgment to our court of appeals by March 5. To take only one example, it would be unfair to reach a conclusion without giving plaintiffs an opportunity to examine the complete administrative record. Government counsel, however, succeeded in obtaining an order from the Supreme Court postponing proceedings on completing the administrative record until after ruling on its FRCP 12(b)(1) motion to dismiss. As a result, we have yet to receive a complete administrative record. Although plaintiffs are likely to prevail on even the truncated administrative record, as set forth above, our appellate court might disagree with that conclusion or the agency might seek to cure the flaws in its process via a fresh agency action. Plaintiffs are entitled to learn of all flaws, if any more there be, lurking in the whole record. One such possibility suggested by plaintiffs is that the rescission was contrived to give the administration a bargaining chip to demand funding for a border wall in exchange for reviving DACA. A presidential tweet after our hearing gives credence to this claim. Another possibility raised by plaintiffs is racial animus. These theories deserve the benefit of the full administrative record. It will be impossible to litigate this case to a fair and final conclusion before March 5.[18]

---

[18]  On December 29, 2017, President Trump tweeted: "The Democrats have been told, and fully understand, that there can be no DACA without the desperately needed WALL at the Southern Border and an END to the horrible Chain Migration & ridiculous Lottery System of Immigration etc. We must protect our Country at all cost!" (Dkt. No. 227-2). Plaintiffs separately request judicial notice of this tweet. Defendants object to judicial notice on various relevancy grounds, but do not argue that it is not properly subject to judicial notice under FRE 201 (Dkt. Nos. 227, 230). Plaintiffs' request is accordingly **GRANTED**.

*United States District Court*
For the Northern District of California

1

### C.    Balance of Equities and Public Interest.

2         On provisional relief motions, district judges must consider whether (or not) such relief

3    would be in the public interest.  On this point, we seem to be in the unusual position wherein the

4    ultimate authority over the agency, the Chief Executive, publicly favors the very program the

5    agency has ended.  In September, President Trump stated his support for DACA, tweeting:

6    "Does anybody really want to throw out good, educated and accomplished young people who

7    have jobs, some serving in the military?  Really! . . . ."  He has also called upon Congress to

8    ratify DACA, tweeting, "Congress now has 6 months to legalize DACA (something the Obama

9    Administration was unable to do).  If they can't, I will revisit this issue!" (App. 1958).

10        For the reasons DACA was instituted, and for the reasons tweeted by President Trump,

11   this order finds that the public interest will be served by DACA's continuation (on the conditions

12   and exceptions set out below).  Beginning March 5, absent an injunction, one thousand

13   individuals per day, on average, will lose their DACA protection.  The rescission will result in

14   hundreds of thousands of individuals losing their work authorizations and deferred action status.

15   This would tear authorized workers from our nation's economy and would prejudice their being

16   able to support themselves and their families, not to mention paying taxes to support our nation.

17   Too, authorized workers will lose the benefit of their employer-provided healthcare plans and

18   thus place a greater burden on emergency healthcare services.

19        On provisional relief motions, district judges must also weigh the balance of hardships

20   flowing from a grant versus denial of provisional relief.  The hardship to plaintiffs need not be

21   repeated.  The only hardship raised by defendants is interference with the agency's judgment on

22   how best to allocate its resources in keeping our homeland secure, as well as its judgment in

23   phasing out DACA.  Significantly, however, the agency's judgment here was not based on a

24   policy change.  It was based on a mistake of law.  If the instant order is correct that DACA fell

25   within the statutory and constitutional powers of the Executive Branch, then a policy supported

26

27

28

1   as high up as our Chief Executive has been the victim of a colossal blunder.  A preliminary

2   injunction will set that right without imposing any policy unwanted by the Executive Branch.[19]

3               **D.      Scope of Provisional Relief.**

4          For the foregoing reasons, defendants **ARE HEREBY ORDERED AND ENJOINED**, pending

5   final judgment herein or other order, to maintain the DACA program on a nationwide basis on

6   the same terms and conditions as were in effect before the rescission on September 5, 2017,

7   including allowing DACA enrollees to renew their enrollments, with the exceptions (1) that new

8   applications from applicants who have never before received deferred action need not be

9   processed; (2) that the advance parole feature need not be continued for the time being for

10  anyone; and (3) that defendants may take administrative steps to make sure fair discretion is

11  exercised on an individualized basis for each renewal application.

12         Nothing in this order prohibits the agency from proceeding to remove any individual,

13  including any DACA enrollee, who it determines poses a risk to national security or public

14  safety, or otherwise deserves, in its judgment, to be removed.  Nor does this order bar the agency

15  from granting advance parole in individual cases it finds deserving, or from granting deferred

16  action to new individuals on an ad hoc basis.

17         The agency shall post reasonable public notice that it will resume receiving DACA

18  renewal applications and prescribe a process consistent with this order.  The agency shall keep

19  records of its actions on all DACA-related applications and provide summary reports to the

20  Court (and counsel) on the first business day of each quarter.[20]

21

22         [19]  If a likelihood of irreparable injury is shown and an injunction is in the public interest, a preliminary
injunction is also appropriate when a plaintiff demonstrates that serious questions going to the merits are raised
and the balance of hardships tips sharply in the plaintiff's favor. *Alliance for the Wild Rockies v. Cottrell*,
23  632 F.3d 1127, 1134–35 (9th Cir. 2011).  Because plaintiffs have clearly demonstrated a likelihood of
24  irreparable injury and that the balance of hardships tips sharply in plaintiffs' favor, preliminary relief would also
be appropriate under this alternative standard of review.
25

26         [20]  A mandatory injunction orders a responsible party to take action, while "[a] prohibitory injunction
prohibits a party from taking action and preserves the status quo pending a determination of the action on the
merits." *Brewer I*, 757 F.3d at 1060.  The relevant status quo is the legally relevant relationship between the
27  parties before the controversy arose.  *Id.* at 1061.  Here, plaintiffs contest the validity of defendants' rescission
of DACA, the status quo before which was that DACA was fully implemented.  Accordingly, plaintiffs'
28  requested preliminary injunction is not mandatory.  But even if it were, plaintiffs have demonstrated that
sufficiently serious irreparable harm would result to warrant even a mandatory injunction.

