IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY and KIRSTJEN NIELSEN, in her official capacity as Secretary of the Department of Homeland Security,<br><br>Defendants. | No. C 17-05211 WHA<br>No. C 17-05235 WHA<br>No. C 17-05329 WHA<br>No. C 17-05380 WHA<br>No. C 17-05813 WHA<br><br>**ORDER GRANTING IN PART DEFENDANTS' MOTION TO DISMISS UNDER FRCP 12(b)(6)** |

**INTRODUCTION**

In these challenges to the government's rescission of the Deferred Action for Childhood Arrivals program, the government moves to dismiss plaintiffs' complaints for failure to state a claim. For the reasons discussed below, the motion is **GRANTED IN PART** and **DENIED IN PART**.

**STATEMENT**

This order incorporates the statement set forth in the order dated January 9, 2018, largely denying dismissal under FRCP 12(b)(1) and largely granting plaintiffs' motion for provisional relief (Dkt. No. 234). This order, however, addresses a separate motion by the government to dismiss all claims for failure to state a claim for relief under FRCP 12(b)(6). This order sustains three claims for relief but finds that the rest fall short.

**ANALYSIS**

**1. APA C**LAIMS UNDER **5 U.S.C. § 706(2)(A).**

For the same reasons that plaintiffs are likely to succeed on their claim that the rescission of DACA was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the Administrative Procedure Act, as explained in the January 9 order, the government's motion to dismiss plaintiffs' APA claims under 5 U.S.C. § 706(2)(A) is **DENIED.**

**2. APA C**LAIMS UNDER **5 U.S.C. § 706(2)(D).**

The original DACA program began in 2012 without any notice or opportunity for public comment. Likewise, the rescission in question ended DACA without notice or opportunity for public comment. One issue now presented is whether the rescission is invalid for having been carried out without notice-and-comment procedures.

Under the APA, an agency action must be set aside if it was done "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). An agency is required to follow prescribed notice-and-comment procedures before promulgating certain rules. 5 U.S.C. § 553. The Regulatory Flexibility Act further requires that notice-and-comment rulemaking include an assessment of the impact on small entities. 5 U.S.C. § 604(a). These requirements do not apply, however, to general statements of policy. 5 U.S.C. § 553(b)(A).

A general statement of policy "advis[es] the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1012–13 (9th Cir. 1987). Such policies also "serve to educate and provide direction to the agency's personnel in the field, who are required to implement its policies and exercise its discretionary power in specific cases." *Id.* at 1013 (quotes and citations omitted). "The critical factor" in determining whether a directive constitutes a general statement of policy is "the extent to which the challenged [directive] leaves the agency, or its implementing official, free to exercise discretion to follow, or not to follow, the [announced] policy in an individual case." *Ibid.* Thus, to qualify as a statement of policy two requirements must be satisfied: (1) the policy operates only prospectively, and (2) the policy does "not establish a binding norm," and

2

is not "finally determinative of the issues or rights to which [it] address[es]," but instead leaves officials "free to consider the individual facts in the various cases that arise." *Id.* at 1014 (quotes and citations omitted). Under this standard, the rescission memorandum is a general statement of policy.

This order rejects plaintiffs' contention that the rescission could only be done through notice and comment. For the same reasons that the promulgation of DACA needed no notice and comment, its rescission needed no notice and comment.

Almost this exact problem was addressed in *Mada-Luna*. There, our court of appeals held that the repeal of an INS policy under which applicants could seek deferred action was not subject to notice and comment. It rejected the argument that the repeal could not constitute a general statement of policy because it diminished the likelihood of receiving deferred action for a class of individuals. *Id.* at 1016. Rather, because the original policy allowed for discretion and failed to establish a "binding norm," the repeal of that policy also did not require notice and comment. *Id.* at 1017. So too here. The DACA program allowed but did not require the agency to grant deferred action, and upon separate application, travel authorization, on a case-by-case basis at the agency's discretion. Therefore, neither its promulgation nor its rescission required notice and comment.

*Parco v. Morris*, 426 F. Supp. 976 (E.D. Pa. 1977), on which plaintiffs heavily rely, does not warrant the conclusion that the rescission policy is a substantive rule. *Parco* also addressed whether the rescission of an INS policy required notice and comment. Notably, the government in *Parco* stipulated that the policy's precipitous rescission was the sole reason for denial of the plaintiff's application for immigration relief. *Id.* at 984. The district court determined that the repeal therefore left no discretion, explaining that "discretion" was stripped of all meaning where "one contends that under a certain regulation 'discretion' was exercised favorably in all cases of a certain kind and then, after repeal of the regulation, unfavorably in each such case." *Ibid.* Here, by contrast, plaintiffs do not allege that all deferred action applications under DACA were approved but now, after the rescission, all requests for deferred action will be denied.

