**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

REGENTS OF THE UNIVERSITY
OF CALIFORNIA; JANET
NAPOLITANO, in her official
capacity as President of the
University of California,
                *Plaintiffs-Appellees*,

v.

U.S. DEPARTMENT OF
HOMELAND SECURITY;
KIRSTJEN NIELSEN, in her
official capacity as Acting
Secretary of the Department of
Homeland Security,
                *Defendants-Appellants.*

No. 18-15068

D.C. No.
3:17-cv-05211-WHA

| | |
|---|---|
| STATE OF CALIFORNIA; STATE OF MAINE; STATE OF MINNESOTA; STATE OF MARYLAND, <br>         *Plaintiffs-Appellees*, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY; KIRSTJEN NIELSEN, in her official capacity as Acting Secretary of the Department of Homeland Security; UNITED STATES OF AMERICA, <br>         *Defendants-Appellants*. | No. 18-15069 <br><br> D.C. No. <br> 3:17-cv-05235-WHA |

| | |
|---|---|
| CITY OF SAN JOSE, <br>         *Plaintiff-Appellee*, <br><br> v. <br><br> DONALD J. TRUMP, President of the United States, in his official capacity; KIRSTJEN NIELSEN, in her official capacity as Acting Secretary of the Department of Homeland Security; UNITED STATES OF AMERICA, <br>         *Defendants-Appellants*. | No. 18-15070 <br><br> D.C. No. <br> 3:17-cv-05329-WHA |

| | |
|---|---|
| DULCE GARCIA; MIRIAM GONZALEZ AVILA; SAUL JIMENEZ SUAREZ; VIRIDIANA CHABOLLA MENDOZA; JIRAYUT LATTHIVONGSKORN; NORMA RAMIREZ, *Plaintiffs-Appellees*, v. UNITED STATES OF AMERICA; DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; KIRSTJEN NIELSEN, in her official capacity as Acting Secretary of the Department of Homeland Security, *Defendants-Appellants*. | No. 18-15071 D.C. No. 3:17-cv-05380-WHA |

| | |
|---|---|
| COUNTY OF SANTA CLARA; SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 521, | No. 18-15072 |
| *Plaintiffs-Appellees*, | D.C. No. 3:17-cv-05813-WHA |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States; JEFFERSON B. SESSIONS III, Attorney General; KIRSTJEN NIELSEN, in her official capacity as Acting Secretary of the Department of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY, | |
| *Defendants-Appellants.* | |

REGENTS OF THE UNIVERSITY OF CALIFORNIA; JANET NAPOLITANO, in her official capacity as President of the University of California; STATE OF CALIFORNIA; STATE OF MAINE; STATE OF MINNESOTA; STATE OF MARYLAND; CITY OF SAN JOSE; DULCE GARCIA; MIRIAM GONZALEZ AVILA; SAUL JIMENEZ SUAREZ; VIRIDIANA CHABOLLA MENDOZA; JIRAYUT LATTHIVONGSKORN; NORMA RAMIREZ; COUNTY OF SANTA CLARA; SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 521,

　　　　　*Plaintiffs-Appellees*,

　　　　　v.

UNITED STATES OF AMERICA; DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; KIRSTJEN NIELSEN, in her official capacity as Acting Secretary of the Department of Homeland Security,

　　　　　*Defendants-Appellants.*

No. 18-15128

D.C. Nos.
3:17-cv-05211-WHA
3:17-cv-05235-WHA
3:17-cv-05329-WHA
3:17-cv-05380-WHA
3:17-cv-05813-WHA

| | |
|---|---|
| REGENTS OF THE UNIVERSITY OF CALIFORNIA; JANET NAPOLITANO, in her official capacity as President of the University of California; STATE OF CALIFORNIA; STATE OF MAINE; STATE OF MINNESOTA; STATE OF MARYLAND; CITY OF SAN JOSE; DULCE GARCIA; MIRIAM GONZALEZ AVILA; SAUL JIMENEZ SUAREZ; VIRIDIANA CHABOLLA MENDOZA; JIRAYUT LATTHIVONGSKORN; NORMA RAMIREZ, *Plaintiffs-Appellants*, v. UNITED STATES OF AMERICA; DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; KIRSTJEN NIELSEN, in her official capacity as Acting Secretary of the Department of Homeland Security, *Defendants-Appellees.* | No. 18-15133 D.C. Nos. 3:17-cv-05211-WHA 3:17-cv-05235-WHA 3:17-cv-05329-WHA 3:17-cv-05380-WHA 3:17-cv-05813-WHA |

DULCE GARCIA; MIRIAM
GONZALEZ AVILA; SAUL
JIMENEZ SUAREZ; VIRIDIANA
CHABOLLA MENDOZA; NORMA
RAMIREZ; JIRAYUT
LATTHIVONGSKORN; COUNTY
OF SANTA CLARA; SERVICE
EMPLOYEES INTERNATIONAL
UNION LOCAL 521,
        *Plaintiffs-Appellants*,

v.

UNITED STATES OF AMERICA;
DONALD J. TRUMP, in his
official capacity as President of
the United States; U.S.
DEPARTMENT OF HOMELAND
SECURITY; KIRSTJEN NIELSEN,
in her official capacity as
Acting Secretary of the
Department of Homeland
Security,
        *Defendants-Appellees.*

No. 18-15134

D.C. Nos.
3:17-cv-05211-WHA
3:17-cv-05235-WHA
3:17-cv-05329-WHA
3:17-cv-05380-WHA
3:17-cv-05813-WHA

OPINION

Appeal from the United States District Court
for the Northern District of California
William Alsup, District Judge, Presiding

Argued and Submitted May 15, 2018
Pasadena, California

Filed November 8, 2018

Before:  Kim McLane Wardlaw, Jacqueline H. Nguyen,
and John B. Owens, Circuit Judges.

Opinion by Judge Wardlaw;
Concurrence by Judge Owens

## SUMMARY[*]

### Immigration

In an action challenging the Department of Homeland Security's rescission of Deferred Action for Childhood Arrivals (DACA), the panel affirmed the district court's grant of preliminary injunctive relief, and affirmed in part the district court's partial grant and partial denial of the government's motion to dismiss for failure to state a claim.

Begun in 2012, DACA allows those noncitizens who unwittingly entered the United States as children, who have clean criminal records, and who meet various educational or military service requirements to apply for two-year renewable periods of deferred action—a revocable decision by the government not to deport an otherwise removable person from the country.  In 2014, Secretary of Homeland Security Jeh Johnson issued a memorandum that announced the related Deferred Action for Parents of Americans and Lawful Permanent Residents program (DAPA), which allowed deferred action for certain noncitizen parents of American citizens and lawful permanent residents, and expanded DACA.  All of the policies outlined in the 2014

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

Johnson memorandum were enjoined nationwide in a district court order upheld by the Fifth Circuit and affirmed by an equally divided Supreme Court.  After a new presidential administration took office, Acting Secretary of Homeland Security Elaine Duke issued a memorandum in September 2017 rescinding DACA.

Suits were filed in the Northern District of California by the Regents of the University of California, a group of states led by California, the City of San Jose, the County of Santa Clara and Service Employees International Union Local 521, and a group of individual DACA recipients led by Dulce Garcia.  The cases were consolidated, and the district court ordered the government to complete the administrative record.  Seeking to avoid providing additional documents, the government filed a petition for mandamus, which this court denied.  The government petitioned the Supreme Court for the same mandamus relief; the Court did not reach the merits of the administrative record dispute, but instructed the district court to rule on the government's threshold arguments challenging reviewability of its rescission decision.  The district court entered a preliminary injunction requiring DHS to adjudicate renewal applications for existing DACA recipients, and the court partially granted and partially denied the government's motion to dismiss.

The panel held that neither the Administrative Procedure Act nor the Immigration and Nationality Act (INA) barred judicial review of the decision to rescind DACA.  With respect to the APA, the panel reviewed the cases of *Heckler v. Chaney*, 470 U.S. 821 (1985), *Montana Air Chapter No. 29 v. Federal Labor Relations Authority*, 898 F.2d 753 (9th Cir. 1990), and *City of Arlington v. FCC*, 569 U.S. 290 (2013).  The panel concluded that, where the agency's decision is based not on an exercise of discretion, but instead

on a belief that any alternative choice was foreclosed by law because the agency lacked authority, the APA's "committed to agency discretion" bar to reviewability, 5 U.S.C. § 701(a)(2), does not apply. The panel also concluded that the Acting Secretary based the rescission of DACA solely on a belief that DACA was beyond the authority of DHS. Accordingly, the panel determined that the rescission was within the realm of agency actions reviewable under the APA.

With respect to the INA, the panel rejected the government's contention that review was barred by 8 U.S.C. § 1252(g), which precludes judicial review of "any cause or claim by or on behalf of any alien arising from the decision or action of the [Secretary of Homeland Security] to commence proceedings, adjudicate cases, or execute removal orders." The panel explained that, under *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471 (1999), the rescission does not fall within the three discrete actions mentioned in 8 U.S.C. § 1252(g).

Having concluded that neither the APA nor the INA precludes judicial review, the panel turned to the merits of the preliminary injunction and considered whether the agency was correct in concluding that DACA was unlawful. The Attorney General's primary bases for concluding that DACA was illegal were that the program was "effectuated . . . without proper statutory authority" and that it amounted to "an unconstitutional exercise of authority." More specifically, the Attorney General asserted that "the DACA policy has the same legal and constitutional defects that the courts recognized as to DAPA" in the Fifth Circuit litigation. The panel considered the DAPA litigation, comparing aspects of DAPA and DACA, and concluded that that DACA was a permissible exercise of executive discretion,

notwithstanding the Fifth Circuit's conclusion that the related DAPA program exceeded DHS's statutory authority. Thus, the panel concluded that, because the Acting Secretary was incorrect in her belief that DACA was illegal and had to be rescinded, plaintiffs are likely to succeed in demonstrating that the rescission must be set aside under the APA as arbitrary and capricious.

The panel next concluded that the district court did not abuse its discretion in issuing a nationwide injunction, noting that such relief is commonplace in APA cases, promotes uniformity in immigration enforcement, and is necessary to provide the plaintiffs here with complete redress.

Finally, addressing the district court's order granting in part and denying in part the government's motion to dismiss, the court concluded that the district court properly dismissed plaintiffs' APA notice-and-comment claim, and their claim that the DACA rescission violates their substantive due process rights. The panel further concluded that the district court also properly denied the government's motion to dismiss plaintiffs' APA arbitrary-and-capricious claim, their claim that the new information-sharing policy violates their due process rights, and their claim that the DACA rescission violates their right to equal protection.

Concurring in the judgment, Judge Owens wrote that, as he believed the Plaintiffs' Equal Protection claim has some likelihood of success on the merits, he concurred in the judgment affirming the preliminary injunction. However, Judge Owens disagreed with the majority's conclusion that otherwise unreviewable agency action is reviewable when the agency justifies its action by reference to its understanding of its jurisdiction. Therefore, Judge Owens would hold that § 701(a)(2) precludes the court from

subjecting DACA's rescission to arbitrary-and-capricious review. Judge Owens would also affirm the preliminary injunction and remand for consideration whether Plaintiffs have demonstrated a likelihood of success on the merits of their Equal Protection claim.

As for the government's appeal from the motions to dismiss, Judge Owens dissented from the majority's holding to affirm the district court's denial of the motion to dismiss Plaintiffs' APA arbitrary-and-capricious claim. However, he concurred in the majority's holding to affirm the district court's dismissal of Plaintiffs' APA notice-and-comment claim. He also concurred in the judgment to affirm the district court's ruling on Plaintiffs' Due Process claims. He also agreed with the majority's decision to affirm the district court's denial of the motion to dismiss the Equal Protection claim and hold that the Equal Protection claim offers an alternative ground to affirm the preliminary injunction.

## COUNSEL

Hashim M. Mooppan (argued), Deputy Assistant Attorney General; Thomas Pulham, Abby C. Wright, and Mark B. Stern, Appellate Staff; Alex G. Tse, Acting United States Attorney; Chad A. Readler, Acting Assistant Attorney General; United States Department of Justice, Washington, D.C.; for Defendants-Appellants.

Michael J. Mongan (argued), Deputy Solicitor General; Samuel P. Siegel, Associate Deputy Solicitor General; James F. Zahradka II, Deputy Attorney General; Michael L. Newman, Supervising Deputy Attorney General; Edward C. DuMont, Solicitor General; Xavier Becerra, Attorney

General; Office of the Attorney General, San Francisco, California; for Plaintiff-Appellee State of California.

Susan P. Herman, Deputy Attorney General; Janet T. Mills, Attorney General; Office of the Attorney General, Augusta, Maine; for Plaintiff-Appellee State of Maine.

Jacob Campion, Assistant Attorney General; Lori Swanson, Attorney General; Office of the Attorney General, St. Paul, Minnesota; for Plaintiff-Appellee State of Minnesota.

Leah J. Tullin, Assistant Attorney General; Steven M. Sullivan, Solicitor General; Brian E. Frosh, Attorney General; Attorney General's Office, Baltimore, Maryland; for Plaintiff-Appellee State of Maryland.

Jeffrey Michael Davidson (argued), Breanna K. Jones, David S. Watnick, Erika Douglas, and Mónica Ramírez Almadani, Covington & Burling LLP, San Francisco, California; Ivano M. Ventresca, Megan A. Crowley, Alexander A. Berengaut, Mark H. Lynch, and Robert A. Long, Covington & Burling LLP, Washington, D.C.; for Plaintiff-Appellee The Regents of the University of California, et al.

Brian Danitz, Tamarah Prevost, and Justin T. Berger, Cotchett Pitre & McCarthy LLP, Burlingame, California, for Plaintiff-Appellee City of San José.

Mark D. Rosenbaum (argued), Malhar Shah, and Judy London, Public Counsel, Los Angeles, California; Haley S. Morrisson, Matthew S. Rozen, and Nicole A. Saharsky, Gibson Dunn & Crutcher LLP, Washington, D.C.; Kelsey J. Helland, Jonathan N. Soleimani, Kirsten Galler, Ethan D. Dettmer, and Theodore J. Boutrous Jr., Gibson Dunn &

Crutcher LLP, Los Angeles, California; Luis Cortes Romera, Barrera Legal Group PLLC, Kent, Washington; Erwin Chemerinsky, Berkeley, California; Laurence H. Tribe, Cambridge, Massachusetts; Leah M. Litman, Irvine, California; for Plaintiffs-Appellees Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Virdiana Chabolla Mendoza, Norma Ramirez, and Jirayut Latthivongskorn.

Andrew Kushner, Eric P. Brown, and Stacey M. Leyton, Altshuler Berzon LLP, San Francisco, California, for Plaintiff-Appellee County of Santa Clara and Service Employees International Union Local 521.

Marcelo Quiñones, Laura S. Trice, Greta S. Hansen, and James R. Williams, Office of the County Counsel, County of Santa Clara, San Jose, California, for Plaintiff-Appellee County of Santa Clara.

Jessica Levin, Melissa Lee, Lorraine K. Bannai, and Robert S. Chang, Ronald A. Peterson Law Clinic, Seattle University School of Law, Seattle, Washington, for Amici Curiae 42 Historians and the Fred T. Korematsu Center for Law and Equality.

Leo Gertner, Deborah L. Smith, and Nicole G. Berner, Service Employees International Union, Washington, D.C.; Deepak Gupta, Gupta Wessler PLLC, Washington, D.C.; David J. Strom, American Federation of Teachers, Washington, D.C.; Judith Rivlin, American Federation of State, County, and Municipal Employees, Washington, D.C.; Patricia M. Shea, Communications Workers of America, Washington, D.C.; Bradley Raymond, International Brotherhood of Teamsters, Washington, D.C.; Joseph E. Kolick Jr., International Union of Painters and Allied Trades, Hanover, Maryland; Mario Martínez,

Martínez Aguilasocho & Lynch APLC, Bakersfield, California; for Amici Curiae Service Employees International Union; American Federation of Teachers; American Federation of State, County and Municipal Employees; Communications Workers of America; International Brotherhood of Teamsters; International Union of Painters and Allied Trades; and United Farm Workers of America.

Geoffrey S. Brounell and Peter Karanjia, Davis Wright Tremaine LLP, Washington, D.C., for Amicus Curiae United We Dream.

Sean Goldhammer, Lubna A, Alam, Jason Walta, Emma Leheny, and Alice O'Brien, National Education Association, Washington, D.C.; Andra M. Donovan, San Diego Unified School District, San Diego, California; Abhas Hajela, Capitol Advisors Group LLC, Sacramento, California; Eric E. Stevens, Girard Edwards Stevens & Tucker LLP, Sacramento, California; Kathryn M. Sheffield, California Faculty Association, Sacramento, California; Glenn Rothner, Rothner Segall & Greenstone, Pasadena, California; D. Michael Ambrose and Elaine M. Yama-Garcia, California School Boards Association Education Legal Alliance, Sacramento, California; Jean Shin and Laura P. Juran, California Teachers Association, Burlingame, California; Vibiana M. Andrade, Los Angeles County Office of Education, Downey, California; Devora Navera Reed and David Holmquist, Los Angeles Unified School District, Los Angeles, California; Sonja H. Trainor and Francisco Negrón, National School Boards Association, Alexandria, Virginia; Michael L. Smith, Oakland Unified School District, Oakland, California; Raoul Bozio, Sacramento City Unified School District, Sacramento, California; for Amici Curiae Public Education Groups.

