Jeffrey M. Davidson (Bar No. 248620)
David Watnick (Bar No. 305909)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
Telephone: + 1 (415) 591-6000
Facsimile: + 1 (415) 591-6091
Email: jdavidson@cov.com,
dwatnick@cov.com

Lanny A. Breuer (admitted *pro hac vice*)
Mark H. Lynch (admitted *pro hac vice*)
Alexander A. Berengaut (admitted *pro hac vice*)
Megan A. Crowley (admitted *pro hac vice*)
Carlton E. Forbes (*pro hac vice* application
forthcoming)
Rebecca Yergin (*pro hac vice* application
forthcoming)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: + 1 (202) 662-6000
Facsimile: +1 (202) 662-6291
E-mail: lbreuer@cov.com, mlynch@cov.com,
aberengaut@cov.com, mcrowley@cov.com,
cforbes@cov.com, ryergin@cov.com

Charles F. Robinson (Bar No. 113197)
Margaret Wu (Bar No. 184167)
Sonya Sanchez (Bar No. 247541)
University of California
Office of the General Counsel
1111 Franklin Street, 8th Floor
Oakland, CA 94607-5200
Telephone: + 1 (510) 987-9800
Facsimile: + 1 (510) 987-9757
Email: charles.robinson@ucop.edu,
margaret.wu@ucop.edu,
sonya.sanchez@ucop.edu

Attorneys for Plaintiff
THE REGENTS OF THE UNIVERSITY
OF CALIFORNIA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>          Plaintiff,<br><br>     v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY and CHAD WOLF, *in his official capacity as purported Acting Secretary of the Department of Homeland Security*,<br><br>          Defendants. | Civil Case No.: 17-cv-05211-WHA<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

1
2
3
4

The Regents of the University of California ("UC" or "the University"), on its own behalf and on behalf of all students currently enrolled at the University, brings this action for declaratory and injunctive relief against the Department of Homeland Security ("DHS") and purported Acting Secretary of Homeland Security, Chad Wolf (together, "Defendants"), and alleges as follows:

5

### INTRODUCTION

6
7
8
9
10
11
12
13
14

1.      Since its inception in 2012, the Deferred Action for Childhood Arrivals ("DACA") program has provided more than 800,000 individuals the ability to live, study, and work in the United States without fear that they could be detained and deported at any time.  The program has allowed DACA recipients to pursue opportunities in higher education, to more readily obtain driver's licenses and access lines of credit, to obtain jobs, and to access certain Social Security and Medicare benefits. The opportunities afforded by DACA have permitted recipients to better care for their families, including their approximately 200,000 U.S.-citizen children.  At the same time, DACA recipients have made invaluable contributions to American society, including through their professional, intellectual, and cultural achievements.

15
16
17
18
19
20
21
22

2.      The University, in particular, has directly benefited from the DACA program in its capacities as educator and employer.  UC has more than 4,000 undocumented students, including approximately 1,700 current DACA recipients and as many as 1,700 more students who would have been eligible for DACA but for Defendants' unlawful actions described below.  Many of the University's staff members are also DACA recipients.  These individuals make important contributions to University life by expanding the intellectual vitality of the University; filling crucial roles as medical residents, research assistants, and student government leaders; and increasing the diversity of the community.

23
24
25
26
27

3.      Despite the clear successes and benefits of DACA, the federal government has sought arbitrarily to rescind the program for shifting and untenable reasons.  In 2017, DHS abruptly and arbitrarily sought to rescind the program without reason (the "Rescission").  This Court enjoined the Rescission, the Ninth Circuit affirmed, and on June 18, 2020, the Supreme Court of the United States held that the Rescission was arbitrary and capricious in violation of the Administrative Procedure Act

28

1
2
3
4

("APA").  The Supreme Court's decision rested on a finding that, even if DHS's purported concerns about the lawfulness of DACA were credited, DHS had failed to consider options for modifying DACA short of rescinding the program altogether and failed to address whether there had been legitimate reliance on the program.

5
6
7

4.     Despite clear directives from the Supreme Court, as well as the decisions of many other courts—including the Ninth Circuit—that previously found the Rescission arbitrary and capricious, Defendants have persisted in their efforts to harm DACA and DACA recipients.

8
9
10
11
12
13
14
15
16
17
18
19

5.     Forty days after the Supreme Court's decision—and only 11 days after a district court reinstated DACA in its entirety—Defendants announced immediate "interim" modifications to the program.  On July 28, 2020, Defendant Chad Wolf, the purported Acting Secretary of DHS, issued—without authority—a memorandum directing DHS personnel to (1) reject all pending and future DACA applications, (2) cut the DACA renewal period (and accompanying work authorization) in half, and (3) reject all pending and future applications for advance parole (*i.e.*, permission to travel outside the United States and return lawfully).  *See* Memorandum from Chad Wolf, Acting Secretary of DHS, to Mark Morgan, Senior Official Performing the Duties of Commissioner, U.S. Customs and Border Protection, et al., Reconsideration of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (July 28, 2020) (the "Wolf Memorandum").  As a result of these efforts, despite the ruling of the Supreme Court, DACA is once again imperiled by arbitrary administrative action.

20
21
22
23
24
25
26
27

6.     By eliminating new DACA applications, the Wolf Memorandum cuts off DACA for applicants who are indistinguishable from current DACA recipients aside from the timing of their applications or the year of their birth.  For example, a first immigrant who aged into eligibility the day after the unlawful Rescission is deprived of the benefits of DACA, while a second immigrant approved for DACA the day before the unlawful Rescission maintains the right to stay in the program.  The first immigrant will be unable to lawfully work in the United States, will not have access to employer-sponsored healthcare, and may be arrested and deported at any time.  The second immigrant can work lawfully, will have access to healthcare, and can participate in United States civic life without fear of

28

deportation.  There is no basis for treating the two differently, but that is exactly what the Wolf Memorandum does.  The Wolf Memorandum is all the more arbitrary because it denies DACA eligibility to individuals who aged into the program while the illegal Rescission was in place and who, but for the illegal Rescission, would be current DACA recipients.

7.     The Wolf Memorandum also chops the DACA renewal period in half, requiring DACA recipients to renew every year rather than every other year.  The result is a doubling of the already steep renewal fee, a likely slowdown in processing times due to the doubling of renewal applications, and an increased likelihood that DACA grants will lapse, resulting in job loss and deportation.

8.     The Wolf Memorandum offers no basis for these modifications to DACA other than purported Acting Secretary Wolf's "strong desire" to "mitigate" supposed concerns about the program while he buys time to "consider[] anew the DACA policy." *Id.* at 4, 7.  As with DHS's earlier efforts to rescind DACA, the Wolf Memorandum fails to adequately take account the vast programmatic benefits of the policy or of the reliance interests it has engendered, nor does it conduct any reasoned policy analysis for why DACA should be restricted and impaired.

9.     The Wolf Memorandum scarcely acknowledges the exigent circumstances of COVID-19 before concluding that the population that would be eligible for DACA—and its attendant work authorization and health care benefits—has no reliance interest on the program in the midst of a global pandemic.  But the 2012 DACA Memorandum created a legitimate expectation that upon aging into the program, eligible immigrants would be able to avail themselves of the benefits of DACA, including access to lawful work, employer-sponsored healthcare, and heightened employment prospects in a depressed job market.  The Wolf Memorandum does not acknowledge the essential ways DACA recipients have contributed (and continue to contribute) during the pandemic, for example the contributions of an estimated 29,000 DACA recipients who work as frontline health care workers.  Nor does the Wolf Memorandum explain Defendants' sudden abandonment of their earlier supposed concerns about DACA's lawfulness that had been put forward as the reason for the original Rescission.

