BRETT A. SHUMATE
 Assistant Attorney General
BRAD P. ROSENBERG
 Special Counsel
STEPHEN M. PEZZI (FL Bar #1041279)
 Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC  20005
Telephone: (202) 305-8576
E-mail: stephen.pezzi@usdoj.gov

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, *et al.*,<br><br>               Plaintiffs,<br><br>    v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>               Defendants. | Case No. 17-cv-05211-WHA<br>Case No. 17-cv-05235-WHA<br>Case No. 17-cv-05329-WHA<br>Case No. 17-cv-05380-WHA<br>Case No. 17-cv-05813-WHA<br><br>**ATTACHMENT:**<br><br>**FIFTH CIRCUIT OPINION,**<br><br>**JUDGMENT, AND MANDATE** |

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**

# United States Court of Appeals
## for the Fifth Circuit

_____

No. 23-40653

_____

United States Court of Appeals
Fifth Circuit

**FILED**

January 17, 2025

Lyle W. Cayce
Clerk

STATE OF TEXAS; STATE OF ALABAMA; STATE OF ARKANSAS;
STATE OF LOUISIANA; STATE OF NEBRASKA;
STATE OF SOUTH CAROLINA; STATE OF WEST VIRGINIA;
STATE OF KANSAS; STATE OF MISSISSIPPI,

*Plaintiffs—Appellees*,

*versus*

UNITED STATES OF AMERICA; ALEJANDRO MAYORKAS, *Secretary,
U.S. Department of Homeland Security*; TROY MILLER, *Senior Official
Performing the Duties of the Commissioner, U.S. Customs and Border
Protection*; PATRICK J. LECHLEITNER, *Senior Official Performing the
Duties of the Director of U.S. Immigrations and Customs Enforcement*;
UR M. JADDOU, *Director of U.S. Citizenship and Immigration Services*;
JASON D. OWENS, *Chief of the U.S. Border Patrol*,

*Defendants—Appellants*,

MARIA ROCHA; JOSE MAGANA-SALGADO; NANCI J. PALACIOS
GODINEZ; ELLY MARISOL ESTRADA; KARINA RUIZ DE DIAZ;
CARLOS AGUILAR GONZALEZ; LUIS A. RAFAEL;
DARWIN VELASQUEZ; JIN PARK; OSCAR ALVAREZ;
DENISE ROMERO; JUNG WOO KIM; ANGEL SILVA;
HYO-WON JEON; ELIZABETH DIAZ; BLANCA GONZALEZ;
MOSES KAMAU CHEGE; MARIA DIAZ,

*Intervenor Defendants—Appellants*,

STATE OF NEW JERSEY,

*Intervenor—Appellant.*

No. 23-40653

_____

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 1:18-CV-68

_____

Before SMITH, CLEMENT, and HIGGINSON, *Circuit Judges*.[*]

JERRY E. SMITH, *Circuit Judge*:

This is the latest chapter in the long-running litigation challenging the Deferred Action for Childhood Arrivals program, commonly known as DACA. In 2021, a district court held that Texas has standing to challenge DACA and that DACA is procedurally and substantively unlawful. The court halted the program and enjoined the government from approving any new DACA applications but stayed the effective date of its vacatur as to all DACA recipients who had received their initial DACA status before the date of the order. In 2022, this court affirmed in part and remanded because the Department of Homeland Security ("DHS") had cured DACA's procedural defect by promulgating a Final Rule. This appeal addresses that Final Rule.

Relying on this court's previous decision, the district court found that Texas still has standing to challenge DACA and held that the Final Rule is substantively unlawful. The court accordingly vacated the Rule, entered a nationwide injunction, and preserved the stay.

We largely agree with the district court and thus affirm its judgment, though we modify the remedial order. We heed the Final Rule's severability clause and do not disturb DACA's policy of forbearance. We also limit the

_____

[*] Judge Higginson concurs in full as to parts I, II, IV, V, and VII, and concurs in judgment only as to part III.

No. 23-40653

injunction to Texas only.  We maintain the stay pending further appeal.

## I. Facts and Procedural History

### A.

In 2012, the DHS Secretary announced DACA in a three-page memorandum ("DACA" or "the Memorandum").[1]   The program applied to childhood arrivals who, at the time of the program's creation, (1) were under age 31 in 2012; (2) had continuously resided in the United States since 2007; (3) were current students; (4) had completed high school or were honorably discharged veterans; (5) had not been convicted of any serious crimes; and (6) did not threaten national security or public safety.  *See DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 9–10 (2020) ("*Regents*").  "Among other provisions, the DACA Memorandum directed that removal of certain aliens who entered the United States unlawfully as children should be deferred and that these immigrants should receive certain benefits."  *Texas v. United States*, 50 F.4th 498, 508 (5th Cir. 2022) ("*Texas II*").

In summary, the Memorandum instructed immigration officials not to remove "certain young people who were brought to this country as children and know only this country as home."[2]   Those persons would be deemed eligible for a renewable two-year period of lawful presence through "deferred action."[3]  "Those granted such relief are also eligible for work authorization

---

[1] Memorandum from Janet Napolitano, Sec'y, DHS, to David Aguilar, Acting Comm'r, U.S. Customs and Border Prot., et al. (June 15, 2012), https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.

[2] *Id.*

[3] The government describes deferred action as "an exercise of the Secretary's broad authority to establish national immigration enforcement policies and priorities" and "a form of enforcement discretion not to pursue [ ] removal . . . for a limited period in the interest of ordering enforcement priorities in light of limitations on available resources,

and various federal benefits." *Regents*, 591 U.S. at 9. That is because the status of "lawful presence"—though not an enforceable right to remain in the United States and revokable at any time—"nevertheless has significant legal consequences," including eligibility to receive Social Security and Medicare benefits. *Texas v. United States*, 809 F.3d 134, 148 (5th Cir. 2015) ("*Texas I*"), *aff'd by an equally divided Court*, 579 U.S. 547 (2016) (mem.).[4]

Upon taking office in 2017, the Trump Administration attempted to rescind DACA. Multiple groups of plaintiffs challenged that rescission. In 2020, the Supreme Court held that "[b]ecause the DACA program is more than a non-enforcement policy, its rescission is subject to review under the APA." *Regents*, 591 U.S. at 19. The Court held that the recission was arbitrary and capricious because it failed to consider adequately "the options of retaining forbearance or accommodating particular reliance interests." *Id.* at 33.

Shortly after *Regents*, President Biden took office. Nine months into his tenure, DHS published a notice of proposed rulemaking ("NPRM")

---

taking into account humanitarian considerations and administrative convenience." Deferred Action for Childhood Arrivals, 87 Fed. Reg. 53,152, 53,298 (Aug. 30, 2022).

[4] As we explained in 2015,

> [P]ersons granted lawful presence pursuant to DAPA [Deferred Action for Parents of Americans and Lawful Permanent Residents] are no longer "bar[red] . . . from receiving social security retirement benefits, social security disability benefits, or health insurance under Part A of the Medicare program." That follows from [8 U.S.C.] § 1611(b)(2)–(3), which provides that the exclusion of benefits in § 1611(a) "shall not apply to any benefit[s] payable under title[s] II [and XVIII] of the Social Security Act . . . to an alien who is *lawfully present* in the United States as determined by the Attorney General . . . ." (emphasis added).

*Texas I*, 809 F.3d at 148 (footnote omitted). This case is also commonly referred to as "*DAPA*."

regarding DACA. 86 Fed. Reg. 53,736 (Sept. 28, 2021). The following year, DHS promulgated a final rule replacing the Memorandum. 87 Fed. Reg. 53,152 ("Final Rule" or "Rule"). The Rule took effect on October 31, 2022, *id.*, and continues the DACA policy in the same form as the Memorandum. But unlike the Memorandum, the Final Rule includes an express severability provision.[5]

## B.

Meanwhile, a related suit challenging the Memorandum continued its way through the courts. That suit—this one—began in May 2018 when ten states challenged the Memorandum for violating the notice-and-comment rulemaking requirements of the Administrative Procedure Act ("APA") and violating the Immigration and Nationality Act ("INA"), and the Take Care Clause.[6] Certain DACA recipients and New Jersey intervened as co-defendants.[7]

The district court stayed litigation after the Trump Administration agreed to terminate DACA, but litigation resumed after *Regents*. In July 2021, the district court granted summary judgment for the states.[8] The court

---

[5] The provision reads: "[A]lthough there are significant benefits to providing work authorization alongside forbearance, forbearance remains workable and desirable without work authorization, and DHS would have adopted the forbearance portion of the policy even if it did not believe that the work authorization portion of the rule were legally authorized." 87 Fed. Reg. 53,248–49; 8 CFR § 236.24(a) & (b).

[6] The states are Texas, Alabama, Arkansas, Louisiana, Nebraska, South Carolina, West Virginia, Kansas, Mississippi, and Maine. Maine has since dismissed itself.

[7] We refer to these defendants-appellants as the "Private Intervenors" and "New Jersey." The original defendant-appellant, the federal government, we call "the government." We refer to the plaintiffs-appellees as "the states" or "Texas."