United States District Court

For the Northern District of California

1    By way of explanation, while plaintiffs have demonstrated that DACA recipients,

2  as well as their families, schools, employers, and communities, are likely to suffer substantial,

3  irreparable harm as a result of the rescission, they have not made a comparable showing as to

4  individuals who have never applied for or obtained DACA.

5    This order will not require advance parole.  Unlike the widespread harm to plaintiffs and

6  our economy that would result were the 689,800 DACA enrollees to lose their ability to work in

7  this country, plaintiffs have not demonstrated that comparable harm will occur as a result of

8  DACA recipients' inability to travel abroad.  True, Individual Plaintiffs Jirayut Latthivongskorn

9  and Norma Ramirez describe professional disadvantages that may result if they are unable to

10  travel internationally.  These, however, do not amount to hardships justifying a provisional

11  injunction requiring DHS to resume accepting applications for advance parole.  However, as

12  stated, nothing in this order would bar individuals from asking for such agency relief or bar the

13  agency from granting it in deserving cases.

14    With respect to geographical scope, this order finds a nationwide injunction is

15  appropriate.  Our country has a strong interest in the uniform application of immigration law

16  and policy.  Plaintiffs have established injury that reaches beyond the geographical bounds

17  of the Northern District of California.  The problem affects every state and territory of the

18  United States.

19    In February 2017, our court of appeals considered this very issue in *Washington v.*

20  *Trump*, 847 F.3d 1151, 1167 (9th Cir. 2017), and upheld a nationwide injunction imposed by a

21  single district court, observing that limiting the geographic scope of an injunction on an

22  immigration enforcement policy "would run afoul of the constitutional and statutory

23  requirements for uniform immigration law and policy" and that, as here, "the government ha[d]

24  not proposed a workable alternative."  Indeed, the Fifth Circuit reached the same conclusion in

25  determining the appropriate scope of an injunction over DAPA, *Texas*, 809 F.3d at 187–88,

26

27

28

47

1  holding that uniform application of the immigration laws justified a nationwide injunction.  So

2  too here.[21]

3       Limiting relief to the States in suit or the Individual Plaintiffs would result in

4  administrative confusion and simply provoke many thousands of individual lawsuits all over the

5  country.  The most practical relief is to maintain DACA in the same manner to which the agency

6  and recipients are accustomed, subject to the exceptions above noted.

7                                **CONCLUSION**

8       Defendants' motion to dismiss under FRCP 12(b)(1) is **GRANTED IN PART** only to the

9  limited extent stated above and is otherwise **DENIED**.  Maine and Minnesota's APA claims are

10  hereby **DISMISSED**.  Maine or Minnesota may seek leave to amend and will have **21 CALENDAR**

11  **DAYS** from the date of this order to file a motion, noticed on the normal 35-day track, for leave to

12  file an amended complaint.  A proposed amended complaint must be appended to the motion and

13  plaintiffs must plead their best case.  Any such motion should clearly explain how the

14  amendments to the complaint cure the deficiencies identified herein.  To the extent stated above,

15  plaintiffs' motion for provisional relief is **GRANTED**.  A separate order will address defendants'

16  motion to dismiss pursuant to FRCP 12(b)(6).

17                   **CERTIFICATION UNDER 28 U.S.C. § 1292(b)**

18       Pursuant to our court of appeals' order dated December 21, 2017, the district court

19  hereby certifies for interlocutory appeal the issues decided herein (i) whether (or not) the

20  rescission of DACA is unreviewable as committed to agency discretion or by reason of 8 U.S.C.

21  § 1252(g), (ii) whether (or not) plaintiffs have standing, and (iii) all other questions interposed

22  by the government in its motion to dismiss under FRCP 12(b)(1).  This order finds that these are

23  controlling questions of law as to which there is substantial ground for difference of opinion and

United States District Court
For the Northern District of California

24

25      [21] Oddly, the government's contrary authority is *Bresgal v. Brock*, 843 F.2d 1163, 1169–70 (9th Cir.
26  1987), a decision in which our court of appeals upheld a nationwide injunction and held, "[t]here is no general
   requirement that an injunction affect only the parties in the suit," and "nationwide relief in federal district or
27  circuit court [is permitted] when it is appropriate."  *Bresgal* merely observed that "[w]here relief can be
   structured on an individual basis, it must be narrowly tailored to remedy the specific harm shown."  *Id*. at 1170.
28  Here, it cannot be so structured.  Nor are any of the government's other authorities, which restate the general
   proposition that a remedy should match the injury alleged, *see, e.g.*, *Town of Chester v. Laroe Estates, Inc.*,
   137 S. Ct. 1645, 1650 (2017), to the contrary.

that their resolution by the court of appeals will materially advance the litigation.  This order

realizes that the same issues are reviewable upon appeal of this injunction.  Nevertheless, out of

caution and to avoid any problem concerning scope of review, the district court so certifies.

**IT IS SO ORDERED.**

Dated:  January 9, 2018.



WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court

For the Northern District of California

49