3

1  Plaintiffs argue that the rescission memorandum is more than a policy because it creates
2  a blanket prohibition against granting deferred action to DACA applicants. Plaintiffs are
3  correct that the rescission policy contains mandatory language on its face. It is also true that the
4  rescission memorandum categorically eliminates advance parole for DACA recipients.
5  This comes closer to resembling a substantive rule. However, it remains the case that because
6  the original promulgation of the discretionary program did not require notice and comment,
7  a return to the status quo ante also does not require notice and comment. *Mada-Luna*, 813 F.2d
8  at 1017.
9  Defendants' motion to dismiss plaintiffs' claims pursuant to Section 706(2)(D) of the
10 APA and the Regulatory Flexibility Act is accordingly **GRANTED**.

### 3. DUE PROCESS CLAIMS.

12 To assert a due process claim, a plaintiff must first show that he or she has an interest in
13 liberty or property protected by the Constitution. *See Bd. of Regents v. Roth*, 408 U.S. 564, 569
14 (1972). Plaintiffs fail to make the threshold showing that they have a protected interest in the
15 continuation of DACA and, accordingly, their due process claims based on the rescission must
16 be dismissed. Plaintiffs have adequately alleged, however, that the agency's changes to its
17 information-sharing policy are "fundamentally unfair."

#### A. Deferred Action.

19 Because discretionary immigration relief "is a privilege created by Congress, denial of
20 such relief cannot violate a substantive interest protected by the Due Process clause." *Munoz v.*
21 *Ashcroft*, 339 F.3d 950, 954 (9th Cir. 2003) (citing *INS v. Yang*, 519 U.S. 26, 30 (1996)).
22 Moreover, "aliens have no fundamental right to discretionary relief from removal" for purposes
23 of due process. *Tovar-Landin v. Ashcroft*, 361 F.3d 1164, 1167 (9th Cir. 2004). Our court of
24 appeals has accordingly held there is no protected interest in temporary parole, since such relief
25 is "entirely within the discretion of the Attorney General." *Kwai Fun Wong v. United States*,
26 373 F.3d 952, 967–68 (9th Cir. 2004). Nor did an INS policy which allowed the agency to
27 recommend deferred action as "an act of administrative choice" create substantive liberty
28 interests. *Romeiro de Silva v. Smith*, 773 F.2d 1021, 1024 (9th Cir. 1985). These authorities

4

foreclose any argument that plaintiffs have a protected interest in continued deferred action or advance parole under DACA.[1]

Plaintiffs reply that even absent a protected interest in the initial, discretionary grant of deferred action, there is a protected interest in the *renewal* of DACA and its associated benefits. Yet a benefit is not a "protected entitlement" where "government officials may grant or deny it in their discretion." *Castle Rock*, 545 U.S. 748, 756 (2005). Rather, an individual has a protected property right in public benefits where the rules conferring those benefits "greatly restrict the discretion" of the people who administer them. *Nozzi v. Hous. Auth. of City of Los Angeles*, 806 F.3d 1178, 1191 (9th Cir. 2015). Plaintiffs' authorities confirm that the same principle applies in the context of renewing or retaining existing benefits. *Wedges/Ledges of California, Inc. v. City of Phoenix, Ariz.*, 24 F.3d 56, 64 (9th Cir. 1994); *Stauch v. City of Columbia Heights*, 212 F.3d 425, 430 (8th Cir. 2000). No such limitations on agency discretion are alleged to have applied under DACA. Rather, the USCIS DACA FAQs referenced by plaintiffs in their complaints make clear that "USCIS retain[ed] the ultimate discretion to determine whether deferred action [was] appropriate in any given case even if the guidelines [were] met" (Garcia Compl. ¶ 24 n.16; Santa Clara Compl. ¶ 58; UC Compl., Exh. B; State Compl., Exh. E).