Caryn C. Lederer, Chirag G. Badlani, and Matthew J. Piers, Hughes Socol Piers Resnick & Dym Ltd., Chicago, Illinois; Daniel B. Rice and Joshua A. Geltzer, Institute for Constitutional Advocacy and Protection, Georgetown University Law Center, Washington, D.C.; for Amici Curiae Current and Former Prosecutors and Law Enforcement Leaders.

Zachary Kolodin, Michael N. Fresco, Adeel A. Mangi, and Steven A. Zalesin, Patterson Belknap Webb & Tyler LLP, New York, New York; Juvaria Khan, Sirine Shebaya, and Jonathan Smith, Muslim Advocates, Washington, D.C.; for Amici Curiae 119 Religious Organizations.

Jennifer J. Yun, Ishan Bhabha, Lindsay C. Harrison, and Thomas J. Perrelli, Jenner & Block LLP, Washington, D.C., for Amici Curiae Institutions of Higher Education.

Jennifer B. Sokoler and Anton Metlitsky, O'Melveny & Myers LLP, New York, New York, for Amicus Curiae Eighteen Universities.

Lauren R. Goldman and Karen W. Lin, Mayer Brown LLP, New York, New York; Andrew J. Pincus, Mayer Brown LLP, Washington, D.C.; Ari Holzblatt, Patrick J. Carome, and Seth Waxman, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C.; for Amici Curiae 102 Companies and Associations.

John-Paul S. Deol and Daniel J. McCoy, Fenwick & West LLP, Mountain View, California; Mark S. Ross, James L. McGinnis, and Neil A.F. Popović, Sheppard Mullin Richter & Hampton LLP, San Francisco, California; for Amicus Curiae The Bar Association of San Francisco.

Juan P. Valdivieso, Boies Schiller Flexner LLP, Oakland, California; Albert Giang, Boies Schiller Flexner LLP, Los Angeles, California; J. Wells Harrell and Joshua Riley, Boies Schiller Flexner LLP, Washington, D.C.; for Amici Curiae Former Federal Immigration and Homeland Security Officials.

Kaitland M. Kennelly and William J. Schwartz, Cooley LLP, New York, New York, for Amici Curiae Partnership for Educational Justice, DelawareCAN: The Delaware Campaign for Achievement Now, HawaiiKidsCAN, NewMexicoKidsCAN, and Virginia Excels.

Matthew Scherb, Michael Dundas, Valerie L. Flores, Leela A. Kapur, James P. Clark, and Michael N. Feuer, City Attorney, Office of the City Attorney, Los Angeles, California; Donna R. Ziegler, Alameda County Counsel, Oakland, California; Anne L. Morgan, City Attorney, Austin, Texas; Eugene O'Flaherty, City Corporation Counsel, Boston, Massachusetts; Cheryl Watson Fisher, City Solicitor, Chelsea, Massachusetts; Kimberly M. Foxx, States Attorney for Cook County, Chicago, Illinois; Jeremy Berry, City Attorney, Atlanta, Georgia; Farimah F. Brown, City Attorney, Berkeley, California; Nancy E. Glowa, City Solicitor, Cambridge, Massachusetts; Edward N. Siskel, City Corporation Counsel, Chicago, Illinois; Larry E. Casto, City Attorney, Dallas, Texas; Kristin M. Bronson, City Attorney of the City and County of Denver, Denver, Colorado; Gregory L. Thomas, City Attorney, Gary, Indiana; Ronald C. Lewis, City Attorney, Houston, Texas; Eleanor M. Dilkes, City Attorney, Iowa City, Iowa; Jennifer Vega-Brown, City Attorney, Las Cruces, New Mexico; Karl A. Racine, Attorney General, District of Colombia, Washington, D.C.; Donna Y. L. Leong, Corporation Counsel, Honolulu, Hawaii; Aaron O. Lavine, City

Attorney, Ithaca, New York; Daniel T. Satterberg, King County Prosecuting Attorney, Seattle, Washington; Charles Parkin, City Attorney, Long Beach, California; Margaret L. Carter, O'Melveny & Myers LLP, Los Angeles, California; Susan Segal, City Attorney, Minneapolis, Minnesota; John Rose Jr., Corporation Counsel, New Haven, Connecticut; Barbara J. Parker, City Attorney, Oakland, California; Tracy P. Reeve, City Attorney, Portland, Oregon; Michael P. May, City Attorney, Madison, Wisconsin; Charles J. McKee, Monterey County Counsel, Salinas, California; Zachary W. Carter, City Corporation Counsel, New York, New York; Marcel S. Pratt, Acting City Solicitor, Philadelphia, Pennsylvania; Jeffrey Dana, City Solicitor, Providence, Rhode Island; Timothy R. Curtin, City Corporation Counsel, Rochester, New York; Dennis J. Herrera, City Attorney for the City and County of San Francisco, San Francisco, California; Lane Dilg, City Attorney, Santa Monica, California; Francis X. Wright Jr., City Solicitor, Somerville, Massachusetts; Matthew D. Ruyak, Interim City Attorney, Sacramento, California; Kelley A. Brennan, City Attorney, Santa Fe, New Mexico; Peter S. Holmes, City Attorney; Seattle, Washington; Mike Rankin, City Attorney, Tucson, Arizona; Michael Jenkins, West Hollywood City Attorney, Jenkins & Hogan LLP, Manhattan Beach, California; John Daniel Reaves, General Counsel, The U.S. Conference of Mayors, Washington, D.C.; for Amici Curiae 40 Cities and Counties, The National League of Cities, and The United States Conference of Mayors.

Jennifer Chang Newell and Katrina L. Eiland, ACLU Foundation Immigrants' Rights Project, San Francisco, California; David Hausman, Michael K.T. Tan, and Lee Gelernt, ACLU Foundation Immigrants' Rights Project, New York, New York; Julia Harumi Mass, ACLU Foundation of Northern California, San Francisco,

California; Ahilan T. Arulanantham, ACLU Foundation of Southern California, Los Angeles, California; David Loy, ACLU Foundation of San Diego & Imperial Counties, San Diego, California; for Amici Curiae American Civil Liberties Union Foundation, ACLU Foundation of Northern California, ACLU Foundation of Southern California, and ACLU Foundation of San Diego & Imperial Counties.

Claire M. Blakey, Johanna S. Dennehy, and Harry Lee, Steptoe & Johnson LLP, Washington, D.C.; Christopher W. Smith, Steptoe & Johnson, Los Angeles, California; for Amici Curiae Immigration Law Scholars.

Avi Zevin, Jack Lienke, and Richard L. Revesz, Institute for Policy Integrity, New York, New York, for Amicus Curiae Institute for Policy Integrity at New York University School of Law.

Anna-Rose Mathieson and Ben Feuer, California Appellate Law Group LLP, San Francisco, California; Daniel Hemel, Chicago, Illinois; Seth Davis, Irvine, California; for Amici Curiae Twenty-Four Law Professors.

Philicia Hill, Dorian Spence, Dariely Rodriguez, and Jon Greenbaum, The Lawyers' Committee for Civil Rights Under Law, Washington, D.C.; Sameer P. Sheikh, Martin L. Saad, John F. Cooney, and William D. Coston, Venable LLP, Washington, D.C.; for Amici Curiae The Lawyers' Committee for Civil Rights Under Law, Anti-Defamation League, and Social Justice Organizations.

Joan R. Li, Kara C. Wilson, Monique R. Sherman, and Maureen P. Alger, Cooley LLP, Palo Alto, California, for Amici Curiae Legal Services Organizations.

Mary Kelley Persyn, Persyn Law & Policy, San Francisco, California, for Amici Curiae American Professional Society on the Abuse of Children and California Professional Society on the Abuse of Children.

Christopher J. Hajec, Immigration Reform Law Institute, Washington, D.C., for Amicus Curiae The Immigration Reform Law Institute.

---

# OPINION

WARDLAW, Circuit Judge:

It is no hyperbole to say that Dulce Garcia embodies the American dream. Born into poverty, Garcia and her parents shared a San Diego house with other families to save money on rent; she was even homeless for a time as a child. But she studied hard and excelled academically in high school. When her family could not afford to send her to the top university where she had been accepted, Garcia enrolled in a local community college and ultimately put herself through a four-year university, where she again excelled while working full-time as a legal assistant. She then was awarded a scholarship that, together with her mother's life savings, enabled her to fulfill her longstanding dream of attending and graduating from law school. Today, Garcia maintains a thriving legal practice in San Diego, where she represents members of underserved communities in civil, criminal, and immigration proceedings.

On the surface, Dulce Garcia appears no different from any other productive—indeed, inspiring—young American. But one thing sets her apart. Garcia's parents brought her to this country in violation of United States immigration laws

when she was four years old.  Though the United States of America is the only home she has ever known, Dulce Garcia is an undocumented immigrant.

Recognizing the cruelty and wastefulness of deporting productive young people to countries with which they have no ties, the Secretary of Homeland Security announced a policy in 2012 that would provide some relief to individuals like Garcia, while allowing our communities to continue to benefit from their contributions.  Known as Deferred Action for Childhood Arrivals, or DACA, the program allows those noncitizens who unwittingly entered the United States as children, who have clean criminal records, and who meet various educational or military service requirements to apply for two-year renewable periods of deferred action—a revocable decision by the government not to deport an otherwise removable person from the country.  DACA also allows recipients to apply for authorization to work in this country legally, paying taxes and operating in the above-ground economy.  Garcia, along with hundreds of thousands of other young people, trusting the government to honor its promises, leapt at the opportunity.

But after a change in presidential administrations, in 2017 the government moved to end the DACA program.  Why?  According to the Acting Secretary of Homeland Security, upon the legal advice of the Attorney General, DACA was illegal from its inception, and therefore could no longer continue in effect.  And after Dulce Garcia—along with other DACA recipients and affected states, municipalities, and organizations—challenged this conclusion in the federal courts, the government adopted the position that its fundamentally legal determination that DACA is unlawful is unreviewable by the judicial branch.

With due respect for the Executive Branch, we disagree. The government may not simultaneously both assert that its actions are legally compelled, based on its interpretation of the law, and avoid review of that assertion by the judicial branch, whose "province and duty" it is "to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). The government's decision to rescind DACA is subject to judicial review. And, upon review, we conclude that plaintiffs are likely to succeed on their claim that the rescission of DACA—at least as justified on this record—is arbitrary, capricious, or otherwise not in accordance with law. We therefore affirm the district court's grant of preliminary injunctive relief.[1]

## I.

### A. History of Deferred Action

The central benefit available under the DACA program is deferred action. Because much of this dispute revolves around the legitimacy of that practice, we begin by reviewing the Executive Branch's historical use of deferred action.

The basic concept is a simple one: deferred action is a decision by Executive Branch officials not to pursue deportation proceedings against an individual or class of individuals otherwise eligible for removal from this country. *See* 6 Charles Gordon et al., Immigration Law & Procedure § 72.03[2][h] (2018) ("To ameliorate a harsh and unjust outcome, the immigration agency may decline to institute proceedings, may terminate proceedings, or may decline to

---

[1] We also affirm in part the district court's partial grant and partial denial of the government's motion to dismiss for failure to state a claim.

execute a final order of deportation. This commendable exercise in administrative discretion . . . is now designated as deferred action."); *Barahona-Gomez v. Reno*, 236 F.3d 1115, 1119 n.3 (9th Cir. 2001) ("Deferred action refers to an exercise of administrative discretion by the [immigration agency] under which [it] takes no action to proceed against an apparently deportable alien based on a prescribed set of factors generally related to humanitarian grounds." (internal quotation marks omitted)); Hiroshi Motomura, Immigration Outside the Law 29 (2014) (noting that "deferred action is usually granted only for limited periods of time and does not provide a path to lawful permanent resident status or citizenship").

Unlike most other forms of relief from deportation, deferred action is not expressly grounded in statute. It arises instead from the Executive's inherent authority to allocate resources and prioritize cases. *Cf.* 6 U.S.C. § 202(5) (charging the Secretary of Homeland Security with "[e]stablishing national immigration enforcement policies and priorities"). As such, recipients of deferred action "enjoy no formal immigration status." *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 964 (9th Cir. 2017) (*Brewer II*). But despite its non-statutory origins, Congress has historically recognized the existence of deferred action in amendments to the Immigration and Nationality Act (INA), as well as other statutory enactments. *See* 8 U.S.C. § 1227(d)(2) ("The denial of a request for an administrative stay of removal under this subsection shall not preclude the alien from applying for . . . deferred action[.]"); REAL ID Act of 2005, Pub. L. No. 109-13, § 202(c)(2), 119 Stat. 231, 313 (2005) (listing proof of "approved deferred action status" as sufficient "evidence of lawful status" for the issuance of a driver's license). The Supreme Court has also recognized deferred action by name, describing the

Executive's "regular practice (which ha[s] come to be known as 'deferred action') of exercising discretion for humanitarian reasons or simply for its own convenience." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483–84 (1999) (*AADC*). Thus, "it is well settled that the Secretary [of Homeland Security] can exercise deferred action." *Brewer II*, 855 F.3d at 967.

Official records of administrative discretion in immigration enforcement date at least back to the turn of the twentieth century, not long after the enactment of the nation's first general immigration statute in 1882. *See* Act of Aug. 3, 1882, ch. 376, 22 Stat. 214. A 1909 Department of Justice circular regarding statutorily authorized denaturalization instructed that "as a general rule, good cause is not shown for the institution of proceedings . . . unless some substantial results are to be achieved thereby in the way of betterment of the citizenship of the country." U.S. Dep't of Justice, Circular Letter No. 107 (Sept. 20, 1909) (quoted in Memorandum from Sam Bernsen, Gen. Counsel, INS, *Legal Opinion Regarding Service Exercise of Prosecutorial Discretion* at 4 (Jul. 15, 1976) (Bernsen Memorandum)).

The government's exercise of deferred action in particular first came to light in the 1970s, as a result of Freedom of Information Act litigation over the government's efforts to deport John Lennon and Yoko Ono, apparently based on Lennon's "British conviction for marijuana possession." Motomura, *supra*, at 28; *see generally* Shoba Sivaprasad Wadhia, Beyond Deportation: The Role of Prosecutorial Discretion in Immigration Cases 2–27 (2015). Then known as "nonpriority status," the practice had been observed in secret within the former Immigration and Naturalization Service (INS) since at least

the 1950s, but INS officials had publicly denied its existence.  *See* Leon Wildes, *The Nonpriority Program of the Immigration and Naturalization Service Goes Public: The Litigative Use of the Freedom of Information Act*, 14 San Diego L. Rev. 42, 52–53 (1976); Wadhia, *supra*, at 16.  After the Lennon case revealed the practice, the INS issued its first public guidance on the use of deferred action, stating that "[i]n every case where the district director determines that adverse action would be unconscionable because of the existence of appealing humanitarian factors, he shall recommend consideration for nonpriority." Immigration and Naturalization Service, Operations Instructions § 103.1(a)(1)(ii) (1975) (quoted in Wadhia, *supra*, at 17).  Although the 1975 guidance was rescinded in 1997, DHS officials continue to apply the same humanitarian factors in deciding whether to grant an individual deferred action.   6 Gordon et al., *supra*, § 72.03[2][h] & nn.133–34; *see also AADC*, 525 U.S. at 484 n.8.

In addition to case-by-case adjudications, the Executive Branch has frequently applied deferred action and related forms of discretionary relief programmatically, to entire classes of otherwise removable noncitizens.  Indeed, the Congressional Research Service has compiled a list of twenty-one such "administrative directives on blanket or categorical deferrals of deportation" issued between 1976 and 2011.  Andorra Bruno et al., Cong. Research Serv., Analysis of June 15, 2012 DHS Memorandum, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children 20–23 (July 13, 2012); *see also id.* at 9 ("The executive branch has provided blanket or categorical deferrals of deportation numerous times over the years.").

To take one early example, in 1956 President Eisenhower extended immigration parole to over thirty thousand Hungarian refugees who were otherwise unable to immigrate to the United States because of restrictive quotas then in existence. *See* White House Statement on the Termination of the Emergency Program for Hungarian Refugees (Dec. 28, 1957). The power to parole—that is, to allow a noncitizen physically to enter the country, while treating that person as "at the border" for purposes of immigration law—is established by statute, but the version of the INA in existence when President Eisenhower acted did not explicitly authorize programmatic exercises of the parole power.[2] Immigration and Nationality Act of 1952, Pub. L. No. 82-414, § 212(d)(5), 66 Stat. 163, 188. *See generally* 6 Gordon et al., *supra*, § 62.01. Subsequent presidents made use of similar categorical parole initiatives. Wadhia, *supra*, at 30.