10.    The Wolf Memorandum's modifications of the DACA policy have significant consequences for the University and its students.  Thousands of University students who could have

enjoyed the benefits and made the contributions that DACA facilitates will be unable to do so simply because of the year they were born.  For example, without work authorization, many will not have the opportunity to work as, for instance, research assistants and teaching fellows, as well as the opportunity to work lawfully in their chosen fields after graduation.  Without the ability to work, some students will not be able to afford their education, and will have to abandon their studies prematurely.  This obvious harm to those students would also negatively impact the University in turn, as it relies on the diverse perspectives those students bring to the classroom and beyond, and has made considerable investments in those students' educations.

11.    Further, halving the renewal period from two years to one creates additional monitoring costs for the University, which now has a heightened burden of keeping track of its employees' work authorization expiration dates and compliance with the shortened timeframe.  This shortened timeframe also increases the risk of lapses in work authorization, and those lapses would disrupt and harm ongoing research and services by depriving the University of the talents and efforts of DACA recipients who rely on work authorization to contribute outside of the classroom.  Specifically, the effective doubling of renewal applications clogs an already burdened processing pipeline at the United States Citizenship and Immigration Services ("USCIS"), which frequently takes extensive time to process renewal applications.  Yet USCIS will now outright reject (rather than simply hold) DACA renewal requests received more than 150 days prior to the recipient's DACA expiration.  Thus lapses in work authorization are likely to occur even for DACA recipients who timely file their renewal applications.  Moreover, the doubled renewal fees have significant consequences for DACA students, who will incur greater financial burdens or may not be able to afford to remain in the DACA program.  In certain cases, the doubled fees may have direct financial impact on the University itself.  And the University bears further direct economic harm by having to increase financial aid amounts to those students able to secure such aid who otherwise would have been able to support themselves without it.

12.    As explained below, Defendants' capricious modifications to the DACA program violates both the procedural and substantive requirements of the APA, 5 U.S.C. § 706, the Due Process Clause of the Fifth Amendment, the Appointments Clause, U.S. Const. art. II, § 2, cl. 2, the Homeland

1
2
3

Security Act, 6 U.S.C. § 112 *et seq*. ("HSA"), the Federal Vacancies Reform Act, 5 U.S.C. § 3345 *et seq*. ("FVRA"), and constitutes *ultra vires* agency action.  Accordingly, Defendants' unconstitutional, unjust, and unlawful action must be set aside.

4

## THE PARTIES

5
6
7
8
9
10
11
12

13.     Plaintiff The Regents of the University of California is a California public corporation, authorized and empowered to administer a public trust known as the University of California, pursuant to Article IX, Section 9, subdivisions (a) and (f) of the California Constitution.  Its principal place of business is in Oakland, Alameda County, California.  The University brings this complaint on behalf of itself and on behalf of all students currently enrolled at the University.  More than 4,000 undocumented students are enrolled at the University, of whom about 1,700 are DACA recipients and approximately 1,700 would have aged into DACA eligibility but for Defendants' actions.  Some of these recipients are also employed by the University.

13
14
15
16
17
18

14.     Defendant DHS is a federal cabinet agency responsible for implementing and enforcing the Immigration and Nationality Act ("INA").  DHS is a Department of the Executive Branch of the United States Government and an agency within the meaning of 5 U.S.C. § 551(1).  DHS, as well as its component agencies USCIS, U.S. Customs and Border Protection ("CBP"), and U.S. Immigration and Customs Enforcement ("ICE"), have responsibility for, among other things, administering and enforcing the nation's immigration laws and policies, including the DACA program.

19
20
21
22

15.     Defendant Chad Wolf is the purported Acting Secretary of DHS, although he has not been lawfully designated to serve in that capacity, and cannot lawfully exercise the purported powers of the Acting Secretary of DHS.  Purported Acting Secretary Wolf issued the Memorandum making "interim" modifications to DACA on July 28, 2020, under his purported authority.

23
24

16.     USCIS is a component of DHS, 6 U.S.C. § 271, and an agency within the meaning of the APA, 5 U.S.C. § 551(1).  USCIS is responsible for processing and adjudicating DACA applications.

25
26

17.     Joseph Edlow is the purported Deputy Director for Policy of USCIS, although he has not been lawfully designated to serve in that capacity and cannot lawfully exercise the purported powers of

27
28

his office.  Purported Deputy Director Edlow issued additional guidance regarding the implementation of the Wolf Memorandum on August 21, 2020.

### JURISDICTION

18.     This action arises under the Due Process Clause of the Fifth Amendment, U.S. Const. amend. V; the Appointments Clause, U.S. Const. art. II, § 2, cl. 2; the FVRA, 5 U.S.C. § 3345 *et seq.*; the HSA, 6 U.S.C. § 112 *et seq.*; and the APA, 5 U.S.C. § 550 *et seq.*  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1361, and 2201–2202.

19.     There exists an actual and justiciable controversy between Plaintiff and Defendants requiring resolution by this Court.  Plaintiff has no adequate remedy at law.

### VENUE

20.     Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(e), because this is a civil action in which Defendants are an agency, or officers of an agency, of the United States, because a substantial part of the events or omissions giving rise to this action occurred in the District, and, further, because Plaintiff resides in this District and no real property is involved in the action.

### INTRADISTRICT ASSIGNMENT

21.     Pursuant to Local Rule 3-2(c), intradistrict assignment is proper in San Francisco or Oakland because a substantial part of the events or omissions which give rise to the claim occurred in the County of Alameda.

### BACKGROUND

**A.    *The DACA Program***

22.     On June 15, 2012, the Secretary of Homeland Security Janet Napolitano announced that individuals who arrived in the United States as children and met certain criteria could apply for deferred action for two-year periods, subject to renewal.  *See* DACA Memorandum.  In establishing the program, the Secretary elected to extend deferred action to "certain young people who were brought to this country as children and know only this country as home."  *Id.*  The Secretary emphasized that federal immigration laws are "not designed . . . to remove productive young people to countries where they may

not have lived or even speak the language.  Indeed, many of these young people have already

contributed to our country in significant ways." *Id.*  This program is known as Deferred Action for

Childhood Arrivals or "DACA."

23.     Individuals were eligible for the program if they (1) came to the United States when they

were under the age of sixteen; (2) continuously resided in the United States since June 15, 2007, and

were present in the United States on June 15, 2012, and on the date they requested DACA; (3) were

currently in school, had graduated from high school, had obtained a general education development

certificate, or were an honorably discharged veteran of the Coast Guard or Armed Forces of the United

States; (4) had not been convicted of a felony, a significant misdemeanor, or three or more other

misdemeanors, and otherwise did not pose a threat to national security or public safety; (5) did not have

lawful immigration status on June 15, 2012; and (6) were under the age of 31 as of June 15, 2012.  *See

id.*; *see also* U.S. Citizenship & Immigration Servs.: Consideration of Deferred Action for Childhood

Arrivals Process (Aug. 26, 2017) (hereinafter "USCIS FAQs").  Individuals must generally be 15 years

old in order to apply.  Individuals who met these criteria were then eligible for an exercise of

prosecutorial discretion, following an individualized review of their applications.  *See* DACA

Memorandum.

24.     When they applied for admission to the program, DACA recipients were required to

disclose sensitive, personal information to Defendants, including their lack of lawful immigration status

as of June 15, 2012, their date of initial entry into the United States, their country of birth, their current

and previous mailing addresses, and other contact information.  *See* USCIS Form I-821D; USCIS Form

I-821D Instructions.