[8] *Texas v. United States*, 549 F. Supp. 3d 572, 624 (S.D. Tex. 2021), *aff'd in part, vacated in part, remanded*, 50 F.4th 498 (5th Cir. 2022), and *supplemented*, 691 F. Supp. 3d 763 (S.D. Tex. 2023), and *supplemented*, No. 1:18-CV-00068, 2023 WL 5950808 (S.D. Tex.

found (1) that the states had standing under a pocketbook-injury theory because DACA recipients' presence increased Texas's emergency-healthcare and public-education expenditures; (2) that the Memorandum was procedurally unlawful because it was instituted without notice and comment; and (3) that DACA conflicts with the INA. *Dist. Ct. Op. 2021*, 549 F. Supp. 3d at 583–621.

The district court vacated the Memorandum, remanded for further administrative proceedings, and entered a nationwide permanent injunction prohibiting the government "from approving any new DACA applications and granting the attendant status." *Id.* at 624. The court stayed the order of immediate vacatur as to then-existing DACA recipients. *Id.*

The government, New Jersey, and the Private Intervenors appealed, but before this Court made its ruling, DHS issued an NPRM and promulgated the Final Rule. 87 Fed. Reg. 53,152. We affirmed in part (including the vacatur of the Memorandum), preserved the stay as to existing recipients, and remanded for the district court to consider challenges to the Final Rule in the first instance. *Texas II*, 50 F.4th at 531–32.

The focus on remand was the Final Rule, which DHS promulgated following a notice-and-comment period. 5 U.S.C. § 500 *et seq.* The Final Rule was to become effective on October 31, 2022, but following the remand in *Texas II*, the parties agreed that the Final Rule would be subject to the district court's earlier injunction of the DACA program pending the district court's ruling. The states levied two attacks against the Final Rule: (1) It substantively violates the APA, and (2) it violates the Take Care Clause.

The district court held that "the Final Rule, like the 2012 DACA

---

Sept. 13, 2023). We cite the 2021 district court opinion as "*Dist. Ct. Op. 2021*, 549 F. Supp. 3d" and the district court's 2023 opinion as "*Dist. Ct. Op. 2023*, 691 F. Supp. 3d."

Memorandum before it, is subject to [the district c]ourt's (and the Fifth Circuit's) prior rulings." *Texas v. United States*, 691 F. Supp. 3d 763, 796 (S.D. Tex. 2023) ("*Dist. Ct. Op. 2023*"). The court acknowledged its limited mandate "to determine if there are material differences between the Final Rule and the 2012 DACA Memorandum, and, if so, whether the already established rulings concerning the 2012 DACA Memorandum apply to the Final Rule"—a mandate that "clearly does not permit the parties to relitigate previously established issues." *Id.* at 778. Noting that this court had already found standing, the district court nevertheless added that, "if called upon to revisit the standing issue, [the district court] would again find it exists, especially in light of recent developments." *Id.*

Explaining those "recent developments," the court noted, first, "DHS's admission in the administrative record that DACA 'could result in some indirect fiscal effects on State and local governments, [but] the size and even the direction of the effects is dependent on many factors.'" *Id.* at 779 (quoting 87 Fed. Reg. 53,173). The court was thus satisfied that the injury was traceable to DACA and accepted Texas's evidence that "those costs would be alleviated, or at least diminished, if DACA were eliminated because some DACA recipients would leave the country," thus satisfying redressability. *Id.*

Second, the district court noted that *United States v. Texas*, 599 U.S. 670 (2023) ("*Immigration Priorities*"), had identified the DACA litigation as an exception to "the no standing rule" that that decision announced. *Dist. Ct. Op. 2023*, 691 F. Supp. 3d at 779. In *Immigration Priorities*, the Court held that Texas and Louisiana lacked standing to challenge the 2021 DHS "Guidelines for the Enforcement of Civil Immigration Law"—a prosecutorial enforcement decision. 599 U.S. at 681. The Court distinguished that challenge from "a challenge to an Executive Branch policy that involves both the Executive Branch's arrest or prosecution priorities *and* the Executive

No. 23-40653

Branch's provision of legal benefits or legal status," which, the Court said, "could lead to a different standing analysis." *Id.* at 683 (noting *Texas I*, 809 F.3d at 154). The district court interpreted the statement as an "overt adoption of the *Texas I* opinion by the Supreme Court," such that there could be "no question that standing exists in this case." *Dist. Ct. Op. 2023*, 691 F. Supp. 3d at 780.

The district court then found that "there are no material differences between the Final Rule and the 2012 DACA Memorandum" and that the Rule's forbearance and benefits provisions are not severable. *Id.* at 782, 795. So, the court supplemented the existing injunction and order of vacatur to include the Final Rule and left the nationwide injunction intact. *Id.* at 796. As before, the court stayed the effective date of its order as to all DACA recipients who had received their initial DACA status before July 16, 2021. The government, the Private Intervenors, and New Jersey appeal.

## II. Standard of Review

We review a summary judgement *de novo*. *Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 160 (5th Cir. 2021). Standing is a question of law that we review *de novo*; we review all facts expressly or impliedly found by the district court for clear error. *Pederson v. La. State Univ.*, 213 F.3d 858, 869 (5th Cir. 2000). We review a vacatur for abuse of discretion. *Texas II*, 50 F.4th at 529. Although we review an injunction for abuse of discretion, *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 620 (5th Cir. 2013), we review its scope *de novo*. *Texas v. EEOC*, 933 F.3d 433, 450 (5th Cir. 2019).

## III. Standing

Before considering the merits of an appeal, "[w]e have 'an obligation

to assure ourselves' of litigants' standing under Article III."[9]   Under Article III, a plaintiff needs a "personal stake" in the case.  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).  "That is, the plaintiff must have suffered an injury in fact—a concrete and imminent harm to a legally protected interest, like property or money—that is fairly traceable to the challenged conduct and likely to be redressed by the lawsuit."[10]  Only one plaintiff needs standing for the suit to proceed.[11]  "As the parties invoking federal jurisdiction, the States bear the burden of establishing standing."   *Texas II*, 50 F.4th at 513.

As before, "Texas is the only state that has attempted to demonstrate standing."   *Id.* at 514.  We accordingly focus solely on Texas's theory of standing.  Because this court has already held that Texas has standing to challenge DACA, this question is controlled by our rule of orderliness, absent an intervening and unequivocal change in standing doctrine.[12]  Because no

---

[9] *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340 (2006) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000)).

[10] *Biden v. Nebraska*, 143 S. Ct. 2355, 2365 (2023).

[11] *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006).

[12] *See Jacobs v. Nat'l Drug Intel. Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008).  Texas maintains that this question is also controlled by the law of the case doctrine, which, similar to this circuit's rule of orderliness, provides that "an issue of law or fact decided on appeal may not be reexamined either by the district court on remand or by the appellate court on a subsequent appeal."  *Fuhrman v. Dretke*, 442 F.3d 893, 896 (5th Cir. 2006) (quotations omitted).  The law of the case doctrine applies to questions of jurisdiction such as standing. *See Free v. Abbott Lab'ys, Inc.*, 164 F.3d 270, 272–73 (5th Cir. 1999) (noting that "a federal court must always be satisfied that subject matter jurisdiction exists," but "refus[ing] to recognize a 'jurisdiction exception' to the law of the case doctrine").  But issues on appeal are revisable in the event of "an intervening change in the law."  *Carnival Leisure Indus., Ltd. v. Aubin*, 53 F.3d 716, 718–19 (5th Cir. 1995).  Like the parties' rule-of-orderliness dispute, then, whether the law of the case doctrine controls also boils down to whether "controlling authority has since made a contrary decision of the law applicable" to the issue of standing.  *Fuhrman*, 442 F.3d at 897.

No. 23-40653

subsequent Supreme Court decision has worked a sufficiently unequivocal change to justify a departure from *Texas II*, Texas still has standing.

A. Legal Framework

Texas's theory of standing is straightforward: DACA recipients impose over $750 million in annual costs on the state, those costs are traceable to and exacerbated by the Final Rule, and a favorable judgment against DACA would at least partially alleviate Texas's harm. In *Texas II*, a unanimous panel accepted that theory. 50 F.4th at 517–20.[13] Under the rule of orderliness, we are bound to follow that holding absent an intervening change in the law. *See Jacobs*, 548 F.3d at 378.

The government accepts that the rule of orderliness would ordinarily control but posits that it is inapplicable here because of an "intervening change in the law" by the Supreme Court. *In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 792 (5th Cir. 2021). Specifically, the government posits that *Immigration Priorities* abrogated this court's standing analysis in *Texas II*.[14]

_____

Because of the overlap between the rule of orderliness and the law of the case doctrine, we use the term "rule of orderliness." We prefer that term over "law of the case" because the rule of orderliness is well settled in this circuit and frequently applied. The law of the case doctrine, by contrast, has been described as an "amorphous concept" with no "precise requirements." *Arizona v. California*, 460 U.S. 605, 618 (1983).