Next, plaintiffs argue that once DACA status was conferred, and recipients organized their lives in reliance on the program's protections and benefits, they developed interests protected by the Constitution. Plaintiffs' authorities, however, stand only for the uncontroversial proposition that once in possession of a particular benefit, the alteration, revocation or suspension of that benefit may implicate due process.[2] Such a principle has no application where, as here, extant benefits are *not* impacted by a change in policy. *Indeed, there is no dispute that the rescission acts only prospectively.* That is, all existing DACA recipients

---

[1] Plaintiffs' attempt to distinguish *Romeiro de Silva* on the ground that the INS policy there involved "unfettered discretion," whereas the exercise of prosecutorial discretion under DACA was guided by standard operating procedures, is unconvincing.

[2] *See Bell v. Burson*, 402 U.S. 535, 539 (1971); *Gallo v. U.S. Dist. Court For Dist. of Arizona*, 349 F.3d 1169, 1179 (9th Cir. 2003); *Medina v. U.S. Dep't of Homeland Sec.*, 2017 WL 5176720, at *9 (W.D. Wash. Nov. 8, 2017).

5

1  will receive deferred action through the end of their two-year terms. What they will not receive,
2  if the rescission endures, will be DACA renewal, thereafter. For this reason, *Ixcot v. Holder*,
3  646 F.3d 1202 (9th Cir. 2011), and *Arevalo v. Ashcroft*, 344 F.3d 1 (1st Cir. 2003), which
4  addressed whether amendments to the INA were impermissibly retroactive, do not compel a
5  different result.

6  Plaintiffs contend that the government's communications with plaintiffs regarding
7  renewals, its operation of the program, and the public promises of government officials
8  "together created an understanding that DACA recipients were entitled to the continued benefits
9  of the program so long as they met the renewal criteria" (Dkt. No. 205 at 29). Plaintiffs are
10 correct, of course, that claims of entitlement can be defined by "rules or mutually explicit
11 understandings." *Perry v. Sindermann*, 408 U.S. 593, 601 (1972). Importantly, however, a
12 person's belief of entitlement to a government benefit, no matter how sincerely or reasonably
13 held, does not create a protected right if that belief is not mutually held by the government.
14 *Gerhart v. Lake Cty., Mont.*, 637 F.3d 1013, 1020 (9th Cir. 2011). An agency's past practice of
15 generally granting a government benefit is also insufficient to establish a legal entitlement.
16 *Ibid.*

17 This order empathizes with those DACA recipients who have built their lives around
18 the expectation that DACA, and its associated benefits, would continue to be available to them
19 if they played by the rules. That expectation, however, remains insufficient to give rise to a
20 constitutional claim under the Fifth Amendment. Because plaintiffs have failed to allege facts
21 demonstrating a protected interest in DACA's continuation or the renewal of benefits
22 thereunder, defendants' motion to dismiss plaintiffs' due process claims based on the rescission
23 must be **GRANTED**.

24  **B.   Information-Sharing Policy.**

25 Plaintiffs fare better with their substantive due process claim that DHS allegedly
26 changed its policy with respect to the personal information provided by DACA recipients
27 during the application process. Plaintiffs allege that the government repeatedly represented
28 that information provided by DACA applicants would not be used for immigration enforcement

6

purposes absent special circumstances, and that DACA recipients relied on these promises in submitting the extensive personal information needed to meet the program's requirements.

Defendants insist that the agency's information-sharing policy remains unchanged. On a motion to dismiss, however, the well-pled factual allegations in a complaint must be accepted as true. *Manzarek v. St. Paul Fire & Marine Ins. Co.,* 519 F.3d 1025, 1031 (9th Cir. 2008). Plaintiffs have clearly alleged that DHS changed its information-sharing policy such that now, rather than affirmatively protecting DACA recipients' information from disclosure, the government will only refrain from "proactively" providing their information for purposes of immigration enforcement proceedings (Garcia Compl. ¶ 126; Santa Clara Compl. ¶ 58; State Compl. ¶ 122).

Plaintiffs have also adequately alleged a "mutually explicit understanding" giving rise to a protected interest in the confidentiality of DACA recipients' personal information. They allege that throughout DACA's existence, DHS made affirmative representations as to how this information would (and would not) be used. The policy stated (Garcia Compl. ¶ 126; Santa Clara Compl. ¶ 58; State Compl. ¶ 121 (citing USCIS DACA FAQs)):

> Information provided in this request is protected from disclosure to ICE and CBP for the purpose of immigration enforcement proceedings unless the requestor meets the criteria for the issuance of a Notice to Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance (www.uscis.gov/NTA). Individuals whose cases are deferred pursuant to DACA will not be referred to ICE. The information may be shared with national security and law enforcement agencies, including ICE and CBP, for purposes other than removal, including for assistance in the consideration of DACA, to identify or prevent fraudulent claims, for national security purposes, or for the investigation or prosecution of a criminal offense. The above information sharing policy covers family members and guardians, in addition to the requestor. This policy, which may be modified, superseded, or rescinded at any time without notice, is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable by law by any party in any administrative, civil, or criminal matter.