Another salient example is the Family Fairness program, established by the Reagan Administration and expanded under President George H.W. Bush. The Immigration Reform and Control Act of 1986 (IRCA) had provided a pathway to legal status for hundreds of thousands of undocumented noncitizens, but did not make any provision for their close relatives unless those individuals separately qualified under the Act's criteria. *See generally* 3 Gordon et al., *supra*, § 38.06. President Reagan's INS Commissioner interpreted IRCA not to authorize immigration benefits for

---

[2] Indeed, there is evidence that "Congress originally intended that parole would be used on a case-by-case basis on behalf of individual aliens." Cong. Research Serv., Review of U.S. Refugee Resettlement Programs & Policies 8 (1980); *see also* S. Rep. No. 89-748, at 17 (1965). The statute was amended in 1980 to expressly prohibit categorical grants of parole. Refugee Act of 1980, Pub. L. No. 96-212, § 203(f), 94 Stat. 102, 108; *see* 8 U.S.C. § 1182(d)(5).

anyone outside the statutory criteria, but nevertheless exercised executive discretion to defer the deportation of the minor children of noncitizens legalized under the statute. Alan C. Nelson, Comm'r, INS, *Legalization & Family Fairness: An Analysis* (Oct. 21, 1987). And in 1990, the INS instituted "significant liberalizations" of the policy by granting one-year periods of extended voluntary departure to children and spouses of individuals legalized under IRCA who could establish admissibility, continuous residency, and a clean criminal record. *INS Reverses Family Fairness Policy*, 67 No. 6 Interpreter Releases 153 (Feb. 5, 1990); *see also* 3 Gordon et al., *supra*, § 38.06. Contemporary estimates by INS officials of the number of people potentially eligible ranged as high as 1.5 million.[3] *See Immigration Act of 1989 (Part 2): Hearings Before the Subcomm. on Immigration, Refugees & Int'l Law of the H. Comm. on the Judiciary*, 101st Cong. 49, 56 (1990) (testimony of Gene McNary, Comm'r, INS). Extended voluntary departure, the mechanism through which these individuals were allowed to remain in the United States is, like deferred action, a creature of executive discretion not specifically authorized by statute. *See Hotel & Rest. Emps. Union, Local 25 v. Smith*, 846 F.2d 1499, 1510 (D.C. Cir. 1988) (en banc) (opinion of Mikva, J.).

Since then, the immigration agency has instituted categorical deferred action programs for self-petitioners under the Violence Against Women Act; applicants for T

---

[3] There is some controversy surrounding this number. *See generally Unconstitutionality of Obama's Executive Actions on Immigration: Hearing Before the House Comm. on the Judiciary*, 114th Cong. 84–85 (2015) (written testimony of Professor Stephen H. Legomsky). But even the lowest reported contemporary estimate was that 100,000 people would actually benefit from the program, indicating a major policy initiative. *See INS Reverses Family Fairness Policy, supra*.

and U visas (which are issued to victims of human
trafficking and of certain crimes, respectively); foreign
students unable to fulfill their visa requirements after
Hurricane Katrina; and widowed spouses of United States
citizens who had been married less than two years. None of
these deferred action programs was expressly authorized by
statute at the time they were initiated.

## B.   *The DACA Program*

DACA was announced in a June 15, 2012, memorandum
from Secretary of Homeland Security Janet Napolitano,[4]
entitled "Exercising Prosecutorial Discretion with Respect
to Individuals Who Came to the United States as Children."
Secretary Napolitano explained that the nation's
immigration laws "are not designed . . . to remove
productive young people to countries where they may not
have lived or even speak the language," especially where
"many of these young people have already contributed to our
country in significant ways," and, because they were brought
here as children, "lacked the intent to violate the law." She
therefore determined that "[p]rosecutorial discretion, which
is used in so many other areas, is especially justified here."

The Napolitano memorandum thus laid out the basic
criteria of the DACA program, under which a noncitizen will
be considered for a grant of deferred action if he or she:

- came to the United States under the age of sixteen;

---

[4] Napolitano is a party to this appeal in her current capacity as
President of the University of California.

- has continuously resided in the United States for at least five years preceding [June 15, 2012] and is present in the United States on [June 15, 2012];

- is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;

- has not been convicted of a felony offense, a significant misdemeanor offense, or multiple misdemeanor offenses, nor otherwise poses a threat to national security or public safety; and

- is not above the age of thirty [on June 15, 2012].[5]

DACA applicants must submit extensive personal information to DHS, along with fees totaling nearly $500. Applicants also submit to biometric screening in which they are photographed and fingerprinted, enabling extensive biographical and biometric background checks. If those checks come back clean, each application is then evaluated for approval by DHS personnel on a case-by-case basis.

If approved into the DACA program, an applicant is granted a renewable two-year term of deferred action—again, "a form of prosecutorial discretion whereby the Department of Homeland Security declines to pursue the removal of a person unlawfully present in the United States." *Brewer II*, 855 F.3d at 967. In addition to the deferral of removal itself, pre-existing DHS regulations allow all deferred-action recipients to apply for employment

---

[5] This criterion became known as the "age cap."

authorization, enabling them to work legally and pay taxes. 8 U.S.C. § 1324a(h)(3) (empowering the Executive Branch to authorize the employment of noncitizens); 8 C.F.R. § 274a.12(c)(14) (providing that "[a]n alien who has been granted deferred action" is eligible for work authorization upon a showing of "economic necessity for employment"). Indeed, "DACA recipients are *required* to apply for employment authorization, in keeping with the Executive's intention that DACA recipients remain 'productive' members of society." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1062 (9th Cir. 2014) (*Brewer I*) (emphasis in original). Finally, DHS does not consider deferred-action recipients, including those benefitting from DACA, to accrue "unlawful presence" for purposes of the INA's re-entry bars.[6]  8 U.S.C. § 1182(a)(9)(B)(ii); *see Brewer I*, 757 F.3d at 1059.

---

[6] 8 U.S.C. §§ 1182(a)(9)(B)(i)(I)–(II) establish a three-year and ten-year bar on admission after specified periods of "unlawful presence." Additionally, 8 U.S.C. § 1182(a)(9)(C) provides a permanent bar on admission for immigrants who have accrued an aggregate of more than one year of "unlawful presence" and who later attempt to cross the border clandestinely.  As the district court noted below, DHS "excludes recipients of deferred action from being 'unlawfully present' because their deferred action is considered a period of stay authorized by the government." *Regents of Univ. of Cal. v. DHS*, 279 F. Supp. 3d 1011, 1039 (N.D. Cal. 2018).  As DHS noted in its DACA Frequently Asked Questions (FAQs), "[f]or purposes of future inadmissibility based upon unlawful presence, an individual whose case has been deferred is not considered to be unlawfully present during the period in which deferred action is in effect."  Importantly, however, "deferred action does not confer lawful status upon an individual, nor does it excuse any previous or subsequent periods of unlawful presence."

The FAQs are attached as an exhibit to the *Regents* complaint, and are cited pervasively throughout the *Garcia* complaint.  *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (explaining that for

In an attempt to build on the success of the DACA program, in 2014 Secretary of Homeland Security Jeh Johnson issued a separate memorandum that both announced the related Deferred Action for Parents of Americans and Lawful Permanent Residents program (DAPA), which allowed deferred action for certain noncitizen parents of American citizens and lawful permanent residents, and expanded DACA by (1) removing the age cap, (2) extending the term of deferred-action and related work-authorization grants from two to three years, and (3) moving up the cutoff date by which an applicant must have been in the United States to January 1, 2010.  Twenty-six states challenged this extension in federal court, arguing that DAPA is unconstitutional.  All of the policies outlined in the Johnson memorandum were enjoined nationwide in a district court order upheld by the Fifth Circuit and affirmed by an equally divided Supreme Court.  *See United States v. Texas*, 136 S. Ct. 2271 (2016); *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015); *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015); *see also Neil v. Biggers*, 409 U.S. 188, 192 (1972) (affirmance by an equally divided court has no precedential value).  The original DACA program remained in effect.

In 2017, a new presidential administration took office, bringing with it a change in immigration policy.  On February 20, 2017, then-Secretary of Homeland Security John Kelly issued a memorandum that set out the

---

purposes of a motion to dismiss, "[c]ertain written instruments attached to pleadings may be considered part of the pleading.  Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." (internal citation omitted)).

administration's new enforcement priorities, stating that "the Department no longer will exempt classes or categories of removable aliens from potential enforcement."  However, the memorandum explicitly left DACA and DAPA in place.  In a second memorandum issued June 15, 2017, after "consider[ing] a number of factors, including the preliminary injunction in the [*Texas*] matter, the ongoing litigation, the fact that DAPA never took effect, and our new immigration enforcement priorities," Secretary Kelly rescinded DAPA as an "exercise of [his] discretion."

Then, on June 28, 2017, Texas Attorney General Ken Paxton wrote to United States Attorney General Jefferson B. Sessions III threatening that if the federal government did not rescind DACA by September 5, 2017, Paxton would amend the complaint in the *Texas* litigation to challenge DACA as well as DAPA.

On September 4, 2017, the day before Paxton's deadline, Attorney General Sessions sent his own letter to Acting Secretary of Homeland Security Elaine Duke.  The Attorney General's letter "advise[d] that the Department of Homeland Security . . . should rescind" the DACA memorandum based on his legal opinion that the Department lacked statutory authority to have created DACA in the first place.  He wrote:

> DACA was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress'[s] repeated rejection of proposed legislation that would have accomplished a similar result.  Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch.

The Attorney General further opined that "[b]ecause the DACA policy has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA."

The very next day, following the Attorney General's directive, Acting Secretary Duke issued a memorandum rescinding DACA. The memorandum begins with a "Background" section that covers DACA, DAPA, the *Texas* litigation, Secretary Kelly's previous memoranda, Texas Attorney General Paxton's threat, and the Attorney General's letter. Then, in the section titled "Rescission of the June 15, 2012 DACA Memorandum," the Duke memorandum states:

> Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated. In the exercise of my authority in establishing national immigration policies and priorities, except for the purposes explicitly identified below, I hereby rescind the June 15, 2012 memorandum.

The Duke memorandum further states that although DHS would stop accepting initial DACA requests effective immediately, the agency would provide a one-month window in which renewal applications could be filed for current DACA beneficiaries whose benefits were set to expire before March 5, 2018. It also states that DHS would not terminate existing grants of deferred action under DACA

"solely based on the directives in this memorandum." Thus, beginning on March 5, 2018, each DACA recipient's grant of deferred action would be allowed to expire at the end of its two-year term. As of September 4, 2017—the day before the rescission—approximately 689,800 individuals were enrolled in DACA.

## C.  *Procedural History*

The rescission of DACA instantly sparked litigation across the country, including the cases on appeal here. Suits were filed in the Northern District of California by the Regents of the University of California, a group of states led by California, the City of San Jose, the County of Santa Clara and Service Employees International Union Local 521, and a group of individual DACA recipients led by Dulce Garcia. The complaints included claims that the rescission was arbitrary and capricious under the Administrative Procedure Act (APA); that it was a substantive rule requiring notice-and-comment rulemaking under the APA; that it violated the due process and equal protection rights protected by the U.S. Constitution; and that DHS was equitably estopped from using the information provided on DACA applications for enforcement purposes. The cases were consolidated before Judge William Alsup in the District Court for the Northern District of California and proceeded to litigation.

On October 17, 2017, the district court ordered the government to complete the administrative record, holding that the record proffered by the government was incomplete in several respects. Seeking to avoid providing additional documents, the government filed a petition for mandamus. In arguing its mandamus petition, the government took the position that the legality of the rescission should stand or fall based solely on the reasons and the record already provided

by the government. We denied the mandamus petition, stating that "the notion that the head of a United States agency would decide to terminate a program giving legal protections to roughly 800,000 people based solely on 256 pages of publicly available documents is not credible, as the district court concluded." *In re United States*, 875 F.3d 1200, 1206 (9th Cir. 2017) (footnotes omitted).

The government next petitioned the Supreme Court for the same mandamus relief; the Court did not reach the merits of the administrative record dispute, but instead instructed the district court to rule on the government's threshold arguments challenging reviewability of its rescission decision before requiring the government to provide additional documents. *In re United States*, 138 S. Ct. 443, 445 (2017). Thus, the administrative record in this case still consists of a scant 256 publicly available pages, roughly three-quarters of which are taken up by the three published judicial opinions from the *Texas* litigation.

Returning to the district court, the government moved to dismiss the consolidated cases on jurisdictional grounds and for failure to state a claim, while the plaintiffs moved for a preliminary injunction. The district court granted the request for a nationwide preliminary injunction, holding that most of the plaintiffs had standing;[7] that neither the APA nor the INA barred judicial review; and that plaintiffs were likely to succeed on their claim that the decision to rescind DACA was arbitrary and capricious. The district court therefore entered a preliminary injunction requiring DHS to adjudicate renewal applications for existing DACA recipients.

---

[7] Two states were dismissed from the case with leave to amend. That decision is not challenged on appeal.

In a separate order, the court partially granted and partially denied the government's motion to dismiss. The court dismissed plaintiffs' notice-and-comment and Regulatory Flexibility Act claims; a due process claim premised on an entitlement to deferred action; and the equitable estoppel claim. The court denied the motion as to plaintiffs' equal protection claim and a due process claim premised on an alleged change in DHS's information-sharing policy.

The district court certified the issues addressed in both its orders for interlocutory review under 28 U.S.C. § 1292(b). We granted the government's petition for permission to appeal the orders. Plaintiffs cross-appealed, asserting that the district court erroneously dismissed their notice-and-comment and due process claims.

## II.

"We review the district court's decision to grant or deny a preliminary injunction for abuse of discretion." *Hernandez v. Sessions*, 872 F.3d 976, 987 (9th Cir. 2017) (quoting *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc) (per curiam)). Within this inquiry, "[w]e review the district court's legal conclusions *de novo*, the factual findings underlying its decision for clear error." *Id.* (quoting *K.W. ex rel. D.W. v. Armstrong*, 789 F.3d 962, 969 (9th Cir. 2015)). A district court's decision on a motion to dismiss for lack of subject matter jurisdiction or for failure to state a claim is also reviewed de novo. *See, e.g.*, *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 963 (9th Cir. 2017).

# III.

The threshold question in this case is in many ways also the most pivotal: is Acting Secretary Duke's decision to rescind the DACA program reviewable by the courts at all? The government contends that both the APA and the INA bar judicial review; we address each statute in turn.

## A. Reviewability under the APA

The APA provides for broad judicial review of agency action: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. Thus, as a general matter, the Supreme Court has consistently articulated "a 'strong presumption' favoring judicial review of administrative action." *Mach Mining, LLC v. EEOC*, 135 S. Ct. 1645, 1651 (2015) (quoting *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986)); *see also, e.g.*, *Lincoln v. Vigil*, 508 U.S. 182, 190 (1993) ("[W]e have read the APA as embodying a 'basic presumption of judicial review.'") (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967)).

However, the APA also forecloses judicial review under its procedures to the extent that "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2).[8] "This

---

[8] This bar does not affect a plaintiff's ability to bring freestanding constitutional claims. *See Webster v. Doe*, 486 U.S. 592, 601–05 (1988); *Padula v. Webster*, 822 F.2d 97, 101 (D.C. Cir. 1987) ("[E]ven where agency action is 'committed to agency discretion by law,' review is still available to determine if the Constitution has been violated." (quoting *Doe v. Casey*, 796 F.2d 1508, 1517–18 n.33 (1986), *aff'd in part, rev'd in part on other grounds*, *Webster v. Doe*, 486 U.S. 592 (1988))).

is a very narrow exception" that comes into play only "in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971) (internal quotation marks omitted), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977); *see also Heckler v. Chaney*, 470 U.S. 821, 830 (1985) ("[R]eview is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.").

In *Heckler v. Chaney*, the Supreme Court analyzed this exception in considering "the extent to which a decision of an administrative agency to exercise its 'discretion' not to undertake certain enforcement actions is subject to judicial review under the [APA]." 470 U.S. at 823. In *Chaney*, the Commissioner of the Food and Drug Administration (FDA) declined to take investigatory and enforcement action against state prison officials' use of drugs, which had been FDA-approved for medical use, in human executions. *Id.* at 823–24. A group of prisoners on death row had petitioned the FDA, arguing that using the drugs to execute humans was unlawful because they were only approved for medical use, and not for executions. *Id.* Responding to the petition, the Commissioner questioned whether the FDA had jurisdiction to prohibit the use of drugs in executions, but went on to conclude that even if the agency did have jurisdiction, it would "decline to exercise it under [the agency's] inherent discretion to" do so. *Id.* at 824. The inmates then sued the FDA, attempting to invoke the APA's framework for judicial review. *Id.* at 825.

The Supreme Court held that the FDA Commissioner's discretionary decision not to enforce the Food, Drug, and Cosmetic Act against state prison officials was unreviewable

under the APA. *Chaney*, 470 U.S. at 837–38. The Court identified a pre-APA "tradition" under which "an agency's decision not to prosecute or enforce . . . is a decision generally committed to an agency's absolute discretion," and concluded that "the Congress enacting the APA did not intend to alter that tradition." *Id.* at 831–32. As the Court summed up its holding, "[t]he general exception to reviewability provided by § 701(a)(2) for action 'committed to agency discretion' remains a narrow one, but within that exception are included agency refusals to institute investigative or enforcement proceedings, unless Congress has indicated otherwise." *Id.* at 838 (citation omitted). That is, the normal presumption in favor of judicial review is reversed when the agency action in question is a refusal to enforce the substantive law.