25.     Continuing their longstanding practice with respect to deferred-action applications,

Defendants repeatedly promised DACA applicants that the information they submitted as part of their

applications would not be used for civil immigration enforcement purposes against DACA applicants or

their families.  *See* USCIS FAQs; Form I-821D Instructions.  Because only individuals who might be

subject to removal proceedings would apply for DACA, this promise was necessary for individuals to

submit applications without fear that the Executive Branch was using DACA as a way to find and remove undocumented immigrants.

26.     Individuals who received deferred action under DACA were not subject to removal for a period of two years, subject to renewal.  *See* DACA Memorandum.

27.     DACA recipients also were eligible for work authorizations that allowed them to work legally in the United States, pursuant to a long-standing federal regulation.  *See id.*; 8 C.F.R. § 274a.12(c)(14) (providing that "an alien who has been granted deferred action" may obtain work authorization upon demonstrating economic necessity); USCIS FAQs ("Under existing regulations, an individual whose case has been deferred is eligible to receive employment authorization for the period of deferred action, provided he or she can demonstrate 'an economic necessity for employment.'").  An individual's work authorization expires at the same time as his or her DACA grant and could be renewed upon a renewal of a DACA grant.

28.     DACA recipients were "not considered to be unlawfully present during the period in which deferred action [was] in effect."  USCIS FAQs.

29.     Since the program was first introduced in 2012, more than 825,000 individuals received DACA benefits.  This includes an estimated 238,623 residents of the State of California.  Dkt. 299-1 at 6.

**B.     *The Many Benefits of DACA***

30.     As noted above, DACA recipients have contributed in innumerable ways to the University.

31.     As an institution whose core mission is serving the interests of the State of California, the University seeks "to achieve diversity among its student bodies and among its employees."  *See* Academic Senate of the Univ. of Cal., *Regents Policy 4400: Policy of University of California Diversity Statement*, UNIV. OF CAL.: BOARD OF REGENTS, http://regents.universityofcalifornia.edu/ governance/policies/4400.html.  The University recognizes the importance of diversity to its academic mission, as it allows "students and faculty [to] learn to interact effectively with each other, preparing them to participate in an increasingly complex and pluralistic society."  *Id.*  The educational experience

of all University students is fuller and more enriching when ideas are "born and nurtured in a diverse community." *Id.* DACA students and DACA-eligible students at the University are an integral part of that community. Their talents, perspectives, and experiences contribute enormously to University life. DACA students, for instance, volunteer as interpreters, bring nuanced perspectives to class discussions, serve in student government, and serve as leaders in various student organizations. Dkts. 118, Ex. 41 ¶ 10; 118-1, Ex. 48 ¶¶ 8, 11.

32. DACA recipients also make significant contributions to University life in their role as employees. They work at UC campuses and in UC medical centers as teaching assistants, research assistants, post-doctoral fellows, and health care providers. DACA recipients often possess valuable foreign language skills. By allowing DACA recipients to work lawfully, DACA moved recipients out of the informal economy, increasing the pool of talent from which UC could fill positions at the University.

33. Additionally, DACA recipients who are enrolled as students support themselves and cover a portion of their tuition through work, including work for the University. For many of these students, DACA work authorization is what allows them to attend UC and continue each year with their chosen program of study.

34. The University has invested considerable resources in recruiting and retaining these individuals—as students and employees. It has made scarce enrollment space available to these students on the basis of their individual achievements. It also has invested substantial time, financial aid, research dollars, housing benefits, and other resources in them on the expectation that these students will complete their course of study and become productive members of the communities in which the University operates, and other communities throughout the nation. The University has significant interests in retaining this wealth of talent and in continuing to enjoy the many benefits of their participation in University life.

35. Furthermore, by allowing recipients to receive deferred action and obtain work authorization, DACA opened myriad opportunities to them. As noted above, and as emphasized by the Supreme Court, DACA recipients became eligible for federal work authorization, which significantly improved their opportunities for employment, medical benefits, and higher paying jobs. *Dep't of*

1   *Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1906 (2020).  Under the program,

2   DACA recipients received social security numbers and therefore were able to access credit more easily.

3   DACA enabled recipients to obtain driver's licenses in a number of states where they otherwise could

4   not.  It also protected these individuals' right to travel freely by making them eligible to receive

5   "advance parole," which allowed them to travel abroad temporarily for humanitarian, educational, or

6   employment purposes, and to return to the United States lawfully.  *See* 8 C.F.R. § 212.5(f); USCIS

7   FAQs.

8          **C.   *Defendants' Attempt to Unlawfully Rescind DACA***

9          36.   Although the Administration initially stated a commitment to DACA, *see, e.g.*,

10  Memorandum from John Kelly, Secretary of Homeland Security, Enforcement of the Immigration Laws

11  to Serve the National Interest, at 2 (Feb. 20, 2017), on September 5, 2017, Defendants abruptly

12  announced their plan to rescind the program.

13         37.   Prior to DHS's issuance of the attempted Rescission, then-Attorney General Jeff Sessions

14  held a press conference in which he asserted that "[o]ur collective wisdom is that the policy is

15  vulnerable to the same legal and constitutional challenges that the courts recognized with respect to the

16  DAPA [Deferred Action for Parents of Americans] program."  *See* Attorney General Sessions Delivers

17  Remarks On DACA (Sept. 5, 2017), https://www.justice.gov/opa/speech/attorney-general-sessions-

18  delivers-remarks-daca ("Press Conference").  Similarly, a September 4, 2017 letter from the Attorney

19  General to then-Acting Secretary of Homeland Security Duke reiterated that DACA "was effectuated . .

20  . without proper statutory authority" and "was an unconstitutional exercise of authority by the Executive

21  Branch."  *See* Letter from Attorney General Sessions to Acting Secretary of DHS Duke (Sept. 4, 2017).

22  The Attorney General also noted the potential of litigation from several states and that DACA was

23  "likely" to be enjoined in that yet-to-be-filed litigation.

24         38.   After the press conference, Acting Secretary Duke, purporting to act "[i]n the exercise of

25  [her] authority in establishing national immigration policies and priorities," formally rescinded the

26  DACA Memorandum.  The attempted Rescission stated that DACA "should be terminated" in light of

27  the Fifth Circuit's ruling regarding DAPA in *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), the

28

Supreme Court's non-precedential affirmance of that ruling by an equally divided court, and the Attorney General's September 4 letter.  Acting Secretary Duke did not cite any policy reason for eliminating DACA and instead relied solely on Attorney General Sessions's assertion of DACA's illegality in rescinding the program.

39.     The President, however, apparently disagreed with DHS's and his Attorney General's views on the legality of DACA.  In contradiction to Acting Secretary Duke's and Attorney General Sessions' position that the prior administration had exceeded the authority of the Executive Branch in establishing DACA, *see* Press Conference, the President tweeted on the night of the attempted Rescission, "Congress now has 6 months to legalize DACA (something the Obama Administration was unable to do).  If they can't, I will revisit this issue!"  *See* Donald J. Trump (@realDonaldTrump), Twitter (Sept. 5, 2017, 5:38 PM), https://twitter.com/realDonaldTrump/status/905228667336499200.