[13] As we explain *infra* Part III.C, though the *Texas II* panel wrote that Texas was entitled to special solicitude, that recognition was not a necessary condition to holding that Texas had standing to challenge DACA.

[14] The Private Intervenors similarly contend that since *Texas II*, the law has evolved in a way undercutting Texas's theory of standing. Like the government, the Private Intervenors invoke *Immigration Priorities* but also claim that *Haaland v. Brackeen*, 599 U.S. 255 (2023), directly forecloses Texas's theory of *parens patriae* standing to challenge the federal government. But as we will explain, Texas has established standing under a normal theory of pocketbook injury. And *Texas II*, which controls this case, did not rely on a *parens patriae* theory of standing.

10

It is "well-settled" in the Fifth Circuit that, even if a panel's interpretation of the law appears flawed,[15] "one panel of our court may not overturn another panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or our *en banc* court." *Id.* "This rule is strict and rigidly applied." *Id.* Jurisdictional questions such as a "panel's understanding of . . . Article III standing" remain binding under the rule of orderliness. *Data Mktg. P'ship v. U.S. Dep't of Lab.*, 45 F.4th 846, 856 n.2 (5th Cir. 2022).

For a Supreme Court decision to change our circuit's law, "neither a mere hint of how the Supreme Court might rule in the future, nor a decision that is merely illuminating with respect to the case before us will permit a subsequent panel to depart from circuit precedent."[16] Instead, the intervening decision or decisions "must unequivocally overrule prior precedent." *Bonvillian*, 19 F.4th at 792 (quotations omitted). When an intervening Supreme Court decision "fundamentally changes the focus of the relevant analysis, our precedents relying on that analysis are implicitly overruled."[17] But that occurs only "when the changed analysis clearly applies to the case before us, such that we are unequivocally directed by controlling Supreme Court precedent to overrule the decision of the prior panel."[18]

---

[15] We do not mean to imply that *Texas II* is flawed.

[16] *Martinelli v. Hearst Newspapers, L.L.C.*, 65 F.4th 231, 234 (5th Cir. 2023) (cleaned up) (quoting *United States v. Alcantar*, 733 F.3d 143, 146 (5th Cir. 2013), and *Tech. Automation Servs. Corp. v. Liberty Surplus Ins. Corp.*, 673 F.3d 399, 405 (5th Cir. 2012)), *cert. denied*, 144 S. Ct. 2561 (2024) (mem.).

[17] *Martinelli*, 65 F.4th at 234 (cleaned up).

[18] *Id.* (cleaned up); *see also United States v. Zuniga-Salinas*, 945 F.2d 1302, 1306 (5th Cir. 1991); *Stokes v. Sw. Airlines*, 887 F.3d 199, 204 (5th Cir. 2018) ("Such a change occurs, for example, when the Supreme Court disavows the mode of analysis on which our precedent relied."); *Gonzalez v. Thaler*, 623 F.3d 222, 226 (5th Cir. 2010) (examining whether a Supreme Court decision "establishes a rule of law inconsistent with our own"

No. 23-40653

As we now explain, no subsequent Supreme Court decision has un-
equivocally overruled our standing analysis in *Texas II*.

## B. Application

"The fundamentals of standing are well-known and firmly rooted in
American constitutional law." *Food & Drug Admin. v. All. for Hippocratic
Med.*, 602 U.S. 367, 380 (2024) ("*Alliance*"). To establish standing, "a plain-
tiff must demonstrate (i) that she has suffered or likely will suffer an injury in
fact, (ii) that the injury likely was caused or will be caused by the defendant,
and (iii) that the injury likely would be redressed by the requested judicial
relief." *Id.* "The second and third standing requirements—causation and
redressability—are often 'flip sides of the same coin,'" meaning if "a defen-
dant's action causes an injury, enjoining the action or awarding damages for
the action will typically redress that injury. So the two key questions in most
standing disputes are injury in fact and causation."[19]

Texas argues that it has standing because DACA recipients impose
over $750 million in annual costs on the state (including local Texas com-
munities) and that those costs are traceable to and exacerbated by the Final
Rule. *See Texas II*, 50 F.4th at 517–20 (recognizing that theory). DACA's
defenders posit that the "indirect, incidental effects" that the Final Rule
imposes on Texas are not judicially cognizable injuries in the wake of *Immi-
gration Priorities* and that Texas relied on "stale speculation" to support both
the extent of those costs and its theory of causation.

We first address whether Texas can still show an injury in fact in the
wake of *Immigration Priorities*, then we discuss whether such an injury

---

(cleaned up)).

[19] *Alliance*, 602 U.S. at 380–81 (quoting *Sprint Commc'ns Co. v. APCC Servs., Inc.*,
554 U.S. 269, 288 (2008)).

remains sufficiently traceable to DACA (and thus would be redressed by an order setting aside the Final Rule).

### 1. Injury in Fact

An injury in fact must be "concrete," meaning that it must be "real, and not abstract." *TransUnion*, 594 U.S. at 424 (quotations omitted). It must also be particularized, meaning the injury must "affect the plaintiff in a personal and individual way" and must not be a generalized grievance. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 n.1 (1992). The injury can be physical or monetary, an injury to one's property or to one's constitutional rights. *Alliance*, 602 U.S. at 381. The injury must be actual or imminent, not speculative; that is, the injury must have already occurred or be likely to occur soon. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). "For standing purposes, a loss of even a small amount of money is ordinarily an injury." *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) (quotations omitted).

In *Texas II*, we affirmed the district court's conclusion that Texas has standing to challenge DACA on a pocketbook-injury theory. The district court had found that the states had "adequately shown that they bear the costs of medical services required by federal law" because "Texas spends tens of millions of dollars annually to provide emergency Medicaid services to illegal aliens" and because, under *Plyler v. Doe*, 457 U.S. 202 (1982), every state must educate all children regardless of immigration status and Texas had "established for standing purposes that it bears the burden of increased education costs." *Dist. Ct. Op. 2021*, 549 F. Supp. 3d at 593–94. That "obligation to subsidize . . . additional aliens' healthcare and education costs," we held, is an "injury in fact." *Texas II*, 50 F.4th at 519 (quotations omitted).

The government argues that *Immigration Priorities* upends our holding in *Texas II* for two reasons. First, because the plaintiffs lack standing to seek

an order requiring the Executive Branch to increase its enforcement actions, given the "principle of enforcement discretion over arrests and prosecutions [that] extends to the immigration context." *Immigration Priorities*, 599 U.S. at 679. And, second, because "indirect" effects of federal policy can no longer give rise to a cognizable injury in fact because "in our system of dual federal and state sovereignty, federal policies frequently generate indirect effects on state revenues or state spending." *Id.* at 680 n.3.

Whether Texas satisfies the injury in fact requirement thus comes down to two main questions: First, is Texas's challenge to the Rule an incognizable challenge to prosecutorial discretion under *Immigration Priorities*? Second, are the costs imposed on Texas by the Final Rule nonetheless too indirect to constitute an injury in fact?

Answering either question requires examining what the Court said in *Immigration Priorities*:

> In 2021, Secretary of Homeland Security Mayorkas promulgated new "Guidelines for the Enforcement of Civil Immigration Law." The Guidelines prioritize the arrest and removal from the United States of noncitizens who are suspected terrorists or dangerous criminals, or who have unlawfully entered the country only recently, for example.

> Texas and Louisiana sued the Department of Homeland Security, as well as other federal officials and agencies. According to those States, the Guidelines contravene two federal statutes that purportedly require the Department to arrest more criminal noncitizens pending their removal. First, the States contend that for certain noncitizens, such as those who are removable due to a state criminal conviction, § 1226(c) of Title 8 says that the Department "shall" arrest those noncitizens and take them into custody when they are released from state prison. Second, § 1231(a)(2), as the States see it, provides that the Department "shall" arrest and detain certain

noncitizens for 90 days after entry of a final order of removal. 599 U.S. at 674.