The language contained in the policy's caveat, that it could "be modified, superseded, or rescinded at any time," is ambiguous. One reading advanced by the government is that this caveat allows the agency to change how it treats information already received from DACA applicants. Another reading, however, is that it simply allows the government to change its

7

policy in connection with future applicants.  Secretary of Homeland Security Jeh Johnson's December 2016 letter to United States Representative Judy Chu supports the later reading. He stated that, "[s]ince DACA was announced in 2012, DHS has consistently made clear that information provided by applicants . . . will not later be used for immigration enforcement purposes except where it is independently determined that a case involves a national security or public safety threat, criminal activity, fraud, or limited other circumstances where issuance of a notice to appear is required by law" (Garcia Compl. ¶¶ 36–37; State Compl. ¶ 98, Exh. F). This ambiguity presents a question of fact that cannot be resolved on the pleadings.

Taken as true at this stage, as must be done on a FRCP 12(b)(6) motion, plaintiffs' allegations regarding the government's broken promise as to how DACA recipients' personal information will be used — and its potentially profound consequences — "shock[s] the conscience and offend[s] the community's sense of fair play and decency." *Marsh v. County of San Diego*, 680 F.3d 1148, 1154 (9th Cir. 2012) (quotes and citations omitted).  Defendants' motion to dismiss plaintiffs' due process claims based on changes to the government's information-use policy is **DENIED**.

4. **EQUITABLE ESTOPPEL.**

Plaintiffs bring claims for equitable estoppel, arguing that the government should not be permitted to terminate DACA or use the information collected from applicants for immigration enforcement purposes.

Defendants first contend that plaintiffs' equitable estoppel claims fail because there is no recognized claim for relief based on estoppel.  The Supreme Court has refused to adopt, however, "a flat rule that estoppel may not in any circumstances run against the Government," noting that "the public interest in ensuring that the Government can enforce the law free from estoppel might be outweighed by the countervailing interest of citizens in some minimum standard of decency, honor, and reliability in their dealings with their Government." *Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.*, 467 U.S. 51, 60–61 (1984).  Moreover, our court of appeals has addressed such claims on the merits, and has held that the government may be

8

subject to equitable estoppel if it has engaged in "affirmative misconduct." *Watkins v. U.S. Army*, 875 F.2d 699, 706–07 (9th Cir. 1989).

To state an equitable estoppel claim against the government, a party must show (1) that the government engaged in "affirmative conduct going beyond mere negligence"; and (2) "the government's wrongful act will cause a serious injustice, and the public's interest will not suffer undue damage" if the requested relief is granted. *Id.* at 707. "Neither the failure to inform an individual of his or her legal rights nor the negligent provision of misinformation constitute affirmative misconduct." *Sulit v. Schiltgen*, 213 F.3d 449, 454 (9th Cir. 2000). Moreover, our court of appeals has defined "affirmative misconduct" to mean a "deliberate lie" or "a pattern of false promises." *Socop-Gonzalez v. I.N.S.*, 272 F.3d 1176, 1184 (9th Cir. 2001). The allegations in the complaints fail to meet this standard, inasmuch as no affirmative instances of misrepresentation or concealment have been plausibly alleged.

Plaintiffs are correct that estoppel "does not require that the government *intend* to mislead a party," *Watkins*, 875 F.2d 707, but plaintiffs fail to explain how contradictory policies under two different administrations add up to "affirmative misconduct beyond mere negligence." Plaintiffs fail to allege, for example, that the government's past statements regarding DACA's legality were a "deliberate lie" or more than mere negligence. Nor have plaintiffs pleaded that the alleged change in the agency's information-use policy was the result of an affirmative misrepresentation. Rather, they have merely alleged a change in policy. Under plaintiffs' theory new administrations would almost never be able to change prior policies because someone could always assert reliance upon the old policy. Defendants' motion to dismiss plaintiffs' equitable estoppel claims is **GRANTED**.