Importantly for present purposes, the Court explicitly left open the question whether "a refusal by the agency to institute proceedings based solely on the belief that it lacks jurisdiction" might be reviewable notwithstanding this general rule. *Chaney*, 470 U.S. at 833 n.4 ("[W]e express no opinion on whether such decisions would be unreviewable under § 701(a)(2) . . . .").[9] This reservation makes perfect

---

[9] *Chaney*'s footnote 4 reads in its entirety:

> We do not have in this case a refusal by the agency to institute proceedings based solely on the belief that it lacks jurisdiction. *Nor* do we have a situation where it could justifiably be found that the agency has "consciously and expressly adopted a general policy" that is so extreme as to amount to an abdication of its statutory responsibilities. *See, e.g., Adams v. Richardson*, 156 U.S. App. D.C. 267, 480 F.2d 1159 (1973) (en banc). Although we express no opinion on whether such decisions would be unreviewable under

sense. It is one thing to read the APA's exception for "agency action [] committed to agency discretion by law" as including the Executive's discretionary decisions to decline enforcement, given a pre-existing legal tradition that had treated those decisions as unreviewable. It would be quite another to say that an agency's *non*-discretionary belief that it lacked the *power* to enforce the law was similarly "committed to agency discretion." 5 U.S.C. § 701(a)(2); *see Chaney*, 470 U.S. at 833 n.4 ("[W]e note that in those situations [involving a belief that the agency lacked discretion,] the statute conferring authority on the agency might indicate that such decisions were not 'committed to agency discretion.'").

Several years after *Chaney*, our court directly addressed the question that the Supreme Court had left open. In *Montana Air Chapter No. 29 v. Federal Labor Relations Authority*, a union representing civilian Air National Guard employees filed an unfair labor practice charge against the National Guard Bureau, but the Federal Labor Relations Authority (FLRA) refused to issue a complaint. 898 F.2d 753, 755 (9th Cir. 1990). The opinion letters issued by FLRA's general counsel indicated that he had "determined, according to his interpretation of the statutes and regulations, that he lacked jurisdiction to issue an unfair labor practice complaint" under the circumstances. *Id.* at 757.

Acknowledging *Chaney*'s rule that "[a]n agency's decision not to take enforcement action . . . is presumed to

---

§ 701(a)(2), we note that in those situations the statute conferring authority on the agency might indicate that such decisions were not "committed to agency discretion."

*Heckler v. Chaney*, 470 U.S. 821, 833 n.4 (emphasis added).

be immune from judicial review," we noted that the Supreme Court had nevertheless "suggested that discretionary nonenforcement decisions may be reviewable when" the refusal to enforce is based on a supposed lack of jurisdiction. *Id.* at 756 (citing *Chaney*, 470 U.S. at 833 n.4). We took the next logical step, holding that *Chaney*'s presumption of nonreviewability "may be overcome if the refusal is based solely on the erroneous belief that the agency lacks jurisdiction." *Id.* at 754. Because "the General Counsel's decision not to issue an unfair labor practice complaint was based on his belief that he lacked jurisdiction to issue such a complaint," we proceeded to "examine the General Counsel's statutory and regulatory interpretations to determine if his belief that he lacked jurisdiction was correct." *Id.* at 757.[10]

The final piece of the APA reviewability puzzle is the Supreme Court's decision in *City of Arlington v. FCC*, 569 U.S. 290 (2013). There, the Court was faced with the question whether an agency's determination of its own jurisdiction is entitled to the same deference as any other agency interpretation under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Writing for the Court, Justice Scalia explained in no uncertain terms that in the context of administrative agencies, "the distinction between 'jurisdictional' and 'nonjurisdictional' interpretations is a mirage." *City of*

---

[10] We reject the government's reading of *Montana Air*, under which the *Chaney* presumption would be overcome only if the agency action is based on a belief in a lack of jurisdiction, *and* the refusal to enforce is so extreme as to become an abdication of the agency's statutory responsibilities. Both *Chaney* and *Montana Air* make clear that these are two independent exceptions to the narrow rule of nonreviewability, not two elements of a single test. *Chaney*, 470 U.S. at 833 n.4; *Montana Air*, 898 F.2d at 756.

*Arlington*, 569 U.S. at 297.  With respect to courts, the jurisdictional/nonjurisdictional divide is a real and consequential one, because "[a] court's power to decide a case is independent of whether its decision is correct . . . . Put differently, a jurisdictionally proper but substantively incorrect judicial decision is not ultra vires." *Id.*  But the same is not true with respect to agencies: "Both their power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires." *Id.*  Thus, the Court concluded, "[t]he reality, laid bare, is that there is *no difference*, insofar as the validity of agency action is concerned, between an agency's exceeding the scope of its authority (its 'jurisdiction') and its exceeding authorized application of authority that it unquestionably has." *Id.* at 299 (emphasis in original).[11]

To summarize, *Chaney* holds that an agency's refusal to enforce the substantive law is presumptively unreviewable because that discretionary nonenforcement function is "committed to agency discretion" within the meaning of the APA.  *Montana Air* builds upon the question left open by *Chaney*'s footnote four, explaining that a nonenforcement decision is reviewable notwithstanding *Chaney* if the decision was based solely on the agency's belief that it lacked jurisdiction to act.  And *City of Arlington* teaches that there is no difference between an agency that lacks

---

[11] The opinion is replete with equally emphatic—and equally quotable—formulations of the same point.  *See, e.g.*, *City of Arlington*, 569 U.S. at 301 ("In sum, judges should not waste their time in the mental acrobatics needed to decide whether an agency's interpretation of a statutory provision is 'jurisdictional' or 'nonjurisdictional.'  Once those labels are sheared away, it becomes clear that the question in every case is, simply, whether the statutory text forecloses the agency's assertion of authority, or not.").

jurisdiction to take a certain action, and one that is barred by the substantive law from doing the same; the question "is always, simply, whether the agency has stayed within the bounds of its statutory authority." *City of Arlington*, 569 U.S. at 297 (emphasis omitted). The rule that emerges is this: an agency's nonenforcement decision is outside the scope of the *Chaney* presumption—and is therefore presumptively reviewable—if it is based solely on a belief that the agency lacked the lawful authority to do otherwise. That is, where the agency's decision is based not on an exercise of discretion, but instead on a belief that any alternative choice was foreclosed by law, the APA's "committed to agency discretion" bar to reviewability, 5 U.S.C. § 701(a)(2), does not apply.

This rule is fully consistent with the Supreme Court's decision in *ICC v. Brotherhood of Locomotive Engineers* (*BLE*), which rejected the notion that "if the agency gives a 'reviewable' reason for otherwise unreviewable action, the action becomes reviewable." 482 U.S. 270, 283 (1987). We have no quarrel with that statement in the abstract, but as applied it simply begs the question: is the agency action in question "otherwise unreviewable"?

The *BLE* case concerned the reviewability of the Interstate Commerce Commission's denial of a motion to reopen proceedings on grounds of material error. *Id.* at 280. The Supreme Court held that category of agency action presumptively unreviewable because it "perceive[d] . . . a similar tradition of nonreviewability" to the one it had found in *Chaney* for nonenforcement decisions. *Id.* at 282. In reaching its holding, the Court rejected an argument that there was nevertheless "law to apply"—and that therefore the action was not committed to agency discretion—as the agency's order had discussed the legal merits at length. *Id.*

at 280–81.  What mattered was that the agency's "formal action" was one for which a tradition of nonreviewability was discernable, regardless of how the agency explained its action.[12]  *Id.*

*BLE* thus stands for the proposition that if a particular type of agency action is presumptively unreviewable, the fact that the agency explains itself in terms that are judicially cognizable does not change the categorical rule.  Fair enough.  But the categorical rule announced in *Chaney* does not encompass nonenforcement decisions based solely on the agency's belief that it lacked power to take a particular course; instead, the Court explicitly declined to extend its rule to that situation.  *Chaney*, 470 U.S. at 833 n.4.  And in *Montana Air*, we held that such decisions *are* reviewable.  898 F.2d at 754.  *BLE*'s statement about "otherwise unreviewable" agency decisions, 482 U.S. at 283, therefore has no application to the category of agency action at issue here.

We believe the analysis laid out above follows necessarily from existing doctrine.  And, just as importantly,

---

[12] The Court gave as an example a prosecutor's refusal to institute criminal proceedings based on her "belief . . . that the law will not sustain a conviction."  *BLE*, 482 U.S. at 283.  Such a belief is not equivalent to a conclusion that the government lacked the power to institute a prosecution in the first place.  For one colorful example, in *Bond v. United States*, prosecutors made the "surprising" decision to charge "an amateur attempt by a jilted wife to injure her husband's lover" under the federal statute implementing the international Convention on Chemical Weapons.  134 S. Ct. 2077, 2083–84 (2014).  While the Court ultimately interpreted the statute not to encompass the charged conduct, *id.* at 2093–94, no one suggested that the government's aggressive decision to institute the prosecution was itself ultra vires.

this approach also promotes values fundamental to the administrative process.

First, the *Montana Air* rule does not impermissibly encroach on executive discretion; to the contrary, it empowers the Executive. If an agency head is mistaken in her assessment that the law precludes one course of action, allowing the courts to disabuse her of that incorrect view of the law does not constrain discretion, but rather opens new vistas within which discretion can operate. That is, if an administrator chooses option *A* for the sole reason that she believes option *B* to be beyond her legal authority, a decision from the courts putting option *B* back on the table allows a reasoned, discretionary policy choice between the two courses of action. And if the agency's view of the law is instead confirmed by the courts, no injury to discretion results because the status quo is preserved.

Moreover, allowing judicial review under these circumstances serves the critical function of promoting accountability within the Executive Branch—not accountability to the courts, but democratic accountability to the people. Accountability in this sense is fundamental to the legitimacy of the administrative system: although they are "unelected . . . bureaucrats," *City of Arlington*, 569 U.S. at 305, the heads of cabinet-level departments like DHS "are subject to the exercise of political oversight and share the President's accountability to the people." *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 886 (1991). Indeed, the Constitution's "Appointments Clause was designed to ensure public accountability for . . . the making of a bad appointment . . . ." *Edmond v. United States*, 520 U.S. 651, 660 (1997); *see also* Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2251–52 (2001) ("[A]ccountability" is one of the two "principal

values that all models of administration must attempt to further."); 1 Richard J. Pierce, Jr., Administrative Law Treatise 114 (5th ed. 2010) ("Agencies are politically accountable because the President is accountable for the actions of agencies.").

This democratic responsiveness is especially critical for agencies exercising prosecutorial functions because, as Justice Scalia explained in his oft-cited dissent in *Morrison v. Olson*, "[u]nder our system of government, the primary check against prosecutorial abuse is a political one." 487 U.S. 654, 728 (1988) (Scalia, J., dissenting). This check works because "when crimes are not investigated and prosecuted fairly, nonselectively, with a reasonable sense of proportion, the President pays the cost in political damage to his administration." *Id.* at 728–29. In other words, when prosecutorial functions are exercised in a manner that is within the law but is nevertheless repugnant to the sensibilities of the people, "the unfairness will come home to roost in the Oval Office." *Id.* at 729.

But public accountability for agency action can only be achieved if the electorate knows how to apportion the praise for good measures and the blame for bad ones. Without knowing the true source of an objectionable agency action, "the public cannot 'determine on whom the blame or the punishment of a pernicious measure, or series of pernicious measures ought really to fall.'" *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 498 (2010) (quoting The Federalist No. 70, at 476 (Alexander Hamilton) (Jacob E. Cooke ed. 1961)). In then-Professor Kagan's words, "the degree to which the public can understand the sources and levers of bureaucratic action" is "a fundamental precondition of accountability in administration." Kagan, *supra*, at 2332.

The *Montana Air* rule promotes accountability by ensuring that the public knows where to place blame for an unpopular measure.  When an agency justifies an action solely with an assertion that the law prohibits any other course, it shifts responsibility for the outcome from the Executive Branch to Congress (for making the law in question) or the courts (for construing it).  If the Executive is correct in its interpretation of the law, then the public is correct to blame the other two branches for any resulting problems.  But if the Executive is wrong, then it avoids democratic accountability for a choice that was the agency's to make all along.  Allowing the judiciary—the branch ultimately responsible for interpreting the law, *see Marbury*, 5 U.S. (1 Cranch) at 177—to review such decisions prevents this anti-democratic and untoward outcome.  As Judge Bates of the District Court for the District of Columbia aptly put the point in confronting the very issue we face here, "an official cannot claim that the law ties her hands while at the same time denying the courts' power to unbind her.  She may escape political accountability or judicial review, but not both." *NAACP v. Trump*, 298 F. Supp. 3d 209, 249 (D.D.C. 2018).

We therefore must determine whether the Acting Secretary's decision to end DACA was based solely on a belief that the program was unlawful, such that the *Chaney* presumption does not apply.[13]

---

[13] Because we take this doctrinal course, we need not decide whether the rescission of DACA would be reviewable absent the exception reflected in *Montana Air* and *Chaney*'s footnote four.  But we do note several points.  First, a literal reading of *Chaney*'s language would not even encompass the decision to rescind DACA, since *Chaney* by its own terms applies only to "agency decisions *not to undertake* enforcement action."  470 U.S. at 832 (emphasis added).  Nowhere does the opinion

We take Attorney General Sessions literally at his word when he wrote to Acting Secretary Duke that "DACA was effectuated . . . without proper statutory authority," and that DACA "was an unconstitutional exercise of authority by the Executive Branch." These are the reasons he gave for advising Acting Secretary Duke to rescind DACA. We

---

suggest the broader proposition that any decision simply related to enforcement should be presumed unreviewable. Our court's dicta in *Morales de Soto v. Lynch*, 824 F.3d 822, 827 n.4 (9th Cir. 2016), which addressed a completely separate issue of jurisdiction under the INA, is not to the contrary. Thus, to the extent that the *Montana Air* exception might not seem a perfect fit for the rescission of DACA—which was not exactly a decision not to enforce—the *Chaney* presumption itself shares the same defect. There is no daylight between the *Chaney* rule and the *Montana Air* exception in terms of the type of agency action to which they apply. So if the rescission of DACA were outside the *Montana Air* exception by virtue of not being strictly a nonenforcement decision, it would also fall outside the *Chaney* presumption of unreviewability in the first place.

Second, the D.C. Circuit has developed a line of cases explaining that while *Chaney* bars judicial review of a "single-shot nonenforcement decision," on the other hand, "an agency's adoption of a general enforcement policy is subject to review." *OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808, 812 (D.C. Cir. 1998) (quoting *Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 674–75 (D.C. Cir. 1994)); *see also Kenney v. Glickman*, 96 F.3d 1118, 1123 (8th Cir. 1996); *Nat'l Treasury Emps. Union v. Horner*, 854 F.2d 490, 496–97 (D.C. Cir. 1988).

Thus, every one of the four courts that has considered the question has held that the rescission of DACA is reviewable under the APA, although each has employed slightly different reasoning for that conclusion. *See NAACP v. Trump*, 298 F. Supp. 3d 209, 226–34 (D.D.C. 2018); *Casa de Md. v. DHS*, 284 F. Supp. 3d 758, 769–70 (D. Md. 2018); *Regents of Univ. of Cal. v. DHS*, 279 F. Supp. 3d 1011, 1029–31 (N.D. Cal. 2018) (decision below); *Batalla Vidal v. Duke*, 295 F. Supp. 3d 127, 147–52 (E.D.N.Y. 2017).

therefore agree with the district court that the basis for the rescission was a belief that DACA was unlawful, and that the discretionary "litigation risk" rationale pressed by the government now is a mere post-hoc rationalization put forward for purposes of this litigation.[14]  Acting Secretary Duke's September 5, 2017, rescission memorandum contains exactly one sentence of analysis:

> Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated.

In the next sentence, the Acting Secretary went on to announce the rescission itself:

> In the exercise of my authority in establishing national immigration policies and priorities, except for the purposes explicitly identified below, I hereby rescind the June 15, 2012 memorandum.

The easy rejoinder to the government's insistence that the Acting Secretary rescinded DACA due to "litigation risks" is that the Acting Secretary did not mention "litigation risks" as a "consideration."  And both "consideration[s]"

---

[14] After hundreds of pages of briefing and over an hour of oral argument, it remains less than clear how "litigation risk" differs from a substantive belief that DACA is illegal.  We take the term to refer to a concern that DACA would be abruptly enjoined, regardless of whether the program was illegal or not.  Of course, such a concern is not independent of an on-the-merits assessment of DACA's legality.

actually enumerated by the Acting Secretary are most naturally read as supporting a rationale based on DACA's illegality. The "ongoing litigation" referenced is of course *Texas v. United States*, in which the Fifth Circuit upheld a preliminary injunction against the related DAPA policy, and the Supreme Court affirmed by an equally divided vote.[15] *See Texas*, 136 S. Ct. 2271 (2016); *Texas*, 809 F.3d 134 (5th Cir. 2015). The "rulings" in that case are propositions of law—taken alone, they are more readily understood as supporting a legal conclusion (DACA is illegal) than a pragmatic one (DACA might be enjoined). The pragmatic interpretation requires extra analytical steps (someone might sue to enjoin DACA, and they might win) that are entirely absent from the list of factors that the Acting Secretary stated she was "taking into consideration" in making her decision. Acting Secretary Duke easily could have included "the prospect of litigation challenging DACA" in her list of considerations; had she done so, then perhaps the reference to the *Texas* litigation could be read as supporting a practical worry about an injunction.[16] Absent that, however, the mention of the courts' "rulings" is best read as referencing the courts' legal conclusions.