40.     In fact, the Administration meant to use the attempted Rescission as a bargaining chip with Congress.  For example, on October 8, 2017, President Trump sent a letter to Congressional leaders setting forth the "Immigration Principles and Policies" that he said "must be included as part of any legislation addressing the status of [DACA] recipients."  President Donald J. Trump's Letter to House and Senate Leaders & Immigration Principles and Policies (Oct. 8, 2017), https://www.whitehouse.gov/briefings-statements/president-donald-j-trumps-letter-house-senate-leaders-immigration-principles-policies/.   By linking the attempted Rescission to the Administration's legislative strategy, Defendants used the decision to rescind DACA to make DACA recipients a bargaining chip in order to secure support for harsh immigration legislation from members of Congress who support DACA recipients and would not otherwise support the Administration's immigration agenda.

41.     President Trump then made the ploy explicit in advertising that "[t]he Democrats have been told, and fully understand, that there can be no DACA without the desperately needed WALL at the Southern Border and an END to the horrible Chain Migration & ridiculous Lottery System of Immigration etc.  We must protect our Country at all cost!"  *See* Donald J. Trump (@realDonaldTrump), Twitter (Dec. 29, 2017, 5:16 AM), https://twitter.com/realDonaldTrump/status/946731576687235072.

1

**D.    *The Court Preliminarily Enjoins the Attempted Rescission***

2

42.    On September 8, 2017, the University filed a complaint challenging Defendants' attempt

3

to rescind DACA.  The initial Complaint contended, among other things, that Defendants' decision to

4

rescind DACA was arbitrary and capricious and violated the APA because it was not adequately

5

explained and failed to account for reliance interests.  Dkt. 1.

6

43.    On November 1, 2017, the University moved for provisional relief on its APA claims,

7

seeking a preliminary injunction prohibiting Defendants from proceeding with the attempted Rescission

8

during the pendency of the litigation.  Dkt. 111.

9

44.    On January 9, 2018, the Court granted in substantial part the University's motion and

10

issued a nationwide injunction prohibiting Defendants from rescinding active DACA grants (and

11

attendant work authorizations) and generally requiring Defendants to continue permitting DACA

12

renewals consistent with preexisting procedures.  Dkt. 234.  The Court found that the University was

13

likely to succeed on its claim that the attempted Rescission was arbitrary and capricious and that the

14

other preliminary injunction factors were satisfied based on the extraordinary harm the University and

15

the hundreds of thousands of individual DACA recipients would have faced if DACA were rescinded.

16

*Id.* at 43–46.

17

45.    On November 8, 2018, the Ninth Circuit upheld the Court's preliminary injunction in

18

full.  *Regents of the Univ. of California v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476 (9th Cir. 2018).

19

46.    On November 12, 2019, hours before the Supreme Court heard oral argument in the

20

instant action, President Trump falsely smeared DACA recipients as supposed "hardened criminals," yet

21

implored the Supreme Court to reinstate the Rescission with a promise to "deal . . . with Dems for them

22

to stay!"  *See* Donald J. Trump (@realDonaldTrump), Twitter (Nov. 12, 2019, 3:45 AM),

23

https://twitter.com/realDonaldTrump/status/1194219655717642240.

24

**E.    *The Supreme Court Rules the Rescission Arbitrary and Capricious***

25

47.    The Supreme Court rejected DHS's attempt to rescind DACA and upheld the finding that

26

the Rescission was arbitrary and capricious in violation of the APA.  *Regents*, 140 S. Ct. at 1913–15.

27

28

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 17-5211

48.     Specifically, the Supreme Court held that DHS's attempt to rescind DACA was arbitrary and capricious and thus violated the APA because the agency failed to consider important aspects of the issue, including both "the options of retaining forbearance" of deportation of DACA recipients, and "particular reliance interests" on the DACA program. *Id*. at 1915.  Accordingly, the Supreme Court vacated the attempted Rescission in its entirety, re-establishing the status quo from before the 2017 Duke Memorandum.  *See id*. at 1901, 1916 n.7.  The Administration should at that time have reinstated DACA in full, including accepting new applications from those who had aged into the program during the pendency of the unlawful Rescission.

49.     That did not occur.  The day after the Supreme Court's decision, Edlow stated on USCIS's official website that the Supreme Court's decision "has no basis in law" and "merely delays the President's lawful ability to end the illegal Deferred Action for Childhood Arrivals amnesty program," which he falsely stated allowed DACA recipients to "take jobs" from "Americans."

**F.     *Defendants' Arbitrary and Capricious Modifications to DACA***

50.     On June 30, 2020, in a letter to purported Acting Secretary Chad Wolf, Attorney General William Barr withdrew both Attorney General Sessions's September 4, 2017 letter to Acting Secretary Duke and an earlier opinion by the Office of Legal Counsel finding that DACA is lawful.  Attorney General Barr explicitly withheld any determination regarding DACA.  Rather, he stated that he "wish[ed] to wipe the slate clean" to give purported Acting Secretary Wolf full discretion over the DACA program.  Letter from Attorney General Barr to Acting Secretary of DHS Wolf (June 30, 2020).  Having eliminated the sole ground for the prior Rescission, and with the Supreme Court having rejected the Rescission as arbitrary and capricious, one would have expected Defendants to keep DACA in place.

51.     On July 17, 2020, a district court in the District of Maryland vacated the attempted Rescission and ordered the restoration of DACA "to its pre-September 5, 2017 status."  *Casa De Maryland v. U.S. Dep't of Homeland Sec.*, No. PWG-17-2942 (D. Md. July 17, 2020) ECF No. 97 at 3.

52.     On July 28, 2020, purported Acting Secretary Wolf, abandoning the prior rationales for the Rescission, issued a memorandum making "immediate" modifications to DACA in an effort to buy time while he conducts a "full reconsideration of the DACA policy."  *See* Wolf Memorandum at 1.  The

Wolf Memorandum, issued without notice and comment rulemaking, makes "interim" changes to DACA including rejection of "all pending and future initial requests for DACA," rejection of "all pending and future applications for advance parole," and halving the renewal period from two years to one. *Id*. at 1–2, 5.

53.     Specifically, the Wolf Memorandum rescinds both the 2017 Duke and the 2018 memorandum in which then-DHS Secretary Nielsen articulated her "understanding" of the 2017 Duke memorandum, and makes "certain immediate changes" to DACA "to mitigate" purported Acting Secretary Wolf's supposed "enforcement policy concerns" while he considers which ultimate action he wishes to take. *See id*. at 4.  The Wolf Memorandum recites supposed enforcement policy concerns, none of which has anything to do with the welfare of DACA recipients, their families, or the national economy, among other interests noted by the Supreme Court.  Rather, the Wolf Memorandum makes explicit that Defendants once more wish to use DACA recipients as a bargaining chip, stating that "rescinding DACA entirely may well create a more pressing need for Congress to decide whether it wants to address this issue." *Id*. at 4–5.  The idea that hundreds of thousands of people should be purposefully and grievously injured in order to prompt congressional action is an appalling breach of the basic principle that the government should aim to improve, rather than harm, people's lives.

54.     The Wolf Memorandum then states that given his purported enforcement policy concerns, "some changes should immediately be made" to DACA to "limit its scope" while purported Acting Secretary Wolf considers whether the program "should be maintained, rescinded, or modified"— an Orwellian euphemism for eliminating DACA for vast numbers of otherwise eligible individuals who, by sheer accident of their birth year, are now denied important work and health care benefits in the midst of a pandemic.  *Id*. at 5.

55.     The Wolf Memorandum asserts that the immediate changes will not materially encroach on the reliance interests of DACA recipients.  It claims, for example, that reliance interests are not "significantly affected" by cutting the renewal periods in half because this change might have the "potential" benefit of lessening the impact in case purported Acting Secretary Wolf "ultimately

decide[s] to rescind" the program.  *Id*. at 5–6.  This tenuous chain of possibilities, however, cannot offer an adequate explanation for the significant burden of limiting the renewal periods.