What the Court found "extraordinarily unusual" about the lawsuit was that several states had sought "a federal court to order the Executive Branch to alter its arrest policies so as to make more arrests." *Id.* at 686. The Court held that because "[f]ederal courts have not traditionally entertained that kind of lawsuit," the "States lack Article III standing because this Court's precedents and the 'historical experience' preclude the States' 'attempt to litigate this dispute at this time and in this form.'" *Id.* (quoting *Raines v. Byrd*, 521 U.S. 811, 829 (1997)). The Court noted that its "standing decision today is narrow and simply maintains the longstanding jurisprudential status quo." *Id.*

*Immigration Priorities* is thus an odd rock on which to build a theory that it worked a sufficiently fundamental change in standing doctrine to overcome our rule of orderliness. The Court grounded its decision in *Linda R.S. v. Richard D.*, 410 U.S. 614 (1973), which it read as establishing the principle that a party "lacks a judicially cognizable interest in the prosecution of another." *Immigration Priorities*, 599 U.S. at 677 (cleaned up). But the Court explicitly noted that "a challenge to an Executive Branch policy that involves both the Executive Branch's arrest or prosecution priorities *and* the Executive Branch's provision of legal benefits or legal status could lead to a different standing analysis." *Id.* at 683. The Court then cited two cases as examples: *Regents* (noting that "benefits such as work authorization and Medicare eligibility accompanied by non-enforcement meant that the policy was more than simply a non-enforcement policy") and *Texas I* (noting that "*Linda R.S.* concerned only non-prosecution, which is distinct from both non-prosecution and the conferral of benefits"). *Immigration Priorities*, 599 U.S. at 683 (both quotes cleaned up). Finally, the Court reiterated that it "need

not resolve the Article III consequences of such a[n enforcement discretion *plus* benefits conferral] policy." *Id.*

The upshot is that even if *Immigration Priorities* is "illuminating with respect to the case before the court," it can hardly be read to "unequivocally overrule prior precedent." *Bonvillian*, 19 F.4th at 792 (cleaned up). The holdings in *Regents* and *Texas I* were explicitly preserved, combined with "the longstanding jurisprudential status quo" and "the Federal Judiciary's traditional role in separation of powers cases." *Immigration Priorities*, 599 U.S. at 686. "Fifth Circuit precedent is implicitly overruled if a subsequent Supreme Court opinion establishes a rule of law inconsistent with that precedent." *Gahagan v. U.S. Citizenship & Immigr. Servs.*, 911 F.3d 298, 302 (5th Cir. 2018) (quotations omitted). But in *Immigration Priorities*, the Court explicitly preserved Fifth Circuit precedent. So, at least as to the government's prosecutorial-discretion argument, *Immigration Priorities* did not work the kind of unequivocal change in law necessary to get around our rule of orderliness.

The next question is whether Texas's asserted injury—principally, three-quarters of a billion dollars spent providing social services to DACA recipients—is too "attenuated" to support standing. *Immigration Priorities*, 599 U.S. at 680 n.3.

The government contends that *Immigration Priorities* "abrogates this Court's prior reliance on plaintiffs' asserted social-services expenditures to conclude that Texas had established a cognizable injury." The argument hinges on the interpretation of footnote 3 in *Immigration Priorities*. There, the Court noted that "federal courts must remain mindful of bedrock Article III constraints in cases brought by States against an executive agency or officer." *Id.* Because "federal policies frequently generate indirect effects on state revenues or state spending," the Court wrote, "when a State

asserts . . . that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated." *Id.* Thus, the government argues, *contra Texas II*, whatever "indirect, incidental effects that the DACA rule may have on plaintiffs are not judicially cognizable injuries."

Footnote 3 is tentative and equivocal,[20] so it is worth examining closely. To support or perhaps explain its point, the Court cited three cases: *Massachusetts v. Laird*, 400 U.S. 886 (1970); *Florida v. Mellon*, 273 U.S. 12, 16–18 (1927); and *Lujan*, 504 U.S. at 561–62.

The first case, *Laird*, resulted in a summary denial of Massachusetts's attempt to file a complaint against the Secretary of Defense "to obtain an adjudication of the constitutionality of the United States' participation in the Indochina war." *Laird*, 400 U.S. at 886 (Douglas, J., dissenting). The Court gave no reason for its denial (the dissent suggests the Court might have denied the case on political question grounds, not standing), so *Laird*'s relevance to Texas's challenge to DACA is itself quite attenuated. At the very least, the Court's citation to *Laird* does not come close to unequivocally overruling our precedent.

In the second case, *Florida*, the state sought an injunction barring the collection in Florida of inheritance taxes imposed by the federal Revenue Act of 1926. 273 U.S. at 15. Florida alleged an injury "because the imposition of the federal tax, in the absence of a state tax which may be credited, will cause the withdrawal of property from the state with the consequent loss to the

---

[20] "States *sometimes* have standing to sue the United States." A state's "claim for standing *can* become *more* attenuated." "In short, none of the various theories of standing asserted by the States *in this case* overcomes the fundamental Article III problem with *this* lawsuit." *Immigration Priorities*, 599 U.S. at 680 n.3 (emphases added).

state of subjects of taxation." *Id.* at 16.[21]  The Court rejected that theory because "the anticipated result is purely speculative, and, at most, only remote and indirect," thus concluding that "there [wa]s no substance in the contention that the state has sustained, or is immediately in danger of sustaining, any direct injury as the result of the enforcement of the act in question." *Id.* at 18.  Here, Texas's injury is not speculative at all; the Private Intervenors' "own expert estimated that DACA recipients overall impose a cost of over $250,000,000 on Texas per year and another $533,000,000 annually in costs to local Texas communities." *Dist. Ct. Op. 2021*, 549 F. Supp. 3d at 594.

Finally, the Court noted *Lujan*, 504 U.S. at 561–62, presumably for its discussion of how, where "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*," the bar the plaintiff must meet to establish causation and redressability is higher.  In *Texas II*, we held that Texas could clear that bar, and our holding is not disturbed here.  Texas's asserted injury does not arise solely from a "lack of regulation" of DACA recipients (as did Texas's challenge in *Immigration Priorities*), but from the Executive Branch's policy of non-prosecution *plus* the conferral of benefits, a distinction recognized explicitly in *Immigration Priorities*, 599 U.S. at 683.

Read in context, then, footnote 3 of *Immigration Priorities*, like the opinion itself, announces no broad new rule, and certainly not one that un-

---

[21] Florida also asserted that its citizens were "injured in such a way that the state may sue in their behalf as parens patriae." *Florida*, 273 U.S. at 16.  The Court rejected that theory because the Florida residents were "also citizens of the United States and subject to its laws," and so, in "respect of their relations with the federal government," "'it is the United States, and not the state, which represents them as parens patriae.'" *Florida*, 273 U.S. at 18 (quoting *Massachusetts v. Mellon*, 262 U.S. 447, 485–86 (1923)).  Here, Texas does not rely on a *parens patriae* theory of standing.

equivocally suggests that Texas's asserted injuries are too indirect or attenuated to support standing.[22]  In short, because *Immigration Priorities* has not unequivocally overruled our analysis of Texas's injury in *Texas II*, "Texas

_____

[22] Indeed, even setting *Texas II* aside, Texas's asserted injury does not appear "too attenuated" to constitute an injury in fact under settled law.  Consider *Department of Commerce v. New York*, in which several states challenged the addition of a citizenship question to the federal census.  588 U.S. 752, 758–59 (2019).  The states contended that such a question would "depress the census response rate and lead to an inaccurate population count," which would in turn lead to the states' "qualifying for less federal funding if their populations are undercounted."  *Id.* at 767.  The Supreme Court held that was "a sufficiently concrete and imminent injury to satisfy Article III."  *Id.*

The injury Texas asserts here is no more attenuated.  By conferring lawful presence, DACA makes recipients eligible for a variety of state and federal benefits, and both parties' experts agree that the costs borne by Texas result at least in part from the presence of DACA recipients.  *See Dist. Ct. Op. 2021*, 549 F. Supp. 3d at 593–94.

As in *Department of Commerce*, here "[t]he District Court concluded that the evidence" "established a sufficient likelihood" that, were DACA recipients to leave, "Texas would no longer be obligated to pay for those costs associated with DACA recipients' entitlement to social services," which would necessarily "reduce some of the state's financial expenditures."  *Dep't of Com.*, 588 U.S. at 767 (first two quotes); *Dist. Ct. Op. 2021*, 549 F. Supp. 3d at 594 (final two quotes).  Those costs, too, are thus "sufficiently concrete and imminent" to constitute an injury in fact.  *Dep't of Com.*, 588 U.S. at 767.  Indeed, as we have noted outside the context of DACA, a district court's findings regarding education and healthcare costs provide "strong bases for finding cognizable, imminent injury."  *Texas v. Biden*, 10 F.4th 538, 547–48 (5th Cir. 2021) (per curiam).

Other courts have also recognized standing in related cases based on indirect fiscal injuries.  *See, e.g.*, *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 279 F. Supp. 3d 1011, 1033–34 (N.D. Cal. 2018) (recognizing states' standing to challenge the Trump Administration's DACA rescission on account of lost tax revenue and increased healthcare costs), *rev'd in part, vacated in part sub nom. Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020); *Cook County v. McAleenan*, 417 F. Supp. 3d 1008, 1017 (N.D. Ill. 2019), *aff'd sub nom. Cook County v. Wolf*, 962 F.3d 208, 217 (7th Cir. 2020) (recognizing the county's standing to challenge the Trump Administration's public-charge rule because it could increase healthcare costs); *see also Wolf*, 962 F.3d at 235 ("Cook County has standing" because "noncitizens who give up government-funded healthcare [as a result of the challenged public-charge rule] are likely to rely on the county-funded emergency room.") (Barrett, J., dissenting).

has satisfied the first standing requirement by demonstrating injury in fact." *Texas II*, 50 F.4th at 517.