### 5.  EQUAL PROTECTION CLAIMS.

To state an equal protection claim plaintiffs must show that the rescission was motivated by a discriminatory purpose. *Arce v. Douglas*, 793 F.3d 968, 977 (2015) (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977)). Determining whether discrimination is a motivating factor "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at

9

266. A plaintiff need not show that the discriminatory purpose was the sole purpose of the challenged action, but only that it was a "motivating factor." *Ibid.* In analyzing whether a facially-neutral policy was motivated by a discriminatory purpose, district courts must consider factors such as whether the policy creates a disparate impact, the historical background and sequence of events leading up to the decision, and any relevant legislative or administrative history. *Id.* at 266–68.[3]

*First,* Individual Plaintiffs and Santa Clara clearly allege that the rescission had a disproportionate impact on Latinos and Mexican nationals. Indeed, such individuals account for 93 percent of DACA recipients (Garcia Compl. ¶¶ 100, 151; Santa Clara Compl. ¶¶ 9, 75). Defendants reply that this disparate impact is an accident of geography, not evidence of discrimination. True, a disparate impact of a facially-neutral rule, standing alone, cannot establish discriminatory intent. *See Washington v. Davis*, 426 U.S. 229, 242 (1976). Individual Plaintiffs and Santa Clara, however, have alleged a discriminatory impact only as a starting point. They also allege a history of bias leading up to the rescission of DACA in the form of campaign statements and other public comments by President Trump, as next discussed.[4]

*Second*, plaintiffs allege that President Trump has, on multiple occasions since he announced his presidential campaign, expressed racial animus towards Latinos and Mexicans. When President Trump announced his candidacy on June 16, 2015, for example, he characterized Mexicans as criminals, rapists, and "people that have lots of problems." Three days later, President Trump tweeted that "[d]ruggies, drug dealers, rapists and killers are coming across the southern border," and asked, "When will the U.S. get smart and stop this travesty?"

---

[3] The Supreme Court's decision in *United States v. Armstrong*, 517 U.S. 456 (1996), which addressed the showing necessary for a defendant to be entitled to discovery on a selective-prosecution claim, has no application here. Plaintiffs' claims cannot fairly be characterized as selective-prosecution claims because they do not "implicate the Attorney General's prosecutorial discretion — that is, in this context, his discretion to choose to deport one person rather than another among those who are illegally in the country." *Kwai Fun Wong*, 373 F.3d at 970. Rather, plaintiffs allege that the agency's decision to end a nationwide deferred action program was motivated by racial animus towards a protected class.

[4] The City of San Jose's equal protection claim falls a little short. Rather than alleging a disparate impact on a protected class, it alleges only that "[d]efendants' actions target individuals for discriminatory treatment based on their national origin, without lawful justification" (San Jose Compl. ¶ 54). For this reason, defendants' motion to dismiss San Jose's equal protection claim is **GRANTED**.

10

During the first Republican presidential debate, President Trump claimed that the Mexican government "send[s] the bad ones over because they don't want to pay for them." And in August 2017, he referred to undocumented immigrants as "animals" who are responsible for "the drugs, the gangs, the cartels, the crisis of smuggling and trafficking, MS 13" (Garcia Compl. ¶¶ 102–13, 124; Santa Clara Compl. ¶¶ 75–76).

Circumstantial evidence of intent, including statements by a decisionmaker, may be considered in evaluating whether government action was motivated by a discriminatory purpose. *Arlington Heights*, 429 U.S. at 266–68. These statements were not about the rescission (which came later) but they still have relevance to show racial animus against people south of our border.

Should campaign rhetoric be admissible to undermine later agency action by the victors? This order recognizes that such admissibility can readily lead to mischief in challenging the policies of a new administration. We should proceed with caution and give wide berth to the democratic process. Yet are clear cut indications of racial prejudice on the campaign trail to be forgotten altogether?

Our court of appeals recently confirmed that "evidence of purpose beyond the face of the challenged law may be considered in evaluating Establishment and Equal Protection Clause claims." *Washington v. Trump*, 847 F.3d 1151, 1167 (9th Cir. 2017). *Washington* found that President Trump's statements regarding a "Muslim ban" raised "serious allegations and presented significant constitutional questions," although it ultimately reserved consideration of plaintiffs' equal protection claim. *Id.* at 1167–68. Citing to *Washington*, at least two district courts have since considered President Trump's campaign statements in finding a likelihood of success on Establishment Clause claims. *See, e.g.*, *Aziz v. Trump*, 234 F. Supp. 3d 724, 736 (E.D. Va. 2017) (Judge Leonie Brinkema); *Hawai'i v. Trump*, 245 F. Supp. 3d 1227, 1236 (D. Haw. 2017) (Judge Derrick Watson). This order will follow these decisions and hold that, at least at the pleading stage, campaign rhetoric so closely tied to the challenged executive action is admissible to show racial animus.