Attorney General Sessions's September 4, 2017, letter likewise focuses on the supposed illegality of DACA, rather

---

[15] This conclusion is only bolstered by the fact that the government's production of the "administrative record" in this case includes the entirety of the three published judicial opinions in the *Texas* litigation.

[16] The Acting Secretary did reference Texas Attorney General Ken Paxton's threat to amend the *Texas* suit to include DACA, but she did so in the "Background" section of her memorandum. If anything, the inclusion of the threat in the background portion renders its omission from the list of factors the Acting Secretary was actually "[t]aking into consideration" all the more stark.

than any alleged "litigation risk."  Its substantive paragraph states

> DACA was effectuated . . . *without proper statutory authority* and with no established end-date, after Congress'[s] repeated rejection of proposed legislation that would have accomplished a similar result.  Such an open-ended circumvention of immigration laws was *an unconstitutional exercise of authority* by the Executive Branch.

(emphases added).

These sentences unmistakably reflect the Attorney General's belief that DACA was illegal and therefore beyond the power of DHS to institute or maintain.  The letter goes on to opine that "[b]ecause the DACA policy has the same legal and constitutional defects that the courts recognized as to DAPA [in the *Texas* litigation], it is likely that potentially imminent litigation would yield similar results with respect to DACA."  But in the context of the full paragraph, the reference to "similar results" is best read not as an independent reason for rescinding DACA, but as a natural consequence of DACA's supposed illegality—which is the topic of the paragraph as a whole.  In the words of Judge Garaufis of the District Court for the Eastern District of New York, that reference "is too thin a reed to bear the weight of Defendants' 'litigation risk' argument."  *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 429 (E.D.N.Y. 2018).

In any event, the Attorney General's letter is relevant only to the extent it illuminates whether Acting Secretary Duke—the official who actually rescinded the DACA program—did so as an exercise of her discretion or because she understood her hand to be forced by the law.  In this

connection, it is helpful to compare the operative language used by Acting Secretary Duke to rescind DACA with that used by her predecessor, Secretary John Kelly, to rescind DAPA just months before.   In his June 15, 2017, memorandum, Secretary Kelly wrote:

> After consulting with the Attorney General, and *in the exercise of my discretion* in establishing national immigration enforcement policies and priorities, I hereby rescind the November 20, 2014 memorandum [that established DAPA].

(emphasis added).   Placed alongside Acting Secretary Duke's language, the parallels—and the differences—are stark.  Acting Secretary Duke's memorandum reads:

> *In the exercise of my authority* in establishing national immigration policies and priorities, except for the purposes explicitly identified below, I hereby rescind the June 15, 2012 memorandum [that established DACA].

(emphasis added).

The obvious similarities between the two passages strongly suggest that Acting Secretary Duke modeled her language after that of Secretary Kelly's memo.  And indeed, we *know* that the Acting Secretary considered the Kelly memorandum in reaching her decision, because the government has told us so.   *See* Petition for Writ of Mandamus, *In re United States*, No. 17-72917 (9th Cir. Oct. 20, 2017) (stating that the government's proffered administrative record in this case, which includes the Kelly memorandum, "consist[s] of the non-privileged materials considered by the Acting Secretary in reaching her decision

to rescind the DACA policy"); *id.* at 18 (taking the position that only materials personally reviewed by the Acting Secretary herself, not by subordinates, are "considered" by the Secretary).

Given that Acting Secretary Duke hewed so closely to Secretary Kelly's language in general, it is appropriate to draw meaning from the one major difference between the two sentences: Secretary Kelly exercised his "*discretion*" in ending DAPA; Acting Secretary Duke merely exercised her "*authority*." *Cf., e.g.*, *Jama v. ICE*, 543 U.S. 335, 357 (2005) ("[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended."). The point is that with the example set by the Kelly memorandum in front of her, Acting Secretary Duke clearly would have known how to express that the rescission was a discretionary act— if that were indeed the case.[17] Furthermore, the near-verbatim language of the two rescission memoranda suggests that the Acting Secretary adopted the majority of Kelly's wording, but actively rejected describing the DACA rescission as an act of discretion. This difference in language cuts strongly against any suggestion that the rescission was discretionary.

The government counters that the memorandum "focused from beginning to end principally on litigation concerns, not the legality of DACA *per se*." But as the State plaintiffs point out, the memorandum's references to these

---

[17] Secretary Kelly's references to the factors he considered, which included obviously discretionary considerations such as "our new immigration enforcement priorities," provided a further model for how to describe a discretionary decision, which Acting Secretary Duke also chose not to follow.

supposed "litigation concerns" were limited to a simple summary of the *Texas* litigation's procedural history; appeared only in the "Background" section of the memorandum; and were not referenced in the Acting Secretary's statement of what she was "[t]aking into consideration." *See also* note 16, *supra*.

The government also asserts that because the Acting Secretary wrote that DACA "should" rather than *must* be ended, she did not view herself as bound to act. But even on its face, "should" is fully capable of expressing obligation or necessity. *See, e.g.*, *Should*, New Oxford American Dictionary (3d ed. 2010) ("used to indicate obligation, duty, or correctness"); *cf. Should*, Garner's Dictionary of Legal Usage (3d ed. 2011) ("should . . . is sometimes used to create mandatory standards"). The Acting Secretary's use of "should" instead of "must" cannot overcome the absence of any discussion of potential litigation or the "risks" attendant to it from the rescission memorandum's statement of reasons, and the discrepancy between the rescission of DAPA as an act of "discretion" and the rescission of DACA as an act of "authority."

Finally, the government takes a quote from the Supreme Court to the effect that courts should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974), and contorts it into an argument that the district court's "narrow reading of the Acting Secretary's rationale is *hardly the only one* that 'may reasonably be discerned' from the Acting Secretary's memorandum." But *Bowman* is about finding a reviewable rationale in an agency's action versus finding *no* articulation of that rationale. *Bowman* does not say—and it certainly does not logically follow—that a court must ignore the most

natural reading of an agency's statement of reasons just because it may also be "reasonably susceptible" to a (less compelling) reading that the government would prefer. The government is in effect asking the court to defer to agency counsel's post-hoc rationalization, as long as there is some reading of the rescission memorandum—never mind how strained—that would support it. *Bowman* does not require this incongruous result.

We agree with the district court that the Acting Secretary based the rescission of DACA solely on a belief that DACA was beyond the authority of DHS. Under *Montana Air* and *Chaney*'s footnote four, this conclusion brings the rescission within the realm of agency actions reviewable under the APA. Unless the INA itself deprives the courts of jurisdiction over this case, we must proceed to evaluate the merits of plaintiffs' arbitrary-and-capricious claim.

## B. *Jurisdiction under the INA*

The government contends that the INA stripped the district court of its jurisdiction in a provision that states:

> Except as provided in this section [which sets out avenues of review not applicable here] . . . no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the [Secretary of Homeland Security] to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

8 U.S.C. § 1252(g).

The Supreme Court has explicitly held that this section "applies only to three discrete actions that the [Secretary] may take: her 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" *AADC*, 525 U.S. at 482 (emphasis in original). As the Court put it, "[i]t is implausible that the mention of three discrete events along the road to deportation was a shorthand way of referring to all claims arising from deportation proceedings. Not because Congress is too unpoetic to use synecdoche, but because that literary device is incompatible with the need for precision in legislative drafting." *Id.*

The government attempts to expand Section 1252(g) to encompass this case in two ways. First, it points out that the *AADC* Court read that provision as Congress's effort to shield executive decisions not to grant deferred action from review outside the procedures prescribed by the INA. The Court quoted a treatise describing the practice of deferred action and the litigation that would result when the government declined to grant deferred action: "Efforts to challenge the refusal to exercise such discretion on behalf of specific aliens sometimes have been favorably considered by the courts . . . ." *Id.* at 484–85 (quoting 6 Charles Gordon et al., Immigration Law and Procedure § 72.03[2][h] (1998)). Having reviewed these developments, the Court concluded: "Section 1252(g) seems clearly designed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations. . . ." *Id.* at 485.

The government argues that *AADC*'s reasoning—and therefore Section 1252(g)—applies to the rescission of DACA, which is itself in some sense a "no deferred action" decision. It seems quite clear, however, that *AADC* reads Section 1252(g) as responding to litigation over *individual* "no deferred action" decisions, rather than a programmatic

shift like the DACA rescission. For example, the treatise passage *AADC* quotes to set the scene for Congress's action refers explicitly to "[e]fforts to challenge the refusal to exercise [deferred action] *on behalf of specific aliens. . . .*" *Id.* (emphasis added). And in any case, the holding of *AADC* was explicit: "The provision applies only to [the] three discrete actions" mentioned in the statute. *Id.* at 482.

The government's fallback argument is thus to cast the rescission of DACA as an initial "action" in the agency's "commence[ment] [of] proceedings." 8 U.S.C. § 1252(g). But *AADC* specifically rejected a broad reading of the three discrete actions listed in Section 1252(g). "[D]ecisions to open an investigation, [or] to surveil the suspected violator" are *not* included in Section 1252(g)'s jurisdictional bar, *AADC*, 525 U.S. at 482, even though these actions are also "part of the deportation process," *id.*, and could similarly be construed as incremental steps toward an eventual "commence[ment] [of] proceedings," 8 U.S.C. § 1252(g).

Indeed, in a case closely on point, our court rejected the application of Section 1252(g) and allowed to proceed a challenge to INS guidance narrowly interpreting the terms of a "one-time legalization program" for undocumented immigrants. *See Catholic Soc. Servs., Inc. v. INS*, 232 F.3d 1139, 1141 (9th Cir. 2000). We noted that "[a]s interpreted by the Supreme Court in [*AADC*], [Section 1252(g)] applies only to the three specific discretionary actions mentioned in its text, not to all claims relating in any way to deportation proceedings," and held that the challenge was not barred. *Id.* at 1150. The panel did not appear concerned by the fact that it was possible to conceptualize that policy choice by INS as an ingredient in a subsequent decision to commence proceedings against particular individuals.

The government cites no cases applying the Section 1252(g) bar to a programmatic policy decision about deferred action; the two cases it does cite were challenges to individual "no deferred action" decisions—that is, they fall exactly within Section 1252(g) as interpreted by the Court in *AADC*. *See Vasquez v. Aviles*, 639 F. App'x 898 (3d Cir. 2016); *Botezatu v. INS*, 195 F.3d 311 (7th Cir. 1999). Especially in light of the "'strong presumption in favor of judicial review of administrative action' governing the construction of jurisdiction-stripping provisions of IIRIRA,"[18] *ANA Int'l, Inc. v. Way*, 393 F.3d 886, 891 (9th Cir. 2004) (quoting *INS v. St. Cyr*, 533 U.S. 289, 298 (2001)), we hold that Section 1252(g) does not deprive courts of jurisdiction to review the DACA rescission order.[19]

## IV.

Having concluded that neither the APA nor the INA precludes judicial review, we turn to the merits of the preliminary injunction. The district court held that plaintiffs satisfied the familiar four-factor preliminary injunction

---

[18] Section 1252(g) is one such provision. *See AADC*, 525 U.S. at 475 (describing § 1252(g)'s passage as part of IIRIRA).

[19] In its response and reply brief, the government appears to argue that another provision of the INA, 8 U.S.C. § 1252(b)(9), also stripped the district court of jurisdiction. Although ordinarily an argument not raised in the opening brief would be waived, this argument is jurisdictional so we must consider it. *See, e.g.*, *Embassy of the Arab Republic of Egypt v. Lasheen*, 603 F.3d 1166, 1171 n.3 (9th Cir. 2010) ("[C]hallenges to subject matter jurisdiction cannot be waived[.]"). But Section 1252(b)(9) does not bar jurisdiction here, because it "appl[ies] only to those claims seeking judicial review of orders of removal." *Singh v. Gonzales*, 499 F.3d 969, 978 (9th Cir. 2007) (citing *St. Cyr*, 533 U.S. at 313).

standard[20] with respect to their claim under the APA that the rescission of DACA was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A). The government takes issue with the district court's conclusion on only one of the preliminary injunction factors: the likelihood of success on the merits.

In an arbitrary-and-capricious challenge, "[i]t is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 50 (1983); *see also, e.g.*, *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (*Chenery II*) ("[A] reviewing court . . . must judge the propriety of [agency] action solely by the grounds invoked by the agency." (citing *SEC v. Chenery Corp.*, 318 U.S. 80 (1943) (*Chenery I*)).

Similarly, it is black letter law that where an agency purports to act solely on the basis that a certain result is legally required, and that legal premise turns out to be incorrect, the action must be set aside, regardless of whether the action *could* have been justified as an exercise of discretion. That principle goes back at least as far as the Supreme Court's seminal decision in *Chenery I*, in which the Court stated:

> If [agency] action rests upon an administrative determination—an exercise of judgment in an area which Congress has entrusted to the agency—of course it must

---

[20] "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

> not be set aside because the reviewing court
> might have made a different determination
> were it empowered to do so. But if the action
> is based upon a determination of law as to
> which the reviewing authority of the courts
> does come into play, *an order may not stand
> if the agency has misconceived the law*.

*Chenery I*, 318 U.S. at 94 (emphasis added).

This holding of *Chenery I* remains good law.  *See, e.g.*, *United States v. Ross*, 848 F.3d 1129, 1134 (D.C. Cir. 2017) ("Where a statute grants an agency discretion but the agency erroneously believes it is bound to a specific decision, we can't uphold the result as an exercise of the discretion that the agency disavows."); *Safe Air for Everyone v. EPA*, 488 F.3d 1088, 1101 (9th Cir. 2007) (setting aside agency action that was justified on a "legally erroneous" basis, and remanding for further consideration under other justifications).  As the D.C. Circuit flatly put it, "An agency action, however permissible as an exercise of discretion, cannot be sustained where it is based not on the agency's own judgment but on an erroneous view of the law."  *Sea-Land Serv., Inc. v. DOT*, 137 F.3d 640, 646 (D.C. Cir. 1998) (internal quotation marks omitted) (quoting *Prill v. NLRB*, 755 F.2d 941, 947 (D.C. Cir. 1985)).

Thus, if the DACA rescission was based solely on an erroneous legal premise, it must be set aside under 5 U.S.C. § 706(2)(A).  We have already concluded, in our discussion of reviewability, that the rescission was indeed premised on

the belief that the DACA program was unlawful.  We next must decide whether that legal conclusion was correct.[21]

Attorney General Sessions's September 4, 2017, letter expresses several possible bases for the agency's ultimate conclusion that DACA was unlawful.  First, the Attorney General states that "DACA was effectuated by the previous administration through executive action . . . after Congress'[s] repeated rejection of proposed legislation that would have accomplished a similar result."  But our court has already explained that "Congress's failure to pass the [DREAM] Act does not signal the illegitimacy of the DACA program," partly because "the DREAM Act and the DACA program are not interchangeable policies because they provide different forms of relief": the DREAM Act would have provided a path to lawful permanent resident status, while DACA simply defers removal.  *Brewer II*, 855 F.3d at 976 n.10; *see* Motomura, *supra*, at 175 ("DACA is not the DREAM Act; as an interim executive measure, it is limited in duration and provides no durable immigration status.") (footnote omitted);  *see also, e.g.*, DREAM Act of 2011, S. 952, 112th Cong. (2011).  Moreover, there is nothing inherently problematic about an agency addressing a problem for which Congress has been unable to pass a legislative fix, so long as the particular action taken is properly within the agency's power.  This argument therefore provides no independent reason to think that DACA is unlawful.

---

[21] The government does not argue that its conclusion is entitled to *Chevron* deference, likely because "[d]eference to an agency's interpretation of a statute is not appropriate when the agency wrongly 'believes that interpretation is compelled by Congress.'"  *Gila River Indian Cmty. v. United States*, 729 F.3d 1139, 1149 (9th Cir. 2013) (quoting *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 798 (D.C. Cir. 2004)).

The Attorney General's primary bases for concluding that DACA was illegal were that the program was "effectuated . . . without proper statutory authority" and that it amounted to "an unconstitutional exercise of authority." More specifically, the Attorney General asserted that "the DACA policy has the same legal and constitutional defects that the courts recognized as to DAPA" in the *Texas* litigation.

The claim of "constitutional defects" is a puzzling one because as all the parties recognize, no court has ever held that DAPA is unconstitutional. The Fifth Circuit and district court in *Texas* explicitly declined to address the constitutional issue. *See Texas*, 809 F.3d at 154 ("We decide this appeal . . . without resolving the constitutional claim."); *Texas*, 86 F. Supp. 3d at 677 ("[T]he Court is specifically not addressing Plaintiffs' likelihood of success on . . . their constitutional claims . . . ."). Indeed, the government makes no attempt in this appeal to defend the Attorney General's assertion that the DACA program is unconstitutional. We therefore do not address it further.

With respect to DACA's alleged "legal . . . defects," the district court explained in great detail the long history of deferred action in immigration enforcement, including in the form of broad programs; the fact that the Supreme Court and Congress have both acknowledged deferred action as a feature of the immigration system; and the specific statutory responsibility of the Secretary of Homeland Security for "[e]stablishing national immigration enforcement policies and priorities," 6 U.S.C. § 202(5). The government does not contest any of these propositions, which themselves go a long way toward establishing DACA's legality. Instead, the government argues that the Fifth Circuit's reasons for

striking down the related DAPA policy would also apply to DACA.

The Fifth Circuit concluded that DAPA was unlawful on two grounds: first, that DAPA was in fact a legislative rule and therefore should have been promulgated through notice-and-comment rulemaking; and second, that DAPA was substantively inconsistent with the INA. *See Texas*, 809 F.3d at 171–78, 178–86.

With respect to the first holding, notice-and-comment procedures are not required where the agency pronouncement in question is a "general statement[] of policy." 5 U.S.C. § 553(b)(3)(A). "The critical factor to determine whether a directive announcing a new policy constitutes a rule or a general statement of policy is the extent to which the challenged [directive] leaves the agency, or its implementing official, free to exercise discretion to follow, or not to follow, the [announced] policy in an individual case." *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1013 (9th Cir. 1987) (alterations in original) (internal quotation marks omitted).

On its face, DACA obviously allows (and indeed requires) DHS officials to exercise discretion in making deferred action decisions as to individual cases: Secretary Napolitano's memorandum announcing DACA specifically states that "requests for relief pursuant to this memorandum are to be decided on a case by case basis." The Fifth Circuit in *Texas* held that DAPA was a substantive rule notwithstanding similar discretionary language, based primarily on statistics regarding the approval rates of DACA applications. The court read those statistics as revealing that DACA was discretionary in name only—that is, that DHS personnel had no discretion to deny deferred action if the DACA criteria were met. *Texas*, 809 F.3d at 172–73.

But as the dissenting judge in *Texas* pointed out, DACA's (then) 5% denial rate—which did not include applications rejected for administrative deficiencies—is consistent with a discretionary program given that applicants self-select: "It should be expected that only those highly likely to receive deferred action will apply; otherwise, applicants would risk revealing their immigration status and other identifying information to authorities, thereby risking removal (and the loss of a sizeable fee)." *Texas*, 809 F.3d at 210 (King, J., dissenting).

Moreover, the denial rate has risen as the DACA program has matured. DHS statistics included in the record reveal that in fiscal year 2016, for example, the agency approved 52,882 initial DACA applications and denied 11,445; that is, 17.8% of the applications acted upon were denied.[22] As Judge King concluded, "Neither of these numbers suggests an agency on autopilot." *Texas*, 809 F.3d at 210 n.44 (King, J., dissenting); *see also Arpaio v. Obama*, 27 F. Supp. 3d 185, 209 n.13 (D.D.C. 2014) (noting that these same statistics "reflect that . . . case-by-case review is in operation").[23] In light of these differences, we do not

---

[22] U.S. Citizenship & Immigration Services, Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, by Fiscal Year, Quarter, Intake, Biometrics and Case Status Fiscal Year 2012–2017 (March 31, 2017). The number of initial applications is the relevant metric because renewal applications are by definition limited to the pool of those already approved for DACA at least once. Therefore, one would expect an even lower denial rate for renewals.

[23] Judge King's dissent also makes the critical observation that, according to the declarations filed in that case, the reason DHS could not point to specific instances in which DACA applicants met the program criteria but were denied as a matter of discretion was that DHS did not have the ability to track and sort the reasons for DACA denials. *Texas*, 809 F.3d at 211 (King, J., dissenting).

agree that DACA is a legislative rule that would require notice-and-comment rulemaking.

As to the substantive holding in *Texas*, the Fifth Circuit concluded that DAPA conflicted with the INA largely for a reason that is inapplicable to DACA. Specifically, the Fifth Circuit reasoned that the INA provides "an intricate process for illegal aliens to derive a lawful immigration classification from their children's immigration status" but that "DAPA would allow illegal aliens to receive the benefits of lawful presence solely on account of their children's immigration status without complying with any of the requirements . . . that Congress has deliberately imposed." *Texas*, 809 F.3d at 179–80. As the district court in this case noted, there is no analogous provision in the INA defining how immigration status may be derived by undocumented persons who arrived in the United States as children. One of the major problems the Fifth Circuit identified with DAPA is therefore not present here.

In resisting this conclusion, the government flips the Fifth Circuit's reasoning on its head, arguing that "[i]nsofar as the creation of pathways to lawful presence was relevant, the fact that Congress had legislated only for certain individuals similarly situated to DAPA beneficiaries—and not DACA recipients—would make DACA *more* inconsistent with the INA than DAPA." To the extent the government meant to draw on the *Texas* court's analysis, it gets it exactly backwards: the whole thrust of the Fifth Circuit's reasoning on this point was that DHS was without authority because "Congress has 'directly addressed the precise question at issue.'" *Texas*, 809 F.3d at 186 (quoting *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 52 (2011)). There is no argument that Congress has similarly occupied the field with respect to DACA; as

the Attorney General himself noted, Congress has repeatedly rejected Dreamer legislation.

The second major element of the Fifth Circuit's analysis on the substantive issues was that the INA itself "prescribes . . . which classes of aliens can achieve deferred action and eligibility for work authorization." *Texas*, 809 F.3d at 186. The court drew the implication that the statute must therefore preclude the Executive Branch from granting these benefits to other classes. *Id.* (pairing this notion with the pathway-to-lawful-presence argument as the keys to its conclusion).

But "[t]he force of any negative implication . . . depends on context." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381 (2013). Indeed, "[w]e do not read the enumeration of one case to exclude another unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003). Here, the express grants of deferred action cited by the Fifth Circuit were not passed together as part of the original INA; rather, they were added to the statute books piecemeal over time by Congress. *See* Violence Against Women Act of 2000, Pub. L. No. 106-386, div. B, sec. 1503, § 1154(a)(1)(D)(i), 114 Stat. 1491 (codified at 8 U.S.C. § 1154(a)(1)(D)(i)) (specifying deferred action for certain VAWA self-petitioners); USA PATRIOT Act of 2001, Pub. L. No. 107-56, § 423(b), 115 Stat. 272, 361 (same, for family members of lawful permanent residents killed by terrorism); National Defense Authorization Act for Fiscal Year 2004, Pub. L. No. 108-136, § 1703(c)–(d), 117 Stat. 1392, 1694–95 (same, for relatives of noncitizens killed in combat and posthumously granted citizenship).

Given this context, we find it improbable that Congress "considered the . . . possibility" of all other potential uses for deferred action "and meant to say no" to any other

application of that tool by the immigration agency. *Barnhart*, 537 U.S. at 168. We think the much more reasonable conclusion is that in passing its seriatim pieces of legislation, instructing that this and that "narrow class[]" of noncitizens should be eligible for deferred action, *Texas*, 809 F.3d at 179, Congress meant to say nothing at all about the underlying power of the Executive Branch to grant the same remedy to others. We do not read an "and no one else" clause into each of Congress's individual express grants of deferred action.

Another element in the Fifth Circuit's analysis was that "DAPA would make 4.3 million otherwise removable aliens eligible for lawful presence, employment authorization, and associated benefits, and 'we must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency.'" *Id.* at 181 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)). DACA, on the other hand, had 689,800 enrollees as of September 2017. The government asserts that this difference in size is "legally immaterial," but that response is unconvincing. If the point is that the "economic and political magnitude" of allowing 4.3 million people to remain in the country and obtain work authorization is such that Congress would have spoken to it directly, then surely it makes a difference that one policy has less than one-sixth the "magnitude" of the other. *Id.* As the district court laconically put it, "there is a difference between 4.3 million and 689,800."

Finally, the government finds "an insurmountable obstacle to plaintiffs' position" in that "the district court's injunction affirmed by the Fifth Circuit covered both DAPA and *expanded DACA*." It is true that the *Texas* court also

enjoined the expansions of DACA that were announced in the same memorandum as the DAPA program. *See Texas*, 809 F.3d at 147 n.11 ("The district court enjoined implementation of the following three DACA expansions, and they are included in the term 'DAPA' in this opinion . . . ."). But no analysis was devoted to those provisions by either the Fifth Circuit or the *Texas* district court, and one of the keys to the Fifth Circuit's reasoning—that Congress had supposedly occupied the field with respect to obtaining immigration benefits through one's children—does *not* apply to either the original DACA program or its expansions. Under these circumstances, we do not find the *Texas* courts' treatment of the DACA expansions to be strong persuasive authority, much less an "insurmountable obstacle." *Cf.* Bryan A. Garner et al., The Law of Judicial Precedent 170 (2016) ("An authority derives its persuasive power from its ability to convince others to go along with it.").

In sum, the reality is (and always has been) that the executive agencies charged with immigration enforcement do not have the resources required to deport every single person present in this country without authorization. *Compare* Bernsen Memorandum, *supra*, at 1 (stating, in 1976, that "[t]here simply are not enough resources to enforce all of the rules and regulations presently on the books"), *with* Memorandum from John Morton, Assistant Secretary, DHS, *Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens*, at 1 (June 30, 2010) (estimating that ICE has enough resources to deport only 4% of the undocumented population in any given year, and concluding that "ICE must prioritize the use of its . . . removal resources to ensure the removals the agency does conduct promote the agency's highest enforcement priorities") *and* Motomura, *supra*, at 26 ("The letter of the law creates a large removable population, but

whether an individual is actually targeted for removal has long depended on government discretion and bad luck." (footnote omitted)).  Recognizing this state of affairs, Congress has explicitly charged the Secretary of Homeland Security with "[e]stablishing national immigration enforcement policies and priorities."  6 U.S.C. § 202(5).

It is therefore no surprise that deferred action has been a feature of our immigration system—albeit one of executive invention—for decades; has been employed categorically on numerous occasions; and has been recognized as a practical reality by both Congress and the courts.  *See, e.g.*, *Brewer II*, 855 F.3d at 967 ("[I]t is well settled that the Secretary [of Homeland Security] can exercise deferred action" as part of her statutory authority "to administer and enforce all laws relating to immigration and naturalization.").  In a world where the government can remove only a small percentage of the undocumented noncitizens present in this country in any year, deferred action programs like DACA enable DHS to devote much-needed resources to enforcement priorities such as threats to national security, rather than blameless and economically productive young people with clean criminal records.

We therefore conclude that DACA was a permissible exercise of executive discretion, notwithstanding the Fifth Circuit's conclusion that the related DAPA program exceeded DHS's statutory authority.  DACA is being implemented in a manner that reflects discretionary, case-by-case review, and at least one of the Fifth Circuit's key rationales in striking down DAPA is inapplicable with respect to DACA.  With respect for our sister circuit, we find the analysis that seemingly compelled the result in *Texas* entirely inapposite.  And because the Acting Secretary was therefore incorrect in her belief that DACA was illegal and

had to be rescinded, plaintiffs are likely to succeed in demonstrating that the rescission must be set aside. *Chenery I*, 318 U.S. at 94; *Safe Air for Everyone*, 488 F.3d at 1101–02.

To be clear: we do not hold that DACA *could not* be rescinded as an exercise of Executive Branch discretion. We hold only that here, where the Executive *did not* make a discretionary choice to end DACA—but rather acted based on an erroneous view of what the law required—the rescission was arbitrary and capricious under settled law. The government is, as always, free to reexamine its policy choices, so long as doing so does not violate an injunction or any freestanding statutory or constitutional protection.[24]

## V.

Having concluded that the district court was correct in its APA merits holding, we now turn to the question of the appropriate remedy.   The district court preliminarily

---

[24] The government has submitted a letter pursuant to Federal Rule of Appellate Procedure 28(j), informing us that the current Secretary of Homeland Security, Kirstjen Nielsen, issued a new memorandum regarding the DACA rescission on June 22, 2018.  In the memorandum, Secretary Nielsen "provide[d] additional explanation of the basis for the DACA rescission," in response to an order filed in a parallel lawsuit.  The government's letter does not argue that the Nielsen memorandum represents fresh agency action that could possibly moot this appeal.  We therefore leave it to the district court in the first instance to determine the admissibility of Secretary Nielsen's letter given that it cannot possibly be a part of the administrative record in this case, and its impact, if any, on this case.  And to the extent the Nielsen memorandum is offered as an additional justification of the original DACA rescission, we do not consider it in our review of Acting Secretary Duke's decision because it is well-settled that "we will not allow the agency to supply post-hoc rationalizations for its actions . . . ." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 603 (9th Cir. 2014).

enjoined the rescission of DACA with respect to existing beneficiaries on a nationwide basis. The government asserts that this was error, and that a proper injunction would be narrower.

The general rule regarding the scope of preliminary injunctive relief is that it "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs before the court." *L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011) (internal citation omitted). But "[t]here is no general requirement that an injunction affect only the parties in the suit." *Bresgal v. Brock*, 843 F.2d 1163, 1169 (9th Cir. 1987); *see also id.* at 1170–71 ("[A]n injunction is not necessarily made over-broad by extending benefit or protection to persons other than prevailing parties in the lawsuit—even if it is not a class action—*if such breadth is necessary to give prevailing parties the relief to which they are entitled*.") (emphasis in original).

It is also important to note that the claim underlying the injunction here is an arbitrary-and-capricious challenge under the APA. In this context, "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (internal citation omitted). As Justice Blackmun explained while "writing in dissent but apparently expressing the view of all nine Justices on this question," *id.*:

> The Administrative Procedure Act permits suit to be brought by any person "adversely affected or aggrieved by agency action." In some cases the "agency action" will consist of a rule of broad applicability; and if the

> plaintiff prevails, the result is that the rule is invalidated, not simply that the court forbids its application to a particular individual. Under these circumstances a single plaintiff, so long as he is injured by the rule, may obtain "programmatic" relief that affects the rights of parties not before the court.

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 913 (1990) (Blackmun, J., dissenting) (citation omitted).

A final principle is also relevant: the need for uniformity in immigration policy. *See Hawaii v. Trump*, 878 F.3d 662, 701 (9th Cir. 2017), *rev'd on other grounds*, 138 S. Ct. 2392 (2018) ("Because this case implicates immigration policy, a nationwide injunction was necessary to give Plaintiffs a full expression of their rights."). As the Fifth Circuit stated when it affirmed the nationwide injunction against DAPA, "the Constitution requires an *uniform* Rule of Naturalization; Congress has instructed that the immigration laws of the United States should be enforced vigorously and *uniformly*; and the Supreme Court has described immigration policy as a comprehensive and *unified* system." *Texas*, 809 F.3d at 187–88 (emphases in original) (citations and internal quotation marks omitted). Allowing uneven application of nationwide immigration policy flies in the face of these requirements.

In its briefing, the government fails to explain how the district court could have crafted a narrower injunction that would provide complete relief to the plaintiffs, including the entity plaintiffs. *Cf. Washington v. Trump*, 847 F.3d 1151, 1167 (9th Cir. 2017) ("[T]he Government has not proposed a workable alternative form of the TRO . . . that would protect the proprietary interests of the States at issue here

while nevertheless applying only within the States' borders."). Nor does it provide compelling reasons to deviate from the normal rule in APA cases, or to disregard the need for uniformity in national immigration policy. The one argument it does offer on this latter point—that "[d]eferred action is itself a departure from vigorous and uniform enforcement of the immigration laws," and that "enjoining the rescission of DACA on a nationwide basis . . . increases rather than lessens that departure"—is a red herring. DACA *is* national immigration policy, and an injunction that applies that policy to some individuals while rescinding it as to others is inimical to the principle of uniformity.

We therefore conclude that the district court did not abuse its discretion in issuing a nationwide injunction. Such relief is commonplace in APA cases, promotes uniformity in immigration enforcement, and is necessary to provide the plaintiffs here with complete redress.

## VI.

We turn next to the district court's treatment of the government's motion to dismiss for failure to state a claim. The government moved to dismiss all of plaintiffs' claims; the district court dismissed some claims and denied the government's motion as to others. We take each claim in turn.[25]

---

[25] Plaintiffs do not challenge the district court's dismissal of their equitable estoppel claim.

## A. *APA: Arbitrary-and-Capricious*

For the reasons stated above in discussing plaintiffs' likelihood of success on the merits, the district court was correct to deny the government's motion to dismiss plaintiffs' claim that the DACA rescission was arbitrary and capricious under the APA. *See* 5 U.S.C. § 706(2)(A).

## B. *APA: Notice-and-Comment*

Plaintiffs also assert that the rescission of DACA is in fact a substantive rule under the APA, and that it therefore could not be validly accomplished without notice-and-comment procedures.

As touched on above with respect to DACA itself, an agency pronouncement is excluded from the APA's requirement of notice-and-comment procedures if it constitutes a "general statement[] of policy." 5 U.S.C. § 553(b)(3)(A). General statements of policy are those that "advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Mada-Luna*, 813 F.2d at 1012–13 (quoting Attorney General's Manual on the Administrative Procedure Act 30 n.3 (1947)). "To qualify as a general statement of policy . . . a directive must not establish a binding norm and must leave agency officials free to consider the individual facts in the various cases that arise and to exercise discretion." *Id.* at 1015 (internal quotation marks omitted); *see also id.* at 1013 ("The critical factor to determine whether a directive announcing a new policy constitutes a rule or a general statement of policy is the extent to which the challenged [directive] leaves the agency, or its implementing official, free to exercise discretion to follow, or not to follow, the [announced] policy in an individual case." (alterations in original) (internal quotation marks omitted)).

The district court held that because DACA itself was a general statement of policy that did not require notice and comment, it could also be rescinded without those procedures. This proposition finds support in *Mada-Luna*, in which "we conclude[d] that [a deferred-action Operating Instruction] constituted a general statement of policy, and thus could be validly repealed and superseded without notice-and-comment proceedings." *Id.* at 1017. Plaintiffs contest this conclusion, arguing that the DACA *rescission* was a binding rule, even though DACA's *adoption* was a general statement of policy. They provide two bases for this assertion.

First, plaintiffs argue that the rescission is binding because it requires DHS officials to reject new DACA applications and (after a certain date) renewal applications. It is true that Acting Secretary Duke's rescission memorandum makes rejections of DACA applications mandatory. But the relevant question under the rescission memorandum is not whether DHS officials retained discretion to accept applications for a program that no longer existed; instead, the question is whether DHS officials retained discretion *to grant deferred action* and collateral benefits outside of the (now-cancelled) DACA program.

For its part, the government asserts that the rescission memorandum made clear that, despite the rescission, "future deferred action requests will be 'adjudicat[ed] . . . on an individual, case-by-case basis.'" Mildly put, this assertion mischaracterizes the memorandum. The quoted language refers to the treatment of only (a) initial applications pending on the date of the rescission, and (b) renewal applications filed within the one-month wind-down period. It does *not* refer to how future requests for deferred action outside the DACA program would be handled. Still, the rescission

memorandum also did not forbid the agency from granting such requests, and it acknowledged the background principle of deferred action as "an act of prosecutorial discretion meant to be applied only on an individualized case-by-case basis." And the memorandum closed by stating that "no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS"—presumably including granting deferred action on a case-by-case basis to some people who would have been eligible for DACA.

If allowed to go into effect, the rescission of DACA would undoubtedly result in the loss of deferred action for the vast majority of the 689,800 people who rely on the program. But the rescission memorandum does not mandate that result because it leaves in place the background principle that deferred action is available on a case-by-case basis.[26] Plaintiffs' primary argument against this conclusion is a citation to *United States ex rel. Parco v. Morris*, 426 F. Supp. 976 (E.D. Pa. 1977), which is said to be "the only other decision to address an Executive Branch decision to terminate a deferred-action program without undergoing notice-and-comment rulemaking." But as the district court noted, the key factor in that case was the contention that under the policy at issue, "'discretion' was exercised favorably in all cases of a certain kind and then, after repeal of the regulation, unfavorably in each such case." *Parco*,

---

[26] The Regents argue that "the agency's discretion to grant deferred action on the basis of the DACA criteria has been eliminated." This is not quite right either. DHS's authority to grant deferred action *under the DACA program* has been eliminated, but the DACA criteria themselves are some of those that have traditionally guided immigration enforcement discretion. *See* Wadhia, *supra*, at 57 ("DHS used traditional humanitarian factors to outline the parameters for the DACA program, such as tender age and longtime residence in the United States.").

426 F. Supp. at 984. DACA, by contrast, explicitly contemplated case-by-case discretion, and its rescission appears to have left in place background principles of prosecutorial discretion.

Plaintiffs also argue that the DACA rescission is not a general policy statement because it is binding as a legal interpretation that a DACA-like program would be illegal. But again, this argument answers the wrong question. The Acting Secretary's legal conclusion that a DACA-like program is unlawful does not constrain the discretion of line-level DHS employees to grant deferred action on a case-by-case basis, and those employees lack authority to institute such an agency-wide program in the first place. And plaintiffs do not point to any reason why *this* Acting Secretary's legal conclusion about DACA would bind subsequent Secretaries if they were to disagree with its reasoning—just as Acting Secretary Duke reversed course from previous Secretaries who concluded DACA was legal. This is not a "new 'binding rule of substantive law,'" *Mada-Luna*, 813 F.2d at 1014, affecting the rights of the people and entities regulated by the agency; it is an interpretation of the agency's own power, and plaintiffs do not explain why it should be read as binding future DHS Secretaries. The district court correctly dismissed plaintiffs' notice-and-comment claims.

## C.  Due Process: Deferred Action

The *Garcia* plaintiffs—individual DACA recipients—have brought a substantive due process claim alleging that the rescission deprived them of protected interests in their DACA designation, including the renewal of their benefits. The district court dismissed this claim, holding that there is no protected entitlement in either the initial grant of deferred action under DACA or the renewal of benefits for existing

DACA enrollees. On appeal, the *Garcia* plaintiffs challenge this ruling only as it applies to the renewal of DACA benefits, not as to the initial grant.

"A threshold requirement to a substantive or procedural due process claim is the plaintiff's showing of a liberty or property interest protected by the Constitution." *Wedges/Ledges of Cal., Inc. v. City of Phoenix*, 24 F.3d 56, 62 (9th Cir. 1994). It is possible to have a property interest in a government benefit, but "a person clearly must have more than an abstract need or desire for [the benefit]. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). Although "a benefit is not a protected entitlement if government officials may grant or deny it in their discretion," *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005), a legitimate claim of entitlement may exist where there are "rules or mutually explicit understandings that support [a plaintiff's] claim of entitlement to the benefit . . . ." *Perry v. Sindermann*, 408 U.S. 593, 601 (1972); *see also, e.g.*, *Gerhart v. Lake Cty.*, 637 F.3d 1013, 1020 (9th Cir. 2011). The dispute here focuses on whether such "mutually explicit understandings" existed between the government and DACA recipients with respect to the renewal of DACA benefits.

The *Garcia* plaintiffs assert that they and the government "'mutually' understood that DACA recipients would be able to renew their benefits and protection on an ongoing basis so long as they fulfilled the program's criteria." But this argument is undercut by the DACA FAQs published by DHS, which explicitly state that "USCIS retains the ultimate discretion to determine whether deferred action is appropriate in any given case even if the [renewal]

guidelines are met." The FAQs also state that any individual's "deferred action may be terminated at any time, with or without a Notice of Intent to Terminate, at DHS's discretion," and Secretary Napolitano's DACA memorandum claims that it "confers no substantive right, immigration status or pathway to citizenship." Whether or not these provisions are legally operative, they do not indicate that the government shared plaintiffs' expectation of presumptive renewal.

Attempting to overcome this facially discretionary language, plaintiffs emphasize several factors. First, they say, the very nature of the DACA project was such that presumptive renewal was required to encourage people to participate; a two-year term with no presumption of renewal would not have been attractive enough to outweigh the risks to the applicants. Moreover, Secretary Napolitano's DACA memorandum itself states that grants of deferred action under DACA will be "subject to renewal," and the actual criteria for renewal were "nondiscretionary" in nature.[27] Finally, the plaintiffs point to a more than 99% approval rate for adjudicated DACA renewal applications. This, they assert, is powerful evidence of a mutual understanding of presumptive renewal.

---

[27] DHS's DACA FAQs state that "[y]ou may be considered for renewal of DACA if you met the guidelines for consideration of Initial DACA (see above) AND you: [1] Did not depart the United States on or after Aug. 15, 2012, without advance parole; [2] Have continuously resided in the United States since you submitted your most recent request for DACA that was approved up to the present time; and [3] Have not been convicted of a felony, a significant misdemeanor, or three or more misdemeanors, and do not otherwise pose a threat to national security or public safety."

All these points might have revealed a question of fact as to whether a mutually explicit understanding of presumptive renewal existed—thereby avoiding dismissal on the pleadings—if plaintiffs were bringing a claim that, for example, their individual DACA renewals were denied for no good reason. But it is hard to see how an expectation of renewal within the confines of the existing DACA policy could have created a mutually explicit understanding that the DACA program *itself* would not be terminated wholesale. That is, a 99% renewal rate under DACA provides no evidence that the government shared an understanding that the DACA program would continue existing indefinitely to provide such renewals. None of plaintiffs' cited authorities appear to address this kind of claim.

While we may agree with much of what plaintiffs say about the cruelty of ending a program upon which so many have come to rely, we do not believe they have plausibly alleged a "mutually explicit understanding" that DACA—created by executive action in a politically polarized policy area and explicitly couched in discretionary language—would exist indefinitely, including through a change in presidential administrations. *See Gerhart*, 637 F.3d at 1020 ("A person's belief of entitlement to a government benefit, no matter how sincerely or reasonably held, does not create a property right if that belief is not mutually held by the government."). On that basis, we affirm the district court's dismissal.

## D.  Due Process: Information-Sharing

Several of the complaints allege a different due process theory: DACA recipients had a protected interest based on the government's representations that the personal information they submitted with their applications would not be used for enforcement purposes, and the government

violated this interest by changing its policy to allow such use.  The district court held that the plaintiffs had plausibly alleged facts that state a claim under this theory.

As with their other due process claim, the question whether DACA recipients enjoy a protected due process right protecting them from having the government use their information against them for enforcement purposes turns on the existence of a "mutually explicit understanding[]" on that point between the government and DACA recipients.  *Perry*, 408 U.S. at 601; *see also Gerhart*, 637 F.3d at 1020.  The DACA FAQs published by DHS state the following information-use policy:

> Information provided in this request *is protected from disclosure* to ICE and CBP for the purpose of immigration enforcement proceedings unless the requestor meets the criteria for the issuance of a Notice to Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance (www.uscis.gov/NTA).  Individuals whose cases are deferred pursuant to DACA will not be referred to ICE.  The information may be shared with national security and law enforcement agencies, including ICE and CBP, for purposes other than removal, including for assistance in the consideration of DACA, to identify or prevent fraudulent claims, for national security purposes, or for the investigation or prosecution of a criminal offense.  The above information sharing policy covers family members and guardians, in addition to the requestor.  This policy, which may be modified, superseded, or

> rescinded at any time without notice, is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable by law by any party in any administrative, civil, or criminal matter.

(emphasis added). The statement that applicant information "is protected from disclosure" to the enforcement arms of DHS is a strong commitment, and plaintiffs plausibly allege that DACA recipients reasonably relied on it.

The government of course points to the express caveat that the information-sharing policy "may be modified, superseded or rescinded at any time." But as the district court held, this qualifier is ambiguous as to whether it allows the government to change its policy only prospectively, or also with respect to information already received—and this ambiguity presents a fact question not amenable to resolution on the pleadings. Plaintiffs' interpretation that a policy change would only apply prospectively is a plausible one, given that the policy is written in terms of what will happen to "[i]nformation provided in *this request*," rather than DACA-derived information generally. (emphasis added). It is at least reasonable to think that a change in the policy would apply only to those applications submitted after that change takes effect. And while the government also relies on the language stating that the policy does not create enforceable rights, such a disclaimer by an agency about what its statements do and do not constitute as a legal matter are not dispositive. *See, e.g.*, *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022–23 (D.C. Cir. 2000) (declining to give legal effect to agency statement that its guidance did "not represent final Agency action, and cannot be relied upon to create any rights . . . ."). Plaintiffs have plausibly

alleged a mutually explicit understanding that DACA applicants' information would be protected from disclosure.

The government argues in the alternative that plaintiffs have failed to plausibly allege that DHS actually changed its policy. Plaintiffs' allegations rest on a set of FAQs about the DACA rescission that DHS published the same day it issued the rescission memorandum, September 5, 2017. In those rescission FAQs, the previous language stating that personal information "is protected from disclosure" has been replaced with the following:

> Information provided to USCIS in DACA requests *will not be proactively provided* to ICE and CBP for the purpose of immigration enforcement proceedings, unless the requestor meets the criteria for the issuance of a Notice to Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance (www.uscis.gov/NTA).

(emphasis added).

The government's first response—that the differing language in the two FAQs does not actually reflect a difference in policy—is hard to swallow. It does not take much parsing of the text to see the significant difference between "protect[ing]" something from "disclosure" on the one hand, and merely declining to "proactively provide[]" it on the other. This is especially so when the entities in question (and to which USCIS presumably *would* now provide information *re*actively) are fellow components of the same umbrella agency.

Changing gears, the government also points to yet a third set of FAQs, published months after the rescission and not part of the record in this case, which state:

> Information provided to USCIS for the DACA process will not make you an immigration priority for that reason alone. That information *will only be proactively provided* to ICE or CBP if the requestor meets the criteria for the issuance of a Notice To Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance (www.uscis.gov/NTA). *This information-sharing policy has not changed in any way since it was first announced*, including as a result of the Sept. 5, 2017 memo starting a wind-down of the DACA policy.

USCIS, Guidance on Rejected DACA Requests: Frequently Asked Questions (Nov. 30, 2017) (emphases added). The government notes that a district court relied on FAQs containing this language in parallel litigation to dismiss a nearly identical information-use due process claim. *See Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 279–81 (E.D.N.Y. 2018).

But this case is critically different because in *Batalla Vidal* the plaintiffs had attached the new version of the FAQs to their complaint. As the court there explained, "Plaintiffs . . . have effectively pleaded themselves out of court by relying on a document that contradicts their otherwise-unsupported allegation of a change to DHS's information-use policy." *Id.* at 280. By contrast, here the most recent FAQs were not attached to or referenced in any of the

complaints—indeed, they postdate the filing of the complaints. Therefore, the normal rule applies: materials outside the complaint cannot be considered on a motion to dismiss. *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

Even if it could be considered, this newest FAQ would not conclusively resolve the question of fact surrounding DHS's current information-sharing policy because it still contains the language that suggests a change from the pre-rescission policy. *See* USCIS, Guidance, *supra* ("[I]nformation will only be *proactively provided* to ICE or CBP if the requestor meets the criteria for the issuance of a Notice To Appear[.]") (emphasis added).[28] Plaintiffs have plausibly alleged that DHS has changed its policy.

Finally, in order to state a substantive due process claim, plaintiffs must allege conduct that "shock[s] the conscience and offend[s] the community's sense of fair play and decency." *Sylvia Landfield Tr. v. City of L.A.*, 729 F.3d 1189, 1195 (9th Cir. 2013) (quoting *March v. Cty. of San Diego*, 680 F.3d 1148, 1154 (9th Cir. 2012)). The government makes a passing argument that this standard is not satisfied because the information-sharing policy has always contained some exceptions, but as the *Garcia* plaintiffs put it, "[a]pplicants accepted those limited, acknowledged risks when they applied for DACA. They did not accept the risk that the government would abandon the other assurances that were 'crucial' to 'inducing them to

---

[28] Astonishingly, this sentence—which appears to represent a change from the prior policy of affirmatively protecting information from disclosure—is *immediately adjacent* to DHS's assurance that nothing has changed. *Cf.* George Orwell, Nineteen Eighty-Four (1949), at 175 ("Oceania was at war with Eastasia: Oceania had always been at war with Eastasia.").

apply for DACA.'" (alterations incorporated). We agree. *Cf. Raley v. Ohio*, 360 U.S. 423, 437–39 (1959) (holding that "convicting a citizen for exercising a privilege which the State had clearly told him was available to him" was "the most indefensible sort of entrapment by the State" and violated due process); *Cox v. Louisiana*, 379 U.S. 559, 568–71 (1965) (due process violation where defendant was convicted for leading a demonstration in a location where the police chief had given him permission to do so). Plaintiffs have stated a due process claim based on the alleged change in DHS's information-sharing policy.

## E. Equal Protection

The district court also held that plaintiffs stated a viable equal protection claim by plausibly alleging that the DACA rescission disproportionately affected Latinos and individuals of Mexican descent and was motivated by discriminatory animus. *See Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015) (holding a facially neutral action unconstitutional where "its enactment or the manner in which it was enforced were motivated by a discriminatory purpose," and reviewing the *Arlington Heights* factors for assessing discriminatory purpose) (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977)).

Because the district court denied the government's motion to dismiss plaintiffs' equal protection claim at the pleading stage, we take all of the complaints' allegations as true, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and construe them in the light most favorable to the plaintiffs, *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005). We agree with the district court that plaintiffs plausibly alleged an equal protection claim.

Most significantly, plaintiffs allege that the rescission of DACA disproportionately impacts Latinos and individuals of Mexican heritage, who account for 93% of DACA recipients. *See Arlington Heights*, 429 U.S. at 266. The complaints also allege a history of animus toward persons of Hispanic descent[29] evidenced by both pre-presidential and post-presidential[30] statements by President Trump, who is alleged to have decided to end DACA, even though the directive to the Acting Secretary was issued from Attorney General Sessions. Finally, the district court properly considered "the unusual history behind the rescission," all of which appeared in the record submitted by the government. *See Arlington Heights*, 429 U.S. at 267. As the district court noted, "DACA received reaffirmation by the agency as recently as three months before the rescission, only to be hurriedly cast aside on what seems to have been a contrived excuse (its purported illegality). This strange

---

[29] The government argues that the statements by the President cited in the complaints do not provide sufficient evidence to plausibly allege discriminatory intent. The government first submits that nationality, as opposed to ethnicity, is not an invidious classification, and that many of the cited comments go only to Mexican nationality. "Often, however, the two are identical as a factual matter: one was born in the nation whose primary stock is one's own ethnic group." *St. Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 614 (1987) (Brennan, J., concurring). And plaintiffs allege discriminatory intent not only toward "Mexican nationals," but also toward "individuals of Mexican heritage, and Latinos."

[30] The district court took judicial notice of one such statement by the President: "[o]n December 29, 2017, President Trump tweeted: 'The Democrats have been told, and fully understand, that there can be no DACA without the desperately needed WALL at the Southern Border and an END to the horrible Chain Migration & ridiculous Lottery System of Immigration etc. We must protect our Country at all cost!'" There were many similar statements made by the President after he took the oath of office leading up to the DACA rescission on September 5, 2017.

about-face, done at lightning speed, suggests that the normal care and consideration within the agency was bypassed."

The government contends that the equal protection claim is foreclosed by *AADC*, in which the Supreme Court stated that "as a general matter . . . an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation." 525 U.S. at 488. But in the context of this case, the challenge to the rescission of DACA is not raised "as a defense against [] deportation," and is not a claim of "selective enforcement." *Id.* Rather, it is a freestanding claim that the Executive Branch, motivated by animus, ended a program that overwhelmingly benefits a certain ethnic group. Thus, the equal protection claim does not implicate the concerns motivating the Court in *AADC* and underscored by the government: inhibiting prosecutorial discretion, allowing continuing violations of immigration law, and impacting foreign relations. The two cases cited by the government do not support its position, as both of them involved an individual noncitizen making an equal protection argument in an attempt to avoid his own deportation. *See Kandamar v. Gonzales*, 464 F.3d 65, 72–74 (1st Cir. 2006); *Hadayat v. Gonzales*, 458 F.3d 659, 665 (7th Cir. 2006). Plaintiffs' challenge to the rescission of DACA—which is itself discretionary—is not such a case.

The government also contends that even if not totally barred by *AADC*, plaintiffs' claims must be subject to the heightened pleading standard applied to selective-prosecution claims in the criminal context. *See United States v. Armstrong*, 517 U.S. 456, 463–65 (1996). But this argument meets the same objection: as the district court held, plaintiffs' challenge is not a selective-prosecution claim.

We are therefore not persuaded by the government's arguments.

The Supreme Court's recent decision in *Trump v. Hawaii*, 138 S. Ct. 2392 (2018), does not foreclose this claim. There, statements by the President allegedly revealing religious animus against Muslims were "[a]t the heart of plaintiffs' case . . . ." *Hawaii*, 138 S. Ct. at 2417. The Court assumed without deciding that it was proper to rely on the President's statements, but nevertheless upheld the challenged executive order under rational basis review. *Id.* at 2420, 2423. Here, by contrast, plaintiffs provide substantially greater evidence of discriminatory motivation, including the rescission order's disparate impact on Latinos and persons of Mexican heritage, as well as the order's unusual history. Moreover, our case differs from *Hawaii* in several potentially important respects, including the physical location of the plaintiffs within the geographic United States, *see Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 781 (9th Cir. 2014) (en banc), the lack of a national security justification for the challenged government action, and the nature of the constitutional claim raised.

Therefore, we conclude that plaintiffs have stated a plausible equal protection claim.

## VII.

The rescission of DACA—based as it was solely on a misconceived view of the law—is reviewable, and plaintiffs are likely to succeed on their claim that it must be set aside under the APA. We therefore affirm the district court's entry

of a preliminary injunction.[31]     The district court also properly dismissed plaintiffs' APA notice-and-comment claim, and their claim that the DACA rescission violates their substantive due process rights.  The district court also properly denied the government's motion to dismiss plaintiffs' APA arbitrary-and-capricious claim, their claim that the new information-sharing policy violates their due process rights, and their claim that the DACA rescission violates their right to equal protection.

\*          \*          \*

The Executive wields awesome power in the enforcement of our nation's immigration laws.  Our decision today does not curb that power, but rather enables its exercise in a manner that is free from legal misconceptions and is democratically accountable to the public.  Whether Dulce Garcia and the hundreds of thousands of other young dreamers like her may continue to live productively in the only country they have ever known is, ultimately, a choice for the political branches of our constitutional government.  With the power to make that choice, however, must come accountability for the consequences.

**AFFIRMED.**

---

[31] We do not disagree with the reasoning of Judge Owens's concurring opinion that the likelihood of success on plaintiffs' equal protection claim is a second, alternative ground for affirming the entry of the injunction.

OWENS, Circuit Judge, concurring in the judgment:

As I believe that Plaintiffs' Equal Protection claim has some "likelihood of success on the merits," I concur in the judgment affirming the preliminary injunction.  The extraordinary practical impact of allowing DACA's rescission to take effect before a final adjudication of its legality far outweighs the minimal practical impact of keeping the program in place a bit longer.  For that reason, it is better now to risk incorrectly preserving the status quo than to risk incorrectly disrupting it.[1]  However, I disagree with the portion of the majority's opinion that we may review the rescission of DACA for compliance with the APA.[2]

Under 5 U.S.C. § 701(a)(2), "agency action [that] is committed to agency discretion by law" is not subject to judicial review for compliance with the APA.  Since *Heckler*

---

[1] The government appears to share this view.  In its petition for certiorari before judgment, the government asserted that "a primary purpose of the Acting Secretary's orderly wind-down of the DACA policy was to avoid the disruptive effects on all parties of abrupt shifts in the enforcement of the Nation's immigration laws.  Inviting more changes before final resolution of this litigation would not further that interest."

[2] As for the government's appeal from the motions to dismiss, I dissent, for reasons stated here, from the majority's holding to affirm the district court's denial of the motion to dismiss Plaintiffs' APA arbitrary-and-capricious claim (Part VI-A).  However, I concur in the majority's holding to affirm the district court's dismissal of Plaintiffs' APA notice-and-comment claim (Part VI-B).  I also concur in the judgment to affirm the district court's ruling on Plaintiffs' Due Process claims (Part VI-C; Part VI-D).  And, as explained here as well, I agree with the majority's decision to affirm the district court's denial of the motion to dismiss the Equal Protection claim (Part VI-E) and hold that the Equal Protection claim offers an alternative ground to affirm the preliminary injunction.

*v. Chaney*, courts read § 701(a)(2) to preclude judicial review of certain types of administrative action that are "traditionally . . . 'committed to agency discretion.'" 470 U.S. 821, 832 (1985) (holding unreviewable the decision not to institute enforcement proceedings); *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) (same for the allocation of funds from a lump-sum appropriation); *Webster v. Doe*, 486 U.S. 592, 599–600 (1988) (same for decisions of the Director of the Central Intelligence Agency to terminate an employee due to national security interests); *ICC v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 281–82 (1987) (*BLE*) (same for an agency's refusal to grant reconsideration of an action due to material error).

An agency decision to rescind a non-enforcement policy in the immigration context is this type of administrative action. From *Heckler*, we know that agency actions that "involve[] a complicated balancing of a number of factors," like allocating agency resources and prioritizing agency policies, "are peculiarly within [the agency's] expertise," and are therefore "general[ly] unsuitab[le] for judicial review." 470 U.S. at 831. And in *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999) (*AADC*), the Supreme Court made clear that Executive Branch decisions that implicate enforcement priorities in the context of immigration are among those that judges are least equipped to review. *Id.* at 489–90. In *AADC*, the Court explained that the concerns necessitating the Executive's "broad discretion" in criminal prosecutions are "greatly magnified in the deportation context." *Id.* (citing *United States v. Armstrong*, 517 U.S. 456, 464 (1996)).

In deciding to rescind an immigration policy of non-enforcement, DHS thus acts with broad discretion that courts cannot review absent clear congressional authorization.

Here, rather than authorize judicial review, the broad, discretion-granting language of the enabling statute reinforces that DHS's enforcement decision is not subject to APA review. *See* 6 U.S.C. § 202(5) ("The Secretary shall be responsible for . . . [e]stablishing national immigration enforcement policies and priorities."); *see also Webster*, 486 U.S. at 599–600.

Perhaps recognizing that immigration enforcement decisions exhibit the characteristics of unreviewable agency actions, the majority decides that we should nonetheless review the rescission of DACA because these features are not actually at work here: Acting Secretary Duke explained that DACA was rescinded based on DHS's belief that the program was unlawful. The majority points to *Heckler*'s footnote 4, where the Court left open the question whether courts may review agency action if "a refusal by the agency to institute proceedings [is] based solely on the belief that it lacks jurisdiction." *Heckler*, 470 U.S. at 833 n.4 ("[W]e express no opinion on whether such decisions would be unreviewable under § 701(a)(2) . . . ."). The majority concludes that the Supreme Court has not yet answered this question, and that our court, in *Montana Air Chapter No. 29 v. FLRA*, 898 F.2d 753, 756–57 (9th Cir. 1990), has answered it in the affirmative: that otherwise unreviewable agency action is reviewable when the agency justifies its action by reference to its understanding of its jurisdiction. I respectfully disagree.

In *Montana Air*, we confronted the question left open in *Heckler*'s footnote 4. Specifically, we held that a decision by the Federal Labor Relations Authority's General Counsel not to issue an unfair labor practice complaint was reviewable only because his decision was "based solely on his belief that he lacks jurisdiction to issue such a

complaint." *Id.* at 756. But what we held reviewable were the General Counsel's "statutory and regulatory interpretations to determine if his belief that he lacked jurisdiction was correct." *Id.* at 757. Applying *Chevron*, we found "impermissible" the General Counsel's interpretations of the statute under which he acted. *Id.* at 758.

Here, by contrast, Plaintiffs do not ask that we apply *Chevron* to review whether Acting Secretary Duke impermissibly interpreted 6 U.S.C. § 202(5) in concluding that the statute authorized the rescission of DACA.[3] Instead, Plaintiffs ask that we review for arbitrariness and capriciousness the *procedures* the agency used to rescind DACA. But nothing in *Montana Air* suggests that *Heckler*'s footnote 4 authorizes arbitrary-and-capricious, rather than *Chevron*, review of agency action simply because the agency acted based on its understanding of its enabling statute. And, despite Plaintiffs' arguments to the contrary, *BLE* plainly prohibits us from doing so.

In *BLE*, the Supreme Court held that an agency's refusal to reconsider a prior adjudicative decision was unreviewable even where the agency based its refusal on its interpretation of its enabling statute. 482 U.S. at 278–84. In so holding, the Court explained that the agency's refusal to reconsider was unreviewable because it was the *type* of action that "has traditionally been 'committed to agency discretion,'" *id.* at 282 (quoting *Heckler*, 470 U.S. at 832); thus any inquiry into its *reasons* for acting was inappropriate, *id.* at 280–81. "It is

---

[3] This is not surprising: § 202(5) makes the Secretary "responsible for . . . [e]stablishing national immigration enforcement policies and priorities." If we accept that this broad, discretion-granting statute authorized DACA's implementation, it surely also sanctions DACA's termination.

irrelevant that the [agency's] order refusing reconsideration discussed the merits of the unions' claim at length," the Court explained, as "[i]t would hardly be sensible to say that the [agency] can genuinely deny reconsideration only when it gives the matter no thought." *Id.* *BLE* thus makes clear that when determining the scope of permissible judicial review, courts consider only the *type* of agency action at issue, not the agency's *reasons* for acting.

Finally, Plaintiffs argue that even if *BLE* precludes review of *some* types of agency action regardless of the agency's reason for acting, that rule only applies to single-shot enforcement decisions, not to general statements of policy. *See NAACP v. Trump*, 298 F. Supp. 3d 209, 227–36 (D.D.C. 2018) (discussing *Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 676 (D.C. Cir. 1994), and permitting APA review on this ground). In other words, Plaintiffs would have us hold that general statements of policy—but not single-shot enforcement decisions—are subject to APA review when the agency's sole reason for acting is its understanding of its jurisdiction. While the majority acknowledges Plaintiffs' argument without reaching its merits, I believe that such a distinction collapses *Heckler* on its head: In deciding whether agency action is reviewable, the first question we ask is what type of agency action is before us—whether it is agency action that courts typically review or agency action "traditionally . . . 'committed to agency discretion.'" *Heckler*, 470 U.S. at 832. This initial inquiry includes consideration of whether the action is a single-shot non-enforcement decision or a general statement of policy. It would beg the question to conclude that unreviewable agency action is in fact reviewable because it is the type of action that courts typically review.

I would therefore hold that § 701(a)(2) precludes us from subjecting DACA's rescission to arbitrary-and-capricious review.

At the same time, as the government concedes, DACA's rescission may be reviewed for compliance with the Constitution. I would hold that Plaintiffs have plausibly alleged that the rescission of DACA was motivated by unconstitutional racial animus in violation of the Equal Protection component of the Fifth Amendment, and that the district court correctly denied the government's motion to dismiss this claim.

Notably, Plaintiffs did not seek a preliminary injunction on their Equal Protection claim, instead relying solely on their APA argument. Nonetheless, this court may affirm a preliminary injunction on any basis supported by the record. *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1021 (9th Cir. 2013). And because a preliminary injunction preserves the court's power to render a meaningful decision on the merits, we can affirm an injunction issued on legally erroneous grounds where remand for consideration of alternative grounds is warranted. *See Gerling Global Reinsurance Corp. of Am. v. Low*, 240 F.3d 739, 754 (9th Cir. 2001) ("It is possible that [the challenged law] violates the Due Process Clause, but the district court did not reach that issue, and it is not fully developed in the record or in the briefs presented to this court. We leave the preliminary injunction in place in order to give the district court an opportunity to consider whether Plaintiffs are likely to succeed on the merits."); *see also United States v. Hovsepian*, 359 F.3d 1144, 1157 (9th Cir. 2004) (en banc) (holding that the district court erred in entering an injunction but leaving "the injunction in place . . . pending the conclusion of all proceedings in this case, in aid of the court's jurisdiction"). Accordingly, I would affirm

the preliminary injunction and remand for consideration whether Plaintiffs have demonstrated a likelihood of success on the merits of their Equal Protection claim.

As the majority details, the record assembled at this early stage is promising. Plaintiffs highlight (1) the disproportionate impact DACA's rescission has on "individuals of Mexican heritage, and Latinos, who together account for 93 percent of approved DACA applications"; (2) a litany of statements by the President and high-ranking members of his Administration that plausibly indicate animus toward undocumented immigrants from Central America;[4] and (3) substantial procedural irregularities in the challenged agency action.

Such evidence—plus whatever additional evidence Plaintiffs muster on remand—may well raise a presumption that unconstitutional animus was a substantial factor in the rescission of DACA. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–68 (1977); *see also Hawaii*, 138 S. Ct. at 2420 (holding that courts "may consider plaintiffs' extrinsic evidence" as permitted by the applicable level of scrutiny). If the government fails to rebut that presumption, Plaintiffs will have demonstrated a likelihood of success on the merits. *See Arlington Heights*, 429 U.S. at 270 & n.21 (noting that proof that an action was motivated by a discriminatory purpose shifts to the government the burden of establishing that the same decision would have resulted without the impermissible purpose);

---

[4] Like the majority, I do not interpret *Trump v. Hawaii*, 138 S. Ct. 2392 (2018), to preclude review of the President's statements when applying the *Arlington Heights* standard. At the merits stage, the district court can still decide whether, or to what degree, the President's statements betray a discriminatory animus behind DACA's rescission.

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006) (affirming the injunction where the government failed to meet its burden at preliminary injunction stage, because "the burdens at the preliminary injunction stage track the burdens at trial"). As such, I believe that Plaintiffs have plausibly alleged an Equal Protection violation and that the district court should decide whether it is an alternative ground to grant the preliminary injunction.

Moreover, the balance of equities here weighs heavily in favor of affirming the preliminary injunction. A merits decision from the district court concluding that the Executive rescinded DACA because of unconstitutional racial animus would be little more than an advisory opinion if by that time thousands of young people had lost their status due to the lack of an injunction preserving it. Preliminary injunctive relief exists precisely for circumstances like these: "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Thus, on these facts, the district court was correct to issue a preliminary injunction. *See Ashcroft v. ACLU*, 542 U.S. 656, 670 (2004) (affirming injunction where "the potential harms from reversing the injunction outweigh those of leaving it in place by mistake"); *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975) (granting preliminary relief because "otherwise a favorable final judgment might well be useless"); *Brown v. Chote*, 411 U.S. 452, 457 (1973); *cf. Winter v. NRDC, Inc.*, 555 U.S. 7, 26 (2008) (reversing injunction without addressing likelihood of success on the merits where "the balance of equities and consideration of the overall public interest in this case tip strongly in favor of [defendants]").

Accordingly, while I would remand for the district court to evaluate the Plaintiffs' likelihood of success on the merits of their Equal Protection claim as an alternative basis for preliminary relief in the first instance, I join the majority in affirming the preliminary injunction to preserve the status quo while Plaintiffs attempt to prove up that claim.