56.    The Wolf Memorandum further brushes aside the steep application fees DACA recipients must now pay twice as often merely because of purported Acting Secretary Wolf's "strong desire to limit the scope of the policy." *See id*. at 6–7.  Nor does it address the fact that DACA recipients who paid for a two-year renewal application but whose applications have not yet been granted can now only benefit from their DACA grants for one year.

57.    And the Wolf Memorandum claims that no reliance interests exist at all for would-be DACA recipients who are no longer eligible to apply for DACA.  It merely states that it "makes sense to continue" the "status quo" of not requiring consideration of new DACA requests while DHS evaluates the program. *Id*. at 6.  This purported "status quo" was only the status quo because of Defendants' illegal 2017 Rescission.  The proper status quo is the restoration of DACA as it would have existed absent the illegal Rescission.

58.    At bottom, none of the explanations proffered by the Wolf Memorandum is remotely plausible.  The Wolf Memorandum fails to follow the Supreme Court's direction to consider alternative ways of mitigating those supposed enforcement policy concerns.  Nor does it explain why Defendants have abandoned Defendants' prior justifications based on DACA's alleged illegality and their supposed concerns about executive overreach.  Instead, Defendants' action seems calculated to harm DACA based on no clear rationale at all.

59.    On August 21, 2020, Edlow issued additional guidance regarding the implementation of the Wolf Memorandum.  Memorandum from Joseph Edlow, *Implementing Acting Secretary Chad Wolf's July 28, 2020 Memorandum* (Aug. 21, 2020) ("Edlow Memorandum").  Among other things, the Edlow Memorandum generally instructs that any DACA renewal application filed "more than 150 days before the [applicant's] current DACA period expires" should be rejected.  Edlow Memorandum at 3–5.  According to the Memorandum, rejecting—rather than simply holding—early renewal applications will promote "efficient use of agency resources." *Id.* at 5.  Further, the Memorandum asserts that "it is not necessary to accept DACA renewal requests more than 150 days before the [applicant's] current DACA

period expires," because, according to USCIS, most renewal applications are processed in fewer than 150 days.  *Id.*

60.   In practice, this 150-day rule, coupled with growing delays in the processing of DACA renewal applications, will prevent many DACA recipients from applying for renewal with adequate time for USCIS to adjudicate and approve the renewal request before the prior DACA grant expires.  This will lead to lapses in DACA protections and employment authorization, terminations from employment, and interruptions in access to higher education.

61.   The Edlow Memorandum also acknowledges that the one-year limitation the Wolf Memorandum places on DACA renewals effectively doubles the cost of renewals.  *Id.* at 5–6.  Although the Edlow Memorandum recognizes that the Wolf Memorandum "asked USCIS to consider whether it is possible to reduce renewal fees," the Edlow Memorandum proposes no reduction, instead offering only the vague representation that "USCIS is currently considering the merits and feasibility of reducing DACA-related fees."  *Id.*

### G.   *The Unlawful Designation of Chad Wolf as Purported Acting Secretary of DHS, and of Joseph Edlow as Purported USCIS Deputy Director for Policy.*

62.   Although Defendant Wolf has purported to be Acting Secretary of the Department of Homeland Security since November 13, 2019, he has no legally valid claim to that title.  He thus lacked authority to issue the Wolf Memorandum, which is void and lacks any legal force.

63.   This is not an issue of mere formality—Defendant Wolf's unauthorized actions as purported Acting Secretary implicate constitutional concerns.  The Constitution's Appointments Clause provides that the president

> shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, *and all other Officers of the United States*, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art. II, § 2, cl. 2 (emphasis added).

64.     Because the Secretary of Homeland Security is a principal Officer (rather than inferior Officer), the Appointments Clause requires that the person holding office of Secretary be appointed by the President "with the Advice and Consent of the Senate." *Id.*

65.     Federal statute also requires that the Secretary of Homeland Security be nominated by the president and confirmed by the Senate.  6 U.S.C. § 112(a)(1).

66.     The FVRA establishes the "exclusive means for temporarily authorizing an acting official to perform the functions and duties of any office of an Executive agency . . . for which appointment is required to be made by the President, by and with the advice and consent of the Senate," unless another statute expressly provides for another means of temporarily designating an acting officer.  5 U.S.C. § 3347(a).

67.     The FVRA does not provide the President with the power to circumvent fundamental separation of powers by indefinitely installing "acting" officials without the advice and consent of the Senate.  Among other things, the FVRA limits the time during which an office may be filled by an acting official, providing that "the person serving as an acting officer . . . may serve in the office . . . for no longer than 210 days beginning on the date the vacancy occurs." *Id*. § 3346.

68.     Separately, the Homeland Security Act ("HSA"), rather than the FVRA, governs the order of succession for the position of Acting Secretary of Homeland Security when the office of the Secretary is vacant. *See* 6 U.S.C. § 113(a)(1)(A), (g).

69.     The HSA provides that any vacancy in the office of the Secretary of Homeland Security is to be filled by the Deputy Secretary of Homeland Security or, if that office is likewise vacant, by the Under Secretary for Management. *Id.* § 113(a)(1)(A), (g)(1).  The HSA permits the Secretary of Homeland Security to establish a further succession order to apply in the event the offices of both the Deputy Secretary of Homeland Security and Under Secretary for Management are vacant. *Id*. § 113(g)(2).

70.     DHS has established multiple orders of succession and/or delegations pertaining to the office of the Secretary and other DHS offices. *See* Dep't of Homeland Sec., Delegation No. 00106, Revision No. 08.5 (Dec. 15, 2016) ("DHS Orders").

71.     From at least December 15, 2016, through and beyond April 11, 2019, DHS Orders Section II.A stated: "In case of the Secretary's death, *resignation*, or inability to perform the functions of the Office, *the orderly succession of officials is governed by Executive Order 13753*, amended on December 9, 2016." *Id*. (emphases added).

72.     Executive Order 13753, in turn, requires succession to the Acting Secretary role in the following order: (1) the Deputy Secretary of Homeland Security; (2) the Under Secretary for Management; (3) the Administrator of the Federal Emergency Management Agency; (4) the Under Secretary for National Protection and Programs; (5) the Under Secretary for Science and Technology; (6) the Under Secretary for Intelligence and Analysis; and (7) Commissioner of U.S. Customs and Border Protection.

73.     From at least December 15, 2016, through and beyond April 11, 2019, DHS Orders Section II.B provided: "I [the Secretary of Homeland Security] hereby delegate to the officials occupying the identified positions *in the order listed ([at] Annex A)*, my authority to exercise the powers and perform the functions and duties of my office, to the extent not otherwise prohibited by law, *in the event I am unavailable to act during a disaster or catastrophic emergency*." DHS Orders § II.B (emphases added).

74.     As of April 10, 2019, Annex A, which applied only when the Secretary is "unavailable to act during a disaster or catastrophic emergency," and not in the event of resignation, placed the Commissioner of U.S. Customs and Border Protection third in the succession order, behind the Deputy Secretary of Homeland Security and the Under Secretary for Management. DHS Orders Annex A. If, however, the Secretary of Homeland Security resigned, the Commissioner of U.S. Customs and Border Protection remained seventh in the standard order of succession. *See* Exec. Order No. 13753 § 1.

75.     On or about April 9 or 10, 2019, then-Secretary of Homeland Security Kirstjen Nielsen issued an amendment to DHS Orders Annex A ("April 2019 Amendment"). Again, by its explicit terms Annex A only applies when the Secretary is "unavailable to act *during a disaster or catastrophic emergency*." DHS, *Orders of Succession and Delegations of Authorities for Named Positions*, Delegation No. 00106, Revision No. 08.5 (Apr. 10, 2019). The amended text listed the Commissioner

of U.S. Customs and Border Protection third behind the Deputy Secretary of Homeland Security and Under Secretary for Management.  The Amendment to Annex A labeled and identified the Annex not as an "order of succession," but instead as an "Order for Delegation of Authority."

76.     Annex A did not—and does not—apply to succession in the case of *resignation* of the Secretary of Homeland Security.  The April 2019 Amendment did not direct any changes to the text of DHS Orders Section II.A.  Thus, notwithstanding the April 2019 Amendment, DHS Orders Section II.A still required following the order of succession specified in Executive Order 13753 in the event of a Secretary's resignation.

77.     Secretary Nielsen, the most recent Senate-confirmed Secretary of Homeland Security, resigned her position effective no later than April 10, 2019.

78.     Following Secretary Nielsen's resignation, on April 11, 2019, Kevin McAleenan, who was then serving as CBP Commissioner, purportedly, but unlawfully, assumed the position of Acting Secretary of Homeland Security.

79.     McAleenan's purported assumption of the Acting Secretary office was unlawful because, under the applicable DHS Orders, two other Senate-confirmed individuals were *ahead* of McAleenan to succeed to that office: Christopher Krebs, who then served as the Senate-confirmed Under Secretary for National Protection and Programs, and David Glawe, who then served as the Senate-confirmed Under Secretary for Intelligence and Analysis.

80.     Because McAleenan's purported succession was unlawful under the HSA and DHS Orders of Succession and Delegations, he had no valid legal claim to the office of Acting Secretary of Homeland Security, and could not lawfully exercise the authority of that office.

81.     On November 8, 2019, the 211th day of his purported tenure as Acting Secretary, McAleenan issued a directive attempting to amend the order of succession for the Secretary of Homeland Security to elevate the Under Secretary for Strategy, Policy, and Plans to be fourth in line to lead the agency in the event of the Secretary's resignation.  DHS, *Orders of Succession and Delegations of Authorities for Named Positions*, Delegation No. 00106, Revision No. 08.6 (Nov. 8, 2019).

82.     Unlike Secretary Nielsen's April 2019 Amendment, McAleenan *did* purport to change DHS Orders Section II.A such that, like Section II.B, it would now rely upon Annex A to establish the order of succession; thus Annex A for the first time would apply in the event of the Secretary of Homeland Security's *resignation*.  *See* Amendment to the Order of Succession for the Secretary of Homeland Security.  McAleenan's attempted change confirmed the invalidity of his own service as Acting Secretary, since the change would have been superfluous if Annex A had otherwise already applied to establish the succession order in the event of the Secretary's resignation.

83.     McAleenan likewise purported to change *the order of the positions listed in Annex A*, moving the position of Under Secretary for Strategy, Policy, and Plans to fourth in line, behind only the then-vacant Offices of Deputy Secretary of Homeland Security and Under Secretary for Management, as well as the Office then held by McAleenan, Commissioner of U.S. Customs and Border Protection.  *Id.*

84.     McAleenan's attempted directive was without force of law because McAleenan was not validly serving as Acting Secretary under the HSA, as his purported succession to the office of Acting Secretary violated the applicable DHS order of succession.

85.     Likewise, at the time he purported to change the Acting Secretary succession order, McAleenan's purported service as Acting Secretary violated the FVRA, as his service had already exceeded the 210-day time limit for acting-official service set forth in that statute.

86.     Irrespective of the legality of his purported service as Acting Secretary, McAleenan was not legally authorized to alter the DHS order of succession, as the HSA extends such power only to the Secretary of Homeland Security, not the Acting Secretary.  6 U.S.C. § 113(g)(2) ("the *Secretary* may designate such other officers of the Department in further order of succession to serve as *Acting Secretary*" (emphases added)).

87.     On October 11, 2019, McAleenan announced his resignation as Acting Secretary.

88.     On November 13, 2019, Defendant Wolf, who on that day was confirmed as Under Secretary for Strategy, Policy, and Plans, purported to assume the office of Acting Secretary of Homeland Security according to McAleenan's invalid succession directive.

89.     Because the succession directive that purported to designate Defendant Wolf as Acting Secretary was unlawful and invalid, Defendant Wolf was not, and has never been, the Acting Secretary of Homeland Security according to the Homeland Security Act.

90.     Likewise, Defendant Wolf's purported service as Acting Secretary violates, and has always violated, the FRVA, because the office of Secretary of Homeland Security had been vacant for more than 210 days before Defendant Wolf purported to assume the office of Acting Secretary.  On November 6, 2019, the Office of the Secretary of Homeland Security had been vacant for 210 days since April 10, 2019, the date that former Secretary Nielsen purported to resign.  After November 6, 2019, at the latest, the FVRA required the office to "remain vacant" until the president submitted a new nominee for Senate confirmation.  5 U.S.C. § 3348(b)(1).  Defendant Wolf began serving as Acting DHS Secretary on November 13, 2019, after the 210-day period under the FVRA had run.

91.     On August 14, 2020, the Government Accountability Office ("GAO") issued an opinion reviewing the legality of Defendant Wolf's designation as Acting DHS Secretary and concluded that Wolf was improperly designated.  GAO, *Matter of Department of Homeland Security – Legality of Service of Acting Secretary of Homeland Security and Service of Senior Official Performing the Duties of Deputy Secretary of Homeland Security*, B-331650 (Aug. 14, 2020).

92.     DHS requested that GAO rescind its decision, but GAO affirmed its decision after concluding that DHS had not shown material errors of fact or law, nor provided information not previously considered that warranted reversal or modification of the decision.  GAO, *Department of Homeland Security – Legality of Service of Acting Secretary of Homeland Security and Service of Senior Official Performing the Duties of Deputy Secretary of Homeland Security – Reconsideration*, B-332451, August 21, 2020.

93.     On September 10, 2020, in response to the GAO opinion and litigation over the legality of purported Acting Secretary Wolf's service, Peter Gaynor, Administrator of the Federal Emergency Management Agency, purporting to exercise the functions of Acting Secretary "[a]s the most senior successor listed" under Executive Order No. 13753, issued an order to make another change to the DHS order of succession.  This order purported to re-issue the November 2019 order of succession Kevin

1   McAleenan unlawfully attempted to enact, thereby placing Defendant Wolf's position above Gaynor's

2   own position in the order of succession, and purportedly retroactively rendering Wolf the Acting

3   Secretary of Homeland Security.

4          94.     Gaynor, however, was never lawfully the Acting Secretary of Homeland Security, and

5   lacked any power to issue such order.  The succession orders lawfully in place upon Secretary Nielsen's

6   resignation, Executive Order 13753, provided that Christopher Krebs became Acting Secretary upon

7   Secretary Nielsen's resignation.  Because Krebs never resigned that role, there was no vacancy for Peter

8   Gaynor to fill on September 10, 2020.

9          95.     In addition, as an inferior officer, Gaynor was not constitutionally authorized to modify

10  the DHS order of succession.

11         96.     Gaynor also failed to report his purported acting service to the Comptroller General and

12  Congress, as the FVRA requires.  5 U.S.C. § 3349(a).

13         97.     Irrespective of the legality of Gaynor's purported service as Acting Secretary, he was not

14  legally authorized to alter the DHS order of succession, as the HSA extends such power only to the

15  Secretary of Homeland Security, not the Acting Secretary.  6 U.S.C. § 113(g)(2) ("the *Secretary* may

16  designate such other officers of the Department in further order of succession to serve as *Acting*

17  *Secretary*" (emphases added)).

18         98.     Moreover, Gaynor never resigned his purported role as Acting Secretary, leaving no

19  vacancy for Defendant Wolf to purportedly fill.

20         99.     Also on September 10, 2020, President Trump nominated Defendant Wolf as Secretary of

21  Homeland Security.

22         100.    In addition to the other legal defects rendering his purported service as Acting Secretary

23  unlawful, having been nominated as Secretary of Homeland Security, Defendant Wolf thereby became

24  statutorily ineligible to serve as Acting Secretary of Homeland Security under the FVRA, 5 U.S.C.

25  § 3345(b)(1).

26

27

28

101.    On September 17, 2020, Defendant Wolf, "out of an abundance of caution," purported to ratify his actions taken prior to the order issued by Gaynor on September 10, 2020, 85 Fed. Reg. 59,651 (Sept. 23, 2020).

102.    On October 7, 2020, Defendant Wolf purported to ratify actions taken by Commissioner McAleenan and Edlow.  Ratification of Department Actions, 85 Fed. Reg. 65,653 (Oct. 16, 2020).

103.    As a result of Defendant Wolf's unlawful service as purported Acting DHS Secretary, Edlow's service as purported USCIS Deputy Director for Policy is also unlawful.

104.    Defendant Wolf purportedly designated Edlow Deputy Director for Policy at USCIS on February 19, 2020.

105.    Because he was not lawfully serving as Acting Secretary, Defendant Wolf lacked any legal authority to designate Edlow to the position of USCIS Deputy Director for Policy.

106.    Nor can Defendant Wolf's September 17, 2020 memorandum legitimize either Defendant Wolf or Edlow's unlawful actions, as the FVRA prohibits the ratification of these actions.  *See* 5 U.S.C. § 3348(b)(1), (d)(1)–(2) ("An action taken by any person who is not acting under section 3345, 3346, or 3347 . . . shall have no force or effect" and "may not be ratified.").

107.    In turn, Edlow is not lawfully serving as, and has never had any lawful basis to serve as, USCIS Deputy Director for Policy.  Thus, the Edlow Memorandum purportedly issued pursuant to Edlow's authority as USCIS Deputy Director for Policy is void and lacks any legal force.

### FIRST CLAIM FOR RELIEF
### Agency Action That Is Arbitrary and Capricious,
### An Abuse of Discretion, and Otherwise Not In Accordance with Law
### in Violation of 5 U.S.C. § 706(2)(A)–(C)

108.    The above paragraphs are incorporated herein by reference.

109.    DHS is an agency subject to the requirements of the APA.  5 U.S.C. § 701(b)(1).

110.    The Wolf Memorandum, issued by DHS, constitutes final agency action that is reviewable by this Court under the APA.

111.    The Edlow Memorandum, issued by USCIS, constitutes final agency action that is reviewable by this Court under the APA.

112.    The APA provides that courts "shall . . . hold unlawful and set aside" final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2)(A)–(C).

113.    Pursuant to the arbitrary-and-capricious standard, an agency must engage in "reasoned decisionmaking." *Michigan v. EPA*, 576 U. S. 743, 750 (2015).  A court reviewing such a decision must assess whether the decision was "based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971); *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014).

114.    The Wolf Memorandum is arbitrary and capricious under this standard—as was the unsuccessful Rescission, *see Regents*, 140 S. Ct. at 1915—for the following reasons among others.

115.    *First*, in their attempt to modify DACA, Defendants have brushed aside and ignored the relevant factors set out by the Supreme Court a mere 40 days earlier.  *Id.*

116.    Significantly, the Wolf Memorandum fails to adequately address the reliance interests occasioned by DACA, instead relying on a tenuous chain of inferences in purporting to consider such interests.  *Id.*  The Wolf Memorandum, for example, brushes aside the significant burden the doubling of application fees imposes on DACA recipients such as the University's students.  And in merely stating that it "makes sense" to keep the supposed "status quo" of rejecting new DACA requests during the pendency of this litigation, the Wolf Memorandum fails to consider the detrimental effects of stripping otherwise eligible individuals of the ability to apply for DACA in light of the current global crisis. Where, as here, significant reliance interests are at stake, Defendants must, in addition to demonstrating that "there are good reasons" for the newest policy, offer "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009).

117.    *Second*, in outright rejecting all pending and future DACA applications, the Wolf Memorandum fails to explain its arbitrary treatment of individuals who are now otherwise DACA-eligible simply because they were not yet old enough to apply before the unlawful Rescission.  The

desire to maintain the "status quo" is specious, because the "status quo" of failing to accept new initial DACA applications was created by the unlawful Rescission, which has now been set aside by the courts.

118.    *Third*, the Wolf Memorandum is arbitrary and capricious, an abuse of discretion, and not in accordance with law because it effectively doubles the fees for renewal applications without explanation, and because the increase creates an inconsistency with a previous rulemaking.

119.    *Fourth*, the Wolf Memorandum is arbitrary and capricious, an abuse of discretion, and not in accordance with law because it continues a pattern of using the lives of DACA recipients as a bargaining chip for Defendants' political advantage with scant regard for the reliance interests at play.

120.    *Fifth*, because Defendant Wolf has been unlawfully serving as purported Acting Secretary of Homeland Security since November 13, 2019, he has no authority to take any actions in that capacity.  His purported issuance of the Wolf Memorandum is thus not in accordance with law, in violation of the Homeland Security Act and Vacancies Reform Act, in violation of the Appointments Clause, and is invalid and void.

121.    The Edlow Memorandum is also arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law because it: (1) was issued by an individual who did not have legal authority to issue the Memorandum because Edlow was designated to serve in his position by Defendant Wolf, who was and is unlawfully serving as Acting DHS Secretary, and (2) fails to offer a reasoned basis for instructing the rejection of DACA renewal applications filed more than 150 days before the applicant's current DACA grant expires, and fails to consider the harmful consequences of the 150-day rule—namely, that it will result in lapses in DACA protections and work authorization, and thus lapses in employment and access to education and healthcare.

122.    The University and its students were harmed and continue to be harmed by these unlawful acts.

### SECOND CLAIM FOR RELIEF
### Agency Action Without Observance of Procedure Required by Law
### in Violation of 5 U.S.C. § 706(2)(D)

123.    The above paragraphs are incorporated herein by reference.

124.      The APA requires courts to set aside agency action taken "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

125.      Under the APA, federal agencies must follow notice-and-comment rulemaking procedures to promulgate substantive rules.  *See* 5 U.S.C. § 553.  The APA defines "rule" that is substantive broadly to include:

> the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages . . . .

5 U.S.C. § 551(4).  A substantive rule is a rule that "impose[s] new rights or obligations by changing an existing law."  *Grier v. Hood*, 46 F. App'x 433, 439 (9th Cir. 2002) (citations omitted).

126.      The Wolf Memorandum constitutes a substantive rule subject to APA's notice-and-comment requirements because it effectively doubles the fees for renewal applications, and such fees are required to be fixed via notice-and-comment rulemaking.

127.      In issuing the Wolf Memorandum and imposing interim limiting modifications to DACA that double the already steep fees, Defendants impermissibly announced a new rule without undertaking notice-and-comment rulemaking.

128.      The University and its students were harmed and continue to be harmed by these unlawful acts.

### THIRD CLAIM FOR RELIEF
### Violation of Procedural Due Process
### Under the Fifth Amendment

129.      The above paragraphs are incorporated herein by reference.

130.      The Due Process clause of the Constitution provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law[.]"  Both UC students who are DACA recipients and the University are "persons" who have constitutionally-protected interests within the meaning of the Due Process Clause.

131.   *First*, UC students who are DACA recipients have constitutionally-protected interests in the benefits that the DACA program provides them, including the ability to work, to pursue opportunities in higher education, to more readily obtain driver's licenses and access lines of credit, to obtain jobs, and to access certain Social Security and Medicare benefits.  These DACA recipients paid for a two-year renewal application, but can now only receive benefits for one year.  The terms of their existing participant has been changed, depriving them of such benefits, with no forewarning.

132.   *Second*, UC students with pending applications filed before the Wolf Memorandum issued have a constitutional right to have notice and an opportunity to be heard under the Due Process clause.  Under the true status quo of the DACA program—as acknowledged by the Supreme Court in *Regents* and the court in *Casa de Maryland*—Defendants were required to adjudicate new applications for DACA, applications for two-year DACA renewals, and applications for advance parole. Defendants' outright retroactive rejection of those applications violates those otherwise-DACA eligible applicants' due process rights.

133.   *Third*, the University also has constitutionally-protected interests in the multiple educational benefits that flow from a diverse student body.  Thousands of DACA students have earned prized places as undergraduate and graduate students at the University of California through their record of high—even extraordinary—personal achievement in high school and college.  In reliance on DACA, the University has chosen to make scarce enrollment space available to these students and to invest in them substantial time, financial aid, research dollars, housing benefits, and other resources, on the expectation that these students will complete their course of study and become productive members of the communities in which the University operates, and other communities throughout the nation.  If these students leave the University before completing their education, UC will lose the benefits it derives from their contributions, as well as the value of the time and money it invested in these students with the expectation that they would be allowed to graduate and apply their talents in the United States job market.

134.    The Wolf Memorandum and Edlow Memorandum unlawfully deprive both UC students and the University of these and other constitutionally-protected interests without due process of law. Such deprivation occurred with no notice or opportunity to be heard.

135.    Defendants therefore have violated the Fifth Amendment to the United States Constitution.

136.    The University and its students were harmed and continue to be harmed by these unlawful acts.

### FOURTH CLAIM FOR RELIEF
### Violation of the Appointments Clause,
### U.S. Const. art. II, § 2, cl. 2

137.    The above paragraphs are incorporated herein by reference.

138.    The Secretary of Homeland Security is a principal officer of the United States whose appointment requires presidential nomination and Senate confirmation.

139.    Defendant Wolf is purporting to perform the functions and duties of the office of Secretary of Homeland Security even though he has not been confirmed by the Senate to hold that office and there is no legal basis for him to exercise the functions and duties of that office.

140.    Defendant Wolf's exercise of those functions and duties without having been confirmed by the Senate or otherwise having the legal authority to exercise them violates the Appointments Clause. His purported issuance of the Wolf Memorandum is therefore invalid and void.

### FIFTH CLAIM FOR RELIEF
### Unlawful Appointment Under the Homeland Security Act, 6 U.S.C. §§ 112–13
### and/or the Federal Vacancies Reform Act, 5 U.S.C. § 3345 *et seq.*

141.    The above paragraphs are incorporated herein by reference.

142.    The Secretary of Homeland Security may be appointed by the president only with the advice and consent of the Senate.  6 U.S.C. § 112(a)(1).

143.    When the Office of the Secretary of Homeland Security is vacant, the order of succession is governed by 6 U.S.C. § 113 and any lawful, valid agency succession orders issued pursuant to that statute.

144.    Pursuant to those authorities, Defendant Wolf is not, and has never been, legally authorized to hold the position of Acting Secretary, or to perform the functions and duties of that office.

145.    Furthermore, Defendant Wolf's purported service as Acting Secretary, and purported exercise of the functions and duties of that office, are unlawful under the FVRA because the applicable 210-day time limit for an Acting Secretary to serve has expired (and had already expired at the time that Defendant Wolf purported to assume the office of Acting Secretary).  Since the applicable time limit under the FVRA has expired, Defendant Wolf's actions "shall have no force or effect" and "may not be ratified."  5 U.S.C. § 3348(d)(1)–(2).

146.    Because Defendant Wolf is purporting to serve as Acting Secretary, and purporting to perform the functions and duties of the Secretary of Homeland Security without having been confirmed by the Senate, and without any other legal authority to do so, his purported issuance of the Wolf Memorandum was ultra vires, and therefore invalid and void.

**SIXTH CLAIM FOR RELIEF**
**Ultra Vires Agency Action**

147.    The above paragraphs are incorporated herein by reference.

148.    Courts have equitable authority to enjoin ultra vires agency action.  *See, e.g.*, *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

149.    Because Defendant Wolf is purporting to serve as Acting Secretary, and purporting to perform the functions and duties of the Secretary of Homeland Security without having been confirmed by the Senate, and without any other legal authority to do so, his purported issuance of the Wolf Memorandum was ultra vires, and therefore invalid and void.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully request that this Court:

A.    Vacate and set aside the Wolf Memorandum;

B.    Vacate and set aside the Edlow Memorandum;

C.    Declare that the Wolf Memorandum is void and without legal force or effect;

D.    Declare that the Edlow Memorandum is void and without legal force or effect;

E.      Declare that the Wolf Memorandum is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and without observance of procedure required by law in violation of 5 U.S.C. §§ 702–706;

F.      Declare that the Edlow Memorandum is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law in violation of 5 U.S.C. §§ 702–706;

G.      Declare that the Department of Homeland Security must consider new applications from individuals who are eligible under the criteria set by the 2012 DACA Memorandum;

H.      Declare that the Wolf Memorandum is in violation of the Constitution and contrary to the laws of the United States;

I.      Declare that the Edlow Memorandum is in violation of the Constitution and contrary to the laws of the United States;

J.      Declare that Defendant Wolf is not lawfully serving as Secretary of Homeland Security or Acting Secretary of Homeland Security, and any policies, orders, or directives he issues are void;

K.      Declare that Edlow is not lawfully serving as USCIS Deputy Director for Policy, and any policies, orders, or directives he issues are void;

L.      Preliminarily and permanently enjoin and restrain Defendants, their agents, servants, employees, attorneys, and all persons in active concert or participation with any of them, from implementing or enforcing the Wolf Memorandum or the Edlow Memorandum and from taking any other action to rescind DACA that is not in compliance with applicable law;

M.      Preliminarily and permanently enjoin and restrain Defendant Wolf from exercising or performing any of the powers or duties of the office of Secretary of Homeland Security or Acting Secretary of Homeland Security, and from holding himself out as the Secretary of Homeland Security or Acting Secretary of Homeland Security;

N.      Grant such further relief as this Court deems just and proper.

1    DATED:  November 2, 2020                    COVINGTON & BURLING LLP

2                                                By:     */s/ Jeffrey M. Davidson*
                                                        Jeffrey M. Davidson (Bar No. 248620)
3                                                        Salesforce Tower
                                                        415 Mission Street, Suite 5400
4                                                        San Francisco, CA 94105-2533
                                                        Telephone: + 1 (415) 591-6000
5                                                        Facsimile: + 1 (415) 591-6091
                                                        Email:  jdavidson@cov.com
6
                                                        Attorneys for Plaintiff THE REGENTS OF
7                                                        THE UNIVERSITY OF CALIFORNIA

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 17-5211