### 2. Causation and Redressability

Texas also satisfied the second and third standing requirements—traceability and redressability.[23] The costs DACA imposes on Texas constitute an injury in fact, but to satisfy Article III, Texas must show that "a ruling in favor of [Texas] would redress that harm." *Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019). That is, in addition to showing injury, a "plaintiff must also establish that the plaintiff's injury likely was caused or likely will be caused by the defendant's conduct." *Alliance*, 602 U.S. at 382.

Where the plaintiff is not the target of the challenged policy, "causation ordinarily hinges on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well." *Id.* at 383 (cleaned up). Plaintiffs attempting to show causation generally cannot "rely on speculation about the unfettered choices made by independent actors not before the courts," but instead "must show that the third parties will likely react in predictable ways that in turn will likely injure the plaintiffs." *Id.* (cleaned up). The causation requirement thus precludes purely speculative links, requiring a plaintiff to "show a predictable chain of events leading from the government action to the asserted injury." *Id.* at 385.

Texas must demonstrate that, in the absence of DACA, at least some DACA recipients would leave the state and thereby partially alleviate its

---

[23] Following *Alliance*, we consider both traceability and redressability as part of the same analysis. *See Alliance*, 602 U.S. at 380 ("The second and third standing requirements—causation and redressability—are often flip sides of the same coin." (quotations omitted)).

injury.  That is not a high bar; a plaintiff need only show that "a favorable decision will relieve a discrete injury," not "that a favorable decision will relieve his *every* injury."  *Massachusetts v. EPA*, 549 U.S. 497, 525 (2007) (quoting *Larson v. Valente*, 456 U.S. 228, 244 n.15 (1982)).

As the district court and this court have recognized, Texas has made this showing by putting forward sufficient, unrebutted evidence to support the "common-sense assertion" that, absent DACA, some recipients would leave the United States.  *Dist. Ct. Op. 2021*, 549 F. Supp. 3d at 595 n.25; *Texas II*, 50 F.4th at 519–20.  In challenging DACA, "Texas does not allege a tax injury, let alone a generic one," but instead "identifies expenditures in providing emergency medical services, social services and public education for illegal aliens" traceable to DACA.  *Texas II*, 50 F.4th at 518.  And "if DACA were no longer in effect, at least some recipients would leave, and their departure would reduce [Texas's] costs for those individuals and their families who depart with them."  *Id.* at 520.  "Because Article III 'requires no more than *de facto* causality,'" *Dep't of Com.*, 588 U.S. at 768 (quoting *Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986)), Texas satisfies the second and third standing requirements here.

Resisting that conclusion, the Private Intervenors contend that *Brackeen* established a rule that injuries cannot be "fairly trace[d]" to a challenged policy where those costs result from "unchallenged provisions that 'operate independently' of [the challenged policy]."  599 U.S. at 296.  In other words, DACA merely confers lawful status, and the benefits that flow from lawful status stem from "entirely separate statutes and regulations."  Ergo, under *Brackeen*, Texas can no longer show causation.

But *Brackeen* merely restated the language of the pre-*Texas II* decision in *California v. Texas*, 593 U.S. 659 (2021); it did not announce a new development in standing doctrine.  Further, in *Brackeen*, the Court noted that

"Texas would continue to incur the complained-of costs even if it were relieved of the duty" imposed by the challenged policy, undercutting Texas's traceability argument. 599 U.S. at 296. Here, though, the district court found that Texas's complained-of costs would at least partially decline were it to obtain its sought-after relief.[24]  *Brackeen*, then, no more negates our obligation to follow *Texas II* than does *Immigration Priorities*.

Nor does *Alliance*, which the government and Private Intervenors also contend renders Texas's injuries too speculative to establish standing.[25] They rely on the statement in *Alliance* that it would be "flatly inconsistent with Article III" to allow teachers in border states to challenge immigration laws because those policies lead to overcrowded classrooms. *Alliance*, 602 U.S. at 392. Therefore, their theory runs, a state unhappy with federal immigration policy must not have standing to sue either.

That contention fails because the causal chain between the challenged policy and the asserted injury is far less attenuated here than in the teacher

---

[24] *Dist. Ct. Op. 2023*, 691 F. Supp. 3d at 779; *see also Massachusetts*, 549 U.S. at 526 (stating that standing is met where the complained-of harm "would be reduced to some extent if petitioners received the relief they seek").

[25] In *Alliance*, the Court held that several pro-life doctors and associations who do not prescribe or use mifepristone did not have standing to challenge the FDA's 2016 and 2021 relaxations of mifepristone prescription requirements. 602 U.S. at 374. First, the Court concluded that the plaintiffs could not show that the FDA's actions caused or could cause them conscience injuries in light of federal conscience protections. *Id.* at 390. Second, the "various monetary and related injuries" the plaintiffs alleged they would "suffer as a result of FDA's actions" were too speculative to satisfy the causation requirement because the plaintiffs presented no evidence "tending to suggest that FDA's deregulatory actions have both caused an increase in the number of pregnant women seeking treatment from the plaintiff doctors *and* caused a resulting diversion of the doctors' time and resources from other patients." *Id.* at 390–91. "[P]erhaps more to the point," the Court added, "the law has never permitted doctors to challenge the government's loosening of general public safety requirements simply because more individuals might then show up at emergency rooms or in doctors' offices with follow-on injuries." *Id.* at 391.

Case: 23-40653     Document: 222     Page: 23     Date Filed: 03/04/2025

No. 23-40653

hypothetical. A border-state teacher would have a hard time demonstrating with sufficient certainty that looser immigration policy would lead to more *school-age* immigrants' settling in *her* town and enrolling in *her* school or that, if the policy were changed, *those* schoolchildren would then pack up and leave. But here, Texas has provided sufficient evidence that DACA has caused the harms it alleges and that those costs would be partially alleviated if DACA were enjoined. *Alliance* thus does not unequivocally overrule *Texas II*.[26]

In sum, no Supreme Court decision since *Texas II* is a sufficiently unequivocal overruling of that decision to overcome our rule of orderliness. Because we have already held that Texas has standing to challenge DACA in materially identical circumstances, we are bound to follow that ruling here.

## C. Special Solicitude

We close by addressing one possible tension between *Immigration Priorities* and our previous review of Texas's standing in *Texas II*: the role of "special solicitude" in state standing analysis. The government contends that *Texas II* relied on special solicitude to justify Texas's standing and that *Immigration Priorities* interred the concept, so *Texas II* has been implicitly overruled.[27] We disagree. Our holding in *Texas II* did not depend on special

---

[26] Though it goes more to injury in fact than causation, Texas's asserted pocket-book injury is also far more cognizable than are the doctors' asserted conscience injuries in *Alliance*: Although federal law "definitively protect[s] doctors from being required to perform abortions or to provide other treatment that violates their consciences," *Alliance*, 602 U.S. at 387, here federal law exacerbates Texas's asserted injury. *See Texas II*, 50 F.4th at 517 ("Federal law requires the State to provide emergency Medicaid to noncitizens and public education to all children, regardless of their immigration status.").

[27] *See Immigration Priorities*, 599 U.S. at 685 n.6 (noting that *Massachusetts v. EPA* does not control the Court's analysis); *id.* at 688–89 (Gorsuch, J., concurring) (suggesting that because special solicitude has not "played a meaningful role" in the Supreme Court's decisions since *Massachusetts*, "it's hard not to think, too, that lower courts should just

solicitude, and we do not rely on it here.[28]

Under *Massachusetts v. EPA*, states are considered "not normal litigants for the purposes of invoking federal jurisdiction" and may be "entitled to special solicitude in our standing analysis." 549 U.S. at 518, 520. The source of that favored treatment is murky, and judges and scholars seem to agree that the meaning and continued vitality of special solicitude as a concept are uncertain.[29] The general idea is that where a state has a "procedural right" to challenge agency action and a "stake in protecting its quasi-sovereign interests," that state "is entitled to special solicitude in our standing analysis." *Id.* at 520; *see also Texas I*, 809 F.3d at 151–52.

Applying that understanding in *Texas II*, we held that Texas warranted special solicitude because the state met the two requirements *Massachusetts* imposed. *See* 50 F.4th at 517. Specifically, "Texas warrants special solicitude because of its procedural right under the APA to challenge DACA and Texas's quasi-sovereign interest in alien classification, an area in which the State would like to, but cannot, regulate." *Id.*

In *Texas II*, we did not explicitly address whether Texas could estab-

---

leave that idea on the shelf in future ones").

[28] For this reason, we need not decide whether special solicitude as a concept has been definitively interred. *Cf. Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 534 (2022) (suggesting that when the Supreme Court has "abandoned" a doctrinal test, district and circuit courts are no longer bound to employ it).

[29] *See, e.g.*, *Immigration Priorities*, 599 U.S. at 688 (Gorsuch, J., concurring) ("Before *Massachusetts v. EPA*, the notion that States enjoy relaxed standing rules 'ha[d] no basis in our jurisprudence.'" (quoting *Massachusetts*, 549 U.S. at 536) (Roberts, C.J., dissenting)); *Netflix, Inc. v. Babin*, 88 F.4th 1080, 1089 n.12 (5th Cir. 2023) (remarking that "the 'special solicitude' once afforded to states under *Massachusetts* . . . seems to also be falling out of favor with the Supreme Court"); Case Comment, *California v. Texas*, 135 HARV. L. REV. 343, 350 (2021) (describing the "academic response to *Massachusetts v. EPA*" as "muddled" and noting several possible understandings of special solicitude).

lish standing *only* because of the special solicitude it warranted or whether special solicitude was helpful but ultimately superfluous. "With special solicitude," we wrote, "a state can establish redressability 'without meeting all the normal standards[,]'" as the state need only show that "'there is some possibility that the requested relief' will reduce the harm." *Id.* at 520 (quoting *Massachusetts*, 549 U.S. at 517–18). Texas had asserted that "if DACA were no longer in effect, at least some recipients would leave, and their departure would reduce the State's Medicaid, social services and education costs for those individuals and their families who depart with them." *Id.* We thus concluded that "[e]*specially* with the benefit of special solicitude, Texas has established that rescinding DACA would redress its harm." *Id.* (emphasis added).

Given the use of the word "especially" instead of a phrase such as "because of," we do not read that passage to suggest that Texas satisfied the redressability requirement *solely* thanks to special solicitude. Our understanding is buttressed by the fact that, irrespective of whether special solicitude is warranted, a plaintiff "must still satisfy the basic requirements of standing."[30] In other words, we understand *Texas II* to say that although Texas's standing may be a close call on account of redressability concerns, redressability is nevertheless satisfied under normal standing requirements and is *clearly* satisfied given the special solicitude Texas warrants. Therefore, even assuming, *arguendo*, that *Immigration Priorities* dissolved the pillar of special solicitude, our standing analysis in *Texas II* still is valid and thus

---

[30] *Louisiana ex rel. Landry v. Biden*, 64 F.4th 674, 684 (5th Cir. 2023); *see also Massachusetts*, 549 U.S. at 521; *Arizona v. Biden*, 31 F.4th 469, 476 (6th Cir. 2022) (noting that special solicitude "does not allow [states] to bypass proof of injury in particular or Article III in general").

controls.[31]

＊  ＊  ＊  ＊  ＊

To sum up:  In *Texas II*, we held that Texas has standing to challenge DACA.  Under the rule of orderliness, we are bound to follow *Texas II* absent an intervening change in the law that unequivocally overrules that decision. The appellants urge that since *Texas II*, several Supreme Court cases have pared back states' capacities to establish standing to challenge federal policies.  But none of those decisions unequivocally undermines our analysis in *Texas II*, so its holding controls: Texas has standing to bring this suit.

## IV. Cause of Action

"Because the states are suing under the APA, they must satisfy not only Article III's standing requirements, but an additional test:  The interest they assert must be arguably within the zone of interests to be protected or regulated by the statute that they say was violated."  *Texas I*, 809 F.3d at 162 (cleaned up).  That test "is not meant to be especially demanding."  *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 399 (1987).

The test should be applied "in keeping with Congress's 'evident intent' when enacting the APA 'to make agency action presumptively reviewable," and it "forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the

---

[31] *See generally* Katherine Mims Crocker, *Not-So-Special Solicitude*, 109 Minn. L. Rev. 815, 821 (2024) ("At bottom, the concept [of special solicitude] appears to have affected the outcome in few if any cases."); *see also id.* at 884–85 (noting the reasons why "special solicitude was not (or should not have been) dispositive" in *Texas II*).

suit.'"[32] That "lenient approach is an appropriate means of preserving the flexibility of the APA's omnibus judicial-review provision, which permits suit for violations of numerous statutes of varying character that do not themselves include causes of action for judicial review." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014).

Texas need only show that it has an interest in the INA's enforcement and that its interest arguably falls within the zone of interests the INA aims to advance. As with standing, our zone-of-interest analysis is subject to the rule of orderliness, so we again hold that Texas has a cause of action to challenge DACA. We also reject the government's independent argument that the INA limits judicial review in this context to aliens and thus precludes judicial review over this lawsuit.

### A. Zone of Interests

In *Texas I*, we held that the "interests the states seek to protect fall within the zone of interests of the INA" because Congress had "explicitly allowed states to deny public benefits to illegal aliens." 809 F.3d at 163.[33] The

---

[32] *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (quoting *Clarke*, 479 U.S. at 399).

[33] We did not consider the issue in *Texas II* because the panel concluded that the government had not raised zone-of-interest objections at the district court level. Nevertheless, we noted that were we to exercise our discretion to consider the argument, we would conclude that the states' "objectives are consistent with the INA's, so they pass the lenient zone-of-interests test." *Texas II*, 50 F.4th at 520–21. Specifically, we observed that the INA was a "comprehensive federal statutory scheme for regulation of immigration and naturalization" and that the states have an interest in seeing the INA enforced because the INA "encompasses their concerns about the financial burdens of illegal immigration." *Id.* at 521 (quotations omitted from first quote).

On remand, the government contended that the *Texas II* panel was mistaken in its belief that the government had not raised this issue earlier in the litigation. Because that question is clearly controlled by *Texas I*, we need not resolve whether the government forfeited its zone-of-interest argument.

government contends that that conclusion "is inconsistent with the Supreme Court's affirmation in *Immigration Priorities* that a plaintiff lacks a cognizable interest in the enforcement of the immigration laws against a third person." But as discussed above, *Immigration Priorities* was a consciously narrow opinion that explicitly held out the DAPA and DACA suits as uncontrolled by its decision. *See Immigration Priorities*, 599 U.S. at 683 (noting *Regents* and *Texas I* as distinct from the Court's analysis). Accordingly, nothing in *Immigration Priorities* unequivocally overrules *Texas I*'s interpretation of the INA, so our answer here must echo our conclusion there: "The interests the states seek to protect fall within the zone of interests of the INA." *Texas I*, 809 F.3d at 163.

## B. Jurisdiction Strip

The government also contends that the INA limits judicial review in the context of this suit only to aliens, 8 U.S.C. § 1252(b)(9), (g), and thus precludes judicial review under the APA.[34] That theory was raised and

---

[34] Section 1252(b)(9) reads,

With respect to review of an order of removal under subsection (a)(1), the following requirements apply: Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section. Except as otherwise provided in this section, no court shall have jurisdiction, by habeas corpus under section 2241 of title 28 or any other habeas corpus provision, by section 1361 or 1651 of such title, or by any other provision of law (statutory or nonstatutory), to review such an order or such questions of law or fact.

Section 1252(g) reads,

Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence

rejected in *Texas I* and *Regents* and so similarly fails here.

The APA "embodies the basic presumption of judicial review to one 'suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute,' so long as no statute precludes such relief or the action is not one committed by law to agency discretion." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140 (1967) (citation omitted) (quoting 5 U.S.C. § 702). That presumption applies not just to an "agency action made reviewable by statute but also for review of final agency action for which there is no other adequate remedy in a court." *Id.* (cleaned up) (noting 5 U.S.C. § 704). Therefore, "only upon a showing of clear and convincing evidence of a contrary legislative intent should the courts restrict access to judicial review." *Id.* at 141 (quotations omitted).

The "targeted language" of § 1252(b)(9), the first statutory provision invoked by the government, "is not aimed at this sort of case." *Regents*, 591 U.S. at 19. Because the provision "does not present a jurisdictional bar where those bringing suit are not asking for review of an order of removal, the decision to seek removal, or the process by which removability will be determined," § 1252(b)(9) "is certainly not a bar where, as here, the parties are not challenging any removal proceedings." *Id.* (cleaned up).

The Supreme Court also dispatched with the government's § 1252(g) argument, a provision it deemed "similarly narrow" that could not support the government's "implausible" contention that it "imposes a general juris-dictional limitation."[35] The 1252(g) argument also runs headlong into *Texas I*. Here, as there, the "United States relies on 8 U.S.C. § 1252(g) for

---

proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

[35] *Regents*, 599 U.S. at 19 (quotations omitted).

the proposition that the INA expressly prohibits judicial review." 809 F.3d at 164. But here, as there, the government's broad reading is contrary to *Reno v. American–Arab Anti–Discrimination Committee*, 525 U.S. 471 (1999) ("*AAADC*"), "in which the Court rejected the unexamined assumption that § 1252(g) covers the universe of deportation claims—that it is a sort of 'zipper' clause that says 'no judicial review in deportation cases unless this section provides judicial review.'"[36]

So the government fails in its attempt to re-launder an argument it has already raised and lost. "Congress has expressly limited or precluded judicial review of many immigration decisions, including some that are made in the Secretary's 'sole and unreviewable discretion,' but [DACA] is not one of them." *Texas I*, 809 F.3d at 164 (footnotes omitted).

## V. Substantive Illegality

At last, we turn to the merits of Texas's claim. Because the Final Rule is materially identical to the 2012 Memorandum, the Final Rule substantively violates the INA. The government's arguments to the contrary, as it readily acknowledges, are foreclosed. *See Texas II*, 50 F.4th at 526.

The INA "expressly and carefully provides legal designations allowing defined classes of aliens to be lawfully present." *Texas I*, 809 F.3d at 179 & n.162. In the INA, Congress enacted a "comprehensive federal statutory scheme for regulation of immigration and naturalization" and "set the terms and conditions of admission to the country." *Texas II*, 50 F.4th at 521 (cleaned up). Because it chose not to include DACA recipients in that comprehensive scheme, "Congress's rigorous classification scheme forecloses the contrary scheme in the DACA Memorandum." *Id.* at 526.

---

[36] *Texas I*, 809 F.3d at 164 (quoting *AAADC*, 525 U.S. at 482 (cleaned up)).

No. 23-40653

No party contends that the Supreme Court or our en banc court has ruled otherwise. Nor does any party contend that Congress has amended the INA.[37] Though DHS promulgated a Final Rule between *Texas II* and this case, the Final Rule is materially identical to the 2012 Memorandum. Absent a relevant change in law, *Texas II* controls, meaning that DACA remains "manifestly contrary to the [INA]." *Id.* at 528 (quotations omitted).

## VI. Remedy

The government raises five challenges to the district court's remedial order vacating the Rule and enjoining DACA nationwide: first, that the APA does not authorize vacatur of agency actions; second, that the district court abused its discretion by not remanding the Final Rule to DHS; third, that 8 U.S.C. § 1252(f)(1) strips the district court of jurisdiction to enjoin and vacate the Final Rule; fourth, that the district court erred by not severing forbearance from work authorization in its order of vacatur; and fifth, that nationwide relief is overly broad. We address each argument in turn.

## A. Vacatur

The government contends that the APA does not authorize vacatur of agency action. But "[b]inding Fifth Circuit precedent recognizes this remedy" and forecloses its argument.[38] "[T]he APA empowers and commands courts to 'set aside' unlawful agency actions, allowing a district court's vaca-

---

[37] *See Jacobs*, 548 F.3d at 378 ("Congress is presumed to be aware of court decisions construing statutes and may, of course, amend a statute as a result.").

[38] *Texas Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.*, 110 F.4th 762, 779 (5th Cir. 2024) (describing the remedy of vacatur) (citing *Data Mktg. P'ship*, 45 F.4th at 856 n.2; *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374–75 (5th Cir. 2022) ("Vacatur is the only statutorily prescribed remedy for a successful APA challenge to a regulation.")).

31

tur to render a challenged agency action 'void.'"[39]

### B. Remand Without Vacatur

The government next posits that the district court, instead of vacating the Rule, should have remanded it to the agency without vacatur. We disagree. Vacatur is the default remedy for violations under § 706(2). *Data Mktg. P'ship*, 45 F.4th at 856 n.2. Remand without vacatur is limited to "rare cases." *Chamber of Com. v. U.S. SEC*, 88 F.4th 1115, 1118 (5th Cir. 2023) (quotations omitted). It is appropriate only when two conditions are met: "*First*, there must be a 'serious possibility' that the agency will be able to correct the rule's defects on remand," and, *second*, when "vacating the challenged action would produce 'disruptive consequences.'" *Id.* (quoting *Texas II*, 50 F.4th at 529). Remand without vacatur is thus inappropriate where an unlawful final rule "suffers from a fundamental substantive defect that the [agency] could not rectify on remand." *Rest. L. Ctr. v. U.S. Dep't of Lab.*, 120 F.4th 163, 177 (5th Cir. 2024) (on pet. for reh'g).

DHS does not address how it would correct any of the Rule's defects on remand. But even if it did, "DACA's deficiencies are [so] severe . . . [that t]here is no possibility that DHS could obviate these conflicts on remand," given that the Final Rule "contradicts significant portions of the INA." *Texas II*, 50 F.4th at 529. "[I]n light of DACA's critical substantive failings, the district court was well within its discretion to order vacatur." *Id.* at 530.

### C. Section 1252(f)(1)

The government attempts to evade review entirely by theorizing that 8 U.S.C. § 1252(f)(1) strips the district court of jurisdiction to enjoin and

---

[39] *Id.* (cleaned up).

No. 23-40653

vacate the Rule.[40]  But we rejected that theory in *Texas II*, *see* 50 F.4th at 529, and that holding controls.[41]

## D. Severability

The government avers that the district court erred when it vacated the entire Rule instead of severing the Rule's forbearance provisions from the work authorization provisions and vacating only the latter.  We agree.

In the context of agency rulemaking, a two-prong inquiry guides our severability analysis:  "Whether the offending portion[s] of a regulation [are] severable depends upon the intent of the agency *and* upon whether the remainder of the regulation could function sensibly without the stricken provision[s]."[42]  We "adhere to the text of a severability clause in the absence of extraordinary circumstances."  *Nat'l Ass'n of Mfrs. v. U.S. SEC*, 105 F.4th 802, 815 (5th Cir. 2024) (cleaned up).

The Final Rule includes a severability clause providing that if any provision of the Rule is held "invalid and unenforceable in all circumstances," then that "provision shall be severable from the remainder of this subpart and shall not affect the remainder thereof."  8 C.F.R. § 236.24(a).  In promulgating the Rule, the Secretary went one step further and explained that "[t]he provisions  in  § 236.21(c)(2)  through  (4)  and  § 274a.12(c)(14)  and

---

[40] Section 1252(f)(1) is inapplicable to vacatur because it is a "limit on injunctive relief," and vacatur is different from injunctive relief.  *Texas II*, 50 F.4th at 528.

[41] In *Texas II*, we held that § 1252(f)(1) did not apply to the district court's enjoining of DACA because, though the district court's judgment "vacate[d] the DACA Memorandum[,]" it "stay[ed] the vacatur as to those who have been granted DACA status" so that "[n]o present DACA recipient [wa]s subject to removal under the district court's existing judgment."  *Id.* at 529.

[42] *MD/DC/DE Broads. Ass'n v. F.C.C.*, 236 F.3d 13, 22 (D.C. Cir. 2001) (citing *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294 (1988)).

274a.12(c)(33) [conferring benefits] are intended to be severable from . . . any grant of forbearance from removal resulting from this subpart." *Id.* § 236.24(b). Indeed, the only change from the Memorandum to the Rule is the inclusion of the severability clause.

As for the first condition—the intent of the agency—the district court concluded that "DHS would not have adopted DACA without the benefits provisions." *Dist. Ct. Op. 2023*, 691 F. Supp. 3d at 789. That conclusion, however, unduly ignores the severability clause. The district court justified its conclusion by noting that "DHS does not need the Final Rule to exercise forbearance as to the DACA recipient population," meaning "forbearance with no benefits would be superfluous." *Id.* But DACA has ramifications beyond DHS: "The DACA policy allows DHS, in line with its particular expertise, to proactively identify noncitizens who may be a low priority for removal should [Immigrations and Customs Enforcement ("ICE")] or [U.S. Customs and Border Protection ("CBP")] encounter them in the field." 87 Fed. Reg. at 53,178. This means that, "once a valid DACA recipient is confirmed, ICE or CBP may be able to make a determination without necessitating further investigation." *Id.* So, *contra* the district court, we cannot conclude that a policy of forbearance without the other aspects of DACA would be superfluous. Nor do we see any reason to disregard the severability clause.

As for the second condition—whether the surviving provisions could function without the stricken ones—the district court concluded that the Final Rule would not "function sensibly" in the absence of the benefits provision. *Dist. Ct. Op. 2023*, 691 F. Supp. 3d at 792. The court reasoned that DACA is "primarily a benefits rule." *Id.* at 793. But that reasoning says nothing about whether DACA could function as a forbearance-only policy or whether DHS intended DACA potentially to function as a forbearance-only

policy. Though the Supreme Court has referred to forbearance as "the heart of DACA," it also recognized that "forbearance and benefits are legally distinct and can be decoupled." *Regents*, 591 U.S. at 28, 30. Lawful presence "is not the same as forbearance nor does it flow inexorably from forbearance." *Id.* at 26 n.5.

Moreover, though DACA is primarily a benefits rule, the Department intended for the Rule also to function as a forbearance policy.[43] The government maintains that a forbearance-only policy "would confer a range of benefits to DHS, while also conferring benefits to DACA recipients and their families, in the form of increased security, reduced fear and anxiety, and associated values." 87 Fed. Reg. at 53,293. As the government explains, some of the benefits of forbearance to DHS include streamlining higher-priority cases through busy immigration courts and avoiding the costs of enforcement actions against low-priority noncitizens.

Because DHS intended the aspects of DACA to be severable and to function independently from one another, the district court erred by not severing the forbearance provisions from the work-authorization provisions.

### E. Nationwide Injunction

The government contends that the nationwide scope of the injunction is overly broad and requests that we limit relief to Texas, the only state that has demonstrated injury. We agree.

Remedies must be "tailored to redress" a plaintiff's injury, *Gill v. Whitford*, 585 U.S. 48, 73 (2018), and equitable remedies such as injunctions

---

[43] *See* 87 Fed. Reg. at 53,248–49 ("[F]orbearance remains workable and desirable without work authorization, and DHS would have adopted the forbearance portion of the policy even if it did not believe that the work authorization portion of the rule were legally authorized.").

should not provide more relief than "necessary to give the prevailing party the relief to which [it] is entitled," *Hernandez v. Reno*, 91 F.3d 776, 781 & n.16 (5th Cir. 1996). We must consider the "effect on each party of the granting or withholding of the requested relief."[44] Though universal relief may be an appropriate remedy in some circumstances, "nationwide injunctions are not required or even the norm."[45] Instead, "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

Because Texas is the only plaintiff that has demonstrated or even attempted to demonstrate an actual injury, and because that injury is fully redressable by a geographically limited injunction, we narrow the scope of injunction to Texas. Though we have previously upheld nationwide injunctions because of the interest of uniformity in immigration laws,[46] the balance of the equities outweighs that interest here.[47]

Just one state, Texas, demonstrated an actual injury caused by the Final Rule. *See supra* Part III. New Jersey intervened to defend DACA, and 22 states and the District of Columbia also urge this court to preserve the program.[48] Further, the injury that Texas asserts—health, education, and

---

[44] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987)).

[45] *Mock v. Garland*, 75 F.4th 563, 587 (5th Cir. 2023) (cleaned up).

[46] *See Texas I*, 809 F.3d at 187–88; *Texas II*, 50 F.4th at 531.

[47] DACA's contravention of federal law is reason to hold DACA unlawful. *See supra* Part V. But for remedial purposes, our focus should be on Texas, and remedying its harm does not require nationwide relief. *See Gill*, 585 U.S. at 73; *Winter*, 555 U.S. at 32 ("An injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course.").

[48] *See* Amicus Brief of 22 States and the District of Columbia at 3–10; *see also id.* at 1 ("Over 60 percent of all current DACA recipients (nearly 330,000 individuals) live in amici States, where they are valued members of our communities and vital participants in

other social-service-related expenses for the DACA population—can be redressed by a more limited injunction that does not trigger the costs that New Jersey and the other *amici* states aver they would incur if the nationwide injunction were upheld.[49]   An injunction limited to Texas alone is better tailored to Texas's asserted injury. *Cf. Gill*, 585 U.S. at 73. We accordingly narrow the scope of the injunction to Texas.

## VII. Stay

The issuance of a stay is an "exercise of judicial discretion," and whether a stay should be granted depends "upon the circumstances of the particular case." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (quoting *Virginian R. Co. v. United States*, 272 U.S. 658, 672–73 (1926)).  "'A stay is not a matter of right, even if irreparable injury might otherwise result.'" *Id.*  The burden is on the requesting party to show that the "circumstances justify an exercise of [this court's] discretion." *Id.* at 434.  Four factors guide our decision:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

---

the workforce who contribute to the tax base.").

[49] For example, New Jersey avers that DACA recipients contribute an estimated $18.7 million per year in income tax. *See also* 87 Fed. Reg. at 53,270 n.334 (noting that "'States and local governments could lose $1.25 billion in tax revenue each year'" (quoting *Regents*, 591 U.S. at 31)).  Texas posits that without nationwide relief, DACA recipients would be free to move around the country, undermining uniformity in immigration law.  But as far as Texas is concerned, a narrowed injunction can only help further redress Texas's injury by providing an incentive for DACA recipients to move to other states not subject to the injunction.  Considering the "effect on each party of the granting or withholding of the requested relief," *Winter*, 555 U.S. at 24, a narrowed injunction can satisfy Texas's injury without unduly aggravating New Jersey's.

*Id.* at 426 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

A stay from this court may be called for when we are "faced with serious legal questions that merit careful scrutiny and judicious review." *Campaign for S. Equality v. Bryant*, 773 F.3d 55, 57 (5th Cir. 2014). A "movant 'need only present a substantial case on the merits when a serious legal question is involved and show that the balance of equities weighs heavily in favor of granting the stay.'" *Id.* (quoting *Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. Unit A June 1981)).

Though Texas has succeeded on the merits, our previous decision to maintain the stay—not to mention the immense reliance interests that DACA has created—guide us to preserve the stay as to the existing applicants. "DACA has had profound significance to recipients and many others in the [now-twelve] years since its adoption." *Texas II*, 50 F.4th at 531. "Given the uncertainty of final disposition and the inevitable disruption that would arise from a lack of continuity and stability," we therefore preserve the stay as to existing recipients. *Id.* (cleaned up).

\* \* \* \* \*

The injunction is AFFIRMED in part and MODIFIED in part. We limit injunctive relief, including the effectiveness of the vacatur of the Final Rule, to Texas, and require such relief to heed DACA's severability provision. This matter is REMANDED for further proceedings as the district court may find appropriate. The request for a stay is GRANTED pending a further order of this court or the Supreme Court. We impose no restriction on the matters that the district court, in its wisdom, may address on remand, and we express no view on what decisions it should make.

# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 17, 2025

Lyle W. Cayce
Clerk

No. 23-40653

STATE OF TEXAS; STATE OF ALABAMA; STATE OF ARKANSAS; STATE OF LOUISIANA; STATE OF NEBRASKA; STATE OF SOUTH CAROLINA; STATE OF WEST VIRGINIA; STATE OF KANSAS; STATE OF MISSISSIPPI,

*Plaintiffs—Appellees,*

*versus*

UNITED STATES OF AMERICA; ALEJANDRO MAYORKAS, *Secretary, U.S. Department of Homeland Security*; TROY MILLER, *Senior Official Performing the Duties of the Commissioner, U.S. Customs and Border Protection*; PATRICK J. LECHLEITNER, *Senior Official Performing the Duties of the Director of U.S. Immigrations and Customs Enforcement*; UR M. JADDOU, *Director of U.S. Citizenship and Immigration Services*; JASON D. OWENS, *Chief of the U.S. Border Patrol,*

*Defendants—Appellants,*

MARIA ROCHA; JOSE MAGANA-SALGADO; NANCI J. PALACIOS GODINEZ; ELLY MARISOL ESTRADA; KARINA RUIZ DE DIAZ; CARLOS AGUILAR GONZALEZ; LUIS A. RAFAEL; DARWIN VELASQUEZ; JIN PARK; OSCAR ALVAREZ; DENISE ROMERO; JUNG WOO KIM; ANGEL SILVA; HYO-WON JEON; ELIZABETH DIAZ; BLANCA GONZALEZ; MOSES KAMAU CHEGE; MARIA DIAZ,

*Intervenor Defendants—Appellants,*

STATE OF NEW JERSEY

*Intervenor—Appellant.*

---

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 1:18-CV-68

---

Before SMITH, CLEMENT, and HIGGINSON, *Circuit Judges.*

## J U D G M E N T

This cause was considered on the record on appeal and was argued by counsel.

IT IS ORDERED and ADJUDGED that the judgment of the District Court is AFFIRMED IN PART and REVERSED IN PART, and the cause is REMANDED to the District Court for further proceedings in accordance with the opinion of this Court.

IT IS FURTHER ORDERED that each party bear its own costs on appeal.

The judgment or mandate of this court shall issue 7 days after the time to file a petition for rehearing expires, or 7 days after entry of an order denying a timely petition for panel rehearing, petition for rehearing en banc, or motion for stay of mandate, whichever is later. See Fed. R. App. P. 41(b). The court may shorten or extend the time by order. See 5th Cir. R. 41 I.O.P.



**Certified as a true copy and issued
as the mandate on Mar 11, 2025**

**Attest:** *Lyle W. Cayce*

**Clerk, U.S. Court of Appeals, Fifth Circuit**

# *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

March 11, 2025

Mr. Nathan Ochsner
Southern District of Texas, Brownsville
United States District Court
600 E. Harrison Street
Room 1158
Brownsville, TX 78520

     No. 23-40653   State of Texas v. USA
     USDC No. 1:18-CV-68

Dear Mr. Ochsner,

Enclosed is a copy of the judgment issued as the mandate and a
copy of the court's opinion.

                    Sincerely,

                    LYLE W. CAYCE, Clerk

                    *Christy Combel*

                    By: _____
                    Christy M. Combel, Deputy Clerk
                    504-310-7651

cc:
     Mr. Jorge Benjamin Aguinaga
     Mr. Brian Boynton
     Mr. Monroe David Bryant Jr.
     Mr. Matt A. Crapo
     Mr. Nicholas S. Crown
     Mr. Mark A. Csoros
     Mr. Michael Dundas
     Mr. Jeremy M. Feigenbaum
     Mr. Carlos Moctezuma Garcia
     Mr. Douglas Harry Hallward-Driemeier
     Mr. Peter Karanjia
     Mr. Joshua Koppel
     Ms. Fatima L. Menendez
     Mr. Anton Metlitsky
     Ms. Ester Murdukhayeva

Ms. Melissa Nicole Patterson
Ms. Nina Perales
Ms. Mary Kelly Persyn
Mr. Andrew John Pincus
Mr. Mayur Prasad Saxena
Mr. Emerson A. Siegle
Ms. Meaghan McLaine VerGow
Mr. James J. Walker
Mr. Michael Ray Williams
Mr. David Zimmer