11

*Third*, a final consideration is the unusual history behind the rescission. DACA received reaffirmation by the agency as recently as three months before the rescission, only to be hurriedly cast aside on what seems to have been a contrived excuse (its purported illegality). This strange about-face, done at lightning speed, suggests that the normal care and consideration within the agency was bypassed (Garcia Compl. ¶ 154; Santa Clara Compl. ¶¶ 8, 77).

That President Trump has at other times shown support for DACA recipients cannot wipe the slate clean as a matter of law at the pleading stage. Although the government argues that these allegations fail to suggest that the Acting Secretary (as the purported decisionmaker) terminated DACA due to racial animus, plaintiffs have alleged that it was President Trump himself who, in line with his campaign rhetoric, directed the decision to end the program (Garcia Compl. ¶¶ 11, 124; Santa Clara Compl. ¶ 21).

Construed in the light most favorable to plaintiffs, as must be done at the pleading stage, these allegations raise a plausible inference that racial animus towards Mexicans and Latinos was a motivating factor in the decision to end DACA. The fact-intensive inquiry needed to determine whether defendants acted with discriminatory intent cannot be made on the pleadings. Accordingly, defendants' motion to dismiss Santa Clara's and Individual Plaintiffs' equal protection claims must be **DENIED.**

State Plaintiffs allege an equal protection claim on the alternative theory that the rescission "violates fundamental conceptions of justice by depriving DACA grantees, as a class, of their substantial interests in pursuing a livelihood to support themselves and further their education" (State Compl. ¶¶ 172–77). Plaintiffs do not respond to the government's arguments that this theory fails to state a claim under FRCP 12(b)(6). Defendants' motion to dismiss State Plaintiffs' equal protection claim is accordingly **GRANTED**.

6. **DECLARATORY RELIEF.**

Defendants move to dismiss the Individual Plaintiffs' claim for declaratory relief. Individual Plaintiffs' request for declaratory relief is also contained in their prayer for relief and, accordingly, the standalone claim is superfluous. Defendants' motion to dismiss this claim is **GRANTED.**

12

# CONCLUSION

Consistent with the foregoing, defendants' motion to dismiss is **GRANTED IN PART** and **DENIED IN PART** as follows:

- Plaintiffs' APA claims are sustained, except for the following: Garcia Complaint – Fifth Claim for Relief; UC Complaint – Second Claim for Relief; State Complaint – Second Claim for Relief; San Jose Complaint – Second Claim for Relief.
- Plaintiffs' Regulatory Flexibility Act claims are dismissed.
- Plaintiffs' due process claims are sustained, except for the following: UC Complaint – Third Claim for Relief; Garcia Complaint – First Claim for Relief (to the extent based on the rescission); Santa Clara Complaint – First Claim for Relief (to the extent based on the rescission).
- Plaintiffs' equal protection claims are sustained, except for the following: State Complaint – Sixth Claim for Relief; San Jose Complaint – First Claim for Relief.
- Plaintiffs' equitable estoppel claims are dismissed.
- Individual Plaintiffs' declaratory relief claim is dismissed.

Plaintiffs may seek leave to amend and will have **21 CALENDAR DAYS** from the date of this order to file motions, noticed on the normal 35-day track, seeking leave to amend solely as to the claims dismissed above. Proposed amended complaints must be appended to each motion and plaintiffs must plead their best case. Any such motion should clearly explain how the amendments to the complaints cure the deficiencies identified herein and should include as an exhibit a redlined or highlighted version of the complaints identifying all changes.

# CERTIFICATION UNDER 28 U.S.C. § 1292(b)

The district court hereby certifies for interlocutory appeal the issues of whether (i) President Trump's campaign statements are properly considered in evaluating plaintiffs' equal protection claims, (ii) whether the Individual Plaintiffs' and County of Santa Clara's

allegations as pleaded state an equal protection claim, (iii) whether plaintiffs' allegations concerning changes to the government's information-sharing policy state a due process claim; (iv) whether plaintiffs have failed to state a claim under 5 U.S.C. § 553; and (v) whether plaintiffs have failed to state a due process claim based on the rescission of DACA.  This order finds that these are controlling questions of law as to which there is substantial ground for difference of opinion and that their resolution by the court of appeals will materially advance the litigation.

**IT IS SO ORDERED.**

Dated:  January 12, 2018.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE